1  Diana Napolis, In Pro Per
2  6877 Navajo Road, PMB 114
   San Diego, CA. 92119-1503
3  (619) 462-5818

4  In Pro Per

5

6

7              IN THE UNITED STATES DISTRICT COURT

8            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

9

10  DIANA NAPOLIS

11        Plaintiff

12        v.                          ) Case No.: '08 CV 0557 WQH NLS
                                      )
13  MICHAEL AQUINO, MICHELLE          ) COMPLAINT FOR:
    DEVEREAUX, TANI JANTSANG,         )
14  CAROL HOPKINS, DR. ELIZABETH      )  1. NEGLIGENCE;
    LOFTUS, LESLEY WIMBERLY, MARK     )  2. DEFAMATION;
15  SAUER, DAVID COPLEY, SAN DIEGO    )  3. VIOLATION OF PLAINTIFF'S
    UNION-TRIBUNE, a business entity, SAN )    RIGHT TO PRIVACY;
16  DIEGO STATE UNIVERSITY, and DOES  )  4. FALSE LIGHT;
17  1-100, inclusive,                 )  5. INTENTIONAL INFLICTION OF
                                         EMOTIONAL DISTRESS;
18        Defendants                   6. CONSPIRACY TO VIOLATE
                                         PLAINTIFF'S RIGHT TO
19                                       PRIVACY AND FIRST
                                         AMENDMENT RIGHT TO FREE
20                                       SPEECH;
                                      7. CONSPIRACY
21

22

23

24

25

26

27

28

**ORIGINAL**

FILED
2008 MAR 25 PM 12: 31
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY

Plaintiff Diana Napolis is a citizen of the State of California and the United States of American and resident of San Diego County entitled to the protections of the Constitutions of the State of California and the United States of America.

Plaintiff DIANA NAPOLIS alleges against Defendants as follows:

PARTIES

1. Defendant Dr. Michael Aquino (hereinafter referred to as M. Aquino) founder of the satanic organization the Temple of Set is believed to be a resident of San Francisco, California.

2. Defendant Michelle Devereaux (hereinafter referred to as Devereaux) is believed to be a resident of San Francisco, California.

3 Defendant Tani Jantsang (hereinafter referred to as Jantsang) founder of the satanic organization the "Satanic Reds" is believed to be a resident of Florida.

4. Defendant Carol Hopkins (hereinafter referred to as Hopkins) is believed to be a resident of Cuernavaca, Mexico and San Diego, California.

5. Defendant Dr. Elizabeth Loftus (hereinafter referred to as Loftus) a False Memory Syndrome Foundation Advisory Board member and Professor of psychology at UC Irvine is believed to be a resident of Irvine, California.

6. Defendant Lesley Wimberly (hereinafter referred to as Wimberly) of Victims of Child Abuse Laws is believed to be a resident of Tuscon, Arizona.

7. Defendant Mark Sauer (hereinafter referred to as Sauer) reporter for the San Diego Union-Tribune is believed to be a resident of San Diego, California.

8. Defendant David Copley (hereinafter referred to as Copley) publisher of the San Diego Union-Tribune is believed to be a resident of San Diego, California.

9. Defendant San Diego State University (hereinafter referred to as SDSU) is believed to be a resident of San Diego, California.

10. Plaintiff Diana Napolis has a Masters degree in Transpersonal psychology and worked as a Court Intervention Social worker at Child Protective Services [CPS] in San Diego, California during the years 1990-1996. After resigning from CPS, Plaintiff was self-employed as a Visitation Supervisor for Family Court from 1996-2000. In the year 2000, Plaintiff received her Marriage and Family Therapy [MFT] license.

## **GENERAL ALLEGATIONS**

11. Plaintiff alleges that satanist Defendant Aquino, and his associates, conspired to violate Plaintiff's Right to Privacy and First Amendment Rights to Free Speech on the internet between 1995-2000 after she proved the existence of the satanic ritual abuse of children, under the pseudonyms "Curio" and "Karen Jones," which was contrary to their agenda.

12. Defendants and other Does proceeded to conspire with Defendant Devereaux and SDUT reporter Mark Sauer to identify Plaintiff, after which Defendant Devereaux enlisted the aid of Defendant San Diego State University Campus police, by fraudulent misrepresentation, to identify Plaintiff in June 2000. Despite Plaintiff cautioning Defendant SDSU campus police that dangerous individuals were seeking her identity, campus police proceeded to engage in reckless and outrageous conduct and subjected Plaintiff to invasion of privacy by inappropriately revealing her identity to San Diego Union-Tribune reporter Mark Sauer, after which he wrote an invasive and defamatory news article about Plaintiff titled, "A Web of Intrigue/The Search for Curio Leads Cybersleuths Down a Twisted Path" on September 24, 2000 which Defendant Copley published.

13. After Defendant Mark Sauer's defamatory news article was published, Plaintiff was subjected to further invasion of privacy, threats from Defendant Jantsang, and defamation on the internet which, in combination with Mark Sauer's article, resulted in the ruination of Plaintiff's reputation and career as a Family Court Visitation Supervisor.

14. Eight months after Plaintiff's identity was revealed, and since May 2001, Defendant Aquino and others have caused Plaintiff to be subjected to prolonged psychological and physical torture and terrorization by the usage of nonlethal technology, such as "Voice to Skull Devices," "Voice Synthesis Devices," "Computer/Brain Interface" technology, psychotronics, electromagnetic, and other nonlethal technology. Because of these assaults, Plaintiff has been unable to seek gainful employment since May 2001 and receives Social Security Disability benefits.

15. In October 2002, due to threats made by Plaintiff's perpetrators that they would kill Plaintiff by nonlethal technology, it caused Plaintiff to write a pseudo-threat to a Hollywood figure to ensure that she would be placed in the custody of law enforcement, in efforts to save her life. Due to Plaintiff's eventual plea to "stalking" and subsequent notoriety, it resulted in further ruination of Plaintiff's reputation and career, and revocation of her MFT license. These malicious actions by Defendant Aquino, and others, caused Plaintiff to be misdiagnosed as "mentally ill" after which she was forced by the criminal justice system to take psychotropic medication. After May of 2007, Plaintiff experienced enough psychological recovery to allow her to file a complaint against Defendants.

16. The terminology which defines Nonlethal weaponry can be found on the Center for Army Lessons Learned website http://ca..army.mil. Their Mission Statement reads, in

part, that the Center for Army Lessons Learned is the home of the Combined Arms Center which provides leadership and supervision for leader development and professional military and civilian education. Nonlethal Weapons are defined on this web page as:

"Weapon systems that are explicitly designed and primarily employed so as to incapacitate personnel or material, while minimizing fatalities, permanent injury to personnel, and undesired damage to property and the environment."

17. Because this technology may or may not leave any obvious external wounds, it can be used to secretly torture. In a report titled, "Future Sub-lethal, Incapacitating and Paralyzing Technologies – Their Coming Role in the Mass Production of Torture, Cruel, Inhuman and Degrading Treatment," by Dr. Steve Wright of the Omega Foundation, presented to the Expert Seminar On Security Equipment and the Prevention of torture, Dr. Wright wrote:

"There has been much speculation but a dearth of hard data about such psychotronic weapons which are already worrying those concerned about bioethics. Such electronic neuron-influence weapons would be in breach of the recent EU resolution regarding technologies which interact directly with the human nervous system. Voice to Skull technology has already been discussed in the literature … Without adequate international controls we may end up with weapons of mass punishment and gross human rights violations … to a capacity where one person or group can torture or deliberately debilitate and punish 1 – to many."

18.   In a July 7, 1997 U.S. News and World Report article titled, "Wonder Weapons The Pentagon's Quest for Nonlethal Arms is Amazing. But is it Smart?" by Douglas Pasternak it states:

"Weapons already exist that use laser, which can temporarily or permanently blind enemy soldiers, so-called acoustic or sonic weapons … that can vibrate the insides of humans to stun them, nauseate them or even liquefy their bowels, and reduce them to quivering diarrheic messes."

19.   Many concerns have been raised about the usage of nonlethals nationally and internationally. In a report titled, "US Electromagnetic Weapons and Human Rights – A Study of the History of US Intelligence Community Rights Violations and Continuing Research in Electromagnetic Weapons," by Peter Phillips, Dec. 2006, the introduction reads:

"This research explores the current capabilities of the US military to use electromagnetic [EMF] devices to harass, intimidate, and kill individuals and the continuing possibilities of violations of human rights by the testing and deployment of these weapons."

20. Plaintiff believes the length of this complaint is necessary and is directly related to the serious and manifest crimes it seeks to expose.

## **BACKGROUND**

21.  Beginning in 1990, Plaintiff was witness to a documented cover-up of the satanic ritual abuse of children while employed as a Court Intervention Social Worker for Child Protection Services [CPS] which was due to the efforts of a woman by the name of Defendant Carol Hopkins - a 1991-92 San Diego Grand Jury Foreman - a 1993-94 San Diego Grand Jury, the False Memory Syndrome Foundation, and two newspaper reporters, Jim Okerblom and Mark Sauer of the San Diego Union-Tribune. Plaintiff had researched and investigated the validity of ritual abuse and had handled several case assignments with negative occult themes within this agency.

22.  The general term "ritual abuse" is usually used to describe negative occult abuse, including satanic ritual abuse [SRA], because it is inclusive of all negative occult belief systems which are both evil and criminal in nature. Some people believe the occult automatically refers to Satanism, but it does not. Instead the word "occult" refers to a wide spectrum of beliefs. Historically, some people have misused occult principles for their own benefit. What differentiates the positive from the negative is that the positive occult has the goal of self-empowerment in order to become a contributing member of society. The negative occult is dedicated to the gathering of power over others so one can abuse them. Consequently negative occult practices are condemned by all occultists world-wide because they are evil.

23.  Plaintiff's Masters degree in Transpersonal Psychology and her personal disciplines encompassed positive spiritual ideologies and meditation practices from around the world, including Buddhism, Taoism, Hinduism, Esoteric Christianity, Native American teachings, and the positive occult. Transpersonal Psychology teaches how to incorporate positive spiritual beliefs and values and includes interventions which mainstream psychology has to offer in order to access higher states of consciousness. Therefore, Plaintiff considered herself to be well qualified to investigate and differentiate between harmless occult/pagan practices and those of the truly negative occult or Satanism.

24.  In 1988-89 two hearings were held by the California State Advisory Board to Social Services in San Francisco and San Diego during which time 43 individuals, including law enforcement, therapists, researchers, and victims in the State of California testified to the reality of ritual abuse. These hearings resulted in a published report in April 1991 titled, "Ritualistic Abuse in California." The Advisory Board concluded in this report that ritual abuse should be taken seriously and made recommendations to the California State Legislature, CPS, Community Care licensing, Law enforcement and all treating professionals, such as LCSW's and MFT's, that training about ritual abuse be offered throughout the State.

25.  In the California State Advisory report, Dr. Catherine Gould, an expert in the field, provided the following definition of ritual abuse:

"Ritual abuse is a brutal form of abuse of children, adolescents, and adults, consisting of physical, sexual, and psychological abuse, involving the use of rituals. Ritual does not necessarily mean satanic. However, most survivors state that they were ritually abused as part of satanic worship for the purpose of indoctrinating them into satanic beliefs and practices. Ritual abuse rarely consists of a single episode. It usually involves repeated abuse over an extended period of time.

The physical abuse is severe, sometimes including torture and killing. The sexual abuse is usually painful, sadistic, and humiliating, intended as a means of gaining dominance over the victim. The psychological abuse is devastating and involves the use of ritual/indoctrination, which includes mind control techniques and mind altering drugs, and ritual/intimidation which conveys to the victim a profound terror of the cult members and of the evil spirits they believe a cult members can command. Both during and after the abuse, most victims are in a state of terror, mind control, and dissociation in which disclosure is exceedingly difficult."

26.  The only addition Plaintiff would make to this definition is that Ritual Abuse is also intended to spiritually destroy a child.

27.  The outcome of the California State Advisory Board hearings was favorably reported by the San Diego Union-Tribune in their article titled, "Ritual Child Abuse: Horrible, But True," on April 17, 1989, authored by John Gilmore.  The abstract and first paragraph read:

"Patricia Holladay, a Rancho Bernardo (San Diego) clinical psychologist, has treated six children aged 2 to 13 who were victims of ritualistic abuse in the past three years. She said two children were abused at a preschool, two were abused by a drug - using mother who became involved in Satanism, and two were subjected to abuse while visiting their father … Reports of babies and children being abused in ritualistic or satanic acts in San Diego County and elsewhere in the state, often dismissed by authorities as too heinous to be true, must be taken seriously, social workers and psychologists say."

28.  On April 2, 1991, Plaintiff wrote an internal memo to CPS Assistant Deputy Director Sherry Paul requesting permission to set up support systems for social workers who were addressing allegations of ritual abuse on their caseload. [Exhibit 1] She wrote:

April 2, 1991
To: Sherry Paul
From: Diana Napolis PSW, Court Intervention

RITUAL ABUSE CASE CONSULTATION

There have been a growing number of ritual child abuse cases in the past few years. Social services & police agencies around the country are endeavoring to isolate & identify this phenomena and disseminate helpful information as quickly as possible. There are difficulties meeting the demands for information because there are few experts in the field and so much to learn.

Due to the prevalence of cult groups and their propensity to horribly abuse young children (often the younger the better), I feel that CPS needs to have support systems firmly in place ready to fill the needs of the community & individual social workers. We are faced with the responsibility of recognizing, investigating and protecting children in an area where there is so little known and often associated with denial & fear.

I would like to help set up such a recognition, identification & treatment guide for court intervention workers. I am suggesting a weekly time commitment devoted to case consultation & peer support. Eventually, we could set up a library and network with others community agencies to best address this unfortunate growing problem in San Diego.

29.    Plaintiff was authorized to proceed with this ritual abuse project from Assistant Deputy Director Sherry Paul in her memo dated April 10, 1991 which she sent to the top Administration of Social Services. Plaintiff's supervisor, Joyce Wakefield, proceeded to assign Plaintiff ritual abuse cases to investigate in Court Intervention which was a specialized unit which presents evidence of child abuse to Juvenile Court. The following is an example of one of Plaintiff's cases that she investigated during her tenure at CPS:

Plaintiff filed a 300 (d) sexual molest petition on behalf of a six-year-old boy named Jimmy.  The mother could not protect him due to emotional problems and the father was never located. Jimmy evidenced severe emotional disturbance so he was placed in a group home with professionals who were skilled in treating this population. Jimmy had an older sister, 19, named Maria, who had been a dependent of the court a year earlier, but her case was closed after she reached adult status. Plaintiff visited Jimmy in his group home due to reports that he was "acting out." Plaintiff sat down in his room and spoke with him about what was on his mind. Jimmy said he was experiencing nightmares about what had happened to him in real life. He remembered his friend taking him to a cave, where he saw someone "laying on a star," screaming. He enacted this. He then asked plaintiff to draw a "star" on a blank piece of paper. Plaintiff asked him to draw it, but he was adamant that she draw it. She drew a star, then he proceeded to draw on the paper to tell her the story about what happened to him. He drew pictures, stating, "These were the Spirits"... he drew a picture of a body placed on the star..."My friend started reading from a book" (Jimmy started chanting words in an unknown language) ... "My friend would read out of a book ... There's a white book and a black book. The white book is the secret words of the Devil, the black book is the secret life of the kid." Jimmy said he heard the laugh of the "devil," saying 'I will destroy you.'"

Due to Plaintiff's occult studies, she knew that a "star" is usually referred to as a five pointed star or pentagram, which is a benign pagan symbol which symbolizes the natural "elements" – earth, air, water and fire - with the point at the top signifying "spirit" over matter, but when this symbol is turned upside down, it has an explicit satanic meaning - the two points signifying "horns"- also known as the Baphomet - symbolizing "matter" over spirit. Plaintiff decided to interview Jimmy's sister who was living in a border town, and they met at a McDonalds in San Ysidro. Plaintiff asked her whether she knew if Jimmy had ever been exposed to Satanism. She said, "Yes, so have I." She described running away from her foster placements when she too was a ward of the Juvenile Court, and meeting with other children and adults in La Jolla, in a "cabin," near Soledad Mountain (which is a landmark with a cross on it) during which time they would read out of the Satanic Bible. She mentioned being drugged and "passing out" after one of these events, eventually to awaken with a human body part next to her. She gave graphic descriptions of this event. Plaintiff thought this information had credibility because she had received information earlier from a cult investigator by the name of Rick Post (murdered) that Anton LaVey, founder of the Church of Satan, had moved from San Francisco to La Jolla. The information gathered was given to Jimmy's therapist and Plaintiff then transferred his case to the Family Maintenance and Reunification Department as was required

30. After successfully addressing several cases with allegations of ritualistic abuse, Plaintiff wrote a series of internal memos dated May 7, 1991, Sept. 26, 1991, and October 8, 1991 about her findings. In these memos, Plaintiff suggested ways in which CPS might address ritual abuse allegations at every level of the system. She informed management that some social workers were too frightened to investigate ritual abuse and case assignments should be handled judiciously. Plaintiff also advised that because children of satanic abuse often have only one chance to disclose, if these cases weren't assigned to an investigator trained in ritual abuse, it might lead to harm to the child and a societal "backlash."

31. CPS San Diego ultimately acted on the State Advisory Boards recommendations. In September 1991 a Ritual Abuse Protocol titled, "Ritual Abuse, Treatment, Intervention, and Safety Guidelines," was submitted to CPS - which Plaintiff's supervisor asked her to contribute to - by the San Diego Ritual Abuse Task Force, Linda Walker, who was Executive Director of the Commission on Children and Youth, and Napolean Jones who was at that time Presiding Judge of the Juvenile Court and Chairperson of the Commission on Children and Youth. In the introduction to the protocol, the authors cited the 1988-89 hearings which were held by the California State Advisory Board to Social Services about the reality of ritual abuse.

32. Napolean Jones sent a survey to many professionals in San Diego which resulted in the finding that a total of one third (or 134) of those professionals who responded reported that they had treated at least one client who claimed to be a victim of satanic cult activity. This is of course a huge number. They noted that the majority of SRA victims suffer from Multiple Personality Disorder [MPD], now called Dissociative Identity Disorder [DID]. MPD/DID is created by extreme child abuse perpetrated at an early age. It is due to a

creative function of the mind which survives by "splitting" one's identity into alternate personalities so that the core personality can avoid being overwhelmed by having to experience the horrific trauma they experienced as children. MPD/DID's usually spontaneously switch between identities in response to changes in the physical or social environment. The Ritual Abuse Protocol only touched on these themes, focusing on the reality of satanic victimization, and proved that this topic was a real phenomena in San Diego which needed to be formally addressed.

33.   In 1991-92 a Grand Jury was convened with Defendant Hopkins appointed as Chairperson of the Social Services Committee. She was investigating the District Attorney Ed Miller's Child Abuse Unit as well as CPS. A grand jury is a court appointed authority that is mandated to objectively investigate the operations of governmental programs of the County, cities and special districts. The 1991-92 Grand Jury failed to meet that requirement and instead Plaintiff believes that Defendant Hopkins used the Grand Jury as a means to promote the views of the False Memory Syndrome Foundation [FMSF] which Plaintiff believed placed children at risk of harm.

34.   Specifically, in Grand Jury report No. 8, dated June 29, 1992 titled, "Child Sexual Abuse, Assault, and Molest Issues," Hopkins quoted from and referenced the FMSF as a legitimate authority. These views included the FMSF's positions about the alleged ability of therapists to "create abuse in the minds of children and adults" which they attributed to "inappropriate" therapy.

35.   Unfortunately, over the years, the FMSF have become widely known as an organization which denies the fact that satanic ritual abuse occurs, without good cause, questions the validity of repressed memory based on misrepresentations, and provides what many people believe is a fraudulent defense for accused child molesters.

## THE FALSE MEMORY SYNDROME FOUNDATION [FMSF]

36.   As background to the genesis of the False Memory Syndrome Foundation [FMSF], of which Defendant Loftus is a member, in the early 1990's Peter and Pamela Freyd's daughter, Jennifer Freyd, Ph.D, a memory specialist, privately accused her father Peter Freyd of molesting her as a youth. The Freyds responded to her allegations by forming the False Memory Syndrome Foundation and dismissed their daughter's allegations by claiming she had "false memory syndrome." They claimed that Jennifer Freyd's therapist "implanted" their daughter with "false memories" of sexual abuse, but Jennifer Freyd claimed she had remembered her parents abuse after the second session of therapy. Pam Freyd responded to her daughter by sending an anonymous "Jane Doe" article to Jennifer Freyd's University where she was employed, disclosing personal information about her at the time her daughters tenure was to be decided. Peter Freyd responded by accusing his daughter of having "brain damage."

37.    Jennifer Freyd gave an interview in an August 8, 1993 news article, published in the Oregonian titled, "Memories of a Disputed Past – The Founders of the False Memory Foundation Say Therapists Plant Memories of Childhood Sex Abuse in Clients. Not So, Says her Daughter. She Says her Father Raped Her," clearly stating her position. The Freyds then invited their daughter to become a Board member of their own organization which appeared to be very inappropriate given the circumstance.

38.    Many professionals have exposed what they believe to be the politics and agenda of the FMSF over the years. However, there is usually a price to be paid for educating the public about this organization. In Freyd v. Whitfield, 972 F. Supp. 940 (1997), the court granted summary judgment to Charles L Whitfield after being sued by the Freyds for "defamation." The overview states:

"After being accused of sexually abusing their daughter during her childhood, the parents began a public campaign challenging the validity of repressed memories. They began aggressively contesting the existence of traumatic amnesia and repressed memories by congressional lobbying, public lectures, scientific conferences, On-line discussion groups, a newsletter, television and radio appearances, an 800 number, countless media articles and the picketing of therapists' homes. The parents became very well-known both in professional circles and among the general public. A psychologist began a lecture series and a book in which he criticized the parents' theories and affirmed his belief in their daughter's experiences. The parents filed a defamation action against the psychologist. The psychologist removed the matter to the district court then filed a motion for summary judgment. The court granted the motion after determining that there were no contested issues of material fact. The court found that the parents were public figures and that the psychologist did not act with malice, with knowledge that his statements were false, or with reckless disregard to their truth or falsity."

39.    More recently Charles Whitfield. M.D. wrote an article about the disinformation that "false memory syndrome" proponents disseminate, published in the Journal of Child Sexual Abuse 9, 3 &/4 (2000), pg. 53-78, titled, "The 'False Memory' Defense: Using Disinformation and Junk Science in and out of Court." His abstract read:

"This article describes a seemingly sophisticated, but mostly contrived and often erroneous 'false memory' defense, and compares it in a brief review to what the science says about the effect of trauma on memory. Child sexual abuse is widespread and dissociative/traumatic amnesia for it is common. Accused, convicted and self-confessed child molesters and their advocates have crafted a strategy that tries to negate their abusive, criminal behavior, which we can call a 'false memory' defense. Each of 22 of the more commonly used components of this defense is described and discussed with respect to what the science says about them. Armed with this knowledge, survivors, their clinicians, and their attorneys will be better able to refute this defense of disinformation."

40. In 1993 FMSF Advisory Board members Ralph Underwager (deceased),

and his wife Hollida Wakefield, betrayed a pro-pedophilia agenda when they were quoted in the Winter 1993 issue of "Paidika – the Journal of Pedophilia," which was published in the Netherlands. This was not an educational journal for professionals who studied pedophilia, this was a magazine published for pedophiles. The number one man listed on their editorial board was Bill Andriette, the "Editor of NAMBLA Bulletin." NAMBLA stands for North American Man-Boy Love Association which is an organization comprised of pedophiles who attempt to sway the public into believing that their behavior should be legalized. In response to the question, "Is Paedophilia for you a responsible choice?" Dr. Underwager stated the following:

> "Certainly it is responsible. What I have been struck by as I have come to know more about and understand people who choose paedophilia is that they let themselves be too much defined by other people. That is usually an essentially negative definition. Paedophiles spend a lot of time and energy defending their choice. I don't think a paedophile needs to do that. Paedophiles can boldly and courageously affirm what they choose. They can say that what they want is to find the best way to love. I am also a theologian and, as a theologian I believe it is God's will that there be closeness and intimacy, unity of the flesh. A paedophile can say 'This closeness is possible for me within the choices that I've made.'"

41.    In this interview, Dr. Underwager raised the specter of "God" to validate for pedophiles that sex with children was an acceptable choice. Ralph Underwager was asked to resign from the FMSF after he gave this interview, but his wife Hollida Wakefield remains an FMSF Advisory Board member to this day. According to the FMSF's first newsletter (March 15, 1992 Vol. 1 No. 1), Ralph Underwager and his wife Hollida Wakefield were not only one of the founding members in the formation of the FMSF along with the Freyds, but the Freyd's used Ralph Underwager's organization's services - Institute for Psychological Therapies - and their telephones on behalf of the FMSF when they first formed their organization. Dr. Underwager was instrumental in the formation of Victims of Child Abuse Laws [VOCAL], of which Defendant Wimberly is a member, which was created after a high-profile ritual abuse investigation took place in Jordan, Minnesota. Plaintiff first heard of VOCAL while she was a social worker at CPS. The inside story was that some of the membership of this organization might be comprised of actual child abusers who were trying to hide their culpability by attacking the system. Professionals came to that opinion after VOCAL developed a reputation for over-the-top behavior and denial in cases of obvious child abuse which resulted in the fact that they were not taken very seriously. The FMSF has gained an equally disreputable reputation over the years for similar reasons.

42. After Anna C. Salter wrote a monograph titled, "Accuracy of Expert Testimony in Child Sexual Abuse Case: A Case Study of Ralph Underwager " (1988),  Ms. Salter was sued by Underwager and Wakefield. As described in the appellate decision Underwager/Wakefield v. Salter, 22 F.3d 730 (1994), Anna Salter was sued for defamation after she discovered that in their efforts to prove that most accusations of child sexual abuse stemmed from memories implanted by faulty clinical techniques, rather than from sexual contact between children and adults, that Underwager misrepresented studies, ripped

quotations from their context, and ignored evidence which contradicted their thesis. The court stated in their final conclusions, after dismissing Underwager's lawsuit for defamation that:

> "A person who concludes that a public figure is a knave may shout that conclusion from the mountain tops. Both Salter and Toth came to believe that Underwager is a hired gun who makes a living by deceiving Judges about the state of medical knowledge and thus assisting child molesters to evade punishment. Persons who hold such opinions cannot be expected to look kindly on their subjects, and the law certainly does not insist that they shut up as soon as they are challenged."

43.  It appears that Dr. Underwager was one of the first to claim that most memories of child sexual abuse could be "implanted" by therapists but the FMSF took it one step further and gave this unlikely occurrence a name: "False Memory Syndrome."

44.  Anna C. Salter reported in a journal article titled, "Confessions of a Whistle-blower: Lessons Learned," published in Ethics and Behavior 8 (2) 115-124, (1998), about Underwager and his wife Hollida Wakefield' retaliation against her after she privately published her article which exposed them. Ms. Salter wrote:

> "In 1988 I began a report on the accuracy of expert testimony in child sexual abuse cases utilizing Ralph Underwager and Hollida Wakefiled as a case study (Wakefield and Underwager, 1988). In response, Underwager and Wakefield began a campaign of harassment and intimidation, which included multiple lawsuits; an ethics charge; phony (and secretly taped) phone calls; and ad hominem attacks, including one that I was laundering federal grant money. The harassment and intimidation failed as the author refused demands to retract ... In addition, the lawsuits and ethics charges were dismissed."

45.  Dr. Underwager was well known at that time for making his living by testifying on behalf of the defense in child sexual and ritual abuse cases in the United States and Canada. Nobody knows how many alleged perpetrators he freed by what appears to have been false testimony.

46.  More recently, in United States v. Grigoruk 56 M.J. 304 (2002), the court found it was not ineffective of counsel to decide not to use Ralph Underwager as an expert witness on behalf of his client. Defense counsel stated he became concerned about Dr. Underwager's references to "false claims" and the "documents" he carried to rebut them. He was concerned that the court members might think he was trying to "pass off a quack" on them.

47.  As early as 1993 it appeared that the FMSF had an agenda, rather than a legitimate concern about "false" accusations, and their writings appeared to be geared towards developing legal defenses for perpetrators under the guise of "false memory syndrome," a syndrome which has never been proven to exist.

48. There is reason to be concerned about other Board members of the FMSF regardless of the fact that they have Ph.D's after their names and work at academic institutions. According to Dr. Colin Ross,' "Project Bluebird, Deliberate Creation Of Multiple Personality By Psychiatrists,"(2000) several original FMSF Advisory members such as Martin Orne (deceased) from the University of Pennsylvania and Dr. Louis Jolly West (deceased) from UCLA had ties to the CIA, having accepted funding from them for various projects, a point which becomes relevant later in this complaint, as well as the sub-title of Dr. Ross's book, "The Intentional creation of MPD/DID" by Psychiatrists.

49. In 1998 another FMSF Advisory Board member, Richard Ofshe, Ph.D. from UC Berkeley, an alleged expert on "coercive persuasion," wrote an article titled, "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation," published in 88 J. Crim. L. & Criminology 429. In 1999 Law Professor Paul Cassell investigated several of the cases that Richard Ofshe claimed were "false confessions," which supposedly resulted in wrongful convictions, and he found that Ofshe used secondary sources and misstated facts when coming to his conclusions. Professsor Cassell documented his findings in his article titled, "The Guilty and the 'Innocent': an Examination of Alleged Cases of Wrongful Convictions from False Confessions," which was published in Harvard Journal of Law and Public Policy (1999) Vol. 22, pp. 523-602. Professor Cassell then concluded:

"Testimony resting on Leo and Ofshe's research, at least concerning how 'false' confessions are produced, does not appear to satisfy the requirements to be admissible expert testimony … Because of the high error rate and failure to follow accepted research techniques, courts should not allow expert testimony resting on Leo and Ofshe's analysis of any of the particular cases discussed here."

50. Another FMSF Advisory Board member, Defendant Elizabeth Loftus, who regularly testifies for the defense, including for alleged perpetrators in child molestation civil cases, published a research study in 1995 about the supposed ability to implant "false" memories in children that they were "lost in a shopping mall," and she and others went on to claim that this experiment proved that "false" memories could be implanted in vulnerable clients. Martha Dean, Ph.D and Lynn Crook, M.A exposed the multitude of problems in the Shopping Mall study in their journal article titled, "'Lost in a Shopping Mall' – A breach of Professional Ethics," published in Journal of Ethics and Behavior (1998) (1), 39-50, and did not believe at all that this study proved that traumatic "false memories" could be implanted.

51. Due to Lynn Crook's and Jennifer Hoult's complaints that Defendant Loftus publicly misrepresented their cases (Defendant Loftus testified on behalf of Crook's parents), ethical complaints were filed against Defendant Loftus in December 1995. Defendant Loftus eventually left her post at the University of Washington and she is currently employed at UC Irvine as a Professor of Psychology.

52.   In 2005 a civil suit was filed against Defendant Loftus and others (Taus v. Loftus) 2007 Cal. LEXIS 1896 for violating Ms. Taus's privacy. Ms. Taus claimed that Defendant Loftus misrepresented herself in order to obtain information about her in efforts to deny the fact that Ms. Taus had repressed and then accurately remembered the facts about her own abuse as a child. A December 6, 2006 article titled, "High Court Considers Privacy Issue – In a Case Involving Repressed Memory, Several Justices Suggest that a Researcher [Loftus] who Lies to get Information May be Breaking the Law," describes these issues. In the FMSF newsletter Fall 2007, Vol. 16, No. 4 it was reported that Defendant Loftus reached a settlement agreement with Ms. Taus.

53.   The FMSF's major concern over the years has been about repressed memory retrieval in therapy, lawsuits filed against alleged perpetrators based on those repressed memories which might toll the statute of limitations, the denial of satanic ritual abuse – one of their major focuses -  and the denial of the reality of MPD/DID, which they claim is a rare phenomena, if it exists at all.  However, because there is no doubt that repressed memory and satanic ritual abuse exists, the FMSF's purpose appears to have been to simply generate a contrived controversy about these subjects

54.   When victims enter therapy, the very process of discussing one's past allows access to memories that may or may not have been formally repressed or dissociated. An entire school of psychology called psychodynamic theory is based on the fact that past events can shape future behaviors and many therapists subscribe to this theory. Other schools of psychology, such as Behaviorism, believe that one should treat the client's presenting symptom such as obesity, depression, and phobias, without looking to the past for the reason for the presenting problem. Dissociative Amnesia (another term for repressed memory) is listed as a mental disorder in both the DSM, Diagnostic Statistical Manual of Mental Disorders [DSM-IV-TR, 2000, pg. 520] and the [DSM-IV, 1994, pg. 478] a textbook for mental health practitioners. The authors of the DSM define Dissociative Amnesia as "the inability to recall important personal information, usually of a traumatic or stressful nature, that is too extensive to be explained by normal forgetfulness," and "it can be present in any group, from young children to adults."

55.   It appears that one of the first conscious ploys of the FMSF was to rename psychodynamic theory to "Repressed Memory Therapy," in efforts to provide a straw man for the public and to confound the court system, after which they could blame all repressed memory claims on the "dangerous" Repressed Memory Therapists. The FMSF have been smart enough not to attack victims of abuse directly (or rather, publicly) but instead have chosen the tactic of attacking the therapist by accusing the "Repressed Memory Therapists" of implanting "false memories" in their clients, and/or claiming that MPD/DID is more than likely iatrongenically induced by their therapist. Consequently the therapist should be sued for "malpractice." However, there is a large body of evidence which proves that it is possible, if not common, to repress a traumatic memory of abuse, and these memories are no more or less accurate than continuous memories.

56.  Professor Ross E. Cheit, legal scholar at Brown University, repressed memories of his own sexual abuse by a Camp Counselor. After having recurring nightmares about his abuse, he investigated and discovered other victims of the same perpetrator who abused him. Professor Cheit confronted his perpetrator and was able to record his confession on tape, after which he filed a lawsuit and received a default judgment in a civil claim.

57.  Professor Cheit's case was described in the May 7, 1995 issue of the Providence Sunday Journal, in their three part series titled, "Bearing Witness – A Man's Recovery of his Sexual Abuse as a Child," by Mike Stanton.

58.  Professor Cheit then compiled an archive of 101 successfully addressed repressed memory court cases which had been corroborated and described his archive which proved repressed memory existed  in an article titled, "Consider This, Skeptics of Recovered Memory," published in the Journal of Ethics and Behavior  (1998)  8(2), 141-160. His archive of repressed memory court cases can be found at http://www.brown.edu/Departments/Taubman_Center/Recovmem  archive. As background to his project, Cheit writes:

"This project began as a letter to PBS which objected to false statements made by Ms. Ofra Bikel, producer of the program 'Divided memories.' That letter described how an undergraduate Research Assistant at Brown University found half a dozen corroborated case of recovered memory in just a few hours of electronic database searching, disproving Ms. Bikel's claim to the contrary."

59.  Legal scholar Alan W. Sheflin, JD., M.A. and Daniel Brown Ph.D., also reported on the current state of the science regarding the accuracy of repressed memory in their article titled, "Repressed Memory Dissociative Amnesia: What the Science Says," published in Journal of Psychology and the Law/Summer (1996). Their abstract reads:

"Amnesia for child sexual abuse [CSA] is a robust finding across studies using very different samples and methods of assessment. Studies addressing the accuracy of recovered abuse memories show that recovered memories are no more or less accurate than continuous memories for abuse."

60.  In addition, in Doe v. Roe, 955 P.2d 951 (Ariz. 1998), the court reviewed the substantial evidence which proved repressed memory on pg. 956, under, "Mechanics of Memory repression and Recall." The court stated: "In fact, some preliminary studies suggest that retrieved memories that were formerly repressed are in fact more accurate than normal conscious memory."

61.  Plaintiff believes that this substantial body of evidence proves that repressed memory (or Dissociative Amnesia) exists and it is evident that courts throughout the country have recognized that fact.  Plaintiff believes the FMSF knowingly ignores this information and file Amicus Briefs challenging the reliability and admissibility of recovered memories in order to try to prevent a victim from being able to sue their alleged perpetrators in court.

Wendy Murphy, J.D. described these facts in the November 1997 issue of Trial Magazine in her article titled, "Debunking False Memory Myths in Sexual Abuse Cases." The Leadership Council, an organization comprised of professionals in many fields, submit Amicus Briefs in favor of allowing evidence of repressed memory into court proceedings, in opposition to the briefs filed by the FMSF.

62. As previously stated, many MPD/DID's have been victimized by satanic cults or families, and have sought therapy because of their abuse. However, according to Gail Goodman of UCDavis, FMSF Advisory Board member Richard Ofshe has publicly stated that it is "prima facie evidence of malpractice for therapists to have diagnosed ritual abuse in their clients," an untempered statement which is obviously false considering how many convictions and social services substantiation of cases which have ritual abuse as the context of the abuse. Obviously someone has to treat the victims and/or perpetrators on these cases.

63. Before 1992 there were several court cases involving perpetrators using Satanism or negative ritual to harm children which Defendants Hopkins, Loftus, reporter Mark Sauer, publisher Defendant Copley, and other Advisory Board members of the FMSF should have been aware of. They are:

63a.  [Florida (1984)] In People v. Fuster, Frank Fuster was convicted for child molestation after his wife, Illiana, testified against him and confirmed the children's allegations. The children claimed Frank and his wife made them play "pee pee" and "poo poo" games. Several of the children could repeat Frank Fuster's prayers from heart: "Devil I love you. Please take this bird with you and take all the children up to hell with you. You gave me the grateful gifts. God of ghosts, please hate Jesus and kill Jesus because he is the baddest, damnest person in the whole world. We don't love children because they are a gift of God. We want the children to be hurt." Frank Fuster's conviction was upheld on appeal. This case was documented in "Unspeakable Acts" (1986) by Jan Hollingsworth

63b.  [Roseburg, Oregon] In State v. Marylou Gallup, 816 P.2d 669 (1991), State v. Edward J. Gallup Sr. 779 P.2d 169 (1989),  the Gallups were convicted of sexual molestation. The children stated the Gallups subjected them to satanic abuse and would turn toothpicks into crosses, asking, "Who are we worshipping today children…Jesus." Then they would turn the crosses upside down and ask, "Who are we worshipping today children…Satan." Mary Lou Gallup's conviction was vacated due to a technicality but Edward J. Gallup Sr. and Edward J. Gallup Jr.'s convictions still stand. Bruce McCulley of Cavalcade Productions testified at the California State Advisory hearings about ritual abuse in 1988 about this and other cases of ritual abuse which he and his father, Dale McCulley, later documented on their video, Introduction to Children at Risk: Ritual Abuse in America, 1992, Narrated by Mike Farrell.

63c.  [Travis County, Texas (1992)] In People v. Fran and Daniel Keller, No. 3-92-603-CR and No. 3-92-604-CR, the Keller's were convicted of molesting one child although there were several more alleged victims. The children gave detailed descriptions of the Kellers ritually abusing them in daycare which reportedly sent 7 children into therapy for

more than a year. The children described ritual acts: being terrorized in a graveyard, seeing animals killed, being buried alive with animals, painting pictures with bones dipped in blood, being shot and resurrected, being stuck with needles and drugged, and seeing bodies dug up and mutilated with a chainsaw. A child led an investigator to a graveyard where they found animal bones. Parents reported children who were terrified of baths, children who believed they must kill themselves on their birthday, children who were afraid of ponies, fearful they would be put in jail, and children who could conduct a séance, complete with otherworldly "chants." The Keller's convictions were upheld on appeal.

63d.    [Raleigh, North Carolina (1990)] In State v. Figured 446 S.E. 2d 838, Patrick Figured was convicted of sexually abusing several children. His girlfriend, Sonja Hill, was convicted of indecent liberties with a child on 7/28/93. On March 27, 1990, parents in this case sued Sonja Hill and her mother, Polly Byrd, accusing them of satanically ritually abusing their children which resulted in a default judgment in favor of the parents. Patrick Figured's conviction was upheld on appeal and Sonja Hills convictions still stands. See Raleigh Man Sentenced to 3 Life Terms for Abuse, News and Observer, Oct. ___1992; Johnston Couple Win Child Sexual Abuse Suit, News and Observer, March 27, 1990.

63e.    [Thurston County, Washington (1988)] In State v. Ingram, No. 13613-9-II, according to Sheriff Neil McClanahan (personal communication) Paul Ingram, also a Sheriff at Thurston County Sheriffs Department, confessed to satanically and sexually abusing his children. FMSF Advisory Board member Richard Ofshe made an attempt, which failed, to talk Ingram out of his confession. According to a Clemency and Pardons Board Transcript, dated June 7, 1996, both FMSF Advisory Board members Richard Ofshe and Elizabeth Loftus were present at Paul Ingram's clemency hearing, and asked the Board to release him, claiming he was innocent. However, Paul Ingram's son appeared at this hearing as well and stated he wanted his father to remain in prison because he had been sexually molested by him as a child. In response, Richard Ofshe claimed that Paul Ingram's son was blaming his sexual abuse for his "failed" life and questioned the validity of his statements because he thought that was new information. Paul Ingram's conviction was upheld on appeal.

63f.    [Fort Bragg, California (1984)] Department of Social Services shut down the daycare of Barbara and Sharon Orr after physical abuse and satanic ritual abuse allegations. Therapist Pamela Hudson treated dozens of these child victims. She described having no prior experience or training about ritual abuse but came to understand it after many years of treating these particular victims. Some of the symptoms the children exhibited were defecating on the floor in certain patterns, and lying spread-eagled on the floor, as if in crucification. She described children reporting being locked in a cage, their parents were threatened, they were buried in the ground in "boxes," held under water, threatened with guns and knives, injected with needles, bled and drugged, photographed during the abuse, tied upside down over a "star," hung from poles and hooks, had blood poured on their heads, and witnessed the ritual sacrifices of babies, after which they were forced to chant "Baby Jesus is dead."  Ms. Hudson, L.C.S.W. documented the satanic element of the alleged crimes in "Treating Survivors of Satanist Abuse," edited by Valerie Sinason, pgs. 71- 81,

1994, and "Ritual Child Abuse: Discovery, Diagnosis and Treatment," (Jan 1, 1991). Ms. Hudson also testified at the California State Advisory hearings about ritual abuse in 1988.

63g.    [Orlando, Florida (1992)] In the case of James L. Wright and Margie Wright CR0911814-A, Case No. CR0911814-B, the children disclosed sexual abuse in the context of Satanic rituals.  The victim's parents met James and Margie Wrights through their Church and Bible classes they attended together. The children reported that they saw James Wright sacrifice a stray dog, slit its throat and stomach, and remove some entrails. He held up the entrails for the children to see and said the same thing could happen to the children if they "tattled."  Sheriff's investigators found the dog's skeleton near the Wright's trailer. A 9 year old girl told investigators that Jim Wright forced her to have oral sex with him at gunpoint. "I didn't tell because I was scared," said a boy. "Jim had a gun and said he'd kill my family, and he put a bad curse on us. Jim said devil words to us." The children spoke of satanic symbols, chalices filled with blood, and a box containing a corpse. The parents of three of the victims moved residences and the prosecutor expressed concern because the children had been threatened by the cult not to testify. Maggie Wright testified against her husband. See "Convict's Wife Sentenced for Trying to Molest Kids," Orlando Sentinel Tribune, May 9, 1992; "A Family Fears That Satanic Cult Will Try to Silence their Sons," Orlando Sentinel Tribune, August 10, 1991; "Child Abuse Suspect Trades Testimony for Lesser Charges," Orlando Sentinel Tribune, January 31, 1992

63h.    [San Francisco, California (1991)] In Aquino v. Stone 957 F.2d 139; 768 F.Supp. 529,  internal court documents and news articles document the case of Defendant ex-Lt. Col. Michael Aquino, founder of a Satanist group, Temple of Set, who was processed out of the Army in 1990 after a ritual child abuse investigation. The CID took statements from a child at the Presidio Army Base where he was stationed and took statements from other children in several other jurisdictions in Northern California.  Lt. Col. Aquino sued the Army after they "Titled" him under an investigatory report for indecent acts with a child, sodomy, conspiracy, kidnapping, false swearing, and for his dismissal from the active reserves. The standard for Titling is probable cause to believe the offenses have been committed.  Only one child victim, the daughter of the Chaplain of the Presidio, was named in the victim block of the CID report, although the word "children" was mentioned throughout the record, which caused some parents to allege a coverup. Mr. Aquino's process out of the Army and "Titling" was upheld on appeal. However, Aquino was never criminally charged with any criminal offense. Two of the several investigators involved, Glen Pamfiloff and Sandi Gallant, testified at the at the California State Advisory hearings about ritual abuse in 1988.

63i.    [Sonoma, California (1988)] People v. Daryl Ball and Charlotte Thrailkill, SCR 14750-C. In this case, the prosecutor's opening remarks referred to these children's sexual molestation in the context of ritual abuse. The defendants eventually plea-bargained to child sexual abuse. The CID questioned Charlotte Thrailkill about Michael Aquino and it was alleged (in private statements that the children made to investigators) that Ball/Thrailkill were members of Lt. Col. Aquino's inner satanic order, or as the children described it, the "Devil worship club."

63j.   [Westpoint, New York (1991)] In the Westpoint Army Base case, the Army made a monetary settlement with several parents who claimed that their children were satanically and sexually ritually abused at their daycare. Several news sources documented the satanic element of the crime and quoted Doctor Walter Grote, parent of a ritually abused children, who refused a promotion in protest due to the Army's mishandling of this case. The court record of this case is sealed. See "West Point Case Provoked $100 Million Civil Suit," San Jose Mercury News, August 9, 1987; "A Legacy of Pain," The Times Herald Record, June 11,1991; "The People v. R. Giuliani," The Record, Sept. 27, 1987; "Child Abuse at the Presidio, "The Parents Agony, The Army's Cover-up, The Prosecution's Failure," San Jose Mercury News, July 24, 1988.

64.  One of the FMSF's tactics have been to use "recanting" clients as evidence to prove the existence of False Memory Syndrome. "Recantors" are usually clients who had previously been diagnosed as MPD/DID, and who claimed to have been ritually sexually abused by their satanic families or cults but who then decide to turn on their therapists, claiming their therapist "implanted' them with false memories of satanic abuse. In some of these cases, it appears the therapists have been guilty of very minor infractions, but in a disturbing number of cases there have been allegations made that there is no evidence for satanic ritual abuse, and based on that claim therapists have been accused of "malpractice."

65.  Law professor Alan Sheflin and psychologist Dan Brown investigated 30 "false memory" cases in their article, "The False Litigant Syndrome: 'Nobody Would Say that unless it Was the Truth,'" published in the Journal of Psychiatry and Law (1999) 27/Fall-Winter, and discovered that in all 30 cases they examined, not one of the therapists appeared to have been guilty of malpractice. Instead the client's recantations could be attributed to mental illness, shame, guilt, greed, or suggestibility. Another reason why a client might retract their allegations (which they didn't mention) might also be because they were threatened by their family or cult group, or if they're MPD, one of their perpetrators might have accessed one of their alters who might not be aware that the abuse took place.

66. During the past 15 years, a silent war has been waged between the FMSF, their supporters, and other legitimate professionals. The FMSF have succeeded in creating a political climate in which ritual victims are too frightened to speak out and therapists are too frightened to treat them. A prevailing pattern has emerged over the years, in that the most vocal proponents who claim SRA exists, appear to have been targeted, either in the court room, by picketing and/or encumbering the resources of their political opponents. Some academic researchers have legitimatized the FMSF over the years in an apparently effort to appear "balanced," but Plaintiff believes that this organization serves no legitimate purpose. The field of child protection has not moved forward because of their claims, it has moved backward.

67.  In the FMSF's first newsletter (March 15, 1992, Vol. 1 No.1), the FMSF wrote that they were sending FBI's Special Agent Ken Lanning's "Guide to Investigators" (1991-92) about ritual abuse to others in which he concluded that he was unable to find evidence

for the "extreme" claims of satanic crime, such as cannibalism and murder. This indicates that denying the existence of SRA was one of the FMSF's first priorities. As of 2/8/2008, a search of the FMSF's newsletter web site http://www.fmsfonline.org/cgi-bin/nsearch.cgi revealed that this organization mentioned the word "satan" in 124 separate newsletters out of a possibility of 129 files. Nobody knows why this organization is so fixated on the topic of Satanism.

68.  In the same time period that FBI Ken Lanning's report was written, author Michael Newton wrote his book, "Raising Hell: An Encyclopedia of Devil Worship and Satanic Crime," published in 1993, which described numerous court cases of cannibalism, murder, and torture by satanists.   It is therefore unfortunate that a spokesperson for the FBI purported to find no evidence of these crimes.

69.  FBI's Ken Lanning was a consultant for a pivotal 1994 research study, titled "Characteristics and Sources of Allegations of Ritualistic Child Abuse," co-authored by Gail Goodman, Bette Bottoms, and another researcher. This problematic study was fraught with many irregularities, the most outstanding of which was the failure to correctly include Juvenile Court proceedings in their analysis of Social Services legal mandates.

70.  The FBI in general has been accused of incompetency over the years for not taking these cases seriously, which has resulted in cursory investigations, ruining case investigations, and in one instance in Omaha, Nebraska, reported by John De Camp in the book, "The Franklin Coverup: Child Abuse, Satanism, and Murder in Nebraska," (1996) the investigating FBI agent was alleged to have threatened a victim to recant his abuse.

71.  Due to this information it is obvious that there might be a conflict of interest for the government to comment on these crimes. For examples of this documented conduct, see: "West Point Case Provoked $100 Million Civil Suit," San Jose Mercury News, August 9, 1987; "A Legacy of Pain," The Times Herald Record, June 11,1991; "The People v. R. Giuliani," The Record, Sept. 27, 1987;, PAUL A. BONACCI vs. LAWRENCE E. KING, 4:CV91-3037, UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEBRASKA  (February 19, 1999); and "'Through a Glass, Very Darkly': Cops, Spies and a Very Odd Investigation," U. S. News and World Report (Dec. 27, 1993) in which the CIA ordered  an investigation closed and designated it as a "CIA internal matter" after Custom's Officials discovered what appeared to be a brainwashing, ritualistic cult, where children were being moved to various locations.

**THE SAN DIEGO 1991-92 GRAND JURY**

72.  Defendant Carol Hopkins of the 1991-92 Grand Jury first came to Plaintiff's attention after she read a series of remarkably poor recommendations Defendant Hopkins made to CPS and the Board of Supervisors in several Grand Jury reports.

73.  In Grand Jury report No. 2 "Families in Crisis" June 29, 1992, in Recommendation #92/35, Defendant Hopkins suggested that alleged perpetrators "should

accompany their children to the Receiving Home once the children were removed from their residence." In Recommendation #92/41, she suggested that alleged perpetrators in sexual molestation cases "should have frequent ongoing visitation with the offending parent, even if only in therapy." In Recommendation #92/42, she suggested that parents "should have unsupervised visitation with their children." In Recommendation #92/27, she suggested that the Department of Social Services should "purge from the San Diego County Child Abuse computer all unfounded complaints within 30 days and all unsubstantiated complaints which have remained inactive for one year."

74. These were all recommendations that for the most part were implemented under the watch of Ivory Johnson, Director of CPS, which were completely contrary to the best interests of children. The facts are: alleged perpetrators should not accompany their children to a Receiving Home once a disclosure has been made about child abuse because it could intimidate the child; children should not have visitations with parents in sexual molestation cases until they have worked through their traumatic issues and are ready to interact with the perpetrator (after the alleged perpetrator has addressed his/her own issues in therapy); parents should not have unsupervised visitations with a child who disclosed child abuse because the perpetrator might force the child into recanting their abuse; the Child Abuse computer should not purge unfounded or unsubstantiated complaints because as child abuse is often a hidden crime, this information can be used at a later time as cumulative evidence in a complex child abuse investigation, especially if the child has been forced to recant during a prior interview with a social worker which might have led to an "unfounded" or "unsubstantiated" case closing code at that time.

75. Defendant Hopkins also stressed in the Grand Jury report that children sometimes "lie" about their abuse. Experienced investigators are aware that although it is a rare occurrence for children to lie about their abuse, it is much more common for perpetrators to lie about whether or not they have abused children. Defendant Hopkins not only stressed that children "lied" but recommended that hearsay evidence be excluded from Juvenile court proceedings.

76. In Report No. 8, "Child Sexual Abuse, Assault, and Molest Issues," Defendant Hopkins claimed that the 1991-92 Grand Jury had received complaints by families who had been investigated by CPS for SRA and claimed "all of the cases tested rational credulity." She wrote:

"Witnesses were asked to provide any factual information or evidence they had available which would substantiate the existence of SRA in San Diego County or elsewhere. The jury found there was no physical evidence of SRA in San Diego County."

77. Because ritual abuse is not listed as a type of abuse in the Welfare and Institutional 300 Code that is entered into the DOJ child abuse index, the only evidence that is needed to prove a child has been ritually abused before Juvenile Court is to prove physical, sexual, emotional abuse, or neglect has occurred in an abusive Satanic context.

That evidence might consist of statements by the child or witnesses indicating that chanting occurred before, during, or after the abuse, statements about blood drawn from the child, or a child placed within pentagrams while being abused. There does not have to be physical evidence to prove that these particular acts occurred, the statements of the victim or witness is considered to be sufficient. Therefore, Ms. Hopkins ideas about what "physical evidence" was needed before being persuaded that satanic abuse was occurring was not based on reality.

78.  Given the fact that 134 professionals in San Diego County had just reported in 1991 that they had one or more clients who claimed to be a victim of ritual abuse, and 43 witnesses had testified to the reality of ritual abuse during hearings held by the State of California in 1988-89 in both San Francisco and San Diego, the Plaintiff believed that this outright dismissal of SRA by a San Diego Grand Jury to be either a sign of gross incompetence/ignorance or it pointed to a preconceived agenda.

79.  The Sheriff's Department had just published a manual, "Gangs, Groups and Cults" (1990). Beginning on pg 118, they stated that ritual abuse was an issue in San Diego County which needed attention from authorities. Plaintiff believes all of this information should have been persuasive enough for Defendant Hopkins to be concerned that SRA was occurring in San Diego.

80.  Defendant Hopkins also included the FMSF's position about repressed memory in Grand Jury Report No. 8 stating that, "There is little evidence that a child will repress a traumatic event. There is good evidence that a traumatic event tends to etch itself indelibly on the mind."

81.  The San Diego Community Child Abuse Coordinating Council responded to Defendant Hopkins Grand Jury Report on April 15, 1993 in their report, "Response to Grand Jury Report #8," stating that members of their committee found that "much of the information contained in Grand Jury Report #8 was contrary to the findings of the best research done in the field, specifically in the areas of repression of traumatic childhood memories and suggestion of children." They wrote that they did not recognize any of the cases descriptions that she presented, an opinion with which others later concurred.

82.  Defendant Hopkins had included in Report No. 8 that she was opposed to Senator Newton Russell's Bill SB177 which intended to create a State-wide Task force on ritualistic child abuse and she wanted Social Services to take that stand as well. Defendant Hopkins wrote: "The Jury strongly urges the Board of Supervisors and San Diego's Department of Social Services to oppose this Legislation."

83.  Senator Russell was responding to the recommendations of the 1988-89 State Advisory Board hearings. Hopkins wrote that she was concerned that the Los Angeles County Woman's Commission on Ritual Abuse Task Force (chaired by Dr. Catherine Gould) might be appointed to this task force and that appointment might constitute a "bias."

In retrospect, Plaintiff believes Hopkins was concerned that this task force might be too successful with Dr. Gould as a member.

84.  Defendant Hopkins stated in Report No. 2 "Families in Crisis," in Recommendation #92/47:  "Revaluate the Ritual Abuse Protocol and provide justification to the Grand Jury for the procedures therein." In Report No. 8, Defendant Hopkins finally writes: "The Grand Jury is aware that the Department of Social Services has reevaluated the investigative protocols on ritual and satanic abuse. The social worker who investigated in this area has been reassigned and the Ritual abuse report is no longer being distributed by the Commission on Children and Youth. This is as it should be."

85.  Plaintiff believes that the statement, "This is as it should be" was a dismissive and arrogant remark to make by a deceptive Grand Juror who was trying to deny that serious criminal activity was occurring. The Social worker Hopkins referred to who was reassigned was someone other than the Plaintiff.

86.  Given that Plaintiff was professionally investigating ritual abuse allegations during the time period these remarks were made, and was successfully protecting these children via the system Hopkins was criticizing at the time she was claiming these crimes did not occur, Plaintiff did not think much of Defendant Hopkins position. It appeared that Defendant Hopkins was not aware of Plaintiff at that time, probably because none of the ritual abuse cases she handled were ever publicized in the media and she was never asked to testify before the Grand Jury.

87. In short, Defendant Hopkins quoted the FMSF's contrived positions on memory, therapy, and ritual abuse in a 1991-92 Grand Jury report, four months after this organizations inception, and suggested that the ritual abuse protocol be withdrawn by CPS. CPS then withdrew the SRA protocol. That meant that the innovative, intelligence, and compassionate work of dozens of professionals intended to protect victims of satanic ritual abuse was cast aside and completely disregarded because of the efforts of what appeared to be a corrupt Grand Jury. Plaintiff believes that CPS abdicated their responsibility, caved in to negative press by the San Diego Union-Tribune, and should be publicly censured for not following through with their obligations to protect children from all types of abuse, even if that type of abuse was controversial.

88.  Plaintiff was surprised that a few professionals in San Diego retreated from the topic of ritual abuse, but in spite of writing numerous letters to management over the years, she was powerless to do anything about it. Because of her job description, Plaintiff was too busy to explore the politics of the situation at the time. However, Plaintiff investigated the politics surrounding these issues years later. Plaintiff had mistakenly assumed that the Director of CPS, Ivory Johnson, Linda Walker, or others would respond to Defendant Hopkins report in order to rectify this state of affairs. Due to the fact that it became politically incorrect to mention "ritual abuse" at CPS during this time period, a few supervisors who did not agree with CPS Director Ivory Johnson's choice to withdraw the

SRA protocol continued to assign cases with satanic cult allegations to Plaintiff for investigation because they knew Plaintiff would take the subject seriously.

89.   In FMSF newsletter (July 3, 1993 Vol. 1 No. 7), Pam Freyd (who appears to be the main author of this newsletter) reported about the 1991-1992 San Diego Grand Jury's alleged findings of "systemic abuse." Specific instructions were given in this newsletter about how to order the 1991-92 San Diego Grand Jury report. Given the heavily biased content of FMSF disinformation which was in this 1991-92 Grand Jury report, it gave the appearance that the FMSF and Defendant Hopkins were actively communicating and working in concert.

90. Defendant Hopkins prior association with FMSF Advisory Board member Defendant Elizabeth Loftus was revealed in an August 20, 1998 article, published in the alternative newspaper, The San Diego Reader titled, "Child Molestation Trial Spot Lights Ongoing Debate," authored by Tim Brookes. In this article, Defendant Hopkins recounted what occurred during a dinner that Hopkins hosted for FMSF Advisory Board member Defendant Elizabeth Loftus and Defendant reporter Mark Sauer after Defendant Loftus testified for the defense in the Dale Akiki "ritual abuse" case.

91.   Defendant Hopkins stated that during the writing of the 1991-92 Grand Jury report she had discussed cases with Defendant Loftus but she believed that she had no prior knowledge of Loftus before that time. When Defendant Loftus entered her home, she told Hopkins her house was very familiar and she believed she was present at her wedding ten years earlier. They looked at the wedding photos and found that Defendant Loftus was there in attendance. This indicates that not only did these people know each other, and obviously colluded during the writing of the 1991-92 Grand Jury report, but it was peculiar that neither one of them remembered their past association. Defendant Hopkins took the opportunity to claim in this news article that people often accused her of being a child molester because of the unpopular positions that she took. (Hopkins later made this same false complaint about Plaintiff). Plaintiff wrote a letter in response to this article as well as researcher Constance Dahlenberg, which was published in the Reader on September 3, 1998. Dr. Dahlenberg wrote:

"Ms. Hopkins was presented with great admiration, and pages are devoted to her single-minded fight against the current child protection system. Not a word is said about the fact that the next years San Diego Grand Jury found her report to be so highly biased against child protection that an unprecedented second report was issued, criticizing the first. Why leave this information out of the piece? Further, why depend on Ms. Hopkins, a highly biased layperson, to describe scientific experiments, rather than asking one of the scientists interviewed. As a researcher who has spoken at conferences with Dr. Ceci, for instance, I can assure you that Ms. Hopkins 's statements about what she imagines Dr. Ceci must have done in his research are wholly false."

92.   District Attorney Edwin Miller replied to Defendant Hopkins reports on Oct. 30, 1992, stating in part:

"We are concerned with a pervasive thread throughout Report No. 2. It exalts family 'reunification' apparently even at the expense of child safety …the Grand Jury 'failed to analyze cases in a "fair and impartial manner … It was impossible to fathom the grand jury's motives due to the misreported cases in the 1991 Grand Jury report … The facts reported were such a departure from the truth that it must have been the result of unparalleled incompetence or intentional misconduct by one or more grand jurors."

93.  Mr. Miller's concern that Defendant Hopkins misrepresented child abuse cases that his office had investigated in the 1991-92 Grand Jury report was later proven to be true by the subsequent 1992-93 San Diego Grand Jury. Although Defendant Hopkins was instrumental in stopping the court proceedings involving a man named Jim Wade, which appears to have been appropriate, DA Miller wrote an extensive reply to her analysis of this case, corrected her many misrepresentations and provided an adequate explanation as to why the case was filed. All of this information provides a clear pattern of conduct by a Grand Juror who appeared to be blatantly attempting to undermine child abuse victims.

94.  Defendant Hopkins then disclosed in a December 5, 1994 San Diego Union newspaper article titled, "She Righted Wrongs: But Former Grand Juror Carol Hopkins, Credited with Saving Families, Struggles with her Own," by Clark Brooks, that although Hopkins was married she had an "affair" with the legal counsel of the 1991-92 Grand Jury, Senior Assistant Attorney General of San Diego, Gary Schons, although they maintained that their affair began after the Grand Jury report was dismissed.

95.  Gary Schons had been assigned to the 1991-92 Grand Jury because the District Attorney's Office had a conflict of interest due to the fact that their office was under investigation by the 1991-92 Grand Jury. However, Plaintiff believes that Defendant Hopkins' admission indicates there was also a conflict of interest between the Attorney General's office and the 1991 Grand Jury due to their "affair," even though they maintain it occurred after the Grand Jury was dismissed. Defendant Hopkins also stated in this news article that she opposed the re-election of DA Ed Miller and that Paul Phingst was her candidate of choice for the Office of the District Attorney.

96.  Gary Schons went on over the years to align himself with the viewpoints of the FMSF and made statements about the Eileen Franklin case that equated repressed memory with "voodoo evidence" as documented in a San Diego Union-Tribune article dated March 24, 1996 titled, "Memories Revisited/Murder retrial would mean tough fights for both sides," by Mark Sauer. It read, in part:

"Eileen Franklin-Lipsker has recovered memories of her father murdering two others women, but investigations by the prosecution have determined those memories to be false. Yet because of their bias, according to the motion, prosecutors are moving ahead with the retrial of George Franklin, despite this evidence that the memories of their main witness are not credible …Should that happen, it is not at all certain the retrial of George Franklin will take place, since not all prosecutors endorse the theory of repressed

memory. Should the attorney general decide not to retry Franklin, he would be free. For example, in a yet-to-be-published article written for a prosecutors journal, Gary W. Schons, senior assistant attorney general for the San Diego region, calls repressed memory "voodoo evidence" and warns prosecutors away from it. Citing the Franklin case, Schons writes: "It is critical that prosecutors appreciate that 'recovered memory' is scientifically unfounded and, for the most part, untrustworthy. There is absolutely no verifiable scientific basis for the existence and operation of the psychological process known as repression."

97.  Of course, Mr. Schons statements are not correct and indicated a bias towards the FMSF's contrived positions on the workings of memory. Pam Freyd mentioned Gary Schons in two FMSF newsletters. In newsletter May 1, 1996, Vol. 5 No. 5  Freyd published Schons' book review of "Convicting The Innocent: The Story of a Murder, A False Confession, and the Struggle to Free a Wrong Man." In this review Mr. Schons made statements about the Dale Akiki case – a case which had allegations of ritual abuse  – that do not appear to be true. He claimed that "Dale Akiki, who in 1991 was charged with multiple counts of child molestation based on therapeutically retrieved memories of 3 - 4 year - olds from a church day, was acquitted after the longest and costliest trial in San Diego history." However, according to DA Ed Miller's formal response, most of the children first disclosed abuse to others before disclosing to their therapists. In the FMSF's newsletter 2007, Vol. 16, No. 3, Mr. Schons book review was again referred to by Pam Freyd.

98.  Defendant Hopkins could not have succeeded in shutting down the topic of ritual abuse at CPS and the District Attorney's office without two reporters from the San Diego Union Tribune [SDUT], Jim Okerblom and Defendant Mark Sauer, contributing to it and Defendant David Copley choosing to publish these articles.

99.  Before 1992 there were several news articles published in the San Diego Union-Tribune written by several different authors which reported favorably about satanic abuse. They were: "Satanic Rites Can Put Children at Risk, Panel Says," Feb. 28, 1988 by Ed Jahn; "Ritual Child Abuse: Horrible, but True," April 17, 1989 by John Gilmore; "Religious Revival Takes on Topic of Satanic Worship," July 22, 1989. by Bob Rowland; "Satanism Upswing Seen in County,"  Jan 28, 1991 by Michael Bunch; "Mexico Witch Doctor Accused of Killing 41 in Sacrifices," July 28, 1990 by Nancy Cleeland; "Defense Claims Brainwashing Inducted Slaying," Aug. 30, 1990 by Valerie Alvord,

100.  In 1991/92, Jim Okerblom and Mark Sauer began reporting about ritual abuse and repressed memory on behalf of Defendant publisher David Copleys, San Diego Union-Tribune full time. The following articles demonstrate an ongoing pattern by the SDUT and Mark Sauer, specifically, to deny the reality of repressed memories and satanic ritual abuse. Later, when Plaintiff describes Defendant Mark Sauer's invasive and defamatory newspaper articles about her, it should be clear that this reporter and publisher was biased against professionals or researchers who investigate satanic ritual abuse.

101. Jim Okerblom began by writing a series of biased articles about CPS cases in the San Diego Union-Tribune involving alleged sexual molestation and ritual abuse which resulted in the dismissal of the Juvenile court petitions. These articles were titled, "Kids taken from Grandparents on Unchecked, Dubious Cult Claims," Nov.8, 1991 and "Children Lose out in Zeal to Protect," January 19, 1992.

102. In all of these cases, it was perfectly appropriate for CPS to have investigated, but it did not appear that these reporters understood CPS legal mandates or the risk factors associated with sexual abuse or ritual abuse allegations. It is unfortunate that due to confidentiality reasons CPS cannot respond to newspaper reporters about individual cases, thus leaving a gap in the publics awareness about the logic behind CPS's actions, which leaves it open for disreputable others to malign this agency for the wrong reasons.

103. In SDUT article, "Psychologists' Meeting Takes a Closer Look at Ritual Abuse," Jan. 25, 1992 (by Jim Okerblom) the reporter quoted information from a survey claiming that 800 psychologists throughout the United States reported treating a total of 5,731 patients who alleged ritual or religious based abuse. Okerblom stated that this information was similar to the survey conducted in San Diego which also indicated that many therapists claimed to be treating ritual abuse survivors which was described in the Ritual Abuse Protocol for CPS. Okerblom reviewed the fact that he had covered three cases in which ritual abuse allegations had been made but had not been substantiated. Okerblom then claimed that the "Institute for Psychological Therapies" had begun a study of the phenomena, inferring the information in these surveys was false. Mr. Okerblom wrote:

"Thousands of people all over the United States are telling their psychologist that they are victims of so-called 'ritual abuse,' according to a new survey, with most reporting that they witnessed human or animal sacrifices, satanism, cannibalism, ritualistic sexual abuse or other bizarre rites … In all, these 800 psychologists had 5,731 patients reporting ritual abuse or religious based abused, Kelly said, about half of them children and half adults who recovered memories of the abuse from their childhoods."

104. Response: A survey which reported 5,731 separate ritual abuse allegations was phenomenal and should have served as persuasive evidence that ritual abuse was occurring to any rational adult. That the reporter had discovered three ritual abuse allegations that were "false" (and that's questionable) does not mean the phenomena did not exist at all. In the wider world of general CPS allegations of physical, sexual, emotional abuse, and neglect, a good number of allegations turn out to be unsubstantiated, meaning there was not enough information to prove or disprove the allegations at the time, and a smaller number are deemed unfounded. Experienced investigators would never claim that if a few incidents involving allegations of neglect were found to be false, that cases of neglect never occurred. Likewise with incidents of ritual abuse. To take such a position was very irresponsible, especially in the same news article which reported thousands of people reporting allegations of ritual abuse. In addition, the Institute for Psychological Therapies that Okerblom quoted belonged to Ralph Underwager an FMSF Advisory Board member who made supportive pro-pedophile comments in Padaika – journal for pedophiles.

105.    In SDUT article, "Child-Molestation Trial Spotlights Raging Debate – Is Accused Man Abusive Monster or is he a Victim?" Feb. 6, 1992 (by Jim Okerblom) the reporter described the upcoming criminal case of Dale Akiki, a man who had been employed by Faith Chapel's daycare, as a case with ritual abuse allegations although the prosecution was not claiming that ritual abuse took place. Okerblom covered the case from the viewpoint of the defense and quoted FMSF Advisory Board member Richard Ofshe who criticized therapists:

"The idea that therapists are allowed to investigate in these cases – and that's really what is happening – without any control on what they are doing is outrageous," said Richard Ofshe, a social psychologist at the University of California at Berkeley … Ofshe is among these who believe that the answer to the thousands of stories of ritual abuse being told around the country is a social phenomenon, stemming both from fundamental Christianity and from the therapy – not from actual events"

106.    Response: Therapists who treat clients involved in court proceedings are mandated to investigate the veracity of the claims of the children involved. Plaintiff believes this reporter used Richard Ofshe to make negative commentary about the validity of ritual abuse, in order to negatively impact the potential jury pool on the Dale Akiki case.

107.    In SDUT article, "Jury Report on Child Protection Reviewed," Feb. 8, 1992, Jim Okerblom/Wilkins) the reporter positively reviewed the 1991-92 Grand Jury recommendations such as Hopkins' attempts to disallow hearsay evidence in Juvenile Court, withdraw immunity statutes that govern social workers and physicians, and her recommendations that once a child has been removed from the home a social worker should be assigned who was immediately "dedicated" to reuniting the family. Okerblom also publicized Hopkins recommendation to revaluate the county's protocol about ritual abuse at that time. Okerblom wrote:

"Several families have seen their children pulled from their homes based on unsubstantiated allegations of Satanism."

108.    Response: In these particular cases, the children were removed from their homes due to a doctor's initial diagnosis of sexual molestation. These children were not removed from their home based on allegations of "satanism" alone.

109.    In SDUT article, "Trial Ordered for Akiki on 52 Counts of Child Abuse, Kidnapping," Feb. 14, 1992 (by Okerblom) the reporter described the Akiki case and quoted FMSF's Ralph Underwager's claims that therapists drove children into "fantasies" after multiple interviews:

"Roland Summit, a psychiatrist at the Harbor-UCLA Medical Center and a leading figure in the child abuse field, is among those who maintain that such stories should not

Summary of Pleading - 28

be dismissed as incredible. The most bizarre elements may be staged by their abusers as part of 'rites and rituals of terror,' Summit said … But other researchers look to different explanations. When children are subjected  to multiple formal and informal interviews, sessions of therapy and interactions with adults who believe the abuse is real, the adults may inadvertently create the stories and drive children into their fantasies, 'said Ralph C. Underwager, a psychologist with the Institute of Psychological  Therapies in Northfield, Minn."

110. Response: Dr. Ralph Underwager was paid a lot of money by defense attorneys to convince jury's that children would "fantasize" about satanic cult activity, but plaintiff believes that the normal fantasy life of a child does not include being victimized by satanists.

111. In SDUT article, "Falsely Accused Parents File Claims," Mar 28, 1992 (by Okerblom) the reporter described a lawsuit filed by the Wallis's who had their children removed briefly by CPS after an allegation of ritual abuse. Okerblom wrote:

"A Rancho Penasquitos couple who were falsely accused of planning to sacrifice their 2-year-old-son to Satan have filed claims against San Diego County and the cities of San Diego and Escondido."

112. Response: Jim Okerblom stated quite factually that these parents were "falsely accused" of planning to sacrifice their 2 year old son to Satan during the Fall Equinox. However, nobody knows with certainty whether those allegation were true or not. The petitions filed on behalf of these children originally included sexual molestation allegations, but they were later dismissed due to a difference in opinion regarding the validity of the sexual molestation diagnosis and because County Counsel felt there was no longer enough evidence to keep the children in protective custody. The child in question was released after the time period in which he was alleged to be at risk of being murdered. At CPS, some people believed that if the allegations were true, but could not be proven, the fact that this case was heavily publicized might have protected that child. Based on the original evidence of sexual molestation, and allegations of a child's upcoming murder, CPS had every right to intervene in this case, and it was very irresponsible of the SDUT to attempt to undermine CPS as an agency for taking these allegations seriously.

113. In SDUT article, "Report Rips Handling of Abuse Cases," June 30, 1992 (by Okerblom) the reporter wrote that the 1991-92 Grand Jury recommended that the standard of proof in sexual molestation cases should be increased to "clear and convincing," rather than the standard of "preponderance of evidence. Okerblom wrote:

" … Among its other recommendations, the jury urged that the county review the competence and training of court-appointed therapists in child-abuse cases because a small percentage may be contaminating children with false memories of satanic rituals and other abuse … The jury says a newly formed group based in Philadelphia, called the False

Memory Syndrome Foundation, attributes 'inappropriate therapy with destroying families and creating abuse in the minds of children and adults."

114. Response: Because child molestation is often very difficult to prove, erring on the side of protecting the child seems the most reasonable approach. If "preponderance of the evidence" is the standard used in civil cases, Plaintiff believes that same standard should be applied in a Juvenile court setting. The 1991-92 Grand Jury had no reason to state that therapists might be contaminating children with false memories of satanic ritual abuse. Therapists "suggestion" of abuse does not occur on a regular basis in child abuse cases. Claiming that "false memories" can be implanted by psychotherapists on a regular basis was the position of the FMSF. On rare occasions in child abuse cases, forensic tapes of a child interview are sometimes made after a child has already disclosed abuse to multiple parties. Plaintiff is aware of some cases in which the child already disclosed abuse to their parent or doctor but then the child became frightened or refused to speak during the forensic interview. As a result of the forensic interviewer's awareness of what the prior statements of the child were, the interviewer might prompt the child to remember. It is the prompting that is recorded on tape for defense attorneys to analyze. Without knowing the context and history of the disclosures, these tapes can be then used by the defense to claim that the interviewers or therapists were "suggesting" abuse to children.

115. In SDUT article, "Did Merced Jury Pirate San Diego Report?" July 9, 1992 (by Okerblom) the reporter wrote that the 1991-92 Grand Jury report, "Families in Crisis" had been widely circulated around California but another County had plagiarized this report:

> "A Grand Jury in Merced released their report which was sharply critical of their own County's Dependency System but the report – word for word - in most sections was identical to the 1991-92 San Diego Grand Jury's report. Even some of the testimony quoted by the San Diego panel appeared in the Merced report … Hopkins, who chaired the committee that wrote the San Diego report, said she spoke briefly with someone from the Merced panel months ago … All I can recall is they wanted to know how to go about an investigation, and I sent them a copy of 'Families in Crisis,' Hopkins said. She added: 'How can they be that stupid? You can't do that. You just can't do it. Grand jury reports have to be the result of an independent investigation.'"

116. Response: Plaintiff believes this article was indicative of irregularities that might have been occurring in other counties, perhaps due to Defendant Hopkins interactions with those counties. It is unfortunate that Defendant Hopkins mailed out her later to be revealed biased and deceptive Grand Jury report to multiple officials throughout the State. At best, this report could have been used to shut down investigations of ritual abuse in agencies, believing that the 1991-92 Grand Jury report contained accurate information. At worst, other people with an agenda may have used her report to intentionally undermine children in their local jurisdictions.

117. Jim Okerblom and Defendant Mark Sauer then wrote a three-part series, published by Defendant David Copley in the SDUT – beginning with "Haunting

Accusations, Repressed Memories of Childhood Abuse: Real or Delusions,") Sept, 13, 1992 (Mark Sauer-Okerblom) – in which they continued to quote the False Memory Syndrome Foundation for the people of San Diego, making this organization appear righteous and "scientific." In the second article in their series, "Recall Experts Say Therapists Create Hysteria," Sept 14, 1992, Okerblom/Mark Sauer quoted the FMSF and their Advisory Board members again. In "Group Therapy Triggered Phony, Hellish Memories," Sept. 14, 1992, Sauer and Okerblom quoted a story of a "retractor" without questioning whether the retraction was true or not. In "Undocumented Demons – Therapist, Church, Cops Caught up in Tales of Atrocities," Sept. 15, 1992, the reporters were somewhat even-handed. In their article "Satanism is on the Fringe in Repressed Memory Cases," Sept. 15, 1992, Mark Sauer-Okerblom clearly sided with the defense position by denying that ritual abuse occurred based on the claim that there was no evidence.

118. Pam Freyd wrote in a FMSF's newsletter, dated October 5, 1992 (Vol. 1 No. 9), that readers should access Mark Sauer/Okerbloms three part news series entitled "Haunting Accusations: Repressed Memories of Childhood Abuse: Real or Delusions," mentioned above, which makes it appear the FMSF was working in concert with these two reporters, based on the content of these newspaper articles which overly represented the FMSF's contrived positions on the workings of memory and the complete denial of satanic ritual abuse.

119. In article, "Alleged Murder-Plot Target Says He's Victim of "Memory' Therapy," Dec. 15, 1992 (by Jim Okerblom) the reporter described a daughter's attempts to have her father, a psychiatrist, killed after undergoing "repressed memory psychotherapy." The reporters favorably quoted the False Memory Syndrome Foundation's claim that they had found 2000 cases of "false memory."

120. In SDUT article, "Do Therapist Plant Memories of Abuse," Dec. 27, 1992 (by Mark Sauer/Okerblom) the reporters briefly described the upcoming prosecution of Dale Akiki, and referred to CPS's Ritual abuse Protocol as a "booklet" which had been withdrawn:

"One official said the county is 'no longer looking at ritual abuse,' adding that there is 'no such task force now operating in the community"... The 1991-92 San Diego County grand jury, as part of a June report critical of the child welfare system here, sent a Cavalcade training videotape out for review by experts. Their reaction: 'The therapy itself may be the abuse.'"

"Richard Ofshe, a University of California Berkeley sociologist and an expert on influence, is among those who predict a major backlash against such therapy because it will be judged to be harmful. 'It's going to make lobotomies look like they were doing people a favor,' Ofshe said."

121. Response: Even though this article appeared to support both sides of the argument, Defendant Sauer and Okerblom concluded their story by quoting an ill-advised

comment by FMSF Advisory Board member Richard Ofshe who compared ritual abuse therapy with lobotomies, which was clearly meant to undermine victims of ritual abuse and the therapists who treat them.

122. In SDUT article, "Tales of Terror at Church Nursery Raise Urgent, Troubling Questions," Dec. 27, 1992 (by Defendant Mark Sauer/Okerblom) the reporters wrote a fairly even-handed article about the ritual abuse trial of Dale Akiki. However, they claimed:

"But more allegations were forthcoming, coinciding with the airing of the CBS-TV movie 'Do You Know the Muffin Man'… Soon after the initial broadcast, the accounts of the Faith Chapel children being reported by parents and therapists grew stranger."

123. Response: The Akiki case was filed after a Grand Jury heard 33 witnesses and after multiple parents claimed that their children were terrified of Dale Akiki. Trying to create a simple cause and effect scenario such as timing the allegations with the airing of a movie was very unlikely.

## THE 1992-1993 SAN DIEGO GRAND JURY

124. In 1992-93, due to complaints made by then District Attorney Ed Miller and CPS, another San Diego Grand Jury was convened which corrected the misrepresentations that were made in the 1991-92 Grand Jury report. In Defendant Hopkins attempts to sway the Board of Supervisors and the public into believing that the System was "out of control," she had misreported about individual child abuse cases and her analysis was found to be false and misleading.

125. In Report No. 13, dated June 29, 1993 titled, "Protect the Child, Preserve the Family," although appearing to minimize what appears to have been corruption by the 1991 Grand Jury, the 1992-93 Grand Jury proceeded to correct the 1991-92 Grand Jury's misrepresentations about several child abuse cases and described these cases in more accurate terms. The 1992-93 Grand Jury stated in their report:

"The 1992-93 Grand Jury became concerned that some of the recommendations contained in the 91-92 reports were not in the best interest of threatened children … The Jury was approached by social workers and supervisors who felt anxious and concerned that the new department philosophy of family preservation was taking precedence over the need to protect children … Judges, familiar with the Juvenile System, told the Jury of their concerns over trends in local child protection practices which appeared to have been caused by the '91-92 reports."

126. Because of Defendant Hopkins' obvious bias and prolific misrepresentations which undermined children, she earned a very bad reputation in San Diego with those involved in child protection.

127. The San Diego Union-Tribune's editorial policy continued to support the FMSF and continued to deny that ritual abuse occurred. In SDUT article, "Therapists Find Cures are Matter of Lives and Deaths," August 20, 1993 (by Tiffany Porter) the reporter wrote about a "Past Life Regression" author who was to speak at a conference. Pam Freyd of the FMSF was quoted as stating:

> "Hypnotherapeutic techniques used to help recall past lives are similar to those used to bring about recollections of sexual abuse, satanic abuse and abductions by space aliens."

128. Response: This statement by Pam Freyd (originally made by FBI's Ken Lanning) is commonly made to deny the reality of ritual abuse. Regarding past lives, there are large numbers of people who believe in reincarnation, in fact, most of the entire Eastern hemisphere of the world. Tibet has teams of religious specialists who track the reincarnation of Lamas or Rinpoches. There are many examples of small children who are questioned who give personal and specific answers about the personal lives of the Lamas in question. These children are then specially schooled in the Tibetan Buddhist tradition believing that they are the reincarnation of an enlightened teacher. Pam Freyd is not an example of a sophisticated source who knows the answers to anything as complex as "past lives," or about the enduring life of the soul. Regarding the growing number of people reporting "abduction" experiences by "aliens," no one knows the answer to the questions raised by these alleged victims. All that is known is that a significant number of people are reporting distress which is enough reason to seriously investigate the phenomena. Hypnosis is sometimes used in these cases to refresh a "victim's" memory of an already remembered unusual encounter. Pam Freyd's poor attempts to undermine victims of ritual abuse by denouncing all three phenomena in one sentence has never been persuasive evidence to Plaintiff that ritual abuse does not occur.

129. In SDUT article, "Satan-Chasers Real Terrorists in Witch-hunts," Sept. 7, 1993, (by Defendant Mark Sauer) the reporter stated:

> "It seems that in our scientific wonder world of the late 20th century one strange little corner is reserved for people who believe to their souls there exists a worldwide, underground satanic conspiracy. The notion would be almost a quaint nod to the Middle Ages if it weren't for the harm innocent people are suffering at the hands of such true believers. (Speaking about a film by Antony Thomas debunking ritual abuse) ... Thomas focuses much of his film, though, on the damage to families caused by pathetically misguided Satan searchers, like the San Diego County authorities who inflicted a months-long visit to hell on the Wallis family of Escondido.

130. Response: At this point in the SDUT's coverage, Mark Sauer did not appear to pretend to objectively report anymore but had an obvious agenda to deny that ritual abuse occurred, given not only the title of his article, but the content. Because satanists are known to terrorize and torture their children, Mark Sauer's attempts to intimate that professionals who investigate these subjects were the "real terrorists," bespeaks of simple-mindedness and

an agenda. In this article he also irresponsibly characterized County officials as "pathetic" and "misguided" in clear attempts to intimidate these individuals and agencies.

131. In SDUT article, "Psychology on Trial-Akiki Case Raises Questions on Reliability of Psychotherapy," Nov. 14, 1993 (by Defendant Mark Sauer) the reporter quoted FMSF Advisory Board member Defendant Elizabeth Loftus during the prosecution of the Akiki case:

> "The idea of repression, that you can block things out and it is a common way to deal with these life situations has been uncritically accepted as the truth, Loftus said, but there is no cogent support for this idea."

132. Response: Plaintiff has extensively documented the evidence that proves repressed memory exists which indicates that FMSF Advisory Board member Elizabeth Loftus must not be interested in telling the truth.

133. In SDUT article, "Was Akiki Inquiry Rush to Judgment- Police Work in Similar Case Averted Trial," Nov. 22, 1993 (by Okerblom and Mark Sauer) the reporter described Dale Akiki's acquittal and sided with the defense by writing that all of the children's unusual allegations were skillfully shown by defense attorney Kate Coyne to be the "product of their imagination which had been fueled by therapy." Sauer then described another child abuse case which allegedly too included "bizarre" allegations and made the following remark:

> "Instead of being concerned about the influence of discredited ritual abuse theories as Rubenstein had been, Avery – a member of the county's disbanded Ritual Abuse Task Force – embraced them. She hired therapist Linda Walker as her consultant and referred families to therapist Pamela Badger. The two have been outspoken proponents of the mythical ritual-abuse threat for years."

134. Response: There are several reasons why children might make allegations that seem incredible at the time but are later clarified. According to Senator Newton Russell's office, the child in question who claimed to see giraffes killed in the Dale Akiki case actually testified that wallpaper had elephants and giraffes on it and the wall paper was repeatedly stabbed by the perpetrators. In this article, Okerblom and Sauer clearly stated that ritual abuse had been "discredited" and was a "myth" and again inappropriately named specific individuals in apparent attempts to intimidate them and ruin their reputation. And despite these news reporters attempts to make it appear the eight children in the Akiki case had disclosed abuse after "months in therapy," this was untrue. According to DA Ed Miller, in his 1994 response to the 1993-94 Grand Jury report, he stated that they (these reporters) misstated testimony during the Akiki trial, that five of the eight children who disclosed abuse made their disclosure first to persons other than their therapists. Of the remaining three children, they made a disclosure to their therapist in the first few sessions which is completely contrary to how Mark Sauer described this case.

135. In "Grand Jury Urged to Examine Akiki Case's Handling," Dec. 2, 1993 (by Okerblom) the reporter described Board of Supervisor Dianne Jacob asking for a grand jury investigation of the Akiki case, with "help from the State Attorney General's Office." Supervisors Brain Bilbray and Pam Slater urged changes in the way therapists are used in child-abuse cases, in part because of issues raised by the Akiki case:

"Gary Schons, who heads the criminal division of the attorney general's local office, said he had not yet heard of Jacob's request and couldn't comment on it before discussing it with his bosses... [Bilbray] His and Slater's proposal says there is an 'increased public awareness of the ability of therapists to influence the 'memories' and 'testimony of children in courts of law' and a perception that some therapists are acting on a 'bias toward identification of satanic and ritualistic satan and dogmatic assumptions' about allegations of sexual molestation'...Bilbray        described psychotherapy theories about satanic ritual child abusers – one of the issues in the Akiki case – as a 'virus that spread not in just this county, but throughout the nation.'... Slater was more blunt: 'It comes down to the county having to foot the bill to defend these bozos,' she said. "It's like the inmates-running-the asylum kind of thing ...Two therapists involved in the Akiki case could not be reached because they were out of town. Five did not return phone calls and two others would not discuss the matter. The 11th, Elizabeth Young, said 'I certainly accept the Akiki verdict' ... Dr. Clark Smith, a psychiatrist and president-elect of the San Diego Psychiatric Society, said the county might save money over time by avoiding lawsuits if it used better-trained evaluators and therapists. Of ritual-abuse theories promoted by some therapists, Smith said, 'Most mental - health professionals think this is a lot of bull.'"

136. Response: It appeared from this article that Carol Hopkins ex-boyfriend Gary Schons might have been the legal advisor for the 1993-94 Grand Jury as well as the 1991-92 Grand Jury. That is troubling because Mr. Schons appeared to favor the illogical and indefensible FMSF viewpoints. On every case Plaintiff addressed with ritual abuse allegations, she referred the children to an experienced therapist who was familiar with the subject matter. To have done otherwise would have been very poor practice, considering the level of expertise that is required to understand ritual abuse, let alone to have the courage to address it. It appears that this article is further evidence indicating that Mark Sauer was using his position at the SDUT to intimidate professionals who worked with ritual abuse by his selective quoting. He quoted Brian Bilbray's claim that satanic ritual abuse allegations were a "virus." He quoted Pam Slater irresponsibly describing professionals as "bozos," and Dr. Smith's characterization of satanic ritual abuse as "a lot of bull." Plaintiff believes that due to the continual publication of this type of biased material it caused San Diego CPS and other agencies to inappropriately retreat from investigating the subject of satanic ritual abuse.

137. On November 24, 1993, Plaintiff wrote a letter which was published in the San Diego Union-Tribune in response to Jim Okerblom and Defendant Sauer's biased articles about the supposed nonexistence of ritual abuse. The Plaintiff's letter was published, but the SDUT deleted her list of convictions involving ritual abuse. Plaintiff's letter read, in part:

"I am outraged over the concerted efforts of reporters Jim Okerblom and Mark Sauer to present biased coverage on the subject of ritual abuse. No one likes to hear about horrible crimes, but what compounds those criminal acts are newspapers intent on discrediting children, adults, their memories and the criminal acts perpetrated upon them. These types of crimes do occur. As horrible as they are for adults to listen to, why don't we consider how horrible it is for victims experiences to be relegated into pat phrases such as 'fads,' 'urban legends' and "witch-hunts."

## THE 1993-94 SAN DIEGO GRAND JURY

138. In 1993-1994 a Grand Jury was convened which investigated the prosecution of Dale Akiki and the District Attorneys office's handling of this case. Their report was titled, "Analysis of Child Molestation Issues," Report No. 7, June 1, 1994, and they made recommendations to the District Attorney's Office and Board of Supervisors that were both shocking and contrary to the interests of children. They recommended that County of San Diego should completely withdraw the standing Multi-victim/Multi-perpetrator Ritual Abuse protocol. In recommendation # 94/50, they then advised the District Attorney's office and the Board of Supervisors about San Diego County:

"San Diego should refrain from investigating or prosecuting any cases involving satanic ritual abuse."

139. This recommendation appeared to be very clear efforts to try to cover up satanic crime in San Diego County. For an ostensibly legitimate governmental body - like a Grand Jury - to instruct a District Attorney's office to ignore and not prosecute a horrific form of child maltreatment indicated to Plaintiff that corruption was occurring, and this is how they accomplished it.

140. In the body of the 1994 Grand Jury report, the authors quoted Defendant Elizabeth Loftus - Advisory Board member of the FMSF, Ken Lanning of the FBI, and quoted from Dr. Gail Goodman and Bette Bottoms 1994 research study titled, "Characteristics and Sources of Allegations of Ritualistic Abuse," a study which Plaintiff believes was not a legitimate study but was instead intended to minimize allegations of ritual abuse.

141. This research study made it appear that only a small group of therapists were reporting ritual abuse allegations in obvious attempts to make it appear that ritual abuse should not be taken seriously, when in actuality, when one reads the actual study, the researchers received overwhelming evidence that proved satanic ritual abuse occurred. Dr. Goodman and Bette Bottoms then proceeded to claim that their study proved that generational Satanism did not exist but their victim-perpetrator relationship scale only measured one generation of possible abusers and did not allow for other extended family members to be scored. These researchers then purported to describe the legal findings of

hundreds of Social Services agencies in the United States but they neglected to include Juvenile court proceedings, petitions filed, or the legal outcomes, which indicated that these researchers were either woefully ignorant of the subject that they were researching or they fabricated their study. Instead, they mistakenly or purposely used social worker opening and case closing codes of substantiated, unsubstantiated, and unfounded to describe legal proceedings. This study has been used world-wide to make the claim that the "scientific" field found no evidence for satanic ritual abuse. FBI's Ken Lanning was the advisor on this study. Plaintiff requested an explanation from the lead researcher in 2008 for these and other discrepancies but she was met with silence.

142.   The 1993-94 Grand Jury and Defendant Mark Sauer of the San Diego Union-Tribune continued to criticize the District Attorney's office for prosecuting the Dale Akiki case. In SDUT article, "Miller Faulted by Grand Jury on Akiki Case," June 2, 1994 (by Mark Sauer/Wilkins, Krueger) the reporters cited the 1994 Grand Jury's "key findings" that the County had wasted time and money:

"The county has wasted time and money on an unfounded theory: that a widespread cult of secretive satanists is molesting children in elaborate rituals. The jury said the theory should be abandoned ... Carol Hopkins, a member of the 1991-92 grand jury that strongly criticized Miller and other county officials, said the new report validates the conclusion she and her colleagues reached ... The best example of contamination in the Akiki case was the fact that the therapist were not only trying to treat the children but they were also attempting to be criminal investigators."

143. Response: The "findings" of the 1991-1992 and 1992-1994 Grand Jury's were completely unacceptable and that two San Diego Grand Juries focused on denying the reality of satanic ritual abuse points to a larger problem in San Diego which has not been clearly identified. Plaintiff believes, again, that there is nothing wrong with therapists screening allegations of child abuse for true and false reports during court proceedings and in fact that is their job.

144.   DA Ed Miller commented in his August 31, 1994 response to the 1993-94 Grand Jury that when confronted with complaints from several of the parents of alleged victims in the Akiki case about Jim Okerblom's coverage of the proceedings which had been inaccurate and biased, Mr. Okerblom had stated that he did not care what the parents thought since his reporting was going to result in his receiving a "Pulitzer prize." Mr. Miller went on to describe the coverage of the Akiki case as being "biased to the point of being nothing short of disgraceful."  Mr. Miller also described the 1993-94 Grand Jurors as in "over their heads" regarding their analysis of what took place in the Akiki trial. He questioned why there had been so many attacks on advances made to protect children and noted that there was a nationwide trend to attack child abuse prosecutions and prosecutors

145.  Between the years 1992-1994 Senator Newton Russell of California had worked on passage of a penal code which became law in 1995 as 667.83 which added a sentence enhancement to child abuse crimes which were committed in the context of ritual

abuse. This action was taken due to the hearings which were referred to earlier in 1989 in California. However, the authors of the 1991-92 and 1993-94 San Diego Grand Jury report attempted to stop the passage of this law and the formation of a State Ritual Abuse Task Force, a fact which was chronicled in the historical archives of Senator Newton's legislation which Plaintiff retrieved.

146. In the Assembly Office of Research Report, dated March 1, 1994, the author wrote a very skeptical response about allegations of ritual abuse and recommended that no commission on ritual abuse be created. The Akiki case in San Diego was described, reporting that a child accused Akiki of "killing a Giraffe." The rebuttal to this report stated, again, that the child in question testified that wallpaper with elephants and giraffes on it was repeatedly stabbed. On pg. 14 of their report, the 1991-92 San Diego Grand Jury report's conclusions were quoted: "The Jury had heard reliable expert testimony that it is a mistake to force a child to relive and keep talking about an alleged traumatic event. Further, there is little evidence that a child will repress a traumatic event. There is good evidence that a traumatic event tends to etch itself indelibly on the mind."

147. This type of extreme misstatement of fact was routinely made by the FMSF. In other words, Pam Freyd's disinformation campaign reached as far as the California State Legislature in 1994 in efforts to shut down the topic of satanic ritual abuse in opposition to the recommendations of the 1988-89 State Advisory Board hearings.

148. In the Assembly Committee on Public Safety report, dated June 14, 1994, the report cited the defense portrayal of the Akiki case by claiming the children were "fanciful" which casted "doubts on the proposition that children never lie in describing their experiences with sexual abuse." They quoted from the 1993-94 San Diego Grand Jury report:

"The Grand Jury has found no evidence of satanic ritual child molestation in San Diego County. The 1993-94 Grand Jury concluded there is no justification for the further pursuit of the theory of satanic ritual child molestation in the investigation and prosecution of child sexual abuse cases."

149. Congressman Eppell insisted that Penal Code 667. 83 should have a provision that mandated all counties that convicted people under this sentence enhancement to send in form 8715 so that the DOJ could gather statistics and decide in three years [1998] whether the law should sunset or not. In Plaintiff's opinion, three years was too brief a time to canvass the prevalence of ritual crime in the State of California, and she thought it might be difficult collecting statistics, at least in San Diego, because the DA's office in San Diego County and perhaps other counties were refusing to investigate allegations of satanic ritual abuse at all.

150. In SDUT article, "Chasing Satan in Sacramento – Zealous Senator Pushes Law

Adding Ritual Abuse Penalties," June 16, 1994 (by Defendant Mark Sauer) the reporter compared the efforts of Senator Newton Russell's attempts to pass this sentence enhancement to the Red Scare and the Salem Witch Hunts:

"Claims that a secret network of Satanist is abusing children in rituals featuring blood, urine, feces, etc ... seem to have finally gone the way of the Red Scare in the 1950s and the Salem Witch Hunts of the 1690s. After a decade of digging the FBI could find nothing to indicate the existence of a satanic conspiracy anywhere in the United States; in San Diego this month, the county grand jury declared it 'found no evidence of satanic ritual  child molestation' here ... This year Russell came back with SB1997. It sought to add three years to the sentence of anyone convicted of molesting a child 'as part of a ceremony rite or any similar observance.' Yet ritual-abuse investigations elsewhere have turned up nothing ... But when pressed  to cite a single case of verified ritual abuse in California, McElhenny said: 'None that I could talk about' ..."

"Jeffrey Victor, author of 'Satanic Panic: The Creation of a Contemporary Legend,' said such a law would provide government sanction and credibility to the unfounded faith of those who believe that ritual abuse exists. When a San Diego jury last fall rejected prosecutors ritual-abuse charges in the Akiki trial, some critics declared the swift and decisive verdict was the beginning of the end of the phenomenon ... But Victor predicts that 'people with extremist beliefs about this will be promoting it until the end of the century, although they will essentially be ghettoized.' Some people say, 'Well, what does it hurt to have such beliefs? But we don't need fools in government'"

151.  Response: This disrespectful news article about Senator Newton Russell's attempts to pass Penal Code 667.83 – the ritual abuse sentence enhancement – was very inappropriate. Senator Newton's efforts to pass legislation on behalf of a vulnerable class of victims – children of satanists  - is not comparable to what occurred in the Communist "Red Scare." Sauer failed to disclose the fact that what appeared to be two rigged San Diego Grand Jury reports and his news articles were used by the State Assembly Office of Research to oppose this Task Force on Ritual Abuse for the State of California. In this news article, Mark Sauer quoted FMSF Advisory Board member Jeffrey Victor to refer to members of governments who believe that ritual abuse exists as "fools." Although Mark Sauer quoted Senator Newton's aide, Ms. Mc McElhenny, as stating she did not "know" of any ritual abuse cases in California, that is very difficult to believe because she was privy to the findings of several investigations of ritual abuse that took place in California.

152.  Plaintiff corresponded with Senator Russell's office several times during this time period and was asked to write a letter about her experiences investigating ritual abuse to aid in the passage of this law. Consequently, Plaintiff was very interested in seeing that Penal Code 667.83 remained on the books which did become law in 1995. The penal code read, in part:

-Actual or simulated torture, mutilation, or sacrifice of any mammal

-Forced ingestion, or external application of human or animal urine, feces, flesh, blood, or bones.

-Placement of a living child into a coffin, open grave, or other confined area containing animal remains or a human corpse or remains.

153.  Penal code 667.83 did unfortunately sunset in 1998 and the County of San Diego contributed to that occurrence due to the 1991-92 and 1993-94 Grand Juries highly suspect recommendation to the Board of Supervisor to withdraw the standing CPS SRA protocol and their recommendation that the District Attorney's office (and apparently CPS) not investigate SRA cases.

154.  In 1995 Plaintiff wrote a letter to the Office of Criminal Justice Planning, in efforts to force CPS to gather statistics about ritual abuse, but they never replied.

155.  In SDUT article, "A Frightening True Story of Recovered Memory," Book Review, May 15, 1994 (by Defendant Mark Sauer) the reporter positively reviewed a book titled, "Remembering Satan a Case of Recovered Memory and the Shattering of an American Family" by Lawrence Wright which purported to describe the SRA case of Paul Ingram in the State of Washington, but Wright's bias was extreme throughout. At the end of this article, the San Diego Union-Tribune identified Mark Sauer as the "reporter who was covering the repressed memory issue." Sauer wrote:

> "Ingram and his daughters ultimately envisioned much more than mere molestation. They reported scenes of satanic sex and blood rituals; repulsive orgies in which his poker buddies raped and sodomized his children … As prosecutors prepared for Paul Ingram's trial, Richard Ofshe, a University of California Berkeley psychology professor, was hired as an expert to aid in convicting the ex-sheriff's deputy … In this astonishingly thoroughly researched and highly readable tale, Lawrence Wright, a staff writer for the New Yorker, exposes the frightening extreme of the recovered-memory phenomena in America. Thousands of families have been shattered by delayed reports of sexual abuse emerging from therapy that are uncorroborated, impossible to defend against and very possibly false."

156.  Response: This case just described was about a confession of sexual and satanic ritual abuse made by Thurston County Sheriff Paul Ingram which his supervisor Sheriff McClanahan believed wholeheartedly. The court records clearly document that the court did not find Richard Ofshe's opinions about this case to be persuasive. Although Mark Sauer referred to Ofshe as a psychologist, Plaintiff believes Ofshe is actually a sociologist. In this article, the SDUT clearly reported that Mark Sauer was assigned coverage of the repressed memory issue. That indicates that SDUT publisher Defendant Copley approved of Mark Sauer's coverage - which was obviously intentionally skewed in favor of the FMSF - and the position of defense attorneys when they involved prosecutions of satanic ritual abuse.

157. In SDUT article, "Memory Verdict Sends a Message," May 15, 1994 (by Defendant Mark Sauer) the reporter described Gary Ramona's civil case which involved his daughters "repressed memories" of child molest in which a jury found in his favor. Pam Freyd of the FMSF was quoted:

"'For the thousands of families who have contacted us in the past two years, this is a concrete sign that people are finally getting the message: Something profoundly wrong is going on in psychotherapy today,'" Pamela Freyd, a psychologist and founder of the False Memory Syndrome Foundation in Philadelphia, said yesterday. "

158. Response: The SDUT continued to quote the notorious organization, the FMSF, without ever once questioning whether this organization might have an agenda. Mark Sauer also continued to misreport the facts: Pam Freyd is not a "psychologist."

159. In 1993 Plaintiff submitted a research proposal to the head of Social Services Cecil Steppe and asked for part-time status so that she could report back about issues such as ritual abuse, suggestive interviewing, and repressed memory. However, Mr. Steppe and director Ivory Johnson denied Plaintiff's request. Plaintiff decided to continue this research anyway on her own time in addition to her full time investigatory work load.

160. In 1993 Plaintiff formed the Ritual Abuse Court Cases Project in efforts to canvass District Attorneys who had successfully handled cases involving ritual abuse in order to provide objective evidence that this type of crime existed due to what at first appeared to be a "backlash" in San Diego County. At that time there were approximately 14 cases convictions involving ritual abuse in the United States which had been gathered by researcher and film documentarian Dale McCulley. Between the years 1996-1998 Plaintiff researched legal resources and law libraries which resulted in the discovery that there were many appellate courts which upheld Satanism as the motive for the crime.

161. In 1998, Plaintiff published the results of her research on the internet in an archive titled "Satanism and Ritual Abuse Archive" which included over 60 court cases documenting satanic crime and/or ritual abuse. In 2007, Plaintiff updated this archive and it is presently posted at several web sites including http://www.endritualabuse.org/ritualabusearchive.htm [Exhibit 2].

162. Defendant Carol Hopkins continued to hold positions of responsibility in San Diego County. According to news article, "DA Pfingst Gains Respect in Half-Year at the Helm," by July 2, 1995 by Anne Krueger, after taking office in 1995 Paul Phingst appointed Defendant Hopkins to a committee that reviewed child abuse cases that were submitted to the District Attorneys office. This was in spite of the fact that the 1992-93 Grand Jury reported that the previous Grand Jury had caused harm within the system and seriously mischaracterized child abuse cases in Ms. Hopkins efforts to make it appear the "system was out of control."

163. In SDUT article, "Foes Assail Repressed-Memory Therapy," Dec. 1, 1994 (by Defendant Mark Sauer)   the reporter favorably reviewed Ofshe's book, "Making Monsters: False Memories, Psychotherapy and Sexual Hysteria" and FMSF's Elizabeth Loftus' book, "The Myth of Repressed Memory: False Memories and Allegations of Sexual Abuse." Sauer publicized that FMSF's Richard Ofshe was to appear at a conference the next day. In this article, after giving an example of a therapist asking a client what they thought a dream meant, Sauer wrote:

"Certain therapists who practiced such detached neutrality discarded it about 10 years ago because they believed they had made an astonishing discovery: dark memories of sexual abuse and even satanic blood orgies -- of trauma so vast it was capable of splintering minds -- could be unlocked using a new technique called 'recovered-memory therapy.' Trouble was, the discovery was a devastating hoax, said Richard Ofshe 'It's rare when you find a mistake this stunning.'"

164. Response: In this article Sauer was using Richard Ofshe to denounce traumatic amnesia as a "hoax," and it was an obvious attempt to deny that the psychological disorder of MPD/DID could hide the fact that sexual and satanic cult abuse occurs due to the dissociation of the victims.

165. In SDUT article, "'Repressed Memory'" Deconstructed as Quackery with a Heavy Price," (by Defendant Mark Sauer) Dec. 18, 1994, 18 days after the publication of the article described above, Mark Sauer again favorably reviewed the same books previously described by FMSF's Richard Ofshe and Elizabeth Loftus about "reckless and destructive therapy." At this point, Mark Sauer's news coverage was becoming repetitive, which is a common propaganda technique used when disseminating mis/disinformation. Sauer repeated the extreme FMSF position again and wrote:

"The authors attack the notion of repressed memories as lacking scientific foundation."

166. In SDUT article, "Repressed Memory Care a 'War Zone'" Apr. 11, 1995 (by Defendant Mark Sauer) the reporter discussed a documentary by Ofra Bikel "Divided Memories" about repressed memory. Sauer introduced Bikel by the following comment:

"The Israeli-born, New York-based filmmaker, whose acclaimed "Innocence Lost" pieces for "Frontline" recently explored a tragic Dale Akiki-type case in North Carolina, comes late to the repressed-memory debate."

167. Response:  Sauer misreported on the facts yet again: "Innocence Lost" was actually about the brutal torture and murder of three young boys in the state of Arkansas which the State described as a satanic ritualistic killing. These convictions were successfully upheld on appeal and the appellate court upheld the satanic motivation for the crime. [902 S.W. 2d 781 (1995)]. In addition, which has been previously reported, Professor Cheit of

Brown University created his archive of repressed memory cases in response to Ofra Bikels misinformation about that subject, specifically in the film "Divided Memories."

168. In SDUT article, "Mending a Broken Trust, 11 Years After he Sent her to Prison, Son Brings Mom Home," Dec 17, 1995 (by Defendant Mark Sauer) the reporter wrote about a recanting teenager who gave testimony as a child about his mother's satanic abuse in Bakersfield but who later won her release by recanting. Sauer quoted defense attorney Martin Snedekker who successfully overturned a series of ritual abuse cases in Bakersfield as saying:

"On a hunch, he called Richie Shaphard and was delighted to learn the teenager was ready to recant."

169. Response: This article reported that it was the defense attorney who introduced the topic of recanting to this teenager which apparently Mark Sauer never thought was odd.

179. In SDUT article, "Teen Says Parents Were Wrongfully Convicted/Case was originally thought to be a Satanic Sex Ring," Jun 18, 1996 (by Defendant Mark Sauer) the reporter described Carol Hopkins having a recanting teenager in her custody by the name of Sam Doggett from Wenatchee Washington. This case was originally thought to be a sex ring and multiple defendants either plea-bargained or were convicted of child molestation in the late 1990's in Wenatchee, Washington. Mark Sauer purported to quote statements by this teenager:

"But then disaster struck. The disaster, Sam said, was the most notorious prosecution of supposed child molesters since the Dale Akiki case in San Diego and the McMartin Preschool case in Los Angeles, both of which failed to result in convictions."

171. Response: Mark Sauer described Sam Doggett attending a rally on behalf of the Justice Committee (Hopkins's organization) which was dedicated to ending the "nearly 15 years of child-abuse-prosecution hysteria in this country." Plaintiff believes that it was very inappropriate for Defendant Hopkins to have had a "recanting" witness in her custody when Defendant Hopkins had an interest in overturning her parents conviction in what is commonly referred to as the Wenatchee Sex Ring. According to a Press Release on November 26, 1995, Ms. Hopkins called for an apple boycott to bring attention to the "falsely" accused in Wenatchee Washington. In this press release it also stated that Carol Hopkins was the co-founder of the Dale Akiki support organization.

172. The Plaintiff was shocked to read years later in a message by Defendant Hopkins, posted on the internet Witchhunt List-serve (message 9575, dated March 3, 2000) that the Director of CPS, Ivory Johnson, had personally supervised the placement of this recanting child from the Wenatchee Child sex ring in 1995 with Hopkins as a special favor for Ms. Hopkins. This type of placement and supervision was highly unorthodox as Ms. Johnson was an administrator, not a line social worker, and Defendant Hopkins was a direct party in the case of this child because she was taking a public stand on behalf of her already

convicted parents, in efforts to overturn their convictions. In normal CPS placements, the social worker decides whether or not the caretaker of the child can protect the child. That assessment would include the caretaker believing that the child was abused especially if there was every indication that this is what occurred. A social worker in normal circumstances would never place a child with a party who was trying to overturn the conviction of the parents because that would indicate that the caretaker was not protecting that child but was operating on behalf of the abuser. The fact that this occurred in this case points to unethical conduct and a conflict of interest.  Plaintiff also seriously doubts that teenager Sam Doggett made the comparison between her parent's case, the Akiki case, and the McMartin case, and believes it more likely that Mark Sauer wanted to make that statement and used Sam Doggett name to do so.

173. In SDUT article, "Day of Contrition, a Gesture of Solace for the Falsely Accused," January 14, 1997 (by Defendant Mark Sauer) the reporter described Carol Hopkins' publicity stunt, a "Day of Contrition Revisited" and described her organization the Justice Committee as an advocacy group for defendants it claimed were falsely accused. She brought together playwrights and defendants specifically who had been acquitted of ritual abuse. Mark Sauer writes about Ms. Hopkins:

> "She credits Akiki defense attorneys Kate Coyne …and Sue Clemens for the wisdom to put misguided psychotherapy and the outlandish concept of a satanic-ritual-abuse conspiracy on trial…'I believe this case would end this sad chapter in American history. But then it happened all over against recently in Wenatchee, Washington.'"

174. Response: This newspaper article made it appear as if Defendant Hopkins believed that all ritual abuse offenders who had been convicted were actually innocent, which indicates that Hopkins had a decidedly unobjective position, and points to the possibility that Ms. Hopkins might be in favor of satanic ritual abusers not ever being prosecuted for their crimes. Apparently, Hopkins' allusions to "misguided therapy" referred to the disinformation in the SDUT about the Dale Akiki case being a product of therapist suggestion. Sauer also quoted Defendant Hopkins as stating the belief that satanic ritual abuse ever occurred was "outlandish."

175. In "Some Therapies Just 'Crazy,' says Authors," January 14, 1997 (by Defendant Mark Sauer) the reporter reviewed FMSF Advisory Board member Margaret Singer's (deceased) claim that the therapy field was a haven for "whakos" and "charlatons" which included therapists who "convinced" clients that they were UFO abductees or  were victimized by satanic cults. Sauer quoted FMSF Advisory Board member Margaret Singer remarks about "crazy therapies":

> "Critics – including many therapists and professors of psychology themselves are concerned that the field is unique among medical professions for the attraction it holds and haven it provides for certain wackos and charlatans. How else to explain therapists who end up convincing clients they are inhabited by hundreds of squabbling children and other creatures? Or that they've been abducted and experimented upon by space

aliens? Or they're being tormented by people from their past lives? Or they've repressed memories of past satanic-ritual abuse?... Margaret Singer, a clinical psychologist and professor at the University of California Berkeley, has encountered these and scores of equally devastating counseling techniques in 50 years of research and therapeutic practice."

176.  Response: Again, Mark Sauer was trying to align UFO Abduction experiences with satanic ritual abuse victims and continued to malign therapists who treat these victims using another FMSF advisory board member to make his case.

177.  In SDUT article, "Town Without Pity, Mean Justice Exposes Abuse of Power, Bakersfield Division," March 7 1999, Book Review (by Mark Sauer) the reporter favorably reviewed a book about the "Kern County Witch Hunt" in Bakersfield and the appellate courts decision that reversed some convictions of people accused of ritually abusing children in that County:

"But the besieged Dunn has plenty of company. Humes traces the 'Kern County Witch Hunt' of the early 1980s that coincided with charges of cannibalism and blood rituals – the hallmarks of the idiotic yet terrifying satanic ritual abuse scare that swept parts of the nation a decade and more ago."

178.  Response: An objective new reporter would never have described a ritual abuse investigation as "idiotic."

179.  In "Parents of 2 Seized Kids to get $750,000 – Escondido Case Arose from Story of Satanic Threat," Nov. 2000 (by Defendant Mark Sauer) the reporter described the eventual settlement between the Wallis family and the Escondido Police Department after two courts dismissed the suit, and two appeals courts reinstated it:

"The Wallis case was the product of a satanic scare that swept through San Diego and many other communities a decade ago. It was a time when certain psychotherapists, social workers, police officers and prosecutors became convinced that secret cults were subjecting children to all sorts of evil rituals, even murder. The threat here was considered so dire that San Diego County established a Ritual Abuse Task Force. But finding evidence was another matter, and the task force disbanded without fanfare.... According to court documents, Plante was told by Via that 'we have enough to pick up the kids.' But social workers never formally petitioned a judge, and no court order was ever issued to take the children into protective custody. "

180.  Response: Mark Sauer dismissed a horrific crime that actually occurs - satanic ritual abuse - as a "scare," making it appear there was no substance behind these allegations, and then reported with some satisfaction that the Ritual Abuse Task Force was disbanded in San Diego. Mr. Sauer then repeated the mis/disinformation about this case which was found in court records and the appellate documents describing this case. It was alleged that Social workers had to have a court order before removing a child from a dangerous home

environment. That is completely untrue. Juvenile courts are not open 24 hours a day, yet children are removed from their homes at all hours of the night and taken to a receiving home, which in San Diego is called Polinsky Center. Court orders could not be obtained in that circumstance even if a social worker wanted one.

181.  In SDUT article, "Abuse or Unfounded Fear - Either Way, Talks to Delve into Ritual Child Torture," Sept. 21, 02 (by Defendant Mark Sauer) the reporter recounted his version of the Akiki prosecution failure and described the subsequent lawsuit against the county as "driving a stake through the heart of America's ritual abuse witch hunt." Sauer claimed that an upcoming conference about ritual abuse taught by Dr. Ellen Lacter, a colleague of Plaintiffs, sponsored by the 7th International Conference on Family Violence, meant ritual abuse was making a come-back into public awareness, which he was obviously against. Sauer wrote that District Attorney Paul Pfingst expressed "grave concerns that a widely attended and influential conference would feature workshops on ritual abuse, since he has seen no evidence that such cases exist":

> "Pfingst, who used the Akiki case as a springboard to the district attorney's office in his 1994 campaign against longtime D.A. Edwin Miller, said in an interview, 'This theory was completely debunked in the early '90s ... It created so much harm in San Diego and across the country, and to see it even start to emerge again is very disturbing ... If someone wants to go back to teaching that satanic ritual abuse claptrap, we're going to have a serious discussion about whether law enforcement in San Diego should respond and expose it for what it is."

182. Mr. Phingst sent several Grand Jury members to attend this particular ritual abuse workshop so that they could report back to him about the content. Mark Sauer continued to claim in this article that there was no "evidence" for ritual abuse even though by that time he had read Plaintiff's Satanism and Ritual Abuse Archive, as future events will reveal. Paul Phingst's statements were certainly not the statements of an impartial District Attorney because he openly stated that he did not believe that ritual abuse occurred. This information revealed that ex-DA Pual Phingst's office was not taking allegations of satanic ritual abuse seriously and was apparently refusing to investigate this topic at all while he was in office. Plaintiff believes this points to malfeasance.

183. Despite the fact that 11 letters that were sent to the San Diego Union-Tribune in response to Defendant Mark Sauer's news article quoting Paul Phingst, not one single letter was published, which indicates, in addition to the many inappropriately biased newspaper articles that have been described, that the editorial policy of the SDUT was dedicated to describing contrived positions about repressed memory and the ritual abuse of children, and the public was not allowed input.

184. Pam Freyd too wrote in the FMSF's September/October 2002 Vol. 11 No. 5 newsletter about this conference. Ms. Freyd wrote that there was no evidence to support the existence of satanic cults or "satanic conspiracies" and admitted to writing letters to the sponsors of this conference in attempts to get them to denounce the workshops. According

to Dr. Ellen Lacter, Defendant Carol Hopkins also wrote letters in opposition to this workshop. Freyd complained in her newsletter that the organizers of the conference sent out a letter to the sponsors in response to her opposition letters which described the FMSF as a "fringe advocacy organization" and "mostly composed of those accused of abusing their own children." Pam Freyd wrote: "It seems that we were naïve to think that the topic of ritual abuse had been resolved. Let us hope that the general climate is such that we don't need to fear a return of the hysteria about ritual abuse and recovered memories of the early 1900's."

185.  Clearly Pam Freyd's agenda is dedicated to denying the fact that SRA occurs. In recent years, Pam Freyd has tried to soften the FMSFs position in some forums by claiming that although it might be possible to repress a traumatic event, one cannot know with certainty whether that repressed memory was accurate or not without corroboration. The problem with this type of position is that it undermines all eyewitness testimony. Witnesses commonly report that events take place and they retrieve that information from their "memory." Eyewitness testimony has standing in courts throughout America and the veracity of that testimony is based on the observation of the witness and what appears to be their truthfulness.

186. In the FMSF Foundation Newsletter, March-April 2004 Volume 13 No. 2, Pam Freyd wrote about the $10.6 million settlement awarded to Patricia Burgus and her family after she retracted her allegations of SRA in 1997 and sued her psychiatrist for "implanting" false memories.  Freyd wrote:

> "One would think that the huge retractor settlements and awards in recent years would prove a deterrent to others bent on finding ritual abuse in patients. Unfortunately, that is not the case. The California Psychological Association (CPA) will present a workshop on 'Psychotherapy with Ritual Abuse Survivors' at its San Diego conference on March 25 - 28. Speakers Ellen Lacter, Ph.D., and Mary Battles, MCFF, have long advocated the unscientific ritual abuse beliefs that have brought such misery to so many patients and families. It is amazing that the CPA displays such disregard for patient safety. However, as attorney Chris Barden has noted: 'The associations and licensing board have prove virtually worthless in policing their own ranks…' Dr. Barden thinks that both encouraging professionals to base their practice in science and bringing highly visible litigation are needed for change.'"

187. Plaintiff believes that this quote by FMSF founder Pam Freyd gives the impression that she was trying to intimidate therapists who treat victims of ritual abuse victims.

188.  In summation, Defendant Mark Sauer has been the official spokesperson for the San Diego Union-Tribune about "repressed memory" and appears to be the reporter assigned to the coverage of allegations of satanic ritual abuse. Unfortunately, Mr. Sauer's newspaper coverage about these subjects has been found to be repetitively simple-minded, inaccurate, misleading, and a disservice to the citizens of San Diego County. Mr. Sauer has

failed to report that satanic ritual abuse is actually widespread and is occurring throughout the United States and the world. Over the years, in his articles about ritual abuse, Sauer quoted other people who described ritual abuse as "mythical," "misguided," "discredited," "a virus," "bull," a "hoax," "outlandish," "fringe," "dreams," "false memories," "hysteria;" "idiotic," and "claptrap." Mark Sauer described SRA allegations as coming from a "strange little corner," "therapist inspired," "witchhunts," similar to the "red scare," "lobotomies," a "satanic panic," "fantasies," "phony," "delusions," "bizarre," and equivalent to "space abductions." Sauer also quoted other people who described professionals who believed in or investigated ritual abuse (including a State Senator) as "fools," "ghettoized," "true believers," "crazy," "incompetent," "pathetic," "bozos," "misguided," "whakos," and "charlatans," and even claimed in the title of one of his article that it was the "Satan-Chasers" who were the real "terrorists," not ritual abusers who torture children. Sauer and others also used the trick of sleight of hand; anyone who believes in single instances of ritual or satanic ritual abuse must also believe in a "world-wide satanic conspiracy."

189. This history provides an overview about the ties and the serious irregularities involving two Grand Juries, the 1994 DA's office under the leadership of Paul Phingst, Mark Sauer and the San Diego Union-Tribune. The positions of the Assistant Attorney General's Office in San Diego is questioned because Mr. Schons was quoted as stating that there was no evidence to support the reality of repressed memory, apparently due to the influence of Ms. Hopkins and the FMSF.

190. Plaintiff used to believe that it was a possibility that efforts to minimize satanic ritual abuse activity, especially by FBI's Ken Lanning, came from genuine concern and his efforts were geared toward downplaying a sensational crime which might lead to public panic or "witchhunts" against innocent people. Lanning argued that by making unprovable ritual abuse allegations it might make it more difficult to prosecute sex crimes against children. Plaintiff does not believe these arguments have any merit: If there was more sophisticated knowledge about satanic ritual abuse it could only lead to more truthful case outcomes. If prosecutors routinely chose to educate juries about case convictions and the modus operandi involving satanic cults, the suffering of victims of ritual abuse would be validated, institutionalized, and there would no longer be a strategic need to down-play ritual abuse activity in child sexual abuse cases; a strategy which in actuality does not protect children, it only results in leaving an entire population of abuse victims without a voice.

191. Not only does it not appear that what occurred was a societal "backlash," in San Diego or elsewhere, in other words expected collective societal denial and retreat from a topic due to collective defense mechanisms (too much to bear) or attempts to rectify excesses, after analyzing the arguments of the opposition and watching their behavior for a decade or more, Plaintiff believes that Satanists and their supporters have orchestrated a systematic defense in order to cover up the fact that their children, en masse, began disclosing the reality of satanic practices and horrific criminal conduct for the first in this century. The fact that some perpetrator/victims dissociate contributes to this type of criminal

behavior remaining hidden and Plaintiff believes that is how generational evil perpetuates itself.

192.  This information provides motivation as to why Defendants Carol Hopkins, Mark Sauer, David Copley, Dr. Elizabeth Loftus and the FMSF in general, might want to ruin Plaintiff's reputation and career after she proved the reality of satanic ritual abuse on the world-wide web and later publicized facts about what she believed was corruption in San Diego County.

193.  Because Plaintiff wanted to publicize what took place with Defendant Hopkins and the 1991-92 and 1992-93 Grand Juries, she gave this information to author Alex Constantine, after which he published a chapter in his book "Virtual Government," [1997] entitled, "Acclaimed 1992 San Diego Grand Jury Child Abuse Report Found to be Fraudulent by Subsequent Grand Jury."

## CENSORSHIP AND VIOLATION OF PLAINTIFF'S FIRST AMENDMENT RIGHTS TO FREE SPEECH ON THE WORLD WIDE WEB 1995-2000

194.  In 1994 Plaintiff befriended a CPS intern, "Joan," who disclosed that her child had been ritually abused at the Presidio Army Base in San Francisco, California in the late 1980's. Joan told Plaintiff about all parties involved in the investigation which included a satanist, Lt. Col. Michael Aquino who along with his wife Lilith were High Priest and Priestess of their satanic cult, the Temple of Set. "Set" is the name of the evil Egyptian deity who predates the Christian "Satan" in the Bible. Defendant M. Aquino remained on active duty in the Army Reserves while leading this satanic cult for 20 years. Defendant M. Aquino's background included a Ph.D. in Political Science and he was considered to be a specialist in Intelligence, Psychological warfare, and propaganda. Joan claimed that although the army reached a settlement agreement with the parents, the perpetrators were never criminally charged, and she thought that there had been a cover-up. Plaintiff agrees with this position and will use this section to document what she discovered about the government's complicity in the intentional creation of Multiple Personality Disorder which uses satanic ritual abuse as a trauma base.

195.  Plaintiff's colleague and friend Dale McCulley had followed the Presidio Army Base case and other ritual abuse investigations in Northern California. In fact, Mr. McCulley believed that because he became aware of these facts, his wife was deliberately killed in a car accident. A cult member had given Mr. McCulley this information shortly after the accident occurred.

196.  Mr. McCulley sent Plaintiff two appellate documents about the Presidio case and Defendant M. Aquino proving that he had been processed out of the Army in 1990 after a multi-jurisdictional sexual abuse investigation. The San Francisco Police Department had declined to file criminal charges against Defendant M. Aquino, but in 1988 the Criminal Investigative Division [CID] of the Army continued to investigate the allegations of abuse.

197. According to Aquino v. Stone, 957 F.2d 139 (1991), Aquino v. Stone 768 F.Supp. 529 (1992), and internal court documents to his case, Defendant M. Aquino was "Titled" in a Report of Investigation for indecent acts with a child, sodomy, conspiracy, kidnapping, and false swearing. For unknown reasons, the CID chose to release their ROI three months after the statute of limitations ran. The child abuse charges remained against Aquino because, according to the CID, the evidence of alibi offered by LTC Aquino "was not persuasive." Afterwards, Defendant M. Aquino claimed "damages" because of his discharge from the service which he attributed to the inaccurate records about him. According to Aquino v. Stone, 957 F.2d 139 (1991) it clearly stated that Lt. Col. Michael Aquino was suing for his discharge from the service. The document read, in part:

"In 1990, Lt. Col Aquino was processed out of the Army"

198. According to internal documents to his case, Lt. Col. Aquino was charged with false swearing after he tried to force the court martial of the Presidio Chaplain for reporting his own child's alleged abuse at Aquino's hands. Aquino mailed himself a postcard which had the invective "blow it out your ass," and attributed it to the Chaplain. It was later revealed that the Chaplain and his family did not reside in the area from which the postmark was mailed and so Aquino was charged with false swearing.

199. Other parents in Northern California openly accused then Lt. Col. Aquino of satanically ritually molesting their children at that time. In a May 17, 1989 San Jose Mercury news article titled, "Mendocino County Cops, Parents Seek Help in Child Abuse Probe," the parents gave an interview. The following information was reported:

"Ritual Sex Abuse of children has been under investigation in Mendocino County since at least 1984, when several children at the Jubilation Day Care Center in Fort Bragg said they had been sexually abused, tortured and forced to drink blood and eat feces. Debi Withrow, a Ukiah mother of two children who told police and Army investigators that [Michael] Aquino abused them, said parents and hope that their 'children will have their day in court.' Another parent, Dee Hartnett of Santa Rosa, said her daughter also told authorities that [Michael] Aquino was one of the people who abused her in Mendocino County in 1986. The daughter testified against two of her abusers in a case in Santa Rosa that resulted in plea bargains last year. One of the accused Daryl T. Ball was sentenced to prison for 4 years in connection with the abuse of Hartnett's daughter and five other children. The other, Charlotte Thrailkill, was sentenced to 14 years in prison."

200. Of additional concern was the fact that, according to a November 16, 1987 article published in Newsweek titled, "Second Beast of Revelation," then Lt. Col. Aquino referred to himself as the Anti-Christ. Defendant Aquino is also interested in the Nazi's, believing himself to be the son of a Nazi SS officer. Both the Temple of Set and the Church of Satan had a group called the Order of the Trapezoid which has strong Nazi leanings.

201. After the Plaintiff discovered the internet in 1995 she decided to use it as an opportunity to investigate cult groups, undercover, on her own time and publicize the reality

of ritual abuse in a worldwide forum due to the cover-up of ritual abuse in San Diego County. Plaintiff was careful not to reveal any philosophical tenets, personal disciplines, details about employment, or the fact that she was a therapy intern while on the internet because the FMSF appeared to be targeting therapists, and Plaintiff did not want to be on anyone's "hit" list. Therefore, during the time Plaintiff was on the internet, she debated about crime only and did not reveal too much information about her beliefs or her profession but she did disclose that she had studied the occult for many years. That meant that nobody knew what to make of Plaintiff when she wrote to alt. pagan and alt.satanism, under the pseudonym of "Curio Jones" and "Karen Jones," about ritual crime, as she obviously wasn't a Christian extremist.

202.  In 1995, Plaintiff posted several news stories and the Appellate documentation about Defendant Lt. Col. Aquino's dismissal from the Army to alt.pagan and alt.satanism from American Online [AOL] after Plaintiff noticed that Aquino wrote to alt.satanism. Plaintiff did not make much comment, but posted the documents only. Plaintiff considered Aquino's case to be potentially pivotal in providing evidence about satanic ritual abuse because he was a High Priest of the second largest open satanic organization in the country, the Temple of Set [TOS], who was investigated and apparently consequented (although not criminally charged) after a ritual child molestation investigation.

203.  Defendant M. Aquino responded to these articles in alt.satanism claiming that the facts as Plaintiff presented them did not occur.  Plaintiff then received an email warning from a "LeGrant" on August 20, 1995 who claimed that her posts were defaming Dr. Aquino.  He said her facts were not correct and they mirrored Linda Blood's book "The New Satanist" which resulted in a lawsuit against Linda Blood and Times/Warner publisher. LeGrant reported that after this lawsuit it resulted in the book being "pulled from the shelves." Le Grant said he would report Plaintiff to the System Administrators for American On Line if she did not discontinue her messages. However, System Administrators are usually not responsive to anyone except the person claiming "libel" which makes it reasonable to assume that Defendant M. Aquino was the party who complained to AOL. Plaintiff's articles were then immediately cancelled, and she was told not to post messages to that newsgroup anymore, which in effect was censorship.

204.  Plaintiff contacted Ms. Blood about the status of her book and the lawsuit filed against her by Defendant Aquino. Ms. Blood told her that even though there was a settlement agreement, she and Warner books could rightly assert that the lawsuit was without merit and it was settled simply to avoid court costs. She also stated her book had not been "pulled from the shelves."

205.  Because Defendant M. Aquino appeared to have influence with AOL, and it was a clear infraction of Plaintiff's first amendment rights to free speech because no libel had occurred, Plaintiff found another internet company overseas from which to post – anon.penet.fi

206. At first Defendant M. Aquino accused Plaintiff of being Linda Blood who was his ex-girlfriend. Then Defendant M. Aquino and his wife, Lilith Aquino, proceeded to willingly debate with Plaintiff under several different pseudonyms such as hansrkr@aol.com, rennet@aol.com, gollux@aol.com and lancepryne@aol.com. Plaintiff and the Aquinos debated in detail about the facts as stated in the appellate documents and about other ritual abuse cases in the United States and around the world.

207. Robert M., Defendant Aquino's fellow satanic cult member from the Temple of Set, wrote in a message dated February 11, 1996 that Plaintiff was wrong in her assessment about the demise of Lt. Col. Aquino's military career and listed a series of titles of what appeared to be military documents. Plaintiff continued to interact with Defendant M. Aquino because, as an investigator, Plaintiff was authentically interested in learning what his defense position was and wanted to access more information about this case.

208. According to news sources, Defendant M. Aquino's had inherited a multi-million dollar fortune in property in the late 1980's and Plaintiff was later told Aquino tripled his real estate holdings. Because of his wealth, Aquino was able to file frivolous lawsuits against others as a means of intimidation. He also had a history of intimidating people who investigated or wrote about the Presidio case. Those who had investigated or had written about this case had formal complaints filed against them, which included Linda Goldston, reporter for the San Jose Mercury News, and San Francisco Police Inspectors Pamfiloff and Gallant. Some people found themselves frivolously sued, such as Time/Warner and Linda Blood who wrote the "New Satanists" in 1994 and Craig Lockwood who wrote the book, "Other Altars" in 1993, which too described Defendant Aquino's process out of the Army.

209. In other instances, Defendant M. Aquino's forte was writing very polite, intelligent, but affronted letters, with his Ph.D. signed after his name, which does impress many people. Because one of the functions of military intelligence is to disseminate propaganda, Plaintiff learned about many propaganda techniques by watching Defendant M. Aquino's tactics on the internet during this time period. Those techniques include misinformation, disinformation, confusion tactics, misdirection, diversion tactics, and the "Big Lie," which is a tactic used when there is no other alternative. The technique of "revisionism" is used in order to rewrite the history of whatever occurred that is not favorable to the propagandists.

210. At the beginning of this lawsuit it was alleged that the FMSF appeared to be interested in providing fraudulent defenses for satanic cults by, among other tactics, claiming that the therapists who treated cult victims intentionally planted "false memories" of satanic cult involvement into their client's minds. In 1995 a self-described generational Satanist posting in alt.satanism, Defendant satanist Tani Jantsang, who was founder of the organization the "Satanic Reds," came to Plaintiff's attention. Plaintiff never wrote to Defendant Jantsang during this time period because she thought she appeared to be unstable. Defendant Jantsang wrote to satanist Robert M. that he should never deny that Satanists committed crimes because she did not believe that these extreme statements made satanists

appear credible when defending themselves against those who provided evidence which proved criminal conduct was committed by them. Instead, Defendant Jantsang wrote that of course Satanists commit crime, and provided information about a better tactic:

"Better, do as we would do: EXPOSE the doctors (not the accusing patients) as brainwashing them for insurance fraud. HA! Another one well done. (I wrote to COS contact and TOLD THEM this would be done, before it happened) Nothing magical about it, stupid."

211.  Plaintiff interpreted this statement as a blatant confession that Satanists were indeed using the legal system to target therapists who treated satanic ritual abuse victims. In addition, Plaintiff discovered in a Satanic FAQ dated April 10, 1996 that a link to the FMSF's web site was provided for those satanists who found themselves "falsely accused" of satanic ritual abuse. By immediate referral to the FMSF, it automatically provides potential perpetrators of a "false memory" defense.

212.  From 1995-1996, Plaintiff continued to debate with Defendant M. Aquino - just to keep him talking - as she assumed there were other law enforcement officials reading this newsgroup as well. Although Plaintiff had originally interacted with Aquino because she was genuinely interested in his defense, she discovered that the more messages Defendant M. Aquino wrote, the guiltier he appeared to be.  Plaintiff stuck to the facts and debated him about only that which she could prove because Plaintiff was aware that she could still be held accountable for libel even though she was using a pseudonym. Defendant M. Aquino responded in turn by lampooning Plaintiff as much as possible, claiming she was a "pedophile" and a "perv" who had ritual abuse "fantasies."

213.  As an example of one of his messages, dated February 27, 1996, Aquino called Plaintiff a perv' five times.   Plaintiff has realigned the messages so that it is easier to read, but has not changed any of the content. The message read, in part:

"Well, well well if it isn't old Curio II the child sex dream creep yet again. Come back for more sex fantasies have you? Wouldn't it be less expensive to say nothing of less humiliating for you to just go out and buy some dirty magazines for yourself? Or do you just like to strut your perv here on alt.satanism because you can only get it off when a whole lot of people are looking at you in disgust while you masturbate."

"You know, you keep trying so hard here to sell the same pair of useless old shoes long after everyone has recognized you for the FUNDY PERV you are. It has been fun kicking you over the goalpost against and again but even I am getting bored with this broken record babbling of yours. I figure Curio II is just one of those perv's who can only get off on a dirty devil worshiper child sexual fantasy, and this one makes you drool the most just replaying Adams Thompson's money train mock up in your brain, so you hug it like some snotty little teenage kid with his first copy of PLAYBOY. What a jerk, excuse me I guess I should add

– off to that."

c>7) His careful statements about the time frame and then his next
c>statement is contradictory. He says the FBI report #FD-302,
c>1/14/87 states that the Thompson kid had been attending the
c>Presidio day care center since Spring 1986. Spring is March thru June.
c>This is the obvious reason the Statute of limitation was June 86. Instead,
c>he is using the dates on the police report of 8/14/87.

c>Excuse me again!! Statute of limitations was up *June 89. Last known
   incident  was June 86 which was the time frame the Army used.

"Are you talking to YOURSELF here or what. But whatever, and I think I
said this before but of course you couldn't deal with it: YOU'RE
the one who was YELLING AND SCREAMING about the SFPD report
in which Chaplain Adams Thompson said that Kinsey was kidnapped and raped
BETWEEN SEPT 1 AND OCT 31 1986. Know why old man Adams T
picked that bracket? Because THAT was the ONLY TIME that Kinsey was
under Hambrights' control in his class at the Presidio Center, before that
she was with OTHER teachers there and had NO contact with Hambright. So if
Aquino was proved to be in Washington that whole time, that's
a ****ing IRONCLAD ALIBI, you miserable perv fraud.

What are you going to do, sort of "move the date backward several months
until Aquino is back at his previous job in the Presidio?" Gee wow that's
COOL police work! Maybe you could use some white out on what
Chaplain AT SAID TO THE POLICE and make that inconvenient
Sept-Oct period kind of disappear?  Maybe no one would notice the white
out glob?

Oh but drat, if you move the DATE back several months then you
move HAMBRIGHT right out of the picture and Chaplain ATs money
train story ONLY works it Hambright was in it because AT went into
so so much DETAIL about everything that HAMBRIGHT was supposed
to have done.

So your jerk-off house of cards isn't going to stand.  Even in this last
pathetic little ploy of yours, PERV. Move the date into Adams
Thompson's accusation period and Aquino is ALIBIED IN WASHINGTON.
Move it back months until he was still at the Presidio and HAMBRIGHT
had no contact with the kid. To say nothing of the dear sweet chaplain
being caught RED HANDED telling his FAKED UP STORY with
FAKED UP dates to a cop.

You're wasting my time Curio, really wouldn't you rather spend the money

for a skin mag and head for the nearest Grayhound Bus station men room?"

214. Aquino claimed the Presidio parents were simply greedy people who "abused" their children by making them falsely believe they were abused in order to extort money out of the military. Aquino continued to deny that he was ever processed out of the Army in 1990 but stated he was forced into part-time service due to "illegal" behavior by the Army Personnel Department. Aquino claimed he had been assigned to the U.S. Space Command after 1990 and voluntarily retired in 1993 after which he received a Meritorious Services Certificate in 1994.

215. In 1996 Plaintiff sent for the internal documents to Aquino's lawsuit against the Army, Aquino v. Stone, Civil Action No. 90-1547-1 to discover whether there was further evidence about Aquino's alleged process out of the Army because he was denying that was what had occurred.

216. Plaintiff discovered that under Plaintiff's Exhibits, Exhibit Number 12, of his damage claim it clearly stated: "Evidence of Plaintiff's separation from active duty." Under Complaint for Declaratory Judgment and Damages, it stated under No. 6: "The result of such inaccurately maintained records and the willful and intentional misconduct of the Defendant was that Plaintiff was denied by an Army board action the opportunity to continue Plaintiff's career on active duty, to be promoted in the normal course and to retire at the end of Plaintiff's active duty career, all of which has damaged Plaintiff." Under Cause of Action, No. 7, it stated: "The willful and intentionally failure to accurately maintain this Titling action has caused Plaintiff to lose Plaintiff's active duty Army career and attendant benefits to include retirement benefits." In a transcript dated May 31, 1991 of these court proceedings, then Lt. Col. Aquino's own lawyer Gary R. Myers claimed about his client that the "dogma that he predicates his religion upon comes from Egyptian pre-Egyptian theology having to do with the anti-Christ view of things ... As an Army Officer he was utterly superior, but they through [sic] him out."

217. Under the Government Exhibit List, No.15, it included a: "Handwritten therapy synopsis of Pamela Hudson." [See Satanism and Ritual Abuse Archive of Jubilation Day Care/Barbara and Sharon Orr (1984)] Several of the victims in the Jubilation Daycare Case were interviewed by the CID as described in a May 16, 1989 Press Democrat news article, Ukiah Pair Keep Molest Case Alive:

"Local authorities for almost four years have insisted their investigations are inconclusive about repeated allegations from Debi and Greg Withrow that his two sons, from a former marriage, were victims of ritual molestation during ceremonies witnessed by a large group of adults ... Last week, criminal investigators with the Army reportedly questioned Lt. Col Michael Aquino, the satanic priest implicated in the Presidio case, about allegations he was involved in molestation cases in Mendocino and Sonoma counties. Besides the Withrow angle, Aquino was questioned about sexual abuse at the Jubilation Day Care Center in Fort Bragg."

218. All of this information combined proved to Plaintiff that Lt. Col. Aquino was indeed processed out of the Army in 1990 after a multi-jurisdiction ritual abuse investigation took place and so she felt confident stating that is what occurred.

219. During the time period that Plaintiff was writing in alt.satanism, (1995 to mid 1996) two Satanists, "L. Leboucher," aka Scott L. (now Ph.D. in physics) and computer hacker, and satanists Kevin F., routinely defended Plaintiff and supported her rights to free speech. Scott's style of "defending" Plaintiff was to call her a "loon" and a "nut," (who still had a right to be heard) while insulting the Aquino's. Reportedly, Scott and and Kevin had been members of the TOS but no longer cared for the organization and both later affiliated themselves with the Church of Satan. The Church of Satan used to be the largest open satanic organization in the United States. They professed to condemn criminal activity, but Anton LaVey [founder] wrote in the Satanic Bible on pg. 88 that it was acceptable to sacrifice one's enemies, especially an "obnoxious and deserving person."

220. In approximately 1995, Scott L. suggested to Plaintiff that she compile the documents about the Presidio case and investigate the matter more seriously. Scott then told Plaintiff via email that he would try to assist Plaintiff to post messages anonymously to the internet, but because that would have required that these messages be sent from Plaintiff's home computer to Scott, she declined his assistance. Because Plaintiff wanted to protect him, she took his name off of all emails written by him which were stored on her computer, and she never mentioned to anyone at all that he appeared sympathetic to her cause because she thought that might endanger Scott. In 1996-1997, Kevin F. and Scott L. wrote to Plaintiff a few times, apparently wanting to become involved in her investigations. However, Plaintiff never responded to them about this issue.

221. In approximately 1997-98, Scott L. told Plaintiff he worked for the National Security Agency [NSA] and claimed that his particular email address was safe to send messages to because it would only be screened by the NSA. This led Plaintiff to believe Scott was possibly gathering information about satanic cults for the NSA while pretending to be a Satanist, but Plaintiff couldn't be sure, so she never gave Scott any identifying information. Because Plaintiff had heard rumors that the NSA conducted illegal surveillance on the public she was not comforted by Scott's admission that he worked for this agency so she cut off contact with him. However, Plaintiff still thought of Scott and Kevin as "friends" and these two satanists continued to openly defend Plaintiff when she was verbally attacked in alt.satanism although Plaintiff was worried because Scott publicly wrote at one time that he knew her real name and would divulge it for $30,000, but she thought he was joking.

222. In 1996, Defendant Aquino contacted the owner of the anonymous server – anon.penet.fi, operated by Julf Helsingus, in further attempts to censor Plaintiff. In a message by John Yourill, a member of the Temple of Set, he responded to Kevin F. who raised this issue in a message dated March 13, 1996.   The message reads, in part:

>3) Aquino attempted to get the name of a critic posting from the anon.penet.fi

server and ceased harassing Julf Helsingus only when it became clear that he just wasn't going to get that info no-how no-way.

"The critic, someone on the Satanic Ritual Abuse trail, was conducting a smear campaign against Dr. Michael Aquino regarding the Presidio child-abuse case. Two complaints by two different officials of the Temple of Set were sent to Julf expressing the belief that the anon postings by "Curio" were an abuse of anon.penet.fi – the matter ended at that point."

223. It appeared that Defendants M. Aquino was again trying to have Plaintiff's new overseas account cancelled in a second attempt to violate Plaintiff's First Amendment Right to Free speech because no libel was occurring. On August 4, 1996 Defendant M. Aquino, under the name of Hansrker, then misrepresented the facts and falsely claimed that Julf Helsingus of anon.penet.fi had revealed to him that Plaintiff was actually writer Alex Constantine.

224. In approximately 1996, Plaintiff was reading messages in alt.abuse.recovery and read one poster's message that a man by the name of John Price, Ph.D, from the newsgroup sci.psychology.psychotherapy, had written a message in alt.abuse.recovery, claiming that not all sex with children was harmful. The Plaintiff discovered a core group of people in this newsgroup who exhibited very odd behaviors. They were John M. Price, Ph.D., a psychologist affiliated with UC Davis; Leslie E. Packer, Ph.D, a Tourettes Disorder Specialist; Bill Goodrich, Ph.D, M.F.T., a licensed therapist; a Nancy Alvarado, Ph.D., a psychology teacher from UC San Diego, a John Clarke also posting from UCSD; Peter Hood (pseudonym) who generally behaved as if he was crazy; and a Los Angeles Police officer, Lorne G. After observing them for some time, Plaintiff believed these people were attempting to drive posters off of this newsgroup who wrote on behalf of children and they appeared heavily invested in claiming that not all sexual activity with children was harmful. Other red flags were that they were all friendly with Defendant M. Aquino, were obvious supporters of the FMSF, and appeared to be proficient in psychological operation strategies such as divide and conquer, misdirection, and isolation techniques.

225. Due to their behavior they gave themselves away as legitimate parties because of many factors: Their positions were outrageous and contrary to the best interests of children, they abused those who didn't agree with them, and Plaintiff discovered that Bill Goodrich posted messages about child pornography on several newsgroups and, unfortunately he appeared to be using his credentials to support pedophilia. Plaintiff believes two messages written by Bill Goodrich, dated May 15, 1997, gave that clear impression. In both messages, Goodrich began with a denial that he actually viewed child pornography, but claimed instead that the pictures were described to him by a "trusted confidante." In a message, dated May 15, 1997, cross-posted to the internet newsgroups alt.binaries.pictures.erotica.pre-teen, alt.sex.incest, and alt.sex.pre-teens it read, in part, highlighting the most relevant passages by Bill Goodrich was in response to a Mr. Hunt about the effects of child molestation:

Hunt: Point being DIASTER! [sic] BROKEN HOMES DESTROYED CHILDREN !!!"

Goodrich: "In many cases, the children are far more severely traumatized by the reactions of their families and/or "the authorities" than they were by the events themselves. And that "secondary" trauma continues, with the child being treated like "damaged goods" or even a social leper for years and coming to believe that s/he is the cause of many of the subsequent problems in the family."

Hunt: "nothing is more pure than the innocence of a child"

Goodrich: "Few things are more misunderstood than the "innocence" of a child. It is largely a social myth, with the illusion being reinforced by a combination of demonstrated ignorance, physical vulnerability, and limited cognative [sic] sophistication (see Piaget), as well as a seemingly inborn response by most adolescents and adults toward preadolescent children."

Hunt: What is the attraction for the sic fuckers out there that defile children in this country. WE NEED ANSWERS TO!"

Goodrich: "The answers are there, but you will not like them. The attraction is often within the normal range of variation of human sexuality (contrary to social convention). The "defilement" is primarily a matter of interpretation on the part of people OTHER than the child and the w/m. As indicated above, the trauma and other damage of the child is far too often primarily a result of real or expected reactions of others after-the-fact (except in cases of rape). Even the rapists tend to be acting on the same motivations and limitations of their adult-targeting counterparts… If you want Cosmic answers as to why such young girls are not somehow Divinely protected from those things YOU hold in such horror, I would refer you to the Book of Job (if you are a Christian)."

226.   In the just cited message, Plaintiff believes that Dr. Goodrich attempted to make it appear that it was societies response to a molested child that causes trauma, not the inappropriate sexual activity itself. Plaintiff found that this claim was a reoccurring theme in SPP. Goodrich also claimed it was normal to be attracted to a preadolescent child, and he inappropriately questioned whether children should be considered "innocent." Plaintiff does not believe the attraction to preadolescent children is within the normal range of human sexuality and that is why the Diagnostic and Statistical Manual of Mental Disorders [DSM] classifies pedophilia as a psychological disorder that needs treatment. The DSM (1994) pg. 527 describes pedophilia as:

"Individuals with Pedophilia generally report an attraction to children of a particular age range. Some individuals prefer males, others females, and some are aroused by both males and females. Those attracted to females usually prefer 8 - to -10 year olds, whereas those attracted to males usually  prefer slightly older children.…Some

individuals with Pedophilia are sexually attracted only to children, (Exclusive Type), whereas others are sometimes attracted to adults (Nonexclusive Type). '

227. The second message by Dr. Bill Goodrich, dated May 15, 1997, cross-posted to the internet newsgroups alt.binaries.pictures.erotica.pre-teen,alt.sex.incest,alt.sex.pre-teens was Dr. Goodrich's response to an irate poster, "Ronald W. Simmons," who responded to another poster, "Dinkydows," claim that pornography did not reduce the crime rate. Bill Goodrich's message read, in part:

Simmons: "You day [sic] that kiddie porn is OK, because if people don't have it as an outlet, they would go out and do it. Duh. Where do the pictures come from, unless someone goes out and does it?"

Goodrich: "From what I have seen (in the descriptions, etc.), a very large percentage of the pictures here lately have not even been nudes, much less sexual of the nudes, the vast majority come from legitimate nudist sources (again, no sex). "Of those which DO involve sex, the majority come from two sources: 'legitimate' European (and a few American) child-sex publications of 20-40 years ago (made under careful conditions, and - according to some follow-up studies and the statements of a few people such as ODIN ... statements which reasonably match those of other known models – in such a way as to leave the models without psychological harm), and photo essays form certain oriental "Child-brothels" (legal, but less benevolent and ethical). Of the few remaining, several have been shown to be fakes (created from electronically pasted - together pieces of other pictures), a very few have been identified as coming from genuine instances of abuse, and the few remaining are of unknown origin. With the exception of the last two groups, the picture clearly to NOT come from some pedophile 'going out and doing it."

Simmons: "Post your real name, Dinkshit, and let us know who the child molester is. You got something to hide? Sure you do."

Goodrich: "It would seem that you do, as well. One category of tools some of us (psychotherapists) use to evaluate patients/clients is that of 'projective' tests (such as the Rorschach 'ink blots') in which the subject views a relatively nonspecific image and 'tells a story' about it. In light of that, I find the following quite interesting:"

Simmons: "Your arguments don't hold water. Your posts demean humankind. Most of your posts contain the depiction of a crime. Like I've said before, sure, it happens. Ten year old girls masturbate, and are caught by their brothers, and they wind up having sex. It does, indeed happen." ... "But, not five-year olds who have Dad's hard penis shoved down their throat. That's not consent. That's rape. Get real, dink. You have nowhere to go but up from the gutter you're in."

Goodrich: "You look at images of seeming imminent or in progress sex between a fairly young child and an adult, and you tell a story of violence, danger, and

degradation involving family members. Accordingly, you respond with angry, degrading language … Several of the others here look at the same pictures and tell a story of mutually desired and enjoyed activities of shared intimacy. Of happy, well-loved children in danger from a hysterical society perhaps, but not from their partners. They respond to bitterness such as yours with a degree of puzzlement and cynicism just as they would to anyone else making such bitter and angry comments about other loving relationships … As many of them are well aware, sexual attraction to 'illegally young' partners is far more 'normal' than you seem to credit. And the psychological research has gone a long way toward refuting the 'common wisdom'' about the supposed harms of adult/child sexual relationships and activities, as well as determining the elements which can (and the ones which can not) predict the probability of 'harm' from them. For your own peace of mind – and your own 'mental health' – you might want to become familiar with that research. You might also get some help in working out the real sources of that hostility."

228.  Despite what Dr. Goodrich claimed in the above message, children filmed or photographed in sex acts with adults "under careful conditions" are not called "models," they're called victims, although he claimed the perpetrators molested the "models" in such a way as to leave them without "psychological harm." Dr. Goodrich also inappropriately compared a person's negative opinion of child pornography to a Rorschach projective test. Projection is a defense mechanism in which an individual attributes their psychological state to another, rather than taking responsibility for their own thoughts and feelings. A Rorschach test is a series of ink blots of somewhat undecipherable images in which the client is supposed to describe what they "see." In that way, the psychologist can evaluate the inner workings of the clients mind. However, child pornography is not a benign ink blot, it is an inappropriate image of the sexualization of a child which a normal person should find disturbing. Plaintiff believes it appears that Dr. Goodrich was misusing psychological principles in efforts to hide an agenda.

229.  Because of these types of messages, it appeared over time that Dr. John M. Price, Dr. Bill Goodrich, and others were supporting the behaviors of pedophiles. Dr. Leslie Packer and Dr. Goodrich would often post in concert and wrote that they did not believe "just fondling" was harmful for a child.  Plaintiff disagreed and wrote that adults would not tolerate "just fondling" from an adult they were unattracted to and small children were not expected to like it any better. Plaintiff discovered that Nancy Alvarado's role appeared to be to provide intellectual excuses for their unusual and aggressive behavior.

230.  In a message, dated July 3, 1997, SPP's Leslie Packer listed the various psychologists and psychiatrists who were being sued (in FMSF style lawsuits) and appeared to be delighted while mentioning the courts which had ruled that repressed memory was not admissible. Dr. John Price's support of this mission was apparent after Plaintiff read the introduction to his FTP site:

"Files here are related to the hysteria of Satanic Ritual Abuse of children, mostly located in US daycare centers. These reports of horrendous crimes perpetrated on

children in the daycare, where adults had come and gone but never saw anything out of the ordinary, caused large costs in terms of trials, prison time, etc, throughout the country. For the most part, these all seem to be made up stories that cost only the accused their lives, their fortunes, and the home or of their names. The accusers got off scott free."

231. John Price had the depositions of David Calof and Bessel van der kolk in his FTP web site which were conducted by R. Christopher Barden. David Calof later claimed that Barden was using the legal system in order to harass him and the court ruled in Mr. Calof's favor. It became very obvious that all of these people were examples of the extreme element of those who supported the FMSF. Their Modus operandi was to isolate and harass their opponents so that they would lose their will to continue opposing them and thus cease to be a political opponent. It appeared to Plaintiff that these Ph.D's purposely planted themselves in this science newsgroup in a world-wide forum in order to skew public opinion and downplay the harm of child sexual molestation and that was why they did not want Plaintiff or anyone else posting information contrary to their agenda. Because of that, Plaintiff continued to post information to this newsgroup about the FMSF and satanic cults as a public service.

232. Plaintiff could not believe these people were writing under their own names, but in fact they were. Dr. John Price, at times posted from a UC Davis account and was even elected as co-moderator in sci.psychology.psychotherapy.moderated in spite of the fact that he engaged in ad hominem attacks, began calling the Plaintiff "Curidiot," a "kook," and cross-posted most of her messages to alt.usenet.kooks, a newsgroup they appeared to have control of. John Singleton or "Raven," clearly a friend of this group, nominated Plaintiff for "kook of the year," and John Price seconded the motion on August 3, 1998 after she posted information about ritual abuse in obvious attempts to discredit the Plaintiff. Dr. John Price and Leslie Packer were very emotionally abusive to Plaintiff and other posters, in particular, to a man by the name of Brad Jesness. John Price's cruelty to him culminated in his creation of a newsgroup called alt.brad.jesness.die.die.die on July 6, 1997. Price and others continued to isolate Plaintiff on the newsgroups, engaging in ad hominem attacks, and routinely had her messages and accounts cancelled. Plaintiff continued to create and post messages from new accounts because she did not appreciate being censored by others promoting themes which were contrary to the best interests of children and she didn't like bullies.

233. The following information is being provided to document the clear, overwhelming and pervasive pattern of harassment that Plaintiff experienced by Defendant Aquino and his associates which were in apparent efforts to cover up criminal behavior.

234. Plaintiff's internet accounts were routinely cancelled but she was never provided a reason as to why. Eventually this behavior was traced to Dr. John Price and others, and it quickly became apparent that cancelling Plaintiff's accounts was a game. In a message dated Dec 6, 1997, John Price wrote a message to Plaintiff, bragging about it:

"Note that you LOST a hotmail account, AND a dejanews account."

235. Dr. John Price was caught trying to cancel a dejanews account of Plaintiff's in a message dated November 19, 1998 titled "Dejanews supports anonymous libel," which was sent to Deja News Abuse Staff regarding a message she had posted about Dr. Leslie Packer and Michael Aquino. On pg. 2 of this message, Dr. Price wrote: "Dear People, you have both killed this person's accounts before." He then tried to tell them how to track down Plaintiff's identity and requested that they censor her posts which had already been archived.

236. Shortly after this incident occurred, John Price, Ph.D. wrote a message using the words "Satanic Troll" under his organization heading. Obviously, these were not the actions of legitimate professionals.

237. John Price wrote a message on March 17, 1999, clearly stating his position that not all children are harmed by sexual contact with adults, and that some children even benefited from those experiences. Price claimed that it was the professionals who investigated these crimes who were the actual abusers because they were defining "abuse" for children inappropriately.

238. Plaintiff believed that some of Price and Goodrich's arguments were related to arguments made by NAMBLA, North American Man/Boy Love Association, who are famous for orchestrating and citing "research studies" which support their positions that pedophilia is "harmless."

239. Plaintiff discovered that these pseudo-professionals were staged in SPP just in time to discuss and defend a controversial study about child molestation, "A Meta-Analytic Examination of Assumed Properties of Child Sexual Abuse Using College Samples," published in Psychological Bulletin, (1998) Vol. 123, No. 1, 22-53, which cited in their conclusions (after canvassing College students self-report about whether they experienced harm or not from their childhood sexual molestation), that a "willing encounter with positive reactions should be labeled simply adult-child sex, a value neutral term," rather than pejoratively as "sexual abuse." The authors then went on to state the same assessment should occur with adult-adolescent sexual encounters which is not a surprise since one of the authors of this study was traced to NAMBLA. Radio announcer Dr. Laura opposed this study and it reportedly made history as the only study which was ever condemned by the House of Representatives.

240. In 1996, the anonymous server Plaintiff was posting from no longer provided services and she was then forced to post from an internet company in San Diego which she had signed up for under a pseudonym. On approximately December 14, 1996, Plaintiff publicly posted the internal documents to Aquino v. Stone from this internet company which proved, without doubt, that then Lt. Col. Aquino had been processed out of the Army. LAPD Officer Lorne G. responded immediately reporting that children in the Presidio case were led by therapists to make the statements they made to officials and there was no grounds for the discharge of Aquino. Lorne G. that inappropriately compared ritual abuse

allegations to an "urban myth" which fell into the same category as "organ stealing and albino alligators."

241. Immediately after posting these internal documents to the internet, Dr. John Price and Dr. Leslie Packer from SPP assisted Defendant M. Aquino in attempts to trace to trace Plaintiff's email account, and they mistakenly accused San Diego hypnotherapist Stephanie Rothman of being Plaintiff after she and John Price tried to access Plaintiff's computer and timed the posting of one of her messages. After asking an employee of ElectriCiti (the internet company) who the account owner was, unfortunately and mistakenly, hypnotherapist Stephanie Rothman was named. According to Ms. Rothman, Price, Aquino, along with Defendant Carol Hopkins, then began harassing her and sending her messages, along with threats they were going to sue her, until she finally had to publicly ask them on January 23, 1997 to stop harassing her and to leave her alone. Ms. Rothman wrote under the account "hypno":

> "HELLO! I am no more Curio than I am Mickey Mouse. In researching this insanity, I
> have been aware that two other people have been falsely accused of being Curio
> besides me. I feel that I am being used as a patsy to flush Curio out ... My name has
> been bandied about over 11,000 times. I have been harassed. I have lost my boyfriend
> over this mess ... (because of the stress it has caused me) ... Major craziness has
> ensued including threats and harassment toward me by several people in these
> newsgroups. Since I don't have any champions, except for Curio who keeps insisting
> that I am not she (WHICH I AM NOT) and so I felt I had to say something on my own
> behalf. If you want to quit smoking, I can help. If you are after Curio or you have any
> affiliations with SRA, sorry, I am not your man. Please leave me alone."

242. This false identification and the subsequent actions of the Defendants proved that those who were identified as Plaintiff experienced harassment which is why Plaintiff wanted to maintain her anonymity. Plaintiff was initially surprised that the "Doctors" on SPP would work with and assist in Mr. Aquino's efforts to identify her but the pursuit of Plaintiff's identity by these people and others continued. Dr. Leslie Packer then wrote the following message:

> "I will also assist anyone who wants to ID you in RL so that they can sue the sh*t out
> of you for your smears and libel all over the internet. Including Dr. Nancy Alvarado,
> Dr. John Price, Lorne Gilsig, Dr. Chris Barden, and others."

243. The problem with the above statement was that Plaintiff was not committing "libel," she was only rebutting their outrageous positions. Plaintiff experimented and found the same state of affairs on several newsgroups. It appeared that Aquino and supporters of the FMSF were staged on many newsgroups and forums acting as "agent provocateurs" (trying to instigate outbursts from their opponents to use against them at a later time), and trying to censor or belittle those who threatened their agenda. Again, they seemed heavily invested in censoring or discrediting their opponents by any ruse imaginable – including by

making false allegations of "libel," and they tried to create a situation in this world-wide forum in which their propaganda was the only side heard.

244. In April 1997, Defendant M. Aquino filed a lawsuit against internet company Electriciti - Aquino vs. Electiciti, Case #985751 in attempts to force owner Christopher Alan to cancel Plaintiff's internet account (censor her again for a third time) and reveal Plaintiff's name even though it was never clear if she was ever a customer of theirs. At worst, the exchanges between Plaintiff and Defendant occasionally descended into raucous debate, however, nobody was being libeled or "threatened" at that time. Despite the fact that there was no evidence which would support claims of "libel" or "threats" made by Plaintiff, Defendant Aquino continued to make these false allegations to the media. Plaintiff did not know what to do about this except to take each media misrepresentation and explain what had actually occurred with Defendant Aquino.

245. For example, in a September 1997 article, published in "Web Magazine" by Jamie Reno, it was alleged that Plaintiff wrote "threatening" messages to Defendant Aquino which she had not. Defendant Aquino had merely fabricated this information. At that time, Plaintiff was wary of sending email to any of these manipulative "game-players" because she knew it would be easy to change the content of emails via a word processor. Therefore every message Plaintiff wrote was public and was accessible via news searches. Reporter Reno quoted Defendant Aquino's claim about a purported message by Plaintiff.:

"I can find you whenever I want…and it soon will be much more than just finding for both your perv wife and you."

246. Plaintiff never wrote such a message. In addition Mr. Reno stated in his article that, "After the child molesting investigation ended in 1984, the Army awarded Aquino a Meritorious Service Medal for "outstanding service over a long and distinguished military career." However, according to the military, then Lt. Col. Aquino never received a Meritorious Certificate medal.

247. If threats had been made, Plaintiff believed that the appropriate response would have been to contact law enforcement. Apparently Aquino never took that action. In addition, ElectriCiti owner Christopher Alan read every message posted by Plaintiff and decided that no defamation or "threats" had been written by Plaintiff. Instead Mr. Alan believed that Defendant M. Aquino's lawsuit was simply an attempt to force Electriciti to reveal Plaintiff's name which Mr. Alan refused to do. Obviously Mr. Alan would never have taken the position if he believed that one of his alleged customers was writing threatening messages to anyone. All or most internet messages on newsgroups are publicly archived. Plaintiff along with others repeatedly asked Aquino to produce any message that she had written that constituted a "threat" or was "libelous" in any way but Aquino was unable to provide that information.

248. After the first lawsuit against Electriciti was dismissed in mid 1997, Defendant M. Aquino sued the owner of Electriciti, Christopher Alan, personally. Mr. Alan gave an

interview explaining why he refused to cooperate with Defendant Aquino. Specifically in "Net Magazine":

> Net Magazine: "How do you explain your inability to assist Dr. Aquino"
> Christopher Alan: "Inability? We have plenty of ability, it's incentive to 'assist'
> Dr. Aquino we have precious little of. Gee, your ISP is asked to help your local anti-
> christ obtain your true identity and address. Let me think about that for about
> two seconds.. Ahh, no."

249.   The lawsuit against Mr. Alan was dismissed in late 1997 due to the CDA precluding internet companies from liability due to their customer's messages. Years later in 1999, Plaintiff retrieved documents from this lawsuit and discovered that Aquino had actually submitted fraudulent evidence to the court in San Francisco. He purported to "summarize" a list of statements from "Curio" which appeared harassing or threatening but neglected to attach the actual messages themselves to the court documents to prove that she wrote those messages.

250.   Electriciti's lawyer had requested that the Judge dismiss the case as a SLAPP lawsuit – Strategic Lawsuit Against Public Participation  - but that request was denied. Plaintiff believes that the Judge did not rule in Electriciti's favor and chose not to designate this lawsuit as a SLAPP because Aquino had summarized messages allegedly written by Plaintiff on a sheet of paper claiming that she had threatened and libeled him. Plaintiff believes that false information might have made the Judge believe Aquino's claims had merit. However, again, Plaintiff and ElectriCiti believed that Aquino's lawsuit was intended only to force Electriciti to release Plaintiff's name to him for nefarious reasons in furtherance of the conspiracy to violate Plaintiff's First amendment rights to free speech, ruin her reputation and career, and expose her to harm.

251.   Plaintiff was surprised to see in Media Law Reporter 26 Med. L. Rptr. 1032 (1999), another blatantly false misrepresentation of this lawsuit. It was written that Plaintiff had written that the Aquinos were "ring leaders of an international conspiracy to further the satanic ritual abuse of children, and that they engaged in kidnapping, cannibalism and murder of anyone who stood in the way of this international conspiracy."  Plaintiff never wrote such a statement at that time on the internet. Instead, it appeared that these were Defendant Aquino's attempts at revisionism so that others accessing this information would believe that Aquino's claim had merit when in fact his case had been dismissed. It appeared that around this time period, Defendant Aquino stepped down as High Priest of the Temple of Set, and a few years later it was reported Robert M. left the Temple of Set as well.

252.   After the lawsuit against ElectriCiti was dismissed, and from 1997 to the present, Defendant Aquino and his supporters began falsely accusing Plaintiff of being a "stalker," who was committing "libel" – simply because Defendant M. Aquino could not be honest about how his military career actually ended. From approximately October 1997, on, Defendant Aquino began posting a "Periodic Statement concerning 'Curio." In one of these messages, dated October 15, 1997, Defendant Aquino falsely claimed that Plaintiff was an

"internet stalker" who was posting a "steady stream of false and defamatory" statements and "threats" about him and his family. None of these statements were true, but Plaintiff could not initiate any legal action against Aquino because she did not have the finances available, and if she took legal action it would have required that she identify herself to this satanic cult leader which she wanted to avoid at all costs.

253. Aquino's false claims of stalking was the first in a series of messages of FMSF or satanic types falsely accusing Plaintiff of "stalking" over the years – when in fact she was on the internet acting as a child advocate. Plaintiff rarely engaged in debate with Defendant Aquino after 1997 because of these tactics despite the fact that he continually appeared in forums where Plaintiff was posting in apparent efforts to engage in debate.

254. On November 21, 1997, John Price, Ph.D was caught canceling an article Plaintiff posted by attorney Wendy Murphy about those who used "false memory" tactics in courts of law. In one of Dr. Price's cancel message (which was forwarded to Plaintiff) he stated in the section of the cancel message where one is supposed to supply the reason for the cancellation, that he had cancelled Plaintiff's message due to "Hate," "Fucking with his real life positions" and "she deserved it," referring to Plaintiff." In other words, Dr. John Price publicly wrote that he "hated" the Plaintiff. This provides evidence that Dr. Price and the others in SPP had motivation to see Plaintiff identified and perhaps harmed. Clearly Dr. Price was an associate of Defendant Aquino.

255. On SPP, Defendant M. Aquino began to threaten anyone who posted on Plaintiff's behalf. One man, a Mr. White from Carleton University in Ottawa, Ontario wrote to SPP, advising Officer Lorne G. to leave "Curio" alone. Defendant M. Aquino responded on April 24, 1997 by telling Mr. White that Plaintiff was guilty of "libel" and proceeded to make several false statements about her behavior on the internet. Aquino then claimed he was going to complain to Mr. White's school administration for making these few statements correcting Officer G. It appeared that Officer Lorne G. was an associate of Defendant Aquinos.

256. LAPD officer Lorne G. then began writing harassing messages to Plaintiff's email account for the next six months. Plaintiff was somewhat upset by this activity and so wrote a complaint about him to the LAPD. Afterwards, Plaintiff publicly informed Lorne about why she had written this complaint. Lorne G. responded by writing inappropriate messages in SPP claiming that Plaintiff was "mentally ill."

257. An anonymous poster named "Tor" began posting in the newsgroup SPP and defended Plaintiff. Tor said she suffered from Borderline Personality Disorder and that she at one time was suicidal. Tor quickly ascertained what this group was about and confronted the good "Doctors" as well. Tor was then too nominated for a "kook" award and John Price and the rest of these Ph.D's in SPP were very cruel to her. Nancy Alvarado/Stone proceeded to tell Tor to FOAD- "Fuck off and Die."

258. On July 7, 1999, Dr. John Price publicly wrote that Plaintiff was a "bitch," and then asked her out to lunch. On May 6, 2000, another poster at SPP was told to "fuck off and die" by Nancy Alvarado, and Leslie Packer told Plaintiff to blow her "brains out." On March 27, 1999, John Price called Plaintiff a "Kook" and "Winner of the Weird Science Award" and at the end of the message he called her a "corrupt bitch." Another strategy of the extreme element of the FMSF, is to engage in ad hominem attack, ridicule, and victimize their opponents, and then ridicule whomever associates with their victim as well, causing the original opponent to be isolated and, again, less of a political threat.

259. Dr. John Price then wrote a message to Plaintiff on approximately September 13, 1999 in response to Plaintiff's message stating that children could not consent to sexual activity with adults. Price's message read, in part:

> "Very nearly word salad. A few syntactical errors is all you need for the 'deep end' to be not only in sight, but right below your filthy ass."

260. Obviously legitimate professionals do not behave in this manner. In approximately April of 1999, Plaintiff wrote a letter of inquiry to UCSD asking them whether they had ethical guidelines for teachers who post to the newsgroups under their own names who claimed affiliation with their University after Dr. Nancy Alvarado falsely claimed that Plaintiff had referred to her as a "pedophile." Plaintiff wrote a public message to Nancy Alvarado informing her about her request to UCSD in hopes it might inspire Dr. Alvarado to behave in a more professional manner. Plaintiff was ashamed of Dr. Alvarado's behavior because Dr. Alvarado was a Professor in the UC system in San Diego and her outrageous behavior was publicized on a world-wide forum. Dr. Alvarado responded to Plaintiff in a message dated April 23, 1999 titled, "Warning to Curio." [Exhibit 3] In that message, Dr. Alvarado threatened Plaintiff, that if she contacted Alvarado's school again, she would cause trouble for Plaintiff by going to the police and accuse her of "stalking." This was the second time Plaintiff was frivolously accused of stalking by her debate opponents – this time in retaliation for making ethical inquiries about Nancy Alvarado, an action by Alvarado which was obviously very unethical which further compounded Plaintiff's beliefs that these "Dr's" were not who they pretended to be.

261. On April 23, 1999, Plaintiff wrote a reply to Dr. Alvarado warning her that if she was caught making false allegations against Plaintiff for merely requesting ethical guidelines from UCSD that would be further evidence of unethical conduct. [Exhibit 4] This provides further evidence that Plaintiff had good reason to keep her identity private because her political opponents were continually threatening to make false police complaints about her.

262. Based on information that researcher Dale McCulley collected about the Presidio case, Plaintiff believed that the Temple of Set was then Lt. Col. Michael Aquino's outer front "Setian" order but he had an inner satanic order which few people knew about. Children referred to this group as the "devil worship club." Mr. McCulley had internal CID tapes from the Army interviews with children which were given to him by several parents

on this case. ~~In these tapes, children made allegations that Aquino ritually molested them, engaged in cannibalism, and murder.~~ It is Plaintiff's opinion, based on this information, that there was a cover-up by the Army in the Presidio case, and the CID Report of Investigation was released months after the criminal statute of limitations expired, on purpose, in efforts to avoid a scandal. Unfortunately, this culminated in Defendant Aquino being released from the Army onto an unsuspecting public.

263. This information provides further evidence proving that Plaintiff had good reason to try to maintain her anonymity because it appeared that the Aquinos were dangerous, although they were never criminally charged for any crime.

264. Plaintiff continued to research the False Memory Syndrome Foundation, of which Defendant Elizabeth Loftus is a member, and discovered that evidence was surfacing making them appear to be a real and present threat to the mental health profession. The FMSF continuously claim that satanic ritual abuse does not occur and they report that numerous individuals call them falsely alleging to be satanic ritual abusers whom they choose to believe. Perhaps that might be true in 5 or less cases but certainly not in over 80 cases.

265. In the FMS Foundation Newsletter, March-April 2004, Volume 13 No 2 edition, written by Freyd, on page 1, Pam Freyd wrote:

"A $7.5 million settlement for Elizabeth Gale in February set a record for individual psychiatric repressed-memory malpractice suits … In an all-too-familiar story of hypnosis and memory recovery therapy, she came to believe that she had multiple personalities and was a breeder for a satanic ritual abuse cult …One would think that the huge retractor settlements and awards in recent years would prove a deterrent to others bent on finding ritual abuse in patients. Unfortunately, that is not the case. "

266. Plaintiff believes that these types of comments was further evidence indicating that the FMSF in general, and Pam Freyd, in particular, had a personal stake in trying to intimidate therapists from diagnosing ritual abuse in their clients. There is a substantial amount of evidence proving that this is what is occurring.

267. In therapist David Calof's article, "Notes from a Practice Under Siege – Harassment, Defamation, and Intimidation in the Name of Science," published in Ethics and Behavior, 8 (2), 161-187 (1998) he described the multitude of legal problems he faced – which almost drove him out of business - after being targeted and picketed by an FMSF representative from Washington State – by allegedly "falsely accused" Chuck Noah. Mr. Calof was also concerned because Noah was trying to locate the home address of Mr. Calof's father. Mr. Calof reported that FMSF Advisory Board member Elizabeth Loftus was one of Mr. Noah's supporters and had reported that Mr. Noah was "extremely sincere" about his denials that he abused his daughter and stated that "there is absolutely no scientific evidence that these flashbacks correspond to some specific event." The introduction to Mr. Calof's article read:

"I have practiced psychotherapy, family therapy and hypnotherapy for over 25 years without a single board complaint or lawsuit by a client. For over 3 years, however, a group of proponents of the false memory syndrome (FMSF) hypothesis, including members, officials, and supporters of the False Memory Syndrome Foundation, Inc., have waged a multimodal campaign of harassment and defamation directed against me, my clinical clients, my staff, my family, and others connected to me. I have either treated these harassers or their families nor had any professional or personal dealings with any of them; I am not related in any way to the disclosures of memories of sexual abuse in these families. Nonetheless, this group disrupts my professional and personal life and threatens to drive me out of business. In his article I describe practicing pyschotherapy under a state of siege and place the campaign against me in the context of a much broader effort in the FSMF movement to denigrate, defame, and harass clinicians, lecturers, writers, and researchers identified with the abuse and trauma treatment communities."

268. In Mr. Chuck Noah's obituary, in the Nov/Dec. 2004, Vol. 13 No.4 FMSF Newsletter, Pam Freyd lauded Mr. Noah as a "true pioneer in the struggle for good therapy," proving that Pam Freyd approved of Chuck Noah's behavior.

269. Mr. Calof had been known for the exceptional journal he published, titled Treating Abuse Today, in which he was one of the first individuals in the country to contest the FMSF. Mr. Calof later had to give up his journal due to the harassment he received. Mr. Calof also believed, again, that he was being harassed by a lawyer associated with the FMSF by the name of R. Christopher Barden who subjected him to frivolous depositions and whose intention appeared to be solely to embarrass him after which after others such as Dr. John Price posted it to the internet.

270. The FMSF continue to deny the reality of satanic abuse victims by claiming that the victims all have "false memory syndrome," possibly in efforts to deflect from the fact that in some cases clients are giving damning information about the government's involvement in the creation of their psychological condition, and some of their Advisory Board members had received CIA funding to research hypnosis and dissociation. Apparently the FMSF believe the more lawsuits that accuse the therapist, the more it might deflect from the true offenders.

271. This activity is not without precedent. In the 1960's and 70's MKULTRA, a program implemented by the CIA to explore mind control and other illegal activities used various fronts including academic institutions when receiving CIA funding to conduct illegal experimentation on people. The CIA hid their funding behind organizations such as the Human Ecology Foundation and the Geschickter Foundation. Doctors from seemingly reputable academic institutions were granted funds by these organizations and knowingly or unknowingly experimented in areas such as hypnosis, radiation, and mind control on the unsuspecting public. Eventually they were caught and were told to cease and desist after a

series of Congressional hearings were held on August 3, 1977. Nobody believes that the CIA ceased their activities but all evidence points to their having gone further underground.

272. A movie, titled the Manchurian Candidate, based on researcher John Marks book was based on these themes after CIA documents were released to him under a Freedom of Information Act request. In the movie, American prisoners were captured by the Koreans who experimented with Mind control in efforts to create another alter/s who would carry out assassinations based on programmed cues. In addition, in 1943, Project Paperclip was the name of the US Intelligence project which imported Nazi doctors and scientists into America clandestinely. These people were employed by NASA, the CIA, and other government agencies and it is rumored that they were instrumental in experimenting with mind control activities using both children and adults for their subjects.

273. As previously stated, those who suffer from MPD/DID have been subjected to horrific abuse as children and they respond to changes in environment and cope by spontaneously "switching" between identities or alters. But there are groups of patients who have been diagnosed as MPD/DID who appear to have been psychologically "split" intentionally and who "switch" between alters in response to programmed cues (instead of splitting spontaneously as normal MPD's do, due to changes in environment) resulting in others being able to control their various personalities at will. This is Mind control. Obviously due to this information, there might be many reasons why MPD's who are victims of mind control might turn on their therapist and accuse their therapist of "implanting" false memories.

274. Therapist David Neswald, published an article in The California Therapist in October 1991 titled, "Common "Programs" - Observed in Survivors of Satanic Ritualistic Abuse," describing some of these issues. Other therapists who described "programming" by Satanists and and/or clandestine organizations, are Dr. Catherine Gould in her article, "Ritual Abuse, Multiplicity, and Mind Control," Journal of Psychology and Theology (1992), Vol. 20, No.3, 194-198; Dr. Corydon Hammond in his speech "Hypnosis in MPD: Ritual Abuse," also known as the "Greenbaum Speech," delivered at the Fourth Annual Eastern Regional Conference on Abuse and Multiple Personality, June 25, 1992; and Dr. Randy Noblitt and Pamela Perskin in their book, "Cult and Ritual Abuse, It's History, Anthropology and Recent Discovery in Contemporary America" (1995).

275. Reportedly programming is accomplished, in part, by the intentional pairings of words, phrases, sounds, behaviors, to specific commands with the use of hypnosis, electroshock, and mind altering drugs. That makes the FMSF assertions that the average therapist can cause MPD/DID in their patients rather unlikely. The additional trauma base in these specific cases which is used to intentionally split children is satanic abuse, murder, and molestation, which makes children of satanic families optimum subjects/victims. Clandestine organizations obviously choose children of Satanists because these families don't care about their children and will sell them in exchange for money, power, influence, and, more importantly, protection. These victims then perform functions for the cult and other groups, such as drug smuggling, prostitution, and murder, without having any memory

of the event. Although children of satanic cults/families can be considered to be "brainwashed" or indoctrinated to accept satanic ideologies, for instance, against God and principles of good, they are not all considered to be "programmed" or victims of "Mind control." It is very difficult to treat these particular patients because their perpetrators try to intervene in psychological interventions which results in therapists having to negotiate their interventions around purposefully implanted programs designed to stop disclosure, such as suicidal or homicidal ideation, and sometimes these clients even try to kill their therapists.

276. In March 1995, President Clinton created an Advisory Committee on Human Radiation Experiments which was convened to hear testimony from victims. This committee also heard testimony about Mind control experiments on children because some of the same doctors were accused of both activities. One person who testified identified Martin Orne (deceased), an expert in hypnosis and an FMSF Advisory Board member, as one of her abusers. Several other therapists wrote to the committee, some anonymously, disclosing what their MPD/DID clients had been disclosing in therapy. Documentation of the letters provided to this committee was published in Jon Rappoports privately distributed book, "US Government Mind Control Experiments on Children." One letter, dated March 5, 1995, was submitted by Dr. Colin Ross who described MPD/DID patients he had seen who described victimization in the context of military mind control. Another letter, dated March 9, 1995, was submitted by an anonymous psychologist who described several patient's experiences with virtual reality, hypnosis, electroshock, alters with neo-nazi personalities, and family participation.  Other letters from therapists contained information about their clients disclosures that organized satanic families had offered their children to the government for experimentation, there was government involvement in the creation of their MPD/DID, and there were white supremacy and Nazi leanings to some of these groups. It was alleged that all of this activity was being covered up and that might be one reason that the FMSF has concentrated on denying the crimes of satanic cults – because satanic ritual is used as the trauma base to split the minds of children.

277. In 1998 Plaintiff read a book by John de Camp, an ex-senator who disclosed information about a satanic ritual sex ring in Omaha, Nebraska involving mind control on children titled, "The Franklin Cover-up, Child Abuse, Satanism and Murder in Nebraska," (1996). John De Camp wrote on pg.338 of his book that Paul Bonacci and other child victims had given evidence in great depth on the central role of then Lt. Col. Michael Aquino (Defendant Aquino) in this depravity. He wrote:

> "Aquino, alleged to have recently retired from an active military role, was long the leader of an Army psychological warfare section which drew on his expertise and personal practices in brainwashing, Satanism, Nazis, homosexual pedophilia and murder."

278. Plaintiff also read a book by Cathy O'Brien titled, "TranceFormation of America." (1995) who openly claimed that Lt. Col. Aquino had used her in government mind control programs and had electroshocked her, accessing her alters at will. She also claimed in print that Lt. Col. Aquino had molested her daughter.

279. In the year 2000, Plaintiff became aware of Noreen Gosch (mother of a kidnap victim named Johnny Gosch) who openly accused Defendant M. Aquino in print of having paid for the kidnapping of her son when he was a child and using him and others in mind control activities in her book titled, "Why Johnny Can't Come Home."(2000) Ms. Gosch testified at the civil hearing of Bonacci v. King in 1999 (4:CV91-3037) on behalf of Paul Bonacci. According to court transcripts, Noreen Gosch testified in court to the following:

> "There was a man by the name of Michael Aquino. He was in the military.  He had top Pentagon clearance. He was a pedophile. He was a Satanist. He's founded the Temple of Set. And he was also a very close friend of Anton LaVey. The two of them were very active in ritualistic sexual abuse. And they deferred funding from this government program to use this experimentation upon children …where they deliberately split off the personalities of these children into multiples so that when they're questioned or put under oath or questioned under lie detector, that unless the operator knows how to question a multiple personality disorder, they turn up with no evidence. They use these kids to sexually compromise politicians or anyone else they wish to have control of…they were taken to be used by professional pedophiles. People that have the money to buy what they want, take the kids wherever they want … and by splitting the children's personalities they could then train each one of the personalities to do a different function. And the rest of the personalities within that host personality would not be aware of it or remember it."

280. This information documents that as of the year 2000, Defendant M. Aquino had been very publicly accused of participating in ritual sexual abuse, mind control/brainwashing, pedophilia, electroshock, and the intentional creation of MPD/DID. Surprisingly, Leslie Packer at one time invited Defendant M. Aquino to write about mind control in SPP. This information provides further evidence as to why Plaintiff was interacting anonymously on the internet and provides overwhelming evidence that many people described Defendant Aquino as very dangerous. In fact, ex-senator John DeCamp inferred that Aquino had expertise with murder.

281. Defendant M. Aquino did not sue John de Camp, Cathy O'Brien or Noreen Gosch for the content of their books, so Plaintiff felt free to refer to this information on the internet. As previously stated, the FMSF specialize in suing therapists who treat MPD/DID, and at this time approximately 80 malpractice cases against therapists have occurred. It appears there were minor violations in some cases but that has little to do with implanting memories of satanic ritual abuse.

282. With every successful settlement, the FMSF has added a new notch on their collective belts, using these recanting clients as more evidence of "false memory syndrome" and proof that SRA does "not exist." The FMSF have inspired lawsuits against therapists under these guises and revealed their principle MO – at that time - to be intimidation, picketing therapists in retaliation who spoke out against them, frivolously suing, and making defamatory statements about their opposition.

283. The following news articles document the FMSF's participation in lawsuits against therapist who treat clients who have alleged satanic victimization. In news article titled, "Dispute Over Grown Children's Memories of Abuse: Therapists Accused of Splitting Families By Planting Ideas," May 12, 1994 (Arizona Republic) the reporter described eight parents and relatives of clients who accused an Arizona therapist of implanting "false memories" of satanic cult involvement. "Parents who were angry, hurt, and baffled complained to a State Board Wednesday that a Scottsdale counseling center planted memories of child abuse and satanic rituals in their grown children."

"Across the country accusations of childhood sexual assault, satanic cults and other bizarre stories have emerged in therapy sessions, often decades after the abuse reportedly happened. In some cases, it has led to arrest and imprisonment. A backlash movement has surfaced in recent years, including the establishment of the False Memory Syndrome Foundation, a nation-wide organization of familiar members affected by such accusations. Some of the parents who spoke Wednesday belonged to the group."

284. In news article titled, "Jury Gives Millions For False Memories," dated August 2, 1995 (Capital Times) the reporter states that client Vynnette Hamanne once believed that she was the "victim of bizarre childhood sexual abuse involving satanic rituals and that she had seen her grandmother stirring a cauldron of dead babies." The jury believed that the therapist "planted false memories" in her mind:

"Attorneys for Hammane… said the verdict thoroughly discredits the repressed memory theory, which says a person can endure repeated abuse and not remember it until years later." R. Christopher Barden was quoted stating, "Plaintiff thinks the effect is a stunning warning to therapist…and to insurance companies in that they had better start obeying the informed consent laws and stop using experimental treatments like recovered memory treatments on patients without their permission...This is a huge warning shot to them."

285. In another article titled, "Ex-patient at County Mental Health Complex Files Claim Woman Contends Therapist Falsely Told her She had Multiple Personalities," dated December 4, 1997 (Milwaukee Journal Sentinel), the reporter writes:

"A Milwaukee County Mental Health complex was accused of falsely convincing a client that she had multiple personalities and was the victim of childhood sexual abuse and satanic ritual" … "The clients experience involved a phenomena known as "False Memory Syndrome."

286. In news article titled, "$200,000 Award in Suit Against Therapist," dated June 24, 1999 (San Francisco Chronicle) the reporter writes that the therapist "brainwashed a client into believing she had been raped by a satanic cult and forced to kill an infant." The news article claimed the therapist "convinced" his client that she had MPD and was a victim

of "satanic abuse as a child." The client's lawyer was quoted as telling jurors that the therapist had violated the standards of care because he ignored literature in the field that cast doubt on Multiple Personality Disorders and on memories of satanic ritual abuse. The literature in the field the lawyer was referring to was undoubtedly disseminated by the FMSF.

287. In news article titled, "Retractor Helps Others Find Answers," dated November 26, 2000 (St. Petersburg Times) the reporter quotes retractor Laura Pasley after she realized that her accusations against her mother was "unfounded." The article states, "Pasley, a retired secretary in the Dallas police department, is the first 'retractor' in the ranks of the False Memory Syndrome Foundation. Hundreds of others have since disavowed their charges. They have lent immense credibility to the foundation's efforts." The reporter describes Dr. Bennett Braun turning in his license to practice psychiatry and Pam Freyd, claiming, "If not for some professionals with credentials who were a driving force behind people like Bennett Braun, this whole fad would never have gone as far as it did."

288. In an editorial titled, "False Memories Have Made Many Families Suffer," dated December 5, 2000 (St. Petersburg Times), written by an accused parent, she writes that when her daughter left therapy, she got better, just like Laura Pasley:

"Your article reminded me of the thanks we owe to the kind folks of the False Memory Syndrome Foundation, all over North America, and, especially, Pamela and Peter Freyd in Philadelphia. You have sustained thousands of us in our years of pain and loss, providing some light in the darkness of our days."

289. In news article titled, "Trances, Satanic Abuse Now a Trial," dated October 19, 2005 (Lancaster New Era), a "false memory" trial was described in which the jury found the psychiatrist at fault for implanting false memories of satanic ritual abuse. The expert witness for the plaintiff, Dr. John Cannell, told the jury that before 1985 MPD was "rare," then in the next day thousands of cases were reported:

"Studies showed that recovered memories, unless independently corroborated, are unreliable and often a fantasy."

290. This is untrue, as several legitimate professionals have stated that repressed memories are no more or less accurate than continuous memories. Cannell stated that the "FBI could find no proof of such acts as women being impregnated and then having their babies killed and eaten." As previously reported, FBI's Ken Lanning did not appear to be qualified to assess these cases, and the government should not be investigating itself. Dr. Cannel also claimed, that it was the psychiatrist who introduced the idea of devil worship to the plaintiff which is very difficult to believe. Obviously, making these types of claims in multiple lawsuits is absurd, yet people are actually succeeding with this manipulative strategy. It was also stated in an October 25, 2005 news article regarding this case that a witness claimed that "satanic abuse was a mental illness urban legend that swept the nation

in the late 1980's and early 1990's." Apparently, based on these types of misstatements, juries across the United States are ruling against mental health professionals.

291. Attorney Zachary Bravos, Skip Simpson and R. Christopher Barden specialize in these types of lawsuits against therapists. However, it appears that in many of these SRA lawsuits the attorneys are using a cookie-cutter recipe and all they have to do is to plug in the name of the therapist and their client. Skip Simpson described how to file an SRA retractor lawsuit in an article, titled, "Causes of Action Against Health Care Providers by Retractors of Abuse Allegations," published in the Shepard's Expert and Scientific Evidence Quarterly, Vol. 2, Fall, 1994, No. 2. Mr. Simpson claimed that a typical retractor case would involve a therapist who "suggests sexual or satanic ritual abuse to a client," whose "vague memories then become clear accusations." Skip Simpson then claimed that some outside stimuli, news reports, magazine articles, television news or talk shows, eventually "awaken" the patient to the likelihood that the treatment had been an "unnecessary sham." He claimed that the parties who can be sued are the "therapist, the supervising therapist, the hospital, any consultant on the case, and any authors of self-help books, like the "Courage to Heal." The FMSF early on decided they did not like the victim advocacy book the Courage to Heal and a number of "false memory" suits have been waged against the authors of this book.

292. Skip Simpson's claim that some "outside stimuli" usually awakens the patient to their plight of having "false memories" was exemplified in a very surprising appellate decision:

In Hall vs. Miller, 36 P.3d 328 (2001) client Martha B. Hall sued her therapist for negligence because, she claimed, during the years of treatment with defendants, they implanted false memories of satanic ritual abuse, causing her present mental illness. The District Court granted summary judgment for the defendants but the appellate court reversed the decision and tolled the statue of limitations based on the date Ms. Hall attended a seminar held by the False Memory Syndrome Foundation and after the foundation told her that her particular therapist had a "reputation" for diagnosing SRA in his clients.

"Sometime in early 1995, Hall read a magazine article which referred to false memories and subsequently, in July 1995, attended a local chapter meeting of the False Memory Syndrome Foundation (FMSF). According to Hall, this was the first time she was told of Miller's reputation for advocating the existence of Satanic cults and the fallacies of Satanic Ritual Abuse therapy."

293. Plaintiff interpreted this statement to mean that the FMSF was keeping track of therapists who treated SRA multiples. As in many of these cases, Ms. Hall also alleged something spectacularly unlikely and attributed it to her therapist. Ms. Hall alleged that her therapist told her she was "impregnated by an alien." Plaintiff find this very difficult to believe. If this statement came from anyone, it probably came from Ms. Hall. Martha Hall's new psychiatrist, Dr. C. Raymond Lake was referred to her by Howard Fishman (Howard Fishman worked for the FMSF) after Ms. Hall requested a "mental health check-up." Dr. Lake wrote to the court:

"At that initial visit, it was my opinion that she was not aware of the potential
iatrogenic and destructive nature of the diagnoses and subsequent treatment advice
given her by Darrell Miller."

294.  Plaintiff believes it is possible that Dr. Lake suggested to Ms. Hall that the
treatment she had received was "destructive."

"Over the course of subsequent visits (July 26, 1995 and August 8, 1995) Martha Hall
began to gradually accept the causal link between her overall deterioration in function
and the treatment she received from Darrell Miller."

295.  Plaintiff believes it is possible that Dr. Lake suggested this "causal link" to Ms.
Hall. It is to be expected that clients this ill would decompensate during therapy. Dr. Lake
continued:

"I do not believe that Martha Hall possessed sufficient facts or information that
would have led her to believe that her therapist (Miller) was responsible for her
deterioration in function prior to her attendance of the July 1995 FMSF meeting and
her subsequent appointment with me."

296.  The appellate court reversed the lower court's decision, finding that the client
filed her case in a timely manner (from the date of her attendance at the FMSF meeting),
and the therapist settled, apparently due to a lack of funds to continue fighting. In other
words, the FMSF is against the tolling of the statute of limitations in repressed memory
cases (for which there is massive evidence) but is trying to toll the statute of limitations
based on when the client first attended an FMSF conference and was told that their therapist
had implanted a "false memory," (for which there is little evidence other that these types of
lawsuits.)

297. Plaintiff believes that this type of legal precedent has to be contested because it
makes it too easy for an actual member of a satanic cult to disclose to a therapist about their
victimization, and then claim that after they attended a seminar by the FMSF that they
realized they had "false memories," and receive millions of dollars. Plaintiff would be quite
concerned if that was in fact what was occurring and believes making a parallel to
automobile insurance fraud "sting" operations, illustrates the issues:

[a] One or more persons plan to stage a car accident (one or more actual or purposely
planted MPD clients enter therapy with a known expert in SRA and tell their therapist, with
or without conscious ulterior motives, that they were victimized by a satanic cult).

[b] The car crash victim, after their "accident," discovers "severe injuries" (the client
attends a lecture about "false memories," and they "learn" that abusive satanic cults "do not
exist.")

[ c] The car crash victim is then sent to a medical doctor in on the scheme (a psychiatrist is referred by someone associated with the false memory defense – which is what appears to have occurred in the Hall case - who doesn't "believe" MPD or satanic ritual abuse exists. The new treating professional then gives the client another diagnosis, such as "depression," then provides a written statement concluding the prior therapist "injured" the patient).

[d] An attorney aligned with the automobile insurance fraud takes the case to court, or negotiates an extremely large monetary settlement with the automobile insurance companies (an attorney associated with the "false memory defense" takes the case to court or negotiates an extremely large monetary settlement with the malpractice insurance company, sometimes in the millions of dollars).

298. However, several other lawsuits have had successful outcomes for therapists even though their clients recanted their disclosures of satanic activity. They are: Jones v. Lurie, 32 S.W. 3d 737 (2002); Bloom v. Braun, et al. 739 N.E. 2d 925 (2002); Althaus v. Cohen (2000) Pa. LEXIS 2017;  Diane Colwell v. Heather H.F. Mechanic, MFCC, Kevin Connors,  MFCC, Shelby J. Thorpe, PHD, Advanced Psychological Health Center Of North County Case No. N70214 (1999, San Diego, California);  Green v. Charter Pines Hospital, Wallace, Timmons, et al., No. 96-CVS-5235 (1998);  Charter Peachford Behavior Health System, et al. v. Kohout, 504 S.E. 2d 514, 1998 Ga. App. LEXIS 995.

299. In 1998 Plaintiff discovered that several therapists, psychiatrists, and an administrator in Houston, Texas had been indicted by prosecutors in a Federal case alleging "mail fraud" and "insurance fraud" in the case United States vs. Judith A. Petesron, Ph.D, et al. (Crim. No. H97 237.) These mental health professionals were being charged with mail fraud for sending insurance bills through the mail with the diagnosis of DID/MPD. It was claimed that because satanic ritual abuse was included in the context of the diagnosis it was indicative of negligent and criminal behavior by the therapists.

300. Due to Plaintiff's research, and based on the background which has been provided in this lawsuit, she was very worried about this indictment brought by the federal government against a group of therapists, psychiatrists, and administrators, who faced prison time for their diagnosis of MPD/DID within the context of satanic abuse. Claims such as this should have been filed in a civil court room, not a criminal court. If the federal government had succeeded in successfully prosecuting these therapists, it would have set a dangerous precedent, potentially sending any therapist who treated SRA to prison under the guise of "mail fraud" for diagnosing MPD/DID, and sending the bill to the insurance company via the postal system. Plaintiff believed this was even more concerning since some branches of the government had been accused of attempting to purposely create MPD/DID via mind control and it appeared this might be an effort by the Federal government to shut the topic down.

301. Because of these concerns, Plaintiff decided to work full time on behalf of the

defense behind the scenes after she quit her job at CPS in 1996. She began working part-time as a Visitation Supervisor for Family Court and devoted the rest of her time to research. Plaintiff published a web page on Tripod Free Web Pages about this case and published her hand-picked appellate and news documentation which proved satanic cult criminal existed. Plaintiff included Michael Aquino's appellate documentation and described his case in brief.

302.  Plaintiff also published 75 abstracts from MEDLINE about MPD/DID proving it existed. She then suggested to one of the indicted therapists to arrange with another activist to publicly write about the testimony on behalf of the defense on another web page because Plaintiff suspected the FMSF would be covering this trial from the perspective of the prosecution which turned out to be correct. The FMSF's coverage could be found at their website: fmsfonline.org

303.  In the July/August 1998 issue of Treating Abuse Today it was reported that the government's expert witnesses were going to be FMSF Advisory Board member and Defendant Elizabeth Loftus, Richard Ofshe, and FBI's Kenneth Lanning. Fortunately, the Federal government dismissed the Peterson case due to jury misconduct and reported they would not be refiling the charges. Meanwhile, Plaintiff posted message to the internet on behalf of other professionals (under Plaintiff's pseudonym) because they were too afraid to do it under their own names.

304.  On October 21, 1998, during this federal prosecution, Plaintiff was emailed by attorney R. Christopher Barden, Ph.D. who had a formidable reputation as one of the premier attorneys filing "false memory" SRA malpractice lawsuits in the United States and who was making legal commentary about this Federal prosecution on the FMSF's website at FMSFonline.org on behalf of the prosecution. Barden accused Plaintiff of defamation for responding to the following sentence in the way that she did.

305.  In reply to anonymous persons claim: "The FMSF does not provide legal defense to the accused." Plaintiff wrote: "They provide names of attny.s, etc. Read my lips. The FMSF provides legal defense to the accused when members of their board testify for the accused. They also have attorney's who are obviously working for them and providing bogus defenses around the country based on the FMSF pseudoscience. Christopher Barden is one of them."

306.  Barden wrote to Plaintiff, claiming these statements were "libelous," and he gave Plaintiff ten days to respond and apologize, inferring he knew Plaintiff's identity and was going to sue her. Plaintiff replied on October 22, 1998 suggesting that if Mr. Barden did not like what she wrote, perhaps it would be more appropriate to respond to her on the web site in question, instead of threatening to sue her. Plaintiff informed Mr. Barden that not only would she not be apologizing but she would make his frivolous lawsuit threat public as she thought his threat was meant to encumber her resources or intimidate her from covering the Peterson case on behalf of the defense. Plaintiff believed she was making truthful statements about Dr. Barden and the FMSF.

307. Immediately after this exchange, Plaintiff published a web page titled, "Christopher Barden's SLAPP Suit Homepage" and humorously pointed out that even though Dr. Barden was denying that he worked for the FMSF, he was in fact the legal analyst covering the Peterson case on the FMSF's own web page during the Peterson trial. Plaintiff never heard from Mr. Barden again. Plaintiff also posted a link to the relevant law about Strategic Lawsuits Against Public Participation and published a favorable court ruling on behalf of therapist David Calof against Barden on this web page. Barden was attempting to subpoena Mr. Calof in a case in which he was peripherally involved in alleged attempts to harass him. Plaintiff also posted a news article, dated August 20, 1998 titled, "Jurors Believe Therapists," from the Charlotte Observer about a multi-million dollar lawsuit that Barden had just lost in his efforts to sue a therapist for "implanting "false memories in his clients who had once believed that she had been molested by her father and satanic cult members. The news story read, in part:

> "The verdict marked the first loss of its kind for Christopher Barden, a Utah based psychologist and lawyer. He has traveled the country suing therapists he accuses of subjecting patients to dangerous repressed memory techniques. He says such therapies, which claim to retrieve forgotten sexual abuse memories from deep inside the mind, are 'junk science.' …and says he has participated in 22 or 23 similar cases."

308. After Plaintiff's web page was published, Plaintiff received many emails from high-profile academics congratulating Plaintiff for not being intimidated by attorney Barden. Plaintiff believed Barden did not want anyone stating he worked for the FMSF because these attorneys who were suing therapists for "implanting" false memories of satanic cult involvement did not want to be accused of participating in a conspiracy.

309. During 1999, Plaintiff was writing on the Spectral Evidence Discussion group, defending therapists who were being libeled, mocked, and ridiculed by what appeared to be FMSF/satanist - type supporters. For instance, researcher Dr. Van der kolk was routinely referred to as vanderkook which Plaintiff objected to. Plaintiff had discovered that these obnoxious individuals had taken their harassment and libel campaign against their perceived enemies, both therapists and researchers alike, from the newsgroups to this web site. Plaintiff defended these therapists because as a therapy intern knowledgeable about SRA, Plaintiff was soon to join their ranks, and she had sympathy for them. Therefore, in an attempt at solidarity, on January 8, 1999, Plaintiff posted the URL of "Christopher Barden's SLAPP Suit Homepage" to the Spectral Evidence Site. In response, on January 10, 1999, a person writing under the pseudonym "Research Department" gave the web site of the California Stalking Penal Code in reply. This was now the third time Plaintiff had been frivolously accused of stalking – this time for posting a web page that probably embarrassed Barden; however, embarrassing someone is not a crime. Plaintiff then discovered that on the Spectral Evidence site the opposition were using her pseudonym to post libelous messages about targeted therapists which she quickly put an end to.

310. In 1998 Plaintiff decided to publish several more web pages on two separate

web page accounts at another free web posting service Geocities titled, "Wenatchee Sex Ring Case" in anticipation of the expected censorship of one or more of her web sites. Plaintiff discovered that what was referred to as the Wenatchee Sex Ring in Wenatchee Washington was comprised of approximately 20 adults who had been imprisoned after a child sexual abuse investigation and several of these defendants had priors for sexual molestation.

311.    It was earlier mentioned that in 1995 Defendant Hopkins had a "recanting" Wenatchee teenager in her custody in a very unorthodox placement. Plaintiff discovered that Defendant Hopkins was joined in her efforts to overturn the "Wenatchee Sex Ring" defendants by Defendant Loftus, which they succeeded in doing, partly via the assistance of "Project Innocence" at the University of Washington, the University where Defendant Loftus was working at that time. Due to this behavior, Plaintiff published another web page describing the 1998 San Diego Reader article which documented the connections between Defendants Hopkins and Loftus.

312.    During this time period, Defendant Hopkins wrote Plaintiff an email accusing her of being "delusional," she wrote she did not respect "anonymity," and wanted to meet with her. Plaintiff never respond to Hopkins.

313.    The Wenatchee cases were first overturned due to a videotape of a recanting child witness who claimed she had been forced to make false allegations against her perpetrators. This videotape had been made after Roby Roberson (who had been a Wenatchee defendant at one time) took this child from her legal placement to another person's home where she was filmed making her "recantation." The recanting child later told Judge Friel of Wenatchee that Roby Roberson had threatened her and forced her to recant. Judge Friel did not believe her and chose to believe another statement made by her in which she claimed she was forced by the detective on the case to make her accusations.

314. Very soon after this occurred, all of the imprisoned defendants began making the same claims – that the detective in charge of the investigation coerced them into implicating themselves. The Washington appellate courts agreed with Judge Friel, and all of the alleged perpetrators in the Wenatchee Sex ring were released from prison and the City of Wenatchee was subsequently sued.  Due to Plaintiff's history at CPS, and her understanding of the MO of perpetrators, this activity was an immediate red flag to her, so she contacted Wenatchee law enforcement and decided to investigate the situation for herself. At that time, Plaintiff discovered that she had the only web page on the internet in favor of the prosecution. Plaintiff defended law enforcement on the case because they were under repeated attack on the Witchhunt egroups list and in the newspapers. Plaintiff posted correspondence from the prosecuting attorney Gary Risen to a Congressman Ungerect explaining why these cases had been filed and the evidence which supported the filings. Plaintiff also posted a "Fact Sheet on the Wenatchee Child Sexual Abuse Cases" which was obtained from the prosecutor Gary Riesen.

315.  In 1998, Plaintiff published another web page titled, "Carol Hopkins and the Justice Committee," which highlighted Defendant Hopkins' 1991-92 San Diego Grand Jury report, the news article which mentioned Hopkins affair with Attorney General representative in San Diego, Gary Schons, and a few newspaper articles written by Defendant Sauer. Plaintiff made a brief comment about Defendant Sauer on these web pages, writing that:

"In my opinion, Hopkins, Sauer, and Okerblom misreported on and gave a one-sided portrayal of ritual abuse for the county of San Diego nonstop for approximately six years, and they are still doing it. CPS can be a very political organization, and due to the negative publicity, they backed away from openly training in this area for a short time even though they internally acknowledged the crimes and still continued to deal with these cases."

316.  Plaintiff also published a deposition of Defendant Loftus in which she appeared to unfairly describe a therapy encounter between an alleged victim on the Wenatchee case and her therapist. The title of this web page was "Elizabeth Loftus' Deposition on Wenatchee." Given that Plaintiff had a web page defending mental health professions during the Peterson federal prosecution; because the FMSF/Pam Freyd were actively involved in both online coverage of the case on behalf of the prosecution; because of Plaintiff's Satanism and Ritual abuse archive which proved satanic ritual abuse, a crime which the FMSF denied the existence of; because of the anticipated participation of FMSF Advisory board members Defendant Dr. Elizabeth Loftus and Richard Ofshe in this Federal prosecution against these therapists; because Plaintiff published a satirical web page about attorney Christopher Barden; and because Plaintiff published information about Defendant Hopkins, Loftus and the Wenatchee Sex ring, this provides ample evidence of motive as to why these individuals might want to see Plaintiff identified and censored by any means necessary. Defendant Loftus apparently does not believe satanic ritual abuse exists either, along with Hopkins, because she has testified for the defense on several alleged ritual abuse cases.

317.  In addition, Plaintiff published a web page titled, "Dr. Nancy Alvarado from UCSD" and sci.psychology.psychotherapy" on a completely different free web site describing the disgraceful behavior of the "Doctors" in SPP along with links to the relevant messages. Plaintiff published another web page titled, "Aquino v. Electriciti – Harassment by Dr. Michael Aquino from the Temple of Set and his Internet Censorship" in an overview of the censorship she was experiencing by Defendant Aquino and others, By that time (1998) Defendant Aquino, and his supporters, had a long history of attempting to seek her identity and violate Plaintiff's First Amendment rights to free speech. In summary, as of 1999:

a) In 1995 Defendant Aquino or his Temple of Set supporters had complained to AOL administrators to deny Plaintiff access to the newsgroup alt.satanism after posting a few news articles and appellate documents. Her access to this newsgroup was then denied.

b) In 1996 after Plaintiff was forced to use an anonymous service which was located in Finland. Aquino wrote (or the TOS did, on his behalf) a message to Julf Helsingus, the owner of the anonymous server in Finland, complaining about Plaintiff's messages and asked them for Plaintiff's identity and to cancel her account.

c) In 1997, Defendant Aquino sued internet company Electriciti in 1997, falsely alleging that Plaintiff was writing defamatory messages and "threatening" him, in efforts to force the owner of Electriciti to cancel her account and reveal her name to him. During this lawsuit, Defendant Aquino went so far as to attach a list to the court as an exhibit, summarizing these alleged messages but without any of the full messages attached as evidence that they had ever been written.

d) Defendant Aquino's supporter (John Price) cancelled several open messages to the internet that Plaintiff had written specifically about Aquino and her accounts kept getting cancelled by Aquino's associate John Price which he was caught for.

e) In approximately 1998, according to a representative of Tripod, Defendant Aquino threatening that he would sue them if Plaintiff's web page about him was not taken down. Tripod proceeded to take Plaintiffs web page down but agreed to repost it if Plaintiff agreed to take off all mention of Defendant Aquino's name from these web pages which she did except for the reference to him in her archive.

f) On approximately May 23, 2000, all of Plaintiffs web pages on Tripod and Geocities were taken down from the internet based on frivolous claims.

318. It should be noted that a colleague downloaded all of these web pages on May 15, 2000, a full 4 months before Defendant Sauer wrote a defamatory article about Plaintiff, invading her privacy by revealing her name and justifying that action by falsely claiming that she was "harassing" people on the internet. This body of evidence will prove that there was no libel occurring on any of Plaintiff's web pages as sources and documents are cited for most all of the claims. Instead, Plaintiff was participating in a political debate on a public forum which she had every right to do.

319. In 1999, Plaintiff wrote to an e-group yahoo list called WITCHHUNT under the pseudonym of "Karen Jones." One could both access this list via their web page and read and post messages and/or receive email messages from this list. WITCHHUNT was comprised of a heavily biased group of individuals who claimed to be "falsely" accused of child abuse, who hated social services, and who believed that the imprisoned Wenatchee Sex Ring defendants were innocent. Representatives of Victims of Child Abuse Laws [VOCAL] such as Defendant Lesley Wimberly posted messages there as well as an alleged Wenatchee offender Pastor Roby Roberson. Plaintiff provided information about the other side of the Wenatchee case, child protection services matters and was consequently verbally attacked by members of this group. Several of Plaintiff's colleagues refused to write on this list because they considered it to be too toxic of an experience but due to Plaintiff's

background in child investigations Plaintiff was used to dealing with people who claimed to be "falsely" accused of child abuse.

320. Meanwhile, in 1999, John Price, Defendant M. Aquino and others accused yet another person of being Plaintiff. They attempted to make Plaintiff feel guilty about these misidentifications by writing messages such as: "If you gave us your real name, we wouldn't be bothering these other people." This time they had decided that Plaintiff was a "Karen Jones" from SDSU even though Plaintiff said she was posting under a pseudonym. They wrote up a report, publicizing "Karen Jones" supervisor's email, along with suggestions to complain to her supervisors. Plaintiff telephoned "Karen Jones" to warn her and advised her to ignore the situation unless their behavior escalated.

321. In 1999, to Plaintiff's great surprise, Plaintiff was contacted by a concerned citizen from Cuernavaca, Mexico who told Plaintiff that Defendant Hopkins had moved to that town and she had embroiled herself in a high-profile child sexual molestation case on behalf of the defense. Plaintiff was told that children and parents had been threatened and the contact thought Defendant Hopkins' behavior was inappropriate. She had taken the information from Plaintiff's web page about Defendant Hopkins and used that information to rebut Defendant Hopkins in the local newspaper, The Cuernavaca Lookout. Plaintiff accessed the news articles from Cuernavaca and discovered that the URL (web address) of her web page was indeed cited as a source of information about Defendant Hopkins.

322. Plaintiff read the two articles in question from the Cuernavaca Lookout and discovered that Defendant Hopkins had referred to herself as an "international expert on child sexual molest," and she claimed that Judy Johnson (deceased) of the McMartin child abuse case had continually claimed that her son was abused by "aliens." Plaintiff believed that this was a false allegation and believed it was unfair to belittle Ms. Johnson's concerns about her son's potential child abuse, especially so because Ms. Johnson was deceased and could not defend herself. Because she knew Hopkins was reading the Witchhunt egroups list, Plaintiff confronted her about this false statement and requested the source of her comments about "aliens." Plaintiff was then sent the URL of Defendant Hopkins public web page by a colleague in which Hopkins publicized her Bed and Breakfast Inn in Cuernavaca, Mexico. Plaintiff posted this information to the WITCHHUNT list as well and enquired whether anyone knew Defendant Hopkins was in Mexico. Plaintiff was then accused by Defendant Hopkins and others of "stalking," specifically, on August 17, 2000, by Greg Clark of the WITCHHUNT list. He wrote:

"As for cyberstalking Carol Hopkins, what do you call posting that she was there and how to find her? Wouldn't it follow that if she wanted to just get out of Dodge for awhile who the hell are you to tell everyone where she is? That qualifies as cyberstalking if I ever heard it."

323. This was the fourth time Plaintiff had been frivolously accused of stalking – this time for being informed of where Defendant Hopkins had moved by a local citizen in her community who didn't like her and reposting the content of her web page to another

forum. One can tell by the pattern of these false allegations that these people did not have much credibility when describing the details about child abuse investigations to Plaintiff.

324.  On February 26, 1999, Plaintiff received an email at Plaintiff's curiojones3@hotmail.com account from Defendant and apparent satanist Michelle Devereaux, who used the pseudonym of "cyberlurker@justicemail.com." A person named "lurker" had been writing on the Spectral Evidence Web site and she wondered if this was her/him. Plaintiff did not know "cyberlurkers" identity at the time but discovered it later. She blamed Plaintiff for writing a message on the Spectral Evidence Site which accidentally publicized her "friend" Karen K's name and address. This message had first appeared on the Witchhunt list and Chuck Noah and others were speculating about whether Karen K. was the Plaintiff. (Chuck Noah was the FMSF harasser of David Calof). The Plaintiff thought she would stop this line of questioning immediately when these claims appeared on the Spectral Evidence web site and reposted the message in question along with her reply that Karen K. was definitely not the Plaintiff, as she was obviously in Washington State and the Plaintiff lived in San Diego. Since Plaintiff's IP addresses in email already reflected that fact which anyone could discover, she saw no harm in stating that.  Plaintiff had thought the address which was posted on the WITCHHUNT list was the public address of SOPHIE, Karen K's newsletter, and she had no intent to harm her.

325.  In this message, "CyberLurker" or Defendant Devereaux told Plaintiff that Karen K's house had recently been burnt down due to a fire and she blamed this on Plaintiff due to the message she had reposted and the unfortunate misidentification of Karen K. as Plaintiff by Chuck Noah and others. Cyberlurker asked Plaintiff how many other people were going to be misidentified as her and she wrote that because of it, Plaintiff had "blood on my hands." Plaintiff told her it was not her fault and due to her escalating behavior, on March 3, 1999, Plaintiff asked cyberlurker not to write to her anymore. Cyberlurker responded on March 3, 1999, claiming she understood. [Exhibit 5]

326.  Plaintiff logged onto Devereaux's web site but tried to make it brief because she had heard about internet software called Spyware. If someone accesses a web page who has Spyware, information about the user was given after which they could access the person's home computer. Because of that, Plaintiff was careful about all web pages she accessed. Defendant Devereaux was at that time the "Technical Advisor" of the Witchhunt egroups list and Plaintiff later wondered if she had been hired to monitor people who logged onto that web page.

327.  On March 17, 1999, a woman by the name of Eileen King (ACAADC@aol.com), a regular poster on the WITCHHUNT list, forwarded a message to Plaintiff by John Price which had been posted on this list entitled, "Curiophilia." Price took the opportunity to claim Plaintiff routinely "libeled" others and was a "stalker" for this list (now the fifth person to frivolously make this false allegation) and wrote that "a few folk have been looking" for her real identity. He claimed that he had a file in his FTP site under ftp://ftp.calweb.com/user/j/jmprice/wh/curio-philes.txt about Plaintiff. In other words these individuals wanted Plaintiff's real identity very badly and were using false allegations of

"libel" and "stalking" in order to discredit her and to make it appear that their search was justified when Plaintiff wrote to new groups. Instead, it was later discovered that these people were stalking the Plaintiff.

328. On September 25, 1999 Defendant Devereaux sent Plaintiff an email to her curiojones 3@hotmail.com account again, using the email address Cyber4n6@hotmail.com even though Plaintiff had asked her not to write to her again. Cyberforensics claimed that she had attended a computer conference in San Diego and had "stumbled" upon Plaintiff's computer trail, meaning she had traced the computers Plaintiff was posting from and looked up information about her accounts on the computer. At that time Plaintiff had about 10 different email accounts. Defendant Devereaux claimed that an extremely "volatile" woman had contacted her who demanded that she turn all correspondence regarding Plaintiff over to her and then she became "threatening." Cyberforensics also claimed to have "met" Plaintiff in person. (During that weekend an unusually talkative overweight brunette had spoken to Plaintiff and she took notice of this talkative woman and so assumed that woman might have been her.) Defendant Devereaux again mentioned the fire at Karen Kennedy's house and did her best to make herself sound legitimate, stating she sometimes assisted law enforcement in investigating computer crime. She stated that Karen K's case was now an open arson investigation and she referred Plaintiff to the arson investigator Charlie Andrews. Defendant Devereaux claimed she had been "brought into the investigation" because she knew Karen K. and wrote that the FMSF and Chuck Noah had been investigated in regard to the fire. She claimed that she told Mr. Andrews that other people who had been identified as the Plaintiff had likewise been harassed and that afterwards this information was passed on to the "Feds." "Cyberforensics" claimed that Plaintiff should really be posting in stealth mode (because of people looking for her identity), and gave Plaintiff tips about how to stay anonymous.

329. Plaintiff replied to Cyberforensics on September 27, 1999 asking her if she was really "cyberlurker" (who Plaintiff had asked not to contact her again) but Cyberforensics said she wouldn't "cop to it." She suggested that the incident about the fire at Karen K's case be added to Plaintiff's "stalking" web page describing Defendant Aquino's actions against her. Defendant Devereaux suggested that Plaintiff call the Washington State arson investigator, Charlie Andrews, to verify her claims. She wrote that she was "paranoid, having spoken to the "majority of the folks… who have been giving you grief." Plaintiff thanked her for her advice about how to stay more anonymous. Defendant Devereaux suggested that she not post from SDSU anymore. Defendant Devereaux stated she became "alarmed" at finding Plaintiff's computer trail. Defendant Devereaux inferred that some people had tried to engage her in their efforts to find the Plaintiff but that she wasn't convinced of anything other than they didn't "have a life" since the Plaintiff wasn't doing anything illegal. Defendant Devereaux promised she wouldn't be attempting to seek the Plaintiff's identity. Defendant Devereaux claimed to be treading in "dangerous" territory because she didn't know what lengths these folks might go to. She claimed "they" had gotten to Kevin, apparently referring to Kevin F.

330. Plaintiff spoke to Renton, Washington arson investigator Charlie Andrews who confirmed that Karen K. house was considered to be arson and he had spoken to "lurker," or Michelle Deveereaux. Plaintiff didn't know whether or not Defendant Devereaux had ingratiated herself with this arson investigator for ulterior motives or if she was legitimate. He stated Defendant Devereaux had given him a statement saying she believed that the Plaintiff was being stalked and she thought Karen Kennedy's house was intentionally torched. Unfortunately during numerous conversations with Charlie Andrews, he has told the Plaintiff that he cannot release Michelle Devereaux's statement without a subpoena, due to policy restrictions. But Plaintiff suspected Defendant Devereaux wanted Plaintiff to divulge her real name to him after which she was probably going to turn on her and access her name. As a result, Plaintiff always communicated with law enforcement and Mr. Andrews under her pseudonym, until years later.

331. In public, Defendant Devereaux was trying to appear as a "retractor" - the people the FMSF use as proof that satanic ritual abuse does not occur. In public Devereaux inferred that her therapist implanted false memories of cult involvement along with her MPD/DID diagnosis, but in private she confessed to being a victim of satanic ritual abuse and an MPD/DID.

332. On October 10, 1999, "CyberForensics" wrote to Plaintiff's curiojones3@hotmail.com account, forwarding her a message that she had posted to the Witchhunt egroups list. She used her name, Michelle Devereaux in the message and pointed to her web site - http://www.stobsidian.com/TheAdept - which proved that "CyberForensics" or Cyber4n6@hotmail.com was actually Defendant Michelle Devereaux.

333. On October 15, 1999, Cyberforensics (Defendant Michelle Devereaux) wrote to Plaintiff telling her that someone was aware that they had been corresponding and had demanded that she turn all correspondence between Plaintiff and her over to them. Plaintiff claimed to be alarmed and that this person might be traveling to the San Diego area on Monday. She suggested that she and Plaintiff "meet" so she could fill Plaintiff in on what was going on. She had pictures and a "story to tell." She claimed that her goal in telling the Plaintiff all this was to keep her "safe." Plaintiff wrote her back, telling her she didn't think they should physically meet because the "bad" people might follow her.

334. Instead, Defendant Devereaux and Plaintiff arranged to have a private message chat on October 20, 1999. [Exhibit 6]. Ms. Devereaux wrote under the name of "lurker." Although the Plaintiff found it very difficult to believe she was sincere and was trying to assist her, she still went out of her way to be kind to Defendant Devereaux. Devereaux claimed that one of the people who was interested in locating Plaintiff's identity had mentioned "blood," which was triggering for her, and she admitted to being diagnosed MPD/DID. She claimed that law enforcement she had contacted asked her to "not to break off communication" with the people who were looking for Plaintiff, but she was worried that she had put the Plaintiff "in danger," by handing over all of her communications to them. She mentioned she had not "lost time," so she did not think anyone had accessed her, when Plaintiff asked. "Lost time" is a common symptom of MPD/DID's. Devereaux

claimed that she was worried because she had potentially put Plaintiff in danger and that she was glad Plaintiff said "no" to meeting her because "they" might have followed her. Defendant Devereaux wrote in response to Plaintiff telling her she was sorry she was in this position:

> "I just wanted to make sure you are safe. You REALLY do need to be careful 'cuz these people are very dangerous indeed, and very serious."

335. When Plaintiff asked Defendant Devereaux if anyone had actually said they were going to hurt her, Defendant Devereaux (under Lurker) wrote:

> "There are at least 2 people, that I know of who have mentioned physical harm. One [sic] here in SF, the other up north."

336. This Instant Message Chat (that Defendant Devereaux had originally told the Plaintiff was private) was then posted to a group that was set up to harass and mock the Plaintiff by a friend of Defendant Devereaux's, named William Scherk at: http://members.dencity.com/curiojones/transcript.html. He had posted the Message Chat and had listed the name "Curio" on the left and "Lurker" on the right. William Scherk had sent a message to Plaintiff's email on December 18, 1999 with the invitation to join the curiojones group, a "fan" site which had "pictures," and as a place "we can celebrate Karen." His way of "celebrating" Plaintiff was to post various "spoofs" about her, stating that she was a "vigilante," "demented" and connected to "quack" therapists.

337. Defendant Devereaux had deleted some of the information she supplied about Michael Aquino or "Mr. A" from the Instant Message Chat, such as she was born in South Korea on a military base known for Mind control and that's how she knew Mr. "A," and about a researcher in Washington state who was looking for Plaintiff's identity. The Plaintiff thought that might possibly refer to Defendant Dr. Elizabeth Loftus from the University of Washington who was actively trying to overturn the convictions of the Wenatchee Sex Ring at the same time Plaintiff had a web page in favor of the prosecution.

338. Defendant Devereaux and Plaintiff decided to set up a private email account at city2city.com. Her email was TrinitySDream@city2city.com (which she signed as "Tess") and Plaintiff's email was kjamson@city2city.com. In her first message dated October 17, 1999 from this account Trinity (Defendant Devereaux) again responded to Plaintiff's comment in the Instant Message Chat to be careful because Mr. A, or Defendant Michael Aquino might access one of her alters. Defendant Devereaux wrote back stating she found her apartment door unlocked and a cab was waiting for her recently but she had no memory of ever calling them. Plaintiff interpreted this to mean that Defendant Devereaux thought one of her alters might have done this.

339. On October 18, 1999, Trinity (Defendant Devereaux) wrote "Proper authorities have been alerted" in response to Plaintiff's concerns that Devereaux told her dangerous people were looking for her real identify.

340. On October 19, 1999, Defendant Devereaux responded to Plaintiff's request for information about cults. Plaintiff believes this following message proves that Defendant Devereaux acknowledged knowing about cults and death ceremonies, first hand. Devereaux kept fishing for information about the Plaintiff but she didn't give her any, and the Plaintiff denied ever having physically met Deveraux. Devereaux wrote:

"I know quite a bit about this, including the 'cult' alter stuff. She said she used to live in the country…:It really sucked, cuz it turned out my neighbors were actively involved in the cult and were performing ritual magic … Also have a writing from an incident that occurred (back then) it's in poem form, but has to do with a 'ritual death ceremony'. You may also wish to do a search for a document called, 'Rite of the Ghoul'" …"I do seem to recall, at the time of reading that it appeared quite accurate indeed."

341. On October 21, 1999, Plaintiff wrote in response to Defendant Devereaux's request to learn about how she knew about issues such as MPD or SRA. She wrote, "I, of course, know about it first hand," which Plaintiff interpreted to mean again that Defendant Devereaux was MPD and a victim of SRA.

342. On October 21, 1999, Defendant Devereaux again claimed to have met the Plaintiff and wrote that she had gone to "great lengths to protect" her, and again, when the "folk who are interested" in the Plaintiff had been trying to get Defendant Devereaux to ally with them, she wanted to break off contact, but "Don" from the DOJ asked her not to. Defendant Devereaux wrote that she wanted the Plaintiff to contact her by <u>telephone</u> but Plaintiff refused.

343. On October 21, 1999, in response to Defendant Devereaux's request to call her on the telephone, the Plaintiff wrote her a reply in the negative, saying she was very leary of "phone stuff" and Defendant Devereaux's MPD status. Defendant Devereaux wrote back, suggesting that she could use a "voice converter," which Plaintiff declined to do because she had no interest in making telephone contact with Defendant Devereaux.

344. On October 21, 1999, Defendant Devereaux wrote that other people were going to "turn the heat on her" because the Plaintiff continued to write messages on the internet in clear attempts to intimidate Plaintiff from exercising her First amendment rights to free speech. The Plaintiff wrote back on October 22, 1999 telling Defendant Devereaux that she had a perfect right to write messages to the internet and would not stop posting. In fact, Plaintiff wrote, "so what if they planned to hurt me" (because Plaintiff was feeling depressed), and to tell "them" that Plaintiff carried a gun. [Exhibit 7] Although it is true Plaintiff had a gun in her home for ten years, due to the volatile nature of her job description, she never carried it on her person. The Plaintiff merely wrote this as a preventative measure to stop any possible violence directed towards her. At best, Plaintiff thought Defendant Devereaux was a MPD/DID who had different alters with contrary motivations. The Plaintiff continued to maintain contact with Defendant Devereaux in case

she gave the Plaintiff any information of import about potential physical harm that might come to Plaintiff so Plaintiff could notify law enforcement herself.

345. On Oct 22, 1999, Defendant Devereaux wrote in response to the Plaintiff's statement, "who cares if someone hurts me" :

> "Well, actually, I do. I care very much as does Don. He thinks I may have stumbled onto something big. That's why he's checking it out."

346. Plaintiff read three messages by Defendant Michelle Devereaux's which were posted on the WITCHHUNT list which concerned her. On October 13, 1999, in message No. 4237, Defendant Michelle Devereaux claimed that she had been suicidal for nine years because she thought she had been responsible for "killing infants," and apparently her son was placed in foster care by social services after she too had been "falsely accused." She wrote her son was taken away because of her "illness." On October 13, 1999, in message No. 4219, Defendant Devereaux wrote that she thought those diagnosed with MPD should take responsibility for their actions. She claimed to have been in therapy and was at times worried that even her best friend could be an "infiltrator from the cult." She acknowledged that pictures could be triggers (causing an MPD to switch). Defendant Devereaux claimed her parents died with the mistaken knowledge she believed they were satanists and she was "cruel" to them.   On October 14, 1999, in message No. 4258, Defendant Devereaux  wrote that she "used" to believe her parents were Satanists.

347. On October 22, 1999, Plaintiff wrote a message to Defendant Devereaux via their city2city email account confronting her because Plaintiff had read a message by William Sherk claiming that someone had made personal contact with Plaintiff at SDSU. He wrote about a "Halloween Surprise" that they were planning for Plaintiff.  Defendant Devereaux replied on October 22, 1999 claiming that other people might have intercepted email between she and Plaintiff. Defendant Devereaux reiterated the history of her involvement with Plaintiff, about her contacting her LE (law enforcement ) friends when she realized Plaintiff might be "on to something." She claimed she was keeping "Don" (of the DOJ) up to date "wrt these people," she claimed to have told him she was "worried about" Plaintiff and she was contacting the "local DOJ guy as recently as this morning."

348. On October 31, 1999, (Halloween) Plaintiff was sitting at the San Diego State Computer lab, reading a message sent to her by Defendant Devereaux from her city2city account about the "Halloween Surprise." Defendant Devereaux had written in this message, dated October 30, 1999, that she knew what the "Halloween Surprise" was. People were just going to "dress up," and that was just another way to "yank" Plaintiffs chain. Defendant Devereaux claimed she had not given anyone Plaintiff's identity, she had no ill will towards the Plaintiff, and no desire to place the Plaintiff in "harms way." To Plaintiff's surprise, Defendant Michelle Devereaux sat down beside her at San Diego State University Computer Lab while she was reading this message. The Plaintiff quickly ascertained that this was Defendant Devereaux and asked her why she was following the Plaintiff. At that time, although it was clear Plaintiff lived in San Diego, it appeared (at the time) nobody was

aware of her name or, more importantly, nobody could prove Plaintiff's identity as "Curio." The Plaintiff later assumed that Defendant Devereaux's appearance next to her in San Diego was the intended "Halloween Surprise." Satanists often stage activities around symbolic dates such as Halloween.

349. While sitting at the computer Defendant Devereaux said that Defendant M. Aquino wanted her to find Plaintiff and discover who she was. Defendant Devereaux stated she personally thought trying to find the Plaintiff was a "game" which she enjoyed because she thought the Plaintiff had an amusing personality, but Defendant Devereaux stated, she was still going to inform the police about these other people. The Plaintiff told Defendant Devereaux she wasn't going to respond to her and left the computer lab. This incident caused Plaintiff significant emotional distress because she thought she might be killed now that she had been identified.

350. On November 2, 1999, someone writing under the pseudonym toomuchsparetime@hotmail.com, which Plaintiff suspected was Defendant Devereaux, wrote a song to be sung to the Beverley Hillbillies to the Witchhunt list. It read, in part:

> "Pretty soon a lurker -- joined in the game,
>   Had a close encounter – figured out her name,
>   Even took some pictures—of her auburn locks,
>   And made a note -- of her upside down socks
>   Weird that is…really strange…hookey"

351. On November 6, 1999, Plaintiff wrote a letter from Plaintiff's curiojones3@hotmail.com (and forwarded that message to Plaintiff's kid2curio@hotmail.com account for safekeeping) requesting Defendant Devereaux to physically stay away from her.
Plaintiff copied this message to arson investigator Charlie Andrews.[Exhibit 8]

352. In response, Defendant Devereaux wrote to Plaintiff on November 9, 1999, claiming that the library was "public property." [Exhibit 9] Defendant Devereaux wrote that the fact she and Plaintiff ended up reading their emails together was "purely coincidental." Defendant Devereaux again claimed that the Plaintiff was at fault for posting Karen K's address to the internet, Defendant Devereaux falsely stated that the Witchhunt list was "private." In fact Defendant Devereaux had earlier sent Plaintiff a message about how any member of the public could view the witchhunt list on the open internet without subscribing to it which Plaintiff verified. Defendant Devereaux threatened:

> "Is it true that you are carrying a concealed weapon? I sure hope you
>   have a license to carry. After all I do believe it is still illegal to carry
>   a weapon (concealed or otherwise) on to University grounds in the
>   state of California. I also believe it is illegal to use electronic media
>   to threaten people with such weapons."

353. In this letter, it appeared that Defendant Devereaux was trying to retaliate and threaten Plaintiff because Plaintiff requested Defendant Devereaux to stay physically away from her – for the third time. The Plaintiff continued to write to the Witchhunt list and Defendant Devereaux began writing belligerent letters to Plaintiff and continued to write via their city2city account. The Plaintiff continued to interact with Defendant Devereaux somewhat because Plaintiff still thought of herself as an investigator and believed Defendant Devereaux was giving Plaintiff excellent documentation of a cult "retractor" which is the reason Plaintiff kept copies of all of Defendant Devereaux's manipulative messages.

354. On November 12, 1999, Defendant Devereaux wrote as cyberlurker@hotmail.com to the WITCHHUNT list in message No. 5662, appearing to be jealous of the fact that the International Society for the Study of Dissociation [ISSD] had linked to Plaintiff's archive of SRA cases.

355. On November 12, 1999, Defendant Devereaux wrote to the WITCHHUNT list in message No. 5655, writing as cyberlurker@hotmail.com. Devereaux appeared to be somewhat out of control and wrote that she was a "magician" and bragged that she was an "Ipsissimus." That term refers to a hierarchal system in an occult order. Ipsissimus usually indicates someone who has very advanced status and some degree of Mastery within their occult organization. Defendant Devereaux appeared to be mentally ill and so Plaintiff highly doubted whether she had such a status, but it is possible that someone Defendant Devereaux worked for told her she was an Ipsissumus, for instance, Defendant M. Aquino, who also has such a degree in his Temple of Set, in attempts to seduce Defendant Devereaux to work for them. Devereaux went on trying to spoof information about Manchurian Candidates, writing either that's what she was and that's how she "found" the Plaintiff or that it was because Plaintiff was "really, really STUPID." She declared she was a "Manchurian Candidate Cybergod(dess)! And DAMN I'm GOOD!" Defendant Devereaux then drew what she thought were the connections between David Calof, Plaintiff, Karen K., the ISSD, and others. Ms. Devereaux also claimed to have a "secret."

356. On November 13, 1999, Defendant Devereaux wrote from her "Trinity S Dream" account to Plaintiff at Plaintiff's kjamson@city2city.com account claiming the Plaintiff had made a "weak attempt at trying to threaten" her when the Plaintiff copied the letter requesting her to stay physically away from the Plaintiff to arson investigator Charlie Andrews. Defendant Devereaux continued to try to make Plaintiff feel guilty about posting information about Karen K. to the Spectral Evidence Site, yet again. Defendant Devereaux claimed she has no intentions of disclosing any "alleged pictures" of the Plaintiff or her address, and she continued to claim that law enforcement was "watching" the situation.

357. At an earlier date Greg Clark from the WITCHHUNT egroups list had written a message indicating that he, Michelle Devereaux and Dr. John Price were "friends" of his which inferred that via some common factor, these people were connected. On November 13, 2000, on the WITCHHUNT list, in message No. 5666, Greg Clark wrote that some took photographs of Plaintiff unbeknownst to her:

"For those not following this, the person who exposed Curio will soon do a "What I did On My Summer Vacation" site that will have everything including pictures. It promises to be "quite funny.""

358.   On November 14, 1999, in message No. 5739 on the WITCHUNT list under Cyberlurker@hotmail.com, Defendant Devereaux wrote in response to Plaintiff's public message about Devereaux obsession with Plaintiff, claimed it was Plaintiff's "real life v. internet" behavior that was driving her; she claimed that the Plaintiff had exposed her "children to danger," (Plaintiff had no clue what she was referring to); she claimed that if the Plaintiff "persisted" with "this behavior" that "Federal detectives have been alerted and are ready to act accordingly…Capeche?" Devereaux claimed John Prices organizational heading of "satanic trolls" was a joke that Plaintiff took too seriously. Devereaux claimed Plaintiff's internet behavior was alarming, and Defendant Devereaux threatened to reveal Plaintiff's real life identity. Obviously at this point, Defendant Devereaux was behaving as if she was now both malicious, a Satanist, and mentally ill.

359.   On December 23, 1999, in message No. 7175 on the WITCHHHUNT list, John Price wrote a message claiming that Plaintiff was not "fat" and there were pictures of Plaintiff circulating which he had seen.

360.   On December 30, 1999, in message No. 7361 on the WITCHHUNT list, someone writing under the pseudonym "satanic troll" reposted a message the Plaintiff had written on another forum. The Plaintiff chose that time to write that she believed the FMSF should be investigated for possible insurance fraud which was an opinion that Plaintiff had a right to express.

361.   On January 12, 2000, Defendant Devereaux wrote to Plaintiff under her Trinity S Dream account to Plaintiff's kjamson@city2city.com again, apologizing, she wrote that she was scared, and she claimed she was going to alert law enforcement authorities about "what was going on." The Plaintiff wrote that she felt sorry for Defendant Devereaux (because she thought she was mentally ill) and told Devereaux that she cared about others even when it appeared they were playing games with her. The Plaintiff had given Defendant Devereaux the name of San Francisco Detective Sandra Gallant to go to for protection. Devereaux, in turn, gave Plaintiff the names of the law enforcement officials she was referring to, which included Don Cavender of the DOJ, Dave Hendron of the San Diego Police Department, and FBI's Robert Rolfsen. The Plaintiff phoned them all, under her pseudonym, and they told the Plaintiff that they had heard from Defendant Devereaux but she did not give them any information of value.

362.   On January 13, 2000, Defendant Devereaux forwarded Plaintiff a message Plaintiff had written on the open internet about Defendant Devereaux's behavior and Devereaux responded to Dr. John Price's reply. John Price had written to Plaintiff: "Would you like me to host your photograph if I can get permission from the photographer?"

Devereaux wrote:

> "Both of you are assholes! And NO John. You do not have my permission
> to post Karen's pictures. And if you insist on posting them I am certain
> Detective Rolfsen will be more than happy to explain to you the
> intricacies of internet stalking behavior. By the way, he didn't find those
> little comments you made to me funny, or the fact that you've
> threatened on several occasions to travel to San Diego, as recently as
> two days ago."

363. This continual reference to potential harm to Plaintiff continued to frighten her. On January 16, 2000, Plaintiff wrote to Defendant Devereaux at TrinitySDream@City2City.com from Plaintiff's kjamson@city2city account telling Devereaux that law enforcement said they needed information about a credible threat, not vague generalities. Devereaux replied to the Plaintiff on January 16, 2000 claiming she had filed a report with the FBI on January 14, 2000. Defendant Devereaux gave Plaintiff her pager number so law enforcement could contact her, and then *she attached a photograph of the Plaintiff* which she claimed she had given to law enforcement. Defendant Devereaux forwarded her message from the kjamson@city2city account to Plaintiff's curiojones3@hotmail.com account, and Devereaux's response was "From: "Michelle Devereaux" Michelle.Devereaux@Stobsidian.Com account, (at the top of the email) which proves that Defendant Devereaux received Plaintiff's original message from her TrinitySDream@City2City.com email account, and proves that Trinity S. Dream was in fact Defendant Devereaux.

364. This message proves that Defendant Devereaux was corresponding with Plaintiff under the city2city account where Defendant Devereaux was caught acknowledging cult involvement, having a diagnosis of MPD, and expressing her concern that the Plaintiff would be harmed if others discovered Plaintiff's real identity. Plaintiff presumed that Defendant Devereaux had been corresponding with her under various names in order to try to hide her manipulative game playing so the Plaintiff could not use any of Devereaux's messages against her legally in court, but she made a mistake.

365. In approximately March/April 1999, Plaintiff published a web page documenting her interaction with Defendant Devereaux's titled, "Michelle Devereaux and Internet Stalking." On this web page, Plaintiff gave an overview of her experience of Ms. Devereaux's behavior and noted the threats and many false allegations that were being made against her. For instance, Devereaux's friend and a political adversary of Plaintiff's, William Scott Scherk, alleged that:

> "A Satanic cult truly is after you. They set up a hit, but 'lurker' botched it by
> tipping you off."

366. Another threat by a man named "Peter Hood," a friend of Leslie Packer and Dr. Price's, was documented on this web page. He wrote, in part:

"Hey, fuck off and die. Slowly of course. After we find out your true name and address, and you get to answer certain questions in court."

367. After highlighting several other threatening comments which had been made against her, Plaintiff wrote on her web page:

"What this means is that if anything were to happen to me and a picture of me is actually found in the possession of those named above, I suggest law enforcement thoroughly investigate this. I have documented the above activity, not only for my safety but because therapists are being sued and harassed by the SRA cult multiples that they treat.

368. Plaintiff documented on this web page that Mr. Scherk had falsely alleged that she had posted Scherk's private address on the internet. What actually occurred is that Plaintiff had discovered a message posted by Mr. Sherk on a binaries (photos) newsgroup titled, "Flesh and the Devil," after which he posted his address along with a request to "Write!" Plaintiff reposted this particular message which indicates it was Mr. Scherk who released his address, not the Plaintiff. It should be noted that a friend downloaded a copy of the Devereaux stalking web page on October 4 2000 which means that this information was available to law enforcement and interested others. Plaintiff had posted and publicized overwhelming evidence that some group of people meant to harm her which SDUT reporter Mark Sauer should have been more than aware of.

369. Plaintiff informed the stalking unit of her local District Attorney's office that she was being pursued by a satanic cult to see what they advised. Because Plaintiff communicated with them under a pseudonym, they said they would only take action if Plaintiff revealed her real name. Plaintiff was unwilling to do because she did not believe that law enforcement would be able to protect her from Defendant Aquino.

370. On February 13, 2000, Greg Clark from the WITCHHUNT list, sent Plaintiff a message, threatening her in reply to a message written to him, commenting about a teenager who had been in his custody:

" Keep pushing me, Bitch. The next tap on your shoulder at SDSU might be me. Better look now. I might be standing behind you."

371. On Feb 23, 2000, satanist Defendant Jantsang wrote a response to Plaintiff's request for information about the whereabouts of Defendant M. Aquino due to the fact a colleague of Plaintiff had heard rumors that he had died and had asked Plaintiff to verify if this was true. Jantsang wrote, in part:

"Dr. Aquino has been known to be a collector of occult traditions from many

areas. Currently, Dr. Aquino is traveling around in the former Soviet Union rying to track down old occult traditions. I know this because my uncle, a former general in the KGB, told me so. "

372. The Plaintiff wondered why Defendant Jantsang's "uncle" in the KGB would be interacting with Aquino but was later told that due to Jantsang's "uncles" affiliations with the KGB, Jantsang was instrumental in targeting the Plaintiff with psychotronics and other technology, and that Defendant M. Aquino had been to the Soviet Union to prepare for the eventual assault on Plaintiff.

373. In approximately May/June 2000, Defendant M. Aquino, and it appeared Defendant Devereaux, were successful in finally having Plaintiff's free web pages at Geocities and Tripod censored from the internet, apparently due to several frivolous complaints.

374. At that time, Devereaux was writing messages claiming that Plaintiff had posted a private therapy session of Pat Burgus on her Tripod free web site. In reality, Plaintiff had posted a transcript from a video-documentarian of Pat Burgus's statements in which Burgus gave details about the satanic cult she was allegedly involved with shortly before she sued her psychiatrist, Bennett Braun, for implanting "false memories" of satanic cult involvement. Pat Burgus was also the client of R. Christopher Barden at one time. After most of Plaintiff's web pages were taken down, Defendant Devereaux took all of Plaintiff's appellate documentation and posted it to her web page at stobsidian.com, making it appear as if this work were her own. After Plaintiff complained, Defendant Devereaux quickly took this information down.

375. May 15, 2000, Defendant Lesley Wimberly, one of the leaders of VOCAL wrote message #12760 on the Witchhunt list after Wimberly attempted to defame a well-known Doctor in San Diego. This message indicated that Wimberly was a co-conspirator in efforts to violate Plaintiff's right to privacy and to subject her to defamation and libel.

"PS. Just one word of warning to you: surely you must know that the more you post, the closer we get to finding and identifying you."

376. On May 25, 2000, a message was written in SPP and cross-posted to alt.usenet.kooks by "Kali," (Kali is the name of the Hindu Goddess of death and destruction), aka Kimberly Barnard, a friend of John Price and Defendant Devereaux, describing the fact that Plaintiff's web pages were taken down which proves again that these people were enjoying censoring Plaintiff:

"Yesterday was a fateful day for Curio. She lost 2 email accounts, 4 web sites, and her Tripod membership in just under 24 hours. The site containing her Cult Archives is gone. A little birdie tells me that she did not have any of the material archived anywhere. Duh 'oops."

377. It is true that of the 300 plus documents Plaintiff had on her web sites, she had archived very little of it which meant the Plaintiff was going to have difficulty reproducing her work. At the end of Kali's message was a message written by Defendant Devereaux (with her name omitted) which explained how she was able to take down Plaintiff's web pages.

378. This censorship had occurred within days of Plaintiff requesting the source for the "alien abuse" comment from Defendant Hopkins which she attributed to Judy Johnson of the Mcmartin case. Because Plaintiff's web page about Hopkins was taken down due to frivolous complaints, Plaintiff wrote a message to several newsgroups during the week of June 3, 2000 summarizing the facts from the Hopkins web page and posted that message to various newsgroups.

379. On June 13, 2000, Plaintiff was posting a message from San Diego State computer lab when campus police officer Eddie Garcia approached Plaintiff, asking Plaintiff to follow him out into the hallway. Officer Garcia asked Plaintiff if she was "harassing" anyone and what was she doing there. Another officer requested that Plaintiff give them her driver's license and then searched her purse. They told Plaintiff there were allegations that she "carried a gun" and was "harassing" others on the internet. The Plaintiff explained to the campus police (to Officer Svec - who is employed by SDSU but is presently overseas due to his service in the Active Reserves) that she did nothing of the kind and this was just a ruse to try to ascertain her identity.

380. At first the Plaintiff told the officer who took the report that an "ex-boyfriend" was looking for her identity so to please not release her name to anyone. Officer Svec said he would not release her identifying information to anyone, the field report would only be accessible to those inside the Law enforcement system, and he asked the Plaintiff why she was so "paranoid" about law enforcement. The Plaintiff was "paranoid" because she knew that some police officials are simply not that smart and satanic cults can run rings around them.

381. Plaintiff then informed Officer Svec that a dangerous group of people were looking for her identity. Officer Svec searched Plaintiff's purse and stated there were also allegations Plaintiff had stolen an ID from a UCSD professor and was carrying a "gun." Apparently Defendant Devereaux had acted on her threat to Plaintiff that she would report that she was "carrying a gun," which had only been written in response to Devereaux's claim that others intended to harm her. The Plaintiff told Officer Svec that she never stole any ID from a UC San Diego professor and assumed the person who falsely accused her might be Nancy Alvarado from UC San Diego who had in the past threatened to make false criminal complaints about Plaintiff in retaliation after Plaintiff requested ethical guidelines from UC San Diego about Alvarado's conduct. Officer Svec insisted on photographing the Plaintiff and claimed that was routine procedure. Officer Svec also stated that if Plaintiff had any future trouble with these people, to contact them. Svec did disclose that he had received other information which led him to believe that the Plaintiff was the one who was being harassed. The Plaintiff thanked him and that was the end of the exchange.

382. Two months later, to Plaintiff's surprise, an anonymous poster using the name of "No User" wrote a message entitled, "Curio's BIG SPNAK," on August 11, 2000 to alt.usenet.kooks, claiming that Plaintiff (Curio) had been detained at SDSU and had flown into "a rage" accusing the officer of "signing" her "death warrant," and was taken in on a "5150" hold. 5150 means that due to a mental illness, a law enforcement official or other professional, takes someone to a hospital because they appear unable to care for themselves, or they are a danger to others. The message ends, with:

> "Naughty, Naughty Curio. Didn't daddy teach you not to play with guns?"

383. Plaintiff did not know what to make of this comment because SDSU officer Svec had promised Plaintiff that her identity would only be accessible by legitimate law enforcement.

384. In approximately July 2000, the Plaintiff was contacted by the notorious reporter Defendant Sauer of the San Diego Union-Tribune by email who told Plaintiff that they "knew" who she was and he was going to write an article about her. Would she care to give him an interview? Plaintiff became very frightened after this communication. The Plaintiff never responded to Defendant Sauer because she had contacted the police at San Diego State who denied ever having spoken to any news reporter, a claim they repeatedly made up to the date that Defendant Sauer's article was published, which quoted SDSU officials. Based on these misrepresentations by employees of Defendant SDSU, Plaintiff thought Mark Sauer could be bluffing, fishing for her name, or wanting her to verify her name for them. Shortly before Defendant Sauer's article was published, he went to Plaintiff's home, but Plaintiff did not answer the door. Defendant Sauer then went to the home of Plaintiff's close relative seeking Plaintiff's whereabouts which Plaintiff was upset about because, at worst, the message to Plaintiff was that he and therefore others knew where her family lived.

385. On August 29, 2000 a message appeared on the open internet, written by a FrancineCornHarvest@hotmail.com, alleging:

> "We've all known your true identity for months now." "Once they know you are the disgraced, discredited, disgruntled ex-California CPS 'social worker' cut loose with 5 others in 1992 for abuse of power and/or lying in court, the public records exposing you will be easily accessible to anyone who wants your police file, etc. The Diana L. Napolis file."

386. The facts are, Plaintiff voluntarily resigned from CPS in September 1996 and never, at any time, was accused of lying, nor was she ever "discredited." In fact, in 1998, the Plaintiff was able to prove to an Administrative Law Judge that CPS was guilty of incompetence and malfeasance after she proved she quit CPS under duress. The Judge ruled on Plaintiffs behalf and ordered that CPS was to give Plaintiff unemployment benefits.

"FrancineCornHarvest's" message is an example of a libelous post that was immediately written when these people became aware of Plaintiff's real name.

387.   On August 31, 2000, in a WITCHHUNT egroups message, Dr. John Price claimed that the Plaintiff had been "detained, fingerprinted, photographed, and threatened with a 5150 mental health" hold by the SDSU police. Again, at that time, Plaintiff did not understand how these people were aware that San Diego Campus police had questioned her although they seriously mischaracterized what had occurred.

388.   Plaintiff has provided substantial evidence proving that she was harassed, threatened that others would make false police complaints about her, and was physically threatened during the years 1995-2000.

389.   On September 24, 2000, a defamatory and invasive story was published in the San Diego Union Tribune about the Plaintiff, titled the "Web of Intrigue - The Search for Curio Leads Cybersleuths Down a Twisted Path," which was written by Defendant Sauer. [Exhibit 10]. This article was filled with disinformation and was a blatant piece of propaganda intentionally orchestrated by Plaintiff's political opponents.

390.   Because Plaintiff had named reporter Defendant Sauer on her web page as "giving a one-sided portrayal of the reality of SRA for years," which was proven in the beginning of this complaint, and cited his apparent collegial relationship with Defendant Hopkins, the Plaintiff was not surprised to see a skewed article, but was very surprised to see how her privacy was invaded and the extent of the false allegations contained within this article. Because Defendant Sauer was a party to Plaintiff's case, it seems highly unorthodox for Mark Sauer to have written this article due to his conflict of interest and it was irresponsible and negligent of Defendant Copley for publishing it. The many defamatory and invasive comments are as follows. Plaintiff's commentary follows each quote:

391.   "Armed with a telephoto lens and a laptop computer with a hidden camera, Michelle Devereaux headed south from San Francisco on a mission to find Curio" ... "Just when Devereaux was about to give up, however, she spotted a trim, middle-aged woman with longish brown hair sitting amid the forest of computer terminals.

392.   Defendant Sauer began his article by describing Plaintiff as "trim," "middle-aged," a "female," who had "longish brown hair," thus violating Plaintiff's privacy and safety by providing a physical description of Plaintiff.

393.   "Was it Curio? Devereaux had seen her once, even chatted with her briefly, on a  reconnaissance  tour of the computer lab a month before. But she had to be sure."

394.   Defendant Sauer documented in his article that Devereaux was indeed following Plaintiff (against her wishes) except he described this egregious and outrageous conduct as a "reconnaissance tour."

395. "She dispatched Barry with the laptop camera to a vacant machine across from their target with orders to start snapping surreptitiously. Then Devereaux took out a monocular so she could get a long-range view of what the woman was reading on her screen."

396. Defendant Sauer documented in this excerpt that Defendant Devereaux, in spite of her claims to Plaintiff that she was in danger from some unnamed individuals, willfully and with malice violated Plaintiff's safety and privacy by following her and having her photographed. Devereaux did not use a monocular to read Plaintiff's email, she read it from her position sitting next to Plaintiff

397. "Devereaux hastily scribbled a note to Barry: 'It's Curio! She's reading an e-mail I sent her last night!' She handed the note to the student sitting next to her: 'Would you please give this to that guy over there, the one with the baseball cap that says 'Psycho.''?

398. It could be interpreted that Defendants Sauer and Devereaux were trying to intimidate Plaintiff by referring to Devereaux's companion as wearing a cap with the word "psycho" on it who was now aware of Plaintiff's identity.

399. "A dozen or more people from San Diego to Washington State and beyond - all victims of Curio's Internet missives – had been trying to unmask the notorious cyber crusader for nearly five years."

400. Defendant Sauer placed Plaintiff in a false light by inferring that Plaintiff had victimized anyone on the internet. In fact, as evidence has proven, it was the Plaintiff who had been victimized by Defendant Aquino and others. Defendant Sauer admitted in this statement that a group of people had been in pursuit of Plaintiffs identity because she was a "notorious cybercrusader," however Defendant Deveraux had informed Plaintiff that some members of this group pursuing her identity meant to physically harm her.

401. "Now Devereaux had her in the cross hairs. But the photos wouldn't be enough. She hatched a plan."

402. Defendant wondered why an allusion to a gun - "had her in the cross hairs" - was made by Defendant Sauer in this article. Because Defendant Devereaux had tried to frighten, or perhaps, in the beginning, warn Plaintiff, that several dangerous individuals were searching for Plaintiff's identity, Plaintiff was not comforted by the allusions to guns in this article.

403. "Barry would wait out front with the telephoto lens. Devereaux would pick the right moment and approach Curio; she'd get spooked, head for the parking lot and Barry would photograph her license plate. Then they'd have her."

404. Defendant Sauer wrote that Devereaux and her friend Barry intended to "spook" Plaintiff as if this was normal and acceptable behavior. In fact their intent to "spook" plaintiff so that she would run to her car, after which her license plate could be

photographed by "psycho," described the frightening pursuit of Plaintiff's identity. That was very inappropriate stalking behavior and it was even more inappropriate for Sauer to repeat this conduct in a supposedly legitimate publication.

405. "The photos of her from the secret camera weren't that clear; nobody recognized the woman staring at the SDSU computer screen."

406. This statement proves that Defendant Devereaux had distributed photographs of Plaintiff to unnamed others so that she could be identified for fraudulent reasons which invaded Plaintiff's right to privacy and exposed her to danger. Because Defendant Devereaux had warned Plaintiff that several people wished to harm Plaintiff her actions are indicative of malice.

407. "It would be another eight months before those who have railed against her online, have sued her, have traded implied threats with her and reported her to the police would get the answer to the question tormenting them. Who is Curio and why is she saying such nasty things about us on the internet?"

408. Defendant Sauer placed Plaintiff in a false light by claiming that Plaintiff had "traded implied threats" with others. Plaintiff had never made a threat of harm to anyone, yet these false allegations were routinely made by Defendant Aquino, Hopkins, Dr. Alvarado, and others on the internet about Plaintiff without any evidence provided to support these statements. By repeatedly claiming that Plaintiff was guilty of "stalking," it placed Plaintiff at risk of being apprehended by the police based on false allegations, in furtherance of the Defendants campaign to have Plaintiff identified by any means necessary in efforts to destroy Plaintiff's reputation and career, and to stop Plaintiff from exercising her constitutional rights to free speech.

409. "Following the acquittals of the McMartin defendants and Akiki (who won more than $3 million from local authorities in a civil lawsuit), the theory of a satanic-ritual-abuse conspiracy was discredited by mental-health experts and the courts."

410. Plaintiff discovered that from the years 1984-2006 that a total of 130 published or unpublished papers existed about the reality of satanic ritual abuse which were written by mental health experts. It is a misstatement of fact that, in general, satanic ritual abuse was discredited by mental health experts and the courts. It is more accurate to state that Defendants Sauer, Hopkins and the SDUT did everything they could to have satanic ritual abuse and the courts discredit the reality of satanic ritual abuse in San Diego County.

411. "A 10 year investigation of satanic-ritual-abuse allegations by FBI Special Agent Ken Lanning turned up virtually nothing. Yet certain people persist in their belief in 'these heinous crimes against children.' Curio claims to be able to document 50 such cases worldwide."

412.  Defendant Sauer admitted that the Plaintiff had an archive of ritual cases which he obviously had seen but apparently was unimpressed by. He then inferred that there was something wrong with people who persisted in the belief that satanic ritual abuse existed in the same sentence that he acknowledged seeing the objective evidence which proved that it occurred. This indicates malice on the part of Defendant Sauer.

413.  "In her zeal to protect 'young victims', Curio has posted extensive information about notable individuals who worked hard over the years to debunk the notion of satanic-ritual abuse."

414.  This statement almost appeared to be a confession. Defendant Sauer made it obvious that the Plaintiff was posting information about individuals who "worked hard" to debunk ritual abuse without mentioning whether or not the information that Plaintiff was posting had any validity. And why were people "working hard" to debunk the notion of satanic ritual abuse, when it clearly existed?

415.  "Most of these people have stated their conclusions regarding ritual abuse in public forums and have been questioned in open court, where no one is anonymous."

416.  Defendant Sauer appeared to criticize Plaintiff, inferring that she did not have the courage to face people in open court. In actuality, the Plaintiff routinely faced perpetrators in court, as part of her job description, including those accused of ritual abuse. The real reason why the people named have felt no fear stating their conclusions regarding ritual abuse is because they continually state it does not occur, therefore they have nothing to fear from actual abusers. The reason why Plaintiff chose to be anonymous is because she was publicizing satanic ritual abuse cases in a world-wide forum and about the organizations which seek to protect them.

417.  "Most of these people have stated their conclusions regarding ritual abuse in public forums and have been questioned in open court, where no one is anonymous. But now they were being challenged -- libeled, in their words – by someone who operated at a distinct advantage. Curio (who often went by the full pseudonym Karen Curio Jones) said her anonymity was necessary 'or safety reasons,' and she protected it fiercely."

418.  Defendant Sauer placed Plaintiff in a false light by inferring that she had "libeled" others on the internet. Plaintiff had never engaged in libel. Rather, the truth was being told by Plaintiff and Plaintiff believes that Sauer and the individuals quoted in this article wanted that "truth" covered up. Defendant Sauer indicated in the above paragraph that he was fully cognizant of the fact that Plaintiff was worried about her safety, therefore his actions which violated her privacy indicates malice. The reason why Plaintiff chose the full name "Karen Curio Jones" was because she knew the defendants would never be able to discover anyone by that name and so could never endanger another person by falsely accusing them of being Plaintiff.

419. "You can't imagine what this does to you until you've gone through it," said Carol Hopkins, who is near the top of Curio's Internet enemies list. 'She has disrupted our personal lives, called employers, talked to law-enforcement. She makes all sorts of unsubstantiated claims. There are a lot of crazies out there and some may be willing to act. It is truly frightening."

420. Defendant Sauer quoted and the SDUT published several libelous and defamatory statements made by Defendant Hopkins. It is clear that Defendant Hopkins did not have a good reputation in San Diego for good reason, yet Defendant Sauer quoted Hopkins as if Plaintiff's claims about her were "unsubstantiated." All of Plaintiff's claims about Defendant Hopkins were completely substantiated and documented. Defendant Hopkins then inferred that the Plaintiff was "crazy" and "dangerous" thereby placing her in a false light in attempts to ruin Plaintiff's reputation and career. It appears that what Hopkins was actually upset about was the fact that Plaintiff's web page about Hopkins' tenure on the 1991-92 Grand Jury was used to discredit Hopkins in her new locale – Cuernavaca, Mexico – by a concerned citizen.

421. "Carol Hopkins was a natural target for Curio. The former school administrator, Hopkins was an outspoken member of the 1991-92 San Diego county Grand Jury that blasted the child-protection system after investigating wide-ranging allegations of zealous social workers removing children from their homes without cause. Hopkins later formed the Justice Committee and publicized what she identified as false allegations of child abuse here and around the nation."

422. Defendant Sauer neglected to include all of the facts. Plaintiff, as a former child abuse investigator, was very aware of what the inside and public information was about the cases that Defendant Hopkins purported to analyze. Plaintiff refers the court to pages 3-46 which documents the corruption at that time in San Diego County. Although it might have been embarrassing for Defendant Hopkins to see these facts publicized in a world-wide forum, it was not libelous, and any attempts to stop plaintiff from reporting about the other side of the issue was censorship.

423. "Curio blamed Hopkins and two San Diego Union-Tribune reporters (Jim Okerblom and the author of this story) for ending official interest here in satanic-ritual abuse: 'In my opinion, Carol Hopkins, Mark Sauer and Jim Okerblom misreported on and gave a one-sided portrayal of ritual abuse for the county of San Diego nonstop for approximately six years,' Curio wrote in a post revealing Hopkins' recent move to Mexico."

424. It has been thoroughly documented in pages 3-46 of this lawsuit that Defendant Hopkins, Mark Sauer, and others attempted to discredit satanic ritual abuse in San Diego County. Because Sauer was named as a party in this activity which SDUT publisher Copley should have been aware of it, it was a conflict of interest for Defendant Sauer to write this article about Plaintiff and the SDUT was negligent for publishing it. As further events will reveal, Defendant Devereaux sent correspondence to Plaintiff's colleague, Dr. Lacter, which proved that Defendant Sauer was one of the parties who had been searching for Plaintiff's

·identity well before this news article was written, which indicates that Plaintiff was intentionally set up to be identified by law enforcement, based on fraudulent allegations, after which Defendant Sauer could write this defamatory article.

425.  It also appears that Defendant Sauer proved by quoting from one of Plaintiff's web pages that Mar Sauer himself had in fact read those web pages which described that she was concerned about her safety. Further, because Sauer had clearly read Plaintiff's web · pages, that indicated that he was aware of all the facts and evidence upon which Plaintiff's opinions were based.  However, Defendant Sauer chose to disregard this body of evidence.

426.  "Her criticism of me on the Internet was constant," Hopkins said. "She accused me of protecting child molesters, insinuated I was a child molester, claimed I don't believe child abuse exists. Curio was a big factor in my decision to give up the Justice Committee."

427.  Plaintiff has never inferred that Defendant Hopkins was a child molester. In fact, that is a complaint that Hopkins commonly makes about her detractors which was documented in a 1998 San Diego Reader publication. However, Plaintiff does believe that Defendant Hopkins' activities serve to protect child molesters, specifically perpetrators of satanic ritual abuse. Regarding Plaintiff's alleged power over Hopkins to make her give up her organization, the Justice Committee, Plaintiff believes that is a false allegation apparently intended to make Plaintiff appear a villain.

428.  "I moved to Mexico for a fresh start and then she tracks me down here. I've learned that nobody escapes the Internet."

429.  Plaintiff did not pursue Hopkins to Cuernevaca, nor was she ever interested in where Defendant Hopkins resided. Plaintiff has explained how she was made aware that Defendant Hopkins was residing in Cuernevaca, Mexico. Based on this benign activity, Plaintiff was then accused of "stalking" Defendant Hopkins by others and by Defendant Hopkins herself, which Plaintiff later discovered.

430.  "Another of Curio's favorite subjects is Elizabeth Loftus, professor of psychology and adjunct professor of law at the University of Washington in Seattle. An internationally known expert on the workings of memory, Loftus has written numerous articles and books decrying the idea that trauma associated with child sexual abuse acts to repress the memory of such horrible events"

431.  Given the substantial amount of information that proves that child sexual abuse can lead to repression, Plaintiff believes to state otherwise indicates the author of such statements is not interested in the truth. Plaintiff is not a specialist in memory, however legitimate professionals who are specialists have proven that childhood sexual molest can lead to trauma and repression.