432. "According to Curio, Loftus 'colluded with' Hopkins to write the critical grand-jury reports, a claim both women denounce as absurd."

433. The Plaintiff has provided substantial evidence proving that Defendant Hopkins was working with the FMSF and Defendant Loftus during the writing of the 1991-92 Grand Jury report which was obvious due to the fact that their misinformation was contained within the Grand Jury report itself. Hopkins and Loftus merely lied about it in this news article although they acknowledged it in another one, the San Diego Reader in 1998.

434. "Loftus said she recently was invited to deliver the keynote address at a convention of the New Zealand Psychology Society and arrived to find herself the center of controversy. Accusations that she conspired to protect child molesters, many fueled by Curio's Internet postings, led to a story in the Wellington Evening Post and stoked the talk-show fires. 'I spent most of my time defending myself against misrepresentations,' Loftus said. 'People attending my speech were met by individuals with 27-page booklets - much of it compiled from the Internet - accusing me of all sorts of vile stuff."

435. Defendant Loftus placed Plaintiff in a false light by inferring that the bad reception Loftus experienced in New Zealand was due to Plaintiff's misrepresentations of Loftus on the internet. Plaintiff has never misrepresented Loftus's activities on the internet. It has been widely reported that a Dr. John Read of New Zealand protested Loftus's appearance at a conference sponsored by the New Zealand Psychological Society. Dr. Read resigned from his role as the director of scientific affairs and spoke out against Loftus on a national radio program. Plaintiff only had a web page which publicized a few excerpts from Defendant Loftus's deposition in which Loftus appeared to have a predetermined position that the therapist had inappropriately reinforced disclosures of sexual molestation by a child victim. Plaintiff believes that because she regularly took the opposite political position of Dr. Elizabeth Loftus and the FMSF, Loftus took this opportunity to make it appear that Plaintiff was guilty of some malign activity involving Loftus.

436. "But if Hopkins and Loftus consider Curio a tireless nuisance, Michael Aquino considered her a threat to his safety and that of his family. Aquino said that is why he filed suit in San Diego Superior Court against a local Internet provider in a failed attempt to learn Curio's identity."

437. Defendant M. Aquino was a High Priest or leader of a satanic cult for 20 years with hundreds of followers. Defendant Aquino was a psychological operative in the Army and is knowledgeable about the dissemination of propaganda. Plaintiff had posted information from many books proving that Aquino was extremely dangerous and was processed out of the Army after a satanic ritual abuse investigation in 1990. For this, Defendant M. Aquino pursued Plaintiff identity. To any objective party, that would indicate that the Plaintiff was the one in danger, not satanist Michael Aquino. Defendant M. Aquino had proven that he would go to any lengths necessary to accuse Plaintiff of activity which had never occurred, proven by the false information he submitted to the San Francisco court during the Aquino v. Electriciti lawsuit about Plaintiff. Plaintiff never wrote any threat to

1   Defendant Aquino. Further, it does not appear that Aquino made any serious complaint to
2   the police about any alleged threats by Plaintiff. Therefore, again, Defendants Sauer and the
    SDUT placed Plaintiff in a false light by choosing to make it appear that she was guilty of
3   "threatening" Aquino.

4        438.   "It seems inevitable that the retired Army intelligence officer from San
5   Francisco would loom large on Curio's radar screen. He was, after all, a top official in the
    late Anton LaVey's Church of Satan and founded the Temple of Set, a quasi-religious
6   institution that many consider satanic. In the late 1980's, Aquino was investigated in a
7   McMartin/Akiki-type case centering on allegations of satanic abuse at a day-care center at
    San Francisco's Presidio military base. Aquino, who was a lieutenant colonel, was
8   questioned because of his satanic beliefs. Neither Aquino nor anyone associated with him
    was ever charged, much less tried and convicted, in the Presidio case – a point Curio
9   concedes. But that hasn't stopped her from insinuating he abuses children in satanic rituals.
10  'My basic interest was to identify an anonymous person who, because of his/her obsessions
    and delusions, might pose a threat to the safety of myself and my family,' Aquino said.
11  Curio claims that Aquino was booted out of the Army as a result of the Presidio
12  investigation. Aquino, who adamantly denied any involvement in the Presidio day-care
    center or satanic-ritual abuse, said that in addition to the Bronze Star (1970) and many other
13  military awards, he was awarded the Meritorious Service Medal in 1994 following his
    voluntary retirement from the Army."
14

15       439. Defendant Sauer failed to accurately report the facts in his ongoing efforts to
    promote his agenda that the satanic ritual abuse of children does not exist. Clearly
16  Defendant Aquino was processed out of the Army after a satanic ritual child molestation
    investigation in 1990. Aquino has done everything he can to try to cover up this fact for
17  obvious reasons. Defendant Michael Aquino is in fact a Satanist. Most people are aware that
18  Satanists are not known to tell the truth. The Presidio Army child abuse case was not a
    McMartin/Akiki type case because many parents successfully sued the Army after their
19  children were abused at that location. Although Defendant Sauer alluded to Plaintiff's
    allegations by claiming that Aquino was "booted out of the Army," he apparently neglected
20  to fact-check whether or not that was actually the case, and neglected to report that there
21  was factual evidence proving that then Lt. Col. Aquino's "process out" is what actually
    occurred, according to two appellate reports and internal documents to his case. Instead,
22  Defendant Sauer quoted Aquino's statements that he was awarded the "Meritorious Service
23  Medal" in 1994, following his voluntary retirement from the Army." Based on new
    information, it appears that Aquino did not voluntarily retire, rather it appears that he was
24  forced into retirement.

25       440.   On December 1, 2007, per a Freedom of Information Request, Plaintiff wrote
26  to the National Personnel Records Center about Defendant M. Aquino's "Record of
    Assignment," and they sent back this record, plus a cover letter. The Records Center wrote
27  that Defendant Aquino's dates of service were from June 14, 1968 – August 31, 1990 which
28  also matched Aquino's Record of Assignment which had the same dates. Obviously, this
    proves that Aquino's career ended in 1990 unless he went to another branch of service after

1990. Plaintiff also requested and received a list of the awards that had been given to then Lt. Col. Aquino and a Meritorious Certificate was not among them. Because Aquino had submitted official looking documents to the Aquino vs. Electriciti lawsuit which made it appear that he served several weeks at a military base, Plaintiff reported these facts to a CID Army investigator in attempts to reality check whether or not Defendant Aquino was penning and distributing fraudulent military documents.

441. By Defendant Sauer's publication of quotes of Aquino such as: 'My basic interest was to identify an anonymous person who, because of his/her obsessions and delusions, might pose a threat to the safety of myself and my family," it obviously proves that Mr. Aquino had participated in the hunt for Plaintiff's identity, and perhaps he was the one of the people that Defendant Deveraux had warned her about. Defendant Aquino's motivation for making this type of remark was obviously to make Plaintiff appear marginal, delusional, and threatening. Because Aquino cannot produce any threat made by Plaintiff, Defendant Sauer's choice to repeat these false allegations and Defendant Copley's choice to publish these false allegations, proves that these defendants are guilty of defamation, malice, and outrageous conduct.

442. "Devereaux, 43, has two grown sons, a plethora of tattoos and body piercing and an extraordinary knowledge of cyberspace after 20 years in the computer business. She also once believed she had been abused by a satanic cult herself. 'Curio and I were coming from the same place –I spent eight or nine years in therapy, all the while researching satanic-ritual abuse, 'Devereaux said. "It wasn't until 1999 that I exited the cloud of unknowing. Curio, she said, 'sealed it for me that this stuff is all a bunch of crap. When she came along doing her Internet thing and saying all this stuff about these people, I finally realized how crazy it all was. I feel sorry for her on one hand. But she's vicious. And she's got her supporters. She was really hurting people. I decided to get involved."

443. As has been extensively documented, Defendant Devereaux not only once believed that she was abused by Satanists but it appears to Plaintiff that Defendant Devereaux is a satanist. Defendant Sauer also chose to characterize Plaintiff, via Devereaux's comment, as "vicious." Plaintiff was never vicious and to characterize her as such was in furtherance to justify the invasion of Plaintiff's privacy and to malign Plaintiff. Plaintiff not only had a public web page which indicated that Defendant Devereaux of stalking her, but Plaintiff had also posted a public message on sci.psychology.psychotherapy titled, "Stalking and Threats from Michelle Devereaux" which should have been more than sufficient to alert Defendant Sauer that Plaintiff's safety was being threatened by a satanic cult which should have stopped Sauer from invading Plaintiff's privacy.

444. "Devereaux became a cyber-sleuth. She traced Curio's Internet posts to specific computers. Besides her home computer, Curio posted from computer labs at SDSU, USD and UCSD as well as from Children's Hospital, Sharp HealthCare Centers, San Diego Public Library, San Diego County Library and local cyber cafes. So determined was she to protect her anonymity, Curio not only favored public computers but also forged her online identity and scrambled her electronic trail. But Devereaux eventually smoked her out. 'I

came up with a way to monitor the Internet so every time she posted, I got paged," Devereaux said. She had contacted police in San Diego and San Francisco about Curio's 'cyberstalking crusade," yet failed to garner much interest. But Devereaux found a sympathetic ear at SDSU police headquarters on campus."

445.   In this quote, Defendant Sauer mistakenly portrayed Defendant Devereaux as a "cybersleuth" when in fact Devereaux met the elements of an actual stalking complaint. a) Devereaux was following Plaintiff against her will b) Devereaux was writing Plaintiff harassing messages both publicly and privately c) Devereaux was passing along threats to Plaintiff - and by proxy, threatening Plaintiff herself  d) and Plaintiff felt fear because of those threats.  Sauer then quoted Devereaux in order to make the false allegation that Plaintiff was on a "cyberstalking crusade," further defaming Plaintiff and implying that she was involved in criminal activity. The reason why Plaintiff was posting messages from so many locations was because Devereaux herself suggested that she not post messages from San Diego State University anymore.

446.   "In some of the Internet correspondence, it was alleged that Curio had made threats and might be carrying a gun. That raised our interest," said Detective Susan McCrary."

447.   Because Devereaux alleged that others might want to harm Plaintiff, Plaintiff, in a moment of stress,  told Devereaux to tell whomever wanted to harm her that she carried a gun. Defendant Devereaux was completely aware of the context of the remarks about  a "gun" which she herself instigated. Plaintiff was only defending herself. Therefore her attempts to make it appear that Plaintiff was actually "threatening" others is libelous, defamatory, malicious, and constitutes outrageous conduct.

448   "She and Lt. Eddie Gilbert agreed to work with Devereaux to catch Curio as she posted from SDSU." ... "Devereaux turned over her secret photos and a detailed description of Curio; the computer-lab was alerted. In late May, Gilbert got a sudden call from Devereaux: Curio was posting. 'I rushed over, but she was gone,' he said. Then on Tuesday, June 13 at 1 p.m., Devereaux's pager again went off. She called Gilbert immediately.' He again hustled over to the computer lab in the center of campus. And there she was. 'I was in plain clothes with another investigator,' Gilbert said. "She didn't match the photo I had – she'd cut her hair. But I was pretty sure it was her. I requested back-up from uniformed officers because of the information about a gun."

449.   According to SDSU campus police, Officers McCrary and Gilbert are no longer employed at SDSU.  Plaintiff believes that Gilbert, McCrary, and Defendant  SDSU, engaged in blatant acts  of incompetence, negligence and outrageous conduct in their decision to assist Devereaux, a complete stranger from the internet, in an internet dispute in which they had no knowledge of the actual facts but who, according to their own incident report, had enough information to stop them from releasing Plaintiffs identity to this internet stalker who was following Plaintiff based on false pretenses.

450.  "(Curio) moved to another computer and I noticed she had signed on as ThomasDylan@hotmail – one of her aliases. We moved in and detained her. 'She was extremely upset, kind of paranoid, really. She said dangerous people had been after her for some time, that they were out to get her and now the police were cooperating with them.' The officers searched Curio's bag but found no gun. "When we asked if she'd been using university computers to harass people on the internet she said, 'I post messages and information.' She denied ever harassing anyone in her life, however."

451.  Gilbert then proceeded to place Plaintiff in a false light by describing Plaintiff's genuine and realistic fears as "paranoid." These officers clearly demonstrated by the above quote that on behalf of Defendant SDSU they were entirely aware of Plaintiff's concerns that "dangerous people" were after her and yet they appeared to be taking a side against Plaintiff, in favor of Defendants, and publicly ridiculed Plaintiff for her legitimate concerns. By making that conscious choice to take sides, Officers Mcrary and Gilbert, on behalf of Defendant SDSU became actors in the conspiracy to publicly invade Plaintiff's privacy and intervene in her First Amendment rights to free speech. Plaintiff believes that when it was discovered that Plaintiff was not carrying a gun, the matter for SDSU should have ended there, and their failure to do so was negligent and outrageous. If there were other allegations pending which accused Plaintiff of making "harassing" telephone calls, which Plaintiff discovered later, the SDSU campus police should have communicated with legitimate law enforcement about potential suspects only, not the complaining party, especially so because Plaintiff clearly told these officials that a group of dangerous people were searching for her identity. Furthermore, since officers employed by Defendant SDSU acknowledged in this article that Plaintiff stated "now the police were cooperating with them," it further serves as evidence that these incompetent officials blatantly disregarded Plaintiff's concerns.

452.  "But Curio was anonymous no longer.  Her name, Gilbert said, is Diana L. Napolis, 44, of La Mesa. She worked for San Diego County as a child-protection-services investigator for many years before leaving that post in 1996.

453.  Defendant Sauer and SDUT publisher David Copley then chose to quote statements by Officer Gilbert identifying Plaintiff immediately after quoting statements by these officials acknowledging that they were entirely cognizant of the fact that Plaintiff believed she would be in danger if she was identified.

454.  "She told us she is self-employed now, working in child-custody cases downtown,' McCrary said. The police warned her not to use SDSU computers any longer. 'One of our big concerns on this campus is stalking and harassment,' McCrary said. Then they let her go."

455.  Plaintiff was never told not to stop using SDSU computers. She was told by Officer Svec to report back to the officers if she had any more trouble by these mysterious others who were looking for her identity.  SDSU campus police officer Susan McCrary then

engaged in defamation and placed Plaintiff in a false light by inferring that Plaintiff was engaged in "stalking" or "harassment."

456. "Within days of Curio's apprehension at SDSU, state records show, a Diana L. Napolis obtained a marriage and family counseling license from the state of California, enabling her to practice psychotherapy."

457. Plaintiff did not want it publicly known that she was a therapist because she did not want to be the target of any malicious actions instigated by the FMSF or other Satanists given the subject matter that she investigated and researched.

458. " Napolis ignored several requests to be interviewed for this story. Whatever motivates her remains pretty much a secret. But now that Curio has been exposed, no one involved is quite sure what to do."

459. Plaintiff ignored Defendant Sauer's request for an interview because a) she thought he might be "fishing" for her name by pretending to be writing an article in hopes she would identify herself and contact him. b) SDSU campus police told Plaintiff that they had never disclosed her name to a newspaper reporter.

460. "It's like the dog who chases cars and finally catches one," Devereausx said. "Now what?"

461. The statement "now what" resulted in Plaintiff's targeting and eventual psychological incapacitation by Defendant Aquino and others by the usage of nonlethal technology after she was publicly identified by Sauer and publisher Copley.

462. "SDSU police say they are maintaining a file on her and if there's enough evidence of cyberstalking and harassment, they may recommend that the district attorney file charges. California is one of the few states with an anti-cyberstalking law."

463. The reference to "SDSU" and "police" apparently referred to McCrary, Gilbert, and Defendant SDSU, who then proceeded to place Plaintiff in a false light before the public by inferring that Plaintiff might even remotely be connected to criminal cyberstalking and harassment. Defendant Sauer either quoted directly from the campus police or fabricated the statement that they were going to maintain a "file" on Plaintiff. By Defendant Sauer's reference to the California "anti-cyberstalking law" in the next sentence after he quoted "police" stating they were going to keep a "file" on Plaintiff, he attempted to suggest and infer that Plaintiff might be engaged in cyberstalking. Plaintiff believes statements alluding to false claims about her conduct, and the inference that her conduct might constitute "cyberstalking," was meant to intimidate plaintiff from exercising her first amendment right to free speech and to stop her from participating on the internet because the inference was that perhaps further false criminal complaints lay in her future if she continued to assert her rights and participate in a public forum.

464. "It's a very gray area, though," McCrary said. "She hasn't made any physical threats. Everything's been done in a public forum."

465. Because McCrary acknowledged that Plaintiff had not made any threats, then it was completely inappropriate for SDSU or Sauer to suggest that a "file" might be kept open on Plaintiff. A critical element of a criminal stalking complaint is that it has to be proven that the accused made a threat which Plaintiff had not been guilty of. Given that Officer McCrary acknowledged that Plaintiff had made no "physical threats," it was libelous for Sauer to infer Plaintiff was guilty of cyberstalking.

466. "But pulling back the curtain on Curio to reveal Napolis has effectively stripped her of her power, Devereaux contends. 'That may be enough, Aquino said; "Now that this person has been identified, that 'faceless' threat no longer exists. She is now just another woman with 'satanic ritual-abuse' sexual fantasies.' Carol Hopkins likens Napolis to 'the mythical Japanese soldier stumbling out of the jungle still fighting World War II.' Conspiracy theories about satanic-ritual abuse have been thoroughly discredited by reasonable people, but true believers remain."

467. Plaintiff believes that satanic cult leader Defendant Aquino was fully aware that there was little likelihood that Plaintiff was a physical threat to him and to refer that she might be constituted intentionally malicious, reckless, and outrageous conduct. Because of Defendant Aquino and Hopkins reference to Plaintiff's "belief" that satanic ritual abuse was a "sexual fantasy" and a "conspiracy theory" which had been "thoroughly discredited by reasonable people, but "true believers remained," indicates defamation and malice towards Plaintiff. Plaintiff's belief that satanic ritual abuse exists is directly related to the evidence that she acquired which supported that belief. Plaintiff refers to her Satanism and Ritual Abuse Archive of mostly appellate court documentation. Because Plaintiff had this public archive posted at several sites from 1998 to 2000, and reporter Sauer, Hopkins, Devereaux, Loftus and Aquino had clearly seen it, that proves that their only motive was to undermine Plaintiff's research which threatened their agenda. Evidence which supports Plaintiff's beliefs that there was and is an agenda to undermine children of satanic families or cults by the FMSF and others has been extensively documented.

468. "She [Hopkins] said the Curio case boils down to a civil-rights issue: Do first amendment rights of free speech trump the rights of those being accused of a crime (child molestation ) to know their accusers' identity?

469. Plaintiff clearly states that she never falsely accusing anyone of criminal activity. However, Plaintiff was the victim of many false criminal complaints about her while interacting on the internet under a pseudonym. Due to the number of individuals who openly accused Defendant Aquino of vile, frightening and tortuous conduct, Plaintiff believes that she had every right to maintain her anonymity on the internet. Therefore, Plaintiff's safety, right to privacy, and her right to free speech did trump Defendants Hopkins, Loftus, Aquino, and Devereaux efforts to expose Plaintiff by fraudulent misrepresentation in efforts to silence her. It was perfectly legal for Plaintiff to state her

opinion on the internet, which was supported by factual information, but it is very illegal for these Defendants to have misrepresented Plaintiff to law enforcement, merely so that law enforcement could identify Plaintiff to them for nefarious purposes.

470. "On the Internet now, you can say almost anything you want, and there's nothing to stop you," Hopkins said. "When we didn't know who Curio was, she had power. To finally learn she's a nobody, why even bother with her now?"

471. The fact that Defendant Sauer quoted Defendant Hopkins childish comment that Plaintiff was a "nobody," and Defendant SDUT chose to publish it, truly documents that there was an ulterior motive for the invasion of Plaintiff's privacy and it was personal. In fact, Plaintiff at that time was a licensed therapist, had an extensive history as a Court Intervention child abuse investigator, and she supervised visitations between children and parents during custody disputes for Family court, which indicates that Plaintiff had more credentials and experience than Defendant Hopkins and was therefore more knowledgeable about the topics that Defendant Hopkins chose to criticize.

472. In summary, campus police officers employed by Defendant SDSU lied to the Plaintiff about not speaking to a reporter, they disregarded her concerns about dangerous people wanting her identity, and conducted no further investigation, nor contacted the Plaintiff about the situation before they gave Defendant Sauer personal information about her and violated Plaintiff's privacy, which eventually resulted in irrevocable harm to Plaintiff. Plaintiff wonders about the legality of forcing Plaintiff to become a "public figure" by what was later revealed to be fraudulent misrepresentation. Upon the identification of Plaintiff, not one of these Defendants – who were trying to intimidate Plaintiff from participating in a public forum - attempted to file a lawsuit against her. Given that the statute of limitation for libel would probably have been extended from the date these individuals became aware of Plaintiff's identity, it indicates that Defendants Aquino, Loftus, and Hopkins were never really serious about their claims of public "libel." However, Plaintiff was severely emotionally distressed after the publication of this news article because she didn't know if she would be the target of frivolous lawsuits. More importantly, after the publication of this news article, she believed that there might be attempts to kill her.

473. The Plaintiff has studied cults and has been the victim of a satanic cult for a very long time. Some members of cults or their supporters have Ph.D's after their names which makes it difficult for the average lay person to comprehend that highly educated people might be involved in illegal or unethical conduct. Some people are impressed with these degrees and when a verbal or written complaint is made by them, naïve people tend to believe them. However, one would expect trained law enforcement not to conduct cursory investigations and not be swayed by appearances. Clearly this is what occurred with the incompetent and negligent San Diego State University campus police employed by Defendant SDSU.

474.  After this article was published, researcher Lynn Crook telephoned SDSU's Lt. Gilbert, asking why he had released Plaintiff's identity to this group of people, and he responded, saying, "The tide has now turned," obviously revealing that he had sided with Plaintiff's opponents, and had malice towards Plaintiff. By making that statement, and others, it appears again that Gilbert on behalf of Defendant SDSU made himself an actor in the conspiracy to publicly invade Plaintiff's privacy and intervene in her First Amendment rights to free speech.

475.  On January 12, 2001, a purported copy of San Diego State Campus incident report, Case# 00-00973  written by Officer Svec was cross-posted on alt. satanism, alt.paranormal. spells.hexes.magic, and alt.religion.mormon by a "Corax." This report appeared under Plaintiff's middle and last name, appeared to be the incident report describing SDSU campus police's questioning of Plaintiff on June 13, 2000, and disclosed Plaintiff's identifying information, such as her drivers license number. [Exhibit 11].  It was documented in this report that there had been an allegation of "harassing/annoying phone calls" which was an allegation Plaintiff had not been aware of before that time. Officer Svec documented in SDSU's incident report:

> "Napolis was very reluctant to give information and stated several times there were many people who were after her and didn't want the information to be public. I explained to Napolis we were talking to her in reference to a harassment case and she was a suspect. Napolis stated she has never harassed anyone in her life. I also asked her what she was doing in the student computer lab if she wasn't a San Diego State student (SDSU). Napolis said the lab is close to home and she used the computers to communicate with others on child abuse cases." ..."Recommend investigation followup and have this deleated"[sic] ... " Throughout my conversation with Napolis she was very nervous and paranoid. She believed several people were after her and didn't trust law enforcement."

476.  This incident report clearly documented Plaintiff's request to the SDSU campus authorities that she did not want her identity revealed and the fact that she believed several people were "after her." Officer Svec noted this information and then recommended that this incident be "deleated" [sic]. Therefore, the fact that Officers McCrary and Gilbert divulged personal information about Plaintiff on behalf of Defendant SDSU to reporter Mark Sauer, in complete disregard of one of their own officers incident report, indicates negligence, malice, outrageous conduct, and further evidence that they were choosing to be co-conspirators along with Defendants because they took a side against Plaintiff in spite of this information. Plaintiff has repeatedly requested a copy of this SDSU Campus police report to verify its contents but SDSU has continued to deny Plaintiff's access to this report. Therefore Plaintiff claims that due to delayed discovery, she was unable to verify the contents of this police report, and was prevented from accessing information about further evidence of defamation and conspiracy by Defendants and other Does.

477.  According to this publicly posted SDSU campus police incident report, the

allegations of "harassing phone calls" was the subject of a San Francisco Police department report #000107383. Plaintiff contacted the San Francisco police department in attempts to access this police report but they said no such number existed. Plaintiff tried to access this police report again in November of 2007 which this correspondence reveals. [Exhibit 12] The SFPD clerk informed Plaintiff, again, in correspondence, dated November 21, 2007, that there was no such police number. However, they referred her to two other police reports which mentioned Devereaux. One report was #030-191-328- and #000-204-9 - which was an incomplete number. [Exhibit 13]. Plaintiff requested that SFPD clerks investigate after which Plaintiff received a copy of these two police reports after November 21, 2007. According to San Francisco police #000204967, Defendant Michelle Devereaux made the following complaint about Plaintiff on February 18, 2000 [Exhibit 14]:

> "The V/R, Michelle Devereaux, said that since October 2, 1999 the above described suspect using the name of Curio Jones has been sending her name, address and telephone number out over the enternet [sic] without her permission. Ms. Devereaux does have a web cite. [sic] Although no threats have been made by Ms. Jones, Ms. Devereaux is concerned because she heard over the enternet [sic] that Ms. Jones has a gun. Since November 2, 1999, Ms. Devereaux has had many telephone calls where the person hangs up or hangs on the line without answering. Ms. Devereaux believes the calls are being made by Ms. Jones although she has no definitive proof that Ms. Jones has been making the calls."

478. This is a false police report which Plaintiff only discovered due to her personal diligence after November 2007, which gave her further details about Defendant Devereaux's a fraudulent misrepresentation, who is one of the named con-conspirators named in this complaint. Ms. Devereaux cannot prove that Plaintiff ever sent her address and telephone number out to others on the internet which Plaintiff never did. Ms. Devereaux publicly revealed her own name on the internet.

479. Based on these false allegations, Ms. Devereaux was able to enlist the support of the SDSU campus police to identify Plaintiff for Defendants. As has been described in correspondence with Devereaux, Plaintiff refused to make phone contact with her. The matter regarding the alleged "gun" that Plaintiff might have on her possession has already been described in detail.

480. Based on the above information it is obvious that Defendant Devereaux purposely intended to entrap Plaintiff by fraudulent misrepresentation on behalf of named co-conspirators by garnering the support of law enforcement, based on these false complaints, in furtherance of a conspiracy to invade the privacy of the Plaintiff, defame the Plaintiff, ruin the Plaintiff's reputation and career, and stop her from exercising her rights to free speech. Plaintiff was never contacted by the San Francisco or San Diego police about these false allegations of unwanted telephone calls. If this had been a serious complaint, obviously Plaintiff would have been questioned by some investigatory agency.

481. Plaintiff believes that Defendant M. Aquino and Defendant Devereaux chose to

orchestrated this "sting," in this manner because over the years Defendant M. Aquino had falsely identified Plaintiff many times which subjected him to ridicule by his peers. As of 1995 Defendant Aquino and others had accused Plaintiff of being Linda Blood, Alex Constantine, Stephanie Rothman, Karen Jones (from SDSU) and Karen K. By having officials positively identify Plaintiff as "Curio" in a newspaper article, it would appear to be absolute identification of who "Curio," "Karen Jones" was. Plaintiff believes Defendant Devereaux, who apparently lives in San Francisco, had actually been following Plaintiff in her local community which might explain how she was aware that Plaintiff was at the SDSU computer lab on October 31, 2000. Most importantly, identifying of Plaintiff in a publication would provide absolute proof of Plaintiff's identity so that she could later be targeted with illegal technology by interested others.

482. On September 27, 2000, author Alex Constantine publicly posted an article in alt.psychology agreeing with Plaintiff that it was she who was the stalking victim. His closing remark was:

"Who is the cyber-stalker here? Curio, at her university terminal, posting documents on the lies and ulterior motives of the demonstratably culpable? Or the operatives of the FMSF, with their sleuths and surveillance and hyperbolic accusations? It ain't Curio, obviously, but the San Diego Union-Tribune wants you to believe in the fabricated studies that scurrilous rhetoric of the FMSF and heap scorn on a courageous activist. What's up with that?"

483. On September 25, 2000, Phase II of the malicious agenda to "strip Plaintiff of her "power" began which proved what the part of the agenda was by identifying Plaintiff. John Price posted Defendant Sauer's article about Plaintiff "The Web of Intrigue" to alt.usenet.kooks along with instructions about how to complain to the Board of Behavioral Sciences (Plaintiff's licensing board) about Plaintiff's alleged "conduct," providing a link to their web site address in his public message. The Plaintiff had only been licensed for a few months but these people immediately tried to cause trouble for her with her licensing Board. Plaintiff knew that this is what would occur if these defendants knew her real name which is why she chose to remain anonymous. Defendant Sauer's news article also appeared on the web site of a person involved in witchcraft, Catherine Yronwode, with the same introduction about how to file a complaint against Plaintiff to the BBSE.

484. During the year 2000, Plaintiff had been the visitation supervisor on a volatile Family Court case, and it was the only case she had been supervising for some time. The mother on Plaintiff's case read the article the "Web of Intrigue," but Plaintiff explained to her client that she was being targeted by a satanic cult, which her client understood. Within a few days of Defendant Sauer's article about Plaintiff, which was posted multiple times all over the internet, the grandparents on this family court case, Sharon and/or James Duckham, who Plaintiff suspected might be coaching their grandchild, wrote a letter to sci.psychology.psychotherapy. They disclosed that Plaintiff was supervising visits between the mother on the case and their grandchild – and then falsely alleged that Plaintiff had told their grandchild that she was "possessed by the devil." The Duckham's did not sign their

name to the message but it was obvious that they were the grandparents on Plaintiff's family court case. However, the message was difficult to read as it read out as one long line.

485. The Plaintiff has never made such a comment about a child and these claims were never seriously raised by the grandparents, lawyers, or any other parties on the case which Plaintiff confirmed. Apparently because Plaintiff had raised concerns to the minor's attorney and the other lawyers that the Duckhams might be coaching their grandchild (after which the Duckham's tried to have Plaintiff removed as Visitation Supervisor a month earlier) it appeared that the Duckham's accessed the SDUT "Web of Intrigue" article and decided to capitalize on these false allegations in hopes of having Plaintiff removed as visitation supervisor.

486. On September 29, 2000, at 12:34 PST, John Price cross-posted a message to several newsgroups which included the link to the "Web of Intrigue, a link to the BBSE and where to find complaint forms and reposted the Duckhams message. [Exhibit 15] He then realigned the Duckhams message which read:

"Hats off to Mark Sauer of the San Diego Union Tribune for writing the enlightening article on Diana Napolis. Ms. Napolis is a court-appointed monitor in a custody situation involving my ex-daughter-in-law, who was ruled a danger to our 5-year old granddaughter. Ms. Napolis supervises when our granddaughter visits her mother and has been acting so strange this summer we were about to head into court to have Ms. Napolis replaced. She has become convinced that our granddaughter is possessed by the devil. She claims the child told her, "in a low and frightening voice'to never touch her or come near her again. After reading the article, "A Web of Intrigue," I am convinced it is Ms. Napolis who needs supervision and she should be replaced immediately. Why should our hard earned tax dollars pay child custody monitors $30/hr to tell us our children are possessed by the devil?"

487. At that time, the Plaintiff was making $30 an hour. Family Court supervisors set their own fee, the fees vary, and only someone involved in Plaintiff's case would know that she charged $30 an hour.

488. On September 30, 2000 in message No. 189 on the WITCHHUNT list, Defendant Devereaux quoted Kimberly Barnard' s message which repeated the false allegations that Plaintiff had told a child she was "possessed by the devil." Defendant Devereaux, under the name cyberlurker@hotmail.com, wrote that Plaintiff turned a child "not liking" her into "demonic possession." It is clear from this message that Devereaux, or someone else from this nefarious group, was in contact with Defendant Sauer of the SDUT or was in direct contact with the Duckhams. Coincidentally, the grandparents knew how to post anonymously and they knew what exact newsgroup Plaintiff frequented which was sci.psychology.psychotherapy. Devereaux wrote:

"I understand the reader did contact the UT but have no idea if they plan on printing the letter or not."

489. On October 5, 2000, after Plaintiff was identified in Defendant Sauer's news article, Lesley Wimberly of VOCAL made defamatory comments about Plaintiff. Defendant Wimberly wrote:

> "Ms. Napolis has been defaming and damaging others for as long as I have been aware of her. In my opinion, having a woman with her bent for destruction with a license to practice 'therapy' is putting others at serious risk. I believe that the licensing board should at least know about her track record. If they revoke her license, that it their action, not ours. They should at least know about her writings and what she has done to others for the sake of her own ego. It is our duty to report to licensing boards anything that raises concerns regarding the license holder. It is for this purpose that licensing board exist."

490. On October 7, 2000, "Kali," aka Kimberly Barnard, congratulated Defendant Devereaux, claiming that she should receive the "Hammer of Thor" award for her "unveiling of Diana Napolis/Curio," further proving that Ms. Devereaux's acquaintances were aware that Devereaux's actions were conscious and malicious and apparently it was some type of "game" to them.

491. To Plaintiff amazement, Defendant Devereaux then began divulging personal details about the mother who she was supervising on the Witchhunt egroup list on Yahoo. The only way she could have discovered this information was via the grandparents, the Duchkams. The mother still wanted to retain the Plaintiff as a visitation supervisor but Plaintiff discussed the issues with minor's counsel and it was agreed that because Plaintiff was now a "controversial figure," it might damage her client.

492. On October 4, 2000, on the WITCHHUNT list, a Jim Giglio explained to poster Eileen King that Mr. Hagerbaumer, another regular poster on the WITCHHUNT list, had personally complained to the BBSE about Plaintiff due to the complaints that the grandparents had made about her, that she had told their grandchild she was "possessed by the devil."

493. The next move these co-conspirators made against the Plaintiff was to announce on 10-13-2000, by an anonymous person using Plaintiff's real name, Diana Napolis, that she was under investigation for "threatening a child with torture" and that Plaintiff "should be in jail." On October 13, 2000, an anonymous person, "Uli23@my-deja.com, wrote on alt.usenet.kooks and alt.satanism:

> "Diana L. Napolis, of La Mesa, CA, is a serial harasser and a bogus therapist. She has done more damage to children than any of the people she's been harassing over the years. She's a truly evil and psychotic beast. She's currently under investigation for threatening a child with torture because the child failed to denounce the parent. Hopefully, she'll be in jail son. She belongs there."

494. Plaintiff has never caused damage to any child in any job description and, in fact, had spent 10 years at that time acting as a child advocate. On October 13, 2000, "Uli" made another defamatory and false allegation about Plaintiff again on alt.satanism:

> "Diana L. Napolis, a CSW "therapist" based in La Mesa, California, is currently under investigation for threatening a child with torture for failing to support Napolis' allegations of abuse against the child's parent … This dangerous creep has engaged in numerous instances of internet stalking and abuse and has hurled numerous slanders against innocent parties on the internet. She has destroyed families and injured quite a number of children with her brand of "therapy"... There is no reason to continue to cover her scabby ass by persistently referring to her by the alias she used to harass people online. She deserves no privacy. She deserves jail."

495. These types of statements were made violating Plaintiff's privacy and endangering her reputation and career immediately after her real name was revealed by Defendant Sauer and Defendant Copley of the SDUT. Plaintiff had just received her therapy license and multiple parties already wanted to accuse her of malpractice, even though Plaintiff had not yet seen a client as a licensed practitioner. This was also the sixth time that the Plaintiff had been frivolously accused of stalking in this string of libelous messages.

496. The above information provides an overwhelming paper trail, proving that the Plaintiff was the victim of ongoing harassment, censorship, and libel between 1995-2000, which began well before Plaintiff's real identity was discovered. Once John Price, Defendants M. Aquino, Devereaux et al. discovered the Plaintiff's real name, they libeled, harassed, and intimidated her, and attempted to ruin Plaintiff's reputation and career. This is the Modus operandi of satanic cult groups which has been reported by therapists across the country who have experienced similar treatment although Plaintiff does not know of anyone who was targeted exactly like she was.

497. Due to Defendant Sauer's selective quoting in the "Web of Intrigue," Plaintiff believed she could no longer effectively work as a Family Court Supervisor as a visitation supervisor. Plaintiff routinely wrote letters to Family Court and she was required to testify on behalf of children. But due to false allegations in the "Web of Intrigue which tried to make her appear dangerous, there were allegations that Plaintiff carried a "gun," and that SDSU was keeping an open "harassment" file on her, Plaintiff believes her credibility was ruined especially after she was forced to resign from her Family court cases due to the SDUT article and the grandparents participation in these events.

498. On May 23, 2001, Plaintiff sent a letter to SDSU campus police about the misconduct of Susan McCrary and Eddie Gilbert. John Carpenter, SDSU Chief of police, replied on July 2, 2001, stating his officers did nothing wrong and he had released the incident report to the complaining party who had been Defendant Devereaux. He confirmed that SDSU had followed up on a complaint that had been filed in San Francisco about telephone harassment. [Exhibit 16]

499.  The Plaintiff contacted a lawyer who agreed to represent her pro bono and she filed a complaint against San Diego State University with the State of California on March 22, 2001, claiming breach of privacy, which they dismissed on June 13, 2001 after advising her to file a lawsuit due to the complexity of this case.  Because the Plaintiff was suing for breach of privacy, she decided to respond to Defendant Sauer's article under her pseudonym. Because 2001 was the first year of the millennium, the Plaintiff thought she would date and post her response on January 1, 2001 as a symbolic gesture. In part, the Plaintiff wrote that efforts to intimidate her were not going to succeed in stopping her or any other advocate's efforts on behalf of abused children and she briefly corrected the many misrepresentations made by Defendants Hopkins, Loftus, Aquino and Devereaux at that time.

500.  In 2007, the Plaintiff reviewed what had been written about her in addition to new internet messages which contained libel and threats against the Plaintiff.

501.  On May 20, 2001, eight months after the publication of Defendant Sauer's article about the Plaintiff, an anonymous person wrote on alt.satanism calling for Plaintiff's "execution." It read, in part:

" No harm was done? Curio, the psychotic with her fantasies, caused untold harm, she ruined lives. She caused psychological damage to the families of the people she harassed and did this for years, including small children in those families. She ruined careers. *She caused a woman to have to leave the country.* Studies have even shown the change in neurochemistry in people who are stalked this way. And what of their wives and children? *Curio should be executed.* It's as simple as that, Curio should be executed to simply set an example. She should be given the death penalty for this damage."

502.  Reporter Defendant Sauer's article "The Web of Intrigue" was attached to the end of this message which identified who "Curio" was - the Plaintiff, Diana Napolis, which proves that Defendant Sauer's invasive and defamatory article which published not only Plaintiff's real name, location and description culminated in not only clear libel, along with the usual ad hominem attacks and lies, but resulted in attempts to incite physical violence against the Plaintiff as well.

503. Defendant Jantsang (who had earlier described that therapists would be accused of brainwashing) wrote in response to this message calling for Plaintiff's "execution," writing on May 21, 2001: [Exhibit 17]

"Just cutting off her miserable hands should work. Maybe ripping out her tongue too… Yah, works great in churka countries where religious fanatic abound."

504. Defendant Jantsang wrote another message to Plaintiff on May 3, 2002, in reply to Plaintiff who was writing under the name of "Karen Jones" but identified herself in the mssage as "Diana Napolis," and briefly described how she had been targeted by nonlethals.

[Exhibit 18] Plaintiff wrote that she was in very poor health and stated Jantsang should not have written a message threatening that her tongue should be pulled out the year before. Defendant Janstang threatened again, which caused Plaintiff significant emotional distress:

> "Oh dear. You are a fucking NUT ...Yes, I think your tongue should be pulled out, or you should be legally gagged for stalking the Aquinos and slandering the hell out of them. People like you endanger the very concept of 'free speech.'"

505. Plaintiff then discovered after June of 2007 that Defendant Jantsang had written many messages defending Defendant M. Aquino and which described Plaintiff – or "Curio," as a "nut," "stalker," a "terrorist," and "harasser," who should not have had "free speech rights, and finally claimed on January 30, 2004 that Plaintiff was a "cyberstalker." [Exhibit 19]

506. On May 30, 2001, on alt.satanism, cursedone7@aol.com wrote an "apology" to Defendant M. Aquino for "crossing" him/her in the past. The author claimed that "Dr." Aquino "defeated" Curio and claimed that it was the government who was ritually abusing children. This message proves that a satanist on alt.satanism took Defendant M. Aquino seriously and thought he was dangerous, whereas reporter Defendants Sauer and SDSU officers Garcia and McCrary did not: It read, in part...

> "This is a apology to Dr Aquino for crossing him in the past ...Curio became a welfare nutcase after crossing him, she was defeated by him. Linda Blood wound up the same way ... The Prince of Darkness has awesome power and Dr. Aquino is his representative on Earth, My life has gone to total shit for crossing him All these people trashing the TOS are simply has been's they are fools Maybe some will get away with it, but Dr. Aquino has a lot of power and should not be toyed with. I used to think he was nothing, and I made fun of him and called him that Mikey name and such, Now my life is a total fucking hell. Curio is a nobody, Totally defeated by Dr Aquino ... Only a fool would cross Dr Aquino, He has Magical power and he can curse you and  screw up your life, Like he did to me , because I fucked him with online. He is chosen by Set and so is Lilith, Lilith hate's people ...Yes SRA is real but it's the fucking govt that's doing it , not some little sect like the TOS."

507. On June 28, 2001, Defendant Jantsang wrote another message admitting that satanists were setting up therapists and were going to turn on them, accusing them of "brainwashing." This message proves that Defendant Jantsang's agenda was aligned with that of the FMSF. It reads, in part, on pg. 3, third paragraph:

> "Martin, I even wrote a few letters to the TOP psych experts that were claiming SRA was real, and threatened that "our people" would become their patients and then TURN ON THEM and say it was all fake and accuse THEM of brainwashing us. OH don't you know that 1+ year later that is exactly what happened, patients remembered that they were NOT abused and accused the doctors of brainwashing them  - that

happened as I sat in astonishment (OH, HOLY SHIT) and wondered if these "Experts" trashed my ranting letters to them, he he he."

508. In a message dated March 27, 2002, posted in alt.satanism, Defendant Aquino falsely characterized and defamed Plaintiff by claiming that Plaintiff was a "cyberstalker." He wrote. [Exhibit 20]  In part:

"My lawsuit against Electricicit.com was for negligence in its failure to disclose Diana "Curio" Napolis' identity as a cyberstalker."

509. When the Plaintiff was in Patton Hospital two years later, Defendant Devereaux wrote a letter to two colleagues of Plaintiffs, Dale McCulley and Dr. Ellen Lacter. Plaintiff suggested they cease all communications with her as soon as possible, but to question her first about the names of the individuals who had been looking for Plaintiff's identity.

510. In a letter to Dale McCulley, dated February 3, 2003, which he forward to Dr. Ellen Lacter, Defendant Devereaux continued to falsify her true motivations and again wrote that the SFPD report that she filed (inferring on Plaintiffs behalf) was #107383 in apparent attempts to cause Plaintiff to search for the wrong police report number and to hide the fact that she had filed a false police report against Plaintiff under another SFPD report number. [Exhibit 21]. Defendant Devereaux tried to make Mr. McCulley believe that she was going to change sides again and would testify against these co-conspirators in a court of law." Devereaux closed the letter, stating:

"Additionally, Inv. Andrews of the Renton FD has a written notarized statement (from me, dated March, 1999), wherein I stated that it was my belief that if the fire at Kennedy's house was an an arson, it was in all likelihood related to the 'hunt for Curio'...Hopefully what I have provided will contain sufficient evidence for Diana's lawyer to be interested in subpoenaing me, in which case I would then be in a position to 'tell all.'"

511. Defendant Devereaux admitted in this letter that she had provided a notarized statement to an arson investigator that it was possible that people attempting to identify Plaintiff might have been responsible for setting Karen K's house on fire. Since Devereaux documented that statement in a letter, Plaintiff believes that Devereaux's manipulations of law enforcement to have Plaintiff publicly identified, indicated intentional malice, and she obviously did not care whether Plaintiff was harmed or not. Defendant Devereaux had attached two letters for Mr. McCulley to read by anonymous sources. The first letter undated and unsigned read that "the search for Curio was sport, not justice. Bullshit, not protecting people."

512. The second letter appeared to have been written by Defendant Hopkins to Defendant M. Aquino but it was also unsigned with no date. In Defendant Hopkins' alleged letter she wrote that she could gather a small group of people to look for the Plaintiff along

with her husband David Hopkins, *the Attorney General in San Diego, Gary Schons* (her ex-lover), reporter Defendant Sauer, and Pam Freyd, founder of the FMSF. Defendant Hopkins ends the letter, asking why, if Defendant M. Aquino was such a "powerful" black magician, was the Plaintiff "still in their midst." This email read:

> "Dear Mr. Aquino, you will recall that some years ago we had some communication regarding Curio. At that time I just considered her a nuisance, one of many but did call the person you believed her to actually be and reported back to you on our conversation. I believe that it was after that that she came after me. I now live in Mexico and she has now become very dangerous to me. I enjoy none of the legal protections of US. Law and a large day care case has exploded in my community. A year ago I wrote a cautionary article and somehow the parents (Americans) made contact with Curio and are now printing her slander as truth, trying to have me accused and at the least removed from the country. I have decided that burying my head in the sand may be foolish. Finally, today, I have carefully read her website in the hopes it might provide a clue to her identity. I have always theorized it was Constantine Dahlenberg but I don't know why Dahlenberg would be so interested in the Presidio case. I have gone to your website and must admit that I was a bit (make that very) shocked to find that you actually are involved with the Temple of Set. I had assumed that this was all hyperbole on her part as practically nothing she writes about me is true."

------------------

> "I am in complete agreement with your suggestion. I believe if we pool all of our information and are as careful as she is, we'll know who she is. With that in mind, I would like to create a group of you, me, Michelle, my ex-husband (David Hopkins), Gary Schons (prominently featured in the website), and Mark Sauer (also mentioned and a reporter from the San Diego Union Tribune.) I can absolutely vouch for the latter three. They all know what this is doing to me and to them. You seem willing to vouch for Michelle. I would like to suggest that Peter and Pam Freyd also be included. I have great respect for their integrity and equal respect for Peter's incisive intellect."

------------------

> "Please, take no offense. My comments regarding the Setian World had nothing to do with anything other than shock that there was something concrete in her writings. (Previously, I had found nothing even marginally truthful.) BTW, reading your site I was struck by the irony of your position on black magic. If black magic is half as powerful as you would claim, how come Curio did not long ago depart our sphere?) Understand we had hundreds of letters each week and I did not remember the substance of what you said. I do remember however that both you and Pam were certain when you gave me the name of the therapist I called that it was Curio. So, you must have had a name at that time. I am copying Peter in on this as I am certain will remember. He never forgets anything."

------------------

513. It appears by information gathered from this letter that a former 1991-92 San Diego Grand Jury member (Defendant Carol Hopkins) was actively colluding with a local newspaper reporter (Defendant Mark Sauer of the SDUT) – before the "Web of Intrigue" was written - and two individuals who had been accused of child molest (Defendants Michael Aquino and Peter Freyd), and she asked Aquino if he was so powerful why was Plaintiff still in their sphere. Defendant Hopkins wrote that Defendant Aquino could "vouch" for Defendant Devereaux and wrote "You and Pam were certain…" "Pam" apparently refers to Pam Freyd of the FMSF because several sentences later she mentions the name "Peter." Peter Freyd is Pam Freyd's husband. If this letter was from Defendant Hopkins, than it appears that all of the named parties were conspiring to identify Plaintiff, which in addition to the quotes in the "Web of Intrigue" indicated that was the case.

514. On March 15, 2008, Plaintiff discovered this same message by Carol Hopkins, posted by an anonymous party on the WITCHHUNT egroups list in message #31353 titled, "Curio Phyles Resurrected." [Exhibit 22] This message was copied to "Peter and Pamela Freyd," had been written on May 6, 2000, and included the full email headers on it which sourced where the message was written from and where it was sent. It concluded with the following comments by Defendant Hopkins:

"In some previous activities I have been designated a public personality and so have little leverage for a lawsuit. Moreover, I doubt that this woman has anything substantial that could be gained to make a lawsuit worth an attorney's effort … my guess is that she is a completely isolated, lost soul. But, we'll see."

515. In a letter, dated July 8, 2003, from Defendant Devereaux to Dr. Lacter, Dr. Lacter asked Devereaux to explain why she had behaved in the way she had towards Plaintiff. Dr. Lacter wrote: "If you could really help Diana, that would be wonderful." (The Plaintiff was in jail by that time, with a criminal case pending). [Exhibit 23] Defendant Devereaux wrote in response, in part:

"The real story is very long. In fact, I am presently working on a book about it. If the book ever gets published, I will ask the publisher to set up a fund and direct any/all monies from the book to help Diana. It's the very least that I can do. I am writing the book in hopes of exposing what went on in the hunt -- read, who was involved (**E.g., Aquino, Pam and Peter Freyd, Loftus, Barden, Clarke, Casebeer, Hopkins, Sherke, Ohme, etc) as well as the subsequent legal tampering of her case – read, Hopkins and Clarke** ... I am also writing the book in hopes of educating ppl on how they play the game – read, how they manipulate ppl and how they hurt ppl … Ellen, a whole lot of things Diana said was quite true… When I look at the enormity of what I did, I don't know that I will ever forgive myself. I am not asking you to either …I have since cut contact w/them, simply bc I fear that any contact could draw me back in. I don't want to do that. I don't want to hurt anyone else. I am also in the process of publicly outing several ppl – read, Barden, Hopkins, Freyd, et al."

"In closing, my motives are this: to undo what harm I have done, expose the FMSF for what they are, and most importantly bc I am very scared for Diana."

516. Defendant Devereaux wrote this letter in July of 2003, making it appear as if she was benevolent towards Plaintiff (in fact, donating all book proceeds to her), confessed to having knowingly harmed Plaintiff, and made it appear as if she was cutting off all contact with FMSF's Pam Freyd, a claim which in fact was revealed to be false which is further evidence that Defendant Deveraux manipulates the facts. Defendant Devereaux also claimed in this letter that Defendant Hopkins and a John Clarke had "tampered" with Plaintiff's criminal case which occurred in 2002/2003.

517. Additionally in this correspondence, Defendant Devereaux claimed that Aquino, Freyd, Loftus, Barden, and Hopkins were involved in the "hunt" (for plaintiff's identity), indicating there was a conspiracy to identify Plaintiff which involved Defendant Devereaux, which she purportedly was "sorry" for.

518. In another letter, dated August 4, 2003 to Dr. Ellen Lacter from Defendant Devereaux, Dr. Lacter asked her for additional information about who the people were who had been looking for the Plaintiff. Defendant Devereaux again provided the same names. [Exhibit 24] Some of the people named who had directed Devereaux to "locate/expose" the Plaintiff, further proving they were actors in a conspiracy to identify Plaintiff, were:

"William Scott Scherk, SA Jordon (AKA Reader AKA John Singleton), John M. Price, Carol Hopkins, Elizabeth Loftus, Michael Aquino, Herman Ohme, Greg Clarke, Rick Thomas, Jim Giglio, Lesley Wimberly, Laura Pasley, Mark Sauer, Michele Gregg, Patricia Prather, Eric Nelson, Francine Casebeer, and Patricia Burgus."… "Tertiary people…were David Hopkins, Pam and Peter Freyd, and Gary Schons.

519. Again, it was repeated that SDUT reporter Defendant Mark Sauer was one of the parties named who had been searching for Plaintiff's identity, well before he wrote the article, the "Web of Intrigue" about Plaintiff which proves that he was an actor in these events who had a conflict of interest, and apparently his part in this conspiracy was to publicized an invasive and defamatory news article about Plaintiff.

520. The attachment to this letter emailed to Dr. Ellen Lacter included the same letter that was sent to Dale McCulley, except that this particular letter had an email address on it. It was emailed to RCBARDEN@aol.com and was dated Thursday, January 13, 2000 from an anonymous party. That is the email address of attorney R. Christopher Barden who had frivolously threatened to sue Plaintiff in 1998 after which Plaintiff posted a public web page about his tactics.

521. This email letter to Dr. Lacter (about Michelle Devereaux) indicated that R. Christopher Barden was "influential" in instigating the "hunt" for Plaintiff's identity which

proves that Barden conspired with Ms. Devereaux, a claim which was submitted to Dr. Ellen Lacter as factual by Michelle Devereaux. It read, in part:

> "The search for Curio was sport, not justice. Bullshit, not 'protecting people'. At WHAT expense... for WHO ???" ... "You had an influential part in getting her involved in the hunt for Curio – you could admit this in an apology note – it would make the mess more human. She's cyber-smart, but the task was inappropriate for her."

522. In 2007, the Plaintiff searched the FMSF newsletter archives on their web page fmsfonline.org and discovered that Pam Freyd had listed tmdarchives.org (Defendant Michelle Devereaux's new web site) at the end of their newsletter, beginning in 2001, with newsletter Vol. 10, No. 5. to the present. Plaintiff confirmed that this was Defendant Devereaux's website, after a "whois" (web page that reveals web site owners) search check revealed Devereaux's email address cyber5n6@hotmail.com as the contact address for that web page.

523. At that time the Plaintiff discovered yet again that Defendant Devereaux had stolen Plaintiff's research (albeit the weakest cases), which consisted of approximately 30 news articles and court documents about satanic ritual crime and posted it to her web site making it appear as if the Plaintiff's research was in fact Devereaux's own work. Since Plaintiff had requested Devereaux once before to take down Plaintiff's research which was posted on another web site, and in fact Devereaux was responsible for Plaintiff's web pages being taken down and censored from the internet, finding this same information on Devereaux's web page in 2007 has caused significant emotional distress for Plaintiff. Apparently Devereaux appreciated Plaintiff's documentation about satanic ritual crime, she just didn't want the Plaintiff's name attached to her own work.

524. Given that Defendant Michelle Devereaux had been quoted in the "Web of Intrigue," in attempts to ruin Plaintiff's reputation for Plaintiff's belief that satanic ritual abuse occurred, the fact that Devereaux has some of Plaintiff's evidence of satanic cult crime proves that something unusual is occurring. Ms. Devereaux's statement from the "Web of Intrigue," read, in part:

> "[Devereaux] also once believed she had been abused by a satanic cult herself. 'Curio and I were coming from the same place – I spent eight or nine years in therapy, all the while researching satanic-ritual abuse,' Devereaux said. 'It wasn't until 1999 that I exited the cloud of unknowing. 'Curio,' she said, 'sealed it for me that this stuff is all a bunch of crap."

525. In that statement, Ms. Devereaux stated that "Curio" had "sealed" it for her that satanic ritual abuse was a bunch of "crap," thereby indicating that at that time Devereaux was serving the role as a satanic cult "retractor." However, it appears that Defendant Devereaux does believe in the reality of satanic ritual abuse based on the content of her own web page. Because Devereaux's web page also has numerous articles pro and con about

recovered memory and other subjects, Plaintiff believes Devereaux is attempting to infiltrate the legitimate professional community.

526. Plaintiff wrote a letter to Pam Freyd on July 19, 2007, informing her that the web site she referred readers to in her FMSF newsletter - tmdarchives.org - was owned and operated by Defendant Devereaux. Plaintiff informed Freyd that the majority of the appellate documentation in the satanic ritual crimes section on Devereaux's web page was the product of Plaintiff's own research, and that research was published on Devereaux's web site without Plaintiff's permission.

527. Plaintiff inquired of Pam Freyd why she was referring others to a web site which listed satanic crime when her organization claimed satanic ritual abuse of children does not exist. Freyd wrote back on July 26, 2007 indicating that she would review the matter but claimed that the fact that a site included information "arguing for the existence of satanic ritual abuse is not a problem. The Foundation believes strongly that people should examine the claims made by people holding very different perspectives and evaluate those claims for themselves."

528. Given that Pam Freyd has been instrument in attempting to shut down workshop/trainings about satanic ritual abuse all over the country for years, Mrs. Freyds explanation for this unusual occurrence did not make as much sense to Plaintiff as the alternative: Perhaps Ms. Devereaux was rewarded by Pam Freyd for identifying Plaintiff for Pam and Peter Freyd and other conspirators, and because Devereaux wanted to be in the "big leagues," Pam Freyd was willing to elevate Ms. Devereaux's status by linking to her web page which listed satanic cult crime and articles pro and con about the "memory" debate, perhaps in further efforts to use Devereaux as an infiltrator for the FMSF or satanic cults.

529. If Pam Freyd believes that satanic ritual abuse should have coverage than there is no explanation for the following statement which were published in the FMSF Foundation newsletter, Winter 2008, Volume 17, No. 1. Pam Freyd expressed satisfaction that the evidence in the West Memphis case involving the ritual murder of three little boys was being reviewed. Ms. Freyd then wrote:

"...Tired old beliefs about multiple personality and satanic ritual abuse have popped up in several places"..."Thousands of individuals and families were tragically and unnecessarily destroyed by the unfounded beliefs in the accuracy of recovered memories as well as beliefs in the reality of multiple personalities and satanic ritual abuse cults during the late 1980s and early 1990s. Can it happen again?"..."Why when so much scientific research debunking these issues has been both published and publicized, do people cling to the beliefs of recovered memories and satanic ritual abuse?"

530. Plaintiff believes that this evidence provides revealing information about the modus operandi of the False Memory Syndrome Foundation, and Plaintiff cautions others before accessing Michelle Devereaux's web page – tmdarchives.org

**PLAINTIFF'S VICTIMIZATION BY NONLETHAL UNCLASSIFIED TECHNOLOGY, SPECIFICALLY "VOICE TO SKULL" TECHNOLOGY, "VOICE SYNTHESIS DEVICES," AND OTHER ILLEGAL SURVEILLANCE TECHNOLOGY**

531. The Plaintiff has extensively documented the numerous attempts made by Defendant M. Aquino and others to publicly discredit her by the usage of ad hominem attack and outright fabrications before the publication of the SDUT September 24, 2000 article, the "Web of Intrigue," and Defendants Hopkins, Loftus, Wimberly, Aquino and Devereaux's attempts to subject her to false light defamation after her real name was revealed. Even though Plaintiff was subjected to libel and threats by Defendant Jantsang and others, it seemed no one had yet acted on those threats. That changed after May of 2001. Since that time, Plaintiff alleges she has been subjected to illegal monitoring by nonlethal classified government surveillance technology, and she has been made a subject of illegal classified research without her consent, after which this technology was used to assault Plaintiff and subject her to prolonged torture and terrorization.

532. Plaintiff and victims worldwide report that nonlethal technology is being used to torture whomever the military perceives as the enemy, which also includes civilians, political dissidents, and personal enemies of the wealthy, because the technology is for sale. The nonlethal technology Plaintiff will be describing is both unclassified and public (which documentation supports); classified and secret (which means descriptions within documentation might be redacted, or there are documented sources that have leaked information about the subject but have stopped short of disclosing exactly how this technology operates or how it is being implemented); and above classified which means there is no reference to the technology anywhere and officials will completely deny that it exists. Plaintiff believes that the public has a right to know how far our government has strayed from the adherence to basic human rights, such as the right to privacy and the right to be free of torture, and will attempt to document the existence of this invasive technology.

533. As previously stated Plaintiff has a Masters Degree in Transpersonal Psychology which is a branch of psychology that incorporates the spiritual dimension into mainstream, clinical practice. Plaintiff is 52 years old and, before she was targeted, Plaintiff had meditated and studied esoteric subjects for 28 years, and her philosophy incorporated Buddhist precepts about nonviolence.

534. Plaintiff was knowledgeable about Holistic health practices and took inordinate care of herself physically, mentally, and spiritually. She exercised at a gym and kept her weight below 118 pounds for 20 years. Plaintiff's diet included mostly health foods and she refused to take medication unless absolutely necessary because she believed prolonged medication usage damaged the body. Before the year 2001, Plaintiff could best be described as a hermit, who chose her associates very carefully and who fiercely guarded her privacy.

535. Because M. Aquino, his wife Lilith Aquino, John Price, Robert. M. his "wife," M. D., Scott L., Phil S., and others, raped Plaintiff, body, mind and soul, she can no longer meditate and her body has suffered injury. If this could happen to Plaintiff, it could happen to anyone. The Plaintiff requests that judgment be suspended until the entire body of information which documents the existence of this invasive technology is read.

536. Plaintiff was told by the very wealthy Lt. Col. Aquino, via what was later to be revealed "Voice to Skull" [V2K] technology), that he was able to bribe members of the military intelligence and mind control community, both in the United States and Soviet Union, along with others named in this lawsuit, to target Plaintiff with the most sophisticated and deadliest nonlethal technology available. He told Plaintiff millions of dollars were exchanged. These action were taken against Plaintiff because of her political activism, because her archive of court cases proved that satanic ritual abuse existed, and because she proved, despite Lt. Col. Aquino's assertions to the contrary, that his career ended in 1990 after a ritual abuse child molestation scandal. The Aquinos told Plaintiff that they had noticed that Plaintiff had dated her response to Defendant Sauer's article on January 1, 2001, the first day of the millennium, a date Plaintiff chose because of its symbolism. Defendant M. Aquino and Lilith Aquino told Plaintiff they wanted to make an example out of her, as a symbolic event on behalf of evil, for the millennium, and to show the rest of the world what they were capable of. Aquino told Plaintiff they had also asked several other satanic organizations to participate along with them in the torture of Plaintiff.

537. Defendant Scott L. who in 1998 had told Plaintiff that he worked for the NSA, informed Plaintiff, via V2K, that the NSA had been monitoring her for some time because of her prior association with Russell Means who at one time had been the leader of the American Indian Movement. In the 1970's Mr. Means and the American Indian Movement had been the subject of various Counterintelligence programs which were designed to discredit radical organizations considered to be a "threat" to the United States. In the late 1980's Plaintiff had joined Means and others in an illegal encampment in the Black Hills of South Dakota to protest the history of broken treaties between the Native Americans and the United States government. Mr. Means had a history of staging rallies and engaged in civil disobedience occasionally intended to bring attention to the plight of the Native American people and was remarkably successful at these activities. Plaintiff had a personal relationship with Mr. Means between the years 1993-1995. According to Scott L., the NSA monitored Mr. Means and his associates, which at one time included Plaintiff.

538. On November 18, 2007, Plaintiff discovered a variety of videos on UTUBE, an internet site that mentioned Defendant M. Aquino's name. The first video was titled Russian Mind Control and Michael Aquino. The second video was entitled "MindWar Paper by NSA Gen. Michael Aquino" (#20) at http://www.youtube.com/watch?v=t5zfrdwh1QY Plaintiff does not believe Defendant M. Aquino was ever a General for the NSA, but he did write a paper with the title, "From PSYOP to MindWar: The Psychology of Victory" in 1980. The description of this video reads:

"This military doctrine paper is quoted in depth to describe the current use

of psychotronic and microwave weapons technology targeting political dissidents used in terminal experiments to perfect the newest weapons systems to be used on friend and foe alike."

539. The following information described by Plaintiff documents how nonlethal technology can induce bizarre experiences which, if disclosed to mental health professionals, would likely result in a diagnosis of "mental illness," thereby disguising the illegal usage of that invasive and illegal technology.

540. In January 2001 two very unusual incidents occurred. First, for the first time in Plaintiff's life, she had an alien "abduction" experience. Plaintiff had read about this phenomena and was curious about what type of trauma victims were actually experiencing. In brief, Plaintiff felt an object coming over her, and then a part of herself being lifted and taken out of her body. Plaintiff assumed it was her astral or soul body which was taken by this object. Plaintiff descended down an elevator and then exited aboard a craft of some kind. Plaintiff interacted with unusual looking entities who spoke to her in an unknown language and who appeared to be trying to tell her or warn her about something. They showed Plaintiff a board with physics equations on it and pictures of two people struggling over a weapon. Plaintiff told them she did not understand what they were trying to tell her. Plaintiff then returned to her physical body and opened her eyes. Plaintiff had been noting the content of her dreams in personal journals for 20 years and this was not a normal dream.

541. In February 2001, Plaintiff had a second unusual experience. She was unusually tired and fell asleep one evening but woke up within her dream (lucid dreaming) seeing and hearing a man who appeared to be trying to hypnotize her. He was counting down, using the alphabet, but Plaintiff stopped him when he said, "Tommy T." Plaintiff asked him who he was, she requested that he stop violating her, and that was the end of the experience. Before that time Plaintiff had never allowed herself to be hypnotized and she did not believe it was possible to hypnotize her.

542. On February 1, 2001, Plaintiff found employment at a hospital as a Social worker but by the end of the month she began hearing a strange sound in her head, which a voice, identifying themselves as from the "CIA," said was an "implant." Because Plaintiff was continually awakened by this sound, and was never able to get enough sleep to function, she was let go of her job in May of 2001, 8 months into her one year statute of limitations from the date of the SDUT article, the "Web of Intrigue, dated Sept. 24, 2000.

543. The day after Plaintiff was let go of her job, on exactly May 11, 2001, she was physically assaulted by unknown technology which was very intrusive which caused massive shock to Plaintiff. Within one to two weeks of losing her Hospital job, the car of a close relatives was struck and disabled while parked which made it difficult for her to visit Plaintiff. Plaintiff believes this was purposefully done so that her perpetrators could isolate her from her family and make it easier to assault and take her over completely.

544. Plaintiff then began hearing other "voices" in her head on a regular basis, identifying themselves as employees of NASA Ames and Lawrence Livermore Laboratory who said they were "observing" her because of her "alien abduction" experience, and for other reasons. For the next few months these people succeeded in keeping Plaintiff busy - and more importantly, off the internet - by contriving various scenarios for her. One of these scenarios was that they were experimenting with telepathically communicating with "ET's" and they wanted more information about the particular "ET's" who had accessed Plaintiff because they suspected they were a threat. Other identities, including a man named Jack Aldrich gave her this same information.

545. Defendant M. Aquino, Scott L. Lorne G., Dr. John Price (deceased), Leslie P., Phil S., and several others, all made these types of statements to Plaintiff, seriously telling her there was a "war" against aliens and they were involved. However, associating satanic ritual abuse with claims of "aliens" is a typical tactic when trying to discredit therapists, researchers or victims of satanic ritual abuse. Strangely, not one of these individuals told Plaintiff that she was being victimized by nonlethal technology, but they all continued to tell her that that she was being monitored from a remote location by "computer." Plaintiff discovered that this technology is called computer/brain interface.

546. Regarding whether or not the phenomena of "alien abduction" exists, serious researchers are aware that claims of extraterrestrial involvement and government mind control have been inextricably interwoven over the years. Researcher Dr. Helmut Lammer, a Ph.D in Geophysics who reportedly works on NASA space projects, hypothesized that one explanation for UFO phenomena might be the governments illegal usage of Advanced Virtual Reality technology which could induce false ET abduction scenarios into a subject's mind, thereby allowing the government to test illegal, classified technology which was then disguised by what most people believe to be an improbable phenomena – alien abduction.

547. Other UFO buffs hypothesize that the government is in "league" with ET's and are using or misusing their technology. While Plaintiff of course cannot verify what really occurred behind the scenes, it became clear over time that some of Plaintiff's human perpetrators were trying to disguise their identities, pretending to be "ET's," when in fact they were the parties named in her lawsuit who were using very public nonlethal technology called "Voice-to-Skull Devices," "Voice Synthesis Devices," via Tracking and Data Relay Satellites, "Remote Neural Monitoring," "Psychotronics," and other classified technology which mimics natural telepathy. Plaintiff interacted with some exceptional personalities who were never identified who tried to assist her whenever she was victimized by Defendant Aquino and others. After one month went by, these unidentified others told Plaintiff they could no longer assist her because she was being remotely monitored by a computer system which they could not extricate her from. Plaintiff eventually discovered that this claim was absolutely correct and she eventually discovered the technology which proved it.

548. Although some people believe NASA to be an organization intent on serving the public interest, that is not necessarily the case, and if these were some of the parties

making contact with Plaintiff, she was not comforted by their presence. It has been reported that Kurt Debus, one of the first Nazi scientists allowed entrance into the United States via Project Paperclip, later became Director of Cape Canaveral.

549. In 2007, Plaintiff discovered the existence of military technology which explained how "telepathic" communication occurred. The nonlethal technology is referred to as "Voice to Skull Devices" [V2K] or "microwave hearing," and it is defined on the Center for Army Lessons Learned, an official Army website. [Exhibit 25]. The definition reads, in part:

------------

Voice to Skull Devices
Definition/Scope

Nonlethal weapon which includes (1) a neuron-electromagnetic device which uses microwave transmission of sound into the skull of person's or animal by way of pulse-modulated microwave radiation, and (2) a silent sound device which can transmit sound into the skull of person or animals.

Note: The sound modulation may be voice or audio subliminal message

------------

550. The above definition clearly describes the military's ability to send "voices" to a selected target by the usage of "microwaves" and there is a substantial body of evidence proving this capability. This definition of V2K is not only on an official Army web site but is mentioned on the website of the Federation of Scientists and several publications. An internet search of the terms "Voice to skull" reveals 750 plus web pages, published by victims and researchers, who describe accounts of verbal and physical assault from a remote location by the usage of nonlethals and other technology which hasn't been identified to date.

551. The following abstract dated October 31, 1989 was found on the United States patent office web site http://patft.uspto.gov under patent No. 4, 877, 027 submitted by Wayne B. Bruncan which describes how microwave hearing is induced. The Abstract and Description read:

ABSTRACT

Sound is induced in the head of a person by radiating the head with microwaves in the range of 100 megahertz to 10,000 megahertz that are modulated with a

particular waveform. The waveform consists of frequency modulated bursts. Each burst is made up of ten to twenty uniformly spaced pulses grouped tightly together. The burst width is between 500 nanoseconds and 100 microseconds. The pulse width is in the range of 10 nanoseconds to 1 microsecond. The bursts are frequency modulated by the audio input to create the sensation of hearing in the person whose head is irradiated.

## DESCRIPTION

This invention relates to a hearing system for human beings in which high frequency electromagnetic energy is projected through the air to the head of a human being and the electromagnetic energy is modulated to create signals that can be discerned by the human being regardless of the hearing ability of the person.

552. Examples of early research that describes microwave hearing effects are: A. H. Frey "Auditory System Response to Radio Frequency Energy," Aerospace Med. 32, 1140-1142, 1961; Don R. Justesen, "Microwaves and Behavior," Am. Psychologist, 30, 391-401, 1975; Arthur W. Guy, C.K. Chou, James C. Lin, D. Christensen, "Microwave-Induced Acoustic Effects in Mammalian Auditory Systems and Physical Materials," Ann. NY Acad. Sci. 247 , 194-218, 1975 ; Joseph C. Sharp, Mark H. Grove, and Om P. Gandhi, "Generation of Acoustic Signals by Pulsed Microwave Energy," IEEE Trans. Microwave Theory Tech., Vol. MTT-22, pp 583-584, 1974.

553. This body of research referenced above described experiments attempting to identify the "safety" standards of microwaves – perhaps for the benefit of the operator - and was evidenced in a NASA Technical Report, Document ID 19810004209 titled, "Effects of Low Power Microwaves on the Local Cerebral Blood Flow of Conscious Rats," (K. J. Oscar) published on June 1, 1980. The abstract reads:

"A decoy and deception concept presently being considered is to remotely create the perception of noise in the heads of personnel by exposing them to low power, pulsed microwaves. When people are illuminated with properly modulated low power microwaves the sensation is reported as buzzing, clicking, or hissing which seems to originate (regardless of the person's position in the field) within or just behind the head. The phenomena occurs at average power densities as low as microwatts per square centimeter with carrier frequencies from 1.4 to 3.0 GHz. By proper choice of pulse characteristics, intelligible speech may be created. Before this technique may be extended and used for military applications, an understanding of the basic principles much be developed. Such an understanding is not only required to optimize the usage of the concept for camouflage, decoy and deception operations but is required to properly assess safety factors of such microwave exposure."

554.  Although there was substantial research dedicated to assessing the safety standard of microwaves in the United States,  auditory perception induced by microwaves was eventually used as a weapon in both the United States and the Soviet Union. The Soviet Union's interest in telepathic contact via microwaves was documented in an article in the Federal Times, on December 13, 1976, titled "Microwave Weapons Study by Soviets Cited." It reads:

"The Defense Intelligence Agency has released a report on heavy Communist research on microwaves, including their use as weapons. Microwaves are used in radar, television and microwave ovens. They can cause disorientation and possibly heart attacks in humans. Another biological effect with possible anti-personnel uses is "microwave hearing." Sounds and possibly even words which appear to be originating intracranially (within the head) can be induced by signal modulation at very low average power densities," the report said. According to the study, Communist work in this area "has great potential for development into a system for disorienting or disrupting the behavior patterns of military or diplomatic personnel."

555.  Dr. Robert O. Becker, twice nominated for the Nobel Price, also described the ability to send "voices" to a target in 1985 in his book, "The Body Electric  - Electromagnetism and the Foundation of Life." On pg. 319, after discussing early experimentation with pulsed microwaves (or audiograms), Dr. Becker wrote that this device had "obvious applications in covert operations designed to drive a target crazy with 'voices' or deliver undetectable instructions to a programmed assassin."

556.  Dr. John Price communicated with Plaintiff in the summer of 2001 by V2K. Plaintiff was sitting in her living room and Price identified himself and told Plaintiff how much he "hated" her and then began cursing at her. As a result, he contaminated Plaintiff's mind for several weeks. Plaintiff also began hearing voices which sounded familiar to her. One of the voices sounded like her best friend, D., her husband, C., a friend from high school, J., a close relative of Plaintiff's, and even her ex-boyfriend R. This confused Plaintiff but she kept trying to reality test by contacting these people and asking them questions. None of them appeared to know what she was talking about, and Plaintiff realized they were not involved, but she did not understand how or why the voices that she heard sounded like people who she knew.

557. In July 2001, Plaintiff heard a "voice," identifying themselves to her as an "ET," but who was later identified as a UC Davis professor, which was distressing to Plaintiff because the voice sounded as if it was being warped by a synthesizer. Plaintiff is sensitive to sound because she sings and plays the piano, thus victimizing Plaintiff on this level caused intense emotional anguish.

558.  In 2007, Plaintiff discovered the technology which described how mimicking and distorting "voices" sent to a target was achieved after she searched the Center for Army Lesson Learned website and found the definition for "Voice Synthesis Devices." [Exhibit 26] The definition reads:

### Voice Synthesis Devices
### Definition/Scope:

Nonlethal weapon which has the ability to clone a person's voice so that a synthesized message in that person's voice can be transmitted (e.g., by satellite) to a selected audience.

559. If technology exists which makes it possible to "clone" a voice and transmit it by "satellite" (as the above definition describes), it would also be possible to make that voice sound any way the perpetrators intended. That is how it was possible to make Plaintiff believe for a short time that people from her past, present, and eventually Hollywood figures, were aware of or were involved in the assaults against her. More importantly, by the usage of this technology, the real perpetrators diverted attention from themselves, disguised their own identity, and by making it appear Plaintiff's friends were involved in her assault, it succeeded in making Plaintiff feel isolated and without support. The latest technology available which induces auditory phenomena is referred to as the "Radio Frequency Hearing Effect."

560. This overwhelming documentation proves - without question - that technology exists which can transmit "voices" to another person's mind, a point which cannot be overemphasized. More importantly, according to this definition, the military admits to using satellites to transmit voices to "selected audiences," apparently via United States NASA Tracking and Data Relay Satellites and from other private or public facilities located around the world. As a result, it is technologically feasible to isolate, identify, and track a human being via computer/brain interface via satellite.

561. Plaintiff believes the reason why V2K was included within the arsenal of nonlethal weaponry is because this technology was originally intended to incapacitate a target, instead of killing them. Sending "voices" to another, clandestinely, falls within this category of weaponry because hearing "voices" in one's head is tormenting, it does lead to many peoples eventual incapacitation, and once these symptoms are reported to the mental health community, the target is discredited, stigmatized and diagnosed as schizophrenic, due to their symptomology which is diagnosed as "auditory hallucinations." The perfect cover for hiding illegal, invasive military technology. However, the military refers to hearing voices as V2K, acoustic weapons, Artificial Telepathy, Microwave Hearing, Synthetic Telepathy, and Auditory Perception.

562. In the introduction to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, DSM-IV-TR (2000) under Cautionary Statement, it reads:

"These Diagnostic criteria and the DSM-IV Classification of mental disorders reflect a consensus of current formulations of evolving knowledge in our field. They do not encompass, however, all the conditions for which people may be treated or that may be appropriate topics for research efforts."

563. The DSM is updated frequently which is obvious due to the fact the DSM authors include a section which describes proposals for new categories which might be included in future editions. Even though this Diagnostic manual is used by clinicians world-wide and is considered authoritative, the DSM authors own caveats acknowledge that their manual is limited, and does not include all possible human conditions. Presently most mental health practitioners explain hearing "voices" as a product of brain dysfunction. Under the DSM definition of Schizophrenia, it reads:

"Auditory hallucinations are usually experienced as voices, whether familiar or unfamiliar, that are perceived as distinct from the person's own thoughts … it is noted that two or more voices, conversing with one another or voices maintaining a running commentary on the person's thoughts or behavior have been considered to be particularly characteristic of Schizophrenia."

564. Based on the overwhelming evidence available proving that voices can be externally induced by military technology from a remote location, the DSM should be considered an archaic authority on the subject, and mental health professionals should not assume that hearing voices is a product of "auditory hallucinations," which is prevalent in Schizophrenia. Consequently, based on Plaintiff's extensive experience with the mental health community as both a therapist and victim of the illegal usage of military technology, if a client informs a mental health professional that they are impaired by nonlethal technology, Plaintiff believes it is unethical to diagnose the client as mentally ill and force medication on that client. Rather the client should be considered mentally disabled and counseling should be geared towards efforts to assist Plaintiff to cope with the assaults.

565. Congressman Dennis Kucinich, past Presidential Candidate, authored a Bill H.R. 2977 on October 2, 2001 called the Space Preservation Act of 2001 acknowledging the ability to effect the population by the usage of space-based weapons. The Bill introduced its intention as:

"To preserve the cooperative, peaceful uses of space for the benefit of all humankind by permanently prohibiting the basing of weapons in space by the United States, and to require the President to take action to adopt and implement a world treaty banning space-based weapons."

566. The Bill requested the United Nation and the President to order the permanent termination of research and development, testing, manufacturing, production, and deployment of all space-based weapons in the United State and their components. Mr. Kucinch's definition of "Weapons" was a "device" capable of any of the following:

- Damaging or destroying an object (whether in outer space, in the atmosphere, or on earth) by:

- Firing one or more projectiles to collide with that object

- Directing a source of energy, including molecular or atomic energy, subatomic particle beams, electromagnetic radiation, plasma, or extremely low frequency [ELF] or ultra low frequency [ULV] energy radiation against that object; or any other unacknowledged or as yet undeveloped means.

- Inflicting death or injury on, or damaging or destroying a person (or the biological life, bodily health, mental health, or physical and economic well-being of a person) through the use of land-based, sea-based, or space-based systems using radiation, electromagnetic, psychotronic, sonic, laser, or other energies directed at individual persons or targeted populations for the purpose of information war, mood management or mind control of such persons or populations.

Such terms include exotic weapons systems such as electronic, psychotronic, or information weapons, chemtrails, high altitude ultra low frequency weapons systems.

567. Unfortunately, Mr. Kucinich' Bill was withdrawn. But what is important in reviewing this paper trail is that Congressman Kucinich had enough information which convinced him that space-based weapons were being used on the public for "mind control" purposes, and he wanted to bring those concerns into the public arena and make it illegal to victimize a human being on this level. If this Bill had passed, Plaintiff believes it would have made "Voice to Skull" [V2K] devices, "Voice Synthesis Devices," and the usage of Extremely Low Frequencies [ELF] as a weapon illegal because, as it clearly states on the Center for Army Lessons Learned website, it is by the usage of space-based satellites that "voices" are transmitted, which indicates these are space-based weapons.

568. Defendants M. Aquino, Scott L, M. D., and others told Plaintiff numerous times that they were monitoring her by technology which involved human/computer interface. It was clear they could not only send their voices to Plaintiff but they could also read her thoughts and could communicate with her sometimes for hours at a time. Plaintiff discovered that not only is it possible to send "voices" to a selected target but current "Mind-Reading" capability is quite provable.

569. In a Washington Times article, dated August 17, 2002, "NASA Plans to Read Terrorists Minds At Airports," it was reported that NASA's Ames had the ability to "read minds." It read, in part:

"Airport security screeners may soon try to read the minds of travelers to identify terrorists. Officials of the National Aeronautics and Space Administration have told Northwest Airlines security specialists that the agency is developing brain-monitoring devices in cooperation with a commercial firm, which it did not identify.

Space technology would be adapted to receive and analyze brain-wave and heartbeat patterns, then feed that data into computerized programs 'to detect passengers who potentially might pose a threat,' according to briefing documents obtained by the Washington Times."

"NASA wants to use 'noninvasive neuron-electric sensors,' imbedded in gates, to collect tiny electric signals that all brains and hearts transmit. Computers would apply statistical algorithms to correlate physiologic patterns with computerized data on travel routines, criminal background and credit information from 'hundreds to thousands of data sources,' NASA documents say. The notion has raised privacy concerns. Mihir Kshirsager of the Electronic Privacy Information Center says such technology would only add to airport-security chaos...The organization obtained documents July 31, the product of a Freedom of Information Act lawsuit against the Transportation Security Administration, and offered the documents to this Newspaper .... 'We're getting closer to reading minds than you might suppose,' says Robert Park, a physics professor at the University of Maryland and spokesman for the America physical Society. 'It does make me uncomfortable. That's the limit of privacy invasion. You can't go further than that.'... 'We're close to the point where they can tell to an extent what you're thinking about by which part of the brain is activated, which is close to reading your mind. It would be terribly complicated to try to build a device that would read your mind as you walk by.' The idea is plausible, he says, but frightening. "At the Northwest Airlines session conducted Dec. 10-11, nine scientists and managers from NASA Ames research Center at Moffett Field Calif. proposed a 'pilot test' of the Aviation Security Reporting System."

570.  Shortly after this article was published, NASA issued a statement denying that they had "mind reading" capability, but they are lying. The means to do this is fully operational and the public needs to be informed that this technology exists. It appears NASA was concerned that they might be sued by Privacy organizations because of their illegal surveillance capabilities. Further, NASA AMES was the organization named in this article who can "read minds," and it was NASA AMES who first made contact with Plaintiff in early 2001, via then some unexplained type of telepathic contact.

571.  In addition to the fact that at times Plaintiff had lengthy conversations with various individuals who could "read" her mind, they could access her dreams and visualizations as well. Plaintiff discovered that the ability to monitor visualizations was within the capability of "mind-reading" technology by the usage of Magnetic Resonance Imaging [MRI], and surprisingly documentation of this technology's existence is documented on several mainstream web sites. What is missing in the following articles is the fact that not only can the brain/mind be imaged for nefarious purposes but the entire body can be targeted as well.

572. The following articles describe the usage of MRI's to read a subjects mind. In one article titled, "Mind-Reading Machine Knows What You See," dated April 25, 2005, published on the internet site NewScientists.com, it discussed the ability to monitor the visualizations of a subject. It read, in part:

"It is possible to read someone's mind by remotely measuring their brain activity, researchers have shown. The technique can even extract information from subjects that they are not aware of themselves. So far, it has only been used to identify visual patterns a subject can see or has chosen to focus on. But the researchers speculate the approach might be extended to probe a person's awareness, focus of attention, memory and movement intention. In the meantime, it could help doctors work out of patients apparently in a coma are actually conscious … In a separate study, also published in Nature Neuroscience, John-Dylan Haynes and Geraint Rees at University College London, UK, showed two patterns in quick succession to 6 volunteers. The first appeared for just 14 milliseconds - to quick to be consciously perceived by the viewer. By viewing MRI images of the brain, the researchers were able to say which image had been flashed in front of the subjects."

573. Mind-Reading technology was also documented in a February 5, 2006 article, published on the Guardian Observer's web site titled, "We are Moving Ever Closer to the Era of Mind Control, The Military Interest in New Brain-scanning Technology is beginning to Show a Sinister Side." It read, in part:

"Brain imaging has become familiar. Scanners, known by their initials – CAT, Pet, MRI- began as clinical tools, enabling surgeons to identify potential tumors, the damage following a stroke or the diagnostic signs of incipient dementia. But neuroscientists quickly seized on their wider potential. The images of regions of the brain "lighting up" when a person is thinking of their lover, imagining traveling from home to the shops, or solving a mathematical problem have captured the imagination of researchers and public alike. What if they could do more? … More seriously, there is increasing military interest in the development of techniques that can survey and possibly manipulate the mental processes of potential enemies, or enhance the potential of one's own troops. In the US, it stretches back at least half a century. Impressed by claims that the Soviet Union was developing psychological warfare, the CIA and the Defense Advanced Projects Agency (Darpa) began their own programmes. By the 1960's, Darpa, along with the US Navy, was funding almost all US research into "artificial intelligence", in order to develop methods and technologies for the "automated battlefield" and the "intelligent soldier". Contracts were let and patents taken out on techniques aimed at recording signals from the brains of enemy personnel at a distance, in order to "read their minds"… The step beyond reading thoughts is to attempt to control them directly … A new technique – transcranial magnetic stimulation (TMS) has begun to generate interest. This focuses an intense magnetic field on specific brain regions and has been shown to affect thoughts perceptions and behavior … TMS at a distance is now under active military investigation."

574. In a December 2006, 48 page report titled, "US Electromagnetic Weapons and Human Rights" by Peter Phillips, Lew Brown and Bridget Thornton of Sonoma State University, they cite their concerns about Electromagnetic Frequency [EMF] devices and human rights violations. It reads, on pg. 3:

"This research explores the current capabilities of the US military to use electromagnetic (EMF) devices to harass, intimidate, and kill individuals and the continuing possibilities of violations of human rights by the testing and deployment of these weapons ... Americans have little idea about the research concerning the capabilities of electromagnetics, directed acoustics, or computer-human interfacing ... The majority of American do not know that we are currently using these new-concept weapons in Iraq and Afghanistan. Indiana University law professor David fiddler stated to the Economist, "because these weapons are most likely to be used on civilians, it is not clear that using them is legal under the international rules governing armed conflict...if they are used in conjunction with conventional weapons, the could end up making war more deadly, rather than less."

"Neurological Technology which has therapeutic applications with Alzheimer's, epilepsy, depression, and stroke victims using Transcranial Magnetic Stimulation [TMS], allows a paralyzed person to control a computer screen or a limb with a brain implant ... From universities to private business to the military, advances in neuron-technology can be used for amazing good. However, as we learned from the history of the Cold War, technology that has the capacity to heal also has the capacity to harm. Of great concern is the research being conducted at DARPA, which is trying to revolutionize the way soldiers receive information, respond to orders, adapt to stress, and perform while sleep deprived ... One application of augmented cognition allows a user to monitor a person's brain function and send anticipatory commands to the person being monitored. For instance, a military command unit will be able to monitor a pilot in a cockpit, and based on the sensory output of the soldier, the base command can input messages directly into the pilot's brain to improve performance. DARPA describes this as a human computer symbiosis whereby, 'This research will enable development of closed loop human-computer technologies where the state of the user is measured, analyzed, and automatically adapted to by the computational system. The increase in human-computer relations and the ability to manipulate and control a person's senses, memory, and neural output has wide applications ... The basic ability to enter a person's mind is not a futuristic fantasy. This is real and in prototype. Darpa began this research in 1983.

575. In addition to the above information proving that "mind-reading" capability is a reality, in 2002 Plaintiff received a report which had been ostensibly filed in Civil Court under the Civil case name and number, John St. Clair Akwei vs. NSA, Civil Action No: 92-

0449. This report was published on the internet and purported to describe the inner workings of the National Security Agency [NSA] in regards to their surveillance capabilities via computer/brain interface which was referred to as "Remote Neural Monitoring." Because Scott L. had told Plaintiff he worked for the NSA, Plaintiff read this report with interest.

576.  John St. Clair Akwei (or someone using his name - which is what Plaintiff believes occurred after she investigated) did file a lawsuit against the NSA, but it was cursory, poorly written, was 6 or so pages, and he did not appear to be the same personality who wrote the sophisticated, detailed information about the inner-workings of the NSA which is posted on the internet under the case name and filing number of the Akwei lawsuit. Plaintiff sent for this case and discovered that this report was not in the case file. There could be many reasons for that, but one possibility is that someone knowledgeable about the NSA took the opportunity to disclose illegal activity by the NSA under the cover of this lawsuit.

577.  This report explained in some detail how the NSA monitored people by computers (which they referred to as Remote Neural Monitoring) which had been occurring for at least the past 15 years.  In brief, excerpts from the document reading John St. Clair Akwei vs. NSA, Ft. Meade, MD, USA, read:

Pg. 3:

"The NSA's mission and the NSA's domestic Intelligence Operation Communications Intelligence (COMINT) includes 'Blanket coverage of all electronic communication in the U.S. and the world to ensure national security. The NSA at Ft. Meade, Maryland has had the most advanced computers in the world since the early 1960's. NSA technology is developed and implemented in secret from private corporations, academia, and the general public."

"Domestic Intelligence (DOMINT): 'The NSA has records on all U.S. citizens. The NSA gathered information on U.S. Citizens who might be of interest to any of the over 50,000 NSA agents (HUMINT). These agents are authorized by executive order to spy on anyone. The NSA has a permanent National Security Anti-Terrorist surveillance network in place. This surveillance network is completely disguised and is hidden from the public."

"NSA personnel can control the lives of hundreds of thousands of individuals in the U.S. by using the NSA's domestic intelligence [Domint] network and cover businesses. The operations independently run by them can sometimes go beyond the bounds of law. Long-term control and sabotage of tens of thousands of unwitting citizens by NSA operatives is likely to happen. NSA Domint has the ability to covertly assassinate U.S. citizens or run covert psychological control operations to cause subjects to be diagnosed with ill mental health."

Pg. 4:

"A subject's bioelectric filed can be remotely detected, so subjects can be monitored anywhere they are. With special EMF equipment NSA cryptologists can remotely read evoked potentials (from EEG's). These can be decoded into a person's brain-states and thoughts. The subject is then perfectly monitored from a distance."

"NSA Personnel can dial up any individual in the country on the Signals Intelligence EMF scanning network and the NSA's computers will then pinpoint and track that person 24 hours-a-day. The NSA can pick out and track anyone in the U.S."

"For electronic surveillance purposes electrical activity in the speech center of the brain can be translated into the subject's verbal thoughts. RNM can send encoded signals to the brain's auditory cortex thus allowing audio communication direct to the brain (bypassing the ears.) NSA operative can use this to covertly debilitate subjects by stimulating auditory hallucinations characteristic of paranoid schizophrenia."

"Without any contact with the subject, Remote Neural Monitoring can map out electrical activity from the visual cortex of a subject's brain and show images from the subject's brain on a video monitor. NSA operatives see what the surveillance subject's eyes are seeing. Visual memory can also be seen. RNM can send images direct to the visual cortex, bypassing the eyes and optic nerves. NSA operatives can use this to surreptitiously put images in a surveillance subject's brain while they are in R.E.M sleep for brain-programming purposes."

578.  The above information described clear attempts, allegedly by the National Security Agency, to remotely implement illegal Mind control and surveillance operations/programs on the public and Plaintiff has every symptom it describes.

579.  Plaintiff discovered United States Patent No. 3,951,134, dated April 20, 1976, invented by Robert G. Malech, which explained how the preceding description of the NSA's activities – Remote Neural Monitoring – or monitoring the brain waves of a human subject from a remote location was achieved. The abstract reads:

<u>Apparatus and Method for Remotely Monitoring and Altering Brain Waves</u>

"Apparatus for and method of sensing brain waves at a position remote from the subject whereby electromagnetic signals of different frequencies are simultaneously transmitted to the brain of the subject in which the signals interfere with one another to yield a waveform which is modulated by the subject's brain waves. The interference waveform which is representative of the brain wave activity is re-transmitted by the brain to a receiver where it is demodulated and amplified. The demodulated waveform is then displayed for visual viewing and routed to a computer for further processing and analysis. The demodulated waveform also

can be used to produce a compensating signal which is transmitted back to the brain to effect a desired change in electrical activity therein."

580. In Patent No. 6,011,991 invented by Aris Mardirossian on January 4, 2000 titled, <u>Communication system and method including brain wave analysis and/or use of brain activity and documents the ability for two-way communication via computer/brain interface and satellites,</u> the Abstract and Description reads:

ABSTRACT

"A system and method for enabling human beings to communicate by way of their monitored brain activity. The brain activity of an individual is monitored and transmitted to a remote location (e.g. by satellite.) At the remote location, the monitored brain activity is compared with pre-recorded normalized brain activity curves, waveforms, or patterns to determine if a match or substantial match is found. If such a match is found, then the computer at the remote location determines that the individual was attempting to communicate the word, phrase, or thought corresponding to the matched stored normalized signal"

DESCRIPTION

"This invention relates to a system and method for enabling human beings to communicate with one another by monitoring brain activity. In particular this invention relates to such a system and method where brain activity of a particular individual is monitored and transmitted in a wireless manner (e.g. via satellite) from the location of the individual to a remote location so that the brain activity can be computer analyzed at the remote location thereby enabling the computer and/or individuals at the remote location to determine what the monitored individual was thinking or wishing to communicate."

581. It is overwhelmingly clear, based on these Patents, that it is possible to have two-way conversations with a target by remotely monitoring the brain waves of that target via satellite and computer/brain interface.

582. Because of this capability, Plaintiff had other reasons to be concerned when her perpetrators threatened that because of their illegal surveillance capabilities they were now aware of the numbers of Plaintiff's bank accounts, her credit card numbers, her pin numbers, and the names and addresses of her relatives.

583. From May 11, 2001 to November 2002, Defendant Aquino and others kept Plaintiff busy almost 24 hours a day by experimenting on her with the above described technology and other technology yet to be revealed. At one point, Plaintiff stayed awake for 7 days without eating and found little to no need to sleep because of the non-stop assault and communication.

584. Plaintiff began seeing unexplained phenomena on almost a daily basis. In approximately June 2001, about 11PM, Plaintiff was driving down an off-ramp, onto the highway, when she saw a low-flying triangular shaped craft, coming directly toward her car. It then disappeared in a flash. The Plaintiff was so frightened by this, she put her car into reverse and illegally sped backwards, up the off-ramp, to another off-ramp, which went in the complete opposite direction on the freeway. The Plaintiff wound up driving aimlessly around the Grossmont College campus, and then heard a supportive sounding voice telling her to get out of her car and to immediately get under a truck because the "ET's" were going to try to "transport" her. The Plaintiff hid under a truck and saw several more objects in the sky that appeared to be some type of craft.

585. Plaintiff discovered a list of terms by an expert in remote assault weaponry which explained how it was possible to induce visual phenomena to a target. According to "Nonlethal Weapons: Terms and References," by Robert J. Bunker, Editor, for the USA Institute of National Security Studies, posted at http://www.usafa.af.mil/inss/OCP/ocp15.pdf, under the term "HOLOGRAMS," it reads:

"HOLOGRAM, DEATH: Hologram used to scare a target individual to death. Example, a drug lord with a weak heart seeks the ghost of his dead rival appearing at his bedside and dies of fright."

"HOLOGRAM, PROPHET: The projection of the image of an ancient god over an enemy capitol whose public communications have been seized and used against it in a massive psychological operation."

586. The usage of holograms might explain why Plaintiff began seeing unusual visual imagery. If Plaintiff had described this and others types of visual imagery she was eventually subjected to, it might have caused a mental health professional to mistakenly diagnose Plaintiff as experiencing "visual hallucinations."

587. From May 11, 01 to the present, March 2008, in addition to being psychologically attacked by V2K, Plaintiff has been physically attacked by remote assault weapons. They include Electromagnetic Radiation weapons which can cause the bodily tissues to heat from a distance (in other words, cause burns), radio-frequency weapons, pulsed microwaves and acoustic weapons. After Scott L. told Plaintiff that advances in fifth dimensional physics partially explained how Plaintiff was being targeted, Plaintiff believes that the latest sophisticated assaultive classified technology available is a combination of computer/brain interface, voice to skull technology, and Virtual Reality Telepresence, in which the target is the Virtual Reality landscape. Coincidentally, this technology was researched by NASA AMES in the early 1990's. Plaintiff was eventually told that her perpetrators were using virtual reality headgear and that this technology produced a computer image of the target on computers which were portable, enabling the perpetrator to assault the target from any location. Plaintiff believes that Virtual Reality Telepresence capabilities need to be fully investigated.

588. Defendant Aquino, Scott L. and M.D. told Plaintiff that their intent was to injure her as much as possible internally but not so severely that the medical community would be able to document the injury, which is the very definition of nonlethals – the ability to torture someone without leaving a trace of evidence. This ability to secretly torture was discussed in a news article titled, "Invisible Beam Tops List of Nonlethal Weapons," by Greg Gordon, June 1, 2004, published in the Bee Washington Bureau.

589. Other terminology that describes this weaponry is documented in a report titled, "Nonlethals Weapons, Terms and References," by Robert J. Bunker, dated December 1996, (referred to earlier) He describes:

Acoustic Blast Wave, Projector: "Energy generation from a pulsed laser that will project a hot, high pressure plasma in the air in front of a target. It creates a blast wave with variable but controlled effects on hardware and troops."

590. Throughout May 2002 to the present, Plaintiff has been hit in the head repeatedly by a weapon that felt like a blast. Beginning in 2003 to the present, Defendants M. Aquino, his wife, Lilith Aquino, Scott L., M. D., Robert M., his wife, Peggy N. and Peter G. and Kevin F. have tormented Plaintiff by directing this weapon into the interior of her head. At first it was difficult for Plaintiff to read simple language after being assaulted in this way but she eventually learned to compensate. The report further describes the capabilities of this technology:

Acoustic Bullets: "High power, very low frequency waves emitted from one to two meter antenna dishes. Results in blunt object trauma from waves generated in front of the target. Effects range from discomfort to death. A Russian device that can propel a 10 hertz sonic bullet the size of a baseball hundreds of yards is thought to exists."

591. Throughout May 2001 to 2003, Plaintiff experienced being shoved several times by some unknown means, several times so hard that she fell down on her knees. Defendant M. D. and Scott L. would assault Plaintiff's muscle groups and the cartilage in her knees, telling Plaintiff she would be so thin and crippled that the medical community would be diagnose her with Muscular Dystrophy. They also told Plaintiff they were assaulting her glandular system in order to try to cause subtle changes in her body. Plaintiff's weight had been stable at 118 for 20 years, but as a result of that damage, in addition to being forced into taking psychotropic medication for five years by the criminal justice system, Plaintiff now weighs 180 pounds. The report continues:

Acoustic, Infrasound. "Very low-frequency sound which can travel long distances and easily penetrate most buildings and vehicles. Transmission of long wavelength sound creates biophysical effects nausea, loss of bowels, disorientation, vomiting, potential internal organ damage or death may occur. By 1972 an infrasound generator had been built in France which generated waves at 7 hertz. When activated it made the people in range sick for hours."

592.  For the past seven years, since May 2001, Scott L. has hit Plaintiff with a blast of energy in her stomach region which causes her to vomit.

593.  Defendants M. Aquino and Scott L. have told Plaintiff that they used the facilities at Scientific Applications International Corporation [SAIC] in San Diego, Lawrence Livermore Laboratory, Sandia Laboratory and NASA AMES to target Plaintiff.

594. In a paper titled, "US Electromagnetic Weapons and Human Rights," dated Dec. 2006, authored by the Media Freedom Foundation from Sonoma State University, the authors mention that due to private military contractors not needing to respond to FOIA requests, private corporations like Aardvark Tactical, Inc., Ionatron, and SAIC, were free to develop nonlethal weaponry without much oversight. They write:

> "There is a clear consensus of concern for the potentiality of human rights
> abuse with EMF weapons testing and use. They collectively agree that the
> U.S. is the leading global researcher in this area. "It is clear that we know
> very little about the actual levels of experimentation research, and capabilities
> of EMF weapons technologies due to high levels of U.S. Governmental
> Security."

595.  In approximately June-July 2001, Plaintiff was exercising with the Chinese martial art Tai Chi - which is meant to circulate internal energy - when she collapsed and was left in a weakened state for several weeks. Scott L. eventually confessed to Plaintiff that he had been experimenting, trying to impact Plaintiff's atomic field from a distance from Lawrence Livermore Laboratory, and that she was his "science project."

596. Plaintiff has a conference schedule, dated November 16-17 1993, from a "Classified Conference" which had been sponsored by Los Alamos Laboratory about this technology. A speaker from Livermore Lab was scheduled to give a lecture on nonlethals at that time so it is clear that this subject was researched by Lawrence Livermore Laboratory and Los Alamos Laboratory. Lawrence Livermore Laboratory was managed from its inception in 1952 through September 2007 by the University of California School System for the U.S. government. The Department of Energy funds these laboratories.

597.  It has been verified that one of Plaintiff's perpetrators obtained his Ph.D. from UC Davis in Atomic Particle Physics during this time period and worked at a Livermore Lab facility. Plaintiff believes that several other perpetrators either worked or are presently employed by the UC School system.

598.  In early June 2001 Plaintiff stayed in a motel room. Once she was in her room, Defendant M. Aquino and Lorne G. spoke to her, saying they were going to "rape" her. Plaintiff experienced a painful physical sensation in her vagina and then discovered that she was profusely bleeding from her rectum and vagina. Plaintiff took off her pants and tried to clean up. A voice then told her that they were going to kill her by "poisoning" her. Another

person told Plaintiff to open up the door of her motel room. Plaintiff opened the door and then felt a force push her out the door, into the hall. Plaintiff was then locked out of her hotel room with blood streaming down her legs. The hotel manager was unavailable which caused Plaintiff to call a relative, telling her she was about to be "poisoned," and she needed some assistance. The police and EMT's arrived and took Plaintiff to her room and wanted to know why there was so much blood on the floor. Plaintiff said she had been "raped." The EMT's wanted to take her to the hospital but Plaintiff refused.

599. After these types of assaults, Plaintiff would hear a voice advising her to go to the hospital to document any physical damage done. Plaintiff tried to but because Plaintiff had no insurance, she was forced to go to the emergency rooms of Mercy, Alvarado and Thorton Hospitals throughout 2001. These hospital emergency rooms only screen out blatant and obvious physical injuries and so were not able to document any injury to Plaintiff at that time. Plaintiff was unable to pay for these hospital room visits because she was incapable of working due to being assaulted 24 hours a day and did not have sufficient funds.

600. On June 10, 2001, Plaintiff was sitting in her living room when her chest began hurting. Phil S. and John Price told Plaintiff via V2K that they were going to induce a heart attack. Plaintiff was told not to get up from her chair but to remain seated. Plaintiff immediately got up and tried to walk down the hall to her bedroom where there was a phone, but she kept falling down. Plaintiff ended up on the floor of her bedroom in a stupor while she felt sensations as if her heart was jumping out of her chest wall. This was just one of several instances in which Plaintiff believed she was going to die. Every time this occurred, she prayed and prepared to die, which she also did in this instance. Plaintiff then heard a new voice saying, "This is Major _____, I want to puke at what's being done to you. I'm so sorry, we didn't know you were such a good person. Someone please stop this." Another person began speaking to Plaintiff in apparent efforts to relax her and she lay there for several hours and then went to sleep.

601. After Plaintiff woke up, she drove to Grossmont hospital to see if they could document any damage done to her. They did. Plaintiff had no prior medical problems with her heart but after Grossmont Hospital technicians performed an ECG test, on June 10, 2001, the Cardiology Department documented that Plaintiff had an "abnormal ECG," sinus tachycardia with "short PR, and "ST & T wave abnormality." At that time Plaintiff told the emergency room physician that she had been "raped" the week prior in efforts to document any physical damage, but there was none.

602. Three times from May 2001 to 2002, Plaintiff felt sensations as if her mind had exploded. In late May 2001, her mind felt like it was filled with some type of field/energy which was later identified as a nonlethal weapon called Extremely Low Frequencies [ELF]. Voices began echoing in her mind and it sounded like she was speaking in "tongues" because of the nonsensical sounds.

603. The second time this occurred, Plaintiff was in her living room. The field in her

home was so intense, her tongue began to vibrate. Plaintiff began responding to the voices she was hearing until a male voice advised her to stop responding because she was in an Artificial Intelligence program that became activated when she responded. When Plaintiff stopped "thinking," the voices stopped. This is disturbing because if artificial intelligence programs are routinely used while targeting victims with V2K phenomena, this means that great numbers of people can be targeted at once, without the expenditure of much man power.

604. The third time this occurred was in June of 2001. Her mind felt like it was immersed in some type of intense magnetic field, and then it felt like it exploded, and she had great difficulty thinking because her thoughts made no sense. Plaintiff was so psychologically damaged, she could not count change at the grocery store. Plaintiff's perpetrators told her that effect was induced by sending too much ELF or "extremely low frequencies" to her brain. One of her perpetrators then spoke to Plaintiff and said he was going to try to "assist" her with her thinking process. From then on when Plaintiff intended to think a word like "go," it would come out as "stop." Plaintiff was told she was placed on a "word association" program, apparently subliminally, because Plaintiff had no control over her thoughts. Plaintiff eventually discovered that it was specifically designed so that Plaintiff would voice thoughts that were the opposite of her intention. This devastated Plaintiff as she had worked for years to improve her thinking processes in efforts to make herself a better person.

605. Col. John Alexander (ex-director of the Nonlethal Department at Los Alamos Laboratory in New Mexico) described the effects of subliminal persuasion via psychotronics and the impact of ELF or Extremely Low Frequencies in his military paper titled, "The New Mental Battlefield: Beam Me Up, Spock," published in Military Review 1980, Vol. LX, No. 12, 47-54, http://www.Bibliotecapleyades.net/sociopolitical/esp_mindcon16.htm. It reads, in part:

> "The psychotronic weapon would be silent, difficult to detect and would require only a human operator as a power source" …"The use of telepathic hypnosis holds great potential. This capability could allow agents to be deeply planted with no conscious knowledge of their programming. In movie terms, the Manchurian candidate lives and does not even require a phone call" ... "Other mind-to-mind thought induction techniques are also being considered. If perfected, this capability could allow the direct transference of thought via telepathy from one mind or group of minds, to a selected target audience. The unique factor is that the recipient will not be aware that thoughts have been implanted from an external source. He or she will believe that thoughts are original."

> "Soviet researchers studying controlled behavior have also examined the effects of electromagnetic radiation on humans and have applied those techniques against the US Embassy in Moscow. Researchers suggest that certain extremely-low-frequency [ELF] emissions possess psychoactive

characteristics. These transmissions can be used to induce depression or irritability in a target population. The application of large-scale ELF behavior modification could have horrendous impact.

606. Col. Alexander described ELF as electromagnetic radiation and transmissions which could be used to induce depression or irritability in a target population and wrote that the application of large-scale ELF behavior modification could have horrific impact on the population. This is the technology that appears to have been used on Plaintiff. More importantly, the author, Col. John Alexander, openly admitted in this article to the existence of technology which can telepathically impact people from a distance and implant subliminal commands.

607. Lt. Col. Michael Aquino wrote an unpublished paper in response to Col. Alexander's published article that was just quoted titled, "Mind War: The Psychology of Victory," (1980) in which he also discusses ways to impact the public by the usage of extremely low frequencies [ELF] which he appeared to be in favor of, which proves that Aquino is more than aware of this technology. His paper described the U.S. Army's efforts to "map the minds" of neutral and enemy targets. The early efforts to record "evoked" potentials" or "mind-read" was originally referred to by early researchers as "brain-mapping." This paper is posted along with a 2003 update at the Temple of Set website http://www.xeper.org/maquino. It reads, in part:

"LTC John Alexander's Military Review article in support of "psychotronics" intelligence and operational employment of ESP – was decidedly provocative." "Psychotronic research is in its infancy but the U.S. Army already possesses an operational weapons system designed to do what LTC Alexander would like ESP to do – except that this weapons system uses existing communications media. It seeks to map the minds of neutral and enemy individuals and then to change them in accordance with U.S. National interests. It does this on a wide scale, embracing military units, regions, nations and blocs. In its present form it is called Psychological Operations [PSYOPS]" … "There are some purely natural conditions under which minds may become more or less receptive to ideas, and MindWar should take full advantage of such phenomena as atmospheric electromagnetic activity, air ionization, and extremely low frequency waves."

Footnote…"Extremely Low Frequency [ELF] - waves are not normally noticed by the unaided senses, yet their resonant effect upon the human body has been connected to both physiological disorders and emotional distortion. Infrasound wave patterns, including an audience toward everything from alertness to passivity. Infrasound could be used tactically, as ELF-waves endure for great distances."

608. Dr. Michael Persinger, a neuro-psychologist at Canada's Laurentian University and FMSF Advisory Board member, believes he can induce mystical phenomena and ET

abduction scenarios by stimulating the temporal lobes electromagnetically via extremely low frequencies [ELF]. He wrote an article titled, "On the Possibility of Directly Accessing Every Human Brain by Electromagnetic Induction of Fundamental Algorithims," published in Perceptual and Motor Skills, (1995) 80: 791-799. In addition, Dr. Persinger presented a paper to a symposium for the Institute of Electrical and Electronics Engineers [IEEE] in 1979 titled, "ELF Field Mediation in Spontaneous PSI Events: Direct Information Transfer or Conditioned Elicitation," originally published in physicist Russell Targ's book, "Mind at Large," in 1979, and republished in 2002.

609. Mr. Targ disclosed in this book that from 1972-1995, the Department of Defense had funded experiments into psychic phenomena at the Stanford Research Institute [SRI] and spent 20 million dollars over 23 years time. Russell Targ, Senior Physicists Researcher at SRI, reported that these experiments were a success and stated that, without doubt, psychic phenomenon, such as remote viewing and healing from a distance, existed. He claimed that mainstream journals refused to publish these findings due to their ignorance and prejudice. Mr. Targ presented his findings at the symposium of the Institute of Electrical and Electronics Engineers and described a program in the Electronics and Bioengineering Laboratory of SRI where he was conducting experiments in telepathic communications and discussed issues such as whether Extremely Low Frequencies [ELF] could be a carrier for "information transfer," or telepathic contact between two parties, obviously for military applications.

610. Between June 15, 2001 and October 5, 2001, Plaintiff was 5150'd (forcibly taken to the hospital for observation by law enforcement) three times. Plaintiff had been repeatedly seeing unexplained phenomena that appeared to be "UFO's. On June 15, 2001, Plaintiff was seen "talking" to herself while sitting in a doorway. The night before she was 5150'd, Plaintiff had been driving and had been chased by what appeared to be a "UFO" again and drove 20 miles, trying to elude it. Plaintiff exited on an off-ramp to some area unknown to her. Plaintiff jumped out of her car and began running. She felt something like a fist sock her in the back and she tried to run away from it. Plaintiff then stood in an office doorway all night, looking at the sky, where she saw fantastic imagery, while various voices, describing themselves as "aliens," (who Plaintiff believes were actually Defendant M. Aquino and others) told Plaintiff that she was about to be sentenced for her "bad" thoughts. Plaintiff then sat in a doorway all night, trying to talk them into reducing her "sentence," and that is when the police came to take Plaintiff to County Mental Health Psychiatric facility in San Diego. After a brief observation, in which staff noted that Plaintiff was very "thin," Plaintiff was released. She refused to tell the psychiatrists at that time about hearing "voices" because she knew she would be misdiagnosed as a "schizophrenic."

611. After Plaintiff returned home from this hospitalization, unidentified parties told Plaintiff that she was in "hell," she was "dead," and would not ever be able to enter her home again. Plaintiff was then subjected to further induced visual imagery and she stayed outside all night looking at the images of trees and shrubs which had suddenly turned into the shape of animals.

612. On July 3, 2001, Plaintiff was 5150'd for a second time for refusing to eat food. Plaintiff had asked a friend of hers, Dr. Ellen Lacter, to take her to the hospital because Plaintiff wanted to see if her latest assault could be medically documented. Plaintiff's palms had turned white, and she couldn't find a heart beat. Defendants M. Aquino, M. D., Scott L. and others told Plaintiff they were experimenting with "Cybertronics" and "computerizing" her from a distance. They claimed they could take out her body organs, destroy body organs, and she would still live because of the computer/brain interface, even though her body might die. Because Plaintiff was witness and victim to almost incomprehensible technology, she did not know what was possible. Plaintiff was urged by other identities to write about her victimization on the internet but because Plaintiff wrote exactly what had been told to her, she began to appear more and more "delusional."

613. Scott L. had told Plaintiff that he did not want her to eat food, and if she did he would harm one of her relatives, including her younger brother. Consequently, Plaintiff quickly lost weight. At that time Plaintiff was staying at the home of Dr. Ellen Lacter who did not know what was wrong with Plaintiff other than she appeared to be having some type of psychological breakdown. Plaintiff's weight had quickly dropped to 102 pounds due to her suddenly developed "fear" of eating.

614. Dr. Lacter told the Thornton Hospital emergency staff that Plaintiff refused to eat food and thought she was going to die from starvation. Plaintiff was then forcibly hospitalized at County Mental Health Psychiatric facility where she remained for three days.

615. On July 3, 01 and for two days after, the San Diego County Mental health psychiatric facility made Plaintiff drink high calorie drinks and eat food. Because the psychiatric staff did not understand that Plaintiff was being communicated with by V2K technology, they concluded that Plaintiff was "delusional." According to the clinical record, Plaintiff weighed 102 pounds on July 3, 01 and gained four pounds on July 4, 01. Plaintiff decided to leave the hospital against medical advice because she was acutely aware that the medical community was not capable of assisting her.

616. After this hospitalization, Plaintiff returned to Dr. Lacter's house and began contemplating suicide. Plaintiff had her gun in her car but because a shell was stuck in the cylinder, Plaintiff shot the gun into some bushes, trying to dislodge the bullet. Dr. Lacter's husband took the gun away from Plaintiff, called the police, and gave the gun to them.

617. Plaintiff called the police a few months later and asked for the gun back. The officer told her that he would not file charges against her for firing a gun in public but would file charges if she insisted on having her gun back because he didn't think she was psychologically well. Plaintiff asked for her gun back and the officer filed misdemeanor charges against Plaintiff in 2002 for discharging a weapon in public. That is the only criminal history that Plaintiff had at that time.

618. From June 2001 to the day she was arrested November 26, 2002, Plaintiff left her home at approximately 7am and either walked throughout the county, drove her car aimlessly, or rode the trolley system until late at night. From June 2001 to November 2002, while Plaintiff was wondering around town, she lost her purse three times, lost a briefcase, lost her cell phone, and could not pay her bills. During this time, Plaintiff neglected her hygiene and rarely bathed or brushed her teeth. As a result of this medical neglect, after 2004, Plaintiff had extensive dental work which included several cavities filled and root canals.

619. On October 5, 2001, Plaintiff was 5150'd for a third time after she was found "wandering" and loitering in a doorway. That was because Plaintiff had been listening to her "voices" and lost track of time again.

620. In approximately June 2001, after Plaintiff listened to her perpetrators, they contrived a scenario which rationalized why Plaintiff should go "swimming" in Lake Murray, a lake a few blocks from Plaintiff's home. Without much thought, Plaintiff ran to the lake and illegally swam in the lake fully clothed. Plaintiff does not normally like to swim. Plaintiff then ran home at top speed, while a voice told her, "that took exactly 7 minutes and 30 seconds." Plaintiff's perpetrators could never "order" her to do anything against her will and so they often resorted to manipulative story-telling, hoping she would volunteer to do something that ended up making her appear to be very bizarre.

621. Shortly afterwards, Plaintiff's neighbor, Ken Wright, spoke to her about her behavior and wanted to know what was wrong. He had been informed by another neighbor that she had swam in the lake and was acting "crazy." Mr. Wright consulted with another neighbor Paul K. and phoned the police after they heard screaming coming from Plaintiff's home. Plaintiff was screaming because at that time, her perpetrators were drilling into her head with remote assault weapons.

622. Because of these assaults, Plaintiff became severely psychologically incapacitated. As s result, Plaintiff was incapable of renewing her newly acquired MFT license in November of 2001, a license she had worked years to acquire, and as a result, it expired. Plaintiff was completely unable to file a lawsuit during this time period due to her psychological incapacitation.

623. From June 2001 to 2007, two individuals, alleging to be from the Soviet Union interacted with Plaintiff, via V2K, telling her they had been hired to not only physically and psychologically assault Plaintiff but to spiritually murder her. They told Plaintiff they made millions of dollars targeting others esoterically in their native country because of their affiliations with the "KGB" and satanists. These perpetrators told Plaintiff many stories about how exactly this had occurred. One story was that Tani Jantsang had an "uncle" in the KGB who was bribed by Michael Aquino. Defendant Jantsang did write a message on the internet indicating that she had a relative in the KGB. They told Plaintiff that it was the Soviet Union who began the process of computer/brain interface necessary to target plaintiff via their satellite. According to Cheryl Welsh of CAHRA, Citizens Against

Human Rights Abuse, 75% of victims of nonlethal technology are from the Soviet Union and the United States.

624. Although it would seem that the average nonlethal perpetrator would not find it of interest or too egregious to attack an opponent on the esoteric level, it might interest the average Satanist. When satanists sacrifice their victims to satan, they symbolically attempt to destroy their victims soul, or send it to hell, which is one reason why they make their victims last waking moments on earth one of intense suffering. Plaintiff's perpetrators told Plaintiff they had isolated where the astral body resided and were intent on attacking her on this level.

625. As difficult as it is to believe, the public should be made aware that it is a fact that the "astral body" has been mentioned in the nonlethal literature as well as its usage for military surveillance purposes. In a July 1972 declassified paper titled, "Controlled Offensive Behavior," by Captain John D. La Mothe, Medical Intelligence Office, Office of the Surgeon General, Department of the Army, posted at http://www.bibliotecapleyades.net/esptemas4.htm it described the Soviet Union's interest in out-of-body travel and what the United States government thought the countermeasures should be. It read, in part:

> "This report summarizes the information available on Soviet research on human vulnerability as it relates to incapacitating individuals or small groups … One of the purposes of this report is to evaluate research in the field of influencing human behavior in order that the US may be in a position to develop certain countermeasures … Super-high frequency electromagnetic oscillations may have potential uses as a technique for altering human behavior … In certain nonlethal exposures, definite behavioral changes have occurred … The science of parapsychology includes special sensory biophysical activities, brain and mind control, telepathic communications or bio-information, bioluminescent and bioenergetic emissions, and the effects of altered status of consciousness on the human psyche … Other terms that may appear in the Soviet literature that normally mean parapsychology are psycho physiology, psychotronics, psychoenergetics, or biophysical effects … The more sinister aspects of paranormal research appear to be surfacing in the Soviet Union … There are numerous reports on Soviet applications of clairvoyance, hypnotism, dowsing, etc, in military operations … The Apport Technique: The following discussion on apports and astral projection is not intended to be an endorsement for its scientific the USSR and the US are keenly interested in this phenomenon … It is a know fact that the Soviet Union takes the appearance of luminous bodies very seriously as evidence by the Kirlian photography of the human body's aura … The individuals who have studied these effects (real or otherwise) have suggested that since these bodies can travel unlimited distance and are able to pass through solid material (walls), they might well be used to produce instant death in military and civilian officials. It is further conjectured that these bodies could disable military equipment or communication nets."

"According to Pullman, Director of the Southeast Hypnosis Research Center in Dallas, Texas, before the end of the 1970's, Soviet diplomats will be able to sit in their foreign embassies and use ESP (in this case a form of the apport technique) to steal the secrets of their enemies ... Pullman states that a spy would be hypnotized, then his invisible "spirit" would be ordered to leave his body, travel across barriers of space and time to a foreign government's security facility, and there read top-secret documents and relay back their information. Such 'astral projection' already has been accomplished in laboratory settings, Pullman said, adding that the Russians are probably now trying to perfect it."

626. In this declassified report, just referenced, the author described the Soviet Union's research into parapsychology and clearly described what military applications the "astral body" might have.

627. Col. John Alexander, (ex-director of the Nonlethal Department at Los Alamos lab) also discussed the military application of the astral body in his previously cited military paper, " The New Mental Battlefield: Beam Me Up, Spock," published in Military Review. He specifically mentioned the Soviet Union's research into this area and cited the preceding excerpts from Controlled Offensive Behavior, Col. Alexander wrote:

"Psychotronics may be described as the interaction of mind and matter. While the concepts may stretch the imagination of many readers, research in this area has been underway for years, and the possibility for employment as weaponry has been explored. To be more specific, there are weapons systems that operate on the power of the mind and whose lethal capacity has already been demonstrated ... The other area of experimentation involves parapsychological phenomena known as the out-of-body experience [OOBE], remote viewing, extrasensory perception or bio-information ... It has been demonstrated that certain persons appear to have the ability to mentally retrieve data from afar while physically remaining in a secure location ... It is generally believed that the Soviets and their allies are well in the lead in parapsychological research ... Certainly with development, these weapons would be able to induce illness or death at little or no risk to the operator. Range may be a present problem, but this will probably be overcome if it has not been already ... The Soviets have further developed techniques to control and actively employ their knowledge of parapsychology. Included in the research has been investigation into areas such as telepathy (the mental awareness of information over distance), precognition (the knowledge of future events), telekinesis (movement of matter with the mind) and the transfer of bioenergy from one body to another ... The ability to heal or cause disease can be transmitted over distance, thus inducing illness or death for no apparent cause ... The existence of energy emanations from the body has been repeatedly demonstrated through radiation field photography known as the Kirlian effect. This phenomenon, which has been widely replicated in the West, reflects changes in emotional condition."...

"The bulk of out-of-body data from US research is anecdotal. Literally thousands of people have reported the experience of being discretely and consciously located outside of the physical bodies and yet able to view themselves from that perspective with a total awareness of activities in that area. This phenomena is frequently associated with life-threatening circumstances such as accidents, illness or extreme danger. Many soldiers who have had 'close calls' in combat have reported being in the OOBE state of consciousness Many physicians have been embarrassed by patients who, after being revived from an unconscious state, were able to repeat conversations and events that had occurred while they were unconscious ... Scientific experimentation has also been conducted with OOBE. Test subjects have induced OOBE states while being physiologically monitored and have retrieved data that was not available through normal means. Experiments frequently include identification of random numbers either placed out of sight nearby or at a more distant location."

628. Col. Alexander described the scientific evidence which proved the existence of the astral body by Kirlian photography in a mainstream military journal, and its military applications, and that was 27 years ago.

629. According to "Remote Viewers: The Secret History of America's Psychic Spies," by Jim Schnabel, 1997, several well known nonlethal warfare advocates, including Admiral Albert Stubblebine and Col. John Alexander, had attended Robert Monroe's classes and week long workshops to learn how to "astral travel" by the usage of sound entrained to specific brain waves. Admiral Albert Stubblebine was the Commander of the Army Intelligence and Security Command [INSCOM] during 1981-1984. From Remote Viewers:

"Not long after Stubblebine reached INSCOM in 1981, Army Intelligence began to blossom under his influence with alternative New Age-style-thinking ... altered state and visualization techniques to try to enhance learning and boost performance ... INSCOM staff officers were sent to a place called the Monroe institute, a retreat center in the Blue Ridge mountains where they lay in darkened cubicles, listened to altered -state-inducing tapes, and tried to have out-of-body experiences."

630. Ironically, Col. John Alexander studied with Dr. Elizabeth Kubler-Ross who was an expert in near-death experiences and how to make a conscious death transition into the "light." Lt. Col. Alexander was also past president of the International Association for Near Death Studies and was, along with five others, a member of the Aviary, a cabal of intelligence agents who purported to study UFO phenomena.

631. Defendant Aquino, and others, also told Plaintiff it was known where the Chakras resided and they were going to destroy Plaintiffs. The seven Chakras are a metaphysical belief system which originated with the Hindus, Chinese, and Tibetians. Many

people in the Western world are practitioners of this belief system and that is what Hatha Yoga is based on, stretching and assuming forms in order to make the body strong enough for the eventual opening of the chakras, with the eventual goal being unity with God. The Chakras are thought to be energy centers which correspond to the endocrine system and nerve centers of the body. Technology exists that can impact the electromagnetic field of the body, which Col. John Alexander described in his discussion of Kirlian photography which photographs the subtle emanations of the body. Apparently after discovering that the astral body could be used as a military weapon and for surveillance purposes, there were attempts made to isolate and incapacitate the astral body and chakras, probably by tracking changes in the electromagnetic/energetic emissions from the body.

632.  On November 26, 2003, Plaintiff plea-bargained to stalking Jennifer Love Hewitt after Plaintiff wrote her a pseudo-threat in October of 2002 in efforts to save her own life. Robert M's "wife," and Defendant M. Aquino, and his wife, Lilith, eventually confessed that they had pretended to be Hollywood figures, such as Jennifer Hewitt and Steven Speilberg, via V2K and what Plaintiff discovered was "Voice Synthesis Devices," in order to drive Plaintiff crazy from pain and fear, in hopes she would publicly discredit herself.

633. Defendant Aquino introduced these Hollywood figures to Plaintiff by claiming that Steven Speilberg was interested in advanced military technology, which he sometimes used on his films (which Plaintiff later discovered was true) and Aquino, through an intermediary, introduced him to a version of the illegal computer/brain interface technology which monitored Plaintiff. Because Aquino has written several stories about "The Lost Ark," and other "Indiana Jones" movies, it is obvious that he admires Steven Speilberg.

634.  Plaintiff asked "Speilberg" why he was violating her privacy and he told her that his special effects studio Dream Works was interested in duplicating the technology on film. The story line was that because they were making a film together - "The Tuxedo" - "Steven Speilberg" introduced Jennifer Hewitt and other selected Hollywood types to this novel technology. It is true these two were making a film together titled The Tuxedo.

635.  Throughout the entirety of 2002, "Jennifer Hewitt," who was later identified as Robert M.'s wife and Lilith Aquino, began cruelly teasing Plaintiff, physically hurt Plaintiff, and succeeded in emotionally devastating Plaintiff, along with Defendant M. Aquino, Scott L., M.D., Robert M., Phil S. and unnamed others.

636.  During this time period, "Steven Speilberg" continued to violate Plaintiff's privacy and refused to remove "Jennifer Hewitt's" access to Plaintiff when she requested his assistance. This culminated in an incident in approximately May of 2002 in which Hewitt/Lilith Aquino and others told Plaintiff that they were going to try to "crack" Plaintiff's skull open. Plaintiff felt a drilling sensation into her skull and began screaming. Hewitt/Lilith Aquino then proceeded to laugh out loud at Plaintiff's suffering.

637. Plaintiff who by that time thought it was possible, although not probable,

that Hollywood billionaires were having "fun" at Plaintiff's expense, attempted to reality check and confronted Ms. Hewitt at a radio station in San Diego in August 2002 just to see how Hewitt responded. The assaults against Plaintiff continued under Jennifer Hewitt's name which then caused Plaintiff to confront Hewitt again at the Latin Grammy Awards on September 18, 2002.  Several individuals told Plaintiff via V2K not to do this but she did it anyway.

638.  For several weeks, Plaintiff had extensive contact with Steven Speilberg's security advisor Mr. Borman, explaining what her predicament was: She did not know what was going on but was interested in discovering if it was possible that Speilberg had access to this military technology, and she informed Mr. Borman repeatedly that she was only interested in remaining within the bounds of legal behavior

639.  Steven Speilberg filed a restraining order during this time period against Plaintiff, which was finalized in October 2002, within days of this confrontation of Jennifer Hewitt because he was concerned that Plaintiff would confront him too in public.  Plaintiff could not attend the court hearing which was held about the restraining order because she was in too much physical pain which her perpetrators were inducing, however she did submit a Declaration to the Los Angeles Superior Court at that time attempting to explain her situation with the facts that were available to her at the time.

640.  Plaintiff was very disappointed to discover that in order to make sure the court ruled in his favor, Mr. Speilberg and his security manager, Kevin Borman, exaggerated and distorted Plaintiff's conduct, history, and statements, causing the media to repeat claims such as Plaintiff had "accused Steven Speilberg of implanting a mind control device in her head," and "Plaintiff believed a group of Satanists were working from Speilberg's basement," and she was "planning something big," all statements which Plaintiff had never made. Plaintiff never made any attempt to directly contact Mr. Speilberg because she wasn't interested. The gist of the complaint was that Speilberg wanted to stop Plaintiff from being able to confront him in a public setting.

641.  Defendants Aquino and his wife, Lilith, Scott L., M. D., and others, then informed Plaintiff they were going to finally kill her and she would be dead within the week. Plaintiff believed them and slept within reach of the telephone. Because she thought she would be safer in the custody of law enforcement, Plaintiff wrote a pseudo-threat to Jennifer Hewitt's web master, Jim Mix, in October 2002 to have herself purposely arrested and to make sure her case became high-profile.  Plaintiff asked Mr. Mix several times to send her threat to Hewitt but because Mr. Mix appeared to think Plaintiff was joking, Plaintiff reminded him that making email threats was a crime and to be sure to "contact the FBI," although she had no intentions of acting on that threat. Because Plaintiff believed in non-violence, resorting to "threats" indicated that Plaintiff was in deep distress.

642.  As Plaintiff planned, and her perpetrators intended, Plaintiff was arrested on November 26, 2002 for writing "terroristic threats" and for "stalking" Jennifer Love Hewitt. While in custody Plaintiff continued to be assaulted by Defendants M. Aquino, his wife

Lillith Aquino, Scott. L., M. D., Robert M., his wife, Kevin F., and others, but they no longer told her they were going to kill her. In fact, they all frightened Plaintiff by continuing to tell her she would not be able to die a normal death due to the latest techniques in computer/brain interface, which is what they intended to happen.

643. Plaintiff later discovered that the investigatory report, written by an investigator at the DA's office under Paul Phingst at that time, further distorted Plaintiff's behavior and conduct, and alleged conduct by Plaintiff that had never occurred. Plaintiff requested of her lawyer, Robert Ford, that she be given permission to act as co-counsel, (or advisor) because she knew her case was too complicated for her naïve attorney to present in court alone.

644. Plaintiff's lawyer, Robert Ford, decided Plaintiff was too "mentally ill," and told her that her belief that she was being targeted by psychotronics was completely "delusional." At that time, the only information Plaintiff had to prove that psychotronics or nonlethals existed was the John St. Clair Akwei vs, NSA report and a July 8, 1996 Calgary Herald article titled, "Scientists Offer the End of Death: 'Soul Catcher' Computer Chip Implanted behind the Eye," which had warnings about computer/brain interface.

645. While in custody, Plaintiff was evaluated by three psychologists, two of whom opined that Plaintiff was either "schizophrenic" or "delusional," and was "paranoid," after she explained what had occurred on the internet between her and her political opponents - which caused her perpetrators endless amusement. Plaintiff was eventually formally misdiagnosed as "mentally ill" and they informed her attorney that his concerns were justified: Plaintiff was too mentally ill to assist her attorney in her own defense. Plaintiff appealed to the court to reconsider because she understood that her past writings were being used as evidence of "mental illness," but since she had discovered that her perpetrators intentionally provided her with mis/disinformation, she no longer wholeheartedly believed in what was contained in those writings, and certainly they should not be used as reason to confine her against her will until she explained the context. Therefore, Plaintiff argued that the underlying facts were in dispute and the psychiatric evaluations should not be considered legitimate. The local judge and the appellate court ruled against Plaintiff which resulted in Plaintiff's incarceration at Patton State Hospital until she got "better." While at Patton, Plaintiff was forced to take psychotropic medication even though medication has never alleviated the external assaults she is experiencing by V2K technology.

646. Plaintiff plea-bargained on November 5, 2003 to "Stalking" Jennifer Hewitt and she was placed on probation for five years. Plaintiff is now serving her fourth year on probation. Plaintiff's attorney told her that the DA Fiona Kahill had said in the Judges chambers that Plaintiff's "child-saving" days were over. Plaintiff had no idea at the time why an attorney in the DA's office would make such a personal remark about Plaintiff until Plaintiff read Defendant Devereaux's correspondence years later in which she stated that Defendant Hopkins had "tampered" with her legal case. Because Defendant Hopkins was obviously a colleague of then DA Paul Phingst, it appeared entirely possible to Plaintiff that this is what occurred because Phingst was still in office at that time. In fact, Ms. Kahill

informed the San Diego Superior court that Plaintiff had a "history" of harassing people on the internet, and used Mark Sauer's news article the "Web of Intrigue" as evidence.

647. Plaintiff, who two years prior to these events had been a high-functioning professional in her local community, was sentenced to five years probation, ordered by the court to see a psychiatrist, take prescribed medication, Plaintiff was ordered not to use the internet or computers at all, to submit to random lie detector tests, and to enroll in a counseling program. Because Plaintiff finally "acted out," which was what her perpetrators planned in furtherance of the ongoing conspiracy to ruin Plaintiff's reputation and career, Plaintiff's Marriage and Family Therapy [MFT] license was revoked in 2004 due to her criminal offense, which caused Plaintiff reputation to be further ruined and resulted in the loss of her career, income and livelihood.

648. From approximately November 2003 to 2004, Plaintiff's psychiatrist was Dr. Glassman at East County Mental Health who increased Plaintiff's medication when she mentioned she still heard "voices." In March 2004, Plaintiff was awarded Social Security Disability benefits because Plaintiff was completely incapacitated and incapable of working which Dr. Glassman attested to. Because Dr. Glassman believed Plaintiff was too incapacitated to be her own payee, Plaintiff's relative was named as her payee.

649. From approximately June 2004 to December 2005, Dr. David Marks acted as Plaintiff's psychiatrist, and in October of 2004, he allowed Plaintiff to become her own payee. But because Plaintiff occasionally decompensated, Plaintiff's checks have continued to have her name and a relative's name on in the event her relative needs to pay her bills.

650. As a result of Plaintiff's incapacitation which began in May 2001, Plaintiff was forced to file bankruptcy on July 7, 2004 due to the amount of unpaid bills, which totaled $60,000. Plaintiff's psychiatrist Dr. Marks wrote a statement to the holder of her school loan, giving her such a poor prognosis of ever recovering, that the holder of the loan cancelled her debt. From approximately 2006 to the present, Plaintiff's psychiatrist has been Dr. Prakash Bhatia.

651. Between the years 2002 to the present, Defendants M. Aquino, his wife, Lilith Aquino, Scott L. M. D., Robert M. his "wife," and occasionally Kevin F., Peggy N., and Peter G. have attempted to take over Plaintiffs mental life even further and have terrorized and tormented Plaintiff. Because of this excessive torment, between the years 2002-2007, Plaintiff could not sit down for any length of time and paced up to 7 hours a day. Because Plaintiff is often kept awake all night by these individuals, she has been forced to take sleeping pills on a semi-regular basis. These facts should prove that Plaintiff met the "insanity" provision of Civil Code and Procedures 352 until on or about May of 2007 when she began exercising her mind due to a court order which allowed her to use the word processor.

652. After Plaintiff was finally released from jail in November 2003, she told her temporary probation officer that she had been pursued by a satanic cult and she expected

them to try to make trouble for her with probation at some point. In approximately March of 2004, Plaintiff was assigned Probation Officer Stephanie Morehead with Anna Guzman acting as Supervisor of Ms. Morehead.

653. In 2004, Plaintiff began to have difficulty with her Probation Officer Stephanie Morehead and Anna Guzman, after they made attempts to violate Plaintiff's First amendment rights to free speech, and routinely mischaracterized Plaintiff in front of the San Diego Superior Court, all of which has caused Plaintiff significant emotional distress. After Plaintiff was invited to appear on the Montel Williams show, they called the producers of the show, telling them she could not appear and instructed the producers to contact them if Plaintiff ever contacted them again. These individuals have never believed that Plaintiff has been targeted illegally with military technology and instead have routinely believed the misinformation and disinformation that has been written about her. Plaintiff believes that these individuals have violated her rights to free speech only because they have a different opinion than Plaintiff about what she is experiencing. Plaintiff believes it is unfortunate that the topic of nonlethal technology appears to be beyond the comprehension of these particular individuals.

654. In mid 2006, because Defendant M. Aquino, his wife, Lilith, Robert M. and his wife became upset with Plaintiff, and wanted to emotionally traumatize her, they told Plaintiff that they had targeted her relatives. Plaintiff was emotionally devastated and decided to bring publicity to the issue again.

655. In mid 2006 Plaintiff decided to write some exploratory letters to the Institutional Review Board of UC Davis, Berkeley, and Irvine, requesting that they investigate whether a UC Davis professor, Scott L., John Price, or Defendant Elizabeth Loftus, had ever listed her as a human research subject because Lawrence Livermore Lab was run by the Office of the President of the UC School System and appeared to research nonlethal technology. The Office of the President responded to Plaintiff by claiming that they had found no public record of such events. Plaintiff was told by UC Irvine that their "Whistleblowers Unit" of UC Irvine would handle her complaint.

656. Plaintiff had expressed in these letters that she had a public "breakdown," the context of which she wanted to explain to the IRB if this issue ever arose. Plaintiff also wrote that she had not pursued this matter earlier because she was afraid of the people involved.

657. In approximately June/August 2006, Plaintiff's probation officer Stephanie Morehead began receiving complaints from the UC Campus Police about the letters she had sent to the IRB's of both UC Davis and UC Irvine. The IRB's had taken Plaintiff's confidential requests for an investigation, and then apparently notified the individuals involved – despite Plaintiffs claim that she had been afraid to come forward until that time – and turned the correspondence over to the campus police, who then sent it to San Diego County Probation and Officer Morehead. Since Plaintiff had not mentioned to any of these IRB's that she was on probation for a criminal offense, and her letters could not possibly

have been construed as threatening, an unknown party who was aware of Plaintiff's probationary status obviously informed the IRB's, Plaintiff believes to discredit and retaliate against her.

658. In approximately August of 2006, Morehead told Plaintiff to cease all communications with the UC System (for that time period) and reiterated to Plaintiff that she was not allowed to use the word processor at all. It became evident that Morehead and the Administration of Probation were speaking to people from these schools and elsewhere who were claiming Plaintiff was guilty of some activity, but Plaintiff did not know what that could be, and feared that she was being "set-up" again by one or more of the Defendants. Plaintiff asked Morehead whether she would be informed about what the exact allegations against her were so that she could defend herself and Morehead said "yes." However, that was not the case.

659. In September of 2006, Plaintiff was informed by her then psychologist that he had received a phone call from Probation Supervisor Anna Guzman who told him she was building a "legal case" against Plaintiff based on Plaintiff's long telephone bill and the complaints made by the UC System. Ms. Guzman had phoned several people on Plaintiffs phone bill but unfortunately did not appear to understand the content of the information that she received from those phone calls. Plaintiff's attempts to access the Akwei v. NSA lawsuit were described by Guzman as attempts to "obtain a court file without a court order," which was an ignorant remark to make because court files are open to the public unless they are ordered sealed by the court; Plaintiff's phone calls to the aid of Congressman Kucinich and other government officials was misconstrued as "calling Capitol Hill," without good causer. Plaintiff has every right to call government officials as they are in office to serve their citizenry. Ms. Guzman then misinterpreted Plaintiff's communication with a researcher known to Plaintiff who investigates the paranormal – apparently because Ms. Guzman did not understand the paranormal or does not believe in its existence. Clearly, because of Probation's misunderstanding, they were attempting to violate Plaintiff's right to free speech. Plaintiff wrote a letter to Ms. Guzman and her supervisor Ms. Donohoo attempting to educate them about these issues and advised them of their mistake. Plaintiff thought that was the end of the matter.

660. On December 14, 2006, Plaintiff asked Probation to schedule a hearing at San Diego Superior Court to return her belongings that were confiscated by the District Attorney and to request word processing and internet/intranet privileges again due to her good behavior.

661. On December 14, 2006, Officer Morehead wrote and Supervisor Guzman signed a report which was submitted to the San Diego Superior Court, titled "San Diego County Probation Department Probation Officer's Supplemental Report, " which was completely filled with false allegations about Plaintiff. " Ms. Morehead wrote:

"The Probation Department scheduled this hearing at the request of the defendant to modify probation conditions relative to full computer access and full library privileges

and permission to write a "tell all" book. Probation is 'strongly' opposed to his modification for the following reasons."

662.   Plaintiff responded that she had never requested permission to write a book and that it was well within her Constitutional rights to write a book if she wished. The court remained silent on this issue. Morehead continued:

"On 5/26/2006, the undersigned received a call from a concerned citizen claiming the defendant was 'posting' her manifesto on the internet. His name is mentioned in the manifesto in a derogatory manner. The undersigned directed the defendant not to access the internet. She said she was researching psychotronics aka electronic harassment and remote neural monitoring. The defendant continues her claim to be a victim of psychotronics, which is the sole cause of her schizophrenia. The defendant adamantly denies any mental illness to present."

663.   The Plaintiff had in fact not been on the internet and it appeared that one of Plaintiff's perpetrators had coincidentally contacted Probation at the approximate time Plaintiff was requesting review by the UC school system's Institutional Review Boards. Ms. Morehead continued:

"On 7/26/2007, the undersigned received a phone call from another concerned citizen and stated the defendant was attempting to send a message to her through 3rd parties threatening to expose private information about the caller. Given the sensitivity of these claims as well as the dynamics of the case before the court the undersigned will clarify further at the Court discretion."

664.   This type of allegation sounded like the false allegations Defendant Devereaux had made to the San Francisco police department to have Plaintiff identified. However, Morehead refused to reveal the names of the complaining parties to Plaintiff. Morehead continued:

"On 8/10/2006, the Probation department received information from Detective Henock of the UC Davis police regarding an incident report that had been filed on 8/2/2006. The defendant sent a letter and called to report that she was a subject of unauthorized experiments by a former student and a former staff member using computer/brain interface technology. The defendant also sent a 40 page faxed document outlining her background and stating she was writing to inform the Internal Review Board (IRB) administration about the usage of ultra-sophisticated technology that was used on her by a satanic cult from 2001 to present."

"The numerous letters sent to others appear to border on harassment to government officials, academic officials, professionals and private citizens. The defendant has been told that no investigations will be conducted in her allegations with the UC system."

665.   Plaintiff told the court that Probation Officer Morehead had seriously

mischaracterized her work and activities, and it appeared that Probation, in addition to new allegations, were continuing to raise the same allegations that Plaintiff had attempted to correct Anna Guzman about several months earlier. The report continued:

> "On 8/17/2006, the undersigned received a fax from Detective Altamarino of UC Irvine consisting of a complaint letter sent to the Subjects Rights Committee from the Defendant to report same/similar conduct of wrongdoing by campus officials since 2001 to present." "On 8/25/2006 the undersigned directed the defendant not to utilize any electronic communicative device until further notice. She was also directed to provide a copy of her phone bills to ensure the defendant will be not accessing the internet via home or cell phone."

> "On or about 9/7/2006, the undersigned received a call from Detective Altamarino of UC Irvine Police regarding the defendant's behavior. The defendant mailed three floppy discs and one letter to a UCI professor. The same employee had received e-mails from an unidentifiable person containing information about the Curio Jones files. Curio Jones is one of the defendants AKAs. The employee expressed <u>fear</u> to campus police."

666. The reference to a "UCI professor" was later discovered to be Defendant Loftus. However, Plaintiff had never contacted Elizabeth Loftus but chose instead to contact the IRB's. It was the Plaintiff's opponents – the "Dr's" in sci.psychology.psychotherapy who referred to Plaintiff's work as the "Curio Files" or as an obvious pun, the "Curiophiles." Morehead continued:

> "Additionally, the defendant wants to write a book regarding her beliefs on psychoelectronic monitoring which may include the victims in this case" … "As such, and in order to protect the community, the academic world and the victim's the Probation Department recommends that the defendants modification be denied and probation be continued on the same terms and conditions as previously ordered on 11/05/2003."

667. By making these types of allegations, falsely alleging that there were "victims" of Plaintiff, along with the ridiculous notion that the "academic community" needed protection from Plaintiff, it appeared that Morehead and Guzman were making themselves actors in furtherance of the conspiracy by Defendants to deprive Plaintiff of exercising her first amendment rights after speaking to one or more defendants on this case. As a result of these false complaints, which resulted in Morehead/Guzman suggestion to the court that Plaintiff be restricted from writing a book, or at least be impeded in her ability to write a book, the court denied Plaintiff access to a word processor and the internet/intranet. Plaintiff then requested a continuance to allow her time to respond to these false allegations about her which the court allowed.

668. A hearing was held on January 5, 2007 during which Plaintiff inquired why her probationary status was not violated if she was indeed guilty of these activities. Plaintiff

requested permission of Probation administrator Lisa Donohoo to contact the UC system to investigate the false complaints made about her, and was allowed by Ms. Donohoo to proceed. However, Ms. Donohoo refused to disclose what the police report numbers were from UC Davis and UC Irvine about her alleged activity because she said it was policy that probationers not access police reports.

669.  Plaintiff discovered after speaking with UC Davis Officer Henoch that Plaintiff did not send a "40 pg. fax," but had sent approximately 40 pages of materials to the UC Davis IRB. Plaintiff agreed, and asked what was illegal about that activity. Plaintiff was told by Det. Henock that there was nothing illegal about that activity. Furthermore, it did not appear that Officer Morehead had investigated this complaint to discover what phone number was at the top of the fax or any other information which would provide forensic evidence indicating whether or not Plaintiff had actually sent this alleged "fax."

670.  On approximately January 11, 2007, Plaintiff discovered from Kathie Allen of UC Irvine's "Whistleblowers' Unit," that she had initiated the police report about Plaintiff on behalf of a party she refused to identify. The Whistleblower's unit was evidently designed to protect complaining parties in case that person experienced retaliation. However, these individuals did not protect Plaintiff in this case.

671.  On approximately January 11, 2007, Plaintiff spoke to UC Irvine's campus Detective Altamarino who told Plaintiff that Defendant Elizabeth Loftus had alleged that discs, a letter and emails were sent to her from Plaintiff.  Plaintiff confirmed with Altamarino's supervisor, Sgt. Dublin of UC Irvine Campus police, that Plaintiff had been a suspect in a case in which Dr. Elizabeth Loftus alleged that Plaintiff had sent her this material, after which she felt "fear." However, Dublin explained that Plaintiff was no longer a suspect after DOJ checked fingerprints on the envelopes in question and none of the fingerprints matched the Plaintiffs. Sgt. Dublin confirmed that their logs revealed that a Supplemental Report with this information had been sent to San Diego County Probation on September 19, 2006, detailing that Plaintiff was no longer a suspect. This report was evidently sent a full three months before Officer Morehead wrote her December 2006 report factually stating that Plaintiff was guilty of the above activity. Sgt. Dublin told Plaintiff he could not of course release this report to her but could to San Diego Probation if they requested another copy. As a result, due to Delayed Discovery, Plaintiff is not aware of any more specific details regarding the false allegations that Defendant Loftus made against Plaintiff. The Director of Probation claimed that Morehead had not received that report at that time but Plaintiff does not believe that is a satisfactory response. If Morehead had done her job and picked up the telephone and contacted UC Irvine for an update on their investigation within that three month time-period, Morehead would have been updated

672.  Plaintiff alleges that because she requested UC Irvine's IRB's to investigate whether Dr. Loftus might be involved, or was aware of Human Subjects Research violations involving Plaintiff, Defendant Loftus intentionally orchestrated emails, files, and discs be sent to herself, on purpose, to set-up Plaintiff in retaliation against Plaintiff for requesting an investigation of Loftus. These false claims could easily have resulted in the loss of freedom

for Plaintiff and her reincarceration. At the very least, these false allegations were being used as a reason to deny plaintiff access to a word processor and the internet/intranet in order to impede her from writing a book. This indicates malice and San Diego Probation had no right to do this to Plaintiff. It is not explained why Defendant Loftus would claim she felt "fear," even if Plaintiff had sent her this material, because she does not know the content of this alleged material. However, a victim's feelings of "fear" is a critical element in a criminal stalking complaint. Plaintiff believes that Elizabeth Loftus is smart enough to figure out how Plaintiff was targeted and knew perfectly well she had nothing to fear from Plaintiff other than public exposure.

673. Defendant Loftus has a long history of misrepresenting the facts concerning other parties, according to sexual molest victims Jennifer Hoult, Lynn Crook and a recent party, a Ms. Taus. According to a San Diego Union-Tribune article titled, "Memory Expert Quits after Rebuke," March 18, 2003:

"Elizabeth Loftus, who has spent 25 years studying people's memories, says she left the University of Washington for a position in California after her colleagues chastised her efforts to discredit a case study on repressed memories. Loftus accepted a position at the University of California Irvine after colleagues at Washington questioned the methods used in her challenge and recommended she take an ethics class ... During her career, Loftus has examined more than 20,000 people and written 19 books. She appeared frequently in court as an expert witness. However, Loftus often is criticized by victims' advocates, attorneys', and other scientists for challenging so-called repressed memory, the theory that the mind can bury painful, memories, then recover them."

674. In the late 1990's, according to therapist David Calof, the FMSF and Defendant Loftus were implicated in the harassment of Mr. Calof almost immediately after he wrote about the FMSF in his journal "Treating Abuse Today." Defendant Loftus recently settled a court case (2007) with a Ms. Taus who accused Loftus of misrepresenting herself in order to obtain information about her in order to Ms. Taus's case of repressed memory. Defendant Loftus has routinely acted on behalf of the defense in cases alleging satanic ritual abuse, including the Dale Akiki case, the Paul Ingram case, and others. Loftus is an Advisory Board member of the FMSF an organization which denies that satanic ritual abuse occurs. Defendant Loftus gave false information to SDUT reporter Mark Sauer about Plaintiff in the "Web of Intrigue," in September 2001. Loftus also appears to be a close friend of Defendant Carol Hopkins. In 2003, Defendant Deverereaux listed Elizabeth Loftus in correspondence to Dr. Ellen Lacter as one of the parties who had been searching for Plaintiff's identity during the years when she was safeguarding her privacy, therefore, even though Defendant Loftus is sometimes described as the most "famous memory expert" in the world, to Plaintiff, her credibility is decidedly lacking.

675. Plaintiff believes that she is not required to prove a negative, and instead it is Defendant Loftus who is required to justify her actions and furnish the evidence upon which her false allegations were based, because these false allegations caused Plaintiff significant emotional distress for close to two years, and it has taken Plaintiff a full thirteen

months to correct the record and injustice done to her. Throughout that entire time period, Plaintiff thought she might be rearrested on false charges.

676. In February 2007, Plaintiff notified Officer Morehead that there was a Supplemental report available from UC Irvine which released her as a potential suspect and she requested that Morehead write a corrective report to the court advising them of that fact. Morehead refused to write a corrective report, telling Plaintiff that it was "no big deal," because Plaintiff's probationary status was not "violated." Plaintiff told Morehead she thought it was a very "big deal" to make false allegations about someone in a criminal court case, let alone refuse to correct those false allegations when new information became available.

677. On approximately February 1, 2007, Plaintiff left a message for Anna Guzman on her voice mail, telling her that a Supplemental report from UC Irvine was available which released her as a suspect, and to please write a corrective report to the court alerting them to that fact. There was no response.

678. On approximately February 5, 2007, Plaintiff telephoned Guzman's supervisor Lisa Donohoo to tell her Morehead refused to write a corrective report and requested that Donohoo contact UC Irvine's Sgt. Dublin and access the Supplemental Report proving that she was no longer a suspect. Ms. Donohoo promised that she would email UC Irvine, and if it appeared these were false allegations, she would make sure a corrective report was written. However, Donohoo said she would only send one email to UC Irvine because she did not want them to think she was "harassing" them. Donohoo then advised Plaintiff not to make this issue drag "on and on," Plaintiff's probationary status was not violated, and advised her that she only had only a year more of probation so to let the issue "go." Plaintiff told Donohoo that she disagreed, if these allegations were not corrected, it might harm her at a later point and be used against her, and perhaps be used as cumulative evidence as reason to imprison her. At that time, Donohoo confirmed for Plaintiff that she had been receiving phone calls from people from the UC system, apparently making allegations about Plaintiff, but she refused to tell Plaintiff who these people were or what the allegations were. Plaintiff then contacted Donohoo's supervisor John Hensley who refused to correct the allegation involving Defendant Loftus but agreed to correct the false allegations about the 40 page "fax."

679. In March of 2007, Plaintiff scheduled a court hearing at San Diego Superior Court requesting "Clarification of a Court Order," updating the court on the new information which released her as a suspect involving allegations made by Defendant Loftus and an unknown party at UC Davis. However, neither Morehead, Guzman, or Donohoo were present at that hearing and Plaintiff was not provided with any corrective report. However, on that court date, Judge Szumowski made a restrictive court order allowing Plaintiff to use the word processor and access the internet/intranet via a third party.

680. In March 2007 and April 2007, Plaintiff wrote letters of complaint to Director of Probation about Officer Morehead and Guzman's unwillingness to correct false

allegations about her with San Diego Superior Court. On September 14, 2007, the Director of Probation, Mr. Cranford, wrote a letter informing Plaintiff that two outstanding allegations from the UC School system would be corrected.

681. On approximately January 15, 2008, Plaintiff checked the contents of her court file at San Diego Superior Court, and did not find the corrective report ordered to have been written by Probation Director Cranford in September of 2007, but found further reports by Officer Morehead to the court which seriously mischaracterized Plaintiff and which continued to misrepresent the facts about what had occurred.

682. On approximately January 10, 2007, Plaintiff informed the new Director of Probation, now Mack Jenkins, that the corrective report ordered to have been written by acting Director David Cranston, had never been written which meant Officer Morehead and Guzman refused to follow a direct order by their Director, apparently out of malice felt for Plaintiff. Plaintiff was then notified by Defendant Guzman that the corrective report had been written and had been sent to the court. Plaintiff received a copy of this barely legible report dated January 15, 2008, almost a full year after they had received this information. It read, in part:

"The Probation Department is submitting an ex parte report to apprise the Court of two issues that were before the Court on 12/14/2006 depicting the defendant's conduct relative to matters at UC Davis. The report dated 12/14/2006, stated the defendant faxed a 40 page document to UC Davis when in fact the information was mailed by the Defendant. On 02/15/2007, the undersigned submitted a report clarifying that issue.

On 02/05/2007, Lisa Donohoo, probation director received a call from the defendant claiming she spoke with Detective Altamarino regarding a 'false report.' The Defendant stated she (the defendant) was informed by Detective Altamarino that UC Irvine had a supplemental report and/or information exonerating her. On 02/05/2007, Ms. Donohoo contacted Detective Altamarino via e-mail indicating the defendant's claim and requested reports and or information to that effect.

"On 02/05/2007, Detective Altamarino responded to Director Donohoo's the e-mail with the following quoted from the investigative supplemental report #06-0918. 'On 09/18/2006 indicating no identifiable latent prints were found on the floppy discs or the clear tape on the mailing envelope. One identifiable print was developed on the back of the white letter paper that was also inside the envelope. The print was prepared and entered into the Cal-Id AFIS system and was searched against the OC and CA DOJ fingerprint databases. Search results were negative. There were no further reports associated with this case on the defendant.'"

683. According to this information Probation had the information which released Plaintiff as a suspect for almost a year but they refused to write this corrective report to the court. For more than one year, due to this incompetence and malfeasance, Plaintiff has expressed severe emotional distress to her psychologist which was directly connected to the

false allegations made by Defendant Loftus and an unknown party at UC Davis immediately after Plaintiff requested an investigation about Loftus by the Institutional Review Board. Even though Mr. Jenkins responded in a letter that Officer Morehead was simply responding to allegations made by others, Plaintiff believes that Ms. Morehead and Anna Guzman were intentionally negligent and malfeasance occurred. Probation promised to release Plaintiff from Probation in March of 2008 but then changed their mind. Therefore, Plaintiff still cannot access the UC Irvine police report that was fraudulently filed by Kathie Allan and/or Elizabeth Loftus.

684. In approximately May of 2007, Plaintiff struggled to resume her research and updated her Satanism and Ritual Abuse archive. Plaintiff was then able to slowly gather evidence about the dialogue that took place on the internet between her and the Defendants as preparation and evidence for this lawsuit. However, she has been constrained from accessing certain web sites, such as the WITCHUNT egroups list, because it required an email address, and the librarians refused to assist her.

685. After May of 2007, Plaintiff accessed articles from the San Diego Union-Tribune about her arrest and plea-bargain to "stalking" Jennifer Hewitt. In an article dated, Dec. 31, 2002, authored by Mark Sauer, published by Defendant Copley (which Plaintiff had seen in 2003 but had not fully understood due to her mental incapacitation) titled, "Stalking suspect to undergo more psychological tests," a number of false allegations were made by Defendant Sauer. Defendant Sauer wrote and Defendant Copley published the following:

"A former county social worker accused of stalking movie director Steven Spielberg and charged with making death threats against actress/singer Jennifer Love Hewitt is headed for a mental-competency hearing before standing trial."

686. There was never any evidence indicating that Plaintiff ever "stalked" Steven Speilberg, and to her knowledge neither Mr. Speilberg or the Los Angeles court ever accused her of it. Mr. Sauer continued:

"Spielberg got a Los Angeles judge to issue a restraining order against Napolis last fall, claiming she had threatened him and his family at the time his studio's movie "the Tuxedo," starring Love Hewitt, premiered."

687. Plaintiff has never "threatened" Steven Speilberg. Apparently he argued that because of her confrontation of Hewitt, and her accusations against him, he felt that he might be threatened by Plaintiff at some point in the future. Mr. Sauer continued:

"Under the code name "Curio, Napolis anonymously made hundreds of Internet postings   from the mid-1990s to 2000, accusing several individuals in San Diego and the Bay Area of heinous crimes against children.

688. Plaintiff has never made baseless charges about anyone and this was an unfair

representation of Plaintiff's activities on the internet which has been described in detail. Mr. Sauer then wrote:

> "The Internet postings ended in the summer of 2000, however, when Napolis was arrested by campus police for cyberstalking while using a computer at the SDSU Library. No charges were filed but Curio was effectively exposed."

689. Plaintiff was never arrested by SDSU for "cyberstalking." Apparently this is what Mr. Sauer wished had happened, but it never did. Because Mr. Sauer was the reporter who covered this incident for the newspaper, his misstatement of fact indicates intentional libel and malice. Mr. Sauer wrote:

> "Her Internet campaign and the quest to expose her by those whom Napolis had targeted was chronicled in a Union-Tribune story in September 2000. Since then, she has included the newspaper among those she believes are trying to torment her."

690. Sauer again intentionally placed Plaintiff in a false light. Plaintiff never "targeted" anyone on the internet between the years 1995-2000. Plaintiff has also never claimed that the newspaper is trying to "torment" her. These are obvious fabrications by Mark Sauer who was attempting to capitalize on the Jennifer Hewitt case in attempts to make Plaintiff appear "crazy" in attempts to undermine her research.

691. In a San Diego Union-Tribune article, dated September 30, 2003, by SDUT reporter Onell R Soto titled, "Ex-social worker pleads guilty to stalking actress," which Plaintiff became aware of only after August of 2007, it continued to misrepresent Plaintiff's activities on the internet. Mr. Soto and Defendant Copley published:

> "A September 2000 Union-Tribune story detailed how Napolis used the code name "Curio" to anonymously send hundreds of Internet postings from the mid-1990s to 2000 accusing San Diego and San Francisco area figures of crimes against children."

692. In another San Diego Union-Tribune dated November 6, 2003 by Onell R. Soto, titled "Stalker of actress scheduled to be freed," this writer falsely claimed, for the third time, that Plaintiff had "threatened" Steven Speilberg. Mr. Soto wrote:

> "She also made threats against Speilberg, who obtained a restraining order against her in Los Angeles."

693. Mr. Soto then again mischaracterized Plaintiff's activities on the internet. He wrote:

> "Napolis, a former county social worker, made accusations on the internet against people who opposed theories of satanic ritual abuse of children, but was never charged for those comments." ... "Her campaign, much of it under the pseudonym "Curio," was the subject of a September 2000 Union-Tribune profile."

694.  Plaintiff alleges that these statements indicated malice, and further exposed her to public hatred, contempt, ridicule, and disgrace by inferring that she should be "charged" for her comments which rebutted her political opponents claims that satanic ritual abuse of children did not occur.

695.  In approximately January of 2008, Plaintiff contacted the Board of Behavioral Sciences and requested that they release the contents of her file that contained any complaints about her. To date, Plaintiff has received no information from them but believes that one or more of the Defendants or Jane Does made defamatory commentary about Plaintiff to her licensing board. Plaintiff believes the MFT board will only respond to a subpoena therefore this is further evidence of delayed discovery.

696.  On February 7, 2008, Plaintiff discovered in a set of documents that Dr. Ellen Lacter compiled, an article titled "Jennifer Love Hewitt," dated January 8, 2002 which had been posted on the web site of "Celebrity Justice," a TV program that has since been cancelled. [Exhibit 27] Plaintiff had not been aware of this articles existence. It appeared that the author misstated the year that this story was published because Plaintiff was not arrested until November 26, 2002. In addition, this article was filled with misinformation and disinformation about the interaction with Jennifer Hewitt and her family, which Plaintiff would like to correct for the record. Plaintiff never "hit" or "pushed" Ms. Hewitt's mother. If she had been guilty of that activity she would have been charged with battery. This article proceeded to quote Defendant Carol Hopkins false allegations that Plaintiff had stalked and threatened Hopkins, and tried to make it appear as if Plaintiff was responsible for her move to Mexico, due to these alleged threats. It read, in part:

"Carol Hopkins is another Napolis target. The cyberthreats were so extreme, the former school administrator moved to Mexico. But, using the Internet, Napolis convinced others that their new America neighbor was a child molester. Hopkins says, "I had been threatened, I had been told that I would lose my visa, I could lose my house, and that I could be put in jail." Now Napolis is in jail and faces a second court order mental examination to find out if she's fit to stand trial."

697.  Plaintiff discovered that the Celebrity Justice web site no longer exists and this brief article cannot be found on the internet. However, Dr. Ellen Lacter wrote a letter to the court, dated February 18, 2008, attesting to the fact that Plaintiff discovered this "Celebrity Justice" article at her home on February 9, 2008 [Exhibit 28].

698.  On March 4, 2008, the San Diego County Superior Court allowed Plaintiff to access the internet and intranet on her own behalf. On March 15, 2008, Plaintiff accessed message #31004 on the WITCHHUNT egroups list, dated January 11, 2003, titled, "Curio's National TV Debut on EXTRA" in which Herman Ohme referred to Carol Hopkins' statement about Plaintiff, and referred to an "EXTRA" television show transcript allegedly from this television program. This information indicates that Defendant Hopkins made her libelous comments about Plaintiff on national television.

699. On March 14, 2008, Plaintiff discovered a web site on which Defendant Aquino made further libelous statements about Plaintiff. These remarks can be found on http://en.wikipedioa.org/wiki/Talk:Michael_Aquino [Exhibit 29]. In efforts to skew information about the Presidio Army Daycare case investigation, and manipulate the facts in response to an anonymous person – Sherurcij's - mention of information which had been sourced by "Curio Jones" about the Presidio case, Defendant Aquino wrote:

"As for 'Curio Jones', she was another notorious internet stalker and character assassin whose real name was Diana Napolis. She was eventually arrested and confined for stalking and threatening other people such as Steven Speilberg. The inaccuracy and distortions of her attacks on me were easily discoverable ..."

700. Plaintiff was never an "internet stalker" or a "character assassin" on the internet during the time period in question in which Plaintiff and Defendant Aquino debated. Plaintiff was never "inaccurate," nor did she ever distort information about the Presidio investigation, and no one can produce facts indicating otherwise. Due to the fact that Defendant Aquino clearly indicated by these remarks that he was referring to Plaintiff's pre-2002 arrest, and inferred that Plaintiff had stalked and threatened Defendant Aquino, and later stalked and threatened Steven Speilberg, these are libelous remarks. Plaintiff plea-bargained in 2003 to "stalking" Jennifer Hewitt. In fact, the anonymous party who was editing information about Defendant Aquino stated they would not accept these characterizations of Curio Jones/Napolis without the proper legal citations, which Aquino was unable to provide.

701. Further on in this exchange, in response to Sherurcij's reference to the 1997 Aquino v. Electriciti lawsuit, which was described as Aquino's attempts to block messages written from this internet company that Aquino claimed constituted "libel," Aquino again characterized Plaintiff as a "stalker," which was why he claimed he sued ElectriCiti. Aquino wrote:

"No, for refusing to identify the anonymous stalker, "Curio' (Napolis, see above) who was using their ISP for her hate campaign. The suit failed because the Communications Decency Act was found to immunize ISPs against the conduct of their subscribers."

702. On March 15, 2008, Plaintiff discovered another libelous message written by Defendant Aquino about her on the WITCHHUNT Egroups list titled, "Rightmeyer Discovers ecom Suit!" which again inferred Plaintiff had been a cyberstalker as it regarded Aquino. [Exhibit 30] Aquino was responding to an article about the lawsuit Aquino v. ElectriCiti. It read, in part:

"Unfortunately for Ecom, which had hired one of the most expensive law firms in San Francisco, the judge also ruled that this was not a SLAPP-suit, hence Ecom

would be on their very own hook for their law firm's quite substantial (based on their web site squawking for donations) bills.

So much for cyberstalker's thinking that they can abuse SLAPP laws to allow them to conduct hate campaigns with immunity and impunity. SLAPP was never intended for that purpose, as cases like this are continuing to establish.

"This lawsuit came at a time before some of the very strong new anti-cyberstalking legislation in California and at the federal level had appeared. Thanks to the Napolises of the Internet we are coming more amore into a time where cyberstalking will be less and less possible, and more criminalized. The CDA immunity of ISPs which was never intended to shelter cyberstalkers, will obviously be adjusted to reality as well."

703.    On March 15, 2008, Plaintiff discovered in message #17289 on the WITCHHUNT egroups list that Defendant Lesley Wimberly wrote, further subjecting Plaintiff to defamation, by writing that Plaintiff was "unhinged" and not qualified to be a therapist. [Exhibit 31] This comment was in response to another poster who referred to the STUT's article the "Web of Intrigue" and identified Plaintiff as "Ms. Napolis." Wimberly wrote:

"Perhaps we need to alert the licensing board in California by providing them this article and some of Curio's, Dylan's etc. postings. By reading these, surely they will see that she is unhinged from reality and NOT qualified to be a therapist."

704.    In summary, in 1995-2000, Plaintiff participated in a public internet forum and proved that the satanic ritual abuse of children existed. As a result, she was targeted by several satanists who were attempting to cover up this crime and who were supporters of the FMSF. Defendants Aquino, Hopkins, Loftus, and Sauer, who have spent years trying to persuade the public that satanic ritual abuse does not exist, then conspired to have Plaintiff identified, which resulted in Plaintiff's privacy being invaded by fraudulent means. This was proven by the content of Michelle Devereaux's correspondence and the content of the "Web of Intrigue."

705.    After this identification, Defendant Sauer wrote and Defendant Copley published this invasive and defamatory newspaper article, quoting the above Defendants. The disinformation and false allegations in this news article caused tremendous harm and emotional distress to Plaintiff which resulted in the ruination of her career in Family Court, caused public threats to be made against her by Defendant Jantsang and others, and caused the District Attorney and San Diego Probation to believe she had a history of "harassing" others.

706.    Defendant ex-Lt. Col. Aquino and others then targeted Plaintiff with military technology in efforts to psychologically incapacitate her so completely that she could never resume her research and would cease to be a political opponent.  As a result of the malicious

actions by Defendant Aquino and others, Plaintiff wrote a pseudo-threat to a Hollywood figure in 2002 which resulted in further ruination of Plaintiff's reputation, revocation of her MFT license and resulted in humiliation, lost wages and her livelihood. One or more of these Defendants than made false allegations about her to the District Attorney's office and San Diego County Probation which has resulted in severe emotional distress for Plaintiff due to the efforts it has taken to correct these misrepresentations. Because of these outrageous and egregious acts, in efforts to completely destroy Plaintiff, Plaintiff has suffered social isolation, stigmatization, and suffered false allegations that she is "mentally ill."

707. In the latter part of 2007, Plaintiff discovered further defamatory articles on the internet about her, and discovered further defamation in the San Diego Union Tribune due to the malicious actions of Defendant Sauer and the negligent actions of publisher Defendant David Copley. Plaintiff discovered a false police report about her filed by Defendant Devereaux after November of 2007. Plaintiff discovered further false allegations and defamatory comments made about her by Defendant Hopkins, Wimberly, and Aquino in February 2008. Plaintiff believes evidence of further defamation will be revealed in the files of San Diego Probation, the District Attorney's office, and the Board of Behavioral Sciences when she gains access to those files. Therefore the last act by these co-conspirators, due to delayed discovery, is unknown.

708. Whether one believes Plaintiff's claim that she has been brutally targeted by nonlethals for the past seven years, or if one prefers to believe Plaintiff had a psychological mental breakdown after the publication of the "Web of Intrigue," Plaintiff became severely psychological incapacitated after May of 2001 and therefore met the definition of the Code of Civil Procedures 352 "insanity" tolling provision until on or about May of 2007. Plaintiff is and never was "mentally ill," instead Plaintiff was severely psychologically disabled and simply repeated what her perpetrators told her. Plaintiff sometimes still decompensates and her abuse is ongoing. What used to take hours, now takes weeks and months to complete. While Plaintiff has gathered the evidence necessary to file this complaint, she has continued to be tortured, terrorized, and assaulted.

709. Defendant Aquino cannot claim that Plaintiff is guilty of actionable libel due to her claims that he and a group of others have tormented and tortured Plaintiff for seven years because Michael Aquino has been openly and publicly accused of brainwashing, mind control, involved in the intentional creation of MPD/DID, electroshock, ritual child molest, and even murder during the past 20 years. He has never sued the authors of the books who have made these allegations against him. Therefore, Plaintiff's allegations are just one more in a long series of serious complaints about abuse perpetrated by Michael Aquino. Because Lilith Aquino is his wife, and is allegedly his current companion, it is reasonable to assume that she is also involved in these activities, although of course, they have never been criminally charged with any crime.

710. The following information will briefly describe how Plaintiff has been

terrorized by the illegal usage of both public and classified invasive technology. Defendant M. Aquino told Plaintiff via V2K that if she ever made these facts public, he would contact the District Attorney and have her convicted for "criminal libel."

## TERRORIZATION BY V2K, VOICE SYNTHESIS DEVICES,  COMPUTER/BRAIN INTERFACE TECHNOLOGY, AND OTHER NONLETHAL TECHNOLOGY

711.  While writing this complaint (from June 2007 to the present) Defendant M. Aquino and his wife, Lilith Aquino, Robert M., and his "wife," Scott L., M. D., Peggy N., Peter G., and Kevin F. have inflicted a tremendous amount of pain on Plaintiff by directing nonlethals at her ear drums, eye sockets, eyes, tissues of her face, gums, genitals, breasts, the back of Plaintiff's neck, her rib cage, the nerve centers within her body, the cartilage of her nose, the internal organs of her body, the soles of her feet, and they are getting worse. Defendant Aquino and his wife Lilith would oftentimes simultaneously direct nonlethals at her coccyx bone and at the top of her spine so that it felt like an electric current was running through her. At other times they would hit Plaintiff in the stomach as hard as they could in order to make Plaintiff vomit and would apply so much pressure to Plaintiff's skull, she thought it would burst. They would also direct nonlethals into the layers of her skin, causing Plaintiff extreme torment. Defendant M. Aquino and others have threatened Plaintiff that they would completely maim her from a distance so that she would be completely and permanently disabled.

712. Defendant M. Aquino, his wife, Lilith and his associates – who apparently have similar proclivities as Aquino - have subjected Plaintiff to excessive and cruel physical and emotional abuse for seven years. They have told Plaintiff that because M. Aquino paid a substantial sum of money to have her targeted, Plaintiff was their "toy," their "possession," and they "owned" her.  The Aquinos have told Plaintiff that they enjoy "playing underneath her skull," and in fact when Plaintiff cries due to their torment, the Aquino's tell her they are just "playing," and try to stop her from crying by interfering with her thoughts and emotions. Lilith Aquino spent the majority of her time the past three years trying to claim that Plaintiff's intellectual life was actually her own. The Aquinos have told Plaintiff that all of their time free time is and will be in the future dedicated to torturing Plaintiff because they are now "retired" from the Temple of Set and their inner cult order turned against them. The Aquinos would often try to take advantage of Plaintiff's counseling skills by telling her about their background and their problems and even had the nerve to tell Plaintiff that she "comforted" them.  Defendant Aquino informed Plaintiff that due to his mind control affiliations with the CIA, he was able to monitor some MPD/DID's with V2K because it was disguised by the fact that one of the symptoms of MPD is "hearing voices."

713.  Scott L. and M. D. have emotionally traumatized Plaintiff by telling her they were going to spiritually kill Plaintiff's spiritual teachers.  After Plaintiff would vomit on the side of the road, due to blows to her stomach, Scott L. and Kevin F. would tell Plaintiff, "demanifest the sound effects," due to the noise she made while vomiting, subjecting Plaintiff to severe emotional distress. Scott L. and others would hit Plaintiff so hard in the head that it would actually cause Plaintiff to fall to the ground. When they would assault

Plaintiff as a group, Scott L. would say, "Let's see who can make her cry first…" "The coup goes to…" He would also direct nonlethals at Plaintiff's throat, causing her to choke, and told Plaintiff that she should not publicly identify him. Scott L. continues to cause intense fear for Plaintiff by telling her because of the computer/brain interface she is connected to, she will never die a normal death. He along with others have also directed nonlethals at the interior of Plaintiff's body for the past two years, claiming that they wanted to make sure that she was spiritually dead.

714. Robert M., who is apparently Aquino's best friend from the Temple of Set, and his "wife, have brutally emotionally assaulted Plaintiff for years by making cruel and childish references to Plaintiff's eye movements, tongue movements, facial expressions, and the noise she makes during bouts of crying after which she would say, "you look very unattractive when you cry,"…"don't twist your lips." Robert M.s "wife" often give "orders" to Plaintiff and when Plaintiff ignore her, she tells Plaintiff "You better do as I say!" When Plaintiff would tremble due to the assaults, Robert M.'s wife would say, "Look, she's starting to shake!" This person is the only party who laughs frequently at the suffering of Plaintiff and would tell her, "Don't let this get you down, Diana, we're just having fun." Robert M and his wife have repeatedly told Plaintiff that they feel very "important" because of their participation in this ongoing group assault because they have access to classified technology, which the public is unaware of, and it gives them an opportunity to "have power" over someone like her. Plaintiff is struck repeatedly from the time she wakes up in the morning until she goes to bed. Robert M and his wife have told Plaintiff, "We do that to establish dominance over you."

715. All of these perpetrators – as a group - would gang up on Plaintiff and take delight in "judging" Plaintiff's private thoughts and emotions. This has been deeply traumatizing to Plaintiff. Due to the fact that Defendant M. Aquino, Lilith Aquino, and his associates are psychologically regressed, developmentally abnormal, and are profoundly ignorant, Plaintiff is deeply offended by their presence. All of these individuals have told Plaintiff that they are envious that she has a deep spiritual inner life and, as Satanists, they want her to suffer for it. They have told Plaintiff that the assault on her was the biggest satanic "take-out" of the century."

716. On March 21, 2008, Plaintiff's younger brother, who Plaintiff dearly loved, died of a massive heart attack. Plaintiff stayed up all night with another relative attending to her brother at the Hospital. Defendant Aquino, his wife Lilith, Robert M. and his "wife," brutally physically assaulted Plaintiff for the next 24 hours, making cruel remarks to her, while she was crying in grief about her brother's death, such as "good riddance." Plaintiff asked them why they were choosing to be so cruel to her at that particular time. They told her it was because she was "vulnerable" and it gave them pleasure. Plaintiff will disclose more information about these events when it is appropriate.

<u>CONCLUSION</u>

717.  According to Peter Phillips in his report "US Electromagnetic Weapons and Human Rights," (2006) the realm of non-lethal weapons extends into universities with millions of dollars in scholarships and research fellowship. According to the lawsuit, International Committee on Offensive Microwave Weapons v. The United States of America, in 1948, the United Nations adopted the Universal Declaration of Human Rights which, at Article 5, states that "no one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment." According to a Presidential Memorandum, dated March 27, 1997, it prohibited any agency from conducting or supporting any classified human research without the informed consent of the subject.

718.  Clearly, classified experimentation is taking place – without the subject's consent - due to the sheer number of victims reporting these events, including Plaintiff. Due to capabilities of V2K technology and brain/computer interface, which allows two-way communication via satellite link-up, it is possible to target anyone, either foreign or domestic, and cause them to believe they are in communication with God, Allah, beloved relatives, ET's, Hollywood figures, or anyone the perpetrator wishes to overtly or subliminally influence, in order to do the operator's bidding.  Presently it appears that assaultive remote technology from the Soviet Union and the United States is for sale, and victims can be secretly isolated and identified by satellite technology from these two countries, and perhaps others. Therefore international treaties against torture do nothing to stop these types of assaults. Because of this, Plaintiff recommends that privacy organizations examine these weapon systems and, most importantly, recommends that an informal humans rights watch group be organized by those with expertise in nonlethals to monitor potential abuses of these and other technologies.

719.  This complaint describes the latest in mind control technology and substantial evidence has been described which proves its existence.  Therefore, it is a travesty for mental health professionals to continue to misdiagnose victims of nonlethal technology as mentally ill, and it is paramount that they educate themselves about these remote assault weapons. Dr. Todd Pizatz, Plaintiff's psychologist for the past four years, has stated that he does not know with certainty what Plaintiff's diagnosis is, given the amount of information he received from Plaintiff about nonlethals. Plaintiff believes that in light of the evidence available, that is the only ethical response to make.

720.   Defendant M. Aquino, and others, have placed Plaintiff in an electronic and computer based torture chamber for seven years, victimizing her, with no option of escape. The only option left to Plaintiff is to publicize these events and continue to lawfully expose this activity.

721.  Plaintiff believes that there is incontrovertible evidence proving the existence of the satanic ritual abuse of children. Therefore the actions against therapists throughout the United States and other countries who are uncovering this activity, and in some instances, uncovering the government's culpability in the intentional creation of MPD/DID using satanism as a trauma base, should be carefully reviewed. Because these actions against

therapists have been instigated by the False Memory Syndrome Foundation, falsely alleging there is no evidence to prove SRA, statements made by those associated with the FMSF in court proceedings should be the subject of an official formal investigation.

## FIRST CAUSE OF ACTION,
### NEGLIGENCE
**(Against All Defendants)**

722.  Plaintiff incorporates by reference herein paragraphs 1 through 721 inclusive, as though fully set forth herein.

723.  Plaintiff believes that the acts of Defendants listed above continue to this day and are intended to cause Plaintiff continued harm, embarrassment and humiliation.

724.  Plaintiff is informed and believes and thereon alleges that Defendants committed the acts as alleged above which caused injury to Plaintiff as a result of Defendants' want of ordinary care. Defendants had a legal duty to conform to a standard of conduct of reasonableness and conform to said conduct, their failure to do so caused legal harm to Plaintiff, and Plaintiff has, in fact, suffered harm of a kind that is legally compensable by damages. Defendants' acts were a substantial factor in causing Plaintiffs harm.

725.  Plaintiff believes that the acts as alleged above were negligent and a reasonable person or entity would not do the same or act in a similar manner as Defendants.

726.  Defendants were under a duty to exercise ordinary care toward Plaintiff and to avoid reasonably foreseeable injury to Plaintiff and knew or should have foreseen with reasonable certainty that Defendants' acts would cause Plaintiff to suffer damages as set forth herein.

727.  Defendants' acts were careless and negligent as described herein and were a direct and proximate cause of the damages suffered by Plaintiff in an amount presently unknown but which will be established at trail, according to proof.

## SECOND CAUSE OF ACTION
### DEFAMATION
**(Against All Defendants)**

728.  Plaintiff incorporates by reference herein paragraphs 1 through 721 inclusive, as though fully set forth herein.

729.  Plaintiff believes that the acts of Defendants herein continue to this day and are intended to cause Plaintiff continued harm, embarrassment and humiliation.

730.  Defendants, as listed herein, made or provided numerous statements to other individuals about Plaintiff. Defendant reasonably understood that these statements about Plaintiff were intended to inflict harm on Plaintiff. Defendants made statements about Plaintiff that she committed numerous crimes and Defendants knew that these statements were false when made.

731.  Defendants knew that when they made these false statements that it could cause substantial damage to Plaintiff. Statements about Plaintiff's alleged crimes were, in fact, harmful and a substantial factor in causing damage to Plaintiff. These damaging statements caused harm by effecting Plaintiff's first amendment rights, loss of livelihood, loss of business, loss of profession, loss of property and occupation. Defendants' statements also caused severe damage to Plaintiff's reputation, causing shame and embarrassment.

732.  These false statements by Defendants were made with malice, and the specific intent to cause injury to Plaintiff. In the acts of Defendants above were made with conscious disregard for the rights and safety of Plaintiff.

733.  The aforementioned conduct of Defendants was intentional, cruel and in conscious disregard of Plaintiff's rights so as to cause severe damage to Plaintiff and justifies an award of exemplary and punitive damages.

## THIRD CAUSE OF ACTION
### VIOLATION OF PLAINTIFF'S RIGHT TO PRIVACY
#### (Against all Defendants)

734.  Plaintiff incorporates by reference herein paragraphs 1 through 721 inclusive, as though fully set forth herein.

735.  Plaintiff believes that the acts of Defendants listed above continue to this day and are intended to cause Plaintiff continued harm, embarrassment and humiliation.

736.  Plaintiff had a reasonable expectation of privacy regarding her beliefs, occupation and background. Defendants intentionally intruded into Plaintiff's private affairs, including her occupation, personal religious beliefs and psychological well being. The intrusion was highly offensive and would be to any reasonable person. Plaintiff was harmed as a result of these intrusions as indicated in the facts above and the conduct was a substantial factor in causing Plaintiff's loss of occupation, loss of reputation, and other damages to be proven at trial. Defendants' motives and goals were to discredit Plaintiff, damage her reputation and incarcerate her. As alleged above, Defendants have invaded Plaintiff's personal space and effected her mental well being. Defendants have publicized

private information concerning Plaintiff that any reasonable person would consider to be highly offensive.

737. Defendants knew and acted with reckless disregard of the fact that a reasonable person such as Plaintiff would consider information they have published in the newspaper, Internet and in other publications highly offensive. The information disseminated to the public was harmful to Plaintiff and proximate cause of Plaintiff's damages to be proven at the time of trial.

## FOURTH CAUSE OF ACTION
### FALSE LIGHT
### (Against all Defendants)

738. Plaintiff incorporates by reference herein paragraphs 1 through 721 inclusive, as though fully set forth herein.

739. Plaintiff believes that the acts of Defendants herein continue to this day and are intended to cause Plaintiff continued harm, embarrassment and humiliation.

740. Plaintiff believes and has stated herein that Defendants have publicized information and material that show Plaintiff in a false light. Defendants publicized false information about Plaintiff on the Internet, and in newspapers, periodicals, and other methods of dissemination that were highly offensive and would be to a reasonable person. Any reasonable person examining the e-mails, websites, publications or other disseminated information from Defendants would determine that a false impression was made of Plaintiff. Defendants' acts were made in reckless disregard or the truth and were malicious and intended to harm Plaintiff.

741. Plaintiff sustained harm to her profession, occupation, person, property and other damages to be proven at the time of trial. The conduct of Defendants was a substantial cause in causing Plaintiff's harm.

## FIFTH CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against All Defendants)

742. Plaintiff incorporates by reference herein paragraphs 1 through 721 inclusive, as though fully set forth herein.

743. Plaintiff believes that the acts of Defendants herein continue to this day and are intended to cause Plaintiff continued harm, embarrassment and humiliation.

744. The conduct indicated above by Defendants was clearly outrageous. Defendants intended to cause Plaintiff emotional distress and their acts as stated above were made with reckless disregard of the probability that plaintiff would suffer emotional distress knowing that Plaintiff would suffer an emotional reaction to the negligent, defamatory, and fraudulent acts and misstatements about Plaintiff.

745. As a result of Defendants' acts, Plaintiff did, in fact, suffer severe emotional distress, including severe mental anguish. Defendants' conduct was a substantial factor in

causing Plaintiff severe emotional distress. Plaintiff believes that said acts by Defendants continue to this day and are continuing to cause emotional distress to Plaintiff.

746.  Defendants' activities were despicable and subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights so as to justify an award of exemplary and punitive damages.

### SIXTH CAUSE OF ACTION
### VIOLATION OF PLAINTIFF'S CONSTITUTIONAL RIGHT TO PRIVACY
### (Against All Defendants)

747.  Plaintiff incorporates by reference herein paragraphs 1 through 721 inclusive, as though fully set forth herein.

748.  Plaintiff believes that the acts of Defendants herein continue to this day and are intended to cause Plaintiff continued harm, embarrassment and humiliation.

749.  The United States and California recognizes the right to privacy Defendants violated Plaintiffs' right of privacy as indicated in the facts stated above. Defendants intentionally disseminated sensitive and confidential information about Plaintiff into periodicals, on the Internet, under websites, and blogs.

750.  The acts as stated above were a serious invasion of Plaintiff's right to privacy and Plaintiff was severely harmed emotionally and monetarily as a result of said conduct. Said conduct was a substantial factor in causing this harm to Plaintiff.

751.  Plaintiff had a legally protected privacy right as to personal information about her, which was disclosed by Defendants opening her to humiliation and emotional distress. Such acts by Defendants were either negligent or intentional and caused significant damage to Plaintiff.

752.  The conduct by Defendants was offensive and resulted in the penetration of Plaintiff's physical and sensory privacy and was the proximate cause of Plaintiff's severe and mental suffering and anguish.

### SEVENTH CAUSE OF ACTION
### CONSPIRACY
### (Against All Defendants)

753.  Plaintiff incorporates by reference herein paragraphs 1 through 721 inclusive, as though fully set forth herein.

754.  Plaintiff believes that the acts of Defendants herein continue to this day and are intended to cause Plaintiff continued harm, embarrassment and humiliation.

755.  Plaintiff believes that the acts of Defendants are part of a conspiracy amongst all Defendants to violate Plaintiff's first amendment right to free speech, right to privacy and to defame Plaintiff, and this conspiracy and these acts continue to the present.

756.  Defendants were aware of all co-conspirators and acted in concert to deprive Plaintiff of her first amendment right to free speech by seeking to have her incarcerated, defaming her and placing her in a false light. Defendants, acting in agreement, conspired to

subject Plaintiff to torture via non-lethals (illegal surveillance) and to invade her right to privacy as stated herein.

757.  Defendants operated together as part of the conspiracy to commit these wrongful acts stated herein which resulted in severe emotional and psychological damage to Plaintiff. Said conspiracy was the proximate cause of plaintiff's damages. The conspiracy was planned, and designed with malice to injure Plaintiff.

WHEREFORE, Plaintiff prays for Judgment as follows:

1. General damages of no less than $10,000,000.00;

2. For punitive damages in an amount appropriate to punish Defendants and to deter others from engaging in similar conduct;

3. For attorney's fees and costs of suit incurred herein;

4. For such other and further relief as the court may deem just and proper

By: _Diana Napolis_
Diana Napolis, Plaintiff
In Pro Per

Exhibit 1.

April 2, 1991

TO:      Sherry Paul

FROM:    Diana Napolis, PSW
         Court Intervention

RITUAL ABUSE CASE CONSULTATION

There have been a growing number of ritual child abuse cases in the past few years.  Social service & police agencies around the country are endeavoring to isolate & identify this phenomenon and disseminate helpful information a quickly as possible.  There are difficulties meeting the demands for information because there are few experts in the field and so much to learn.

Due to the prevalence of cult groups & their propensity to horribly abuse young children (often the younger the better), I feel that CPS needs to have support systems firmly in place ready to fill the needs of the community & individual social workers.  We are faced with the responsibility of recognizing, investigating and protecting children in an area where there is so little known & often associated with denial & fear.

I would like to help set up such a recognition, identification & treatment guide for court intervention workers, I am suggesting a weekly time commitment devoted to case consultation & peer support. Eventually, we could set up a library & network with other community agencies to best address this unfortunate growing problem in San Diego.

cc:  Joyce Wakefield
     Maria Clarkson

DN/ydt-qt

STOCK #75-3344



## Satanism and Ritual Abuse Archive © 2000, 2007 Diana Napolis M.A.

The following cases describe legal proceedings held in Juvenile, Family, Civil and Criminal Courts around the world where there have been allegations of Satanism or the use of Ritual to abuse others.

Any religion or organization can be used as a front to hide ritual abuse activity, including Christianity, Buddhism, Shamanism, Hinduism, Masonry, Mormonism, Pagan and Satanic religions; however, not all Satanists commit crimes and not all occultism is Satanism. It is imperative that investigators and professionals familiarize themselves with cross-cultural belief systems so as not to target any particular group.

This document will have regular updates; this present version is current as of July 10, 2007. It is recommended that this archive be used as a resource only and original documents be obtained from Lexis/Nexus or Westlaw with the assistance of an attorney. If the reader does not have access to legal searches, or if there are any updates to these cases, contact the author at:

6977 Navajo Rd. PMB 114, San Diego, California 92119-1503

Warning: Some of the following cases depict graphic, violent activity.

---

INTRODUCTION: In the 1980's adults and children came forward around the world disclosing that they were victims/perpetrators of satanic ritual abuse [SRA] and/or were witness to satanic ritual murders. These claims were routinely dismissed by FBI's Special Agent Ken Lanning and an organization called the False Memory Syndrome Foundation which came into existence in 1992 stating there were no case convictions or scientific evidence to prove that satanic ritual abuse existed. Claims such as this should not go unchallenged because therapists across the country have lost their licenses due to allegations that the memories of SRA victims are too "bizarre" to be believed and are to be attributed solely to "False Memory Syndrome." It is apparent that these beliefs have been instigated by the FMSF because they are a political and legal advocacy group acting on behalf of accused perpetrators.

It has been documented that the FBI has been responsible for not only ruining case investigations in several instances but intimidating witnesses to recant their abuse. [See, Westpoint (1991),  Bonacci v. King (1999), Finders (1993) case]. In the Finders case it appeared that the FBI had a conflict of interest because this organization was in their counter-intelligence files.

1

In regard to the scientific community's opinions about the reality of satanic ritual abuse, it appears the Appellate Court in the State of Arkansas had the last word about this subject. According to Echols vs. State (1996):

> "Echols next contends that Dr. Griffis should not have been allowed to testify that the murders had the 'trappings of occultism' because there was no testimony that the field of satanism or occultism is generally accepted in the scientific community. The trial court did not allow the evidence to prove that satanism or occultism is generally accepted in the scientific community. Rather, the trial court admitted the evidence as proof of the motive for committing the murders."

Entire families have been implicated in the ritual abuse of children which proves the fact that generational Satanism exists. See the following legal cases:  Parker (1995), Figured/Hill (1994), and Gallup (1991) Perpetrators have been found to be professionals who work in law enforcement, the military or daycare, and Christian fronts have been used in some instances as a means of hiding the satanic motivation of the perpetrators. See Cannaday (1994), Wright (1992), Gallup (1991) and Orr (1984). In several cases the perpetrators have confessed to the satanic element of the crime or participation in prior satanic offenses. See Helms (2006), Cala (2003), Smith (2003), Delaney (2002), Morris (2001), South (2000), Page (2000), T. Kokoraleis (1999), Bonacci (1999), Brooks (1996), Hughes (1996), Penick (1995), Alvarado (1995), Ingram (1992), Rogers (1992), and Fryman (1988).

The FMSF and those affiliated with this organization have been using the Appellate courts to overturn cases convictions involving ritual abuse themes. The Appellate court cases in this archive are valuable because most Opinions have affirmed that Satanism was the motivation for the crime and the introduction of that evidence has been routinely found to be probative and not prejudicial. The author has chosen to describe the satanic element of the crime only rather than every point of law that was appealed. This level of documentation is important because, if published, the rulings of these courts can be cited as case law. The majority of the appellate cases cited in this archive are published opinions.

In addition to court documents this archive also references news articles that document the ritual elements of the crime which include perpetrator confessions, cannibalism, murder, mutilation in the context of Satanism, and there is ample evidence to prove the existence of cult groups who sacrifice their victims as an offering to Satan.  This proves beyond doubt that unusual occult belief systems exist and the bizarre acts committed by these individuals are not only not unusual, they are commonplace.

In some cases involving multiple defendants the legal histories have been combined in the title of the case and are separated by semicolons, but in other instances the histories are described separately.

This archive begins with a First Amendment case, filed on behalf of a prisoner in the late 1980's, regarding his use of the Satanic Bible [written by Anton La Vey of the Church of Satan] and other accouterments of Satanism.

2

**August 24, 1989, CHARLES MCCORKLE v. W. E. JOHNSON, WARDEN, JOSEPH KOLB, CHAPLAIN, FREDDIE V. SMITH, COMMISSIONER, UNITED STATES COURT OF APPEALS, ELEVENTH CIRCUIT, 881 F.2d 993, Denial of Satanic Material Affirmed**

Overview: Appellate court documents state that Charles McCorkle, a state prisoner confined in the Holman facility in Alabama, filed a complaint, seeking redress for the deprivation of his first amendment rights to freely exercise his chosen religion – Satanism. The prison officials denied his request to access certain Satanic books and articles, including the Satanic Bible, the Satanic Book of Rituals, and a Satanic medallion because they posed security threats and were directly contrary to the goals of the Institution.

The court wrote: "The prohibition on Satanic materials such as those requested by the plaintiff is justified by the defendant's concern for institutional security and order. It is an informed and measured response to the violence inherent in Satan worship and to the potential disorder that it might cause within the prison. "

Testimony was given at an evidentiary hearing where the plaintiff, McCorkle, recounted two of the rituals espoused by the Satanic Book of Rituals. The fertility ritual included the sacrifice of a female virgin, preferably a Christian. The initiation ritual called for wrist slashing, blood drinking, and the consumption of human flesh – usually fingers. The candles preferred by the plaintiff and other Satanists "are not made of wax or paraffin, instead they are made from the fat of unbaptized infants." The plaintiff had been observed drawing his own blood, by slicing his wrists, and had asked other inmates for their blood. One inmate was "highly irritated when the plaintiff requested that he donate a vial of blood for use in the worship of Satan."

The warden testified that upon review of the Satanic Bible, he concluded that persons following its teaching would murder, rape, or rob at will without regard for moral or legal consequences. He thought the prisoner's safety would be at risk if other inmates knew of the contents of the Satanic Bible. Anton Szandor LaVey was quoted in a chapter from the Book of Satan, stating that "right and wrong had been inverted too long," and he challenged readers to "rebel against the laws of man and God." He declared that hatred of one's enemies was of utmost importance and revenge should be a top priority.

The court noted that there were several Satanic sects represented at Holman Prison who did not need these specific books to practice their religion and that plaintiff's right to freely worship Satan could be exercised only at significant cost to guards, other prisoners, and society in general. Accordingly, he denied plaintiff's requests.

----

In State v. Freeman, 559 P.2d 152 (1976) it was the opinion of the expert witness that revenge was the motivation for the murder that the defendant was being tried for, and noted that the defendant had underlined certain passages in the Satanic Bible addressing vengeance and revenge. He stated...that the language, "not only sanctioned revenge, but required it."

3

In <u>Childs v. Duckworth,</u> 705 F.2d 915 (1983) the plaintiff Donald Childs, an alleged member of the "Satanic Church," brought a Civil rights claim, requesting permission for various Satanic items, including the Satanic Bible, which the appellate court denied. Childs confessed to having sacrificed cats and pigeons and casting spells to retaliate against others. The Warden and Director both stated that Satanism was not recognized as a religion by that Institution. The Court stated the authorities had legitimate reason for denying inmates request and it did not deprive him of his Constitutional rights.

In <u>Doty v. Lewis,</u> 995 F. Supp. 1081 (1998) the court ruled that a ban on high security prisoners possession of candles, incense, Baphomet tapestry, and Satanic religious tracts which advocated retaliation, sacrifices, spells and racial separation, did not impinge on plaintiff Doty's free exercise rights, given rational reasons related to prison security for banning materials, and despite the prisoner's sincere belief in the Satanic religion. Materials requested were not essential to practice his religious tenets and there was a rational connection between restrictions of these materials and prison security concerns.

The inmate had thirty-one disciplinary actions reflecting an escalation of violence and aggression each year, and he was trying to engage other prisoners in violent behavior. It was thought that the Satanic Bible in the hands of this particular prisoner would endanger the security of the prison.

The appellate court stated the Satanic Bible presented a serious threat to the safety and security of the prison, that the book condoned human sacrifice, and the book's philosophies were blatantly "vicious," "selfish," and brutal." The book "advocated hurting someone, who in the opinion of the Satanists, deserved to be harmed and destroyed." The plaintiff Doty also admitted that he had engaged in "sacrificing cows."

In <u>Burton v. Frank,</u> 2004 U.S. Dist. LEXIS 9603, the prisoner's request for the Satanic Bible was denied because the prison had shown that inmates possession of the Satanic Bible posed a threat to the prison's legitimate interest in maintaining security and promoting rehabilitation. Passages from the Satanic Bible book were quoted:

"The only time a Satanist would perform a human sacrifice would be if it were to serve a two-fold purpose: that being to release the magician's wrath in the throwing of a curse, and more important, to dispose of a totally obnoxious and deserving individual."

At least one Satanist inmate engaged in a ritual in which an effigy was tortured and "murdered." The appellate court stated that the Satanic Bible outlined procedures for destroying enemies through the use of effigies.

The prison's position was that the Satanic Bible promoted "violent and illegal" behavior and that "manipulation, disregard for laws and authority, self-indulgence and revenge," were inconsistent with criminal rehabilitation. The court also noted that other Satanists in this particular prison kept a notebook called the "Book of Shadows" which was filled with murderous language.

Note: The Church of Satan claims they have never been associated with any criminal activity. However, that is incorrect. Followers of Anton La Vey have routinely requested the Satanic Bible while in prison, and in the majority of cases their requests have been

4

denied. As of 7/4/07 a Lexis Nexus search revealed more than 30 appellate decisions in which the Satanic Bible was mentioned. In this archive, in Maine vs. Waterhouse (1986), the appellate court quoted passages from the Satanic Bible to prove and uphold the satanic motivation for the crime. In Adoption of Quentin (1997) the appellate court noted the perpetrator had read the Satanic Bible.

[Note: The source of cattle mutilations has remained unsolved in the United States which makes the admission of the sacrifice of a cow in Doty vs. Lewis a point of interest.] See "Mutilated Bull: No Blood, No clues," Gallup Independent, May 5, 2007; "The Truth is Out There," The Gallup Independent, May 5, 2007].

**January 6, 2006, STATE OF IDAHO v. THOMAS WENDELL HELMS, COURT OF APPEALS OF IDAHO, 137 P.3d 466, 2006 Ida App. LEXIS 3, Sentencing for Battery of a Correctional Officer Modified**

Overview: Appellant documents state that defendant Thomas Helms was serving time in the Idaho Maximum Security Institution for grand theft, possession of a dangerous weapon by an inmate, and battery with intent to murder. He had a self-inflicted wound on his arm which had required stitches and needed to be moved to another cell. When officers attempted to move him he threw toilet water on them which then required tests to insure that the guards had not contracted HIV or Hepatitis. Helms was charged with battery on a correctional officer and received the maximum prison sentence after a jury trial, a sentence which this appellant court reduced.

Defendant Helms had a history of disruptive behavior and had been placed in increasingly restrictive confinements. He was self-mutilating, destroyed property, exposed himself, and threw feces and urine. Helms had told investigators about "feats" of murder and cannibalism during a brief period of his life when he was not incarcerated, although it was not clear to the majority opinion whether these were actual crimes.

The Dissenting Judge thought a stronger sentence should have been imposed and remarked that the majority opinion minimized Helms' behavior. He was in favor of Helms never being released and cited the following evidence as reason why he should be kept in confinement:

As a youth Helms had sexually violated a young girl and his younger brother. He was designated a sexual predator shortly thereafter. His parole officer stated Helms had no conscience. Helms slashed the throat of one inmate and planned to murder another one. After the attack Helms told officers that if they had not stopped him, he planned to eviscerate the victim, pull out his internal organs, and eat some of them

Helms repeatedly displayed a fascination with homicide, cannibalism, and idolized Charlie Manson. In the year 2000, Helms told investigators that in 1994 he had been involved in the murder of a female African-American prostitute and subsequently ate her heart after assisting in cutting up her body to pieces. He also confessed to another murder at that time. When asked about the truth of these statements in the year 2003, Helms again affirmed that these statements were true, that he was part of a satanic cult at that time, and he had engaged in murder and cannibalism.

Based on this evidence, the Dissenting Judge thought Helms would always remain a danger to society.

**May 26, 2005, THE PEOPLE v. RICHARD JOHN VIEIRA, SUPREME COURT OF CALIFORNIA, 25 Cal. Rptr. 3d 337, Death Sentence Affirmed on Three Counts; Remand to Trial Court and Reversal of the Death Sentence for one count**

Overview: Appellate documents state a jury convicted Richard John Vieira of Stanislaus County of four counts of murder and conspiracy which took place in 1990. Vieira and his co-defendants, David Beck and Gerald Cruz, all lived in a camp where Gerald Cruz served as the leader. Cruz instigated the murders of four individuals from a rival group.

Defendant's sister testified that she lived with Cruz in 1987-1988, at which time Cruz led others in the study of the occult and the performance of supposedly occult rituals that included candles, robes and chanting. Cruz told Young that "to sacrifice your first newborn was the greatest thing you could ever do and that it was 'for the satisfaction of Satan.'"

The defense solicited testimony regarding defendant's cult membership and his incapacity to form the requisite criminal intent. Testimony evidenced that Vieira was a "slave" to other members of the group. Family members testified defendant often appeared to have been "beat up" with black eyes, fat lips and slashes on his arm. According to defendant's diary he had been electroshocked and beat up by members of the group.

A cult expert testified that Cruz directed a cult which had occult and satanic underpinnings, they engaged in various rituals, and defendant was under mind control at the time of the crime. Cruz directed the members of the group to read and study the books of Alistair Crowley of whom Cruz believed himself to be the reincarnation. There were also reports that the defendants were part of a Nazi or White Supremacist organization. The court ultimately rejected the defense's argument that the crimes were committed under duress.

The dissenting Judge wrote that he would have reversed the death penalty and acknowledged that at the time of the murders the defendant was a submissive member of a satanic cult led by Gerald Cruz.

"In this case, the evidence shows that defendant acted under the substantial domination of cult leader Gerald Cruz who controlled every aspect of defendant's life and threatened to kill anyone who did not follow his orders. Absent the pernicious influence of a satanic cult leader, it is doubtful that defendant would have committed murder."

The dissent thought that the defendant was under mind control at the time of the crime and noted that the expert explained how cults use isolation, sleep deprivation, punishment, and occult ritual to dominate and control the minds of their members.

**March 18, 2005, TRACE ROYAL DUNCAN v. STATE OF ALABAMA, COURT OF CRIMINAL APPEALS OF ALABAMA, 925 So.2d 245, 2005 Ala. Crim. App. Lexis 78, Affirmed in Part, Remanded with Instructions; 827 So. 2d 838, 2005 Ala Crim App. LEXIS 116, Court of Appeal Reversed the Death Penalty**

Overview: Appellate documents and news articles state four teenagers, Trace Royal Duncan, 17, Cary Dale Grayson, 19, Kenny Loggins, 17, and Louis Mangione, 16, kidnapped and murdered hitchhiker, Vicki De Blieux, 37, who was traveling to her mother's home in Tennessee. The defendants picked her up and promised to take her to her mother's but instead took her to a wooded area. After she spurned their sexual advances, they kicked and stomped her and threw her over a cliff. Carey Grayson told Louis Mangione that he was going to "sacrifice the bitch." Three defendants then returned to the scene and proceeded to mutilate, cannibalize part of her body, and remove all of her fingers, both to thwart identification, and to keep as souvenirs. The defendants were arrested after Louis Mangione began showing Ms. De Blieux's fingers to friends. Kenneth Loggins and Carey Dale Grayson were sentenced to death. Louis Christopher Mangione and Trace Royal Ducan received a sentence of life imprisonment

The medical examiner found that every bone in the victim's face was fractured at least once, her skull was broken open with most of the brain separated from it. Large lacerations were found on the back of her head along with extensive bruising on the head, her left and right ribs were fractured, there were at least 180 stab wounds all over her body, two incised wounds were found in her chest and abdomen, her left lung was removed by a knife, there was bleeding of the tongue, and all her fingers and thumbs had been removed. The medical examiner could not be certain what wounds were inflicted before and after death.

The satanic element of the crime was documented in Trace Royal Duncan's appeal and several news articles. Duncan's trial counsel stated that his co-defendants were Satanists and that Mr. Duncan "kicked the victim a few times in the head," and the other codefendants "returned to the victim's body to mutilate it, stabbing it over 180 times, removing organs and eating them and removing fingers to thwart identification and to keep as souvenirs..." Counsel was able to interject his theory that two co-defendants were Satanists who instigated the murder, committed most of the acts against the victim, and threatened to kill the appellant if he told what happened. He attempted to portray co-defendant Grayson as the older instigator and leader who was a Satanist wanting to sacrifice the victim to Satan. In closing arguments the defense stated that the co-defendants could have committed the murder as a satanic ritual.

The legal history of this case is as follows:

Trace Royal Duncan: 925 So. 2d 245, 2005 Ala. Crim. App. LEXIS 78; 827 So. 2d 839, 1999 Ala. Crim. App. LEXIS 224; 673 So. 2d 838, 1995 Ala. Crim. App. LEXIS 350

<u>Carey Dale Grayson</u>: 954 So. 2d 1141, 2005 Ala. Crim. App. LEXIS 2676; 824 So. 2d 844, 2002 Ala. LEXIS 13; 824 So. 2d 844, 2001 Ala. LEXIS 167; 824 So. 2d 804, 1999 Ala. Crim. App. LEXIS 261; 665 So. 2d 986, 1995 Ala. Crim. Appl. LEXIS 71

<u>Kenneth Loggins</u>: 771 So. 2d 1093, 2000 Ala. LEXIS 217; 910 So. 2d 146, 2005 Ala. Crim. App. LEXIS 57; 771 So. 2d 1070, 1999 Ala. Crim. App. LEXIS 52

<u>Louis Christopher Mangione</u>: 740 So. 2d 444, 1998 Ala. Crim. App. LEXIS 133; 796 So. 2d. 446, 1999 Ala. Crim. App. LEXIS 2553

News articles report that co-defendant Dale Grayson told newspaper reporters that it was Trace Duncan who stabbed the woman, hacked open her chest and pulled out an organ from her body. The police were told that Grayson was a Satanist who drank the blood of his victim. See "Murder Suspect Claims He's No Satanist," Birmingham News, April 29, 1994; "Grayson Says Friends Carved Woman's Body," Birmingham News, May 5, 1994; "Trial Will Begin for Man Accused in Woman's Sport Killing," Birmingham News, October 29, 1995.

### October 21, 2003, ANGLESEY, NORTH WALES, MATHEW HARDMAN, Appealing Conviction for Murder

Overview: News reports state a teenager found guilty of murdering his elderly neighbor and drinking her blood in a vampire ritual was attempting to challenge his conviction. He was jailed in 2002 for a minimum of 12 years following his trial. The jury was told the art student killed 90 year old Mabel Leyshon and removed her heart in a satanic-style ritual in November 2001. His first bid to appeal was rejected by the Court of Appeal in early 2003. See "Vampire Killer to Challenge Conviction," Press Association, October 21, 2003.

### September 11, 2003, BRASILIA, BRAZIL, Cesio Brandao aka Cesi Favio Caldas aka Sergio Brandao et al. Sentenced for Murder and Attempted Murder

Overview: News articles report that five influential members of Brazilian society went on trial in 2003 for the torture, castration, and murder of five children, aged eight to 13, whose sexual organs had been removed and used in rites of black magic between 1989 and 1993. Amailton Madeira Gomes, son of a businessman, Carlos Alberto Santos, policeman, and two doctors, Anisio Ferreira de Souza, and Cesio Brandao, aka Cesi Favio aka Sergio Brandao were charged with the crimes. The fifth defendant, 75 year old Valentina Andrade, a fortune teller and leader of a UFO group called the Superior Universal Alignment, was tried for these crimes but was not convicted.

The five defendants, including Valentina Andrade, allegedly used their influence in efforts to stop the case from going to trial, intimidated victims, and destroyed evidence. The prosecution asked for the trial to be moved to another locale, Para State.

A total of 19 boys, aged eight to 14, were victimized. Five were mutilated and died, three escaped with horrible injuries, six escaped before they were harmed, and five have never been seen again. Some victims had their eyes gouged out, wrists slit, and sexual organs

8

cut off. The two doctors were accused of selling the internal organs of the children and using their genitals in satanic rituals.

Two mutilated survivors, now adults, escaped from Brazil's Amazon region where they had been tied to trees after being doped and castrated. They both identified Carlos Alberto Santos as the man who kidnapped them when they were nine and 10 years old.

Brazil's Special Secretary for Human Rights said the trial had symbolic significance because of the influential professions of the defendants. The trial was seen as a test of Brazil's ability to bring justice to isolated areas where it was suspected the legal system might be under the sway of powerful locals.

Carlos Albert Santos was sentenced to 35 years, Amailton Gomes was sentenced to 57 years, Anisio Ferreira de Souza was sentenced to 77 years, Cesio Brandao was sentenced to 56 years. See "Trial Opens on Ritualistic Murders of Brazilian Children," Agence France Presse, August 29, 2003; "Two Sentenced in Mutilation Murder Case in Brazil," Associated Press, August 30, 2003; "Satanic Sect Leader Denies Charges She tortured, Murdered Children in Brazil," Agence France Presse, November 19, 2003. See http://www.religionnewsblog.com for articles: "Five on Trial for Child Ritual Murders," August. 29, 2003; "Doctor Gets 56 for Brazil Sect Killings," September 10, 2003; "Brazil Jails Occult Killers," Aug. 31, 2003; "Brazil Court Finds 2 Guilty in Mutilation Killings," August 30, 2003; "Doctor Gets 77 Years for Brazil Sect Killings," Sept. 5, 2003.

### August 9, 2003, CHARLESTON, WEST VIRGINIA: KANAWHA COUNTY CIRCUIT COURT, Case No. 93-F45, Louis Kelley Sentenced to 15 years in prison for Sexual Assaults

Overview: News reports state that Louis Kelley, 37, was sentenced by the court to serve 15-30 years in prison for sexual assault and one to five years in prison for sexual abuse of a boy. Kelly, who also called himself Damien Prince, convinced the boy to participate in Satanic rituals and molested him numerous times. Kelly pleaded guilty in February 2003 to the two counts related to an incident on Halloween night in 1991. "Man to Serve 15 Years for Sexual Assault of Boy During Ritual," Associated Press, August 9, 2003.

### June 19, 2003, MANASSAS, VIRGINIA, JUVENILE AND DOMESTIC COURT, PRINCE WILLIAM COUNTY, Case No. JA020390-02-00, Russell John Smith Plea-Bargained to Four Counts of Rape and was Sentenced to 48 Years

Overview: News reports state that self-described Satanist Russell John Smith, 38, a former guard at the Prince William County jail and founder of a satanic worship group on the internet, plead guilty to four counts of rape. He claimed that most of the sex acts with a 12 year old girl were part of his Satanic rituals. Police who searched his home found numerous Satanic items, including robes, black candles, a goat's skull, a pentagram and an altar. See "Virginia Fugitive Arrested in Oregon," Associated Press, Sept. 4, 2002; "Self-described Satanist Sentenced to 48 Years for Rape," Associated Press, July 25, 2003; "Sentencing Delayed for Satanist who Raped Girl," Associated Press, June 19, 2003; "Metro in Brief," The Washington Post, July 28, 2003.


**May 19, 2003, POWELL v. THE STATE, SUPREME COURT OF GEORGIA, 581 S.E. 2d 13, 2003 Ga. LEXIS 478, Conviction for Murder Affirmed**

Overview: Appellate documents state that on May 22, 1998, Keith Powell, 44, who had been living with his parents, shot his unarmed father during a family dispute. Powell routinely carried a .45 caliber handgun in a holster on his person while in the home.

Mr. Powell claimed that the shooting was in self-defense and that he feared his father due to the abuse he suffered as a child. A friend of his testified to the "positive" relationship that existed between Powell and his father but stated that Powell had a lot of anger toward his mother, accusing her of abusing him in a ritualistic satanic manner.

Note: A psychologist opined that Powell had a delusional disorder, apparently due to the fact he spoke of being beaten, drugged and threatened, supposedly because of "gold" he had discovered at some point in his life. This case has been included because a diagnosis of "delusional disorder" does not necessarily negate this defendant's claim of alleged satanic ritual victimization by his mother.

**January 31, 2003, ROANOKE, VIRGINIA, ROANOKE CITY CIRCUIT COURT, Case No. CR02000968-04, Terry Dale Duncan, Pleaded No Contest to Attempted Capital Murder**

Overview: News reports state Terry Dale Duncan, 30, a self-styled Satanic high priest, pleaded no contest in an attempt to murder his one month old son. His child would have died if not for the intervention of a nurse and social worker after the child missed a doctors appointment. Duncan's child had suffered fractures to a leg, a shinbone, both collarbones, and bruises covered his nose, forehead and eyes. The authorities also discovered a wound that appeared to be a cigarette burn at the back of his throat.

The father said he decided to "sacrifice" the child because he believed he was not the child's father, so he tried to "disassemble" him. The father claimed he used to injure victims in this manner when he was affiliated with an Oklahoma based satanic cult. He told police that, "The majority of those States that we done the sacrifices, some of them were immediate sacrifices to where the heart was busted or the throat was enclosed to cause breathing to stop immediately and cause instant death, and then we disassembled the bodies."

He confessed to many satanic murders but the police stated law enforcement in other communities did not respond to their request for information about any unsolved homicides. See "Father Pleads No Contest to Abusing Infant," The Roanoke Times, January 31, 2003.

**January 8, 2003, FORT WORTH, TEXAS, TARRANT COUNTY JUSTICE CENTER, Case No. 0822743, Joseph Frank Cala II, Conviction for Murder**

Overview: News reports state Joseph Frank Cala II, 41, pleaded guilty to murder in the 2001 death of his 79 years old mother, Lydia M. Cala, after he "beat her to death, sliced her open, and ate some of her heart." After a three-hour hearing, the District Judge chose the maximum of the 20-30 year sentence range contained in a plea agreement.



The victim's daughter testified that she went to her mother's house the evening of Oct. 15, 2001 after neighbors called and said windows had been shattered from inside the house. She was afraid to enter the residence due to fear of her brother, so she notified authorities. Officer Kevin Meador testified that when he looked through a bedroom window, he saw a naked, bloody man standing over what he learned later was a woman's mutilated body. Another officer saw Cala eat what appeared to be an organ, according to police reports. Meador and other officers said they went inside and heard Joey Cala saying that he worshipped the devil. When officers took him into custody, he told them they had interrupted his "sacrifice." The 76 pound woman, had a broken nose, teeth, collar bone, ribs and multiple bruises and cuts likely caused by fist or feet, the medical examiner said. After she died, "her chest and abdomen were cut open and some organs were removed," the medical examiner testified. Part of her heart contained teeth marks and a piece was missing. See "Man Gets 30 Years for Killing, Cannibalizing Mother," Associated Press, January 8, 2003.

**March 13, 2002, MICHAEL DELANEY, INDIVIDUALLY AND AS GUARDIAN AD LITEM FOR BRYAN DELANEY, JASON DELANEY AND JUSTYN DELANEY v. CAROL CLIFTON, PH.D AND MARY ELLEN FARLEY, M.A., COURT OF APPEALS OF OREGON, 41 P.3d 1099, Dismissal of Lawsuit Against Therapist Affirmed**

Overview: Appellate documents state patient's former husband and her children sued professional counselor and clinical psychologists for professional malpractice and the husband, a third party to the therapeutic relationship, sued for intentional infliction of emotional distress.

As background, in 1993, Lee Ann, the wife of the appellant, began to attend lectures and read books about Multiple Personality Disorder [MPD, now called Dissociative Identity Disorder – (DID)] and Satanic cults. She began to suspect she had been a victim of satanic ritual abuse. Her husband, the plaintiff, also became convinced of the existence of the satanic cult, his own involvement, and the validity of the therapy she was receiving.

In therapy, Lee Ann described "alters" that surfaced in response to environmental cues and believed she participated in ceremonies in which people and animals were tortured. Lee Ann was referred to a specialist who also diagnosed her as MPD.

The plaintiff and Lee Ann divorced and the husband filed a claim for damages against the therapist, alleging that the diagnosis of MPD was considered "controversial and unreliable in the mental health profession" and the therapists damaged the relationship between he and his wife. The local court dismissed this claim because the husband was a third party to the therapeutic relationship and Lee Ann had no complaint about her treatment. The appellate court noted that the plaintiff called for the court to join a "national trend" of jurisdictions that, in the context of MPD generally and memory retrieval in particular, recognize negligence claims against therapists brought by persons outside the therapist-patient relationship.

11

The Appellate court wrote: "We are unconvinced that such a trend exists. More to the point, however, we would have to depart from settled Oregon tort jurisprudence to join the trend, if there were one. We decline to do so."

Several other lawsuits have had successful outcomes for therapists after their clients have recanted their disclosures of satanic activity:

November 30, 2000, Jones v. Lurie, 32 S.W. 3d 737. After a trial, no negligence was found on the part of psychologist Lurie and they found her treatment was within the standard of care. The client had disclosed that her grandfather, father, and brother, had sexually abused her, and that her parents took her to satanic rituals where she was physically and sexually abused by other cult members. She claimed to remember murdering and cannibalizing babies and believed "Nazi mind-control" methods were utilized on her, although she later attributed these statements to her therapist. The client had been diagnosed by all of her psychiatrists and treating psychologists with Multiple Personality Disorder [or DID]. A Dr. Johnstone, who was a witness for the client, testified that there was no such diagnosis as multiple personality disorder and that other professionals who wrote about MPD were '"quacks." The court found that the client was mentally ill long before Lurie treated her and affirmed the judgment of the trial court that found no negligence on the part of the therapist.

November 1, 2000, Bloom v. Braun, et al. 739 N.E. 2d 925. After her mother recommended treatment with therapist/defendant Braun, who she was also seeing in therapy, the client came to believe that she had a diagnosis of MPD [DID] and was involved in satanic cult ritual abuse. The client alleged that the therapist "misrepresented" as fact that satanic ritual abuse was proven to exist, there was no objective evidence of such cults, and that since her mother had recovered memories of participating in such rituals, she was also a victim/participant in this activity. She claimed that her memories and the resultant Multiple Personality Disorder were actually caused by the therapy. The appellate court dismissed Bloom's complaint based on her failure to satisfy the requirements of the legal disability exception to the statue of limitations.

August 22, 2000, Althaus v. Cohen, 2000 Pa. LEXIS 2017. After a jury awarded monetary damages to the client and her parents, the therapist appealed. The issue in this case was whether a therapist -- after being referred by social services -- who treats a child for alleged parental sexual abuse owes a duty of care to the child's parents in a therapeutic setting where the child allegedly has been abused by the parents. The child had accused her parents of incest, murder, and leading a satanic cult. The appellate court found that the therapist did not owe a duty of care to the client's parents and reversed the jury's decision, resulting in the parents having to return the monetary award. However, this decision did not affect the nominal amount of money awarded to the child.

August 19, 1998, Green v. Charter Pines Hospital, Wallace, Timmons, et al., No. 96-CVS-5235. Lawyer R. Christopher Barden argued that his client Susan A. Green had been made to falsely believe she had been molested by her father and by satanic cult members. He also stated that therapies which claim to retrieve forgotten sexual abuse memories from deep inside the mind are based on "junk science." The jury rejected these claims and found in favor of the psychologists and believed that the therapist's

therapeutic techniques were well within the standard of care during the time the therapeutic relationship occurred.

September 18, 1995, Stecks v. Young, 38 Cal. App. 4th 365. David and Nancy Stecks brought an action for libel, slander, and intentional infliction of emotional distress against psychologist Young after she made a report to Child Protective Services regarding the Steckses and others. Her client had alleged that these individuals engaged in child abuse and participated in cult activities such as human and animal sacrifice. The appellate court ruled because the therapist was a mandatory reporter, she had absolute immunity.

July 15, 1998, Charter Peachford Behavior Health System, et al. v. Kohout, 504 S.E. 2d 514, 1998 Ga. App. LEXIS 995. The appellate court reversed the judgment of the lower courts finding that therapists and hospital could be sued. The client, Kimberly Kohout, had claimed that she was "brainwashed" into creating "false memories" about being sexually and ritually abused by family members in Satanic cult ceremonies. Kohout admitted to having contacted the False Memory Syndrome Foundation about her "memories." The court ruled that instead of using a "subjective standard" of the patient's awareness of psychological harm, the court should use the objective one of when the patient reasonably should have known about it. The suit was dismissed due to the statute of limitations precluding a legitimate cause of action.

--------------

**July 18, 2001, IN THE INTEREST OF S. C. P., A/K/A S. C. J, MINOR CHILD, M.C.P, MOTHER, COURT OF APPEALS OF IOWA, 2001 Iowa App. LEXIS 442, Termination of Parental Rights Affirmed**

Overview: Appellate documents state that the mother, Mary, was diagnosed with Multiple Personality Disorder [or DID] and other psychological disorders. Her child was a ward of the Juvenile Court and they wanted to terminate parental rights. There was domestic violence between her and the father of her child. The Court's concern was that "by November 1999 Mary was stating she had been the victim of Satanic ritualistic abuse." She blamed her father for causing her mental illness. Mary's therapist testified that she might be able to care for her child within one year. Her therapist stated she was working with the mother on her Dissociative Identity Disorder, helping her to map and contain her identity.

**July 16, 2001, JEFFREY DEWAYNE CLARK v. MICHAEL O'DEA, UNITED STATES COURT OF APPEALS, SIXTH CIRCUIT, 257 F.3d 498, Conviction for First Degree Murder Affirmed**

Overview: Appellate documents state a Kentucky jury convicted Jeffrey Clark and an accomplice of first-degree murder in 1995 for which he received a life sentence. Rhonda Sue Warford was stabbed multiple times and one stab wound pierced her brain stem. The medical examiner noted that an inverted cross was tattooed below her left clavicle, and that her injuries were caused by a sharp singled-edged instrument such as a knife. Both Keith Hardin and Jeffrey Clark were questioned about the crime and they were both indicted, jointly tried, and convicted for first degree murder.

Several witnesses testified about Clark and Hardin's Satanic worship. Search warrants for both Clark's and Hardin's residence were obtained. The Sheriff found various occult related items and documents at the residences of both. Jeffrey Clark was also found to have an inverted tattoo on his shoulder. A witness claimed he took her to an area where he said a number of animal sacrifices had been made. Another witness testified that Clark always carried a knife with him and called it his "sacrificial knife," and stated he had admitted to sacrificing an animal in front of a church. The victim's sister testified, stating she too knew that Hardin was involved in satanic worship.

Defendant Clark contested the admittance of Satanism at his trial, claiming there was a lack of evidence to prove the murder was a ritualistic killing. The State claimed it introduced evidence of Satanism to support its theory that the victim's murder was motivated by the belief held by Clark and Hardin that they would gain "power" by killing her. Testimony had been solicited about satanic teachings and, according to a witness, certain worshippers could empower themselves by killing other living beings by performing a human sacrifice.

The appellate court stated this evidence was probative as to the motive for the killing.

### April 12, 2001, SHARON LYNNE ARMSTRONG MORRIS v. JOEY FRANKLIN MORRIS, SUPREME COURT OF MISSISSIPPI, 783 So. 2d 681, Judgment of Custody Decision Affirmed

Overview: Appellate documents state the husband brought a divorce action against his wife (a nurse), and the court awarded him custody of their three children. The wife, Ms. Armstrong, filed an appeal. The husband alleged she subjected him to cruel and unusual treatment, in part, because she had homicidal thoughts of killing him and her mother. The record describes in detail mutual conflict between the parties. The mother had blackouts and would not know how to get home and would not recognize her husband and children. At times, she was suicidal.

The appellate court noted that her mental problems likely stemmed from her sexual abuse perpetrated by her grandfather from the ages of 8-12. The mother admitted to a history of Satanic cult involvement. Her involvement was reportedly at the insistence of her grandfather, and included "group sex, animal sacrifices, cannibalism and perhaps caused the death of at least one individual." The court acknowledge that much of her emotional problems occurred because of this sexual abuse and because she was made to participate in satanic cult rituals as a child and raped as an adult. Consequently, the appellate court affirmed the decision of the local court.

### October 24, 2000, FORT LAUDERDALE, FLORIDA, BROWARD COUNTY COURT, Case No. 9900926-CF10A, Darrel Wayne Harris Convicted of Attempted Second Degree Murder

Overview: News reports state that Darrel Wayne Harris, a 17-year-old, was charged as an adult and was arraigned on an attempted first-degree murder charge in a stabbing attack that stemmed from a Satanic ritual, police said. Harris allegedly stabbed Robert

Menendez four to six times in the throat and back with a carving knife after a ritual in which they cut their hands to let their blood mingle and chanted lines from a satanic book together. Menendez and Harris had been friends for about a year. Harris told him he had prepared a "special alter" (sic) for satanic ritual at the site, Menendez testified.

As they were chanting on April 21, they drew a pentagram in the dirt and Harris told Menendez to look down at the symbol. As Menendez looked down, Harris attacked him with the knife. "Somewhere along the line the culprit just started to hack him with the knife," said Fort Lauderdale Detective Arturo Carbo. "The victim told us that the stabbing was not part of the ritual and he firmly believed he was going to die." Harris and others left Menendez for dead but he managed to crawl to a nearby area and get help. There was evidence that Harris planned the attack. The victim was hospitalized for several days.

"Harris and Menendez were part of a network of 30 to 40 local young people who were involved in Satanic activities," Carbo said. Menendez told police he and Harris, who had known each other for at least 18 months, hung out at local public libraries to use computers to access satanic Web sites and send e-mail to each other. The group used online nicknames such as Natas, which is Satan spelled backwards, Mindblower and Deathtrap.

On October 24, 2000, a jury convicted Darrel Wayne Harris for attempted second degree murder. The victim formally testified in court that he had "dabbled in the occult" and had read a book on Satanic ritual. He accompanied Harris out of curiosity. Harris took a butcher knife and book on satanic rituals out of his backpack. Using the knife, Harris cut his hand and Menendez' hand and the two mixed their blood. Harris carved a pentagram in the ground and stood behind the cross-legged Menendez, telling him to stare at his hand and watch as the fingers disappeared and reappeared. Harris using the butcher knife, stabbed Menendez once in the neck, and three times in the back. See "Teen Charged as Adult in Stabbing that Took Place During Satanic Ritual," Associated Press, May 28, 1999; "Satanic Ritual Ends in Stabbing: Teen Charged with Attempted Murder," Sun Sentinel, May 28, 1999; "Mom: Son Depressive Teen Charged with Stabbing in Satanic Ritual," Sun Sentinel, May 29, 1999; "Teen Guilty in Occult Ritual Stabbing Garners Second-Degree Murder Verdict," Oct. 25, 2000.

### October 12, 2000, EDDIE LEE SEXTON vs. STATE OF FLORIDA, SUPREME COURT OF FLORIDA, 775 So. 2d. 923, 2000 Fla. LEXIS 1993; 697 So. 2d. 833 (1997) Conviction and Death Sentence Affirmed

Overview: Appellant documents state that Eddie Sexton's criminal trial was continued until August 1998 after the Appeals court in 1997 remanded the case back to the local court because testimony about the abuse of his children needlessly inflamed the jury. After the second trial, Eddie Lee Sexton was found guilty and sentenced to death again on Nov. 18, 1998. The Supreme Court of Florida affirmed the conviction and death sentence on October 12, 2000.

Eddie Sexton was convicted and sentenced to death for the participation in the murder of his son-in-law, Joel Good. Joel was murdered by Sexton's 22 year old son, Willie, who

15

strangled him to death under Sexton's direction. Willie Sexton testified against his father in exchange for his guilty plea to second-degree murder.

The court noted Sexton moved to Florida in 1993 with his family and the victim to avoid arrest and prevent authorities in Ohio from removing his children from the home. His infant grandchild, who was the son of the victim and his daughter, died under suspicious circumstances.

Sexton objected to the testimony of 5 of his daughters, as cited in the appellate opinion that he: "beat them, conducted 'marriage' ceremonies with his daughters, had regular sex with them and fathered several of their children, encouraged his children to have sex with each other, made his sons compare their penis sizes and ridiculed them, practiced Satanism and engaged in other bizarre conduct, threatened his children if they discussed family matters with others, trained his children how to kill FBI agents, engaged in a standoff with police in Ohio shortly before coming to Florida, fled to Florida to prevent his children from being taken into custody, and directed the killing of his infant grandchild."

The States proposed motive for the killing was that Sexton's son-in-law knew Sexton was the father of his own "grandchildren." The prosecution wanted prior bad acts admitted to show the control this man had over his children. The appeals court thought this testimony needlessly inflamed the jury and so ordered a new trial.

News reports state that during the second trial, his son, Willie Sexton, said his father convinced him he had Satanic powers and sexually abused him. He also stated that he was tied up to his bed at night when he was a child, and the father gave coins to the other children to call home if anyone spoke about the abuse.

Sherri Sexton, daughter of Eddie Lee Sexton, discussed séances held in the home. She told news reporters that her dead cat was placed on a table and "my dad had all of us go around the table holding hands. He was talking weird. He was saying he was Satan... He kept asking us to give our souls to him – to follow him to Satan."

Eddie Lee Sexton had been "ordained" by mail order at one time and had filed incorporation papers for a "Calvary Church of God." Mr. Sextons own father was a "Free Will Baptist Preacher." See "Children Tell of Life of Incest, Violence," Beacon Journal , February 6, 1994; "Court Revisits Murder Case, Son's Fears," St. Petersburg Times, September 2, 1998.

[Eddie Lee Sexton is the husband of Estella Sexton whose case is described next.]

**March 9, 1998, STATE OF OHIO vs ESTELLA SEXTON, COURT OF APPEALS OF OHIO, FIFTH APPELLATE DISTRICT, STARK COUNTY, 1998 Ohio App. LEXIS 1302; 1995 Ohio App. LEXIS 1413, Convictions for Complicity to Rape, Felonious Sexual Penetration, Gross Sexual Imposition, Complicity to Gross Sexual Imposition, and Child Endangerment Affirmed**

Overview: Appellate documents state that in April 1992 Machelle, one of Estella Sexton's

16

daughters, alleged that their father, Eddie Sexton, was molesting the three oldest daughters. There were 12 children in the family. DHS took six of the children into custody, but three of the children were returned to the mother under an agreement that she would keep the children away from the father.

In December of 1992, Mrs. Sexton fled Ohio with the three children, and reunited with Mr. Sexton at a hotel in Kentucky. On January 14, 1994, appellant and Eddie Sexton were arrested in Hillsboro County, Florida. The three children were returned to the custody of DHS. While living in Jackson Township, and in a camper in Hillsboro County, Florida, appellant and her husband perpetrated acts of sexual, physical, and mental abuse against all of the children. While living in Jackson Township, Kim, Lana, and Machelle were forced to participate in a wedding ceremony with their father. During the ceremony, Eddie engaged in a French kiss with the girls. Appellant was present, and took pictures of the ceremony.

The Court writes: "In the camper in Florida, appellant and Eddie gave Kim and Chris little red pills and Nyquil to ingest every evening, despite the fact that neither had a cold. On one occasion, Kim did not ingest the medicine and saw appellant fondling Chris' penis while he was asleep."...The mother and father inflicted "shaving rituals" on the girls. While living in Jackson Township, Lana and Machelle were forced to experience a similar shaving ritual. Lana was taken to the master bedroom for the purpose of punishment. Once inside the room, appellant held Lana down, while Eddie shaved her entire body with a razor. "While shaving her, Eddie cut her leg, put the blood on her finger, and made her sign a paper, saying that she was selling her soul to the devil." During the shaving, both appellant and Eddie Sexton fondled Machelle's vaginal area.

Chris received beatings from both appellant and Eddie Sexton. He would beat Chris once or twice a week, while appellant guarded the door. The beatings would often leave bruises. Appellant and Mr. Sexton also punished Chris by having him stand against the wall for five to six hours, holding a penny against the wall with his nose. During this punishment, Chris was not permitted to go to the bathroom.   At age twelve, Chris was forced to participate in weekend parties involving the family members in which he was given beer to drink.

According to Ohio vs. Estella Sexton, February 13, 1995, 1995 Ohio App. Lexis 1413, one of the children stated that family members were involved in satanic rituals, invoking spirits, and "baby thingies and things like that." "We will hold hands ... it mostly takes place after my grandmother died. They will bring her spirit back. Sometimes they bring devils back. They come out of the table and you see them floating around in the room ... we all hold hands while it's happening." This testimony regarding Satanic ritual was found by the court to be relevant to the proceedings.

Note: On October 11, 2005, COURT OF APPEALS OF OHIO, FIFTH APPELLATE DISTRICT, 2005 Ohio App. Lexis 5150, upheld the finding of the local court that Estella Sexton was a "Sexual Predator."

**September 30, 2000, MURFREESBORO, TENNESSEE, RUTHERFORD COUNTY JUDICIAL BUILDING, Case No. 48444, Alonzo South Pleaded Guilty to Three Counts of Aggravated Sexual Battery, Sentenced to 24 years in prison**

Overview: News articles state that according to the plea agreement Alonzo South, 31, admitted that on at least three occasions over the last two years he participated in satanic rituals in which a nude girl under the age of 10 was sexually touched. Court records say the child, who was the daughter of a woman involved in the Satanic group, was raped in a home, the nearby woods, a shed, a pickup truck and a car. See, "Man Gets 24 years for Satanic-ritual Rape of 10-year-old Girl," The Tennessean, Sept. 30, 2000.

**August 10, 2000, PEOPLE OF THE STATE OF ILLINOS v. PATRICK PAGE, SUPREME COURT OF ILLINOIS, 737 N.E.2d 264, Death Sentence Affirmed**

Overview: Appellate documents state that Patrick Page was convicted of three murders in approximately 1985-87. He confessed to committing these murders, along with other defendants, Kenneth Cherney and Gerald Feinberg. One victim was stabbed and set on fire. The second murder victim was also stabbed and a "fire was started over the grave with lighter fluid." The third victim was stabbed, buried, and a sheet and rug were burned over his grave.

Defendant Page claimed that his trial counsel failed to include evidence regarding his involvement in a cult as a mitigating factor because it would explain to the jurors how he was associated with these murders, how others were more culpable, and how he came to be able to be involved in such acts. He claimed he needed to be in a hospital setting.

Defendant told one psychologist that he was engrossed in the study of black magic and that he and several friends, led by a 24 year old warlock, held services, conjured demons and cast spells. A prior police report quoted a witness stating that "there are people who believe Mr. Patrick Page is the Anti-christ, and that Page derived a power from the location where victim was buried... and indicated Page was a leader of a Satanic cult." Another witness, and friend of Page, also stated Page derived "power" from certain locations and she "provided notes regarding defendant's involvement in black magic, rituals and sacrifices."

Defendant Page wrote in an affidavit that he was involved in certain practices from a young age and was still in fear of individuals who were involved and who may still be involved in these practices. Mr. Page's father and brother submitted affidavits stating that when defendant was 16 years old, he was involved in some kind of cult or devil worship. Another psychologist and physician stated that defendant was under the influence of a cult leader at the times he committed these murders. The Doctors described the mind-control techniques used by leaders of cults.

The court thought if this information had been submitted, far from being mitigating evidence, it would probably have served as aggravating evidence. "This evidence describes defendant's involvement in devil worship and ritualistic sacrifices." Defendant wanted his case remanded back to the local court so he could have Neurological

18



Assessment and a cult-related Psycho Social Investigation. The court denied this request and upheld defendant's death sentence.

**April 1, 2000, WARSAW, POLAND, Tomasz Suszyna and Robert Krakowian Pleaded Guilty to Murder**

Overview: News articles state Tomas Suszyna, 22, and Robert Krakowian, 19, plead guilty to a double murder and said the victims were an offering to Satan. The victims, a 19-year-old woman and a 17-year-old boy, were killed during a ritual Satanic mass in southern Poland, police said, after finding the cut up and burned bodies. The two victims were members of a sect that staged the Black mass in a disused bunker on the outskirts of the town of Ruda Slaska, but they did not know they were to die. Another teenage cult member who survived was taken to the hospital with multiple knife wounds. See "Teenage Cult Members Killed in Satanic Mass," Agence France Presse; March 4, 1999 and "Polish Satanists Jailed for Ritual Double Murder," Agence France Presse, April 1, 2000.

**March 9, 2000, IN THE MATTER OF: SHAWN ELLIS, DEPENDENT MINOR CHILD, (FRANKLIN COUNTY CHILDREN SERVICES, COMPLAINANT-APPELLEE, CARLA RICHARDSON, RESPONDENT-APPELLANT) . IN THE MATTER OF: KIMBERLY DAVIS, DEPENDENT MINOR CHILD, (FRANKLIN COUNTY CHILDREN SERVICES, COMPLAINANT-APPELLEE, CARLA RICHARDSON, RESPONDENT-APPELLANT) COURT OF APPEALS OF OHIO, TENTH APPELLATE DISTRICT, FRANKLIN COUNTY, 2000 Ohio App. LEXIS 849, Permanent Court Commitment of Children Affirmed**

Overview: Appellate documents state in May 1995 allegations of abuse and neglect were filed against the mother, Carla Richardson, on behalf of her two children. She failed to protect the children from being sexually molested by a boarder in the home who was ultimately convicted of rape. After three and a half years of offering services and receiving treatment from six different counselors, the mother remained in denial about the abuse her children had suffered. None of the parents complied with the reunification plans for their children and the court stated Satanic occult practices were allegedly commonplace.

The court noted that after being in counseling for over three years, appellant continued to deny what happened to her children and claimed an inability to remember the abuse. "There was even testimony that appellant could not recall taking blood and hair from the children as part of satanic rituals."

**February 24, 2000, NASHVILLE, TENNESSEE, Motion Withdrawn to Hold State in Contempt of Court**

Overview: News articles report that a Federal judge was asked to hold the State in contempt of court in February 2000 for its continued failure to provide court-ordered and doctor-prescribed mental health services to a severely traumatized 17-year-old victim of rape and occult ritual abuse.

Four months prior, State officials signed a federal consent decree in the case which was known as Grier vs. Wadley to make sure Sarah C. received the care she needed. While in the custody of the State, she was exposed to occult sadism, was beaten, hung from walls locked for prolonged periods in closets, and raped repeatedly. This all happened before the age of seven. A State advocacy group, Tennessee Justice Center, filed a class action lawsuit against the State for failure to properly administer the appeals procedure for the health care plan enrollees of TennCare, (Tennessee Behavioral Health). The 17 yr. old victim was just one of the people named in the settlement but she was left without proper care until this motion was filed. In April, the state agreed to properly attend to her care. See "Tenn. Could be in Contempt if Mental Care for Teen Inadequate," The Commercial Appeal, February 24, 2000; "Foster Parents Say State Failed to Care for Abused Girl in State Care," AP, February 24, 2000; "Sarah C. to Get Badly Needed Care," Knoxville News-Sentinel Co., April 18, 2000.

### October 21, 1999, SOUTH AFRICA, Ameriko Manyike Sentenced to Life in Prison

Overview: News articles state Ameriko Manyike, 32, mutilated a 15-yr-old boy and tried to sell his genitals which he had cut off. "Ritual or 'muti' murders are common in South Africa where people are prepared to pay well for potions made of human parts which they believe will bring good health or good fortune." See "Mozambican Jailed for Life in S. Africa for Ritual Murder," Agence France Presse, Oct. 21, 1999.

### August 18, 1999, STATE OF OHIO v. KENNETH J. SMITH, 1999 Ohio App. LEXIS 3794, Status as Sexual Predator Affirmed

Overview: Appellate documents state that on June 4, 1991 Kenneth Smith pled guilty to sexual imposition against a 10 year old child. Years later he appealed the designation as a sexual predator. The trial court noted the nature of the sexual conduct with the victim as indicated in the summary in the presentence investigation report and found defendant's conduct demonstrated "a pattern of abuse."

The court stated that in making its decision, the report indicated alcohol was used, the defendant had threatened the victim, and that Satanic ceremonies had been involved.

### August 11, 1999, HELSINKI, FINLAND, Jarno Sebastian Elg, Terhi Johanna Tervashonka, Mika Kristian Riska Sentenced for Murder

Overview: News articles state a court sentenced three alleged Satanists, including a 17-year-old girl, to prison terms for ritually killing a man and ingesting some of the body parts. Jarno Sebastian Elg, 24, was given a life sentence for killing a 23-year-old man in November and instigating others to participate in a ritual that included torturing the victim and listening to heavy-metal music. The Hyvinkaa District Court in southern Finland sentenced Terhi Johanna Tervashonka, 17, to two years and six months in prison and Mika Kristian Riska, 21, to two years and eight months in the case. The victim, who was not named, suffered prolonged torture and eventually was strangled to death, the court said. It also said the three people convicted "were strongly influenced by Satanism." The court declared most of the details of the case secret. See "Alleged Satanists Sentenced for Murder, Cannibalism," Associated Press, August 11, 1999.



**August 3, 1999, KIEV,  Dmitry Dyomin was Sentenced to Death for Murder; His Accomplices, Valentin Chelyshev and Alexei Andreyev Sentenced to 13 and 8 yrs. in jail**

Overview: News articles state  Dmitry Dyomin and his two accomplices, Valentin Chelyshev and Alexei Andreyev, killed a 15-year-old girl whose tongue was then boiled and ate. Dyomin belonged to a Satanic cult and with the help of his two accomplices, he severed the girl's head with a kitchen knife. Dyomin later lacquered the skull and kept it in his room. Skulls that he had taken out of graves, and books on black magic, pentagrams, and upside-down crucifixes were found during a search of the defendants home. See "Cannibal Satanists Get Death Sentence," ITAR-TASS NEWS Agency, August 3, 1999.

**July 24, 1999, UGANDA, AFRICA, Yunus Samanya, Francis Muwanga, Gloria Nagadya, Sentenced to Death**

Overview: News reports state that Yunus Samanya, 23, a native healer, Francis Muwanga, 24, and his wife, Gloria Nagadya, 21, were sent to the gallows for the ritual murder of a girl, Shamin Muhamad.

The girl's head, tongue, private parts, and two fingers were cut off. The motive for the murder was that the perpetrators wanted to become "rich," with the assistance of evil spirits, and a witchdoctor advised them to make a human sacrifice.

The article also mentioned that cases of child sacrifice had triggered public outrage. See "Shamin Killers for the Gallows," Africa News, July 24, 1999.

Four companion cases are described below:

**October 6, 1999, PEOPLE, STATE OF ILLINOIS v. ROBIN GECHT, SUPREME COURT OF ILLINOIS, 720 N.E. 2d 1098, 1999 Ill. LEXIS 1423, Petition For Leave to Appeal Denied**

Note: Four members of a satanic cult, Andrew Kokoraleis, 23, Thomas Kokoraleis, 26, Robin Gecht, 28, and Edward Spreitzer, 26, were convicted in a series of murders, rituals, and acts of cannibalism over a number of years in the mid 1980's.  The case broke after an 18-year-old prostitute was brought unconscious to the local hospital after being found naked, bleeding profusely and near death. Her left breast had been severed and she identified Robin Gecht, a carpenter-electrician, as her attacker.

All of the defendant's appeals are in published decisions except for Robin Gecht's which is reported as a Table case.

Overview: News articles report that Robin Gecht, 28, a carpenter-electrician was arrested on Oct. 20, 1982, in the vicious slashing of an 18-year-old prostitute which "proved to be the opening of a Pandora's box of depravity, sadism, Satan worship and cannibalism that

perhaps involved nearly a score of Chicago-area women." Within a week of Gecht's release on bond for the attack on the prostitute, another woman claimed to have been attacked by him. He was then rearrested.

Following clues, the police had pulled a van over to the side of the road which was driven by Edward Spreitzer, and which had Andrew Kokoraleis as a passenger, who told them the van belonged to Robin Gecht. The gruesome link between many of the slayings in which the remains were still identifiable was that victim's breasts had been mutilated or slashed off with a knife or piano wire. The three suspects then began implicating each other.

"The first inkling that the killings might have been part of a cult ritual came when a former neighbor of Gecht in Villa Park told authorities that Gecht enjoyed reading books on torture practices of ancient cultures. 'He told me that he was reading about how the ancients cut off the breasts of women and saved them for tobacco pouches,' she said."

The police found six crosses, some black and some red, painted on the walls of a tiny attic room in a house once occupied by Robin Gecht. Thomas Kokoraleis told investigators that the room had contained an altar, made from a board covered with red cloth, where cult members cut up animal parts, and sometimes human parts, for sacrifice.

"All were found to have been legally sane at the time of the murders, but Gecht was said by behavioral experts to exhibit multiple personalities, perhaps as a ruse. For example, in their discussion with him he wandered. His voice changed. He would speak as a small child, a teenager or a businessman. The experts said it probably was a sham."

Robin Gecht was ultimately convicted of the attack on the 18 year old prostitute, and is currently serving a sentence of 120 years. Authorities learned later that Gecht had worked twice for John Wayne Gacy [the well-known serial murderer of 33 boys] as a construction worker. See "Disappearances of Young Women Formed a Path Into the Darkest Depths of the Human Psyche," Chicago Tribune, Oct. 11, 1987; "Trail's End: Gruesome Clues Led to an Altar in an Attic," Chicago Tribune, Oct. 12, 1987.

-----------

### March 15, 1999, THE PEOPLE OF THE STATE OF ILLINOIS v. ANDREW KOKORALEIS, SUPREME COURT OF ILLINOIS, 707 N.E.2d 1224, 1999 Ill. LEXIS 670; 637 N.E.2d 1015 (1994); 547 N.E.2d 202 ( 1989); 507 N.E.2d 146 (1987), Stay of Execution Allowed

Overview: Appellate documents state Andrew Kokoraleis was convicted of the murder and kidnapping of Lorraine Borowski and Rose Beck Davis and was sentenced to death for these murders which occurred in 1982. Lorraine Borowski's skeletal remains were discovered in a cemetery. Defendant told officers that he and his alleged accomplices, Robin Gecht and Edward Spreitzer, engaged in intercourse with the chest cavities of the victims after the breasts were removed. The State presented evidence of defendant's participation in two other murders, Linda Sutton and Shui Mak, and the defendant ultimately confessed to 16 murders.

One of the victims, Linda Sutton, was found with her breasts and anterior chest wall absent. The pathologist concluded that the condition of the body was consistent with breast mutilation. The court agreed to exclude evidence of cult involvement in this defendant's case at the start of the proceedings but the prosecutor told the jurors that the defendant lived out the "Satanic Bible."

In 1994 Defendant Andrew Kokoraleis appealed his conviction and sentence of death in the murder of Lorraine Borowski. He claimed ineffective representation of counsel during his sentencing phase which resulted in the death penalty. He argued that counsel did not independently investigate the psychological factors that made him vulnerable in following co-defendant Robin Gecht, who "fancied he possessed a Charles Manson-like persona, (who) subjected defendant to his will to commit the crimes."

Andrew Kokoraleis denied responsibility for the crimes committed and stated that his statements to police were coerced and that he was "framed." The court stated that given the circumstances of this case, it was not unreasonable for his attorney to not have investigated his "disturbed psyche" because the defense strategy had been to "bar at the outset of trial the introduction of evidence that defendant's crimes were part of some cult ritual. It would have been inconsistent with the strategy of barring that evidence for counsel to later argue the very same evidence showed, in the sentencing phase, that defendant's culpability was due to a disturbed psyche. The fact that counsel did not investigate sources to glean such evidence is therefore rendered strategically inconsequential. Further, as already noted, arguing the lurid particularities of the crimes as evidence of a psyche ripe for Gecht's enslavement was inconsistent with defendant's sworn proclamations of innocence."

On March 15, 1999, the Appeals court stayed Andrew Kokoraleis execution until the Supreme Court reviewed the case. The Supreme Court denied his writ of certiorari, and on March 17, 1999 Andrew Kokoraleis was executed.

See "Cult Murder Trial Opens in Du Page," Chicago Tribune, March 11, 1987; "Mutilation Cult Suspect on Trial," Chicago Tribune, Feb 5, 1985; "Kokoraleis Found Guilty in Rape, Killing," Chicago Tribune, Feb. 12, 1985; "Man Guilty in Murder of Woman," Mar 19, 1987; High Court is Asked to Set Killer's Execution," Chicago Tribune, Dec. 10, 1998; "Gruesome Clues Led to an Altar in an Attic," Chicago Tribune, October 12, 1987; "Cult Murder Trial Opens in Du Page," Chicago Tribune, March 11, 1987; "Satanic Crime Police Say the Devil Made Some People Do It," Chicago Tribune, April 18, 1988; Book – "Deadly Thrills," by Jaye Slade Fletcher.

------------

**March 28, 1991, PEOPLE OF THE STATE OF ILLINOIS v. EDWARD SPREITZER, SUPREME COURT OF ILLINOIS, 572 N.E.2d 931, 1991 Ill. LEXIS 22; 525 N.E. 2d 30 (1988),  Dismissal of Post-Conviction Petition Affirmed**

Overview: Appellate documents state that Edward Spreitzer was found guilty along with Andrew and Thomas Kokoraleis for the murder of Linda Sutton, whose breast had been amputated. Edward Spreitzer confessed to the crime and implicated Robin Gecht. He

23

stated they had picked up a black woman and Gecht dragged her into the bushes, cut off one of her breast, and had sex in the chest cavity. Spreitzer retrieved a wire from their van at Gecht's request, and Gecht severed the woman's other breast and had sex in that chest cavity. Spreitzer later admitted to also severing the victim's breast.

Defendant Spreitzer confessed to 4 other murders, including that of Shuk Mak, Rose Davis, Sandra Deleware, and Raphael Tiradao. Several of these victims also had their breasts removed. The Appellate court stated that the defendant filed a motion to exclude information about his "religious cult" in which "ritualistic ceremonies" were preformed with the amputated breasts in Gecht's attic. Due to the agreement, the prosecutor erred by raising the issue of "devil worship," but defendant did not object to it at the trial court.

Edward Spreitzer plead guilty and was sentenced to die for the slaying of Linda Sutton, and for his part in the killings of Lorraine Borowski, Shui Mak, Rose Beck Davis, Sandra Deleware and Rafael Tirado, but his sentence was commuted by the Governor in 2003.

See "Prosecutors to Seek Death in Devil-Worship Killings," Chicago Tribune, Feb 25, 1986; "Defendant to Tell About Mutilation Victim Was Dead, Lawyer Says," Chicago Tribune, March 4, 1986; "Defense Lawyer Admits Mutilation," Chicago Tribune, Feb 26, 1986; "Spreitzer Sentenced to Death," Chicago Tribune, March 20, 1986; "The Push to Restore Wisconsin's Death Penalty: Advocates Have New Strategy, New Majority," Madison Capitol Times, March 1, 2003.

------------

### January 25, 1990, PEOPLE OF THE STATE OF ILLINOIS v. THOMAS C. KOKORALEIS, APPELLATE COURT OF ILLINOIS, SECOND DISTRICT, 549 N.E.2d 1354, 1990 Ill. App. LEXIS 105; 501 N.E. 2d 207 (1986), Denial of Request to Withdraw Guilty Plea Affirmed

Overview: Appellate documents state that Defendant Thomas Kokoraleis was convicted of the rape and murder of Lorraine Borowski. The Appellate court overturned his conviction in 1986 and remanded the case back to court. Defendant then plead guilty to murder in return for a 70 year sentence. Defendant sought to withdraw his guilty plea but the court denied his request.

The Defense stipulated that if the case had gone to trial, the State would have presented evidence to show that Borowski's body was found with her left breast removed; that the defendant admitted to police officers that he and his cohorts had abducted Borowski, removed her left breast with a piano wire, and killed her; and that the defendant was part of a cult that would rape and kill women and cut off their breasts. The Appellate Court ruled that because the Defendant had falsely confessed to another murder it did not affect his admission of guilt regarding two other murders which he plead guilty to.

News articles report that Cook County Assistant State's Attorney Richard Beuke testified at Thomas Kokoraleis's trial in Du Page County, stating that the severed breast of the murder victims would be removed from a box and placed on the altar. The rituals, while Gecht read passages from the Bible, involved cannibalism. Police thought Robin Gecht

24

was the leader of the group.  See "Gang Member Gets 70 Years in 1982 Slaying," Chicago Tribune, July 17, 1987, and other articles.

**February 19, 1999, PAUL A. BONACCI vs. LAWRENCE E. KING, 4:CV91-3037, UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEBRASKA; $1 Million Default Judgment Awarded for Conspiracy, Emotional Abuse, Battery, False Imprisonment**

Overview:  Court documents and a book publication by Paul Bonacci's attorney, ex-senator John de Camp, state that Larry King organized groups of children to sexually blackmail and compromise politicians and businessmen while he served as Manager of the Franklin Credit Union in Omaha, Nebraska.  King had political ties that reached the presidency of the United States and he sang at the 1988 Republican National Convention in New Orleans.

Paul Bonacci, who suffers from Multiple Personality Disorder [or DID], stated that as a youth he had been subjected to Mind Control, he had been transported across the U.S., and was forced to have sex with various people, forced to deliver drugs, and forced to participate in satanic snuff films, where Larry King was present. He identified the Bohemian Grove in Northern California, a well known gathering/meeting site for politicians, as the location of a satanic murder, and he had inside knowledge about many satanic ritual abuse cases around the country that he claimed to have been present at. These include a case in Jordan, Minnesota, in which Jim Rud was the only defendant charged, and in Bakersfield, California, another case in which several individuals were criminally charged for the sexual abuse of children within the context of ritual abuse.

The Omaha police chief, Robert Wadman and publisher of the local newspaper Harold Andersen, were implicated in the sexual abuse allegations. The FBI refused to investigate the child abuse allegations because the local FBI representative, Nick O'Hara, claimed that Robert Wadman was his "friend." A Grand Jury was convened which labeled the children's allegations as a "hoax," apparently due to the high-profile nature of the alleged perpetrators, the ritual abuse allegations, and after one witness, Troy Boner, recanted his statements about abuse. John de Camp states that his retraction was a key factor in the Grand Jury's findings that all the children had lied. Troy Boner later claimed that the FBI threatened him into recanting.

One sexual molest victim, Alicia Owen, was charged with perjury due to naming the police chief, Robert Wadman, as one of her abusers. She served prison time for this charge but was released in the year 2000. Paul Bonacci claimed that the sex ring that plunged him into Satanism and Mind Control was centered at Offutt U.S. Air force Base, near Omaha. The main investigator assigned to this case, Gary Cadiori, died in a suspicious plane crash shortly after he took statements from the children.

Larry King was convicted in 1991 and sentenced to 15 years in prison for embezzlement, conspiracy, and making false financial record entries. The Credit Union was missing 40 million dollars and there were allegations that funds were used to finance the Contras, and other clandestine operations by the CIA.

25

John de Camp linked Lt. Col. Michael Aquino, leader of the satanic group, the Temple of Set, to mind control operations and writes:

"Child victims gave evidence in depth of the role of Lt. Col. Michael Aquino in this depravity. Aquino…was long the leader of an Army psychological warfare section which drew on his expertise and personal practice in brainwashing, Satanism, Nazism, homosexual pedophilia and murder."

Noreen Gosch, mother of Johnny Gosch who was kidnapped 20 years ago when he was 12, testified at Mr. Bonacci's hearing on his behalf on February 5, 1999 in this civil lawsuit against Mr. King. Ms. Gosch was responsible for the passage of legislation on behalf of missing children, and due to her efforts the National Center for Missing and Exploited Children was created. Over the years, she carried out her own investigation about her son's disappearance and observed at this hearing that if the FBI had actually done their job in her case, it would have "opened up the biggest scandal in the United States, bigger than the Iran-Contra story." Paul Bonacci gave information to Noreen Gosch about the kidnapping of her son, Johnny Gosch, and admitted to participating in his kidnapping.

Ms. Gosch claimed her son, Johnny, visited her in March of 1997 and told her the exact same story Paul Bonacci had, and asked her to make these claims public. He said kidnapped children and others were being used by professional pedophiles and some of those children were victims of mind control. In Ms. Gosch's book, "Why Johnny Can't Come Home," (2000) she wrote that he and three others claimed that Lt. Col. Michael Aquino was involved in Johnny's kidnapping. (pg. 223) Ms. Gosch stated the following in the court hearing:

"There was a man by the name of Michael Aquino. He was in the military. He had top Pentagon clearance. He was a pedophile. He was a Satanist. He's founded the Temple of Set. And he was also a very close friend of Anton LaVey. The two of them were very active in ritualistic sexual abuse. And they deferred funding from this government program to use this experimentation upon children …where they deliberately split off the personalities of these children into multiples so that when they're questioned or put under oath or questioned under lie detector, that unless the operator knows how to question a multiple personality disorder, they turn up with no evidence. They use these kids to sexually compromise politicians or anyone else they wish to have control of…they were taken to be used by professional pedophiles. People that have the money to buy what they want, take the kids wherever they want... and by splitting the children's personalities they could then train each one of the personalities to do a different function. And the rest of the personalities within that host personality would not be aware of it or remember it."

The Circuit court wrote in its judgment against Larry King:

"Two counts are alleged against the defendant King in the complaint. Count V alleges a conspiracy with public officers to deprive the plaintiff [Paul Bonacci] of his civil rights, designed to continue to subject the plaintiff to emotional abuse and to prevent him from informing authorities of criminal conduct. Count VIII charges battery, false imprisonment, infliction of emotional distress, negligence and conspiracy to deprive the

26

plaintiff of civil rights. Between December 1980 and 1988, the complaint alleges, the defendant King continually subjected the plaintiff to repeated sexual assaults, false imprisonments, infliction of extreme emotional distress, organized and directed Satanic rituals, forced the plaintiff to 'scavenge' for children to be a part of the defendant King's sexual abuse and pornography ring, forced the plaintiff to engage in numerous masochistic orgies with other minor children. The defendant King's default has made those allegations true against him. The issue now is the relief to be granted monetarily.

The now uncontradicted evidence is that the plaintiff has suffered much. He has suffered burns, broken fingers, beating of the head and face and other indignities by the wrongful actions of the defendant King. In addition to the misery of going through the experiences just related over a period of eight years, the plaintiff has suffered the lingering results to the present time. He is a victim of multiple personality disorder, involving as many as fourteen distinct personalities aside from his primary personality. He has given up a desired military career and received threats on his life. He suffers from sleeplessness, has bad dreams, has difficulty in holding a job, is fearful that others are following him, fears getting killed, has depressing flashbacks, and is verbally violent on occasion, all in connection with the multiple personality disorder and caused by the wrongful activities of the defendant King."

Larry King did not appear at this civil hearing and a one million dollar default judgment was awarded to Mr. Bonacci.

See books which describes this case: "The Franklin Cover-up: Child Abuse, Satanism, and Murder in Nebraska," by John W. DeCamp, 1996; Why Johnny Can't Come Home, by Noreen Gosch, 2000; [See, Aquino vs. Stone, 1992, Aquino vs. ElectriCiti, 1997], and news articles: "Judge Determining Damages in Bonacci Lawsuit," AP, February 6, 1999; "Owen is Paroled: Served a 4 ½ year sentence - The Woman Linked to the Franklin Credit Union Sexual Abuse Investigation Wants to be a Normal Person." Omaha World-Herald, Sept. 21, 2000. The Court Transcript of this hearing can be ordered from Latimer Reporting 402-476-1153

### July 24, 1998, STATE OF OREGON v. MICHAEL JAMES HAYWARD, SUPREME COURT OF OREGON, 963 P.2d 667, 1998 Ore. LEXIS 593, Murder, Assault, Kidnapping, Robbery, and Burglary Affirmed, Death Sentence Affirmed

Overview: Appellate documents state that on April 10, 1994 Jason Brock, Daniel Rabago, Jason Brumwell, and Johl Brock, three of whom considered themselves to be Satanists and members of a "Death-Metal" band, decided to rob a Dari Mart. They listened to their Death-Metal music before they committed the crime, which included lyrics to "The Pick-Axe Murders," An Experiment in Homicide," "Hammer Smashed face," Meat Hook Sodomy," "Gutted," and "Living Dissection." They planned their crime and went to a Dari Mart store, killed a female clerk, and brutally beat another one.

Jason Brock described the lyrics of "Cannibal Corpse," as explaining or picturing through words "killing people." Johl Brocks testified that the death metal lyrics to which the group listened "described basic satanic practices, ceremonies and stuff." He also stated

that the lyrics on the CD by the band Decide is what led to the two of them "dabbling into Satanism." Daniel Rabago testified "we were all into evil and we were all pretty much deathers."

The evidence of "Death-metal" music and Satanism was admitted into the court testimony and was upheld because it partially explained the motive for the crime and the motive for the degree of brutality used.

## April 28, 1998, LUBUK PAKAM, INDONESIA, Achmad Suradji Sentenced to Death for Murdering 42 Women

Overview: News reports state an Indonesian sorcerer Achmad Suradji, 47, was sentenced to death for murdering 42 women as part of a bizarre attempt to "boost his magical powers." The case first came to light in April last year when police, following up a missing person's report, found a body buried in a sugar cane field near Suradji's house. When they went to question the sorcerer, they found women's shoes and handbags. Over the next few weeks, a further 41 bodies were unearthed close to his village. According to the police, Suradji said that he had a dream in 1986 in which the ghost of his father had told him to kill a total of 70 women and then drink their saliva in order to enhance his mystical powers. See "Sorcerer to die for 42 murders," The Daily Telegraph, April 28, 1998 and "Witch Work; How an Indonesian Lured 42 Women to Their Death," Asiaweek, June 6, 1997.

## March 25, 1998, MEXICO CITY, MEXICO, Elio Hernandez Rivera, David Serna Valdes and Sergio Martinez Salinas, Sentences for Murder, Conspiracy, Drug Trafficking and Weapons Violations Reduced

Overview: News articles state that reputed "Godmother," Sara Maria Aldrete Villarreal, a student at Texas Southmost College, and four other members of a cult were sentenced to more than 60 years in prison for the ritual slaying of 13 people, including Texas College student, Mark Kilroy. After they appealed, an appellate judge reduced the sentences of Rivera, Valdes, and Salinas from 67 to 50 years.

Mark Kilroy, 21, a pre-med student, was kidnapped on the streets of Matamoros on March 14, 1989 during Spring Break. Police arrested cult member Serafin Hernandez, a drug trafficker, after he drove through a federal judicial police roadblock outside Matamoros believing he was rendered "invisible" by his cult's "black magic."

Hernandez confessed to participating in the kidnapping and burial of Mark Kilroy and took authorities to his remains on a ranch near the Rio Grande. Sara Aldrete and other cult members had taken Kilroy there, where they ritualistically murdered him, removed his brain and cut his body into pieces. The police also discovered the remains of 13 other victims, including another U.S. citizen, and a 9-year-old child.

Decomposed goat heads, parts of a rooster, bowls containing dried blood, a cauldron with human remains, including a brain and a heart, and spines crafted into necklaces, were found on the ranch. Authorities said Sara Aldrete was the "Godmother" who presided over rituals along with "Godfather" and cult leader Adolfo de Jesus Constanza. In 1989

28

Aldofo Constanza was killed by another cult member at his request during a police shootout.

The group thought their self-styled religion, which drew from the Caribbean Santeria and the African Palo Mayombe traditions, would render them bulletproof and protect them from police and rival gang members which was the rationale for why they "sacrificed" Mark Kilroy and others. See "I've Never Seen Anything Like This Before," St. Louis Post-Dispatch, April 16, 1989; "Texan Arrested in Cult Killings," St. Louis Post-Dispatch, April 18, 1989; "Behind Drug Cult Killings in Mexico," San Francisco Chronicle, February 7, 1991; "Cult Killers Given Lighter Sentences," San Antonio Express-News, March 25, 1998; "'Devil Ranch' Priestess Still Says She's Innocent," San Antonio Express-News, March 21, 2004.

### March 18, 1998, SOUTH AFRICA, Naledzani Mabuda and his Wife Helen Madida Confessed to Murder

Overview: News reports state the father, Naledzani Mabuda, 26, a traditional healer and spiritual medium, and his wife, Helen, 22, confessed to ritually killing their 23 month old son because Mabuda's ancestors had threatened to destroy him if he did not. Police found the boy's head, legs, hands and genitals buried under various parts of the floor in the couple's house. Mabuda testified in court that killing his son as a sacrifice to the family's ancestors was central to his role as a traditional healer and spiritual medium. Later searches revealed the toddler's intestines, liver, and other internal organs found in a series of ritual "graves" on the nearby mountainside.

The couple were refused bail after another local traditional leader banned them from the village. He testified that the couple had committed a crime of the "greatest evil" and that the townspeople were terrified by the act. A series of sangomas were asked to testify about ritual human sacrifices as part of traditional African beliefs. See, "A Sangoma Couple in Court for Sacrificing Child to Ancestors," Africa News Service, March 18, 1998.

In January 1998 several of South Africa's witch-doctors, or sangomas, claimed that ritual murders and killings related to the medicinal quest for body parts had decreased by more than 90 percent. The news article reports that police estimate that several hundred people, many of them children, are killed in South Africa each year for their body parts. Female genitals, breasts and placentas are used for infertility and good luck, while hands burned to ashes and mixed into a paste are seen as a cure for strokes, and hearts for heart disease. Blood is given to impart vitality and brains for political power and business success. However "true sangomas eschew the use of body parts, treating physical and mental ailments using herbal medicines." See "Witch-doctors Not Making a Killing Any More: South African Healers Say Ritual Murders No Longer in Vogue." The Ottawa Citizen, January 2, 1998.

**February 4, 1998, SEAN RICHARD SELLERS  v. RONALD WARD, WARDEN OF THE OKLAHOMA STATE PENITENTIARY, UNITED STATES COURT OF APPEALS TENTH CIRCUIT, 135 F.3d 1333, 1998 U.S. App. LEXIS 1621; 728 P.2d 515 (1996); 889 P. 2d 895 (1995); 809 P.2d 676 (1991); Federal Habeas Corpus Relief Denied**

Overview: Appellate documents state in 1985 - 1986, at the age of 16, Sean Sellers killed three people, including his parents. He was tried as an adult and sentenced to death. Evidence of his Satanic belief system was admitted by the defense at trial. His defense counsel had portrayed Sellers as the victim of Satanism and said he was addicted to the game Dungeons and Dragons.

Sean Sellers appealed in recent years due to new evidence that he suffered from Multiple Personality Disorder or (DID). Extensive medical documentation was submitted to the court indicating that an "alter" committed the offenses. The appeal was denied although the court was clearly disturbed by the ramifications of Sean Seller's mental disorder.

"Although troubled by the extent of uncontroverted clinical evidence proving Petitioner suffers from Multiple Personality Disorder, now and at the time of the offenses  of conviction, and that the offenses were committed by an 'alter' personality, we are constrained to hold Petitioner has failed to establish grounds for federal habeas corpus relief."

There was no evidence that Sellers host personality was aware of or could not control the alter, and that alter knew the difference between right and wrong at the time they committed the crime.

Note: Sean was executed on Feb. 4, 1999 despite appeals by Amnesty International contesting the legal wisdom of executing a man for crimes he committed at age 16 and who suffered from a psychological disorder like MPD/DID.

**November 26, 1997,  STATE OF TENNESSEE vs. CHRISTA GAIL PIKE, COURT OF CRIMINAL APPEALS OF TENNESSEE, AT KNOXVILLE, 1997 Tenn. Crim. App. LEXIS 1186 (First Degree Murder-Death Penalty) Conviction for First Degree Murder and Conspiracy to Commit First Degree Murder Affirmed. Death Penalty Affirmed**

Overview: Appellate documents state Christa Pike killed another female she felt rivalry with and carved a pentagram into her chest.  A group of "others" were named who helped her, but Pike did not provide information about them. Both the Defendant and suspect Tadaryl Shipp wore pentagram necklaces and a "Satanic Bible" was recovered from a search of Shipp's room. The Defendant admitted that she and another person carved the pentagram in the victim's chest. The medical examiner testified that all of the wounds prior to the final blow to the head had been made while the victim was alive and conscious.

30

The psychiatrist involved thought there were Satanic elements to the crime but believed that Pike was just a "dabbler" in Satanism. A witness stated that as the Defendant described hitting Slemmer in the head with a piece of asphalt and carving a pentagram in her chest, she danced around in a circle, "smiling and singing."

News articles report that an acquaintance of Pike stated she "seemed just like us when she first got here...two weeks later she's talking about the Satanic Bible."

Two years later another news report states Tadaryl Shipp was convicted for this murder:

"A Knox County judge imposed consecutive prison terms Thursday for a young Memphis man who took part in the torture slaying of a Knoxville Job Corps student. Criminal Court Judge Mary Beth Leibowitz said public safety concerns dictate that Tadaryl D. Shipp be imprisoned as long as the law allows. Shipp, 21, had no regard for human life when he helped murder Colleen A. Slemmer, 19, the night of Jan. 12, 1995, the judge said. He treated her with 'gross cruelty' while at least partly satisfying an interest in Satanism, Leibowitz said."

See "Orange County Woman to Die for Tenn. Killing," The News & Observer, April 1, 1996; "Judge Orders Shipp to Serve Life in Slaying, Then Another 25-year Term " Knoxville News-Sentinel, March 12, 1999.

## October 3, 1997, EQUATORIAL GUINEA, An Unnamed Individual was Condemned to Death

Overview: News reports state that an unnamed individual was condemned to death after removing the eyes, tongues, ears, and genitals of his 10 year old victim. Malabo radio reported that 17 ritual murders were committed in Equatorial Guinea in August and September of 1997, according to official figures. --- See "Ritual Murderer of Girl, 10, Sentenced to Death," Agence France Presse, October 3, 1997.

Another news report cites a Spanish journalist and ethnographer, Jose Manuel Novoa, an expert on the country who has conducted investigations in Equatorial Guinea since 1979 and has written two books about cannibalism in the region. Novoa claims that anthropophagy (eating human flesh) is widespread in the country. He stated, "Eating human flesh was a tradition of warriors pertaining to the ethnic group of the Fang, which lives in Equatorial Guinea, Nigeria, Gabon and Cameroon...as they conquered new territories, Fang warriors ate parts of their victims to absorb desirable qualities such as youth and strength...human organs are eaten by members of secret brotherhoods which practice sorcery in forests at night. New members are initiated in ceremonies which invoke spirits...bodies are obtained through murder and robbing them from cemeteries ...the secret groups are known as 'evu societies', because many Guineans believe the human body to contain an organ known as the 'evu.'"... "The human brain is known to be highly toxic, for which reason the cannibals seek to immunize themselves by ingesting potent vegetal poisons in small doses...nevertheless, the cannibalism is believed to have led to a disease known as the kuru." See "Cannibalism Still Common in Equatorial Guinea, Spanish Expert Claims," Deutsche Presse-Agentur, April 5, 1998.

31

In April of 1988, President Omar Bongo met with leaders of the Catholic, Protestant and Moslem communities to discuss possible action against imported beliefs and practice. This action was taken after an admission by a witchdoctor, purporting to belong to a sect based in neighboring Equitorial Guinea, that he had eaten six humans, including two of his own children, over the past decade. The witchdoctor was a railway worker and his followers had killed another victim, a teacher who was seeking help to solve family problems. See "Bongo Denounces Sects in Wake of Gruesome Cannibalism Tale." Reuters (Libreville), April 29, 1988.

The following case involves the author of this archive

**September 23, 1997, SAN FRANCISCO, CALIFORNIA, Aquino v. ElectriCiti, et al., Inc., Media Law Reporter, 26 Med. L. Rptr. 1032, No. 984751, Civil Suit Alleging Infliction of Emotional Distress, and other Claims Dismissed**

Note: Lt. Col. Michael Aquino sued internet provider ElectriCiti, located in San Diego, California, for promoting "defamation," "infliction of emotional distress," and other claims, due to an anonymous person posting information about him on the internet. The author of this archive, Diana Napolis, was this "anonymous" person, who debated with Lt. Col. Aquino while using the pseudonym "Karen Jones" and "Curio" during the years 1995-2000. Lt. Col. Aquino sued, claiming he was "defamed" when it was clear he only wanted the name of the owner of the account in question after military records were posted to the internet, proving he had been processed out of the Army in 1990 after a ritual abuse investigation.

After the Internet provider reviewed the allegedly "defamatory" messages and ascertained that no libel had occurred, they refused to divulge any account name to Lt. Col. Aquino because they believed he was dangerous. ElectriCiti was sued twice, but the claims were ultimately dismissed due to the Communications Decency Act, which precluded internet companies from being held liable for messages written by their customers.

The Media Law Reporter gave an overview of the complaint but unfortunately quoted Aquino's description of the "facts." They wrote that "Curio" stated the Aquinos were the "ring leaders of an international conspiracy to further the satanic ritual abuse of children, and that they engaged in kidnapping, cannibalism and murder of anyone who stood in the way of this international conspiracy."

Lt. Col. Aquino submitted this information to the Media Law Reporter for reasons unknown, even though this author never made those particular statements at the time. However, due to new information which has been reviewed, namely a publication by John de Camp, "The Franklin Coverup," (1996) which alleges criminal activity by Michael Aquino, Noreen Gosch's book, "Why Johnny Can't Come Home," (2000) and after reviewing several internal Criminal Investigative Division Transcripts of the Army interviews of children in their investigation of Lt. Col. Aquino, it does appear that the above statements are absolutely correct.

Lt. Col. Aquino claimed he was not processed out of the Army in 1990; however, according to a letter from the National Personnel Records Center, dated December 1, 2006, his dates of service in the Army were from June 14, 1968 to August 31, 1990. Aquino is known for frivolously suing anyone who mentions this fact. [Aquino v. TimesWarner/Linda Blood, Aquino v. Lockwood]

An internet metasearch reveals 70 web pages which describe this lawsuit [Aquino v. ElectriCiti.] See news articles: "Internet Provider Sued Over Postings," San Diego Union-Tribune, June 24, 1997; "Wired News Flash, Satanist Sues ISP to Silence Usenet Poster," San Francisco, Business Wire, May 22, 1997; [See cases in this archive: Aquino vs. Stone, Presidio Army Base, People v. Daryl Ball, Fort Bragg/Jubilation Day Care Case].

A lawsuit is pending against Lt. Col. Aquino due to his continued efforts to violate the authors First amendment rights to free speech.

**May 13, 1997, J. P. v. CLARENCE CARTER, COMMISSIONER OF THE VIRGINIA DEPARTMENT OF SOCIAL SERVICES, COURT OF APPEALS OF VIRGINIA, 485 S.E.2d 162, 1997 Va. App. LEXIS 310, True Finding of Child Molestation Affirmed**

Overview: Appellate documents state that on May 8, 1993 the Arlington County Police Department received a report that two children had been sexually molested by appellant, their thirteen year old baby sitter. Their report included claims that the appellant, J. P., conducted Satanic rituals, used a "magic" crystal and a "magic" ring, as well as allegations of statutory rape, sodomy, and aggravated sexual battery. The 13 yr. old female minor, J. P., was found to have molested two children in the context of Satanic ritual ceremony while she was babysitting them. The kids reported to their parents and investigators that: "...[appellant] had undressed and fondled [one child] on these two different occasions, performed oral sodomy, had [him] touch her breast and sat on top of [him] and quote 'hurt his penis.' [Appellant] allegedly had [the other child] draw a pentagram and circle and told [him] this is where to love Satan while she fondled his penis. . . [The children's mother] said the boys reported that [appellant] talked of Satan's power and that she would kill them and their parents if they told anyone what happened. This minor's name was submitted to the central registry as a founded sexual abuser."

**May 13, 1997, ADOPTION OF QUENTIN & OTHERS, SUPREME JUDICIAL COURT OF MASSACHUSETTS; 678 N.E.2d 1325, 1997 Mass. LEXIS 104, Order Granting Petition to Dispense with Consent to Adoption of Three Children Affirmed**

Overview: Appellate documents state Department of Social Services planned to adopt out the children of the father and mother. The parents appealed and the court briefly describes Social Services case for neglect, sexual molestation, and statements of the children. While describing the past history of the father, the court writes:

"In 1983, the father joined a religious organization called Orlo Templi Orientis and studied the so-called 'Satanic Bible.' In January, 1984, he was convicted of grave robbing,