1    Diana Napolis, In Pro Per
     6977 Navajo Road, PMB 114
2    San Diego, CA. 92119-1503
     (619) 873-5917
3

4
     In Pro Per
5

6

7
                  IN THE UNITED STATES DISTRICT COURT
8
               FOR THE SOUTHERN DISTRICT OF CALIFORNIA
9

10            FIRST    AMENDED COMPLAINT

11

12

13
     DIANA NAPOLIS
14
              Plaintiff
15                                     ) Case No.: 08CV557 WQHNLS
           v.                          )
16   MICHAEL AQUINO, MICHELLE          ) COMPLAINT FOR:
     DEVEREAUX,  TANYA LYSENKO,        )
17   AKA TANI JANTSANG, CAROL          )   1. NEGLIGENCE;
     HOPKINS, DR. ELIZABETH LOFTUS,    )   2. DEFAMATION;
18   MARK SAUER, DAVID COPLEY, SAN     )   3. VIOLATION OF PLAINTIFF'S
     DIEGO UNION-TRIBUNE, a business   )      RIGHT TO PRIVACY;
19   entity, SAN DIEGO STATE           )   4. FALSE LIGHT;
     UNIVERSITY, and DOES 1-100,       )   5. INTENTIONAL INFLICTION OF
20   inclusive,                            EMOTIONAL DISTRESS;
                                           6. CONSPIRACY TO VIOLATE
21                                            PLAINTIFF'S RIGHT TO
                                              PRIVACY AND FIRST
22            Defendants                      AMENDMENT RIGHT TO FREE
                                              SPEECH;
23   _____     7. CONSPIRACY

24

25

26

27

28

Plaintiff Diana Napolis is a citizen of the State of California and the United States of America and resident of San Diego County entitled to the protections of the Constitutions of the State of California and the United States of America.

Plaintiff DIANA NAPOLIS alleges against Defendants as follows:

## PARTIES

1. Defendant Dr. Michael Aquino (hereinafter referred to as Aquino) founder of the satanic organization the Temple of Set is believed to be a resident of San Francisco, California.

2. Defendant Michelle Devereaux (hereinafter referred to as Devereaux) is believed to be a resident of San Francisco, California.

3. Defendant Tanya Lysenko aka Tani Jantsang (hereinafter referred to as Lysenko/Jantsang) founder of the satanic organization the "Satanic Reds" is believed to be a resident of Lehigh, Florida.

4. Defendant Carol Hopkins (hereinafter referred to as Hopkins) is believed to be a resident of Cuernavaca, Mexico and San Diego, California.

5. Defendant Dr. Elizabeth Loftus (hereinafter referred to as Loftus) a False Memory Syndrome Foundation Advisory Board member and Professor of psychology at UC Irvine is believed to be a resident of Irvine, California.

6. Defendant Mark Sauer (hereinafter referred to as Sauer) reporter for the San Diego Union-Tribune is believed to be a resident of San Diego, California.

7. Defendant David Copley (hereinafter referred to as Copley) publisher of the San Diego Union-Tribune is believed to be a resident of San Diego, California.

8. Defendant San Diego State University (hereinafter referred to as SDSU) is believed to be a resident of San Diego, California.

9. Plaintiff Diana Napolis has a Masters degree in Transpersonal psychology and worked as a Court Intervention Social worker at Child Protective Services [CPS] in San Diego, California during the years 1990-1996. After resigning from CPS Plaintiff was self-employed as a Visitation Supervisor for Family Court from 1996-2000. In the year 2000, Plaintiff received her Marriage and Family Therapy [MFT] license.

## **GENERAL ALLEGATIONS**

10. Plaintiff alleges that satanist Defendant Aquino and his associates conspired to violate Plaintiff's Right to Privacy and First Amendment Rights to Free Speech on the internet between 1995-2000 after she proved the existence of the satanic ritual abuse of children under the pseudonyms "Curio" and "Karen Jones" which was contrary to their agenda.

11. Defendants and other Does proceeded to conspire with Defendant Devereaux and San Diego Union Tribune [SDUT] reporter Mark Sauer to identify Plaintiff after which Defendant Devereaux enlisted the aid of San Diego State University [SDSU] Campus police, by fraudulent misrepresentation, to identify Plaintiff in June 2000. Despite Plaintiff advising Defendant SDSU's campus police that dangerous individuals were seeking her identity, the campus police proceeded to engage in reckless and outrageous conduct and subjected Plaintiff to invasion of privacy by negligently revealing her identity to SDUT reporter Mark Sauer after which he wrote an invasive and defamatory news article about Plaintiff titled, "A Web of Intrigue/The Search for Curio Leads Cybersleuths Down a Twisted Path" on September 24, 2000 which Defendant Copley negligently published.

12. After Defendant Mark Sauer's defamatory news article was published, Plaintiff was subjected to further invasion of privacy after Defendant Devereaux and others accessed private information about Plaintiff's family court case which forced Plaintiff to resign as visitation supervisor due to her concern for the safety of the party she was supervising and because she had become a "controversial figure." After the publication of Mark Sauer's news article Plaintiff was the subject of internet threats by Defendant Lysenko/Jantsang and further libel and defamation.

13. Eight months after Plaintiff's identity was revealed, and since May 2001, Defendant Aquino and others have caused Plaintiff to be subjected to prolonged psychological and physical torture and terrorization by the usage of nonlethal technology, such as "Voice to Skull Devices," "Voice Synthesis Devices," "Computer/Brain Interface" (Remote Neural Monitoring), psychotronics, electromagnetic, and other nonlethal technology. Because of these assaults, Plaintiff has been unable to seek gainful employment since May 2001 and receives Social Security Disability benefits.

14. In October 2002, due to threats made by Plaintiff's perpetrators that they would kill her by nonlethal technology, it caused Plaintiff to write a pseudo-threat to a Hollywood figure to ensure that she would be placed in the custody of law enforcement, in efforts to save her life. Due to Plaintiff's eventual plea to "stalking," and subsequent notoriety, it resulted in further ruination of Plaintiff's reputation and career and revocation of her MFT license. These malicious actions by Defendant Aquino and others caused Plaintiff to be misdiagnosed as "mentally ill" after which she was forced by the criminal justice system to

take psychotropic medication. While being monitored by San Diego Probation Department, Defendant Loftus and other Does conspired to make a false police report about Plaintiff accusing her of activity which had never occurred which caused significant emotional distress for Plaintiff due to the extensive efforts it took to correct these misrepresentations. After May of 2007, Plaintiff experienced enough psychological recovery to allow her to file a complaint against Defendants.

15. The terminology which defines Nonlethal weaponry can be found on the Center for Army Lessons Learned website http://call.army.mil. Their Mission Statement reads, in part, that the Center for Army Lessons Learned is the home of the Combined Arms Center which provides leadership and supervision for leader development and professional military and civilian education. Nonlethal Weapons are defined on this web page as:

"Weapon systems that are explicitly designed and primarily employed so as to incapacitate personnel or material, while minimizing fatalities, permanent injury to personnel, and undesired damage to property and the environment."

16. Because this technology may or may not leave any obvious external wounds, it can be used to secretly torture. In a report titled, "Future Sub-lethal, Incapacitating and Paralyzing Technologies – Their Coming Role in the Mass Production of Torture, Cruel, Inhuman and Degrading Treatment," by Dr. Steve Wright of the Omega Foundation, presented to the Expert Seminar On Security Equipment and the Prevention of torture, Dr. Wright wrote:

"There has been much speculation but a dearth of hard data about such psychotronic weapons which are already worrying those concerned about bioethics. Such electronic neuron-influence weapons would be in breach of the recent EU resolution regarding technologies which interact directly with the human nervous system. Voice to Skull technology has already been discussed in the literature … Without adequate international controls we may end up with weapons of mass punishment and gross human rights violations … to a capacity where one person or group can torture or deliberately debilitate and punish 1 – to many."

17. In a July 7, 1997 U.S. News and World Report article titled, "Wonder Weapons, The Pentagon's Quest for Nonlethal Arms is Amazing. But is it Smart?" by Douglas Pasternak it states:

"Weapons already exist that use laser, which can temporarily or permanently blind enemy soldiers, so-called acoustic or sonic weapons … that can vibrate the insides of humans to stun them, nauseate them or even liquefy their bowels, and reduce them to quivering diarrheic messes."

18.  Many concerns have been raised about the usage of nonlethals nationally and

internationally. In a report titled, "US Electromagnetic Weapons and Human Rights – A Study of the History of US Intelligence Community Rights Violations and Continuing Research in Electromagnetic Weapons," by Peter Phillips, Dec. 2006, the introduction reads:

"This research explores the current capabilities of the US military to use electromagnetic [EMF] devices to harass, intimidate, and kill individuals and the continuing possibilities of violations of human rights by the testing and deployment of these weapons."

19. Plaintiff believes the length of this complaint is necessary and is directly related to the serious and manifest crimes it seeks to expose.

## BACKGROUND

20. Plaintiff was witness to a documented cover-up of the satanic ritual abuse of children while employed as a Court Intervention Social Worker for Child Protection Services [CPS] which was due to the efforts of a woman by the name of Defendant Carol Hopkins - a 1991-92 San Diego Grand Jury Foreman - a 1993-94 San Diego Grand Jury, the False Memory Syndrome Foundation, and two newspaper reporters, Jim Okerblom and Mark Sauer of the San Diego Union-Tribune. Plaintiff had researched and investigated the validity of ritual abuse and had handled several case assignments with negative occult themes within this agency.

21. The general term "ritual abuse" is usually used to describe negative occult abuse, including satanic ritual abuse [SRA], because it is inclusive of all negative occult belief systems which are both evil and criminal in nature. Some people believe the occult automatically refers to Satanism, but it does not. Instead the word "occult" refers to a wide spectrum of beliefs. Historically, some people have misused occult principles for their own benefit. What differentiates the positive from the negative is that the positive occult has the goal of self-empowerment in order to become a contributing member of society. The negative occult is dedicated to the gathering of power over others so one can abuse them. Consequently negative occult practices are condemned by all occultists world-wide because they are evil.

22. Plaintiff's Masters degree in Transpersonal Psychology and her personal disciplines encompassed positive spiritual ideologies and meditation practices from around the world, including Buddhism, Taoism, Hinduism, Esoteric Christianity, Native American teachings, and the positive occult. Transpersonal Psychology teaches how to incorporate positive spiritual beliefs and values and includes interventions which mainstream psychology has to offer in order to access higher states of consciousness. Therefore, Plaintiff considered herself to be well qualified to investigate and differentiate between harmless occult/pagan practices and those of the truly negative occult or Satanism.

23.  In 1988-89 two hearings were held by the California State Advisory Board to Social Services in San Francisco and San Diego during which time 43 individuals, including law enforcement, therapists, researchers, and victims in the State of California testified to the reality of ritual abuse. These hearings resulted in a published report in April 1991 titled, "Ritualistic Abuse in California." The Advisory Board concluded in this report that ritual abuse should be taken seriously and made recommendations to the California State Legislature, CPS, Community Care licensing, Law enforcement and all treating professionals, such as LCSW's and MFT's, that training about ritual abuse be offered to these organizations throughout the State.

24.  In the California State Advisory report, Dr. Catherine Gould, an expert in the field, provided the following definition of ritual abuse:

"Ritual abuse is a brutal form of abuse of children, adolescents, and adults, consisting of physical, sexual, and psychological abuse, involving the use of rituals. Ritual does not necessarily mean satanic. However, most survivors state that they were ritually abused as part of satanic worship for the purpose of indoctrinating them into satanic beliefs and practices. Ritual abuse rarely consists of a single episode. It usually involves repeated abuse over an extended period of time.

The physical abuse is severe, sometimes including torture and killing. The sexual abuse is usually painful, sadistic, and humiliating, intended as a means of gaining dominance over the victim. The psychological abuse is devastating and involves the use of ritual/indoctrination, which includes mind control techniques and mind altering drugs, and ritual/intimidation which conveys to the victim a profound terror of the cult members and of the evil spirits they believe a cult members can command. Both during and after the abuse, most victims are in a state of terror, mind control, and dissociation in which disclosure is exceedingly difficult."

25.  The only addition Plaintiff would make to this definition is that Ritual Abuse is also intended to spiritually destroy a child.

26.  The outcome of the California State Advisory Board hearings was favorably reported by the San Diego Union-Tribune in their article titled, "Ritual Child Abuse: Horrible, But True," on April 17, 1989, authored by John Gilmore.  The abstract and first paragraph read:

"Patricia Holladay, a Rancho Bernardo (San Diego) clinical psychologist, has treated six children aged 2 to 13 who were victims of ritualistic abuse in the past three years. She said two children were abused at a preschool, two were abused by a drug-using mother who became involved in Satanism, and two were subjected to abuse while visiting their father ... Reports of babies and children being abused in ritualistic or satanic acts in San Diego County and elsewhere in the state, often dismissed by

authorities as too heinous to be true, must be taken seriously, social workers and psychologists say."

27.  On April 2, 1991, Plaintiff wrote an internal memo to CPS Assistant Deputy Director Sherry Paul requesting permission to set up support systems for social workers who were addressing allegations of ritual abuse on their caseload. [Exhibit 1] She wrote:

April 2, 1991
To: Sherry Paul
From: Diana Napolis PSW, Court Intervention

RITUAL ABUSE CASE CONSULTATION

There have been a growing number of ritual child abuse cases in the past few years. Social services & police agencies around the country are endeavoring to isolate & identify this phenomena and disseminate helpful information as quickly as possible. There are difficulties meeting the demands for information because there are few experts in the field and so much to learn.

Due to the prevalence of cult groups and their propensity to horribly abuse young children (often the younger the better), I feel that CPS needs to have support systems firmly in place ready to fill the needs of the community & individual social workers. We are faced with the responsibility of recognizing, investigating and protecting children in an area where there is so little known and often associated with denial & fear.

I would like to help set up such a recognition, identification & treatment guide for court intervention workers. I am suggesting a weekly time commitment devoted to case consultation & peer support. Eventually, we could set up a library and network with others community agencies to best address this unfortunate growing problem in San Diego.

28.  Plaintiff was authorized to proceed with this ritual abuse project from Assistant Deputy Director Sherry Paul in her memo dated April 10, 1991 which she sent to the top Administration of Social Services. Plaintiff's supervisor, Joyce Wakefield then assigned Plaintiff ritual abuse cases to investigate in Court Intervention which was a specialized unit which presents evidence of child abuse to Juvenile Court. The following is an example of one of Plaintiff's cases that she investigated during her tenure at CPS:

Plaintiff filed a 300 (d) sexual molest petition on behalf of a six-year-old boy named Jimmy.  The mother could not protect him due to emotional problems and the father was never located. Jimmy evidenced severe emotional disturbance so he was placed in a group home with professionals who were skilled in treating this population. Jimmy had an older sister, 19, named Maria, who had been a Dependent of the court a year earlier, but her case was closed after she reached adult status. Plaintiff visited Jimmy

in his group home due to reports that he was "acting out." Jimmy said he was experiencing nightmares about what had happened to him in real life. He remembered his friend taking him to a cave, where he saw someone "laying on a star," screaming.

He enacted this. He then asked Plaintiff to draw a "star" on a blank piece of paper. Plaintiff asked him to draw it, but he was adamant that she draw it. She drew a star, then he proceeded to draw on the paper to tell her the story about what happened to him. He drew pictures, stating, "These were the Spirits"... he drew a picture of a body placed on the star..."My friend started reading from a book" (Jimmy started chanting words in an unknown language) ... "My friend would read out of a book ... There's a white book and a black book. The white book is the secret words of the Devil, the black book is the secret life of the kid." Jimmy said he heard the laugh of the "devil," saying 'I will destroy you.'"

Due to Plaintiff's occult studies, she knew that a "star" is usually referred to as a five pointed star or pentagram, which is a benign pagan symbol which symbolizes the natural "elements" – earth, air, water and fire - with the point at the top signifying "spirit" over matter, but when this symbol is turned upside down, it has an explicit satanic meaning - the two points signifying "horns"- also known as the Baphomet - symbolizing satan and "matter" over spirit. Plaintiff decided to interview Jimmy's sister who was living in a border town, and they met at a McDonalds in San Ysidro. Plaintiff asked her whether she knew if Jimmy had ever been exposed to Satanism. She said, "Yes, so have I." She described running away from her foster placements when she too was a ward of the Juvenile Court, and meeting with other children and adults in La Jolla, in a "cabin," near Soledad Mountain (which is a landmark with a cross on it) during which time they would read out of the Satanic Bible. She mentioned being drugged and "passing out" after one of these events, eventually to awaken with a human body part next to her. She gave graphic descriptions of this event. Plaintiff thought this information had credibility because she had received information earlier from a cult investigator by the name of Rick Post (murdered) that Anton LaVey, founder of the Church of Satan, had moved from San Francisco to La Jolla, and these accounts of exposure to satanic abuse were from two different siblings. The information gathered was given to Jimmy's therapist and Plaintiff then transferred his case to the Family Maintenance and Reunification Department as was required

29. After successfully addressing several cases with allegations of ritualistic abuse, Plaintiff wrote a series of internal memos to CPS management, dated May 7, 1991, Sept. 26, 1991, and October 8, 1991 about her findings. In these memos, Plaintiff suggested ways in which CPS might address ritual abuse allegations at every level of the system. She informed management that some social workers were too frightened to investigate ritual abuse and case assignments should be handled judiciously. Plaintiff also advised that because children of satanic abuse often have only one chance to disclose, if these cases weren't assigned to an

investigator trained in ritual abuse, it might lead to harm to the child and a societal "backlash."

30. CPS San Diego ultimately acted on the State Advisory Boards recommendations. In September 1991 a Ritual Abuse Protocol titled, "Ritual Abuse, Treatment, Intervention, and Safety Guidelines," was submitted to CPS - which Plaintiff's supervisor asked her to contribute to - by the San Diego Ritual Abuse Task Force, Linda Walker, who was Executive Director of the Commission on Children and Youth, and Napolean Jones who was at that time Presiding Judge of the Juvenile Court and Chairperson of the Commission on Children and Youth. In the introduction to the protocol, the authors cited the 1988-89 hearings which were held by the California State Advisory Board to Social Services about the reality of ritual abuse.

31. Napolean Jones sent a survey to many professionals in San Diego which resulted in the finding that a total of one third (or 134) of those professionals who responded reported that they had treated at least one client who claimed to be a victim of satanic cult activity. This is of course a huge number. They noted that the majority of SRA victims suffer from Multiple Personality Disorder [MPD], now called Dissociative Identity Disorder [DID]. MPD/DID is created by extreme child abuse perpetrated at an early age. It is due to a creative function of the mind which survives by "splitting" one's identity into alternate personalities so that the core personality can avoid being overwhelmed by having to experience the horrific trauma they experienced as children. MPD/DID's usually spontaneously switch between identities in response to changes in the physical or social environment. The Ritual Abuse Protocol only touched on these themes, focusing on the reality of satanic victimization, and proved that this topic was a real phenomena in San Diego which needed to be formally addressed.

32. In 1991-92 a Grand Jury was convened with Defendant Hopkins appointed as Chairperson of the Social Services Committee. She was investigating the District Attorney Ed Miller's Child Abuse Unit as well as CPS. A grand jury is a court appointed authority that is mandated to objectively investigate the operations of governmental programs of the County, cities and special districts. The 1991-92 Grand Jury failed to meet that requirement and instead Plaintiff believes that Defendant Hopkins used the Grand Jury as a means to promote the views of the False Memory Syndrome Foundation [FMSF] which Plaintiff believed placed children at risk of great harm.

33. Specifically, in Grand Jury report No. 8, dated June 29, 1992 titled, "Child Sexual Abuse, Assault, and Molest Issues," Hopkins quoted from and referenced the FMSF as a legitimate authority. These views included the FMSF's positions about the alleged ability of therapists to "create abuse in the minds of children and adults" which they attributed to "inappropriate" therapy.

34.  Unfortunately, over the years, the FMSF have become widely known as an organization which denies the fact that satanic ritual abuse occurs without good cause, questions the validity of repressed memory based on misrepresentations, and provides what many people believe is a fraudulent defense for accused child molesters.

## THE FALSE MEMORY SYNDROME FOUNDATION [FMSF]

35.  As background to the genesis of the False Memory Syndrome Foundation [FMSF], of which Defendant Loftus is a member, in the early 1990's Peter and Pamela Freyd's daughter, Jennifer Freyd, Ph.D, a memory specialist, privately accused her father Peter Freyd of molesting her as a youth. The Freyds responded to her allegations by forming the False Memory Syndrome Foundation and dismissed their daughter's allegations by claiming she had "false memory syndrome." They claimed that Jennifer Freyd's therapist "implanted" their daughter with "false memories" of sexual abuse, but Jennifer Freyd claimed she had remembered her parent's abuse after the second session of therapy. Pam Freyd responded to her daughter by sending an anonymous "Jane Doe" article to Jennifer Freyd's University where she was employed, disclosing personal information about her at the time her daughters tenure was to be decided. Peter Freyd responded by accusing his daughter of having "brain damage."

36.  Jennifer Freyd gave an interview in an August 8, 1993 news article, published in the Oregonian titled, "Memories of a Disputed Past – The Founders of the False Memory Foundation Say Therapists Plant Memories of Childhood Sex Abuse in Clients. Not So, Says her Daughter. She Says her Father Raped Her," clearly stating her position. The Freyds then invited their daughter to become a Board member of their own organization which appeared to be very inappropriate given the circumstance.

37.  Many professionals have exposed what they believe to be the politics and agenda of the FMSF over the years. However, there is usually a price to be paid for educating the public about this organization.  In Freyd v. Whitfield, 972 F. Supp. 940 (1997), the court granted summary judgment to Charles L Whitfield after being sued by the Freyds for "defamation." The overview states:

"After being accused of sexually abusing their daughter during her childhood, the parents began a public campaign challenging the validity of repressed memories. They began aggressively contesting the existence of traumatic amnesia and repressed memories by congressional lobbying, public lectures, scientific conferences, On-line discussion groups, a newsletter, television and radio appearances, an 800 number, countless media articles and the picketing of therapists' homes. The parents became very well-known both in professional circles and among the general public. A psychologist began a lecture series and a book in which he criticized the parents' theories and affirmed his belief in their daughter's experiences. The parents filed a defamation action against the

psychologist. The psychologist removed the matter to the district court then filed a
motion for summary judgment. The court granted the motion after determining that there
were no contested issues of material fact. The court found that the parents were public
figures and that the psychologist did not act with malice, with knowledge that his
statements were false, or with reckless disregard to their truth or falsity."


38.   More recently Charles Whitfield. M.D. wrote an article about the
disinformation that "false memory syndrome" proponents disseminate, published in the
Journal of Child Sexual Abuse 9, 3 &/4 (2000), pg. 53-78, titled, "The 'False Memory'
Defense: Using Disinformation and Junk Science in and out of Court." His abstract read:

"This article describes a seemingly sophisticated, but mostly contrived and often
erroneous 'false memory' defense, and compares it in a brief review to what the science
says about the effect of trauma on memory. Child sexual abuse is widespread and
dissociative/traumatic amnesia for it is common. Accused, convicted and self-confessed
child molesters and their advocates have crafted a strategy that tries to negate their
abusive, criminal behavior, which we can call a 'false memory' defense. Each of 22 of
the more commonly used components of this defense is described and discussed with
respect to what the science says about them. Armed with this knowledge, survivors, their
clinicians, and their attorneys will be better able to refute this defense of
disinformation."

39.   In 1993 FMSF Advisory Board members Ralph Underwager (deceased)
and his wife Hollida Wakefield betrayed a pro-pedophilia agenda when they were quoted in
the Winter 1993 issue of "Paidika – the Journal of Pedophilia," which was published in the
Netherlands. This was not an educational journal for professionals who studied pedophilia,
this was a magazine published for pedophiles. The number one man listed on their editorial
board was Bill Andriette, the "Editor of NAMBLA Bulletin." NAMBLA stands for North
American Man-Boy Love Association which is an organization comprised of pedophiles
who attempt to sway the public into believing that their behavior should be legalized. In
response to the question, "Is Paedophilia for you a responsible choice?" Dr. Underwager
stated the following:

"Certainly it is responsible. What I have been struck by as I have come to know more
about and understand people who choose paedophila is that they let themselves be too
much defined by other people. That is usually an essentially negative definition.
Paedophiles spend a lot of time and energy defending their choices. I don't think a
paedophile needs to do that. Paedophiles can boldly and courageously affirm what they
choose. They can say that what they want is to find the best way to love. I am also a
theologian and, as a theologian I believe it is God's will that there be closeness and
intimacy, unity of the flesh. A paedophile can say 'This closeness is possible for me
within the choices that I've made.'"

40. In this interview Dr. Underwager raised the specter of "God" to validate for pedophiles that sex with children was an acceptable choice. Ralph Underwager was asked to resign from the FMSF after he gave this interview, but his wife Hollida Wakefield remains an FMSF Advisory Board member to this day. According to the FMSF's first newsletter (March 15, 1992 Vol. 1 No. 1), Ralph Underwager and his wife Hollida Wakefield were not only one of the founding members in the formation of the FMSF along with the Freyds but the Freyd's used Ralph Underwager's organization's services - Institute for Psychological Therapies - and their telephones on behalf of the FMSF when they first formed their organization. Dr. Underwager was instrumental in the formation of Victims of Child Abuse Laws [VOCAL], of which Lesley Wimberly is a member, which was created after a high-profile ritual abuse investigation took place in Jordan, Minnesota. Plaintiff first heard of VOCAL while she was a social worker at CPS. The inside story was that some of the membership of this organization might be comprised of actual child abusers who were trying to hide their culpability by attacking the system. Professionals came to that opinion after VOCAL developed a reputation for over-the-top behavior and denial in cases of obvious child abuse which resulted in the fact that they were not taken very seriously. The FMSF has gained an equally disreputable reputation over the years for similar reasons.

41. After Anna C. Salter wrote a monograph titled, "Accuracy of Expert Testimony in Child Sexual Abuse Case: A Case Study of Ralph Underwager " (1988), Ms. Salter was sued by Underwager and Wakefield. As described in the appellate decision Underwager/Wakefield v. Salter, 22 F.3d 730 (1994), Anna Salter was sued for defamation after she discovered that in their efforts to prove that most accusations of child sexual abuse stemmed from memories implanted by faulty clinical techniques, rather than from sexual contact between children and adults, that Underwager misrepresented studies, ripped quotations from their context, and ignored evidence which contradicted their thesis. The court stated in their final conclusions, after dismissing Underwager's lawsuit for defamation that:

"A person who concludes that a public figure is a knave may shout that conclusion from the mountain tops. Both Salter and Toth came to believe that Underwager is a hired gun who makes a living by deceiving Judges about the state of medical knowledge and thus assisting child molesters to evade punishment. Persons who hold such opinions cannot be expected to look kindly on their subjects, and the law certainly does not insist that they shut up as soon as they are challenged."

42. It appears that Dr. Underwager was one of the first to claim that most memories of child sexual abuse could be "implanted" by therapists but the FMSF took it one step further and gave this unlikely occurrence a name: "False Memory Syndrome."

43. Anna C. Salter reported in a journal article titled, "Confessions of a Whistle-blower: Lessons Learned," published in Ethics and Behavior 8 (2) 115-124, (1998), about

Underwager and his wife Hollida Wakefield's retaliation against her after she privately published her article which exposed them. Ms. Salter wrote:

> "In 1988 I began a report on the accuracy of expert testimony in child sexual abuse cases utilizing Ralph Underwager and Hollida Wakefield as a case study (Wakefield and Underwager, 1988). In response, Underwager and Wakefield began a campaign of harassment and intimidation, which included multiple lawsuits; an ethics charge; phony (and secretly taped) phone calls; and ad hominem attacks, including one that I was laundering federal grant money. The harassment and intimidation failed as the author refused demands to retract ... In addition, the lawsuits and ethics charges were dismissed."

44.   Dr. Underwager was well known at that time for making his living by testifying on behalf of the defense in child sexual and ritual abuse cases in the United States and Canada. Nobody knows how many alleged perpetrators he freed by what appears to have been false testimony.

45.   More recently, in United States v. Grigoruk 56 M.J. 304 (2002), the court found it was not ineffective of counsel to decide not to use Ralph Underwager as an expert witness on behalf of his client. Defense counsel stated he became concerned about Dr. Underwager's references to "false claims" and the "documents" he carried to rebut them. He was concerned that the court members might think he was trying to "pass off a quack" on them.

46.   As early as 1993 it appeared that the FMSF had an agenda, rather than a legitimate concern about "false" accusations, and their writings were geared towards developing legal defenses for perpetrators under the guise of "false memory syndrome," a syndrome which has never been proven to exist.

47.   There is reason to be concerned about other Board members of the FMSF regardless of the fact that they have Ph.D's after their names and work at academic institutions. According to Dr. Colin Ross,' "Project Bluebird, Deliberate Creation Of Multiple Personality By Psychiatrists,"(2000) several original FMSF Advisory members such as Martin Orne (deceased) from the University of Pennsylvania and  Dr. Louis Jolly West (deceased) from UCLA had ties to the CIA, having accepted funding from them for various projects, a point which becomes relevant later in this complaint, as well as the sub-title of Dr. Ross's book, "The Intentional Creation of MPD/DID" by Psychiatrists.

48.   In 1998 another FMSF Advisory Board member, Richard Ofshe, Ph.D. from UC Berkeley, an alleged expert on "coercive persuasion," wrote an article titled, "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation," published in 88 J. Crim. L. & Criminology 429. In 1999 Law Professor Paul Cassell investigated several of the cases that Richard Ofshe

claimed were "false confessions," which supposedly resulted in wrongful convictions, and he found that Ofshe used secondary sources and misstated facts when coming to his conclusions. Professsor Cassell documented his findings in his article titled, "The Guilty and the 'Innocent': an Examination of Alleged Cases of Wrongful Convictions from False Confessions," which was published in Harvard Journal of Law and Public Policy (1999) Vol. 22, pp. 523-602. Professor Cassell then concluded:

> "Testimony resting on Leo and Ofshe's research, at least concerning how 'false' confessions are produced, does not appear to satisfy the requirements to be admissible expert testimony … Because of the high error rate and failure to follow accepted research techniques, courts should not allow expert  testimony resting on Leo and Ofshe's analysis of any of the particular cases discussed here."

49. Another FMSF Advisory Board member, Defendant Elizabeth Loftus, who regularly testifies for the defense, including for alleged perpetrators in child molestation civil cases, published a research study in 1995 about the supposed ability to implant "false" memories in children that they were "lost in a shopping mall," and she and others went on to claim that this experiment proved that "false" memories could be implanted in vulnerable clients.  Martha Dean, Ph.D and Lynn Crook, M.A  exposed the multitude of problems in the Shopping Mall study in their journal article titled, "'Lost in a Shopping Mall' – A breach of Professional Ethics," published in Journal of Ethics and Behavior (1998) (1), 39-50, and did not believe  that this study provided persuasive evidence that traumatic "false memories" could be implanted.

50.  Due to Lynn Crook's and Jennifer Hoult's complaints that Defendant Loftus publicly misrepresented their cases (Defendant Loftus testified on behalf of Crook's parents), ethical complaints were filed against Defendant Loftus in December 1995. Defendant Loftus eventually left her post at the University of Washington and she is currently employed at UC Irvine as a Professor of Psychology.

51.  In 2005 a civil suit was filed against Defendant Loftus and others (Taus v. Loftus) 2007 Cal. LEXIS 1896 for violating Ms. Taus's privacy. Ms. Taus claimed that Defendant Loftus misrepresented herself in order to obtain information about her in efforts to deny the fact that Ms. Taus had repressed and then accurately remembered the facts about her own abuse as a child. A December 6, 2006 article titled, "High Court Considers Privacy Issue – In a Case Involving Repressed Memory, Several Justices Suggest that a Researcher [Loftus] who Lies to get Information May be Breaking the Law," described these issues. In the FMSF newsletter Fall 2007, Vol. 16, No. 4 it was reported that Defendant Loftus reached a settlement agreement with Ms. Taus.

52.  The FMSF's major concern over the years has been about repressed memory retrieval in therapy, lawsuits filed against alleged perpetrators based on those repressed memories which might toll the statute of limitations, the denial of satanic ritual abuse –  one

of their major focuses - and the denial of the reality of MPD/DID, which they claim is a rare phenomena, if it exists at all.  However, because there is no doubt that repressed memory and satanic ritual abuse exists, the FMSF's purpose appears to have been to simply generate a contrived controversy about these subjects

53.   When victims enter therapy, the very process of discussing one's past allows access to memories that may or may not have been formally repressed or dissociated. An entire school of psychology called psychodynamic theory is based on the fact that past events can shape future behaviors and many therapists subscribe to this theory. Other schools of psychology, such as Behaviorism, believe that one should treat the client's presenting symptom such as obesity, depression, and phobias, without looking to the past for the reason for the presenting problem. Dissociative Amnesia (another term for repressed memory) is listed as a mental disorder in both the DSM, Diagnostic Statistical Manual of Mental Disorders [DSM-IV-TR, 2000, pg. 520] and the [DSM-IV, 1994, pg. 478] a textbook for mental health practitioners. The authors of the DSM define Dissociative Amnesia as "the inability to recall important personal information, usually of a traumatic or stressful nature, that is too extensive to be explained by normal forgetfulness," and "it can be present in any group, from young children to adults."

54.   It appears that one of the first conscious ploys of the FMSF was to rename psychodynamic theory to "Repressed Memory Therapy," in efforts to provide a straw man for the public and to confound the court system, after which they could blame all repressed memory claims on the "dangerous" Repressed Memory Therapists. The FMSF have strategically chosen not to attack victims of abuse directly (or rather, publicly) but instead have chosen the tactic of attacking the therapist by accusing the "Repressed Memory Therapists" of implanting "false memories" in their clients, and/or claiming that MPD/DID is more than likely iatrongenically induced by their therapist. Consequently the therapist should be sued for "malpractice." However, there is a large body of evidence which proves that it is possible, if not common, to repress a traumatic memory of abuse, and these memories are no more or less accurate than continuous memories.

55.   Professor Ross E. Cheit, legal scholar at Brown University, repressed memories of his own sexual abuse by a Camp Counselor. After having recurring nightmares about his abuse, he investigated and discovered other victims of the same perpetrator who abused him. Professor Cheit confronted his perpetrator and was able to record his confession on tape, after which he filed a lawsuit and received a default judgment in a civil claim.

56.   Professor Cheit's case was described in the May 7, 1995 issue of the Providence Sunday Journal, in their three part series titled, "Bearing Witness – A Man's Recovery of his Sexual Abuse as a Child," by Mike Stanton.

57.   Professor Cheit then compiled an archive of 101 successfully addressed repressed memory court cases which had been corroborated and described his archive which

proved repressed memory existed in an article titled, "Consider This, Skeptics of Recovered Memory," published in the Journal of Ethics and Behavior (1998) 8(2), 141-160. His archive of repressed memory court cases can be found at http://www.brown.edu/Departments/Taubman_Center/Recovmem  archive. As background to his project, Cheit writes:

"This project began as a letter to PBS which objected to false statements made by Ms. Ofra Bikel, producer of the program 'Divided memories.' That letter described how an undergraduate Research Assistant at Brown University found half a dozen corroborated case of recovered memory in just a few hours of electronic database searching, disproving Ms. Bikel's claim to the contrary."

58. Legal scholar Alan W. Sheflin, JD., M.A. and Daniel Brown Ph.D. also reported on the current state of the science regarding the accuracy of repressed memory in their article titled, "Repressed Memory Dissociative Amnesia: What the Science Says," published in Journal of Psychology and the Law/Summer (1996). Their abstract reads:

"Amnesia for child sexual abuse [CSA] is a robust finding across studies using very different samples and methods of assessment. Studies addressing the accuracy of recovered abuse memories show that recovered memories are no more or less accurate than continuous memories for abuse."

59. In addition, in Doe v. Roe, 955 P.2d 951 (Ariz. 1998), the court reviewed the substantial evidence which proved repressed memory on pg. 956, under, "Mechanics of Memory repression and Recall." The court stated: "In fact, some preliminary studies suggest that retrieved memories that were formerly repressed are in fact more accurate than normal conscious memory."

60. Plaintiff believes that this substantial body of evidence proves that repressed memory (or Dissociative Amnesia) exists and it is evident that courts throughout the country have recognized that fact. Plaintiff believes the FMSF knowingly ignores this information and file Amicus Briefs challenging the reliability and admissibility of recovered memories in order to try to prevent a victim from being able to sue their alleged perpetrators in court. Wendy Murphy, J.D. described these facts in the November 1997 issue of Trial Magazine in her article titled, "Debunking False Memory Myths in Sexual Abuse Cases." The Leadership Council, an organization comprised of professionals in many fields, submit Amicus Briefs in favor of allowing evidence of repressed memory into court proceedings, in opposition to the briefs filed by the FMSF.

61. As previously stated, many MPD/DID's have been victimized by satanic cults or families, and have sought therapy because of their abuse. However, according to Gail Goodman of UC Davis, FMSF Advisory Board member Richard Ofshe has publicly stated that it is "prima facie evidence of malpractice for therapists to have diagnosed ritual abuse in

their clients," an untempered statement which is obviously false considering how many convictions and social services substantiation of cases which have ritual abuse as the context of the abuse. Obviously someone has to treat the victims and/or perpetrators on these cases.

62. Before 1992 there were several court cases involving perpetrators using Satanism or negative ritual to harm children which Defendants Hopkins, Loftus, reporter Mark Sauer, publisher Defendant Copley, and other Advisory Board members of the FMSF should have been aware of. They are:

62a.  [Florida (1984)] In People v. Fuster, Frank Fuster was convicted for child molestation after his wife, Illiana, testified against him and confirmed the children's allegations.  The children claimed Frank and his wife made them play "pee pee" and "poo poo" games. Several of the children could repeat Frank Fuster's prayers from heart: "Devil I love you. Please take this bird with you and take all the children up to hell with you. You gave me the grateful gifts. God of ghosts, please hate Jesus and kill Jesus because he is the baddest, damnest person in the whole world. We don't love children because they are a gift of God. We want the children to be hurt." Frank Fuster's conviction was upheld on appeal. This case was documented in "Unspeakable Acts" (1986)  by Jan Hollingsworth

62b.  [Roseburg, Oregon] In State v. Marylou Gallup, 816 P.2d 669 (1991), State v. Edward J. Gallup Sr. 779 P.2d 169 (1989),  the Gallups were convicted of sexual molestation. The children stated the Gallups subjected them to satanic abuse and would turn toothpicks into crosses, asking, "Who are we worshipping today children…Jesus." Then they would turn the crosses upside down and ask, "Who are we worshipping today children…Satan." Mary Lou Gallup's conviction was vacated due to a technicality but Edward J. Gallup Sr. and Edward J. Gallup Jr.'s convictions still stand. Bruce McCulley of Cavalcade Productions testified at the California State Advisory hearings about ritual abuse in 1988 about this and other cases of ritual abuse which he and his father, Dale McCulley, later documented on their video, Introduction to Children at Risk: Ritual Abuse in America, 1992, Narrated by Mike Farrell.

62c.  [Travis County, Texas (1992)] In People v. Fran and Daniel Keller, No. 3-92-603-CR and No. 3-92-604-CR, the Kellers were convicted of molesting one child although there were several more alleged victims. The children gave detailed descriptions of the Kellers ritually abusing them in daycare which reportedly sent 7 children into therapy for more than a year. The children described ritual acts: being terrorized in a graveyard, seeing animals killed, being buried alive with animals, painting pictures with bones dipped in blood, being shot and resurrected, being stuck with needles and drugged, and seeing bodies dug up and mutilated with a chainsaw. A child led an investigator to a graveyard where they found animal bones. Parents reported children who were terrified of baths, children who believed they must kill themselves on their birthday, children who were afraid of ponies, fearful they would be put in jail, and children who could conduct a séance, complete with otherworldly "chants." The Keller's convictions were upheld on appeal.

62d.   [Raleigh, North Carolina (1990)] In State v. Figured 446 S.E. 2d 838, Patrick Figured was convicted of sexually abusing several children. His girlfriend, Sonja Hill, was convicted of indecent liberties with a child on 7/28/93. On March 27, 1990, parents in this case sued Sonja Hill and her mother, Polly Byrd, accusing them of satanically ritually abusing their children which resulted in a default judgment in favor of the parents. Patrick Figured's conviction was upheld on appeal and Sonja Hills convictions still stands. See Raleigh Man Sentenced to 3 Life Terms for Abuse, News and Observer, Oct. __1992; Johnston Couple Win Child Sexual Abuse Suit, News and Observer, March 27, 1990.

62e.   [Thurston County, Washington (1988)] In State v. Ingram, No. 13613-9-II, according to Sheriff Neil McClanahan (personal communication) Paul Ingram, also a Sheriff at Thurston County Sheriffs Department, confessed to satanically and sexually abusing his children. FMSF Advisory Board member Richard Ofshe made an attempt, which failed, to talk Ingram out of his confession. According to a Clemency and Pardons Board Transcript, dated June 7, 1996, both FMSF Advisory Board members Richard Ofshe and Elizabeth Loftus were present at Paul Ingram's clemency hearing, and asked the Board to release him, claiming he was innocent. However, Paul Ingram's son appeared at this hearing as well and stated he wanted his father to remain in prison because he had been sexually molested by him as a child. In response, Richard Ofshe claimed that Paul Ingram's son was blaming his sexual abuse for his "failed" life and questioned the validity of his statements because he thought that was new information. Paul Ingram's conviction was upheld on appeal.

62f.   [Fort Bragg, California (1984)] Department of Social Services shut down the daycare of Barbara and Sharon Orr after physical abuse and satanic ritual abuse allegations. Therapist Pamela Hudson treated dozens of these child victims. She described having no prior experience or training about ritual abuse but came to understand it after many years of treating these particular victims. Some of the symptoms the children exhibited were defecating on the floor in certain patterns, and lying spread-eagled on the floor, as if in crucification. She described children reporting being locked in a cage, their parents were threatened, they were buried in the ground in "boxes," held under water, threatened with guns and knives, injected with needles, bled and drugged, photographed during the abuse, tied upside down over a "star," hung from poles and hooks, had blood poured on their heads, and witnessed the ritual sacrifices of babies, after which they were forced to chant "Baby Jesus is dead." Ms. Hudson, L.C.S.W. documented the satanic element of the alleged crimes in "Treating Survivors of Satanist Abuse," edited by Valerie Sinason, pgs. 71- 81, 1994, and "Ritual Child Abuse: Discovery, Diagnosis and Treatment," (Jan 1, 1991). Ms. Hudson also testified at the California State Advisory hearings about ritual abuse in 1988.

62g.   [Orlando, Florida (1992)] In the case of James L. Wright and Margie Wright CR0911814-A, Case No. CR0911814-B, the children disclosed sexual abuse in the context of Satanic rituals. The victim's parents met James and Margie Wrights through their Church and Bible classes they attended together. The children reported that they saw James Wright sacrifice a stray dog, slit its throat and stomach, and remove some entrails. He held up the

entrails for the children to see and said the same thing could happen to the children if they "tattled." Sheriff's investigators found the dog's skeleton near the Wright's trailer. A 9 year old girl told investigators that Jim Wright forced her to have oral sex with him at gunpoint. "I didn't tell because I was scared," said a boy. "Jim had a gun and said he'd kill my family, and he put a bad curse on us. Jim said devil words to us." The children spoke of satanic symbols, chalices filled with blood, and a box containing a corpse. The parents of three of the victims moved residences and the prosecutor expressed concern because the children had been threatened by the cult not to testify. Maggie Wright testified against her husband. See "Convict's Wife Sentenced for Trying to Molest Kids," Orlando Sentinel Tribune, May 9, 1992; "A Family Fears That Satanic Cult Will Try to Silence their Sons," Orlando Sentinel Tribune, August 10, 1991; "Child Abuse Suspect Trades Testimony for Lesser Charges," Orlando Sentinel Tribune, January 31, 1992

62h. [San Francisco, California (1991)] In Aquino v. Stone 957 F.2d 139; 768 F.Supp. 529, internal court documents and news articles document the case of Defendant ex-Lt. Col. Michael Aquino, founder of a Satanist group, Temple of Set, who was processed out of the Army in 1990 after a ritual child abuse investigation. The CID took statements from a child at the Presidio Army Base where he was stationed and took statements from other children about satanic ritual abuse and murder in several other jurisdictions in Northern California. Lt. Col. Aquino sued the Army after they "Titled" him under an investigatory report for indecent acts with a child, sodomy, conspiracy, kidnapping, false swearing, and for his dismissal from the active reserves. The standard for Titling is probable cause to believe the offenses have been committed. Only one child victim, the daughter of the Chaplain of the Presidio, was named in the victim block of the CID report, although the word "children" was mentioned throughout the record, which caused some parents to allege a coverup. Mr. Aquino's process out of the Army and "Titling" was upheld on appeal. However, Aquino was never criminally charged with any criminal offense. Two of the several investigators involved, Glen Pamfiloff and Sandi Gallant, testified at the at the California State Advisory hearings about ritual abuse in 1988.

62i. [Sonoma, California (1988)] People v. Daryl Ball and Charlotte Thrailkill, SCR 14750-C. In this case, the prosecutor's opening remarks referred to these children's sexual molestation in the context of ritual abuse. The defendants eventually plea-bargained to child sexual abuse. The CID questioned Charlotte Thrailkill about Michael Aquino and it was alleged (in private statements that the children made to investigators) that Ball/Thrailkill were members of Lt. Col. Aquino's inner satanic order, or as the children described it, the "Devil worship club."

62j. [Westpoint, New York (1991)] In the Westpoint Army Base case, the Army made a monetary settlement with several parents who claimed that their children were satanically and sexually ritually abused at their daycare. Several news sources documented the satanic element of the crime and quoted Doctor Walter Grote, parent of a ritually abused children, who refused a promotion in protest due to the Army's mishandling of this case. The court record of this case is sealed. See "West Point Case Provoked $100 Million Civil

Suit," San Jose Mercury News, August 9, 1987; "A Legacy of Pain," The Times Herald Record, June 11,1991; "The People v. R. Giuliani," The Record, Sept. 27, 1987; "Child Abuse at the Presidio, "The Parents Agony, The Army's Cover-up, The Prosecution's Failure," San Jose Mercury News, July 24, 1988.

63. One of the FMSF's tactics have been to use "recanting" clients as evidence to prove the existence of False Memory Syndrome. "Recantors" are usually clients who had previously been diagnosed as MPD/DID, and who claimed to have been ritually sexually abused by their satanic families or cults but who then turn on their therapists, claiming their therapist "implanted' them with false memories of satanic abuse. In some of these cases, it appears the therapists have been guilty of very minor infractions, but in a disturbing number of cases there have been allegations made that there is no evidence for satanic ritual abuse, and based on that claim therapists have been accused of "malpractice."

64. Law professor Alan Sheflin and psychologist Dan Brown investigated 30 "false memory" cases in their article, "The False Litigant Syndrome: 'Nobody Would Say that Unless it Was the Truth,'" published in the Journal of Psychiatry and Law (1999) 27/Fall-Winter, and discovered that in all 30 cases they examined, not one of the therapists appeared to have been guilty of malpractice. Instead the client's recantations could be attributed to mental illness, shame, guilt, greed, or suggestibility. Another reason why a client might retract their allegations (which they didn't mention) might also be because they were threatened by their family or cult group, or if they're MPD, one of their perpetrators might have accessed one of their alters who might not be aware that the abuse took place.

65. During the past 15 years a silent war has been waged between the FMSF, their supporters, and other legitimate professionals. The FMSF have succeeded in creating a political climate in which ritual victims are too frightened to speak out and therapists are too frightened to treat them. A prevailing pattern has emerged over the years, in that the most vocal proponents who claim SRA exists appear to have been targeted either in the court room by picketing and/or encumbering the resources of their political opponents. Some academic researchers have legitimatized the FMSF over the years in an apparently effort to appear "balanced," but Plaintiff believes that this organization serves no legitimate purpose at all. The field of child protection has not moved forward because of their claims, it has moved backward.

66. In the FMSF's first newsletter (March 15, 1992, Vol. 1 No.1), the FMSF wrote that they were sending FBI's Special Agent Ken Lanning's "Guide to Investigators" (1991-92) about ritual abuse to others in which he concluded that he was unable to find evidence for the "extreme" claims of satanic crime, such as cannibalism and murder. This indicates that denying the existence of SRA was one of the FMSF's first priorities. As of 2/8/2008, a search of the FMSF's newsletter web site http://www.fmsonline.org/cgi-bin/nsearch.cgi revealed that this organization mentioned the word "satan" in 124 separate newsletters out of a possibility of 129 files. Nobody knows why this organization is so fixated on the topic of Satanism. For the past two years, in their list of recommended web sites, the first web site

referred to is that of Diane Vera, a well known Satanist, which appears to be unusual for a supposed academically-inspired organization.

67.  In the same time period that FBI Ken Lanning's report was written, author Michael Newton wrote his book, "Raising Hell: An Encyclopedia of Devil Worship and Satanic Crime," published in 1993, which described numerous court cases of cannibalism, murder, and torture by satanists.  It is therefore unfortunate that a spokesperson for the FBI purported to find no evidence of these crimes.

68.  FBI's Ken Lanning was a consultant for a pivotal 1994 research study, titled "Characteristics and Sources of Allegations of Ritualistic Child Abuse," co-authored by Gail Goodman, Bette Bottoms et al. This problematic study was fraught with many irregularities, the most outstanding of which was the failure to correctly include Juvenile Court proceedings in their analysis of Social Services legal mandates.

69.  The FBI in general has been accused of incompetency over the years for not taking these cases seriously, which has resulted in cursory investigations, ruining case investigations, and in one instance in Omaha, Nebraska, reported by John De Camp in the book, "The Franklin Coverup: Child Abuse, Satanism, and Murder in Nebraska," (1996) the investigating FBI agent was alleged to have threatened a victim to recant his abuse.

70.  Due to this information, and other evidence which implicates the government in the intentional creation of MPD, it is obvious that there might be a conflict of interest for the government to comment on these crimes. For examples of this documented conduct, see: "West Point Case Provoked $100 Million Civil Suit," San Jose Mercury News, August 9, 1987; "A Legacy of Pain," The Times Herald Record, June 11,1991; "The People v. R. Giuliani," The Record, Sept. 27, 1987;, PAUL A. BONACCI vs. LAWRENCE E. KING, 4:CV91-3037, UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEBRASKA  (February 19, 1999); and "'Through a Glass, Very Darkly': Cops, Spies and a Very Odd Investigation," U. S. News and World Report (Dec. 27, 1993) in which the CIA ordered  an investigation closed and designated it as a "CIA internal matter" after Custom's Officials discovered what appeared to be a brainwashing, ritualistic cult, where children were being moved to various locations.

## THE SAN DIEGO 1991-92 GRAND JURY

71.  Defendant Carol Hopkins of the 1991-92 Grand Jury first came to Plaintiff's attention after she read a series of remarkably poor recommendations Defendant Hopkins made to CPS and the Board of Supervisors in several Grand Jury reports.

72.  In Grand Jury report No. 2 "Families in Crisis" June 29, 1992, in Recommendation #92/35, Defendant Hopkins suggested that alleged perpetrators "should accompany their children to the Receiving Home once the children were removed from their

residence." In Recommendation #92/41, she suggested that alleged perpetrators in sexual molestation cases "should have frequent ongoing visitation with the offending parent, even if only in therapy." In Recommendation #92/42, she suggested that parents "should have unsupervised visitation with their children." In Recommendation #92/27, she suggested that the Department of Social Services should "purge from the San Diego County Child Abuse computer all unfounded complaints within 30 days and all unsubstantiated complaints which have remained inactive for one year."

73. These were all recommendations that for the most part were implemented under the watch of Ivory Johnson, Director of CPS, which were completely contrary to the best interests of children. The facts are: alleged perpetrators should not accompany their children to a Receiving Home once a disclosure has been made about child abuse because it could intimidate the child; children should not have visitations with parents in sexual molestation cases until they have worked through their traumatic issues and are ready to interact with the perpetrator (after the alleged perpetrator has addressed his/her own issues in therapy); parents should not have unsupervised visitations with a child who disclosed child abuse because the perpetrator might force the child into recanting their abuse; the Child Abuse computer should not purge unfounded or unsubstantiated complaints because as child abuse is often a hidden crime, this information can be used at a later time as cumulative evidence in a complex child abuse investigation, especially if the child has been forced to recant during a prior interview with a social worker which might have led to an "unfounded" or "unsubstantiated" case closing code at that time.

74. Defendant Hopkins also stressed in the Grand Jury report that children sometimes "lie" about their abuse. Experienced investigators are aware that although it is a rare occurrence for children to lie about their abuse, it is much more common for perpetrators to lie about whether or not they have abused children. Defendant Hopkins not only stressed that children "lied" but recommended that hearsay evidence be excluded from Juvenile court proceedings.

75. In Report No. 8, "Child Sexual Abuse, Assault, and Molest Issues," Defendant Hopkins claimed that the 1991-92 Grand Jury had received complaints by families who had been investigated by CPS for SRA and claimed "all of the cases tested rational credulity." She wrote:

"Witnesses were asked to provide any factual information or evidence they had available which would substantiate the existence of SRA in San Diego County or elsewhere. The jury found there was no physical evidence of SRA in San Diego County."

76. Because ritual abuse is not listed as a type of abuse in the Welfare and Institutional 300 Code that is entered into the DOJ child abuse index, the only evidence that is needed to prove a child has been ritually abused in a Juvenile Court setting is to prove that

physical, sexual, emotional abuse, or neglect has occurred in an abusive Satanic context. That evidence might consist of statements by the child or witnesses indicating that chanting occurred before, during, or after the abuse, statements about blood drawn from the child, or a child placed within pentagrams while being abused. There does not have to be physical evidence to prove that these particular acts occurred, the statements of the victim or witness is considered to be sufficient. Therefore, Ms. Hopkins ideas about what "physical evidence" was needed in a Juvenile court proceeding before being persuaded that satanic abuse was occurring was not based on reality. Given that Ms. Hopkins was reviewing child abuse cases and policies at CPS, her lack of education about these issues was quite troubling.

77. Given the fact that 134 professionals in San Diego County had just reported in 1991 that they had one or more clients who claimed to be a victim of ritual abuse, and 43 witnesses had testified to the reality of ritual abuse during hearings held by the State of California in 1988-89 in both San Francisco and San Diego, Plaintiff believed that this outright dismissal of SRA by a San Diego Grand Jury to be either a sign of gross incompetence/ignorance or it pointed to a preconceived agenda. In addition, the Sheriff's Department had just published a manual, "Gangs, Groups and Cults" (1990). Beginning on pg 118, they stated that ritual abuse was an issue in San Diego County which needed attention from authorities.

78. Defendant Hopkins also included the FMSF's position about repressed memory in Grand Jury Report No. 8 stating that, "There is little evidence that a child will repress a traumatic event. There is good evidence that a traumatic event tends to etch itself indelibly on the mind."

79. The San Diego Community Child Abuse Coordinating Council responded to Defendant Hopkins Grand Jury Report on April 15, 1993 in their report, "Response to Grand Jury Report #8," stating that members of their committee found that "much of the information contained in Grand Jury Report #8 was contrary to the findings of the best research done in the field, specifically in the areas of repression of traumatic childhood memories and suggestion of children." They wrote that they did not recognize any of the cases descriptions that she presented, an opinion with which others later concurred.

80. Because child victims of ritual abuse tend to disclose details about their abuse in the latter stages of therapy due to threats and/or fear, attempts to explain delayed disclosure on therapist suggestion is considered by Plaintiff to be just another defense strategy, although there might be rare exceptions.

81. Defendant Hopkins had included in Report No. 8 that she was opposed to Senator Newton Russell's Bill SB177 which intended to create a State-wide Task force on ritualistic child abuse, and in spite of the fact that CPS San Diego had a protocol about investigating ritual abuse, she requested that Social Services take that stand as well.

Defendant Hopkins wrote: "The Jury strongly urges the Board of Supervisors and San Diego's Department of Social Services to oppose this Legislation."

82.  Senator Russell was responding to the recommendations of the 1988-89 State Advisory Board hearings. Hopkins wrote that she was concerned that the Los Angeles County Woman's Commission on Ritual Abuse Task Force (chaired by Dr. Catherine Gould) might be appointed to this task force and that appointment might constitute a "bias." In retrospect, Plaintiff believes Hopkins was concerned that this task force might be too successful with Dr. Gould as a member.

83.  Defendant Hopkins stated in Report No. 2 "Families in Crisis," in Recommendation #92/47:  "Revaluate the Ritual Abuse Protocol and provide justification to the Grand Jury for the procedures therein." In Report No. 8, Defendant Hopkins finally writes: "The Grand Jury is aware that the Department of Social Services has reevaluated the investigative protocols on ritual and satanic abuse. The social worker who investigated in this area has been reassigned and the Ritual abuse report is no longer being distributed by the Commission on Children and Youth. This is as it should be."

84.  Plaintiff believes that the statement, "This is as it should be" was a dismissive and arrogant remark to make by a deceptive Grand Juror who was trying to deny that serious criminal activity was occurring. The Social worker Hopkins referred to who was reassigned was someone other than the Plaintiff.

85.  Given that Plaintiff was professionally investigating ritual abuse allegations during the time period these remarks were made, and was successfully protecting these children via the system Hopkins was criticizing at the time she was claiming these crimes did not occur, Plaintiff did not think much of Defendant Hopkins position. It appeared that Defendant Hopkins was not aware of Plaintiff at that time, probably because none of the ritual abuse cases she handled were ever publicized in the media and she was never asked to testify before the Grand Jury.

86. In short, Defendant Hopkins quoted the FMSF's contrived positions on memory, therapy, and ritual abuse in a 1991-92 Grand Jury report, four months after this organizations inception, and suggested that the ritual abuse protocol be withdrawn by CPS. CPS then withdrew the SRA protocol. That meant that the innovative, intelligence, and compassionate work of dozens of professionals intended to protect victims of satanic ritual abuse was cast aside and completely disregarded because of the efforts of what appeared to be a corrupt Grand Jury. Plaintiff believes that CPS abdicated their responsibility, caved in to negative press by the San Diego Union-Tribune, and should be publicly censured for not following through with their obligations to protect children from all types of abuse, even if that type of abuse was controversial.

87.  Plaintiff was surprised that a few professionals in San Diego retreated from the topic of ritual abuse, but in spite of writing numerous letters to management over the years,

she was powerless to do anything about it. Because of her job description, Plaintiff was too busy to explore the politics of the situation at the time but investigated the politics surrounding these issues years later. Plaintiff had mistakenly assumed that the Director of CPS, Ivory Johnson, Linda Walker, or others would respond to Defendant Hopkins report in order to rectify this state of affairs. Due to the fact that it became politically incorrect to mention "ritual abuse" at CPS during this time period, a few supervisors who did not agree with CPS Director Ivory Johnson's choice to withdraw the SRA protocol continued to assign cases with satanic cult allegations to Plaintiff for investigation because they knew she would take the subject seriously.

88.   In FMSF newsletter (July 3, 1993 Vol. 1 No. 7), Pam Freyd (who appears to be the main author of this newsletter) reported about the 1991-1992 San Diego Grand Jury's alleged findings of "systemic abuse." Specific instructions were given in this newsletter about how to order the 1991-92 San Diego Grand Jury report. Given the heavily biased content of FMSF disinformation which was included in the 1991-92 Grand Jury report, it gave the appearance that the FMSF and Defendant Hopkins were actively communicating and working in concert.

89. Defendant Hopkins prior association with FMSF Advisory Board member Defendant Elizabeth Loftus was revealed in an August 20, 1998 article, published in the alternative newspaper, The San Diego Reader titled, "Child Molestation Trial Spot Lights Ongoing Debate," authored by Tim Brookes. In this article, Defendant Hopkins recounted what occurred during a dinner that Hopkins hosted for FMSF Advisory Board member Defendant Elizabeth Loftus and Defendant reporter Mark Sauer after Loftus testified for the defense in the Dale Akiki "ritual abuse" case.

90.   Defendant Hopkins stated that during the writing of the 1991-92 Grand Jury report she had discussed cases with Defendant Loftus but she believed that she had no prior knowledge of Loftus before that time. When Loftus entered her home, she told Hopkins her house was familiar and she believed she was present at her wedding ten years earlier. They looked at the wedding photos and found that Defendant Loftus was there in attendance. This indicates that not only did these people know each other, and obviously colluded during the writing of the 1991-92 Grand Jury report, but it was strange that neither one of them remembered their past association. Defendant Hopkins took the opportunity to claim in this news article that people often accused her of being a child molester because of the unpopular positions that she took. (Hopkins later made this same complaint about Plaintiff which was not true). Plaintiff wrote a letter in response to this article as well as researcher Constance Dahlenberg, which was published in the Reader on September 3, 1998. Dr. Dahlenberg wrote:

"Ms. Hopkins was presented with great admiration, and pages are devoted to her single-minded fight against the current child protection system. Not a word is said about the fact that the next years San Diego Grand Jury found her report to be so highly biased against child protection that an unprecedented second report was issued, criticizing the

first. Why leave this information out of the piece? Further, why depend on Ms. Hopkins, a highly biased layperson, to describe scientific experiments, rather than asking one of the scientists interviewed. As a researcher who has spoken at conferences with Dr. Ceci, for instance, I can assure you that Ms. Hopkins 's statements about what she imagines Dr. Ceci must have done in his research are wholly false."

91. District Attorney Edwin Miller replied to Defendant Hopkins reports on Oct. 30, 1992, stating in part:

"We are concerned with a pervasive thread throughout Report No. 2. It exalts family 'reunification' apparently even at the expense of child safety …the Grand Jury 'failed to analyze cases in a "fair and impartial manner … It was impossible to fathom the grand jury's motives due to the misreported cases in the 1991 Grand Jury report … The facts reported were such a departure from the truth that it must have been the result of unparalleled incompetence or intentional misconduct by one or more grand jurors."

92. Mr. Miller's concern that Defendant Hopkins misrepresented child abuse cases that his office had investigated in the 1991-92 Grand Jury report was later proven to be true by the subsequent 1992-93 San Diego Grand Jury. Although Defendant Hopkins was instrumental in stopping the court proceedings involving a man named Jim Wade, which appears to have been appropriate, DA Miller wrote an extensive reply to her analysis of this case, corrected her many misrepresentations and provided an adequate explanation as to why the case had been filed. All of this information provides a clear pattern of conduct by a Grand Juror who appeared to be blatantly attempting to undermine child abuse victims.

93. Defendant Hopkins disclosed in a December 5, 1994 San Diego Union newspaper article titled, "She Righted Wrongs: But Former Grand Juror Carol Hopkins, Credited with Saving Families, Struggles with her Own," by Clark Brooks, that although Hopkins was married she had an "affair" with the legal counsel of the 1991-92 Grand Jury, Senior Assistant Attorney General of San Diego, Gary Schons, although they maintained that their affair began after the Grand Jury was dismissed.

94. Gary Schons had been assigned to the 1991-92 Grand Jury because the District Attorney's Office had a conflict of interest due to the fact that their office was under investigation by the 1991-92 Grand Jury. However, Plaintiff believes that Defendant Hopkins' admission indicates there was also a conflict of interest between the Attorney General's office and the 1991 Grand Jury due to their "affair," even though they maintain it occurred after the Grand Jury was dismissed. Defendant Hopkins also stated in this news article that she opposed the re-election of DA Ed Miller and that Paul Phingst was her candidate of choice for the Office of the District Attorney.

95. Gary Schons went on over the years to align himself with the viewpoints of

the FMSF and made statements about the Eileen Franklin case that equated repressed memory with "voodoo evidence" as documented in a San Diego Union-Tribune article dated March 24, 1996 titled, "Memories Revisited/Murder retrial would mean tough fights for both sides," by Mark Sauer. It read, in part:

> "Eileen Franklin-Lipsker has recovered memories of her father murdering two others women, but investigations by the prosecution have determined those memories to be false. Yet because of their bias, according to the motion, prosecutors are moving ahead with the retrial of George Franklin, despite this evidence that the memories of their main witness are not credible ... Should that happen, it is not at all certain the retrial of George Franklin will take place, since not all prosecutors endorse the theory of repressed memory. Should the attorney general decide not to retry Franklin, he would be free. For example, in a yet-to-be-published article written for a prosecutors journal, Gary W. Schons, senior assistant attorney general for the San Diego region, calls repressed memory "voodoo evidence" and warns prosecutors away from it. Citing the Franklin case, Schons writes: "It is critical that prosecutors appreciate that 'recovered memory' is scientifically unfounded and, for the most part, untrustworthy. There is absolutely no verifiable scientific basis for the existence and operation of the psychological process known as repression."

96.   Of course, Mr. Schons statements are not correct and indicated a bias towards the FMSF's contrived positions on the workings of memory. Pam Freyd mentioned Gary Schons in two FMSF newsletters. In newsletter May 1, 1996, Vol. 5 No. 5  Freyd published Schons' book review of "Convicting The Innocent: The Story of a Murder, A False Confession, and the Struggle to Free a Wrong Man." In this review Mr. Schons made statements about the Dale Akiki case – a case which had allegations of ritual abuse  – that do not appear to be true. He claimed that "Dale Akiki, who in 1991 was charged with multiple counts of child molestation based on therapeutically retrieved memories of 3 - 4 year - olds from a church day, was acquitted after the longest and costliest trial in San Diego history." However, according to DA Ed Miller's formal response, most of the children first disclosed abuse to others before disclosing to their therapists. In the FMSF's newsletter 2007, Vol. 16, No. 3, Mr. Schons book review was again referred to by Pam Freyd.

97.   Defendant Hopkins could not have succeeded in shutting down the topic of ritual abuse at CPS and the District Attorney's office without two reporters from the San Diego Union Tribune [SDUT], Jim Okerblom and Defendant Mark Sauer, contributing to it and Defendant David Copley choosing to publish these articles.

98.   Before 1992 there were several news articles published in the San Diego Union-Tribune written by several different authors which reported favorably about satanic abuse. They were: "Satanic Rites Can Put Children at Risk, Panel Says," Feb. 28, 1988 by Ed Jahn; "Ritual Child Abuse: Horrible, but True," April 17, 1989 by John Gilmore; "Religious Revival Takes on Topic of Satanic Worship," July 22, 1989. by Bob Rowland; "Satanism

Upswing Seen in County," Jan 28, 1991 by Michael Bunch; "Mexico Witch Doctor Accused of Killing 41 in Sacrifices," July 28, 1990 by Nancy Cleeland; "Defense Claims Brainwashing Inducted Slaying," Aug. 30, 1990 by Valerie Alvord,

99. In 1991/92, Jim Okerblom and Mark Sauer began reporting about ritual abuse and repressed memory full-time on behalf of Defendant publisher David Copley's San Diego Union-Tribune. The following articles demonstrate an ongoing pattern by the SDUT and Mark Sauer, specifically, to deny the reality of repressed memories and satanic ritual abuse. Later, when Plaintiff describes Defendant Mark Sauer's invasive and defamatory newspaper articles about her, it should be clear that this reporter and publisher was biased against professionals or researchers who investigate satanic ritual abuse.

100. Jim Okerblom began by writing a series of biased articles about CPS cases in the San Diego Union-Tribune involving alleged sexual molestation and ritual abuse which resulted in the dismissal of the Juvenile court petitions. These articles were titled, "Kids taken from Grandparents on Unchecked, Dubious Cult Claims," Nov.8, 1991 and "Children Lose out in Zeal to Protect," January 19, 1992.

101. Plaintiff was aware of all of these cases and the underlying reasons why they were filed at CPS at the time. In all, it was perfectly appropriate for CPS to have investigated, but it did not appear that these reporters understood CPS legal mandates or the risk factors associated with sexual abuse or ritual abuse allegations. It is unfortunate that due to confidentiality reasons CPS cannot respond to newspaper reporters about individual cases, thus leaving a gap in the public's awareness about the logic behind CPS's actions, which leaves it open for disreputable others to malign this agency for the wrong reasons.

102. In SDUT article, "Psychologists' Meeting Takes a Closer Look at Ritual Abuse," Jan. 25, 1992 (by Jim Okerblom) the reporter quoted information from a survey claiming that 800 psychologists throughout the United States reported treating a total of 5, 731 patients who alleged ritual or religious based abuse. Okerblom stated that this information was similar to the survey conducted in San Diego which also indicated that many therapists claimed to be treating ritual abuse survivors which was described in the Ritual Abuse Protocol for CPS. Okerblom reviewed the fact that he had covered three cases in which ritual abuse allegations had been made but had not been substantiated. Okerblom then claimed that the "Institute for Psychological Therapies" had begun a study of the phenomena, inferring the information in these surveys was false. Mr. Okerblom wrote:

> "Thousands of people all over the United States are telling their psychologist that they are victims of so-called 'ritual abuse,' according to a new survey, with most reporting that they witnessed human or animal sacrifices, satanism, cannibalism, ritualistic sexual abuse or other bizarre rites ... In all, these 800 psychologists had 5, 731 patients reporting ritual abuse or religious based abused, Kelly said, about half of them children and half adults who recovered memories of the abuse from their childhoods."

103. Response: A survey which reported 5, 731 separate ritual abuse allegations was phenomenal and should have served as persuasive evidence that ritual abuse was occurring to any rational adult. That the reporter had discovered three ritual abuse allegations that were "false" (and that's questionable) does not mean the phenomena did not exist at all. In the wider world of general CPS allegations of physical, sexual, emotional abuse, and neglect, a good number of allegations turn out to be unsubstantiated, meaning there was not enough information to prove or disprove the allegations at the time, and a smaller number are deemed unfounded. Experienced investigators would never claim that if a few cases which involved allegations of neglect were found to be false, that cases of neglect never occurred. Likewise with incidents of ritual abuse. To take such a position was very irresponsible, especially in the same news article which reported thousands of people reporting allegations of ritual abuse. In addition, the Institute for Psychological Therapies that Okerblom quoted belonged to Ralph Underwager an FMSF Advisory Board member who made supportive pro-pedophile comments in Padaika – journal for pedophiles.

104. In SDUT article, "Child-Molestation Trial Spotlights Raging Debate – Is Accused Man Abusive Monster or is he a Victim?" Feb. 6, 1992 (by Jim Okerblom) the reporter described the upcoming criminal case of Dale Akiki, a man who had been employed by Faith Chapel's daycare, as a case with ritual abuse allegations, although the prosecution was not claiming that ritual abuse took place. Okerblom covered the case from the viewpoint of the defense and quoted FMSF Advisory Board member Richard Ofshe who criticized therapists:

"The idea that therapists are allowed to investigate in these cases – and that's really what is happening – without any control on what they are doing is outrageous," said Richard Ofshe, a social psychologist at the University of California at Berkeley … Ofshe is among these who believe that the answer to the thousands of stories of ritual abuse being told around the country is a social phenomenon, stemming both from fundamental Christianity and from the therapy – not from actual events"

105. Response: Therapists who treat clients involved in court proceedings are mandated to investigate the veracity of the claims of the children involved. Plaintiff believes this reporter used Richard Ofshe to make negative commentary about the validity of ritual abuse in order to negatively impact the potential jury pool on the Dale Akiki case.

106. In SDUT article, "Jury Report on Child Protection Reviewed," Feb. 8, 1992, Jim Okerblom/Wilkins) the reporter positively reviewed the 1991-92 Grand Jury recommendations such as Hopkins' attempts to disallow hearsay evidence in Juvenile Court, withdraw immunity statutes that govern social workers and physicians, and her recommendations that once a child has been removed from the home a social worker should be assigned who was immediately "dedicated" to reuniting the family. Okerblom also publicized Hopkins recommendation to revaluate the county's protocol about ritual abuse at that time. Okerblom wrote:

"Several families have seen their children pulled from their homes based on unsubstantiated allegations of Satanism."

107. Response: In these particular cases, the children were removed from their homes due to a doctor's initial diagnosis of sexual molestation, they were not removed from their home based on allegations of "satanism" alone.

108. In SDUT article, "Trial Ordered for Akiki on 52 Counts of Child Abuse, Kidnapping," Feb. 14, 1992 (by Okerblom) the reporter described the Akiki case and quoted FMSF's Ralph Underwager's claims that therapists drove children into "fantasies" after multiple interviews:

"Roland Summit, a psychiatrist at the Harbor-UCLA Medical Center and a leading figure in the child abuse field, is among those who maintain that such stories should not be dismissed as incredible. The most bizarre elements may be staged by their abusers as part of 'rites and rituals of terror,' Summit said … But other researchers look to different explanations. When children are subjected to multiple formal and informal interviews, sessions of therapy and interactions with adults who believe the abuse is real, the adults may inadvertently create the stories and drive children into their fantasies, 'said Ralph C. Underwager, a psychologist with the Institute of Psychological Therapies in Northfield, Minn."

109. Response: Dr. Ralph Underwager was paid a substantial amount of money by defense attorneys to convince jury's that children would "fantasize" about satanic cult activity, but Plaintiff believes there is no empirical evidence which proves that the normal fantasy life of a child includes being victimized by satanists.

110. In SDUT article, "Falsely Accused Parents File Claims," Mar 28, 1992 (by Okerblom) the reporter described a lawsuit filed by the Wallis's who had their children removed briefly by CPS after an allegation of ritual abuse. Okerblom wrote:

"A Rancho Penasquitos couple who were falsely accused of planning to sacrifice their 2-year-old-son to Satan have filed claims against San Diego County and the cities of San Diego and Escondido."

111. Response: Jim Okerblom stated quite factually that these parents were "falsely accused" of planning to sacrifice their 2 year old son to Satan during the Fall Equinox. However, nobody knows with certainty whether those allegation were true or not. The petitions filed on behalf of these children originally included sexual molestation allegations, but they were later dismissed due to a difference in opinion regarding the validity of the sexual molestation diagnosis and because County Counsel felt there was no longer enough evidence to keep the children in protective custody. The child in question was released after the time period in which he was alleged to be at risk of being murdered. At CPS, some people believed that if the allegations were true, but could not be proven, the fact that this

case was heavily publicized might have protected that child. Regardless, based on the original evidence of sexual molestation, and allegations of a child's upcoming murder, CPS had every right to intervene in this case, and it was irresponsible of the SDUT to attempt to undermine CPS as an agency for taking these allegations seriously.

112. In SDUT article, "Report Rips Handling of Abuse Cases," June 30, 1992 (by Okerblom) the reporter wrote that the 1991-92 Grand Jury recommended that the standard of proof in sexual molestation cases should be increased to "clear and convincing," rather than the standard of "preponderance of evidence. Okerblom wrote:

" ... Among its other recommendations, the jury urged that the county review the competence and training of court-appointed therapists in child-abuse cases because a small percentage may be contaminating children with false memories of satanic rituals and other abuse ...  The jury says a newly formed group based in Philadelphia, called the False Memory Syndrome Foundation, attributes 'inappropriate therapy with destroying families and creating abuse in the minds of children and adults."

113. Response: Because child molestation is often very difficult to prove, erring on the side of protecting the child seems the most reasonable approach. If "preponderance of the evidence" is the standard used in civil cases, Plaintiff believes that same standard should be applied in a Juvenile court setting. The 1991-92 Grand Jury had no reason to state that therapists might be contaminating children with false memories of satanic ritual abuse. Therapists "suggestion" of abuse does not occur on a regular basis in child abuse cases. Claiming that "false memories" can be implanted by psychotherapists on a regular basis was the position of the FMSF. It is common in child abuse cases for forensic tapes of a child interview to be made after a child has already disclosed abuse to multiple parties. Plaintiff is aware of some cases in which the child already disclosed abuse to their parent or doctor but then the child became frightened or refused to speak during the forensic interview. As a result of the forensic interviewer's awareness of what the prior statements of the child were, the interviewer might prompt the child to remember. It is the prompting that is recorded on tape for defense attorneys to analyze. Without knowing the context and history of the disclosures, these tapes can be then used by the defense to claim that the interviewers or therapists were "suggesting" abuse to children.

114. In SDUT article, "Did Merced Jury Pirate San Diego Report?" July 9, 1992 (by Okerblom) the reporter wrote that the 1991-92 Grand Jury report, "Families in Crisis" had been widely circulated around California but another County had plagiarized this report:

"A Grand Jury in Merced released their report which was sharply critical of their own County's Dependency System but the report – word for word - in most sections was identical to the 1991-92 San Diego Grand Jury's report. Even some of the testimony quoted by the San Diego panel appeared in the Merced report ...  Hopkins, who chaired the committee that wrote the San Diego report, said she spoke briefly with someone

from the Merced panel months ago … All I can recall is they wanted to know how to go about an investigation, and I sent them a copy of 'Families in Crisis,' Hopkins said. She added: 'How can they be that stupid? You can't do that. You just can't do it. Grand jury reports have to be the result of an independent investigation.'"

115. Response: Plaintiff believes this article was indicative of irregularities that might have been occurring in other counties, perhaps due to Defendant Hopkins interactions with those counties. It is unfortunate that Defendant Hopkins mailed out her later to be revealed biased Grand Jury report to multiple officials throughout the State. At best, this report could have been used to shut down investigations of ritual abuse in agencies, believing that the 1991-92 Grand Jury report contained accurate information. At worst, other people with an agenda may have used her report to intentionally undermine children in their local jurisdictions.

116. Jim Okerblom and Defendant Mark Sauer wrote a three-part series, published by Defendant David Copley in the SDUT – beginning with "Haunting Accusations, Repressed Memories of Childhood Abuse: Real or Delusions,") Sept, 13, 1992 (Mark Sauer-Okerblom) – in which they continued to quote the False Memory Syndrome Foundation for the people of San Diego, making this organization appear righteous and "scientific." In the second article in their series, "Recall Experts Say Therapists Create Hysteria," Sept 14, 1992, Okerblom/Mark Sauer quoted the FMSF and their Advisory Board members again. In "Group Therapy Triggered Phony, Hellish Memories," Sept. 14, 1992, Sauer and Okerblom quoted a story of a "retractor" without questioning whether the retraction was true or not. In "Undocumented Demons – Therapist, Church, Cops Caught up in Tales of Atrocities," Sept. 15, 1992, the reporters were somewhat even-handed. In their article "Satanism is on the Fringe in Repressed Memory Cases," Sept. 15, 1992, Mark Sauer-Okerblom clearly sided with the defense position by denying that ritual abuse occurred based on the claim that there was no evidence.

117. Pam Freyd wrote in a FMSF's newsletter, dated October 5, 1992 (Vol. 1 No. 9), that readers should access Mark Sauer/Okerbloms three part news series entitled "Haunting Accusations: Repressed Memories of Childhood Abuse: Real or Delusions," mentioned above, which makes it appear the FMSF was working in concert with these two reporters, based on the content of these newspaper articles which overly represented the FMSF's contrived positions on the workings of memory and the complete denial of satanic ritual abuse.

118. In article, "Alleged Murder-Plot Target Says He's Victim of "Memory' Therapy," Dec. 15, 1992 (by Jim Okerblom) the reporter described a daughter's attempts to have her father, a psychiatrist, killed after undergoing "repressed memory psychotherapy." The reporters favorably quoted the False Memory Syndrome Foundation's claim that they had found 2000 cases of "false memory."

119. In SDUT article, "Do Therapist Plant Memories of Abuse," Dec. 27, 1992 (by Mark Sauer/Okerblom) the reporters briefly described the upcoming prosecution of Dale Akiki, and referred to CPS's Ritual abuse Protocol as a "booklet" which had been withdrawn:

> "One official said the county is 'no longer looking at ritual abuse,' adding that there is 'no such task force now operating in the community"… The 1991-92 San Diego County grand jury, as part of a June report critical of the child welfare system here, sent a Cavalcade training videotape out for review by experts. Their reaction: 'The therapy itself may be the abuse.'"

> "Richard Ofshe, a University of California Berkeley sociologist and an expert on influence, is among those who predict a major backlash against such therapy because it will be judged to be harmful. 'It's going to make lobotomies look like they were doing people a favor,' Ofshe said."

120. Response: Even though this article appeared to support both sides of the argument, Defendant Sauer and Okerblom concluded their story by quoting an ill-advised comment by FMSF Advisory Board member Richard Ofshe who compared ritual abuse therapy with lobotomies, which was clearly meant to undermine victims of ritual abuse and the therapists who treat them.

121. In SDUT article, "Tales of Terror at Church Nursery Raise Urgent, Troubling Questions," Dec. 27, 1992 (by Defendant Mark Sauer/Okerblom) the reporters wrote a fairly even-handed article about the ritual abuse trial of Dale Akiki. However, they claimed:

> "But more allegations were forthcoming, coinciding with the airing of the CBS-TV movie 'Do You Know the Muffin Man'… Soon after the initial broadcast, the accounts of the Faith Chapel children being reported by parents and therapists grew stranger."

122. Response: The Akiki case was filed after a Grand Jury heard 33 witnesses and after multiple parents claimed that their children were terrified of Dale Akiki. Trying to create a simple cause and effect scenario such as timing the allegations made about Mr. Akiki with the airing of a movie was very unlikely.

### THE 1992-1993 SAN DIEGO GRAND JURY

123. In 1992-93, due to complaints made by then District Attorney Ed Miller and CPS, another San Diego Grand Jury was convened which corrected the misrepresentations that were made in the 1991-92 Grand Jury report. In Defendant Hopkins attempts to sway the Board of Supervisors and the public into believing that the System was "out of control,"

she had misreported about individual child abuse cases and her analysis was found to be false and misleading.

124.    In Report No. 13, dated June 29, 1993 titled, "Protect the Child, Preserve the Family," although appearing to minimize what appears to have been corruption by the 1991 Grand Jury, the 1992-93 Grand Jury proceeded to correct the 1991-92 Grand Jury's misrepresentations about several child abuse cases and described these cases in more accurate terms. It should be noted that despite repeated requests to the Grand Jury's office to publicly post the 1992-93 Grand Jury report alongside the 1991-92 Grand Jury report, the Grand Juries Office has neglected to do so. The 1992-93 Grand Jury stated in their report:

> "The 1992-93 Grand Jury became concerned that some of the recommendations contained in the 91-92 reports were not in the best interest of threatened children … The Jury was approached by social workers and supervisors who felt anxious and concerned that the new department philosophy of family preservation was taking precedence over the need to protect children … Judges, familiar with the Juvenile System, told the Jury of their concerns over trends in local child protection practices which appeared to have been caused by the '91-92 reports."

125.    The San Diego Union-Tribune's editorial policy continued to support the FMSF and continued to deny that ritual abuse occurred. In SDUT article, "Therapists Find Cures are Matter of Lives and Deaths," August 20, 1993 (by Tiffany Porter) the reporter wrote about a "Past Life Regression" author who was to speak at a conference. Pam Freyd of the FMSF was quoted as stating:

> "Hypnotherapeutic techniques used to help recall past lives are similar to those used to bring about recollections of sexual abuse, satanic abuse and abductions by space aliens."

126. Response: This statement by Pam Freyd (originally made by FBI's Ken Lanning) is commonly made to deny the reality of ritual abuse. Regarding past lives, there are large numbers of people who believe in reincarnation, in fact, most of the entire Eastern hemisphere of the world. Tibet has teams of religious specialists who track the reincarnation of Lamas or Rinpoches. There are many examples of small children who are questioned who give personal and specific answers about the personal lives of the Lamas in question. These children are then specially schooled in the Tibetan Buddhist tradition believing that they are the reincarnation of an enlightened teacher. Pam Freyd is not an example of a sophisticated source who knows the answers to anything as complex as "past lives," or about the enduring life of the soul. Regarding the growing number of people reporting "abduction" experiences by "aliens," no one knows the answer to the questions raised by these alleged victims. All that is known is that a significant number of people are reporting distress which is enough reason to seriously investigate the phenomena. Hypnosis is sometimes used in these cases to refresh a "victim's" memory of an already remembered unusual encounter. Pam Freyd's poor attempts to undermine victims of ritual abuse by denouncing all three phenomena in one sentence has never been persuasive evidence to Plaintiff that ritual abuse does not occur.

127. In SDUT article, "Satan-Chasers Real Terrorists in Witch-hunts," Sept. 7, 1993, (by Defendant Mark Sauer) the reporter stated:

"It seems that in our scientific wonder world of the late 20th century one strange little corner is reserved for people who believe to their souls there exists a worldwide, underground satanic conspiracy. The notion would be almost a quaint nod to the Middle Ages if it weren't for the harm innocent people are suffering at the hands of such true believers. (Speaking about a film by Antony Thomas debunking ritual abuse) … Thomas focuses much of his film, though, on the damage to families caused by pathetically misguided Satan searchers, like the San Diego County authorities who inflicted a months-long visit to hell on the Wallis family of Escondido.

128. Response: At this point in the SDUT's coverage, it did not appear that Mark Sauer was pretending to objectively report anymore but had an obvious agenda to deny that ritual abuse occurred, given not only the title of his article, but the content. Because satanists are known to terrorize and torture their children, Mark Sauer's attempts to intimate that professionals who investigate these subjects were the "real terrorists," bespeaks of simple-mindedness and an agenda. In this article he also irresponsibly characterized County officials as "pathetic" and "misguided" in clear attempts to intimidate these individuals and agencies.

129. In SDUT article, "Psychology on Trial-Akiki Case Raises Questions on Reliability of Psychotherapy," Nov. 14, 1993 (by Defendant Mark Sauer) the reporter quoted FMSF Advisory Board member Defendant Elizabeth Loftus during the prosecution of the Akiki case:

"The idea of repression, that you can block things out and it is a common way to deal with these life situations has been uncritically accepted as the truth, Loftus said, but there is no cogent support for this idea."

130. Response: Plaintiff has extensively documented the evidence that proves repressed memory exists which indicates that FMSF Advisory Board member Defendant Elizabeth Loftus might not be interested in telling the truth.

131. In SDUT article, "Was Akiki Inquiry Rush to Judgment- Police Work in Similar Case Averted Trial," Nov. 22, 1993 (by Okerblom and Mark Sauer) the reporter described Dale Akiki's acquittal and sided with the defense by writing that all of the children's unusual allegations were skillfully shown by defense attorney Kate Coyne to be the "product of their imagination which had been fueled by therapy." Sauer then described another child abuse case which allegedly too included "bizarre" allegations and made the following remark:

"Instead of being concerned about the influence of discredited ritual abuse theories as Rubenstein had been, Avery – a member of the county's disbanded Ritual Abuse Task Force – embraced them. She hired therapist Linda Walker as her consultant and referred families to therapist Pamela Badger. The two have been outspoken proponents of the mythical ritual-abuse threat for years."

132.  Response: There are several reasons why children might make allegations that seem incredible at the time but are later clarified. According to Senator Newton Russell's office, the child in question who claimed to see giraffes killed in the Dale Akiki case actually testified that wallpaper had elephants and giraffes on it and the wall paper was repeatedly stabbed by the perpetrators. In this article, Okerblom and Sauer clearly stated that ritual abuse had been "discredited" and was a "myth" and again inappropriately named specific individuals in apparent attempts to intimidate them and ruin their reputation. And despite these news reporters attempts to make it appear the eight children in the Akiki case had disclosed abuse after "months in therapy," this was untrue. According to DA Ed Miller, in his 1994 response to the 1993-94 Grand Jury report, he stated that they (these reporters) misstated testimony during the Akiki trial, that five of the eight children who disclosed abuse made their disclosure first to persons other than their therapists. Of the remaining three children, they made a disclosure to their therapist in the first few sessions which is completely contrary to how Mark Sauer described this case.

133.  In "Grand Jury Urged to Examine Akiki Case's Handling," Dec. 2, 1993 (by Okerblom) the reporter described Board of Supervisor Dianne Jacob asking for a grand jury investigation of the Akiki case, with "help from the State Attorney General's Office." Supervisors Brain Bilbray and Pam Slater urged changes in the way therapists are used in child-abuse cases, in part because of issues raised by the Akiki case:

"Gary Schons, who heads the criminal division of the attorney general's local office, said he had not yet heard of Jacob's request and couldn't comment on it before discussing it with his bosses... [Bilbray] His and Slater's proposal says there is an 'increased public awareness of the ability of therapists to influence the 'memories' and 'testimony of children in courts of law' and a perception that some therapists are acting on a 'bias toward identification of satanic and ritualistic abuse and dogmatic assumptions' about allegations of sexual molestation'...Bilbray described psychotherapy theories about satanic ritual child abusers – one of the issues in the Akiki case – as a 'virus that spread not in just this county, but throughout the nation.'... Slater was more blunt: 'It comes down to the county having to foot the bill to defend these bozos,' she said. "It's like the inmates-running-the asylum kind of thing ...Two therapists involved in the Akiki case could not be reached because they were out of town. Five did not return phone calls and two others would not discuss the matter. The 11th, Elizabeth Young, said 'I certainly accept the Akiki verdict' ... Dr. Clark Smith, a psychiatrist and president-elect of the San Diego Psychiatric Society, said the county might save money over time by avoiding lawsuits if it used better-trained evaluators and therapists. Of

ritual-abuse theories promoted by some therapists, Smith said, 'Most mental - health professionals think this is a lot of bull.'"

134.  Response: It appeared from this article that Carol Hopkins ex-boyfriend Gary Schons might have been the legal advisor for the 1993-94 Grand Jury as well as the 1991-92 Grand Jury. That is troubling because Mr. Schons appeared to favor the illogical and indefensible FMSF viewpoints. On every case Plaintiff addressed with ritual abuse allegations, she referred the children to an experienced therapist who was familiar with the subject matter. To have done otherwise would have been very poor practice, considering the level of expertise that is required to understand ritual abuse, let alone to have the courage to address it. It appears that this article is further evidence indicating that Mark Sauer was using his position at the SDUT to intimidate professionals who worked with ritual abuse by his selective quoting. He quoted Brian Bilbray's claim that satanic ritual abuse allegations were a "virus." He quoted Pam Slater irresponsibly describing professionals as "bozos," and Dr. Smith's characterization of satanic ritual abuse as "a lot of bull." Plaintiff believes that due to the continual publication of this type of biased material it caused San Diego CPS and other agencies to inappropriately retreat from investigating the subject of satanic ritual abuse.

135.  On November 24, 1993 Plaintiff wrote a letter which was published in the San Diego Union-Tribune in response to Jim Okerblom and Defendant Sauer's biased articles about the supposed nonexistence of ritual abuse. The Plaintiff's letter was published, but the SDUT deleted her list of convictions involving ritual abuse. Plaintiff's letter read, in part:

"I am outraged over the concerted efforts of reporters Jim Okerblom and Mark Sauer to present biased coverage on the subject of ritual abuse. No one likes to hear about horrible crimes, but what compounds those criminal acts are newspapers intent on discrediting children, adults, their memories and the criminal acts perpetrated upon them. These types of crimes do occur. As horrible as they are for adults to listen to, why don't we consider how horrible it is for victims experiences to be relegated into pat phrases such as 'fads,' 'urban legends' and "witch-hunts."

## THE 1993-94 SAN DIEGO GRAND JURY

136.  In 1993-1994 a Grand Jury was convened which investigated the prosecution of Dale Akiki and the District Attorneys office's handling of this case. Their report was titled, "Analysis of Child Molestation Issues," Report No. 7, June 1, 1994, and they made recommendations to the District Attorney's Office and Board of Supervisors that were both shocking and contrary to the best interests of children. They recommended that

the County of San Diego should completely withdraw the standing Multi-victim/Multi-perpetrator Ritual Abuse protocol. In recommendation # 94/50, they advised the District Attorney's office and the Board of Supervisors to take the following position:

"San Diego should refrain from investigating or prosecuting any cases involving satanic ritual abuse."

137. This recommendation appeared to be very clear efforts to try to cover up satanic crime in San Diego County. For an ostensibly legitimate governmental body - like a Grand Jury - to instruct a District Attorney's office to ignore and not prosecute a horrific form of child maltreatment indicated to Plaintiff that further corruption might be occurring, and this is how they accomplished it.

138. In the body of the 1994 Grand Jury report, the authors quoted Defendant Elizabeth Loftus - Advisory Board member of the FMSF, Ken Lanning of the FBI, and quoted from Dr. Gail Goodman and Bette Bottoms 1994 research study titled, "Characteristics and Sources of Allegations of Ritualistic Child Abuse," a study which Plaintiff believes was intentionally designed to minimize allegations of ritual abuse for the following reasons:

a. The overview of this research study claimed that only a small group of therapists were responsible for reporting the most allegations of ritual abuse in obvious attempts to make it appear that these therapists constituted a "fringe" element of the therapeutic community, when in fact, when one reads the actual study, these researchers received thousands of reports of ritual abuse by clinicians and agencies throughout the United States but they continued to discard data by the reporting parties for questionable reasons.

b. The researchers claimed that their study proved that generational Satanism did not exist but their victim-perpetrator relationship scale was designed to measure only one generation of possible abusers and did not allow for other extended family members to be scored.

c. The researchers purported to describe the legal findings of hundreds of Social Services agencies but they reported social worker case opening and closing codes only – substantiated, unsubstantiated, and unfounded – which are not legal findings, and neglected to mention Juvenile Court proceedings, petitions filed, and the correct legal outcomes of these proceedings.

d. It appears it was Dr. Goodman who then provided disinformation to Daniel Goleman of the New York Times in a 1994 article titled, "Proof Lacking for Ritual Abuse by Satanists," claiming that the researchers had "unsubstantiated" 12,000 allegations of satanic group cult sexual abuse. However, these researchers did not

receive that high of a return rate in their post card survey. The cases they actually analyzed was closer to 2000.

139. This study has been used world-wide to make the claim that the "scientific" field found no evidence for satanic ritual abuse but Plaintiff believes this study is invalid. FBI's Ken Lanning was the advisor for this study and it appeared that the researchers attempted to replicate his findings rather than objectively coming to their own conclusions. Plaintiff requested an explanation from the lead researcher in 2008 for these and other numerous discrepancies in case she had misunderstood any of the issues but she was met with silence. A request for formal administrative review of this study is currently pending before the Office of the President of the UC School system. Plaintiff's critique of this study can be found at: http://members.cox.net/dnap/goodmancritique.pdf

140. The 1993-94 Grand Jury and Defendant Mark Sauer of the San Diego Union-Tribune continued to criticize the District Attorney's office for prosecuting the Dale Akiki case. In SDUT article, "Miller Faulted by Grand Jury on Akiki Case," June 2, 1994 (by Mark Sauer/Wilkins, Krueger) the reporters cited the 1994 Grand Jury's "key findings" that the County had wasted time and money:

"The county has wasted time and money on an unfounded theory: that a widespread cult of secretive satanists is molesting children in elaborate rituals. The jury said the theory should be abandoned ... Carol Hopkins, a member of the 1991-92 grand jury that strongly criticized Miller and other county officials, said the new report validates the conclusion she and her colleagues reached ... The best example of contamination in the Akiki case was the fact that the therapist were not only trying to treat the children but they were also attempting to be criminal investigators."

141. Response: The "findings" of the 1991-1992 and 1993-1994 Grand Jury's were completely unacceptable and that two San Diego Grand Juries focused on denying the reality of satanic ritual abuse points to a larger problem in San Diego which has not been clearly identified. Plaintiff believes, again, that there is nothing wrong with therapists screening allegations of child abuse for true and false reports during court proceedings and in fact that is their job.

142. DA Ed Miller commented in his August 31, 1994 response to the 1993-94 Grand Jury that when confronted with complaints from several of the parents of alleged victims in the Akiki case about Jim Okerblom's coverage of the proceedings which had been inaccurate and biased, Mr. Okerblom had stated that he did not care what the parents thought since his reporting was going to result in his receiving a "Pulitzer prize." Mr. Miller went on to describe the coverage of the Akiki case as being "biased to the point of being nothing short of disgraceful." Mr. Miller also described the 1993-94 Grand Jurors as in "over their heads" regarding their analysis of what took place in the Akiki trial. He questioned why there had been so many attacks on advances made to protect children and noted that there was a nationwide trend to attack child abuse prosecutions and prosecutors

143. Between the years 1992-1994 Senator Newton Russell of California had worked on passage of a penal code which became law in 1995 as 667.83 which added a sentence enhancement to child abuse crimes which were committed in the context of ritual abuse. This action was taken due to the hearings which were referred to earlier in 1989 in California. However, it appears that one or more of the Grand Jury members of the 1991-92 and 1993-94 San Diego Grand Jury reports attempted to stop the passage of this law and the formation of a State Ritual Abuse Task Force, a fact which was chronicled in the historical archives of Senator Newton's legislation which Plaintiff retrieved.

144. In the Assembly Office of Research Report, dated March 1, 1994, John Berthelsen of the Assembly Office of Research wrote a skeptical response about allegations of ritual abuse and recommended that no commission on ritual abuse be created. The Akiki case in San Diego was described, reporting that a child accused Akiki of "killing a Giraffe." The rebuttal to this report stated, again, that the child in question testified that wallpaper with elephants and giraffes on it was repeatedly stabbed. On pg. 14 of their report, the 1991-92 San Diego Grand Jury report's conclusions were quoted:

"The Jury had heard reliable expert testimony that it is a mistake to force a child to relive and keep talking about an alleged traumatic event. Further, there is little evidence that a child will repress a traumatic event. There is good evidence that a traumatic event tends to etch itself indelibly on the mind."

145. This type of extreme misstatement of fact was routinely made by the FMSF. In other words, Pam Freyd's disinformation campaign reached as far as the California State Legislature in 1994 in efforts to shut down the topic of satanic ritual abuse in opposition to the recommendations of the 1988-89 State Advisory Board hearings.

146. In the Assembly Committee on Public Safety report, dated May 12, 1994, the report cited the defense portrayal of the Akiki case by claiming the children were "fanciful" which casted "doubts on the proposition that children never lie in describing their experiences with sexual abuse." On pg. 6 they quoted from the 1993-94 San Diego Grand Jury report:

"The Grand Jury has found no evidence of satanic ritual child molestation in San Diego County. The 1993-94 Grand Jury concluded there is no justification for the further pursuit of the theory of satanic ritual child molestation in the investigation and prosecution of child sexual abuse cases."

147. Congressman Eppell insisted that Penal Code 667.83 should have a provision that mandated all counties that convicted people under this sentence enhancement to send in form 8715 so that the DOJ could gather statistics and decide in three years [1998] whether the law should sunset or not. In Plaintiff's opinion, three years was too brief a time to canvass the prevalence of ritual crime in the State of California, and she thought it might be difficult collecting statistics, at least in San Diego, because it appeared that the DA's office

in San Diego County and perhaps other counties were refusing to investigate allegations of satanic ritual abuse at all.

148. In SDUT article, "Chasing Satan in Sacramento – Zealous Senator Pushes Law Adding Ritual Abuse Penalties," June 16, 1994 (by Defendant Mark Sauer) the reporter compared the efforts of Senator Newton Russell's attempts to pass this sentence enhancement to the Red Scare and the Salem Witch Hunts:

> "Claims that a secret network of Satanist is abusing children in rituals featuring blood, urine, feces, etc … seem to have finally gone the way of the Red Scare in the 1950s and the Salem Witch Hunts of the 1690s. After a decade of digging the FBI could find nothing to indicate the existence of a satanic conspiracy anywhere in the United States; in San Diego this month, the county grand jury declared it 'found no evidence of satanic ritual  child molestation' here … This year Russell came back with SB1997. It sought to add three years to the sentence of anyone convicted of molesting a child 'as part of a ceremony rite or any similar observance.' Yet ritual-abuse investigations elsewhere have turned up nothing … But when pressed  to cite a single case of verified ritual abuse in California, McElhenny said: 'None that I could talk about' …"

> "Jeffrey Victor, author of 'Satanic Panic: The Creation of a Contemporary Legend,' said such a law would provide government sanction and credibility to the unfounded faith of those who believe that ritual abuse exists. When a San Diego jury last fall rejected prosecutors ritual-abuse charges in the Akiki trial, some critics declared the swift and decisive verdict was the beginning of the end of the phenomenon … But Victor predicts that 'people with extremist beliefs about this will be promoting it until the end of the century, although they will essentially be ghettoized.' Some people say, 'Well, what does it hurt to have such beliefs? But we don't need fools in government'"

149.  Response: Plaintiff believes that this "news article," which purported to describe Senator Newton Russell's attempts to pass Penal Code 667.83 – the ritual abuse sentence enhancement – was unacceptably disrespectful and was unprofessional for Defendant Copley to have published. Despite what Mr. Sauer alleged, Senator Newton's efforts to pass legislation on behalf of a vulnerable class of victims – children of satanists - was not comparable to what occurred in the Communist "Red Scare." Sauer failed to disclose the fact that what appeared to be two dishonest San Diego Grand Jury reports and his news articles were used by the State Assembly Office of Research to oppose this Task Force on Ritual Abuse for the State of California. In this news article, Mark Sauer quoted FMSF Advisory Board member Jeffrey Victor to refer to members of governments who believe that ritual abuse exists as "fools." Although Mark Sauer quoted Senator Newton's aide, Ms. Mc McElhenny, as stating she did not "know" of any ritual abuse cases in California, that is very difficult to believe because she was privy to the findings of several investigations of ritual abuse that took place in California.

150. Plaintiff corresponded with Senator Russell's office several times during this time period and was asked to write a letter about her experiences investigating ritual abuse to aid in the passage of this law. Consequently, Plaintiff was very interested in seeing that Penal Code 667.83 remained on the books which did become law in 1995. The penal code read, in part:

-Actual or simulated torture, mutilation, or sacrifice of any mammal

-Forced ingestion, or external application of human or animal urine, feces, flesh, blood , or bones.

-Placement of a living child into a coffin, open grave, or other confined area containing animal remains or a human corpse or remains.

151. Penal code 667.83 did unfortunately sunset in 1998 and the County of San Diego contributed to that occurrence due to the 1991-92 and 1993-94 Grand Juries highly suspect recommendation to the Board of Supervisor to withdraw the standing CPS SRA protocol and their recommendation that the District Attorney's office (and apparently CPS) not investigate SRA cases.

152. In 1995 Plaintiff wrote a letter to the Office of Criminal Justice Planning, in efforts to force CPS to gather statistics about ritual abuse, but they never replied.

153. In SDUT article, "A Frightening True Story of Recovered Memory," Book Review, May 15, 1994 (by Defendant Mark Sauer) the reporter positively reviewed a book titled, "Remembering Satan a Case of Recovered Memory and the Shattering of an American Family" by Lawrence Wright which purported to describe the SRA case of Paul Ingram in the State of Washington, but Wright's bias was extreme throughout. At the end of this article, the San Diego Union-Tribune identified Mark Sauer as the "reporter who was covering the repressed memory issue." Sauer wrote:

"Ingram and his daughters ultimately envisioned much more than mere molestation. They reported scenes of satanic sex and blood rituals; repulsive orgies in which his poker buddies raped and sodomized his children ... As prosecutors prepared for Paul Ingram's trial, Richard Ofshe, a University of California Berkeley psychology professor, was hired as an expert to aid in convicting the ex-sheriff's deputy ... In this astonishingly thoroughly researched and highly readable tale, Lawrence Wright, a staff writer for the New Yorker, exposes the frightening extreme of the recovered-memory phenomena in America. Thousands of families have been shattered by delayed reports of sexual abuse emerging from therapy that are uncorroborated, impossible to defend against and very possibly false."

154. Response: This case just described was about a confession of sexual and satanic ritual abuse made by Thurston County Sheriff Paul Ingram which his supervisor Sheriff McClanahan wholeheartedly believed. The court records document that the court did not find Richard Ofshe's opinions about this case to be persuasive. In this article, the SDUT clearly reported that Mark Sauer was assigned coverage of the repressed memory issue. That indicates that SDUT publisher Defendant Copley approved of Mark Sauer's coverage - which was obviously intentionally skewed in favor of the FMSF - and the position of defense attorneys when they involved prosecutions of satanic ritual abuse.

155. In SDUT article, "Memory Verdict Sends a Message," May 15, 1994 (by Defendant Mark Sauer) the reporter described Gary Ramona's civil case which involved his daughters "repressed memories" of child molest in which a jury found in his favor. Pam Freyd of the FMSF was quoted:

"'For the thousands of families who have contacted us in the past two years, this is a concrete sign that people are finally getting the message: Something profoundly wrong is going on in psychotherapy today,'" Pamela Freyd, a psychologist and founder of the False Memory Syndrome Foundation in Philadelphia, said yesterday. "

156. Response: The SDUT continued to quote the notorious organization, the FMSF, without ever once questioning whether this organization might have an agenda. Mark Sauer also continued to misreport the facts: Pam Freyd is not a "psychologist."

157. In 1993 Plaintiff submitted a research proposal to the head of Social Services Cecil Steppe and asked for part-time status so that she could report back about issues such as ritual abuse, suggestive interviewing, and repressed memory. However, Mr. Steppe and director Ivory Johnson denied Plaintiff's request. Plaintiff decided to continue this research anyway on her own time in addition to her full time investigatory work load.

158. In 1993 Plaintiff formed the Ritual Abuse Court Cases Project in efforts to canvass District Attorneys who had successfully handled cases involving ritual abuse in order to provide objective evidence that this type of crime existed due to what at first appeared to be a "backlash" in San Diego County. At that time there were approximately 14 cases convictions involving ritual abuse in the United States which had been gathered by researcher and film documentarian Dale McCulley. Between the years 1996-1998 Plaintiff researched legal resources and law libraries which resulted in the discovery that there were many appellate courts which upheld Satanism as the motive for the crime.

159. In 1998, Plaintiff published the results of her research on the internet in an archive titled "Satanism and Ritual Abuse Archive" which included over 60 court cases documenting satanic crime and/or ritual abuse. In 2007, Plaintiff updated this archive and it is presently posted at several web sites including http://www.endritualabuse.org/ritualabusearchive.htm [Exhibit 2], and her own web site at:. http://members.cox.net/dnap/ritualabusearchive.pdf

160. Defendant Carol Hopkins continued to hold positions of responsibility in San Diego County. According to news article, "DA Pfingst Gains Respect in Half-Year at the Helm," by July 2, 1995 by Anne Krueger, after taking office in 1995 Paul Phingst appointed Defendant Hopkins to a committee that reviewed child abuse cases that were submitted to the District Attorneys office. On several internet web pages Defendant Hopkins described her appointment at the S. D. District Attorney's office as an Ad Hoc Committee on Child Abuse /San Diego County's Child Protection Services Task Force. This was in spite of the fact that the 1992-93 Grand Jury reported that the previous Grand Jury had caused harm within the system, and seriously mischaracterized child abuse cases that were investigated by DA Ed Miller's office, in Ms. Hopkins efforts to make it appear the "system was out of control."

161. In SDUT article, "Foes Assail Repressed-Memory Therapy," Dec. 1, 1994 (by Defendant Mark Sauer) the reporter favorably reviewed Ofshe's book, "Making Monsters: False Memories, Psychotherapy and Sexual Hysteria" and FMSF's Elizabeth Loftus' book, "The Myth of Repressed Memory: False Memories and Allegations of Sexual Abuse." Sauer publicized that FMSF's Richard Ofshe was to appear at a conference the next day. In this article, after giving an example of a therapist asking a client what they thought a dream meant, Sauer wrote:

"Certain therapists who practiced such detached neutrality discarded it about 10 years ago because they believed they had made an astonishing discovery: dark memories of sexual abuse and even satanic blood orgies -- of trauma so vast it was capable of splintering minds -- could be unlocked using a new technique called 'recovered-memory therapy.' Trouble was, the discovery was a devastating hoax, said Richard Ofshe 'It's rare when you find a mistake this stunning.'"

162. Response: In this article Sauer was using Richard Ofshe to denounce traumatic amnesia as a "hoax," which was an obvious attempt to deny that the psychological disorder of MPD/DID could hide the fact that sexual and satanic cult abuse occurs due to the dissociation of the victims.

163. In SDUT article, "'Repressed Memory'" Deconstructed as Quackery with a Heavy Price," (by Defendant Mark Sauer) Dec. 18, 1994, 18 days after the publication of the article described above, Mark Sauer again favorably reviewed the same books previously described by FMSF's Richard Ofshe and Elizabeth Loftus about "reckless and destructive therapy." At this point, Mark Sauer's news coverage was becoming repetitive, which is a common propaganda technique used when disseminating mis/disinformation. Sauer repeated the extreme FMSF position again and wrote:

"The authors attack the notion of repressed memories as lacking scientific foundation."

164. In SDUT article, "Repressed Memory Care a 'War Zone'" Apr. 11, 1995 (by Defendant Mark Sauer) the reporter discussed a documentary by Ofra Bikel "Divided Memories" about repressed memory. Sauer introduced Bikel by the following comment:

"The Israeli-born, New York-based filmmaker, whose acclaimed "Innocence Lost" pieces for "Frontline" recently explored a tragic Dale Akiki-type case in North Carolina, comes late to the repressed-memory debate."

165. Response: Sauer misreported on the facts yet again: "Innocence Lost" was actually about the brutal torture and murder of three young boys in the state of Arkansas which the State described as a satanic ritualistic killing. These convictions were successfully upheld on appeal and the appellate court upheld the satanic motivation for the crime. [902 S.W. 2d 781 (1995)]. In addition, which has been previously reported, Professor Cheit of Brown University created his archive of repressed memory cases in response to Ofra Bikels misinformation about that subject, specifically in the film "Divided Memories."

166. In SDUT article, "Mending a Broken Trust, 11 Years After he Sent her to Prison, Son Brings Mom Home," Dec 17, 1995 (by Defendant Mark Sauer) the reporter wrote about a recanting teenager who gave testimony as a child about his mother's satanic abuse in Bakersfield but who later won her release by recanting. Sauer quoted defense attorney Martin Snedekker who successfully overturned a series of ritual abuse cases in Bakersfield as saying:

"On a hunch, he called Richie Shaphard and was delighted to learn the teenager was ready to recant."

167. Response: This article reported that it was the defense attorney who introduced the topic of recanting to this teenager which apparently Mark Sauer never thought was odd.

168. In SDUT article, "Teen Says Parents Were Wrongfully Convicted/Case was originally thought to be a Satanic Sex Ring," Jun 18, 1996 (by Defendant Mark Sauer) the reporter described Carol Hopkins having a recanting teenager in her custody by the name of Sam Doggett from Wenatchee Washington. This case was originally thought to be a sex ring and multiple defendants either plea-bargained or were convicted of child molestation in the late 1990's in Wenatchee, Washington. Mark Sauer purported to quote statements by this teenager:

"But then disaster struck. The disaster, Sam said, was the most notorious prosecution of supposed child molesters since the Dale Akiki case in San Diego and the McMartin Preschool case in Los Angeles, both of which failed to result in convictions."

169. Response: Mark Sauer described Sam Doggett attending a rally on behalf of the Justice Committee (Hopkins's organization) which was dedicated to ending the "nearly 15 years of child-abuse-prosecution hysteria in this country." Plaintiff believes that it was not

appropriate for Defendant Hopkins to have had a "recanting" witness in her custody when Defendant Hopkins had an interest in overturning her parents conviction in what is commonly referred to as the Wenatchee Sex Ring. According to a Press Release on November 26, 1995, Ms. Hopkins called for an apple boycott to bring attention to the "falsely" accused in Wenatchee Washington. In this press release it also stated that Carol Hopkins was the co-founder of the Dale Akiki support organization.

170. Plaintiff was surprised to read years later in a message by Defendant Hopkins, posted on the internet Witchhunt List-serve (message 9575, dated March 3, 2000) that the Director of CPS, Ivory Johnson, had personally supervised the placement of this recanting child from the Wenatchee Child sex ring in 1995 with Hopkins as a special favor for Ms. Hopkins. This type of placement and supervision was highly unorthodox as Ms. Johnson was an administrator, not a line social worker, and Defendant Hopkins was obviously a direct party in the case of this child because she was taking a public stand on behalf of her already convicted parents in efforts to overturn their convictions. In normal CPS placements, the social worker assesses whether or not the intended caretaker can protect the child. That assessment would include the caretaker believing that the child was abused especially if there was every indication that this is what occurred. A CPS social worker in normal circumstances would never place a child with a party who was trying to overturn the conviction of the parents because that would indicate that the caretaker was not protecting that child but was operating on behalf of the abuser. The fact that this type of placement occurred in this case points to unethical conduct and a conflict of interest. Plaintiff also seriously doubts that teenager Sam Doggett made the comparison between her parent's case, the Akiki case, and the McMartin case, and believes it more likely that Mark Sauer wanted to make that statement and used Sam Doggett name to do so.

171. In SDUT article, "Day of Contrition, a Gesture of Solace for the Falsely Accused," January 14, 1997 (by Defendant Mark Sauer) the reporter described Carol Hopkins' publicity stunt, a "Day of Contrition Revisited" and described her organization the Justice Committee as an advocacy group for defendants it claimed were falsely accused. She brought together playwrights and defendants specifically who had been acquitted of ritual abuse. Mark Sauer writes about Ms. Hopkins:

"She credits Akiki defense attorneys Kate Coyne …and Sue Clemens for the wisdom to put misguided psychotherapy and the outlandish concept of a satanic-ritual-abuse conspiracy on trial…'I believe this case would end this sad chapter in American history. But then it happened all over against recently in Wenatchee, Washington.'"

172. Response: This newspaper article made it appear as if Defendant Hopkins believed that all ritual abuse offenders who had been convicted were actually innocent, which indicates that Hopkins' position was decidedly unobjective. Apparently, Hopkins' allusions to "misguided therapy" referred to the disinformation in the SDUT about the Dale

Akiki case being a product of therapist suggestion. Sauer also quoted Defendant Hopkins as stating the belief that satanic ritual abuse ever occurred was "outlandish."

173. In "Some Therapies Just 'Crazy,' says Authors," January 14, 1997 (by Defendant Mark Sauer) the reporter reviewed FMSF Advisory Board member Margaret Singer's (deceased) claim that the therapy field was a haven for "whakos" and "charlatons" which included therapists who "convinced" clients that they were UFO abductees or were victimized by satanic cults. Sauer quoted FMSF Advisory Board member Margaret Singer remarks about "crazy therapies":

> "Critics – including many therapists and professors of psychology themselves are concerned that the field is unique among medical professions for the attraction it holds and haven it provides for certain wackos and charlatans. How else to explain therapists who end up convincing clients they are inhabited by hundreds of squabbling children and other creatures? Or that they've been abducted and experimented upon by space aliens? Or they're being tormented by people from their past lives? Or they've repressed memories of past satanic-ritual abuse?… Margaret Singer, a clinical psychologist and professor at the University of California Berkeley, has encountered these and scores of equally devastating counseling techniques in 50 years of research and therapeutic practice."

174. Response: Again, Mark Sauer was trying to align UFO Abduction experiences with satanic ritual abuse victims and continued to malign therapists who treat these victims using another FMSF advisory board member to make his case.

175. In SDUT article, "Town Without Pity, Mean Justice Exposes Abuse of Power, Bakersfield Division," March 7 1999, Book Review (by Mark Sauer) the reporter favorably reviewed a book about the "Kern County Witch Hunt" in Bakersfield and the appellate courts decision that reversed some convictions of people accused of ritually abusing children in that County:

> "But the besieged Dunn has plenty of company. Humes traces the 'Kern County Witch Hunt' of the early 1980s that coincided with charges of cannibalism and blood rituals – the hallmarks of the idiotic yet terrifying satanic ritual abuse scare that swept parts of the nation a decade and more ago."

176. Response: An objective new reporter would never have described a ritual abuse investigation as "idiotic."

177. In "Parents of 2 Seized Kids to get $750,000 – Escondido Case Arose from Story of Satanic Threat," Nov. 2000 (by Defendant Mark Sauer) the reporter described the eventual settlement between the Wallis family and the Escondido Police Department after two courts dismissed the suit, and two appeals courts reinstated it:

"The Wallis case was the product of a satanic scare that swept through San Diego and many other communities a decade ago. It was a time when certain psychotherapists, social workers, police officers and prosecutors became convinced that secret cults were subjecting children to all sorts of evil rituals, even murder. The threat here was considered so dire that San Diego County established a Ritual Abuse Task Force. But finding evidence was another matter, and the task force disbanded without fanfare.... According to court documents, Plante was told by Via that 'we have enough to pick up the kids.' But social workers never formally petitioned a judge, and no court order was ever issued to take the children into protective custody. "

178. Response: Mark Sauer dismissed a crime that actually occurs - satanic ritual abuse - as a "scare," making it appear there was no substance behind these allegations, and reported with apparent satisfaction that the Ritual Abuse Task Force was disbanded in San Diego. Mr. Sauer then repeated the mis/disinformation about this case which was found in court records and the appellate documents describing this case. It was alleged that Social workers had to have a court order before removing a child from a dangerous home environment. That is completely untrue. Juvenile courts are not open 24 hours a day, yet children are removed from their homes at all hours of the night and taken to a receiving home, which in San Diego is called Polinsky Center. Court orders could not be obtained in these circumstances even if a social worker wanted one.

179. In SDUT article, "Abuse or Unfounded Fear - Either Way, Talks to Delve into Ritual Child Torture," Sept. 21, 02 (by Defendant Mark Sauer) the reporter recounted his version of the Akiki prosecution failure and described the subsequent lawsuit against the county as "driving a stake through the heart of America's ritual abuse witch hunt." Sauer claimed that an upcoming conference about ritual abuse taught by Dr. Ellen Lacter, a colleague of Plaintiffs, sponsored by the 7th International Conference on Family Violence, meant ritual abuse was making a come-back into public awareness, which he was obviously against. Sauer wrote that District Attorney Paul Pfingst expressed "grave concerns that a widely attended and influential conference would feature workshops on ritual abuse, since he has seen no evidence that such cases exist":

"Pfingst, who used the Akiki case as a springboard to the district attorney's office in his 1994 campaign against longtime D.A. Edwin Miller, said in an interview, 'This theory was completely debunked in the early '90s ... It created so much harm in San Diego and across the country, and to see it even start to emerge again is very disturbing ... If someone wants to go back to teaching that satanic ritual abuse claptrap, we're going to have a serious discussion about whether law enforcement in San Diego should respond and expose it for what it is."

180. DA Phingst sent several Grand Jury members to attend this particular ritual abuse workshop so that they could report back to him about the content. Mark Sauer

continued to claim in this article that there was no "evidence" for ritual abuse, even though by that time he had read Plaintiff's Satanism and Ritual Abuse Archive, as future events will reveal. Clearly, Paul Phingst's statements were not the statements of an impartial District Attorney because he openly stated that he did not believe that ritual abuse occurred. This information revealed that ex-DA Pual Phingst's office was not taking allegations of satanic ritual abuse seriously, and it can be inferred that he was refusing to investigate this topic at all while he was in office which in Plaintiff's opinion would indicate malfeasance.

181. Despite the fact that 11 letters were sent to the San Diego Union-Tribune in response to Defendant Mark Sauer's news article quoting Paul Phingst, not one single letter was published, which indicates, in addition to the many inappropriately biased newspaper articles that have been described, that the editorial policy of the SDUT was dedicated to describing contrived positions about repressed memory and the ritual abuse of children, and the public was not allowed input.

182. Pam Freyd too wrote in the FMSF's September/October 2002 Vol. 11 No. 5 newsletter about this conference. Ms. Freyd wrote that there was no evidence to support the existence of satanic cults or "satanic conspiracies" and admitted to writing letters to the sponsors of this conference in attempts to get them to denounce the workshops. According to Dr. Ellen Lacter, Defendant Carol Hopkins also wrote letters in opposition to this workshop. Ms. Freyd complained in her newsletter that the organizers of the conference sent out a letter to the sponsors in response to her opposition letters which described the FMSF as a "fringe advocacy organization" and "mostly composed of those accused of abusing their own children." She wrote: "It seems that we were naïve to think that the topic of ritual abuse had been resolved. Let us hope that the general climate is such that we don't need to fear a return of the hysteria about ritual abuse and recovered memories of the early 1900's."

183. It is apparent that Pam Freyd's agenda is dedicated to denying the fact that SRA occurs. In recent years, Pam Freyd has tried to soften the FMSFs position in some forums by claiming that although it might be possible to repress a traumatic event, one cannot know with certainty whether that repressed memory was accurate or not without corroboration. The problem with this type of position is that it undermines all eyewitness or victim testimony. All victims access information about their abuse from their memory and are expected to testify on their own behalf. Each victim's credibility is assessed on a case by case basis and not all victims have corroboration of their own abuse. Repressed memory cases should not be treated any differently. In fact, because a memory was repressed or dissociated indicates that perhaps their memory contained information about a more brutal assault than the average case.

184. In the FMSF Foundation Newsletter, March-April 2004 Volume 13 No. 2, Pam Freyd wrote about the $10.6 million settlement awarded to Patricia Burgus and her family after she retracted her allegations of SRA in 1997 and sued her psychiatrist for "implanting" false memories. Freyd wrote:

"One would think that the huge retractor settlements and awards in recent years would prove a deterrent to others bent on finding ritual abuse in patients. Unfortunately, that is not the case. The California Psychological Association (CPA) will present a workshop on 'Psychotherapy with Ritual Abuse Survivors' at its San Diego conference on March 25 - 28. Speakers Ellen Lacter, Ph.D., and Mary Battles, MCFF, have long advocated the unscientific ritual abuse beliefs that have brought such misery to so many patients and families. It is amazing that the CPA displays such disregard for patient safety. However, as attorney Chris Barden has noted: 'The associations and licensing board have prove virtually worthless in policing their own ranks...' Dr. Barden thinks that both encouraging professionals to base their practice in science and bringing highly visible litigation are needed for change.'"

185. Plaintiff believes that this quote by FMSF founder Pam Freyd gave the impression that she was attempting to intimidate therapists who treat victims of ritual abuse. Plaintiff discovered further evidence that she believes proves that this is what is occurring after researching the FMSF newsletters, after reviewing a legal brief which is distributed by the FMSF of "malpractice" cases, and reading news articles about alleged "false memory" cases.

186. In summation, Defendant Mark Sauer has been the official spokesperson for the San Diego Union-Tribune about "repressed memory" and is apparently the reporter assigned to the coverage of allegations of satanic ritual abuse. Unfortunately, Mr. Sauer's newspaper coverage about these subjects has been found to be repetitive, simple-minded, inaccurate, misleading, and a disservice to the citizens of San Diego County. Mr. Sauer has failed to report that satanic ritual abuse is actually widespread and is occurring throughout the United States and the world. Over the years, in his articles about ritual abuse, Sauer quoted other people who described ritual abuse as "mythical," "misguided," "discredited," "a virus," "bull," a "hoax," "outlandish," "fringe," "dreams," "false memories," "hysteria;" "idiotic," and "claptrap." Mark Sauer described SRA allegations as coming from a "strange little corner," "therapist inspired," "witchhunts," similar to the "red scare," "lobotomies," a "satanic panic," "fantasies," "phony," "delusions," "bizarre," and equivalent to "space abductions." Sauer also quoted other people who described professionals who believed in or investigated ritual abuse (including a State Senator) as "fools," "ghettoized," "true believers," "crazy," "incompetent," "pathetic," "bozos," "misguided," "whakos," and "charlatans," and even claimed in the title of one of his article that it was the "Satan-Chasers" who were the real "terrorists," not ritual abusers who torture children. Sauer and others also used the trick of sleight of hand; anyone who believes in single instances of ritual or satanic ritual abuse must also believe in a "world-wide satanic conspiracy."

187. This history provides an overview about the ties and the serious irregularities involving two Grand Juries, the 1994 DA's office under the leadership of Paul Phingst,

Mark Sauer and the San Diego Union-Tribune. The positions of the Assistant Attorney General's Office in San Diego is currently questionable because Mr. Schons was quoted as stating that there was no evidence to support the reality of repressed memory, apparently due to the influence of Ms. Hopkins and the FMSF.

188. Plaintiff used to believe that it was a possibility that efforts to minimize satanic ritual abuse activity, especially by FBI's Ken Lanning, came from genuine concern and his efforts were geared toward downplaying a sensational crime which might lead to public panic or "witchhunts" against innocent people. Lanning argued that by making unprovable ritual abuse allegations it might make it more difficult to prosecute sex crimes against children. Plaintiff no longer believes these arguments have any merit: If there was more sophisticated knowledge about satanic ritual abuse it could only lead to more truthful case outcomes. If prosecutors routinely chose to educate juries about case convictions, and the modus operandi involving satanic cults, the reality of ritual abuse would be validated, institutionalized, and there would no longer be a strategic need to down-play ritual abuse activity in child sexual abuse cases - a long-term strategy which in actuality does not protect children, it only results in leaving an entire population of abuse victims without a voice.

189. Not only does it not appear that what occurred was a societal "backlash," in San Diego or elsewhere, in other words expected collective societal denial and retreat from a topic due to collective defense mechanisms (too much to bear) or attempts to rectify excesses, after analyzing the arguments of the opposition and watching their behavior for a decade or more, Plaintiff believes that Satanists and their supporters have orchestrated a systematic defense in order to cover up the fact that their children, en masse, began disclosing the reality of satanic practices and their horrific criminal conduct for the first in this century. The fact that some perpetrator/victims dissociate contributes to this type of criminal behavior remaining hidden and Plaintiff believes that is how generational evil perpetuates itself.

190. This information provides motivation as to why Defendants Carol Hopkins, Mark Sauer, David Copley, Dr. Elizabeth Loftus and the FMSF in general, might have wanted to ruin Plaintiff's reputation and career after she proved the reality of satanic ritual abuse on the world-wide web and later publicized facts about what she believed was corruption in San Diego County.

191. Because Plaintiff wanted to publicize what took place with Defendant Hopkins and the 1991-92 and 1992-93 Grand Juries, she gave this information to author Alex Constantine, after which he published a chapter in his book "Virtual Government," [1997] entitled, "Acclaimed 1992 San Diego Grand Jury Child Abuse Report Found to be Fraudulent by Subsequent Grand Jury."

**CENSORSHIP AND VIOLATION OF PLAINTIFF'S FIRST AMENDMENT
RIGHTS  TO FREE SPEECH ON THE WORLD WIDE WEB  IN 1995-2000**

192.  In 1994 Plaintiff befriended a CPS intern, "Joan," who disclosed that her child
had been ritually abused at the Presidio Army Base in San Francisco, California in the late
1980's. Joan provided Plaintiff with information about all the parties involved in the
investigation which included a satanist, Lt. Col. Michael Aquino who along with his wife
Lilith were High Priest and Priestess of their satanic cult, the Temple of Set. "Set" is the
name of the evil Egyptian deity who predates the Christian "Satan" in the Bible. Defendant
Aquino remained on active duty in the Army Reserves while leading this satanic cult for 20
years. Defendant Aquino's background included a Ph.D. in Political Science and he was
considered to be a specialist in Intelligence, Psychological warfare, and propaganda. Joan
claimed that although the army reached a settlement agreement with the parents, the
perpetrators were never criminally charged, and she thought that there had been a cover-up
by the military. Plaintiff agrees and will be documenting in this section what she discovered
about the Army's cover-up of the Presidio Day care case, the governments complicity in the
intentional creation of Multiple Personality Disorder which uses satanic ritual abuse as a
trauma base, and Lt. Col. Aquino's alleged participation in that activity.

193.  Plaintiff's colleague and friend Dale McCulley had followed the Presidio Army
Base case and other ritual abuse investigations in Northern California. In fact, Mr. McCulley
believed that because he became aware of these facts, his wife was deliberately killed in a ·
car accident. A cult member had given Mr. McCulley this information shortly after the
accident occurred.

194.  Mr. McCulley sent Plaintiff two appellate documents about the Presidio case
and Defendant Aquino proving that he had been processed out of the Army in 1990 after a
multi-jurisdictional sexual abuse investigation. The San Francisco Police Department had
declined to file criminal charges against Defendant Aquino, but in 1988 the Criminal
Investigative Division [CID] of the Army continued to investigate the allegations of abuse.

195.  According to Aquino v. Stone, 957 F.2d 139 (1991), Aquino v. Stone 768 F.
Supp. 529 (1992), and internal court documents to his case, Defendant Aquino was "Titled"
in a Report of Investigation for indecent acts with a child, sodomy, conspiracy, kidnapping,
and false swearing. For unknown reasons, the CID chose to release their Report of
Investigation three months after the statute of limitations ran. The child abuse charges
remained against Aquino because, according to the CID, the evidence of alibi offered by
LTC Aquino "was not persuasive." Defendant Aquino claimed "damages" because of his
discharge from the service which he attributed to the inaccurate records about him.
According to Aquino v. Stone, 957 F.2d 139 (1991) it clearly stated that Lt. Col. Michael
Aquino was suing for his discharge from the service. The document read, in part:

"In 1990, Lt. Col Aquino was processed out of the Army"

196. According to internal documents to his case, Lt. Col. Aquino was charged with false swearing after he tried to force the court martial of the Presidio Chaplain for reporting his own child's alleged abuse at Aquino's hands. Aquino mailed himself a postcard which had the invective "blow it out your ass," and attributed it to the Chaplain. It was later revealed that the Chaplain and his family did not reside in the area from which the postmark was mailed and so Aquino was charged with false swearing.

197. Other parents in Northern California openly accused then Lt. Col. Aquino of satanically ritually molesting their children at that time. In a May 17, 1989 San Jose Mercury news article titled, "Mendocino County Cops, Parents Seek Help in Child Abuse Probe," the parents gave an interview. The following information was reported:

"Ritual Sex Abuse of children has been under investigation in Mendocino County since at least 1984, when several children at the Jubilation Day Care Center in Fort Bragg said they had been sexually abused, tortured and forced to drink blood and eat feces. Debi Withrow, a Ukiah mother of two children who told police and Army investigators that [Michael] Aquino abused them, said parents and hope that their 'children will have their day in court.' Another parent, Dee Hartnett of Santa Rosa, said her daughter also told authorities that [Michael] Aquino was one of the people who abused her in a case in Mendocino County in 1986. The daughter testified against two of her abusers in a case in Santa Rosa that resulted in plea bargains last year. One of the accused Daryl T. Ball was sentenced to prison for 4 years in connection with the abuse of Hartnett's daughter and five other children. The other, Charlotte Thrailkill, was sentenced to 14 years in prison."

198. Of additional concern was the fact that, according to a November 16, 1987 article published in Newsweek titled, "Second Beast of Revelation," then Lt. Col. Aquino referred to himself as the Anti-Christ. Defendant Aquino is also interested in the Nazi's, believing himself to be the son of a Nazi SS officer. Both the Temple of Set and the Church of Satan have an order called the Order of the Trapezoid which has strong Nazi leanings.

199. After Plaintiff discovered the internet in 1995 she decided to use it as an opportunity to investigate cult groups, undercover, on her own time and publicize the reality of ritual abuse in a worldwide forum due to the cover-up of ritual abuse in San Diego County. Plaintiff was careful not to reveal any philosophical tenets, personal disciplines, details about employment, or the fact that she was a therapy intern while on the internet because the FMSF appeared to be targeting therapists, and Plaintiff did not want to be on anyone's "hit" list. Therefore, during the time-period Plaintiff was on the internet, she debated about crime only and did not reveal too much information about her beliefs or her profession but did disclose that she had studied the occult for many years. That meant that nobody knew what to make of Plaintiff when she wrote to alt. pagan and alt.satanism under the pseudonym of "Curio Jones" and "Karen Jones" about ritual crime as she obviously wasn't a Christian extremist.

200. In 1995, Plaintiff posted several news stories and the Appellate documentation about Defendant Aquino's dismissal from the Army to alt.pagan and alt.satanism from American Online [AOL]. Plaintiff did not make much comment but posted the documents only. Plaintiff considered Aquino's case to be potentially pivotal in providing evidence about satanic ritual abuse because he was a High Priest of the second largest open satanic organization in the country, the Temple of Set [TOS], who was investigated and consequented after a ritual child molestation investigation.

201. Defendant Aquino responded to these articles in alt.satanism claiming that the facts as Plaintiff presented them did not occur. Plaintiff then received an email warning from a "LeGrant" on August 20, 1995 who claimed that her posts were defaming Dr. Aquino. He said her facts were not correct and they mirrored Linda Blood's book "The New Satanist" which resulted in a lawsuit against Linda Blood and Times/Warner publisher. LeGrant reported that as a result of this lawsuit the book was "pulled from the shelves." Le Grant informed Plaintiff that he would report her to the System Administrators for American On Line if she did not discontinue her messages. However, because System Administrators are usually not responsive to anyone except the person who claimed they were "libeled," it makes it reasonable to assume that Defendant Aquino was the party who complained to AOL. Plaintiff's articles were then immediately cancelled, and she was told not to post messages to that newsgroup anymore, which in effect was censorship.

202. Plaintiff contacted Ms. Blood about the status of her book and the lawsuit filed against her by Defendant Aquino. Ms. Blood told her that even though there was a settlement agreement, she and Warner books could rightly assert that the lawsuit was without merit and it was settled simply to avoid court costs. She also stated her book had not been "pulled from the shelves."

203. Because Defendant Aquino appeared to have influence with AOL, and it was a clear infraction of Plaintiff's first amendment rights to free speech because no libel had occurred, Plaintiff found another internet company overseas from which to post which was anon.penet.fi located in Finland.

204. At first Defendant Aquino accused Plaintiff of being Linda Blood. Then Defendant Aquino and his wife, Lilith Aquino, proceeded to willingly debate with Plaintiff under several different pseudonyms such as hansrkr@aol.com, rennet@aol.com, gollux@aol.com and lancepryne@aol.com. Plaintiff and the Aquinos debated in detail about the facts as stated in Aquino v. Stone and about other ritual abuse cases in the United States and around the world.

205. Robert M., Defendant Aquino's best friend and fellow satanic cult member from the Temple of Set wrote in a message dated February 11, 1996 that Plaintiff was wrong in her assessment about the demise of Lt. Col. Aquino's military career and listed a series of titles of what appeared to be military documents. Plaintiff continued to interact with

Defendant Aquino because as an investigator she was authentically interested in learning what his defense position was and wanted to access more information about this case.

206. According to news sources, Defendant Aquino had inherited a multi-million dollar fortune in property in the late 1980's and Plaintiff was later told Aquino tripled his real estate holdings. Because of his wealth Aquino was able to file frivolous lawsuits against others as a means of intimidation and he had a history of intimidating people who investigated or wrote about the Presidio case. Those who had investigated or had written about this case had formal complaints filed against them which included Linda Goldston, reporter for the San Jose Mercury News, and San Francisco Police Inspectors Pamfiloff and Gallant. Other people found themselves frivolously sued, such as Time/Warner and Linda Blood who wrote the "New Satanists" in 1994 and Craig Lockwood who wrote the book, "Other Altars" in 1993, which too described Defendant Aquino's process out of the Army.

207. In other instances, Defendant Aquino's forte is writing very polite, intelligent, but affronted letters, with his Ph.D. signed after his name which does impress many people. Because one of the functions of military intelligence is to disseminate propaganda, Plaintiff learned about many propaganda techniques by watching Defendant Aquino's tactics on the internet during this time period. Those techniques included misinformation, disinformation, confusion tactics, misdirection, diversion tactics, and the "Big Lie," which is a tactic used when there is no other alternative. The technique of "revisionism" is used in order to rewrite the history of whatever occurred that is not favorable to the propagandists.

208. At the beginning of this lawsuit it was alleged that the FMSF appeared to be interested in providing fraudulent defenses for satanic cults by, among other tactics, claiming that the therapists who treated victims intentionally planted "false memories" of satanic cult involvement into their client's minds. In 1995 a self-described generational satanist posting in alt.satanism, Defendant Tanya Lysenko aka Tani Jantsang, founder of the organization the "Satanic Reds," came to Plaintiff's attention. Plaintiff never wrote to Defendant Lysenko/Jantsang during this time period because she thought she appeared to be unstable. Lysenko/Jantsang wrote to satanist Robert M. that he should never deny that satanists committed crimes because she did not believe that these extreme statements made satanists appear credible when defending themselves against those who provided evidence which proved criminal conduct was committed by them. Instead, Defendant Lysenko/Jantsang wrote that of course Satanists commit crime, and provided information about a better tactic:

> "Better, do as we would do: EXPOSE the doctors (not the accusing patients) as brainwashing them for insurance fraud. HA! Another one well done. (I wrote to COS contact and TOLD THEM this would be done, before it happened) Nothing magical about it, stupid."

209. Plaintiff interpreted this statement as a blatant confession that Satanists were

indeed using the legal system to target therapists who treated satanic ritual abuse victims. In addition, Plaintiff discovered in a Satanic FAQ dated April 10, 1996 that a link to the FMSF's web site was included within it for those satanists who found themselves "falsely accused" of satanic ritual abuse. By making a referral to the FMSF, it automatically provides potential perpetrators of satanic ritual abuse with a "false memory" defense.

210. From 1995-1996, Plaintiff continued to debate with Defendant Aquino - just to keep him talking - as she assumed there were other law enforcement officials reading this newsgroup as well. Although Plaintiff had originally interacted with Aquino because she was genuinely interested in his defense, she discovered that the more messages Defendant Aquino wrote, the guiltier he appeared to be. Plaintiff stuck to the facts and debated him about only that which she could prove because she was aware that she could still be held accountable for libel even though she was using a pseudonym. Defendant Aquino responded in turn by lampooning Plaintiff as much as possible, claiming she was a "pedophile" and a "perv" who had ritual abuse "fantasies."

211. As an example of one of his messages, dated February 27, 1996, Aquino called Plaintiff a perv' five times. Plaintiff has realigned the messages so that it is easier to read, but has not changed any of the content. The message read, in part:

"Well, well well if it isn't old Curio II the child sex dream creep yet again. Come back for more sex fantasies have you? Wouldn't it be less expensive to say nothing of less humiliating for you to just go out and buy some dirty magazines for yourself? Or do you just like to strut your perv here on alt.satanism because you can only get it off when a whole lot of people are looking at you in disgust while you masturbate."

"You know, you keep trying so hard here to sell the same pair of useless old shoes long after everyone has recognized you for the FUNDY PERV you are. It has been fun kicking you over the goalpost against and again but even I am getting bored with this broken record babbling of yours. I figure Curio II is just one of those perv's who can only get off on a dirty devil worshiper child sexual fantasy, and this one makes you drool the most just replaying Adams Thompson's money train mock up in your brain, so you hug it like some snotty little teenage kid with his first copy of PLAYBOY. What a jerk, excuse me I guess I should add – off to that."

c>7) His careful statements about the time frame and then his next
c>statement is contradictory. He says the FBI report #FD-302,
c>1/14/87 states that the Thompson kid had been attending the

c>Presidio day care center since Spring 1986. Spring is March thru June.
c>This is the obvious reason the Statute of limitation was June 86. Instead,

c>he is using the dates on the police report of 8/14/87.

c>Excuse me again!! Statute of limitations was up *June 89. Last known
incident was June 86 which was the time frame the Army used.

"Are you talking to YOURSELF here or what. But whatever, and I think I
said this before but of course you couldn't deal with it: YOU'RE
the one who was YELLING AND SCREAMING about the SFPD report
in which Chaplain Adams Thompson said that Kinsey was kidnapped and raped
BETWEEN SEPT 1 AND OCT 31 1986. Know why old man Adams T
picked that bracket? Because THAT was the ONLY TIME that Kinsey was
under Hambrights' control in his class at the Presidio Center, before that
she was with OTHER teachers there and had NO contact with Hambright. So if
Aquino was proved to be in Washington that whole time, that's
a ****ing IRONCLAD ALIBI, you miserable perv fraud.

What are you going to do, sort of "move the date backward several months
until Aquino is back at his previous job in the Presidio?" Gee wow that's
COOL police work! Maybe you could use some white out on what
Chaplain AT SAID TO THE POLICE and make that inconvenient
Sept-Oct period kind of disappear?  Maybe no one would notice the white
out glob?

Oh but drat, if you move the DATE back several months then you
move HAMBRIGHT right out of the picture and Chaplain ATs money
train story ONLY works it Hambright was in it because AT went into
so so much DETAIL about everything that HAMBRIGHT was supposed
to have done.

So your jerk-off house of cards isn't going to stand.  Even in this last
pathetic little ploy of yours, PERV. Move the date into Adams
Thompson's accusation period and Aquino is ALIBIED IN WASHINGTON.
Move it back months until he was still at the Presidio and  HAMBRIGHT
had no contact with the kid. To say nothing of the dear sweet chaplain
being caught RED HANDED telling his FAKED UP STORY with
FAKED UP dates to a cop.

You're wasting my time Curio, really wouldn't you rather spend the money
for a skin mag and head for the nearest Grayhound Bus station men room?"

212.  Aquino claimed that the Presidio parents were in fact greedy people who

"abused" their children by making them falsely believe they were abused in order to extort money out of the military. Aquino continued to deny that he was ever processed out of the Army in 1990 but stated he was forced into part-time service due to "illegal" behavior by the Army Personnel Department. Aquino claimed he had been assigned to the U.S. Space Command after 1990 and voluntarily retired in 1993 after which he received a Meritorious Services Certificate in 1994.

213. In 1996 Plaintiff sent for the internal documents to Aquino's lawsuit against the Army, Aquino v. Stone, Civil Action No. 90-1547-1, in efforts to discover whether there was further evidence about Aquino's alleged process out of the Army because he was denying that was what occurred.

214. Plaintiff discovered that under "Plaintiff's Exhibits, Exhibit Number 12," of his damage claim it clearly stated: "Evidence of Plaintiff's separation from active duty." Under Complaint for Declaratory Judgment and Damages, it stated under No. 6: "The result of such inaccurately maintained records and the willful and intentional misconduct of the Defendant was that Plaintiff was denied by an Army board action the opportunity to continue Plaintiff's career on active duty, to be promoted in the normal course and to retire at the end of Plaintiff's active duty career, all of which has damaged Plaintiff." Under Cause of Action, No. 7, it stated: "The willful and intentionally failure to accurately maintain this Titling action has caused Plaintiff to lose Plaintiff's active duty Army career and attendant benefits to include retirement benefits." In a transcript dated May 31, 1991 of these court proceedings, then Lt. Col. Aquino's own lawyer Gary R. Myers claimed about his client that the "dogma that he predicates his religion upon comes from Egyptian pre-Egyptian theology having to do with the anti-Christ view of things ... As an Army Officer he was utterly superior, but they through [sic] him out."

215. Under the Government Exhibit List, No.15, it included a: "Handwritten therapy synopsis of Pamela Hudson." [See Satanism and Ritual Abuse Archive of Jubilation Day Care/Barbara and Sharon Orr (1984)] Several of the victims in the Jubilation Daycare Case were interviewed by the CID was described in a May 16, 1989 Press Democrat news article, Ukiah Pair Keep Molest Case Alive:

"Local authorities for almost four years have insisted their investigations are inconclusive about repeated allegations from Debi and Greg Withrow that his two sons, from a former marriage, were victims of ritual molestation during ceremonies witnessed by a large group of adults ... Last week, criminal investigators with the Army reportedly questioned Lt. Col Michael Aquino, the satanic priest implicated in the Presidio case, about allegations he was involved in molestation cases in Mendocino and Sonoma counties. Besides the Withrow angle, Aquino was questioned about sexual abuse at the Jubilation Day Care Center in Fort Bragg."

216.  All of this information combined proved to Plaintiff that Lt. Col. Aquino was processed out of the Army in 1990 after a multi-jurisdiction ritual abuse investigation and so felt confident stating that is what occurred.

217.  During the time period that Plaintiff was writing in alt.satanism, (1995 to mid 1996) two Satanists, "L. Leboucher," aka Scott L. (now Ph.D. in physics) and computer hacker, and satanists Kevin F., routinely defended Plaintiff and supported her rights to free speech. Scott's style of "defending" Plaintiff was to call her a "loon" and a "nut," (who still had a right to be heard) while insulting the Aquino's. Reportedly, Scott and and Kevin had been members of the TOS but no longer cared for the organization and both later affiliated themselves with the Church of Satan. The Church of Satan used to be the largest open satanic organization in the United States. They professed to condemn criminal activity, but Anton LaVey [founder] wrote in the Satanic Bible on pg. 88 that it was acceptable to sacrifice one's enemies, especially an "obnoxious and deserving person."

218.  In approximately 1995, Scott L. suggested to Plaintiff that she compile the documents about the Presidio case and investigate the matter more seriously. Scott then told Plaintiff via email that he would try to assist her to post messages anonymously to the internet but because that would have required that these messages be sent from Plaintiff's home computer to Scott she declined his assistance. Because Plaintiff wanted to protect Scott, she took his name off of all emails written by him which were stored on her computer, and she never mentioned to anyone at all that he appeared sympathetic to her cause because she thought that might endanger him. In 1996-1997, Kevin F. and Scott L. wrote to Plaintiff a few times apparently wanting to become involved in her investigations, however, Plaintiff never responded to them about this issue.

219.  In approximately 1997-98, Scott L. told Plaintiff he worked for the National Security Agency [NSA] and claimed that his particular email address was safe to send messages to because it would only be screened by the NSA. This led Plaintiff to believe Scott was possibly gathering information about satanic cults for the NSA while pretending to be a satanist, but Plaintiff couldn't be sure, so she never gave him any identifying information.  Because Plaintiff had heard rumors that the NSA conducted illegal surveillance on the public she was not comforted by Scott's admission that he worked for this agency so she cut off contact with him. However, Plaintiff still thought of Scott and Kevin as "friends" and these two satanists continued to openly defend her when she was verbally attacked in alt.satanism although Plaintiff was worried because Scott publicly wrote at one time that he knew her real name and would divulge it for $30,000, but she thought he was joking.

220.  In 1996, Defendant Aquino contacted the owner of the anonymous server – anon.penet.fi, operated by Julf Helsingus, in further attempts to censor Plaintiff. In a message by John Yourill, a member of the Temple of Set, he responded to Kevin F. who raised this issue in a message dated March 13, 1996.   The message read, in part:

>3) Aquino attempted to get the name of a critic posting from the anon.penet.fi server and ceased harassing Julf Helsingus only when it became clear that he just wasn't going to get that info no-how no-way.

"The critic, someone on the Satanic Ritual Abuse trail, was conducting a smear campaign against Dr. Michael Aquino regarding the Presidio child-abuse case. Two complaints by two different officials of the Temple of Set were sent to Julf expressing the belief that the anon postings by "Curio" were an abuse of anon.penet.fi – the matter ended at that point."

221. It appeared that Defendants Aquino was again trying to have Plaintiff's new overseas account cancelled in a second attempt to violate Plaintiff's First Amendment Right to Free speech because no libel was occurring. On August 4, 1996 under the pseudonym Hansrker, Defendant Aquino misrepresented the facts and falsely claimed that a "deep throat" from anon.penet.fi had revealed to him that Plaintiff was actually author Alex Constantine.

222.  In approximately 1996, Plaintiff read a message in alt.abuse.recovery which claimed that a man by the name of John Price, Ph.D, from the newsgroup sci.psychology.psychotherapy [SPP] had written a message in that newsgroup stating that not all sex with children was harmful which appeared to have traumatized the membership of this newsgroup.  Plaintiff discovered a core group of people in SPP who exhibited very odd behaviors. They were John M. Price, Ph.D., a psychologist affiliated with UC Davis; Leslie E. Packer, Ph.D, a Tourettes Disorder Specialist; Bill Goodrich, Ph.D, M.F.T., a licensed therapist; a Nancy Alvarado, Ph.D., a psychology teacher from UC San Diego, a John Clarke also posting from UC San Diego; Peter Hood (pseudonym) who generally behaved as if he was crazy; and a Los Angeles Police officer, Lorne G. After observing them for some time, Plaintiff believed these people were attempting to drive posters off of this newsgroup who wrote on behalf of children so that they could disseminate FMSF propaganda and viewpoints from NAMBA - North American Man-Boy Love Association - without any opposition.  These people appeared heavily invested in claiming that not all sexual activity with children was harmful and ritual sexual abuse did not occur. Other red flags were that they were friendly with Defendant Aquino, and appeared to be proficient in psychological operation strategies such as divide and conquer, misdirection, and isolation techniques. It became very obvious that all of these people were examples of the extreme element of those who supported the FMSF. Their Modus operandi was to isolate and harass their opponents so that they would lose their will to continue opposing them and thus cease to be a political opponent. Because of that, Plaintiff - who is an activist - continued to post information to SPP and others about the FMSF and satanic cults as a public service.

223. Due to their behavior they gave themselves away as legitimate parties because of many factors: Their positions were outrageous and contrary to the best interests of children, they abused those who didn't agree with them, and Plaintiff discovered that Bill Goodrich posted messages about child pornography on several newsgroups and,

unfortunately he appeared to be using his credentials to support pedophilia. Plaintiff believes two messages written by Bill Goodrich, dated May 15, 1997, gave that clear impression. In both messages, Goodrich began with a denial that he actually viewed child pornography, but claimed instead that the pictures were described to him by a "trusted confidante." In a message, dated May 15, 1997, cross-posted to the internet newsgroups alt.binaries.pictures.erotica.pre-teen, alt.sex.incest, and alt.sex.pre-teens it read, in part, highlighting the most relevant passages by Bill Goodrich in response to a Mr. Hunt about the effects of child molestation:

> Hunt:  Point being DIASTER! [sic] BROKEN HOMES DESTROYED CHILDREN !!!"

> Goodrich:  "In many cases, the children are far more severely traumatized by the reactions of their families and/or "the authorities" than they were by the events themselves. And that "secondary" trauma continues, with the child being treated like "damaged goods" or even a social leper for years and coming to believe that s/he is the cause of many of the subsequent problems in the family."

> Hunt: "nothing is more pure than the innocence of a child"

> Goodrich: "Few things are more misunderstood than the "innocence" of a child. It is largely a social myth, with the illusion being reinforced by a combination of demonstrated ignorance, physical vulnerability, and limited cognative [sic] sophistication (see Piaget), as well as a seemingly inborn response by most adolescents and adults toward preadolescent children."

> Hunt:  What is the attraction for the sic fuckers out there that defile children in this country. WE NEED ANSWERS TO!"

> Goodrich: "The answers are there, but you will not like them. The attraction is often within the normal range of variation of human sexuality (contrary to social convention). The "defilement" is primarily a matter of interpretation on the part of people OTHER than the child and the w/m. As indicated above, the trauma and other damage of the child is far too often primarily a result of real or expected reactions of others after-the-fact (except in cases of rape). Even the rapists tend to be acting on the same motivations and limitations of their adult-targeting counterparts… If you want Cosmic answers as to why such young girls are not somehow Divinely protected from those things YOU hold in such horror, I would refer you to the Book of Job (if you are a Christian)."

224.  In the just cited message, Plaintiff believed that Dr. Goodrich attempted to make it appear that it was societies response to a molested child that caused trauma, not the inappropriate sexual activity itself. Plaintiff discovered that this claim was a reoccurring theme in SPP. Goodrich also claimed it was normal to be attracted to a preadolescent child,

and he inappropriately questioned whether children should be considered "innocent." Plaintiff does not believe that attraction to preadolescent children is within the normal range of human sexuality and that is why the Diagnostic and Statistical Manual of Mental Disorders [DSM] classifies pedophilia as a psychological disorder that needs treatment. The DSM (1994) pg. 527 describes pedophilia as:

> "Individuals with Pedophilia generally report an attraction to children of a particular age range. Some individuals prefer males, others females, and some are aroused by both males and females. Those attracted to females usually prefer 8 - to -10 year olds, whereas those attracted to males usually prefer slightly older children....Some individuals with Pedophilia are sexually attracted only to children, (Exclusive Type), whereas others are sometimes attracted to adults (Nonexclusive Type). '

225.  The second message by Dr. Bill Goodrich, dated May 15, 1997, cross-posted to the internet newsgroups alt.binaries.pictures.erotica.pre-teen, alt.sex.incest, and alt.sex.pre-teens was Dr. Goodrich's response to an irate poster, "Ronald W. Simmons," who responded to another poster, "Dinkydow's" claim that pornography did not reduce the crime rate. Bill Goodrich's message read, in part:

> Simmons: "You day [sic] that kiddie porn is OK, because if people don't have it as an outlet, they would go out and do it. Duh. Where do the pictures come from, unless someone goes out and does it?"

> Goodrich: "From what I have seen (in the descriptions, etc.), a very large percentage of the pictures here lately have not even been nudes, much less sexual of the nudes, the vast majority come from legitimate nudist sources (again, no sex). "Of those which DO involve sex, the majority come from two sources: 'legitimate' European (and a few American) child-sex publications of 20-40 years ago (made under careful conditions, and - according to some follow-up studies and the statements of a few people such as ODIN ... statements which reasonably match those of other known models – in such a way as to leave the  models without psychological harm), and photo essays form certain oriental "Child-brothels" (legal, but less benevolent and ethical). Of the few remaining, several have been shown to be fakes (created from electronically pasted - together pieces of other pictures), a very few have been identified as coming from genuine instances of abuse, and the few remaining are of unknown origin. With the exception of the last two groups, the picture clearly to NOT come from some pedophile 'going out and doing it."

> Simmons: "Post your real name, Dinkshit, and let us know who the child molester is. You got something to hide? Sure you do."

> Goodrich: "It would seem that you do, as well. One category of tools some of us (psychotherapists) use to evaluate patients/clients is that of 'projective' tests (such as the Rorschach 'ink blots') in which the subject views a relatively nonspecific image

and 'tells a story' about it. In light of that, I find the following quite interesting:"

<u>Simmons</u>: "Your arguments don't hold water. Your posts demean humankind. Most of your posts contain the depiction of a crime. Like I've said before, sure, it happens. Ten year old girls masturbate, and are caught by their brothers, and they wind up having sex. It does, indeed happen." ... "But, not five-year olds who have Dad's hard penis shoved down their throat. That's not consent. That's rape. Get real, dink. You have nowhere to go but up from the gutter you're in."

<u>Goodrich</u>: "You look at images of seeming imminent or in progress sex between a fairly young child and an adult, and you tell a story of violence, danger, and degradation involving family members. Accordingly, you respond with angry, degrading language ... Several of the others here look at the same pictures and tell a story of mutually desired and enjoyed activities of shared intimacy. Of happy, well-loved children in danger from a hysterical society perhaps, but not from their partners. They respond to bitterness such as yours with a degree of puzzlement and cynicism just as they would to anyone else making such bitter and angry comments about other loving relationships ... As many of them are well aware, sexual attraction to 'illegally young' partners is far more 'normal' than you seem to credit. And the psychological research has gone a long way toward refuting the 'common wisdom'' about the supposed harms of adult/child sexual relationships and activities, as well as determining the elements which can (and the ones which can not) predict the probability of 'harm' from them. For your own peace of mind – and your own 'mental health' – you might want to become familiar with that research. You might also get some help in working out the real sources of that hostility."

226.  Despite what Dr. Goodrich claimed in the above message, children filmed or photographed in sex acts with adults "under careful conditions" are not called "models," they're called victims, although he claimed the perpetrators molested the "models" in such a way as to leave them without "psychological harm." Dr. Goodrich also improperly compared a person's negative opinion of child pornography to a Rorschach projective test. Projection is a defense mechanism in which an individual attributes their psychological state to another, rather than taking responsibility for their own thoughts and feelings. A Rorschach test is a series of ink blots of somewhat undecipherable images in which the client is supposed to describe what they "see." In that way, the psychologist can evaluate the inner workings of the clients mind. However, child pornography is not a benign ink blot, it is an inappropriate image of the sexualization of a child which a normal person should find disturbing. Plaintiff believes it appears that Dr. Goodrich was misusing psychological principles in efforts to hide an agenda.

227.  Because of these types of messages, it appeared over time that Dr. John M. Price, Dr. Bill Goodrich, and others were supporting the behaviors of pedophiles. Dr. Leslie Packer and Dr. Goodrich would often post in concert and wrote that they did not believe "just fondling" was harmful for a child.  Plaintiff disagreed and wrote that adults would not

tolerate "just fondling" from an adult they were unattracted to and small children were not expected to like it any better. Plaintiff discovered that Nancy Alvarado's role appeared to be to provide intellectual excuses for their unusual and aggressive behavior.

228.  On March 17, 1999, Dr. John Price wrote a message in SPP clearly stating his position that not all children are harmed by sexual contact with adults, and that some children even benefited from those experiences. Price claimed that it was the professionals who investigated these crimes who were the actual abusers because they were defining "abuse" for children inappropriately. These arguments are commonly made by North American Man/Boy Love Association who are famous for orchestrating and citing "research studies" which support their positions that pedophilia is "harmless."

229.  In a message, dated July 3, 1997, SPP's Leslie Packer listed the various psychologists and psychiatrists who were being sued in FMSF style lawsuits and appeared pleased with rulings that excluded repressed memory as evidence. Dr. John Price's support of this mission was apparent after Plaintiff read the introduction to his FTP site:

> "Files here are related to the hysteria of Satanic Ritual Abuse of children, mostly located in US daycare centers. These reports of horrendous crimes perpetrated on children in the daycare, where adults had come and gone but never saw anything out of the ordinary, caused large costs in terms of trials, prison time, etc, throughout the country. For the most part, these all seem to be made up stories that cost only the accused their lives, their fortunes, and the home or of their names. The accusers got off scott free."

230. John Price had the depositions of David Calof and Bessel van der kolk in his FTP web site which were conducted by attorney R. Christopher Barden. David Calof later claimed that Barden was using the legal system in order to harass him and the court ruled in Mr. Calof's favor.

231.  The following information is being provided to document the clear, overwhelming and pervasive pattern of harassment that Plaintiff experienced by Defendant Aquino and his associates which were in apparent efforts to cover up crimes against children.

232.  Plaintiff could not believe these people were writing under their own names, but in fact they were. Dr. John Price at times posted from a UC Davis account and was even elected as co-moderator in sci.psychology.psychotherapy.moderated in spite of the fact that he engaged in ad hominem attacks, began calling the Plaintiff "Curidiot," a "kook," and cross-posted most of her messages to alt.usenet.kooks, a newsgroup they appeared to have control of. John Singleton or "Raven," clearly a friend of this group, nominated Plaintiff for "kook of the year," and John Price seconded the motion on August 3, 1998 after she posted information about ritual abuse in obvious attempts to discredit Plaintiff. Dr. John Price and Leslie Packer were very emotionally abusive to her and other posters, in particular, to a man

by the name of Brad Jesness. John Price's cruelty to him culminated in his creation of a newsgroup called alt.brad.jesness.die.die.die on July 6, 1997.

233. Price and others continued to isolate Plaintiff on the newsgroups, engaging in ad hominem attacks, and routinely had her messages and web page accounts cancelled. Plaintiff continued to create and post messages from new accounts and attempted to maintain good humor about this situation even though she did not appreciate being censored by others promoting themes which were contrary to the best interests of children and she did not like bullies.

234. Although Plaintiff's internet accounts were routinely cancelled she was never provided a reason as to why. Eventually this behavior was traced to Dr. John Price and Defendant Aquino, and it quickly became apparent that cancelling Plaintiff's accounts was a game to them. In a message dated Dec 6, 1997, John Price wrote a message to Plaintiff about this :

"Note that you LOST a hotmail account, AND a dejanews account."

235. Dr. John Price was caught trying to cancel a dejanews account of Plaintiff's in a message dated November 19, 1998 titled, "Dejanews supports anonymous libel," which was sent to Deja News Abuse Staff regarding a message she had posted about Dr. Leslie Packer and Michael Aquino. On pg. 2 of this message, Dr. Price wrote: "Dear People, you have both killed this person's accounts before." He then gave them ideas about how to track down Plaintiff's identity and requested that they censor her posts which had already been archived.

236. Shortly after this incident occurred, John Price, Ph.D. wrote a message using the words "Satanic Troll" under his organization heading. Obviously, these were not the actions of legitimate professionals.

237. Plaintiff discovered that these pseudo-professionals were staged in SPP just in time to discuss and defend a controversial study about child molestation, "A Meta-Analytic Examination of Assumed Properties of Child Sexual Abuse Using College Samples," published in Psychological Bulletin (1998) Vol. 123 No. 1 22-53 which cited in their conclusions (after canvassing College students self-report about whether they experienced harm or not from their childhood sexual molestation) that a "willing encounter with positive reactions should be labeled simply adult-child sex, a value neutral term," rather than pejoratively as "sexual abuse." The authors went on to state the same assessment should occur with adult-adolescent sexual encounters which is not a surprise since one of the authors of this study was traced to NAMBLA. Radio announcer Dr. Laura opposed this study which reportedly made history as the only study which was ever condemned by the House of Representatives.

238.   In 1996, the anonymous server Plaintiff was posting from no longer provided services and she was then forced to post from an internet company, ElectriCiti, in San Diego which she had signed up for under a pseudonym. On approximately December 14, 1996, Plaintiff publicly posted the internal documents to Aquino v. Stone from this internet company which proved without doubt that then Lt. Col. Aquino had been processed out of the Army. LAPD Officer Lorne G. responded immediately reporting that children in the Presidio case were led by therapists to make the statements they made to officials and there were no grounds for the discharge of Aquino. Lorne G. then wrote several public messages, citing his background as a police officer, and compared ritual abuse allegations to an "urban myth" which fell into the same category as "organ stealing and albino alligators."

239.   Immediately after Plaintiff posted these documents to the internet, Dr. John Price and Dr. Leslie Packer from SPP assisted Defendant Aquino in attempts to trace Plaintiff's email account, and they mistakenly accused San Diego hypnotherapist Stephanie Rothman of being Plaintiff after she and John Price tried to access Plaintiff's computer and timed the posting of one of her messages. After asking an employee of ElectriCiti (the internet company) who the account owner was, unfortunately and mistakenly hypnotherapist Stephanie Rothman was named. According to Ms. Rothman, Price, Aquino, along with Defendant Carol Hopkins then began harassing her and sending her messages, along with threats they were going to sue her, until she was forced to publicly ask them on January 23, 1997 to stop harassing her and to leave her alone. Ms. Rothman wrote under the account "hypno":

"HELLO! I am no more Curio than I am Mickey Mouse. In researching this insanity, I have been aware that two other people have been falsely accused of being Curio besides me. I feel that I am being used as a patsy to flush Curio out ... My name has been bandied about over 11,000 times. I have been harassed. I have lost my boyfriend over this mess ... (because of the stress it has caused me) ... Major craziness has ensued including threats and harassment toward me by several people in these newsgroups. Since I don't have any champions, except for Curio who keeps insisting that I am not she (WHICH I AM NOT) and so I felt I had to say something on my own behalf. If you want to quit smoking, I can help. If you are after Curio or you have any affiliations with SRA, sorry, I am not your man. Please leave me alone."

240.   This false identification and the subsequent actions of the Defendants proved that those who were identified as Plaintiff experienced harassment which is why Plaintiff wanted to maintain her anonymity. Plaintiff was initially surprised that the "Doctors" on SPP would work with and assist in Mr. Aquino's efforts to identify her but the pursuit of Plaintiff's identity by these people and others continued. Dr. Leslie Packer then wrote the following message:

"I will also assist anyone who wants to ID you in RL so that they can sue the sh*t out of you for your smears and libel all over the internet. Including Dr. Nancy Alvarado, Dr. John Price, Lorne Gilsig, Dr. Chris Barden, and others."

241.    The problem with the above statement was that Plaintiff was not committing "libel," she was only rebutting the outrageous positions of these other internet participants. Plaintiff experimented and found the same state of affairs on several newsgroups. It appeared that Aquino and supporters of the FMSF were staged on many newsgroups and forums acting as "agent provocateurs" (trying to instigate outbursts from their opponents to use against them at a later time), and trying to censor or belittle those who threatened their agenda. Again, they seemed heavily invested in censoring or discrediting their opponents by any ruse imaginable - including by making false allegations of "libel" - and they tried to create a situation in this world-wide forum in which their propaganda was the only side heard. Plaintiff used to submit her web pages to altavista search engine and on a repeated basis the URL would disappear within days. Plaintiff was later told that Scott L. and Defendant Devereaux were monitoring the search engines on behalf of their cult and routinely deleted content.

242.    Shortly after Plaintiff posted the documents that proved how Aquino's military career ended, Defendant Aquino contacted Plaintiff's internet provider Electriciti falsely claiming that he was being libeled by Plaintiff. Aquino requested that Electriciti provide Plaintiff's identity to him and cancel her account which they refused to do. In April 1997, Defendant Aquino filed a lawsuit in San Francisco against Electriciti - Aquino vs. Electiciti, Case #985751 - in attempts to force owner Christopher Alan to reveal Plaintiff's identity. At worst, the exchanges between Plaintiff and Defendant Aquino occasionally descended into raucous debate, however, nobody was being libeled or "threatened" at that time.

243.    Despite the fact that there was no evidence which would support a claim of "libel" or "threats" made by Plaintiff, Defendant Aquino continued to make these false allegations to the media. Plaintiff did not know what to do about this except to take each media misrepresentation and publicly explain what had actually occurred with Defendant Aquino.

244. For example, in a September 1997 article, published in "Web Magazine" by Jamie Reno, it was alleged that Plaintiff wrote "threatening" messages to Defendant Aquino which she had not. Aquino had completely fabricated this allegation. At that time, Plaintiff did not send email to any of these manipulators because she knew it would be easy to change the content of emails via a word processor. Therefore every message Plaintiff wrote was public and was accessible via news searches. Reporter Reno quoted Defendant Aquino's claim about a purported message by Plaintiff.:

"I can find you whenever I want…and it soon will be much more than just finding for both your perv wife and you."

245. Plaintiff never wrote such a message. If threats had been made the appropriate response would have been to contact law enforcement. Apparently Aquino never took that action. In addition, ElectriCiti owner Christopher Alan read every message posted by

Plaintiff and found that no defamation or "threats" had been written by her. Instead Mr. Alan believed that Defendant Aquino's lawsuit was simply an attempt to force Electriciti to reveal Plaintiff's name which Mr. Alan refused to do. Obviously Mr. Alan would never have taken that position if he believed that one of his alleged customers was writing threatening messages to anyone. Plaintiff along with others repeatedly asked Aquino to produce any message that she had written that constituted a "threat" or was "libelous" in any way but Aquino was unable to provide that information.

246.  After the first lawsuit against Electriciti was dismissed in mid 1997, Defendant Aquino sued the owner of Electriciti, Christopher Alan, personally. Mr. Alan gave an interview explaining why he refused to cooperate with Defendant Aquino. Specifically in "Net Magazine":

Net Magazine: "How do you explain your inability to assist Dr. Aquino"

Christopher Alan: "Inability? We have plenty of ability, it's incentive to 'assist' Dr. Aquino we have precious little of. Gee, your ISP is asked to help your local anti-christ obtain your true identity and address. Let me think about that for about two seconds ... Ahh, no."

247.  The lawsuit against Mr. Alan was dismissed in late 1997 due to the CDA precluding internet companies from liability due to their customer's messages. Years later in 1999, Plaintiff accessed documents from this lawsuit and discovered that Aquino had submitted fraudulent evidence to the court in San Francisco. He purported to "summarize" a list of statements from "Curio" which appeared harassing or threatening but neglected to attach the actual messages themselves to the court documents to prove that she had actually written those messages.

248.  Electriciti's attorneys had requested that the Judge dismiss the case as a SLAPP lawsuit - Strategic Lawsuit Against Public Participation  - but that request was denied. Plaintiff believes that the Judge did not rule in Electriciti's favor and chose not to designate this lawsuit as a SLAPP because as Aquino had summarized messages allegedly written by Plaintiff on a sheet of paper claiming that she had threatened and libeled him, that false information might have influenced the Judge into believing that Aquino's claims had merit. However, again, Plaintiff and ElectriCiti believed that Aquino's lawsuit was intended only to force Electriciti to release Plaintiff's name to him for nefarious reasons in furtherance of the conspiracy to violate her First amendment rights to free speech, ruin her reputation and career, and expose her to harm.

249.  Plaintiff was surprised to see in Media Law Reporter 26 Med. L. Rptr. 1032 (1999), another blatantly false misrepresentation about this lawsuit. It was stated that Plaintiff had written that the Aquinos were "ring leaders of an international conspiracy to further the satanic ritual abuse of children, and that they engaged in kidnapping, cannibalism and murder of anyone who stood in the way of this international conspiracy." Plaintiff

never wrote such a statement at that time on the internet. Instead, it appeared that these were Defendant Aquino's attempts at revisionism so that others accessing this information would believe that Aquino's claim had merit when in fact his case had been dismissed. It appeared that around this time period, Defendant Aquino stepped down as High Priest of the Temple of Set, and a few years later it was reported Robert M. left the Temple of Set as well. However, Robert M. is presently listed as the contact person for the Temple of Set's web page.

250. From approximately October 1997 on, Aquino posted a "Periodic Statement Concerning 'Curio," under his real name while attempting to engage Plaintiff in continued debate under various pseudonyms. In these Period Statements Defendant Aquino falsely claimed that Plaintiff was an "internet stalker" who was posting a "steady stream of false and defamatory" statements and "threats" about him and his family in apparent efforts to disguise the fact that Plaintiff had caught Aquino misrepresenting the facts about his military career. None of these statements were true, but Plaintiff could not initiate any legal action against Aquino because she did not have the finances available, and if she took legal action it would have required that she identify herself to this satanic cult leader which she wanted to avoid at all costs.

251. Aquino's false claims of "stalking" was the first in a series of messages of FMSF or satanic types falsely accusing Plaintiff of "stalking" over the years when in fact she was on the internet acting as a child advocate who was only participating in public debate.

252. On SPP, Defendant Aquino began to threaten anyone who posted on Plaintiff's behalf. One man, a Mr. White from Carleton University in Ottawa, Ontario wrote to SPP advising Officer Lorne G. to leave "Curio" alone. Defendant Aquino responded to Mr. White on April 24, 1997 threatening that he was going to complain to Mr. White's school administration for making these few statements correcting Officer G. It appeared that Officer Lorne G. was an associate of Defendant Aquinos.

253. LAPD officer Lorne G. began writing harassing messages to Plaintiff's email account for the next six months which caused her some alarm. She decided to write a complaint about him to the LAPD and afterwards publicly informed Lorne on SPP why she had written this complaint. Lorne G. responded by writing inappropriate messages in SPP claiming that Plaintiff was "mentally ill."

254. On November 21, 1997, John Price, Ph.D canceled an article Plaintiff posted by attorney Wendy Murphy about those who used "false memory" tactics in a court of law for which he was publicly censured. In one of Dr. Price's cancel message (which was forwarded to Plaintiff) he stated in the section of the cancel message where one is supposed to supply the reason for the cancellation that he had cancelled Plaintiff's message due to "Hate," "Fucking with his real life positions" and "she deserved it," referring to Plaintiff. In other words, Dr. John Price publicly wrote that he "hated" Plaintiff. This provides evidence

that Dr. Price and the others in SPP had motivation to see Plaintiff identified and perhaps harmed. Clearly Dr. Price was an associate of Defendant Aquino.

255.    An anonymous poster named "Tor" began posting in the newsgroup SPP and defended Plaintiff. Tor said she suffered from Borderline Personality Disorder and that she at one time was suicidal. Tor quickly ascertained what this group was about and confronted these "Doctors" as well. Tor was then nominated for a "kook" award and John Price and the rest of these Ph.D's in SPP were very cruel to her. Nancy Alvarado/Stone at one time wrote a message to Tor, telling her to FOAD- "Fuck off and Die."

256.    On July 7, 1999, Dr. John Price publicly wrote that Plaintiff was a "bitch," and then asked her out to lunch. On May 6, 2000, another poster at SPP was told to "fuck off and die" by Nancy Alvarado and Leslie Packer told Plaintiff to blow her "brains out." On March 27, 1999, John Price called Plaintiff a "Kook" and "Winner of the Weird Science Award" and at the end of the message he called her a "corrupt bitch." Dr. John Price then wrote a message to Plaintiff on approximately September 13, 1999 in response to Plaintiff's message stating that children could not consent to sexual activity with adults.  Price's message read, in part:

"Very nearly word salad. A few syntactical errors is all you need for the 'deep end' to be not only in sight, but right below your filthy ass."

257. In approximately April of 1999, Plaintiff wrote a letter of inquiry to UCSD asking them whether they had ethical guidelines for teachers who post to the newsgroups under their own names who claimed affiliation with their University after Dr. Nancy Alvarado falsely claimed that Plaintiff had referred to her as a "pedophile," and told Tor to FOAD. Plaintiff wrote a public message to Nancy Alvarado informing her about her request to UCSD in hopes it might inspire Dr. Alvarado to behave in a more professional manner. Plaintiff was ashamed of Dr. Alvarado's behavior because Dr. Alvarado was a Professor in the UC system in San Diego and her outrageous behavior was publicized on a world-wide forum.  Dr. Alvarado responded to Plaintiff in a message dated April 23, 1999 titled, "Warning to Curio." [Exhibit 3] In that message, Dr. Alvarado threatened that if Plaintiff contacted Alvarado's school again, she would report her for "stalking." This was the second time Plaintiff was frivolously accused of stalking by her debate opponents – this time in retaliation for making ethical inquiries about Nancy Alvarado, an action by Alvarado which was very unethical which further compounded Plaintiff's beliefs that these "Dr's" were not who they pretended to be.

258.    On April 23, 1999, Plaintiff wrote a reply to Dr. Alvarado advising her that if she made false allegations against her for merely requesting ethical guidelines from UCSD that would be further evidence of unethical conduct that Plaintiff would report. [Exhibit 4] This provides further evidence proving that Plaintiff had good reason to keep her identity private because her political opponents were continually threatening to make false police reports about her.