259.  Based on information that researcher Dale McCulley collected about the Presidio case, Plaintiff believed that the Temple of Set was then Lt. Col. Michael Aquino's outer front "Setian" order but he had an inner satanic order which few people knew about. Children referred to this group as the "devil worship club." Mr. McCulley had accessed internal information about the case which evidenced that children made allegations that Aquino ritually molested them and this group had engaged in cannibalism and murder. It is Plaintiff's opinion, based on this information, that there was a cover-up by the Army in the Presidio case, and the CID Report of Investigation was intentionally released months after the criminal statute of limitations expired, on purpose, in efforts to avoid a scandal. Unfortunately, the Army's dereliction of duty culminated in Defendant Aquino being released from the Army onto an unsuspecting public.

260.  Plaintiff continued to research the False Memory Syndrome Foundation, of which Defendant Elizabeth Loftus is a member, and discovered that evidence was surfacing which made them appear to be a real and present threat to the mental health profession. The FMSF continuously claim that satanic ritual abuse does not occur and they report that numerous individuals call them falsely alleging to be satanic ritual abusers whom they choose to believe. Perhaps that might be true in 5 or less cases but certainly not in over 80 cases.

261.  In the FMS Foundation Newsletter, March-April 2004, Volume 13 No 2 edition, on page 1, Pam Freyd wrote:

"A $7.5 million settlement for Elizabeth Gale in February set a record for individual psychiatric repressed-memory malpractice suits ... In an all-too-familiar story of hypnosis and memory recovery therapy, she came to believe that she had multiple personalities and was a breeder for a satanic ritual abuse cult ...One would think that the huge retractor settlements and awards in recent years would prove a deterrent to others bent on finding ritual abuse in patients. Unfortunately, that is not the case. "

262.  Plaintiff believes that these types of statements constitute further evidence indicating that the FMSF in general, and Pam Freyd, in particular, had a personal stake in trying to intimidate therapists from diagnosing ritual abuse in their clients. There is a substantial amount of evidence proving that this is what is occurring.

263.  In therapist David Calof's article, "Notes from a Practice Under Siege – Harassment, Defamation, and Intimidation in the Name of Science," published in Ethics and Behavior, 8 (2), 161-187 (1998) he described the multitude of legal problems he faced, which almost drove him out of business after being targeted and picketed by an FMSF representative from Washington State - allegedly "falsely accused" Chuck Noah. Mr. Calof was also concerned because Noah was trying to locate the home address of Mr. Calof's father. Mr. Calof reported that FMSF Advisory Board member Elizabeth Loftus was one of Mr. Noah's supporters and had reported that Mr. Noah was "extremely sincere" about his denials that he abused his daughter and stated that "there is absolutely no scientific evidence

that these flashbacks correspond to some specific event." The introduction to Mr. Calof's article read:

> "I have practiced psychotherapy, family therapy and hypnotherapy for over 25 years without a single board complaint or lawsuit by a client. For over 3 years, however, a group of proponents of the false memory syndrome (FMSF) hypothesis, including members, officials, and supporters of the False Memory Syndrome Foundation, Inc., have waged a multimodal campaign of harassment and defamation directed against me, my clinical clients, my staff, my family, and others connected to me. I have either treated these harassers or their families nor had any professional or personal dealings with any of them; I am not related in any way to the disclosures of memories of sexual abuse in these families. Nonetheless, this group disrupts my professional and personal life and threatens to drive me out of business. In his article I describe practicing pyschotherapy under a state of siege and place the campaign against me in the context of a much broader effort in the FSMF movement to denigrate, defame, and harass clinicians, lecturers, writers, and researchers identified with the abuse and trauma treatment communities."

264. In Mr. Chuck Noah's obituary, in the Nov/Dec. 2004, Vol. 13 No.4 FMSF Newsletter, Pam Freyd lauded Mr. Noah as a "true pioneer in the struggle for good therapy," proving that Pam Freyd approved of Chuck Noah's behavior.

265. Mr. Calof had been known for the exceptional journal he published, titled Treating Abuse Today, in which he was one of the first individuals in the country to contest the FMSF. Mr. Calof later had to give up his journal due to the harassment he received and the substantial money he had to spend in efforts to defend himself from Chuck Noah in court .

266. The FMSF continue to deny the reality of satanic abuse victims by claiming that the victims all have "false memory syndrome," possibly in efforts to deflect from the fact that in some cases clients are giving damning information about the government's involvement in the creation of their psychological condition, and some of their Advisory Board members had received CIA funding to research hypnosis and dissociation.

267. This activity is not without precedent. In the 1960's and 70's MKULTRA, a program implemented by the CIA to explore mind control and other illegal activities used various fronts including academic institutions when receiving CIA funding to conduct illegal experimentation on people. The CIA hid their funding behind organizations such as the Human Ecology Foundation and the Geschickter Foundation. Doctors from seemingly reputable academic institutions were granted funds by these organizations and knowingly or unknowingly experimented in areas such as hypnosis, radiation, and mind control on the unsuspecting public. Eventually they were caught and were told to cease and desist after a series of Congressional hearings were held on August 3, 1977. Nobody believes that the CIA ceased their activities but all evidence points to their having gone further underground.

268. A movie titled the Manchurian Candidate was based on a book by researcher John Marks after CIA documents were released to him under a Freedom of Information Act request. In the movie, American prisoners were captured by the Koreans who experimented with Mind control in efforts to create another alter/s who would carry out assassinations based on programmed cues. In addition, in 1943, Project Paperclip was the name of the US Intelligence project which imported Nazi doctors and scientists into America clandestinely. These people were employed by NASA, the CIA, and other government agencies and it is rumored that they were instrumental in experimenting with mind control activities using both children and adults for their subjects.

269. As previously stated, those who suffer from MPD/DID have been subjected to horrific abuse as children and they respond to changes in environment and cope by spontaneously "switching" between identities or alters. But there are groups of patients who have been diagnosed as MPD/DID who appear to have been psychologically "split" intentionally and who "switch" between alters in response to programmed cues (instead of splitting spontaneously as normal MPD's due to changes in environment) resulting in others being able to control their various personalities at will. This is Mind control. Obviously, due to this information, there might be many reasons why MPD's who are victims of Mind control might turn on their therapist and accuse their therapist of "implanting" false memories.

270. Therapist David Neswald published an article in The California Therapist in October 1991 titled, "Common 'Programs' - Observed in Survivors of Satanic Ritualistic Abuse," describing some of these issues. Other therapists who described "programming" by satanists and and/or clandestine organizations are Dr. Catherine Gould in her article, "Ritual Abuse, Multiplicity, and Mind Control," Journal of Psychology and Theology (1992), Vol. 20, No.3, 194-198; Dr. Corydon Hammond in his speech "Hypnosis in MPD: Ritual Abuse," also known as the "Greenbaum Speech," delivered at the Fourth Annual Eastern Regional Conference on Abuse and Multiple Personality, June 25, 1992; and Dr. Randy Noblitt and Pamela Perskin in their book, "Cult and Ritual Abuse, It's History, Anthropology and Recent Discovery in Contemporary America" (1995).

271. Reportedly programming is accomplished, in part, by the intentional pairings of words, phrases, and sounds to specific commands with the use of hypnosis, electroshock, and mind altering drugs. That makes the FMSF's assertions that the average therapist can cause MPD/DID in their patients rather unlikely. The additional trauma base in these specific cases which is used to intentionally split children is satanic abuse, murder, and molestation, which makes children of satanic families optimum subjects/victims. Clandestine organizations obviously choose children of Satanists because these families don't care about their children and will sell them in exchange for money, power, influence, and, more importantly, protection. These victims then perform functions for the cult and other groups, such as drug smuggling, prostitution, and murder, without having any memory of the event. Although children of satanic cults/families can be considered to be "brainwashed" or indoctrinated to accept satanic ideologies, for instance, against God and

principles of good, they are not all considered to be "programmed" or victims of Mind control. It is very difficult to treat these particular patients because their perpetrators try to intervene in psychological interventions which results in therapists having to negotiate their interventions around purposefully implanted programs designed to stop disclosure, such as suicidal or homicidal ideation, and sometimes these clients even try to kill their therapists.

272.  In March 1995, President Clinton created an Advisory Committee on Human Radiation Experiments which was convened to hear testimony from victims. This committee also heard testimony about Mind control experiments on children because some of the same doctors were accused of both activities. One person who testified identified Martin Orne (deceased), an expert in hypnosis and an FMSF Advisory Board member, as one of her abusers. Several other therapists wrote to the committee, some anonymously, disclosing what their MPD/DID clients had been disclosing in therapy. Documentation of the letters provided to this committee was published in Jon Rappoports privately distributed book, "US Government Mind Control Experiments on Children." One letter, dated March 5, 1995, was submitted by Dr. Colin Ross who described MPD/DID patients he had treated who described victimization in the context of military Mind control. Another letter, dated March 9, 1995, was submitted by an anonymous psychologist who described several patient's experiences with virtual reality, hypnosis, electroshock, alters with neo-nazi personalities, and family participation. Other letters from therapists contained information about their clients disclosures that organized satanic families had offered their children to the government for experimentation, there was government involvement in the creation of their MPD/DID, and there were white supremacy and Nazi leanings to some of these groups. It was alleged that all of this activity was being covered up and that might be one reason why the FMSF has concentrated on denying the crimes of satanic cults – because satanic ritual is used as the trauma base to split the minds of children.

273.  In 1998 Plaintiff read a book by John de Camp, an ex-senator who disclosed information about a satanic ritual sex ring in Omaha, Nebraska involving Mind control on children titled, "The Franklin Cover-up, Child Abuse, Satanism and Murder in Nebraska," (1996). John De Camp wrote on pg.338 of his book that Paul Bonacci and other child victims had given evidence in great depth on the central role of then Lt. Col. Michael Aquino (Defendant Aquino) in this depravity. He wrote:

"Aquino, alleged to have recently retired from an active military role, was long the leader of an Army psychological warfare section which drew on his expertise and personal practices in brainwashing, Satanism, Nazis, homosexual pedophilia and murder."

274.  Plaintiff read a book by Cathy O'Brien titled, "TranceFormation of America" (1995) who openly claimed that Lt. Col. Aquino had used her in government Mind control programs and had electroshocked her, accessing her alters at will. She also claimed in print that Lt. Col. Aquino had molested her daughter.

275. In the year 2000, Plaintiff became aware of Noreen Gosch (mother of a kidnap victim named Johnny Gosch) who openly accused Defendant Aquino in print of having paid for the kidnapping of her son when he was a child and using him and others in Mind control activities in her book titled, "Why Johnny Can't Come Home."(2000) Ms. Gosch testified at the civil hearing of Bonacci v. King in 1999 (4:CV91-3037) on behalf of Paul Bonacci. According to court transcripts, Noreen Gosch testified in court to the following:

"There was a man by the name of Michael Aquino. He was in the military. He had top Pentagon clearance. He was a pedophile. He was a Satanist. He's founded the Temple of Set. And he was also a very close friend of Anton LaVey. The two of them were very active in ritualistic sexual abuse. And they deferred funding from this government program to use this experimentation upon children …where they deliberately split off the personalities of these children into multiples so that when they're questioned or put under oath or questioned under lie detector, that unless the operator knows how to question a multiple personality disorder, they turn up with no evidence. They use these kids to sexually compromise politicians or anyone else they wish to have control of…they were taken to be used by professional pedophiles. People that have the money to buy what they want, take the kids wherever they want … and by splitting the children's personalities they could then train each one of the personalities to do a different function. And the rest of the personalities within that host personality would not be aware of it or remember it."

276. This information documents that as of the year 2000, Defendant Aquino had been publicly accused of participating in ritual sexual abuse, Mind control/brainwashing, pedophilia, electroshock, and the intentional creation of MPD/DID. Surprisingly, Dr. Leslie Packer at one time invited Defendant Aquino to write about Mind control in SPP. This information provides overwhelming evidence that many people described Defendant Aquino as quite dangerous. In fact, ex-senator John DeCamp inferred that Aquino had expertise in murder. Defendant Aquino did not sue John de Camp, Cathy O'Brien or Noreen Gosch for the content of their books so Plaintiff felt free to refer to this information on the internet.

277. As previously stated, the FMSF specialize in suing therapists who treat MPD/DID, and at this time approximately 80 malpractice cases against therapists have occurred. It appears there were minor violations in some cases but that has little to do with implanting memories of satanic ritual abuse. With every successful settlement, the FMSF has added a new notch on their collective belts, using these recanting clients as more evidence of "false memory syndrome" and proof that SRA does "not exist."

278. The following news articles document the FMSF's participation in lawsuits against therapist who treat clients who have alleged satanic victimization. In news article titled, "Dispute Over Grown Children's Memories of Abuse: Therapists Accused of Splitting Families By Planting Ideas," May 12, 1994 (Arizona Republic) the reporter described eight parents and relatives of clients who accused an Arizona therapist of

implanting "false memories" of satanic cult involvement. "Parents who were angry, hurt, and baffled complained to a State Board Wednesday that a Scottsdale counseling center planted memories of child abuse and satanic rituals in their grown children."

> "Across the country accusations of childhood sexual assault, satanic cults and other bizarre stories have emerged in therapy sessions, often decades after the abuse reportedly happened. In some cases, it has led to arrest and imprisonment. A backlash movement has surfaced in recent years, including the establishment of the False Memory Syndrome Foundation, a nation-wide organization of familiar members affected by such accusations. Some of the parents who spoke Wednesday belonged to the group."

279.  In news article titled, "Jury Gives Millions For False Memories," dated August 2, 1995 (Capital Times) the reporter states that client Vynnette Hamanne once believed that she was the "victim of bizarre childhood sexual abuse involving satanic rituals and that she had seen her grandmother stirring a cauldron of dead babies." The jury believed that the therapist "planted false memories" in her mind:

> "Attorneys for Hammane … said the verdict thoroughly discredits the repressed memory theory, which says a person can endure repeated abuse and not remember it until years later." R. Christopher Barden was quoted stating, "Plaintiff thinks the effect is a stunning warning to therapist … and to insurance companies in that they had better start obeying the informed consent laws and stop using experimental treatments like recovered memory treatments on patients without their permission ... This is a huge warning shot to them."

280. In another article titled, "Ex-patient at County Mental Health Complex Files Claim Woman Contends Therapist Falsely Told her She had Multiple Personalities," dated December 4, 1997 (Milwaukee Journal Sentinel), the reporter wrote:

> "A Milwaukee County Mental Health complex was accused of falsely convincing a client that she had multiple personalities and was the victim of childhood sexual abuse and satanic ritual" … "The clients experience involved a phenomena known as "False Memory Syndrome."

281.  In news article titled, "$200,000 Award in Suit Against Therapist," dated June 24, 1999 (San Francisco Chronicle) the reporter wrote that the therapist "brainwashed a client into believing she had been raped by a satanic cult and forced to kill an infant." The news article claimed the therapist "convinced" his client that she had MPD and was a victim of "satanic abuse as a child." The client's lawyer was quoted as telling jurors that the therapist had violated the standards of care because he ignored literature in the field that cast doubt on Multiple Personality Disorders and on memories of satanic ritual abuse. The literature in the field the lawyer was referring to was undoubtedly disseminated by the FMSF.

282.  In news article titled, "Retractor Helps Others Find Answers," dated November 26, 2000 (St. Petersburg Times) the reporter quoted retractor Laura Pasley after she realized that her accusations against her mother was "unfounded." The article states, "Pasley, a retired secretary in the Dallas police department, is the first 'retractor' in the ranks of the False Memory Syndrome Foundation. Hundreds of others have since disavowed their charges. They have lent immense credibility to the Foundation's efforts." The reporter described Dr. Bennett Braun turning in his license to practice psychiatry and Pam Freyd, claiming, "If not for some professionals with credentials who were a driving force behind people like Bennett Braun, this whole fad would never have gone as far as it did."

283.  In news article titled, "Trances, Satanic Abuse Now a Trial," dated October 19, 2005 (Lancaster New Era), a "false memory" trial was described in which the jury found the psychiatrist at fault for implanting false memories of satanic ritual abuse. The expert witness for the plaintiff, Dr. John Cannell, told the jury that before 1985 MPD was "rare," then thousands of cases were eventually reported. It was reported:

"Studies showed that recovered memories, unless independently corroborated, are unreliable and often a fantasy."

284. This is untrue, as several legitimate professionals have stated that repressed memories are no more or less accurate than continuous memories. It appears that "expert" witnesses on behalf of the "false memory" defense are routinely making these false representations to courts in the United States and elsewhere.  Cannell stated that the "FBI could find no proof of such acts as women being impregnated and then having their babies killed and eaten." As previously reported, FBI's Ken Lanning did not appear to be qualified to assess these cases, and the government should not be investigating itself. Dr. Cannel also claimed that it was the psychiatrist who introduced the idea of devil worship to the plaintiff which is very difficult to believe.  Obviously, making these types of claims in multiple lawsuits is absurd, yet people are actually succeeding with this manipulative strategy. It was also stated in an October 25, 2005 news article regarding this case that a witness claimed that "satanic abuse was a mental illness urban legend that swept the nation in the late 1980's and early 1990's."

285.  Attorney's Zachary Bravos, Skip Simpson and R. Christopher Barden specialize in waging these types of lawsuits against therapists. However, it appears that in many of these SRA lawsuits the attorneys are using a cookie-cutter recipe and all they have to do is insert the name of the therapist and their client. Skip Simpson described how to file an SRA retractor lawsuit in an article titled, "Causes of Action Against Health Care Providers by Retractors of Abuse Allegations," published in the Shepard's Expert and Scientific Evidence Quarterly, Vol. 2, Fall, 1994, No. 2. Mr. Simpson claimed that a typical retractor case would involve a therapist who "suggests sexual or satanic ritual abuse to a client," whose "vague memories then become clear accusations." Skip Simpson claimed that some outside stimuli, news reports, magazine articles, television news or talk shows eventually "awaken" the patient to the likelihood that the treatment had been an

"unnecessary sham." He claimed that the parties who could be sued are the "therapist, the supervising therapist, the hospital, any consultant on the case, and any authors of self-help books such as the "Courage to Heal." The FMSF early on decided they did not like the victim advocacy book the Courage to Heal and a number of "false memory" suits have been waged against the authors.

286.  Skip Simpson's claim that some "outside stimuli" usually awakens the patient to their plight of having "false memories" was exemplified in a very surprising appellate decision: In Hall vs. Miller, 36 P.3d 328 (2001) client Martha B. Hall sued her therapist for negligence because, she claimed, during the years of treatment with defendants, they implanted false memories of satanic ritual abuse which caused her present mental illness. The District Court granted summary judgment for the defendants but the appellate court reversed the decision and tolled the statue of limitations based on the date Ms. Hall attended a seminar held by the False Memory Syndrome Foundation and after the Foundation told her that her particular therapist had a "reputation" for diagnosing SRA in his clients. The court's decision read, in part:

"Sometime in early 1995, Hall read a magazine article which referred to false memories and subsequently, in July 1995, attended a local chapter meeting of the False Memory Syndrome Foundation (FMSF). According to Hall, this was the first time she was told of Miller's reputation for advocating the existence of Satanic cults and the fallacies of Satanic Ritual Abuse therapy."

287.  Plaintiff interpreted this statement to mean that the FMSF was keeping track of therapists who treated SRA multiples. As in many of these cases, Ms. Hall also alleged something spectacularly unlikely and attributed it to her therapist. Ms. Hall alleged that her therapist told her she was "impregnated by an alien." Plaintiff finds this very difficult to believe. If this statement came from anyone, it probably came from Ms. Hall. Martha Hall's new psychiatrist, Dr. C. Raymond Lake was referred to her by Howard Fishman (Howard Fishman worked for the FMSF) after Ms. Hall requested a "mental health check-up." Dr. Lake wrote to the court:

"At that initial visit, it was my opinion that she was not aware of the potential iatrogenic and destructive nature of the diagnoses and subsequent treatment advice given her by Darrell Miller."

288.  Plaintiff believes it is possible that Dr. Lake suggested to Ms. Hall that the treatment she had received was "destructive."

"Over the course of subsequent visits (July 26, 1995 and August 8, 1995) Martha Hall began to gradually accept the causal link between her overall deterioration in function and the treatment she received from Darrell Miller."

289.  Plaintiff believes it is possible that Dr. Lake suggested this "causal link" to Ms. Hall. It is to be expected that clients this ill would decompensate during therapy. Dr. Lake continued:

"I do not believe that Martha Hall possessed sufficient facts or information that would have led her to believe that her therapist (Miller) was responsible for her deterioration in function prior to her attendance of the July 1995 FMSF meeting and her subsequent appointment with me."

290.  The appellate court reversed the lower court's decision, finding that the client filed her case in a timely manner (from the date of her attendance at the FMSF meeting), and the therapist settled, apparently due to a lack of funds to continue fighting. In other words, the FMSF is against the tolling of the statute of limitations in repressed memory cases (for which there is massive evidence) but is trying to toll the statute of limitations based on when the client first attended an FMSF conference and was told that their therapist had implanted a "false memory," (for which there is little evidence other that these types of lawsuits.)

291.  Plaintiff believes that this type of legal precedent has to be contested because it makes it too easy for an actual member of a satanic cult to disclose to a therapist about their victimization, and then claim that after they attended a seminar by the FMSF that they realized they had "false memories," and receive millions of dollars in insurance settlements. Plaintiff would be very concerned if that was in fact what was occurring and believes making a parallel to automobile insurance fraud "sting" operations illustrates the issues. In automobile fraud cases:

[a] One or more persons plan to stage a car accident (one or more actual or purposely planted MPD clients enter therapy with a known expert in SRA and tell their therapist, with or without conscious ulterior motives, that they were victimized by a satanic cult).

[b] The car crash victim, after their "accident," discovers "severe injuries" (the client attends a lecture about "false memories," and they "learn" that abusive satanic cults "do not exist.'')

[ c] The car crash victim is then sent to a medical doctor in on the scheme (a psychiatrist is referred by someone associated with the false memory defense – which is what appears to have occurred in the Hall case - who doesn't "believe" MPD or satanic ritual abuse exists. The new treating professional then gives the client another diagnosis, such as "depression," and provides a written statement concluding the prior therapist "injured" the patient).

[d] An attorney aligned with the automobile insurance fraud takes the case to court, or negotiates an extremely large monetary settlement with the automobile insurance companies (an attorney associated with the "false memory defense" takes the case to court

or negotiates an extremely large monetary settlement with the malpractice insurance company, sometimes in the millions of dollars).

292. However, several other lawsuits have had successful outcomes for therapists even though their clients recanted their disclosures of satanic activity. They are: Jones v. Lurie, 32 S.W. 3d 737 (2002); Bloom v. Braun, et al. 739 N.E. 2d 925 (2002); Althaus v. Cohen (2000) Pa. LEXIS 2017; Diane Colwell v. Heather H.F. Mechanic, MFCC, Kevin Connors, MFCC, Shelby J. Thorpe, PHD, Advanced Psychological Health Center Of North County Case No. N70214 (1999, San Diego, California); Green v. Charter Pines Hospital, Wallace, Timmons, et al., No. 96-CVS-5235 (1998); Charter Peachford Behavior Health System, et al. v. Kohout, 504 S.E. 2d 514, 1998 Ga. App. LEXIS 995.

293. In 1998 Plaintiff discovered that several therapists, psychiatrists, and an administrator in Houston, Texas had been indicted by prosecutors in a Federal case alleging "mail fraud" and "insurance fraud" in the case United States vs. Judith A. Peterson, Ph.D, et al. (Crim. No. H97 237.) These mental health professionals were being charged with mail fraud because they sent insurance bills through the mail with the diagnosis of MPD/DID. It was claimed that because satanic ritual abuse was included in the context of the MPD/DID diagnosis it was indicative of negligent and criminal behavior by the therapists.

294. Due to Plaintiff's research, and based on the background which has been provided, she was very worried about this indictment brought by the federal government against a group of therapists, psychiatrists, and administrators who faced prison time for their diagnosis of MPD/DID within the context of satanic abuse. Claims such as this should have been filed in a civil court room, not a criminal court. If the federal government had succeeded in successfully prosecuting these therapists, it would have set a dangerous precedent, potentially sending any therapist who treated SRA to prison under the guise of "mail fraud" for diagnosing MPD/DID and sending the bills to the insurance company via the postal system. Plaintiff believed this was even more concerning since some branches of the government had been accused of attempting to purposely create MPD/DID via Mind control and it appeared this might be an effort by the Federal government to shut the topic down.

295. Because of these concerns, Plaintiff decided to work full time on behalf of the defense behind the scenes after she quit her job at CPS in 1996. She began working part-time as a Visitation Supervisor for Family Court and devoted the rest of her time to research. Plaintiff published a web page on Tripod Free Web Pages about this case and published her hand-picked appellate and news documentation which proved satanic cult criminal activity existed. Plaintiff included Michael Aquino's appellate documentation and described his case in brief. She also published 75 abstracts from MEDLINE about MPD/DID proving that this disorder existed. She then suggested to one of the indicted therapists to arrange with another activist to publicly write about the testimony on behalf of the defense on another web page because Plaintiff suspected the FMSF would be covering this trial from the perspective of

the prosecution which turned out to be correct. The FMSF's coverage could be found at their website: fmsfonline.org

296.  In the July/August 1998 issue of Treating Abuse Today it was reported that the government's expert witnesses on behalf of the prosecution against these treating professionals were to be FMSF Advisory Board members, Defendant Elizabeth Loftus, Richard Ofshe, and FBI's Kenneth Lanning. Fortunately, the Federal government dismissed the Peterson case due to jury misconduct and reported they would not be refiling the charges. Meanwhile, Plaintiff posted messages to the internet on behalf of other professionals and on behalf of those who were indicted in this Federal case because they were too afraid to do it under their own names.

297.  On October 21, 1998, during this federal prosecution, Plaintiff was emailed by attorney R. Christopher Barden, Ph.D. who had a formidable reputation as one of the premier attorneys filing "false memory" SRA malpractice lawsuits in the United States and who was making legal commentary about this Federal prosecution on the FMSF's website at FMSFonline.org on behalf of the prosecution. Barden accused Plaintiff of defamation for responding to the following sentence in the way that she did.

298.  In reply to anonymous persons claim: "The FMSF does not provide legal defense to the accused." Plaintiff wrote: "They provide names of attny.s, etc. Read my lips. The FMSF provides legal defense to the accused when members of their board testify for the accused. They also have attorney's who are obviously working for them and providing bogus defenses around the country based on the FMSF pseudoscience. Christopher Barden is one of them."

299.  Barden wrote to Plaintiff, claiming these statements were "libelous," and he gave Plaintiff ten days to respond and apologize, inferring he knew Plaintiff's identity and was going to sue her. Plaintiff replied on October 22, 1998 suggesting that if Mr. Barden did not like what she wrote, perhaps it would be more appropriate to respond to her on the web site in question, instead of threatening to sue her. Plaintiff informed Dr. Barden that not only would she not be apologizing but she would make his frivolous lawsuit threat public as she thought his threat was meant to encumber her resources or intimidate her from covering the Peterson case on behalf of the defense.

300.  Plaintiff published a web page titled, "Christopher Barden's SLAPP Suit Homepage" immediately after this exchange and humorously pointed out that even though Dr. Barden was denying that he worked for the FMSF, he was in fact the legal analyst covering the Peterson case on the FMSF's own web page during the Peterson trial. Plaintiff never heard from Dr. Barden again. Plaintiff posted a link to the relevant law about Strategic Lawsuits Against Public Participation and published a favorable court ruling on behalf of therapist David Calof against Barden on this web page. Plaintiff also posted a news article, dated August 20, 1998 titled, "Jurors Believe Therapists," from the Charlotte Observer about a multi-million dollar lawsuit that Barden had just lost in his efforts to sue a therapist

for "implanting "false memories in his clients who had once believed that she had been
molested by her father and satanic cult members. The news story read, in part:

> "The verdict marked the first loss of its kind for Christopher Barden, a Utah based
> psychologist and lawyer. He has traveled the country suing therapists he accuses of
> subjecting patients to dangerous repressed memory techniques. He says such
> therapies, which claim to retrieve forgotten sexual abuse memories from deep inside
> the mind, are 'junk science.' ... and says he has participated in 22 or 23 similar cases."

301.  Plaintiff received several emails from high-profile academics congratulating
her for not being intimidated by attorney Barden after her web page was published. Plaintiff
believed Barden did not want anyone stating he worked for the FMSF because these
attorneys who were suing therapists for "implanting" false memories of satanic cult
involvement did not want to be accused of participating in a conspiracy.

302.  During 1999, Plaintiff was writing on the Spectral Evidence Discussion group
defending therapists who were being libeled, mocked, and ridiculed by what appeared to be
FMSF/satanist - type supporters. For instance, researcher Dr. Van der kolk was routinely
referred to as vanderkook which she objected to. Plaintiff had discovered that these
obnoxious individuals had taken their harassment and libel campaign against their perceived
enemies, both therapists and researchers alike, from the newsgroups to this web site.
Plaintiff defended these therapists because as a therapy intern knowledgeable about SRA,
she was soon to join their ranks, and she had sympathy for them. Therefore, in an attempt at
solidarity, on January 8, 1999, Plaintiff posted the URL of "Christopher Barden's SLAPP
Suit Homepage" to the Spectral Evidence Site. In response, on January 10, 1999, a person
writing under the pseudonym "Research Department" gave the web site of the California
Stalking Penal Code in reply. This was now the third time Plaintiff had been frivolously
accused of stalking – this time for posting a web page that probably embarrassed Barden;
however, embarrassing someone is not a crime. She then discovered that on the Spectral
Evidence site the opposition were using her pseudonym to post libelous messages about
targeted therapists which she quickly put an end to.

303.  In 1998 Plaintiff decided to publish several more web pages on two separate
web page accounts at another free web posting service Geocities titled, "Wenatchee Sex
Ring Case" in anticipation of the expected censorship of one or more of her web sites.
Plaintiff discovered that what was referred to as the Wenatchee Sex Ring in Wenatchee
Washington was comprised of approximately 20 adults who had been imprisoned after a
child sexual abuse investigation and several of these defendants had priors for sexual
molestation.

304.  It was earlier mentioned that in 1995 Defendant Hopkins had a "recanting"
Wenatchee teenager in her custody in a very unorthodox placement. Plaintiff discovered that
Defendant Hopkins was joined in her efforts to overturn the "Wenatchee Sex Ring"
defendants by Defendant Loftus, which they succeeded in doing, partly via the assistance of

"Project Innocence" at the University of Washington, the University where Defendant Loftus was employed at that time. Due to this behavior, Plaintiff published another web page describing the 1998 San Diego Reader article which documented the connections between Defendants Hopkins and Loftus. During this time period, Defendant Hopkins sent Plaintiff an email accusing her of being "delusional," she wrote she did not respect "anonymity," and wanted to meet with her. Plaintiff never responded to Hopkins.

305.   The Wenatchee cases were first overturned due to a recanting child witness who claimed she had been forced to make false allegations against her alleged perpetrators by the investigating officials. However, Roby Roberson (who had been a Wenatchee defendant at one time) had taken this child from her legal placement to another person's home where she was filmed making her "recantation" which Judge Friel of Wenatchee never thought was odd. The recanting child later told Judge Friel that Roby Roberson had threatened her and forced her to recant. Judge Friel did not believe her and chose to believe another statement made by her in which she claimed she was forced by the detective on the case to make her accusations.

306. Very soon after this occurred, all of the imprisoned defendants began making the same claims – that the detective in charge of the investigation coerced them into implicating themselves. The Washington appellate courts agreed with Judge Friel, and all of the alleged perpetrators in the Wenatchee Sex ring were released from prison and the City of Wenatchee was subsequently sued.  Due to Plaintiff's history at CPS, and her understanding of the MO of perpetrators, this activity was an immediate red flag to her, so she contacted Wenatchee law enforcement and decided to investigate the situation for herself. At that time, Plaintiff discovered that she had the only web page on the internet in favor of the prosecution. Plaintiff defended law enforcement on the case because they were under repeated attack on the Witchhunt egroups list and in the newspapers. She posted correspondence from the prosecuting attorney Gary Risen to a Congressman Ungerect explaining why these cases had been filed and the evidence which supported the filings. Plaintiff also posted a "Fact Sheet on the Wenatchee Child Sexual Abuse Cases" which was obtained from the prosecutor Gary Riesen.

307.  In 1998, Plaintiff published another web page titled, "Carol Hopkins and the Justice Committee," which highlighted Defendant Hopkins' 1991-92 San Diego Grand Jury report, the news article which mentioned Hopkins affair with Attorney General representative in San Diego, Gary Schons, and a few newspaper articles written by Defendant Sauer. Plaintiff made a brief comment about Defendant Sauer on these web pages, writing that:

> "In my opinion, Hopkins, Sauer, and Okerblom misreported on and gave a one-sided portrayal of ritual abuse for the county of San Diego nonstop for approximately six years, and they are still doing it. CPS can be a very political organization, and due to the negative publicity, they backed away from openly training in this area for a short

time even though they internally acknowledged the crimes and still continued to deal with these cases."

308.  Plaintiff also published a deposition of Defendant Loftus in which she appeared to unfairly describe a therapy encounter between an alleged victim on the Wenatchee case and her therapist. The title of this web page was "Elizabeth Loftus' Deposition on Wenatchee." Given that Plaintiff had a web page defending mental health professions during the Peterson federal prosecution; because the FMSF/Pam Freyd were actively involved in both online coverage of the case on behalf of the prosecution; because of Plaintiff's Satanism and Ritual abuse archive which proved satanic ritual abuse occurred - a crime which the FMSF denied the existence of; because of the anticipated participation of FMSF Advisory board members Defendant Dr. Elizabeth Loftus and Richard  Ofshe in this Federal prosecution against these therapists; because Plaintiff published a satirical web page about attorney Christopher Barden; and because Plaintiff published information about Defendant Hopkins, Loftus and the Wenatchee Sex ring, this provides ample evidence of motive as to why these individuals might want to see Plaintiff identified and censored by any means necessary. Defendant Loftus apparently does not believe satanic ritual abuse exists, along with Hopkins, because she has testified for the defense on several alleged ritual abuse cases.

309.  In addition, Plaintiff published a web page titled, "Dr. Nancy Alvarado from UCSD" and sci.psychology.psychotherapy" on a completely different free web site describing the shameful and unprofessional behavior of the "Doctors" in SPP along with links to the relevant messages. Plaintiff published another web page titled, "Aquino v. Electriciti – Harassment by Dr. Michael Aquino from the Temple of Set and his Internet Censorship" which provided an overview of the censorship she was experiencing by Defendant Aquino and others. By that time (1998) Defendant Aquino and his supporters had a long history of attempting to seek her identity and violate Plaintiff's First Amendment rights to free speech. In summary, as of 1999:

a) In 1995 Defendant Aquino or his Temple of Set supporters had complained to AOL administrators to deny Plaintiff access to the newsgroup alt.satanism after posting a few news articles and appellate documents. Her access to this newsgroup was then denied.

b) In 1996 after Plaintiff was forced to use an anonymous service which was located in Finland. Aquino wrote (or the TOS did, on his behalf) a message to Julf Helsingus, the owner of the anonymous server in Finland, complaining about Plaintiff's messages and asked them for Plaintiff's identity and to cancel her account.

c) In 1997, Defendant Aquino requested that Plaintiff's internet company Electriciti cancel her account and falsely alleged that she was engaged in "libel." When Electriciti refused to cooperate with Aquino, he sued them twice in 1997 in efforts to have the court order Electriciti to reveal her real name to him. Defendant Aquino went so far as to submit fraudulent information to the court as an exhibit, summarizing alleged messages written by

Plaintiff but without any of the full messages attached as evidence that they had ever been written by her.

d) Defendant Aquino's supporter (John Price) cancelled several open messages to the internet that Plaintiff had written specifically about Aquino, and her accounts were continually cancelled by Aquino's associate John Price which he was caught for.

e) In approximately 1998, according to a representative of Tripod, Defendant Aquino threatened that he would sue them if Plaintiff's web page about him was not taken down. Tripod proceeded to take Plaintiffs web page down but agreed to repost it if Plaintiff agreed to take off all mention of Defendant Aquino's name from these web pages which she did except for the reference to him in her archive. This was blatant censorship.

f) On approximately May 23, 2000, all of Plaintiffs web pages on Tripod and Geocities were taken down from the internet based on frivolous claims apparently by Defendant Devereaux who works with or for Aquino.

310.  It should be noted that a colleague downloaded all of these web pages on May 15, 2000, a full 4 months before Defendant Sauer wrote a defamatory article about Plaintiff, invading her privacy by revealing her name and justifying that action by falsely claiming that she was "harassing" people on the internet. This body of evidence will prove that there was no libel occurring on any of Plaintiff's web pages as sources and documents are cited for most all of the claims.

311.  In 1999, Plaintiff wrote to an e-group yahoo list called Witchhunt under the pseudonym of "Karen Jones." One could both access this list via their web page and read and post messages and/or receive email messages from this list. Witchhunt was comprised of a heavily biased group of individuals who claimed to be "falsely" accused of child abuse who had animosity towards social services and who believed that the imprisoned Wenatchee Sex Ring defendants were innocent. Representatives of Victims of Child Abuse Laws [VOCAL] such as Lesley Wimberly posted messages there as well as an alleged Wenatchee offender Pastor Roby Roberson. Plaintiff provided information about the other side of the Wenatchee case, child protection services matters, and was consequently verbally attacked by members of this group. Several of Plaintiff's colleagues refused to write on this list because they considered it to be too toxic of an experience but due to Plaintiff's background in child investigations she was experienced with dealing with people who claimed to be "falsely" accused of child abuse.

312.  In 1999, John Price, Defendant Aquino and others accused yet another person of being Plaintiff and attempted to emotionally blackmail her about these misidentifications by writing messages such as: "If you gave us your real name, we wouldn't be bothering these other people." This time they had decided that Plaintiff was a "Karen Jones" from SDSU even though Plaintiff said she was posting under a pseudonym. They wrote up a report, publicizing "Karen Jones'" supervisor's email, along with suggestions to complain to

her supervisors. Plaintiff telephoned "Karen Jones" to warn her and advised her to ignore the situation unless their behavior escalated.

313. In 1999, Plaintiff was contacted by a concerned citizen from Cuernavaca, Mexico who told Plaintiff that Defendant Hopkins had moved to that town and she had embroiled herself in a high-profile child sexual molestation case on behalf of the defense. Plaintiff was told that children and parents had been threatened and the contact thought Defendant Hopkins' behavior was inappropriate. She had taken the information from Plaintiff's web page about Defendant Hopkins and used that information to rebut Defendant Hopkins in the local newspaper, The Cuernavaca Lookout. Plaintiff accessed the news articles from Cuernavaca and discovered that the URL (web address) of her web page was indeed cited as a source of information about Defendant Hopkins.

314. Plaintiff read the two articles in question from the Cuernavaca Lookout and discovered that Defendant Hopkins had referred to herself as an "international expert on child sexual molest," and she claimed that Judy Johnson (deceased) of the McMartin child abuse case had continually claimed that her son was abused by "aliens." Plaintiff believed that this was a false allegation and thought it unfair to belittle Ms. Johnson's concerns about her son's potential child abuse, especially so because Ms. Johnson was deceased and could not defend herself. Because she knew Hopkins was reading the Witchhunt egroups list, Plaintiff confronted her about this false statement and requested the source of her comments about "aliens." Plaintiff was then sent the URL of Defendant Hopkins public web page by a colleague in which Hopkins publicized her Bed and Breakfast Inn in Cuernavaca, Mexico. Plaintiff posted this information to the Witchhunt list as well and enquired whether anyone knew Defendant Hopkins was in Mexico. Plaintiff was then accused by Defendant Hopkins and others of "stalking," specifically, on August 17, 2000, by Greg Clark of the Witchhunt list. He wrote:

"As for cyberstalking Carol Hopkins, what do you call posting that she was there and how to find her? Wouldn't it follow that if she wanted to just get out of Dodge for awhile who the hell are you to tell everyone where she is? That qualifies as cyberstalking if I ever heard it."

315. This was the fourth time Plaintiff had been frivolously accused of stalking – this time for being informed of where Defendant Hopkins had moved by a local citizen in her community who didn't like her and reposting the content of her web page to another forum.

316. On February 26, 1999, Plaintiff received an email at her curiojones3@hotmail.com account from Defendant and apparent satanist Michelle Devereaux who used the pseudonym of "cyberlurker@justicemail.com." A person named "lurker" had been writing on the Spectral Evidence Web site and she wondered if this was her/him. Plaintiff did not know "cyberlurkers" identity at the time but discovered it later. Cyberlurker blamed Plaintiff for writing a message on the Spectral Evidence Site which

accidentally publicized her "friend" Karen K's name and address. This message had first appeared on the Witchhunt list and Chuck Noah and others were speculating about whether Karen K. was the Plaintiff. (Chuck Noah was the FMSF persecutor of David Calof). Plaintiff thought she would stop this line of questioning immediately when these claims appeared on the Spectral Evidence web site and reposted the message in question along with her reply that Karen K. was definitely not her as Karen K. was obviously in Washington State and Plaintiff lived in San Diego. Since Plaintiff's IP addresses in email already reflected that fact which anyone could discover, she saw no harm in stating that. Plaintiff had thought the address which was posted on the Witchhunt list was the public address of SOPHIE, Karen K's newsletter, and she had no intent to harm her.

317. In this message, "CyberLurker" or Defendant Devereaux told Plaintiff that Karen K's house had recently been burnt down due to a fire and she blamed this on Plaintiff due to the message she had reposted and the unfortunate misidentification of Karen K. as her by Chuck Noah and others. Cyberlurker asked how many other people were going to be misidentified as her and she wrote that because of it Plaintiff had "blood" on her hands. Plaintiff told cyberlurker that the fire at Karen K.'s house was not her fault and due to her escalating behavior, on March 3, 1999, she asked cyberlurker not to write to her anymore. Cyberlurker responded to Plaintiff on March 3, 1999, claiming she understood. [Exhibit 5]

318. Plaintiff logged onto Devereaux's web site but tried to make it brief because she had heard about internet software called Spyware. If someone accesses a web page who has Spyware, information about the user was given after which they could access the person's home computer.

319. On March 17, 1999, a woman by the name of Eileen King (ACAADC@aol.com), a regular poster on the Witchhunt list, forwarded a message by John Price which had been posted on this list entitled, "Curiophilia." John Price had followed Plaintiff to this list. Price took the opportunity to claim Plaintiff routinely "libeled" others and was a "stalker" for this list (now the fifth person to frivolously make this false allegation) and wrote that "a few folk have been looking" for her real identity. He claimed that he had a file in his FTP site under ftp://ftp.calweb.com/user/j/jmprice/wh/curio-philes.txt about her. In other words these individuals wanted Plaintiff's real identity quite badly and were using false allegations of "libel" and "stalking" in order to discredit her and to make it appear that their search was justified when Plaintiff wrote to new groups. Instead, it was later discovered that these people were stalking the Plaintiff.

320. On September 25, 1999 Defendant Devereaux sent Plaintiff an email to her curiojones3@hotmail.com account again, using the email address Cyber4n6@hotmail.com even though Plaintiff had asked her not to write to her again. Cyberforensics claimed that she had attended a computer conference in San Diego and had "stumbled" upon her computer trail, meaning she had traced the computers Plaintiff was posting from and had accessed information from these computers about her accounts. At that time Plaintiff had approximately 10 different email accounts. Cyberforensics claimed to have "met" Plaintiff

in person. (During that weekend an unusually talkative overweight brunette had spoken to Plaintiff and she took notice of this woman and so assumed that woman might have been her.) Defendant Devereaux again mentioned the fire at Karen Kennedy's house and did her best to make herself sound legitimate, stating she sometimes assisted law enforcement in investigating computer crime. She stated that Karen K's case was now an open arson investigation and she referred Plaintiff to the arson investigator Charlie Andrews. Defendant Devereaux claimed she had been "brought into the investigation" because she knew Karen K. and wrote that the FMSF and Chuck Noah had been investigated in regard to the fire. She claimed that she told Mr. Andrews that other people who had been identified as the Plaintiff had likewise been harassed and that afterwards  this information was passed on to the "Feds." "Cyberforensics" claimed that Plaintiff should really be posting in stealth mode (because of people looking for her identity) and gave her tips about how to stay anonymous.

321.  Plaintiff replied to Cyberforensics on September 27, 1999 asking her if she was really "cyberlurker" (who Plaintiff had asked not to contact her again) but Cyberforensics said she wouldn't "cop to it." She suggested that the incident about the fire at Karen K's case be added to Plaintiff's "stalking" web page describing Defendant Aquino's actions against her. Defendant Devereaux suggested that Plaintiff call the Washington State arson investigator, Charlie Andrews, to verify her claims. She wrote that she was "paranoid, having spoken to the "majority of the folks … who have been giving you grief." Plaintiff thanked her for her advice about how to stay more anonymous. Defendant Devereaux suggested that she not post from SDSU anymore and stated that she became "alarmed" at finding her computer trail. Defendant Devereaux inferred that some people had tried to engage her in their efforts to find Plaintiff but that she wasn't convinced of anything other than they didn't "have a life" since Plaintiff wasn't engaged in any illegal conduct. Defendant Devereaux promised that she wouldn't be attempting to seek her identity but claimed to be treading in "dangerous" territory because she didn't know what lengths these folks might go to. Devereaux claimed "they" had gotten to Kevin, apparently referring to Kevin F.

322.  Plaintiff spoke to Renton, Washington arson investigator Charlie Andrews who confirmed that Karen K. house was considered to be arson and he had spoken to "lurker" or Michelle Devereaux. Plaintiff didn't know whether or not Defendant Devereaux had ingratiated herself with this arson investigator for ulterior motives or if she was legitimate. He stated Defendant Devereaux had given him a statement saying she believed that Plaintiff was being stalked and she thought Karen Kennedy's house was intentionally torched. Unfortunately during numerous conversations with Charlie Andrews, he has told the Plaintiff that he cannot release Michelle Devereaux's statement without a subpoena, due to policy restrictions. Plaintiff suspected Defendant Devereaux wanted her to divulge her real name to him after which she was probably going to turn on her and access her name. As a result, Plaintiff always communicated with law enforcement and Mr. Andrews under her pseudonym, until years later.

323. In public, Defendant Devereaux was attempting to portray herself as a "retractor" - the people the FMSF use as proof that satanic ritual abuse does not occur. In public Devereaux inferred that her therapist implanted false memories of cult involvement along with her MPD/DID diagnosis, but in private she confessed to being a victim of satanic ritual abuse and an MPD/DID.

324. On October 10, 1999, "CyberForensics" wrote to Plaintiff's curiojones3@hotmail.com account, forwarding her a message that she had posted to the Witchhunt egroups list.  She used her name, Michelle Devereaux in the message and pointed to her web site - http://www.stobsidian.com/TheAdept - which proved that "CyberForensics" or Cyber4n6@hotmail.com was actually Defendant Michelle Devereaux.

325. On October 15, 1999, Cyberforensics (Defendant Michelle Devereaux) wrote to Plaintiff telling her that someone was aware that they had been corresponding and had demanded that she turn all correspondence between her and Plaintiff over to them. Cyberforensics claimed to be alarmed and that this person might be traveling to the San Diego area on Monday. She suggested that she and Plaintiff "meet" so she could fill Plaintiff in on what was going on. She wrote she had pictures and a "story to tell." She claimed that her goal in telling the Plaintiff all this was to keep her "safe." Plaintiff wrote her back, telling her she didn't think they should physically meet because Devereaux might be followed by those who wanted to harm her.

326. Instead, Defendant Devereaux and Plaintiff arranged to have a private message chat on October 20, 1999. [Exhibit 6]. Ms. Devereaux wrote under the name of "lurker." Although Plaintiff found it very difficult to believe she was sincere and was trying to assist her, she still went out of her way to be kind to Defendant Devereaux. Devereaux claimed that one of the people who was interested in locating her identity had mentioned "blood," which was triggering for her, and she admitted to being diagnosed MPD/DID.  She claimed that law enforcement she had contacted asked her to "not to break off communication" with the people who were looking for Plaintiff but she was worried that she had put the Plaintiff "in danger" by handing over all of her communications to them.  She mentioned she had not "lost time," so she did not think anyone had accessed her. "Lost time" is a common symptom of MPD/DID's.  Devereaux claimed that she was worried because she had potentially put her in danger and that she was glad she had said "no" to meeting her because "they" might have followed her. Defendant Devereaux wrote in response to Plaintiff telling her she was sorry she was in this position:

> "I just wanted to make sure you are safe. You REALLY do need to be careful 'cuz these people are very dangerous indeed, and very serious."

327. When Plaintiff asked Defendant Devereaux if anyone had actually said they were going to hurt her, Defendant Devereaux (under Lurker) wrote:

"There are at least 2 people, that I know of who have mentioned physical
harm. One [sic] here in SF, the other up north."

328. This Instant Message Chat (that Defendant Devereaux had originally told the
Plaintiff was private) was then posted to a group that was set up to harass and mock
Plaintiff by a friend of Defendant Devereaux's by the name of William Scherk at:
http://members.dencity.com/curiojones/transcript.html. He had posted the Message Chat and
had listed the name "Curio" on the left and "Lurker" on the right. William Scherk had sent a
message to Plaintiff's email earlier on December 18, 1999  with the invitation to join the
curiojones group, a "fan" site which had "pictures," and as a place "we can celebrate
Karen."  His way of "celebrating" Plaintiff was to post various "spoofs" about her, stating
that she was a "vigilante," "demented" and connected to "quack" therapists.

329. Defendant Devereaux had deleted some of the information she supplied about
Michael Aquino or "Mr. A" from the Instant Message Chat, such as she was born in South
Korea on a military base known for Mind control and that was how she knew Mr. "A," and
about a researcher in Washington state who was looking for Plaintiff's identity. The Plaintiff
thought that might possibly refer to Defendant Dr. Elizabeth Loftus from the University of
Washington who was actively trying to overturn the convictions of the Wenatchee Sex Ring
at the same time Plaintiff had a web page in favor of the prosecution.

330. Defendant Devereaux and Plaintiff decided to set up a private email account at
city2city.com. Her email was TrinitySDream@city2city.com (which she signed as "Tess")
and Plaintiff's email was kjamson@city2city.com. In her first message dated October 17,
1999 from this account Trinity (Defendant Devereaux) again responded to Plaintiff's
comment in the Instant Message Chat to be careful because Mr. A, or Defendant Michael
Aquino might access one of her alters. Defendant Devereaux wrote back stating she found
her apartment door unlocked and a cab was waiting for her recently but she had no memory
of ever calling them. Plaintiff interpreted this to mean that Defendant  Devereaux thought
one of her alters might have done this.

331. On October 18, 1999, Trinity (Defendant Devereaux) wrote "Proper authorities
have been alerted" in response to Plaintiff's concerns that Devereaux told her "dangerous"
people were looking for her real identify.

332. On October 19, 1999, Defendant Devereaux responded to Plaintiff's request for
information about cults. Plaintiff believes that the following message proves that Defendant
Devereaux acknowledged knowing about cults and death ceremonies, first hand. Devereaux
kept fishing for information about the Plaintiff but she didn't cooperate and continued to
deny ever having physically met Devereaux. Devereaux wrote:

"I know quite a bit about this, including the 'cult' alter stuff ... Anyway, that's when
I used to live out in the country, in a trailer, no less ... It really sucked, cuz it turned

out my neighbors were actively involved in the cult and were performing ritual magic … Also have a writing from an incident that occurred (back then) it's in poem form, but has to do with a 'ritual death ceremony'. You may also wish to do a search for a document called, 'Rite of the Ghoul' …"I do seem to recall, at the time of reading that it appeared quite accurate indeed."

333.  On October 21, 1999, Defendant Devereaux again claimed to have met the Plaintiff and wrote that she had gone to "great lengths to protect" her, and again, when the "folk who are interested" in Plaintiff had been trying to get Defendant Devereaux to ally with them, she wanted to break off contact, but "Don" from the DOJ asked her not to. Defendant Devereaux wrote that she wanted Plaintiff to contact her by <u>telephone</u> but Plaintiff refused.

334.  Specifically, on October 21, 1999, in response to Defendant Devereaux's request to call her on the telephone, Plaintiff wrote her a reply in the negative, saying she was very leary of "phone stuff" and Defendant Devereaux's MPD status.  Defendant Devereaux wrote back, suggesting that she could use a "voice converter" which Plaintiff declined to do because she had no interest in making telephone contact with Defendant Devereaux.

335.  On October 21, 1999, Defendant Devereaux wrote that other people were going to "turn the heat on her" because Plaintiff continued to write messages on the internet in clear attempts to intimidate Plaintiff from exercising her First amendment rights to free speech.  The Plaintiff wrote back on October 22, 1999 telling Defendant Devereaux that she had a perfect right to write messages to the internet and would not stop posting. In fact, Plaintiff wrote, "so what if they planned to hurt me" (because she was feeling depressed), and to tell "them" that she carried a gun. [Exhibit 7] Although it is true Plaintiff had a gun in her home for ten years due to the volatile nature of her job description, she never carried it on her person. Plaintiff merely wrote this as a preventative measure to stop any possible violence directed towards her. At best, she thought Defendant Devereaux was a MPD/DID who had different alters with contrary motivations. Plaintiff continued to maintain contact with Defendant Devereaux in case she gave her any information of import about potential physical harm that might come to her so Plaintiff could notify law enforcement herself.

336.  On Oct 22, 1999, Defendant Devereaux wrote in response to the Plaintiff's statement, "who cares if someone hurts me" :

"Well, actually, I do. I care very much as does Don. He thinks I may have stumbled onto something big. That's why he's checking it out."

337.  Plaintiff read three messages by Defendant Michelle Devereaux's which were posted on the Witchhunt list about Devereaux's history. On October 13, 1999, in message

No. 4237, Defendant Michelle Devereaux claimed that she had been suicidal for nine years because she thought she had been responsible for "killing infants," and apparently her son was placed in foster care by social services after she too had been "falsely accused." She wrote her son was taken away because of her "illness." On October 13, 1999, in message No. 4219, Defendant Devereaux wrote that she thought those diagnosed with MPD should take responsibility for their actions. She claimed to have been in therapy and was at times worried that even her best friend could be an "infiltrator from the cult." She acknowledged that pictures could be triggers (causing an MPD to switch). Defendant Devereaux claimed her parents died with the mistaken knowledge she believed they were satanists and she was "cruel" to them.   On October 14, 1999, in message No. 4258, Defendant Devereaux  wrote that she "used" to believe her parents were Satanists.

338.  On October 22, 1999, Plaintiff wrote a message to Defendant Devereaux via their city2city email account because she had read a message by William Sherk claiming that someone had made personal contact with Plaintiff at SDSU. He wrote about a "Halloween Surprise" that they were planning for Plaintiff.  Defendant Devereaux replied on October 22, 1999 claiming that other people might have intercepted email between them.

339.  On October 31, 1999, (Halloween) Plaintiff was sitting at the San Diego State Computer lab, reading a message sent to her by Defendant Devereaux from her city2city account about the "Halloween Surprise." Defendant Devereaux had written in this message, dated October 30, 1999, that she knew what the "Halloween Surprise" was. People were going to "dress up," and that was just another way to "yank" Plaintiff's chain. Defendant Devereaux claimed she had not given anyone Plaintiff's identity, she had no ill will towards her, and no desire to place her in "harms way." To Plaintiff's surprise, Defendant Michelle Devereaux sat down beside her at San Diego State University Computer Lab while she was reading this message. Plaintiff quickly ascertained that this was Defendant Devereaux and asked her why she was following her when she had asked her not to. At that time, although it was clear Plaintiff lived in San Diego, it appeared (at the time) nobody was aware of her name or, more importantly, nobody could prove her identity as "Curio." Plaintiff later assumed that Defendant Devereaux's appearance next to her in San Diego was the intended "Halloween Surprise" as satanists often stage activities around symbolic dates such as Halloween.

340.  While sitting at the computer at SDSU Defendant Devereaux said that Defendant Aquino wanted her to find Plaintiff and discover who she was. Defendant Devereaux stated she personally thought trying to find her was a "game" which she enjoyed because she thought the Plaintiff had an amusing personality. Plaintiff told Defendant Devereaux that she was not going to respond to her and left the computer lab. This incident caused Plaintiff significant emotional distress after she realized she was being stalked.

341. On November 2, 1999, someone writing under the pseudonym toomuchsparetime@hotmail.com, which Plaintiff suspected was Defendant Devereaux, wrote a song to be sung to the Beverley Hillbillies to the Witchhunt list. It read, in part:

> "Pretty soon a lurker -- joined in the game,
> Had a close encounter – figured out her name,
> Even took some pictures—of her auburn locks,
> And made a note  -- of her upside down socks
> Weird that is…really strange…hookey"

342. Plaintiff was concerned because someone was alleging to have taken pictures of her.  On November 6, 1999, Plaintiff wrote a letter from her curiojones3@hotmail.com (and forwarded that message to her kids2curio@hotmail.com account for safekeeping) formally requesting Defendant Devereaux to physically stay away from her. Plaintiff copied this message to arson investigator Charlie Andrews. [Exhibit 8]

343. In response, Defendant Devereaux wrote to Plaintiff on November 9, 1999, claiming that the library was "public property." [Exhibit 9] Defendant Devereaux wrote that the fact she and Plaintiff ended up reading their emails together was "purely coincidental." Devereaux again claimed that the Plaintiff was at fault for posting Karen K's address to the internet. Defendant Devereaux then threatened:

> "Is it true that you are carrying a concealed weapon? I sure hope you
> have a license to carry. After all I do believe it is still illegal to carry
> a weapon (concealed or otherwise) on to University grounds in the
> state of California. I also believe it is illegal to use electronic media
> to threaten people with such weapons."

344. In this letter, it appeared that Defendant Devereaux was trying to retaliate because Plaintiff had requested that Defendant Devereaux stay physically away from her – for the third time. Plaintiff continued to interact with Defendant Devereaux somewhat because she still thought of herself as an investigator and believed  Defendant Devereaux was providing her with excellent documentation about a cult "retractor" which is the reason why Plaintiff kept copies of all of Defendant Devereaux's manipulative messages.

345.  On November 12, 1999, Defendant Devereaux wrote to the Witchhunt list in message No. 5655, writing as cyberlurker@hotmail.com. Devereaux appeared to be somewhat out of control and wrote that she was a "magician" and bragged that she was an "Ipsissimus."  That term refers to a hierarchal system in an occult order. Ipsissimus usually indicates someone who has very advanced status and some degree of Mastery within their occult organization. Defendant Devereaux appeared to be mentally ill and so Plaintiff highly doubted whether she had such a status, but it is possible that someone Defendant Devereaux worked for told her she was an Ipsissimus, for instance, Defendant Aquino, who also has such a degree in his Temple of Set, in attempts to seduce Defendant Devereaux to work for

them. Devereaux went on trying to spoof information about Manchurian Candidates, writing either that's what she was and that's how she "found" the Plaintiff or that it was because Plaintiff was "really, really STUPID." She declared she was a "Manchurian Candidate Cybergod(dess)! And DAMN I'm GOOD!" Defendant Devereaux then drew what she thought were the connections between David Calof, Plaintiff, Karen K., the ISSD, and others. Ms. Devereaux also claimed to have a "secret."

346. On November 13, 1999, Defendant Devereaux wrote from her "Trinity S Dream" account to Plaintiff's kjamson@city2city.com account claiming Plaintiff had made a "weak attempt at trying to threaten" her when she copied the letter requesting Devereaux stay physically away from her to arson investigator Charlie Andrews. Defendant Devereaux claimed she has no intentions of publicizing any "alleged pictures" of her or her address – apparently trying to frighten Plaintiff by inferring that she had taken pictures of her.

347. At an earlier date Greg Clark from the Witchhunt egroups list had written a message indicating that he, Michelle Devereaux and Dr. John Price were "friends" of his which inferred that via some common factor, these people were connected. On November 13, 2000, on the Witchhunt list, in message No. 5666, Greg Clark wrote that some took photographs of Plaintiff unbeknownst to her:

> "For those not following this, the person who exposed Curio will soon do a "What I did On My Summer Vacation" site that will have everything including pictures. It promises to be "quite funny."

348. On December 23, 1999, in message No. 7175 on the Witchhunt list, John Price wrote a message claiming that Plaintiff was not "fat" and there were pictures of her circulating which he had seen.

349. On December 30, 1999, in message No. 7361 on the Witchhunt list, someone writing under the pseudonym "satanic troll" reposted a message the Plaintiff had written on another forum. Plaintiff chose that time to write that she believed the FMSF should be investigated for possible insurance fraud which was an opinion that she had a right to express.

350. On January 12, 2000, Defendant Devereaux wrote to Plaintiff under her Trinity S Dream account to her kjamson@city2city.com again, apologizing. She wrote that she was scared, and she claimed she was going to alert law enforcement authorities about "what was going on." Plaintiff wrote that she felt sorry for Defendant Devereaux (because she thought she was mentally ill) and told Devereaux that she cared about others even when it appeared they were playing games with her. Plaintiff had given Defendant Devereaux the name of San Francisco Detective Sandra Gallant to go to for protection. Devereaux, in turn, gave Plaintiff the names of the law enforcement officials she was referring to, which included Don Cavender of the DOJ, Dave Hendron of the San Diego Police Department, and FBI's

Robert Rolfsen. The Plaintiff phoned them all, under her pseudonym, and they told her that they had spoken to Devereaux but she had not givem them any information of value.

351. On January 13, 2000, Defendant Devereaux forwarded Plaintiff a message Plaintiff had written on the open internet about Defendant Devereaux's behavior and Devereaux responded to Dr. John Price's reply. John Price had written to Plaintiff: "Would you like me to host your photograph if I can get permission from the photographer?" Devereaux wrote:

> "Both of you are assholes! And NO John. You do not have my permission
> to post Karen's pictures. And if you insist on posting them I am certain
> Detective Rolfsen will be more than happy to explain to you the
> intricacies of internet stalking behavior. By the way, he didn't find those
> little comments you made to me funny, or the fact that you've
> threatened on several occasions to travel to San Diego, as recently as
> two days ago."

352. This continual reference to potential harm to Plaintiff continued to frighten her. On January 16, 2000, Plaintiff wrote to Defendant Devereaux at TrinitySDream@City2City.com from Plaintiff's kjamson@city2city account telling Devereaux that law enforcement said they needed information about a credible threat, not vague generalities. Devereaux replied on January 16, 2000 claiming she had filed a report with the FBI on January 14, 2000. Defendant Devereaux gave Plaintiff her pager number so law enforcement could contact her, and then she *attached a photograph* of the Plaintiff which she claimed she had given to law enforcement. Defendant Devereaux forwarded her message from the kjamson@city2city account to Plaintiff's curiojones3@hotmail.com account, and Devereaux's response was "From: "Michelle Devereaux" Michelle.Devereaux@Stobsidian.Com account, (at the top of the email) which proves that Defendant Devereaux received Plaintiff's original message from her TrinitySDream@City2City.com email account, and proves that Trinity S. Dream was in fact Defendant Devereaux.

353. This message proves that Defendant Devereaux was corresponding with Plaintiff under the city2city account where Defendant Devereaux acknowledged cult involvement, having a diagnosis of MPD, and expressing her concern that Plaintiff would be harmed if others discovered her real identity. Plaintiff presumed that Defendant Devereaux had been corresponding with her under various names in order to try to hide her manipulative game playing so the Plaintiff could not use any of Devereaux's messages against her legally in court, but she made a mistake.

354. In approximately March/April 1999, Plaintiff published a web page documenting her interaction with Defendant Devereaux's titled, "Michelle Devereaux and Internet Stalking." On this web page, Plaintiff gave an overview of her experience of Ms.

Devereaux's behavior and noted the threats and many false allegations that were being made against her. For instance, Devereaux's friend and a political adversary of Plaintiff's, William Scott Scherk, alleged that:

> "A Satanic cult truly is after you. They set up a hit, but 'lurker' botched it by tipping you off."

355. Another threat by a man named "Peter Hood," a friend of Leslie Packer and Dr. Price's, was documented on this web page. He wrote, in part:

> "Hey, fuck off and die. Slowly of course. After we find out your true name and address, and you get to answer certain questions in court."

356. After highlighting several other threatening comments which had been made against her, Plaintiff wrote on her web page:

> "What this means is that if anything were to happen to me and a picture of me is actually found in the possession of those named above, I suggest law enforcement thoroughly investigate this. I have documented the above activity, not only for my safety but because therapists are being sued and harassed by the SRA cult multiples that they treat.

357. Plaintiff documented on this web page that Mr. Scherk had falsely alleged that she had posted Scherk's private address on the internet. What actually occurred is that Plaintiff had discovered a message posted by Mr. Sherk on a binaries (photos) newsgroup titled, "Flesh and the Devil," after which he posted his address along with a request to "Write!" Plaintiff reposted this particular message which indicates it was Mr. Scherk who released his address, not the Plaintiff. It should be noted that a friend downloaded a copy of the Devereaux stalking web page on October 4 2000 which means that this information was available to law enforcement and interested others. Plaintiff had posted and publicized overwhelming evidence that some group of people meant to harm her which SDUT reporter Mark Sauer should have been more than aware of.

358. On Feb 23, 2000, satanist Defendant Lysenko/ Jantsang wrote a response to Plaintiff's request for information about the whereabouts of Defendant Aquino due to the fact a colleague had heard rumors that he had died and had asked Plaintiff to verify if this was true. Jantsang wrote, in part:

> "Dr. Aquino has been known to be a collector of occult traditions from many areas. Currently, Dr. Aquino is traveling around in the former Soviet Union trying to track down old occult traditions. I know this because my uncle, a former general in the KGB, told me so. "

359.  Plaintiff wondered why Lysenko/Jantsang's "uncle" in the KGB would be interacting with Aquino but was later told that due to her "uncles" affiliations with the KGB, Lysenko/Jantsang was instrumental in targeting the Plaintiff with psychotronics and other technology, and that Defendant Aquino had been to the Soviet Union to prepare for the eventual assault on Plaintiff.

360.  Plaintiff informed the stalking unit of her local District Attorney's office that she was being pursued by a satanic cult to see what they advised. Because Plaintiff communicated with them under a pseudonym, they told her they would only take action if she revealed her real name. Plaintiff was unwilling to do that because she did not believe that law enforcement would be able to protect her from Defendant Aquino. Instead, she thought the content of her public web pages would protect her from false allegations and might prevent her opponents from taking harmful action against her.

361.  In approximately May/June 2000, Defendant M. Aquino, and it appeared Defendant Devereaux, were successful in finally having Plaintiff's free web pages at Geocities and Tripod censored from the internet, apparently due to several frivolous complaints.

362.  At that time, Devereaux was writing messages falsely claiming that Plaintiff had posted a private therapy session of Pat Burgus on her Tripod free web site. In reality, Plaintiff had posted a transcript from a video-documentarian of Pat Burgus's statements in which Burgus gave details about the satanic cult she was allegedly involved with shortly before she sued her psychiatrist, Bennett Braun, for implanting "false memories" of satanic cult involvement. Pat Burgus was also the client of R. Christopher Barden at one time. After most of Plaintiff's web pages were taken down, Defendant Devereaux took all of Plaintiff's appellate documentation and posted it to her web page at stobsidian.com, making it appear as if this research were her own, but at Plaintiff's request Defendant Devereaux  took this information down from her website.

363.  On May 15, 2000, Lesley Wimberly, one of the leaders of VOCAL, wrote message #12760 on the Witchhunt list after Wimberly attempted to defame a well-known Doctor in San Diego, she wrote:

"PS. Just one word of warning to you: surely you must know that the more you post, the closer we get to finding and identifying you."

364.  On May 25, 2000, a message was written in SPP and cross-posted to alt.usenet.kooks by "Kali," (Kali is the name of the Hindu Goddess of death and destruction), aka Kimberly Barnard, a friend of John Price and Defendant Devereaux, describing the fact  that Plaintiff's web pages were taken down which proves again that these people were enjoying censoring Plaintiff:

"Yesterday was a fateful day for Curio. She lost 2 email accounts, 4 web sites, and her Tripod membership in just under 24 hours. The site containing her Cult Archives is gone. A little birdie tells me that she did not have any of the material archived anywhere. Duh 'oops."

365.  At the end of Kali's message was a message written by Defendant Devereaux (with her name omitted) which explained how she was able to take down Plaintiff's web pages. On May 24, 2000, FMSF's Herman Ohme wrote in message #13300 on the Witchhunt list, forwarding a message from an anonymous party about further censorship in a message titled, "Curio's passing":

"I am sorry to inform you that Karen Jones Geocities pages have been removed, all of them. I am sure we will miss the passing of this great literary work. Her cult collection surpassed even that of the most astute cult investigators, Griffis, Gallant, and Gunderson, and was world renown.

There's more. Her hotmail accounts are being suspended one by one, curiojones3 was the first to go, yesterday. Her kar5, jongunthrie, grajton3, jkirpatrick, conaj1, and thomasdylan hotmail accounts are sure to meet the same fate.

Rest assured, she will resurrect her works, although this may take some time In the mean time, please take brief moment with me to say a quiet prayer for the demise of these pages."

366.  On June 13, 2000, Plaintiff was posting a message from San Diego State University computer lab when campus police officer Eddie Garcia approached her, asking her to follow him out into the hallway. Officer Garcia asked Plaintiff if she was "harassing" anyone and what was she doing there. Another officer requested that Plaintiff give them her driver's license and then searched her purse. They told her that there were allegations that she "carried a gun" and was "harassing" others on the internet.  Plaintiff explained to the campus police (to Officer Svec - who is employed by SDSU but is presently overseas due to his service in the Active Reserves) that she did nothing of the kind and this was just a ruse to try to ascertain her identity.

367.  At first the Plaintiff told Officer Svec, who took the report, that an "ex-boyfriend" was looking for her identity so please not release her name to anyone. Officer Svec said he would not release her identifying information to anyone, the field report would only be accessible to those inside the Law enforcement system, and he asked her why she was so "paranoid" about law enforcement. Plaintiff was "paranoid" because she knew that some police officials are simply not that smart and satanic cults can run rings around them.

368.  Plaintiff then informed Officer Svec that a dangerous group of people were looking for her identity. Officer Svec searched her purse and stated there were also allegations Plaintiff had "stolen" an ID from a UCSD professor and was carrying a "gun." Apparently Defendant Devereaux had acted on her threat that she would report that she was "carrying a gun," which had only been written in response to Devereaux's claim that others intended to harm her. Plaintiff told Officer Svec that she had never stole any ID from a UC San Diego professor and assumed the person who falsely accused her might be Nancy Alvarado from UC San Diego who had in the past threatened to make false criminal complaints about Plaintiff in retaliation after she requested ethical guidelines from UC San Diego about Alvarado's conduct. Officer Svec stated that if Plaintiff had any future trouble with these people, to contact them. Svec disclosed that he had received other information which led him to believe that the Plaintiff was the one who was being harassed.

369.  Two months later, to Plaintiff's surprise, an anonymous poster using the name of "No User" wrote a message entitled, "Curio's BIG SPNAK," on August 11, 2000 to alt.usenet.kooks, claiming that Plaintiff (Curio) had been detained at SDSU and had flown into "a rage" accusing the officer of "signing" her "death warrant," and was taken in on a "5150" hold. 5150 means that due to a mental illness, a law enforcement official or other professional, takes someone to a hospital because they appear unable to care for themselves, or they are a danger to others. The message ends, with:

> "Naughty, Naughty Curio. Didn't daddy teach you not to play with guns?"

370.  Plaintiff did not know what to make of this comment because SDSU officer Svec had promised that her identity would only be accessible by legitimate law enforcement.

371.  In approximately July 2000 the Plaintiff was contacted by reporter Defendant Sauer of the San Diego Union-Tribune by email who told Plaintiff that they "knew" who she was and he was going to write an article about her. Would she care to give him an interview? Plaintiff became very frightened after this communication.  She never responded to Defendant Sauer because she had contacted the police at San Diego State University who denied ever having spoken to any news reporter, a claim they repeatedly made up to the date that Defendant Sauer's article was published, which quoted SDSU officials. Based on these representations by employees of Defendant SDSU, Plaintiff thought Mark Sauer could be bluffing, fishing for her name, or wanting her to verify her name for them. Shortly before Defendant Sauer's article was published, he went to Plaintiff's home, but she did not answer the door. Defendant Sauer then went to the home of Plaintiff's close relative seeking her whereabouts which Plaintiff was upset about because, at worst, the message was that he and therefore others knew where her family lived.

372. On August 29, 2000 a message appeared on the open internet, written by a FrancineCornHarvest@hotmail.com, alleging:

> "We've all known your true identity for months now." "Once they know you are the disgraced, discredited, disgruntled ex-California CPS 'social worker' cut loose with 5 others in 1992 for abuse of power and/or lying in court, the public records exposing you will be easily accessible to anyone who wants your police file, etc. The Diana L. Napolis file."

373. The facts are, Plaintiff voluntarily resigned from CPS in September 1996 and was never at any time accused of lying, nor was she ever "discredited." In fact, in 1998 Plaintiff was able to prove to an Administrative Law Judge that CPS was guilty of incompetence and malfeasance after she proved she quit CPS under duress. The Judge ruled on her behalf and ordered that CPS was to give her unemployment benefits. "FrancineCornHarvest's" message is an example of a libelous post that was immediately written when these people became aware of Plaintiff's real name.

374. This information provides substantial evidence proving that Plaintiff was harassed and threatened that others would make false police complaints about her, and was physically threatened during the years 1995-2000 in efforts to stop her from asserting her First Amendment Rights to Free Speech.

375. On September 24, 2000, a defamatory and invasive story was published in the San Diego Union Tribune about the Plaintiff, titled the "Web of Intrigue - The Search for Curio Leads Cybersleuths Down a Twisted Path," which was written by Defendant Sauer. [Exhibit 10]. This article was filled with disinformation and was a blatant piece of propaganda intentionally orchestrated by Plaintiff's political opponents.

376. Because Plaintiff had named reporter Defendant Sauer on her web page as "giving a one-sided portrayal of the reality of SRA for years," which was proven in the beginning of this complaint, and cited his apparent collegial relationship with Defendant Hopkins, she was not surprised to see a skewed article but was very surprised to see how her privacy was invaded and the extent of the false allegations contained within this article. Because Defendant Sauer was a party to Plaintiff's case, it seems highly unorthodox for Mark Sauer to have written this article due to his conflict of interest and it was irresponsible and negligent of Defendant Copley for publishing it. The many defamatory and invasive comments are as follows. Plaintiff's commentary follows each quote:

377. "Armed with a telephoto lens and a laptop computer with a hidden camera, Michelle Devereaux headed south from San Francisco on a mission to find Curio" ... "Just when Devereaux was about to give up, however, she spotted a trim, middle-aged woman with longish brown hair sitting amid the forest of computer terminals.

378. Defendant Sauer began his article by describing Plaintiff as "trim," "middle-aged," a "female," who had "longish brown hair," thus violating Plaintiff's privacy and safety by providing a physical description of her.

379. "Was it Curio? Devereaux had seen her once, even chatted with her briefly, on a reconnaissance tour of the computer lab a month before. But she had to be sure."

380. Defendant Sauer documented in his article that Devereaux was indeed following Plaintiff (against her wishes) except he described this egregious and outrageous conduct as a "reconnaissance tour."

381. "She dispatched Barry with the laptop camera to a vacant machine across from their target with orders to start snapping surreptitiously. Then Devereaux took out a monocular so she could get a long-range view of what the woman was reading on her screen."

382. Defendant Sauer documented in this excerpt that Defendant Devereaux, in spite of her representations to Plaintiff that she was in danger from some unnamed number of individuals, willfully and with malice violated Plaintiff's safety and privacy by following her and having her photographed. Devereaux did not use a monocular to read her email, she read it from her position sitting next to Plaintiff.

383. "Devereaux hastily scribbled a note to Barry: "It's Curio! She's reading an e-mail I sent her last night!' She handed the note to the student sitting next to her: 'Would you please give this to that guy over there, the one with the baseball cap that says 'Psycho.'"?

384. It could be interpreted that Defendants Sauer and Devereaux were trying to intimidate Plaintiff by referring to Devereaux's companion as wearing a cap with the word "psycho" on it who was now aware of Plaintiff's identity.

385. "A dozen or more people from San Diego to Washington State and beyond - all victims of Curio's Internet missives – had been trying to unmask the notorious cyber crusader for nearly five years."

386. Defendant Sauer placed Plaintiff in a false light by inferring that she had victimized anyone on the internet. In fact, as evidence has proven, it was the Plaintiff who had been victimized by Defendant Aquino and others. Defendant Sauer admitted in this statement that a group of people had been in pursuit of Plaintiffs identity because she was a "notorious cybercrusader," however Defendant Deveraux had informed her that some members of this group pursuing her identity meant to physically harm her.

387. "Now Devereaux had her in the cross hairs. But the photos wouldn't be enough. She hatched a plan."

388.  Defendant wondered why an allusion to a gun - "had her in the cross hairs" - was made by Defendant Sauer in this article. Because Defendant Devereaux had tried to frighten or perhaps in the beginning warn Plaintiff that several dangerous individuals were searching for her identity, Plaintiff was not comforted by the allusions to guns in this article.

389.  "Barry would wait out front with the telephoto lens. Devereaux would pick the right moment and approach Curio; she'd get spooked, head for the parking lot and Barry would photograph her license plate. Then they'd have her.

390.  Defendant Sauer wrote that Devereaux and her friend Barry intended to "spook" Plaintiff as if this was normal and acceptable behavior. In fact their intent to "spook" her so that she would run to her car, after which her license plate could be photographed by "psycho," described the frightening pursuit of Plaintiff's identity. That was inappropriate stalking behavior and it was even more inappropriate for Sauer to repeat this conduct in a supposedly legitimate publication.

391.  "The photos of her from the secret camera weren't that clear; nobody recognized the woman staring at the SDSU computer screen."

392.  This statement proves that Defendant Devereaux had distributed photographs of Plaintiff to unnamed others so that she could be identified for fraudulent reasons which invaded Plaintiff's right to privacy and exposed her to danger. Because Defendant Devereaux had warned her that several people wished to harm Plaintiff, Devereaux's actions are indicative of malice.

393.  "It would be another eight months before those who have railed against her online, have sued her, have traded implied threats with her and reported her to the police would get the answer to the question tormenting them. Who is Curio and why is she saying such nasty things about us on the internet?"

394.  Defendant Sauer placed Plaintiff in a false light by claiming that she had "traded implied threats" with others. Plaintiff had never made a threat of harm to anyone, yet those false allegations were routinely made by Defendant Aquino, Hopkins, Dr. Alvarado, and others on the internet about her without any evidence provided to support these statements. By repeatedly claiming that Plaintiff was guilty of "stalking," it placed her at risk of being apprehended by the police based on false allegations, in furtherance of the Defendants campaign to have Plaintiff identified by any means necessary in efforts to destroy her reputation and career, and to stop her from exercising her constitutional rights to free speech.

395.  "Following the acquittals of the McMartin defendants and Akiki (who won more than $3 million from local authorities in a civil lawsuit), the theory of a satanic-ritual-abuse conspiracy was discredited by mental-health experts and the courts."

396. Plaintiff discovered that from the years 1984-2006 that a total of 130 published or unpublished papers existed about the reality of satanic ritual abuse which were written by mental health experts. It is a misstatement of fact that, in general, satanic ritual abuse was discredited by mental health experts and the courts. It is more accurate to state that Defendants Sauer, Hopkins and the SDUT did everything they could to have satanic ritual abuse and the courts discredit the reality of satanic ritual abuse in San Diego County.

397. "A 10 year investigation of satanic-ritual-abuse allegations by FBI Special Agent Ken Lanning turned up virtually nothing. Yet certain people persist in their belief in 'these heinous crimes against children.' Curio claims to be able to document 50 such cases worldwide."

398. Defendant Sauer admitted that the Plaintiff had an archive of ritual cases which he obviously had seen but apparently was unimpressed by. He then inferred that there was something wrong with people who persisted in the belief that satanic ritual abuse existed in the same sentence that he acknowledged seeing the objective evidence which proved that it occurred. This indicates malice on the part of Defendant Sauer.

399. "In her zeal to protect 'young victims', Curio has posted extensive information about notable individuals who worked hard over the years to debunk the notion of satanic-ritual abuse."

400. Defendant Sauer made it obvious that Plaintiff was posting information about individuals who "worked hard" to debunk ritual abuse without mentioning whether or not the information that she was posting had any validity. And why were people "working hard" to debunk the notion of satanic ritual abuse, when it clearly existed?

401. "Most of these people have stated their conclusions regarding ritual abuse in public forums and have been questioned in open court, where no one is anonymous."

402. Defendant Sauer appeared to criticize Plaintiff, inferring that she did not have the courage to face people in open court. In actuality, Plaintiff routinely faced perpetrators in court, as part of her job description, including those accused of ritual abuse. The real reason why the people named have felt no fear stating their conclusions regarding ritual abuse is because they continually state it does not occur, therefore they have nothing to fear from actual abusers. The reason why Plaintiff chose to be anonymous is because she was publicizing satanic ritual abuse cases in a world-wide forum and about the organizations which seek to protect them.

403. "Most of these people have stated their conclusions regarding ritual abuse in public forums and have been questioned in open court, where no one is anonymous. But now they were being challenged -- libeled, in their words – by someone who operated at a distinct advantage. Curio (who often went by the full pseudonym Karen Curio Jones) said her anonymity was necessary 'or safety reasons,' and she protected it fiercely."

404. Defendant Sauer placed Plaintiff in a false light by inferring that she had "libeled" others on the internet. Plaintiff had never engaged in libel. Rather, she was telling the truth and believes that Sauer and the individuals quoted in this article wanted that "truth" covered up. Defendant Sauer indicated in the above paragraph that he was fully cognizant of the fact that Plaintiff was worried about her safety, therefore his actions which violated her privacy indicates malice. The reason why Plaintiff chose the full name "Karen Curio Jones" was because she knew the defendants would never be able to discover anyone by that name and so could never endanger another person by falsely accusing them of being her.

405. "You can't imagine what this does to you until you've gone through it," said Carol Hopkins, who is near the top of Curio's Internet enemies list. 'She has disrupted our personal lives, called employers, talked to law-enforcement. She makes all sorts of unsubstantiated claims. There are a lot of crazies out there and some may be willing to act. It is truly frightening."

406. Defendant Sauer quoted and the SDUT published several libelous and defamatory statements made by Defendant Hopkins. It is clear that Defendant Hopkins did not have a good reputation in San Diego for good reason, yet Defendant Sauer quoted Hopkins' claims as if Plaintiff's claims about her were "unsubstantiated." All of Plaintiff's claims about Defendant Hopkins were completely substantiated and documented. Defendant Hopkins then inferred that the Plaintiff was "crazy" and "dangerous" thereby placing her in a false light. It appears that what Hopkins was actually upset about was the fact that Plaintiff's web page about Hopkins' tenure on the 1991-92 Grand Jury was used to discredit Hopkins in her new locale in Cuernavaca, Mexico by a concerned citizen.

407. "Carol Hopkins was a natural target for Curio. The former school administrator, Hopkins was an outspoken member of the 1991-92 San Diego county Grand Jury that blasted the child-protection system after investigating wide-ranging allegations of zealous social workers removing children from their homes without cause. Hopkins later formed the Justice Committee and publicized what she identified as false allegations of child abuse here and around the nation."

408. Defendant Sauer neglected to include all of the facts. Plaintiff, as a former child abuse investigator, was very aware of what the inside and public information was about the cases that Defendant Hopkins and Sauer purported to analyze. Plaintiff refers the court to pages 3-46 which documents the corruption at that time in San Diego County. Although it might have been embarrassing for Defendant Hopkins to see these facts publicized in a world-wide forum, it was not libelous, and any attempts to stop plaintiff from reporting about the other side of the issue was censorship.

409. "Curio blamed Hopkins and two San Diego Union-Tribune reporters (Jim Okerblom and the author of this story) for ending official interest here in satanic-ritual abuse: 'In my opinion, Carol Hopkins, Mark Sauer and Jim Okerblom misreported on and

gave a one-sided portrayal of ritual abuse for the county of San Diego nonstop for approximately six years,' Curio wrote in a post revealing Hopkins' recent move to Mexico."

410. It has been thoroughly documented in pages 3-46 of this lawsuit that Defendant Hopkins, Mark Sauer and others attempted to discredit satanic ritual abuse in San Diego County. Because Sauer was named as a party in this activity which SDUT publisher Copley should have been aware of it, it was a conflict of interest for Defendant Sauer to write this article about Plaintiff and the SDUT was negligent for publishing it. As further events will reveal, Defendant Devereaux sent correspondence to Plaintiff's colleague, Dr. Lacter which proved that Defendant Sauer was one of the parties who had been searching for Plaintiff's identity well before this news article was written, which indicates that Plaintiff was intentionally set up to be identified by law enforcement, based on fraudulent allegations, after which Defendant Sauer could write this defamatory article.

411. It also appears that Defendant Sauer proved by quoting from one of Plaintiff's web pages that Mark Sauer himself had in fact read those web pages which described that she was concerned about her safety. Further, because Sauer had clearly read Plaintiff's web pages, that indicated that he was aware of all the facts and evidence upon which Plaintiff's opinions were based.

412. "Her criticism of me on the Internet was constant," Hopkins said. "She accused me of protecting child molesters, insinuated I was a child molester, claimed I don't believe child abuse exists. Curio was a big factor in my decision to give up the Justice Committee."

413. Plaintiff has never inferred that Defendant Hopkins was a child molester. In fact, that is a complaint that Hopkins commonly makes about her detractors which was documented in a 1998 San Diego Reader publication. However, Plaintiff does believe that Defendant Hopkins' activities serve to protect child molesters, specifically perpetrators of satanic ritual abuse. Regarding Plaintiff's alleged power over Hopkins to make her give up her organization, the Justice Committee, she believes that is a false allegation apparently intended to make Plaintiff appear a villain.

414. "I moved to Mexico for a fresh start and then she tracks me down here. I've learned that nobody escapes the Internet."

415. Plaintiff did not pursue Hopkins to Cuernavaca, nor was she ever interested in where Defendant Hopkins resided. Plaintiff has explained how she was made aware that Defendant Hopkins was residing in Cuernavaca, Mexico. Based on this benign activity, Plaintiff was then accused by others of "stalking" Hopkins and by Defendant Hopkins herself on national television which she later discovered.

416. "Another of Curio's favorite subjects is Elizabeth Loftus, professor of psychology and adjunct professor of law at the University of Washington in Seattle. An internationally known expert on the workings of memory, Loftus has written numerous articles and books decrying the idea that trauma associated with child sexual abuse acts to repress the memory of such horrible events"

417. Given the substantial amount of information that proves that child sexual abuse can lead to repression, Plaintiff believes to state otherwise indicates the author of such statements is not interested in the truth. Plaintiff is not a specialist in memory, however legitimate professionals who are specialists have proven that childhood sexual molest can lead to trauma and repression.

418. "According to Curio, Loftus 'colluded with' Hopkins to write the critical grand-jury reports, a claim both women denounce as absurd."

419. Plaintiff has provided substantial evidence proving that Defendant Hopkins was working with the FMSF and Defendant Loftus during the writing of the 1991-92 Grand Jury report which was obvious due to the fact that their misinformation was contained within the Grand Jury report itself. Hopkins and Loftus merely lied about it in this news article although they acknowledged it in another one, the San Diego Reader in 1998.

420. "Loftus said she recently was invited to deliver the keynote address at a convention of the New Zealand Psychology Society and arrived to find herself the center of controversy. Accusations that she conspired to protect child molesters, many fueled by Curio's Internet postings, led to a story in the Wellington Evening Post and stoked the talk-show fires. 'I spent most of my time defending myself against misrepresentations,' Loftus said. 'People attending my speech were met by individuals with 27-page booklets - much of it compiled from the Internet - accusing me of all sorts of vile stuff."

421. Defendant Loftus placed Plaintiff in a false light by inferring that the bad reception Loftus experienced in New Zealand was due to her misrepresentations of Loftus on the internet. Plaintiff has never misrepresented Loftus's activities on the internet. It has been widely reported that a Dr. John Read of New Zealand protested Loftus's appearance at a conference sponsored by the New Zealand Psychological Society. Dr. Read resigned from his role as the director of scientific affairs and spoke out against Loftus on a national radio program. Plaintiff only had a web page which publicized a few excerpts from Defendant Loftus's deposition in which Loftus appeared to have a predetermined position that the therapist had inappropriately reinforced disclosures of sexual molestation by a child victim. Plaintiff believes that because she regularly took the opposite political position of Dr. Elizabeth Loftus and the FMSF, Loftus took this opportunity to make it appear that Plaintiff was guilty of some malign activity involving Loftus.

422. "But if Hopkins and Loftus consider Curio a tireless nuisance, Michael Aquino considered her a threat to his safety and that of his family. Aquino said that is why he filed

suit in San Diego Superior Court against a local Internet provider in a failed attempt to learn Curio's identity."

423.  Defendant Aquino was a High Priest or leader of a satanic cult for 20 years with hundreds of followers.  Defendant Aquino was a psychological operative in the Army and is knowledgeable about the dissemination of propaganda. Plaintiff had posted information from many books proving that Aquino was extremely dangerous and was processed out of the Army after a satanic ritual abuse investigation in 1990. For this, Defendant Aquino pursued Plaintiff identity. To any objective party, that would indicate that the Plaintiff was the one in danger, not satanist Michael Aquino. Defendant Aquino had proven that he would go to any lengths necessary to accuse her of activity which had never occurred, proven by the false information he submitted to the San Francisco court during the Aquino v. Electriciti lawsuit about her. Plaintiff never wrote any threat to Defendant Aquino. Further, it does not appear that Aquino made any serious complaint to the police about any alleged threats made by her. Therefore, again, Defendants Sauer and the SDUT placed Plaintiff in a false light by choosing to make it appear that she was guilty of "threatening" Aquino.

424.  "It seems inevitable that the retired Army intelligence officer from San Francisco would loom large on Curio's radar screen. He was, after all, a top official in the late Anton LaVey's Church of Satan and founded the Temple of Set, a quasi-religious institution that many consider satanic. In the late 1980's, Aquino was investigated in a McMartin/Akiki-type case centering on allegations of satanic abuse at a day-care center at San Francisco's Presidio military base. Aquino, who was a lieutenant colonel, was questioned because of his satanic beliefs. Neither Aquino nor anyone associated with him was ever charged, much less tried and convicted, in the Presidio case – a point Curio concedes. But that hasn't stopped her from insinuating he abuses children in satanic rituals. 'My basic interest was to identify an anonymous person who, because of his/her obsessions and delusions, might pose a threat to the safety of myself and my family,' Aquino said. Curio claims that Aquino was booted out of the Army as a result of the Presidio investigation. Aquino, who adamantly denied any involvement in the Presidio day-care center or satanic-ritual abuse, said that in addition to the Bronze Star (1970) and many other military awards, he was awarded the Meritorious Service Medal in 1994 following his voluntary retirement from the Army."

425. Defendant Sauer failed to accurately report the facts in his ongoing efforts to promote his agenda that the satanic ritual abuse of children does not exist. Clearly Defendant Aquino was processed out of the Army after a satanic ritual child molestation investigation in 1990. Aquino has done everything he can to try to cover up this fact for obvious reasons. Defendant Michael Aquino is in fact a Satanist. Most people are aware that Satanists are not known to tell the truth. The Presidio Army child abuse case was not a McMartin/Akiki type case because many parents successfully sued the Army after their children were abused at that location. Although Defendant Sauer alluded to Plaintiff's

allegations by claiming that Aquino was "booted out of the Army," he apparently neglected to fact-check whether or not that was actually the case, and neglected to report that there was factual evidence proving that then Lt. Col. Aquino's "process out" is what actually occurred, according to two appellate reports and internal documents to his case. Instead, Defendant Sauer quoted Aquino's statements that he was awarded the "Meritorious Service Medal" in 1994, following his voluntary retirement from the Army." Based on new information, it appears that Aquino did not voluntarily retire, rather it appears that he was forced into retirement.

426.   On December 1, 2007, per a Freedom of Information Request, Plaintiff wrote to the National Personnel Records Center about Defendant Aquino's "Record of Assignment," and they sent back this record, plus a cover letter. The Records Center wrote that Defendant Aquino's dates of service were from June 14, 1968 – August 31, 1990 which also matched Aquino's Record of Assignment which had the same dates. Obviously, this proves that Aquino's career ended in 1990 unless he went to another branch of service after 1990. Plaintiff also requested and received a list of the awards that had been given to then Lt. Col. Aquino and a Meritorious Certificate was not among them. Because Aquino had submitted official looking documents to the Aquino vs. Electriciti lawsuit which made it appear that he served several weeks at a military base, Plaintiff reported these facts to a CID Army investigator in attempts to reality check whether or not Defendant Aquino was penning and distributing fraudulent military documents.

427. By Defendant Sauer's publication of quotes of Aquino such as: 'My basic interest was to identify an anonymous person who, because of his/her obsessions and delusions, might pose a threat to the safety of myself and my family," it obviously proves that Mr. Aquino had participated in the hunt for Plaintiff's identity, and perhaps he was the one of the people that Defendant Devereaux had warned her about. Defendant Aquino's motivation for making this type of remark was obviously to make Plaintiff appear marginal, delusional, and threatening. Because Aquino cannot produce any threat made by Plaintiff, Defendant Sauer's choice to repeat these false allegations and Defendant Copley's choice to publish these false allegations, proves that these defendants are guilty of defamation, malice, and outrageous conduct.

428.   "Devereaux, 43, has two grown sons, a plethora of tattoos and body piercing and an extraordinary knowledge of cyberspace after 20 years in the computer business. She also once believed she had been abused by a satanic cult herself. 'Curio and I were coming from the same place –I spent eight or nine years in therapy, all the while researching satanic-ritual abuse, 'Devereaux said. "It wasn't until 1999 that I exited the cloud of unknowing. Curio, she said, 'sealed it for me that this stuff is all a bunch of crap. When she came along doing her Internet thing and saying all this stuff about these people, I finally realized how crazy it all was. I feel sorry for her on one hand. But she's vicious. And she's got her supporters. She was really hurting people. I decided to get involved."

429. As has been extensively documented, Defendant Devereaux not only once believed that she was abused by satanists but it appears that Defendant Devereaux is a satanist. Defendant Sauer also chose to characterize Plaintiff, via Devereaux's comment, as "vicious." Plaintiff was never vicious and to characterize her as such was in furtherance to justify the invasion of her privacy and to malign her. Plaintiff not only had a public web page which indicated that Defendant Devereaux of stalking her, but she had also posted a public message on sci.psychology.psychotherapy titled, "Stalking and Threats from Michelle Devereaux" which should have been more than sufficient to alert Defendant Sauer that Plaintiff's safety was being threatened by a satanic cult which should have stopped Sauer from invading Plaintiff's privacy.

430. "Devereaux became a cyber-sleuth. She traced Curio's Internet posts to specific computers. Besides her home computer, Curio posted from computer labs at SDSU, USD and UCSD as well as from Children's Hospital, Sharp HealthCare Centers, San Diego Public Library, San Diego County Library and local cyber cafes. So determined was she to protect her anonymity, Curio not only favored public computers but also forged her online identity and scrambled her electronic trail. But Devereaux eventually smoked her out. 'I came up with a way to monitor the Internet so every time she posted, I got paged," Devereaux said. She had contacted police in San Diego and San Francisco about Curio's 'cyberstalking crusade,' yet failed to garner much interest. But Devereaux found a sympathetic ear at SDSU police headquarters on campus."

431. In this quote, Defendant Sauer mistakenly portrayed Defendant Devereaux as a "cybersleuth" when in fact Devereaux met the elements of a criminal stalking complaint. a) Devereaux was following Plaintiff against her will b) Devereaux was writing Plaintiff harassing messages both publicly and privately c) Devereaux was passing along threats to Plaintiff, and by proxy, threatening Plaintiff herself d) and Plaintiff felt fear because of those threats. Sauer then quoted Devereaux in order to make the false allegation that Plaintiff was on a "cyberstalking crusade," further defaming her by implying that she was involved in criminal activity. The reason why Plaintiff was posting messages from so many locations was because Devereaux herself suggested that she not post messages from San Diego State University anymore.

432. "In some of the Internet correspondence, it was alleged that Curio had made threats and might be carrying a gun. That raised our interest," said Detective Susan McCrary."

433. Because Devereaux alleged that others might want to harm Plaintiff, in a moment of stress, she wrote to Devereaux to tell whomever wanted to harm her that she carried a gun. Defendant Devereaux was completely aware of the context of the remarks about a "gun" which she herself instigated. Plaintiff was only defending herself. Therefore her attempts to make it appear that Plaintiff was "threatening" others is libelous, defamatory, malicious, and constitutes outrageous conduct.

434   "She and Lt. Eddie Gilbert agreed to work with Devereaux to catch Curio as she posted from SDSU." ... "Devereaux turned over her secret photos and a detailed description of Curio; the computer-lab was alerted. In late May, Gilbert got a sudden call from Devereaux: Curio was posting. 'I rushed over, but she was gone,' he said. Then on Tuesday, June 13 at 1 p.m., Devereaux's pager again went off. She called Gilbert immediately.' He again hustled over to the computer lab in the center of campus. And there she was. 'I was in plain clothes with another investigator,' Gilbert said. "She didn't match the photo I had – she'd cut her hair. But I was pretty sure it was her. I requested back-up from uniformed officers because of the information about a gun."

435.   According to SDSU campus police, Officers McCrary and Gilbert are no longer employed at SDSU.  Plaintiff believes that Gilbert, McCrary, and Defendant SDSU, engaged in blatant acts of incompetence, negligence and outrageous conduct in their decision to assist Devereaux, a complete stranger from the internet, in an internet dispute in which they had no knowledge of the actual facts but who, according to their own incident report, had enough information to stop them from releasing Plaintiff's identity to this internet stalker who was following her based on false pretenses.

436.   "(Curio) moved to another computer and I noticed she had signed on as ThomasDylan@hotmail – one of her aliases. We moved in and detained her. 'She was extremely upset, kind of paranoid, really. She said dangerous people had been after her for some time, that they were out to get her and now the police were cooperating with them.' The officers searched Curio's bag but found no gun. "When we asked if she'd been using university computers to harass people on the internet she said, 'I post messages and information.' She denied ever harassing anyone in her life, however."

437.   Officer Gilbert then proceeded to place Plaintiff in a false light by describing Plaintiff's genuine and realistic fears as "paranoid." These officers clearly demonstrated by the above quote that on behalf of Defendant SDSU they were entirely aware of Plaintiff's concerns that "dangerous people" were after her and yet they appeared to be taking a side against Plaintiff, in favor of Defendants, and publicly ridiculed her for her legitimate concerns. By making that conscious choice to take sides, Officers McCrary and Gilbert, on behalf of Defendant SDSU became actors in the conspiracy to publicly invade Plaintiff's privacy and intervene in her First Amendment rights to free speech. Plaintiff believes that when it was discovered that she was not carrying a gun, the matter for SDSU should have ended there, and their failure to do so was negligent. If there were other allegations pending which accused her of making "harassing" telephone calls, which Plaintiff discovered later, the SDSU campus police should have communicated with legitimate law enforcement about potential suspects only, not the complaining party, especially so because Plaintiff clearly told these officials that a group of dangerous people were searching for her identity. Furthermore, since officers employed by Defendant SDSU acknowledged in this article that Plaintiff stated "now the police were cooperating with

them," it further serves as evidence that these incompetent officials blatantly disregarded her concerns.

438. "But Curio was anonymous no longer. Her name, Gilbert said, is Diana L. Napolis, 44, of La Mesa. She worked for San Diego County as a child-protection-services investigator for many years before leaving that post in 1996.

439. Defendant Sauer and SDUT publisher David Copley then chose to quote statements by Officer Gilbert identifying Plaintiff immediately after quoting statements by these officials acknowledging that they were entirely cognizant of the fact that she believed she would be in danger if she was identified.

440. "She told us she is self-employed now, working in child-custody cases downtown,' McCrary said. The police warned her not to use SDSU computers any longer. 'One of our big concerns on this campus is stalking and harassment,' McCrary said. Then they let her go."

441. Plaintiff was never told not to stop using SDSU computers. She was told by Officer Svec to report back to the officers if she had any more trouble by these mysterious others who were looking for her identity. SDSU campus police officer Susan McCrary then engaged in defamation and placed Plaintiff in a false light by inferring that Plaintiff was engaged in "stalking" or "harassment."

442. "Within days of Curio's apprehension at SDSU, state records show, a Diana L. Napolis obtained a marriage and family counseling license from the state of California, enabling her to practice psychotherapy."

443. Plaintiff did not want it publicly known that she was a therapist because she did not want to be the target of any malicious actions instigated by the FMSF or other Satanists given the subject matter that she investigated and researched.

444. " Napolis ignored several requests to be interviewed for this story. Whatever motivates her remains pretty much a secret. But now that Curio has been exposed, no one involved is quite sure what to do."

445. Plaintiff ignored Defendant Sauer's request for an interview because a) she thought he might be "fishing" for her name by pretending to be writing an article in hopes she would identify herself and contact him. b) SDSU campus police told Plaintiff that they had never disclosed her name to a newspaper reporter.

446. "It's like the dog who chases cars and finally catches one," Devereausx said. "Now what?"

447.  The statement "now what" resulted in Plaintiff's targeting and eventual psychological incapacitation by Defendant Aquino and others by the usage of nonlethal technology after she was publicly identified by Sauer and publisher Copley.

448.  "SDSU police say they are maintaining a file on her and if there's enough evidence of cyberstalking and harassment, they may recommend that the district attorney file charges. California is one of the few states with an anti-cyberstalking law."

449.  The reference to "SDSU" and "police" apparently referred to McCrary, Gilbert, and Defendant SDSU, who then proceeded to place Plaintiff in a false light before the public again by inferring that she might even remotely be connected to criminal cyberstalking and harassment. Defendant Sauer either quoted directly from the campus police or fabricated the statement that they were going to maintain a "file" on her. By Defendant Sauer's reference to the California "anti-cyberstalking law" in the next sentence after he quoted "police" stating they were going to keep a "file" on Plaintiff, he attempted to suggest and infer that Plaintiff might be engaged in cyberstalking. Plaintiff believes statements alluding to false claims about her conduct, and the inference that her conduct might constitute "cyberstalking," was meant to intimidate her from exercising her first amendment right to free speech on he internet because the inference was that perhaps further false criminal complaints lay in her future if she continued to assert her rights and participate in a public forum.

450.  "It's a very gray area, though," McCrary said. "She hasn't made any physical threats. Everything's been done in a public forum."

451.  Because McCrary acknowledged that Plaintiff had not made any threats, then it was completely inappropriate for SDSU or Sauer to suggest that a "file" might be kept open on her. A critical element of a criminal stalking complaint is that it has to be proven that the accused made a threat which Plaintiff had not been guilty of. Given that Officer McCrary acknowledged that she had made no "physical threats," it was libelous for Sauer to infer that Plaintiff was guilty of cyberstalking.

452.  "But pulling back the curtain on Curio to reveal Napolis has effectively stripped her of her power, Devereaux contends. 'That may be enough, Aquino said; "Now that this person has been identified, that 'faceless' threat no longer exists. She is now just another woman with 'satanic ritual-abuse' sexual fantasies.' Carol Hopkins likens Napolis to 'the mythical Japanese soldier stumbling out of the jungle still fighting World War II.' Conspiracy theories about satanic-ritual abuse have been thoroughly discredited by reasonable people, but true believers remain."

453.  Plaintiff believes that satanic cult leader Defendant Aquino was fully aware that there was little likelihood that she was a physical threat to him and to refer that she might be constituted intentionally malicious, reckless, and outrageous conduct. It is not clear

why Mark Sauer believed - apparently without question - what a satanist reported about his case rather than what an ex-child abuse investigator reported. Because of Defendant Aquino and Hopkins reference to Plaintiff's "belief" that satanic ritual abuse was a "sexual fantasy" and a "conspiracy theory" which had been "thoroughly discredited by reasonable people, but "true believers remained," indicates malice towards Plaintiff. Plaintiff Napolis' belief that satanic ritual abuse exists is directly related to the evidence that she acquired which supported that belief and refers to her Satanism and Ritual Abuse Archive of appellate court documentation. Because Plaintiff had this public archive posted at several sites from 1998 to 2000, and reporter Sauer, Hopkins, Devereaux, Loftus and Aquino had clearly seen it, that proves that their only motive was to undermine Plaintiff's research which threatened their agenda. Evidence which supports Plaintiff's beliefs that there was and is an agenda to undermine children of satanic families or cults by the FMSF and others has been extensively documented.

454.   "She [Hopkins] said the Curio case boils down to a civil-rights issue: Do first amendment rights of free speech trump the rights of those being accused of a crime (child molestation ) to know their accusers' identity?

455.   Plaintiff clearly states that she never falsely accused anyone of criminal activity. However, Plaintiff was the victim of many false criminal complaints while interacting on the internet under a pseudonym. Due to the number of individuals who openly accused Defendant Aquino of vile, frightening and tortuous conduct, Plaintiff believes that she had every right to maintain her anonymity on the internet.  Therefore, Plaintiff's safety, right to privacy, and her right to free speech did trump Defendants Hopkins, Loftus, Aquino, and Devereaux efforts to expose Plaintiff by fraudulent misrepresentation in efforts to silence her. It was perfectly legal for Plaintiff to state her opinion on the internet, which was supported by factual information, but it is very illegal for these Defendants to have misrepresented Plaintiff to law enforcement, merely so that law enforcement could identify her to them for nefarious purposes. Further, Defendants Aquino, Hopkins and Loftus are public figures and there is no evidence that they can provide that would prove that Plaintiff's statements about them were false or stated with malice.

456.   "On the Internet now, you can say almost anything you want, and there's nothing to stop you," Hopkins said. "When we didn't know who Curio was, she had power. To finally learn she's a nobody, why even bother with her now?"

457.   The fact that Defendant Sauer quoted Defendant Hopkins' childish comment that Plaintiff was a "nobody," and Defendant SDUT chose to publish that type of statement, it truly documents that there was an ulterior motive for the invasion of Plaintiff's privacy and it was personal. In fact, Plaintiff at that time was a licensed therapist, had an extensive history as a Court Intervention child abuse investigator, and she supervised visitations between children and parents during custody disputes for Family court, which indicates that Plaintiff had more credentials and experience than Defendant Hopkins and was therefore more knowledgeable about the topics that Defendant Hopkins chose to criticize.

458.  In summary, campus police officers employed by Defendant SDSU did not tell the truth to Plaintiff about not speaking to a reporter, they disregarded her concerns about dangerous people wanting her identity, and conducted no further investigation, nor contacted her about the situation before they gave Defendant Sauer personal information about her and violated Plaintiff's privacy, which eventually resulted in irrevocable harm to Plaintiff. Plaintiff believes that Sauer forced her to become a "public figure" by what was later revealed to be fraudulent misrepresentation. Upon the identification of Plaintiff, not one of these Defendants who were trying to intimidate her from participating in a public forum   attempted to file a lawsuit against her. Given that the statute of limitation for libel would probably have been extended from the date these individuals became aware of Plaintiff's identity, it indicates that Defendants Aquino, Loftus, and Hopkins were never really serious about their claims of "libel." However, Plaintiff was severely emotionally distressed after the publication of this news article because she didn't know if she would be the target of frivolous lawsuits or there might be attempts to kill her.

459.  Plaintiff has studied cults and has been the victim of a satanic cult for a very long time. Some members of cults or their supporters have Ph.D's after their names which makes it difficult for the average lay person to comprehend that highly educated people might be involved in illegal or unethical conduct.  Some people are impressed with these degrees and when a verbal or written complaint is made by them, naïve people tend to believe them. However, one would expect trained law enforcement not to conduct cursory investigations and not be swayed by appearances. Clearly this is what occurred with the incompetent and negligent San Diego State University campus police employed by Defendant SDSU.

460.   After this article was published, researcher Lynn Crook telephoned SDSU's Lt. Gilbert, asking why he had released Plaintiff's identity to this group of people, and he responded, saying, "The tide has now turned," obviously revealing that he had sided with Plaintiff's opponents and had malice towards her. By making that statement, and others, it is further evidence proving that Gilbert on behalf of Defendant SDSU made himself an actor in the conspiracy to publicly invade Plaintiff's privacy and intervene in her First Amendment rights to free speech because he was apparently expressing disapproval of her.

461.  On January 12, 2001 a purported copy of San Diego State Campus incident Report Case# 00-00973, written by Officer Svec which Plaintiff was told would only be accessed by law enforcement, was cross-posted on alt. satanism, alt.paranormal. spells.hexes.magic, and alt.religion.mormon by a "Corax." This report appeared under Plaintiff's middle and last name, appeared to be the incident report describing SDSU campus police's questioning of her on June 13, 2000, and disclosed her identifying information, such as her drivers license number. [Exhibit 11].  It was documented in this report that there had been an allegation of "harassing/annoying phone calls" which was an allegation Plaintiff had not been aware of before that time. Officer Svec documented in SDSU's incident report:

1
2
3
4
5
6
7

"Napolis was very reluctant to give information and stated several times there were many people who were after her and didn't want the information to be public. I explained to Napolis we were talking to her in reference to a harassment case and she was a suspect. Napolis stated she has never harassed anyone in her life. I also asked her what she was doing in the student computer lab if she wasn't a San Diego State student (SDSU). Napolis said the lab is close to home and she used the computers to communicate with others on child abuse cases." ..."Recommend investigation followup and have this deleated"[sic] ... " Throughout my conversation with Napolis she was very nervous and paranoid. She believed several people were after her and didn't trust law enforcement."

8
9
10
11
12
13
14
15
16

462.  This incident report clearly documented Plaintiff's request to the SDSU campus authorities that she did not want her identity revealed and the fact that she believed several people were "after her." Officer Svec noted this information and then recommended that this incident be "deleated" [sic]. Therefore, the fact that Officers McCrary and Gilbert divulged personal information about Plaintiff on behalf of Defendant SDSU to reporter Mark Sauer, in complete disregard of one of their own officers incident report, indicates negligence, malice, outrageous conduct, and further evidence that they were choosing to be co-conspirators along with Defendants because they took a side against Plaintiff in spite of this information. Plaintiff has repeatedly requested a copy of this SDSU Campus police report to verify its contents but SDSU has continued to deny her access to this report. Therefore, Plaintiff contends that due to delayed discovery she was unable to verify the contents of this police report, and was prevented from accessing information about further evidence of defamation and conspiracy by Defendants and other Does which argumentatively should extend the statute of limitations.

17
18
19
20
21
22
23
24

463.  According to this publicly posted SDSU campus police incident report, the allegations of "harassing phone calls" was the subject of a San Francisco Police department report #000107383. Plaintiff contacted the San Francisco police department in attempts to access this police report but they said no such number existed.  Plaintiff tried to access this police report again in November of 2007 which her correspondence reveals. [Exhibit 12] The SFPD clerk informed her, again, in correspondence dated November 21, 2007 that there was no such police number. However, they referred her to two other police reports which mentioned Devereaux. One report was #030-191-328- and #000-204-9 - which was an incomplete number. [Exhibit 13]. Plaintiff requested that SFPD clerks investigate after which she received a copy of these two police reports after November 21, 2007.  According to San Francisco police #000204967, Defendant Michelle Devereaux made the following complaint about Plaintiff on February 18, 2000 [Exhibit 14]:

25
26
27
28

"The V/R, Michelle Devereaux, said that since October 2, 1999 the above described suspect using the name of Curio Jones has been sending her name, address and telephone number out over the enternet [sic] without her permission. Ms. Devereaux does have a web cite. [sic] Although no threats have been made by Ms. Jones, Ms. Devereaux is concerned because she heard over the enternet [sic] that Ms. Jones has a

gun. Since November 2, 1999, Ms. Devereaux has had many telephone calls where the person hangs up or hangs on the line without answering. Ms. Devereaux believes the calls are being made by Ms. Jones although she has no definitive proof that Ms. Jones has been making the calls."

464.  This is a false police report which Plaintiff only discovered due to her personal diligence after November 2007 which gave her further details about co-conspirator Defendant Devereaux's fraudulent misrepresentation to a law enforcement agency. Ms. Devereaux cannot prove that Plaintiff ever sent her address and telephone number out to others on the internet which Plaintiff never did because she had no idea what Devereaux's address was.

465.  Based on these false allegations, Ms. Devereaux was able to enlist the support of the SDSU campus police to identify Plaintiff for Defendants. As has been described in correspondence with Devereaux, Plaintiff refused to make telephone contact with her. The matter regarding the alleged "gun" that she might have on her possession has already been described in detail. It is obvious that Defendant Devereaux purposely intended to entrap Plaintiff by fraudulent misrepresentation on behalf of named co-conspirators by garnering the support of law enforcement, based on these false complaints, in furtherance of a conspiracy to invade the privacy of Plaintiff, defame her, ruin her reputation and career, and stop her from exercising her rights to free speech. Plaintiff was never contacted by the San Francisco or San Diego police about these false allegations of unwanted telephone calls. If this had been a serious complaint it is to be expected that she would have been questioned by some investigatory agency.

466.  Plaintiff believes that Defendant Aquino and Defendant Devereaux chose to orchestrated this "sting" in this manner because over the years Defendant Aquino had falsely identified him many times which subjected him to ridicule by his peers. As of 1995 Defendant Aquino and others had accused her of being Linda Blood, Alex Constantine, Stephanie Rothman, Karen Jones (from SDSU) and Karen K. By having officials positively identify Plaintiff as "Curio" in a newspaper article, it would appear to be absolute identification of who "Curio," "Karen Jones" was. Plaintiff believes Defendant Devereaux, who apparently lives in San Francisco, had actually been following her in SanDiego which might explain how she was aware that Plaintiff was at the SDSU computer lab on October 31, 2000. Most importantly, the identification of Plaintiff as Diana Napolis in a publication would provide absolute proof of her identity so that she could later be targeted with illegal technology by interested others.

467.  On September 27, 2000, author Alex Constantine publicly posted an article in alt.psychology agreeing with Plaintiff that it was she who was the stalking victim. His closing remark was:

"Who is the cyber-stalker here? Curio, at her university terminal, posting documents on the lies and ulterior motives of the demonstratably culpable? Or the operatives of the FMSF, with their sleuths and surveillance and hyperbolic accusations? It ain't Curio, obviously, but the San Diego Union-Tribune wants you to believe in the fabricated studies that scurrilous rhetoric of the FMSF and heap scorn on a courageous activist. What's up with that?"

468.  On September 25, 2000, Phase II of the malicious agenda to "strip Plaintiff of her "power" began which proved what part of the agenda was by the identification of her real name. John Price posted Defendant Sauer's article about Plaintiff "The Web of Intrigue" to alt.usenet.kooks along with instructions about how to complain to the Board of Behavioral Sciences (her licensing board) about her alleged "conduct" and provided a link to their web site address in his public message. Plaintiff had only been licensed for a few months and had yet to see her first client but these people immediately tried to cause trouble for her with her licensing Board. Plaintiff knew that this is what would occur if these defendants knew her real name which is why she chose to remain anonymous. Defendant Sauer's news article also appeared on the web site of a person involved in witchcraft, Catherine Yronwode, with the same introduction about how to file a complaint against Plaintiff to the BBSE.

469.  During the year 2000, Plaintiff had been the visitation supervisor on a volatile but lucrative Family Court case, and it was the only case she had been supervising for some time. The mother on her case read the article the "Web of Intrigue," but Plaintiff explained to her client that she was being targeted by a satanic cult, which her client understood. Within a few days of Defendant Sauer's article, which was posted multiple times all over the internet, the grandparents on this family court case, Sharon and/or James Duckham, who Plaintiff suspected might be coaching their grandchild, wrote a message to sci.psychology.psychotherapy. They disclosed that Plaintiff was supervising visits between the mother on the case and their grandchild, and then falsely alleged that she had told their grandchild that she was "possessed by the devil."  The Duckham's did not sign their name to the message but it was obvious that they were the grandparents on Plaintiff's family court case. However, the message was difficult to read as it read out as one long line.

470.  Plaintiff had never made such a comment about a child and these claims were never seriously raised by the grandparents, lawyers, or any other parties on the case which was confirmed. Apparently because Plaintiff had raised concerns to the minor's attorney and the other lawyers that the Duckhams might be coaching their grandchild (after which the Duckhams tried to have Plaintiff removed as Visitation Supervisor a month earlier) it appeared that they accessed the SDUT "Web of Intrigue" article and decided to capitalize on these false allegations in hopes of having her removed as visitation supervisor.

471.  On September 29, 2000, at 12:34 PST, John Price cross-posted a message to several newsgroups which included the link to the "Web of Intrigue, a link to the BBSE, and reposted the Duckham's message. [Exhibit 15] He then realigned the message which read:

"Hats off to Mark Sauer of the San Diego Union Tribune for writing the enlightening article on Diana Napolis. Ms. Napolis is a court-appointed monitor in a custody situation involving my ex-daughter-in-law, who was ruled a danger to our 5-year old granddaughter. Ms. Napolis supervises when our granddaughter visits her mother and has been acting so strange this summer we were about to head into court to have Ms. Napolis replaced. She has become convinced that our granddaughter is possessed by the devil. She claims the child told her, "in a low and frightening voice' to never touch her or come near her again. After reading the article, "A Web of Intrigue," I am convinced it is Ms. Napolis who needs supervision and she should be replaced immediately. Why should our hard earned tax dollars pay child custody monitors $30/hr to tell us our children are possessed by the devil?"

472.   At that time, Plaintiff was making $30 an hour. Family Court supervisors set their own fee, the fees vary, and only someone involved in her case would know that she charged $30 an hour.

473.   On September 30, 2000 in message No. 189 on the Witchhunt list, Defendant Devereaux quoted Kimberly Barnard' s  message which repeated the false allegations that Plaintiff had told a child she was "possessed by the devil." Defendant Devereaux, under the name cyberlurker@hotmail.com, wrote that Plaintiff turned a child "not liking" her into "demonic possession." It is clear from this message that Devereaux, or someone else from this nefarious group, was in contact with Defendant Sauer of the SDUT or was in direct contact with the Duckhams. Coincidentally, the grandparents knew how to post anonymously and they knew what exact newsgroup Plaintiff frequented which was sci.psychology.psychotherapy. Devereaux wrote:

"I understand the reader did contact the UT but have no idea if they plan on printing the letter or not."

474.   On October 7, 2000, "Kali," aka Kimberly Barnard, congratulated Defendant Devereaux, claiming that she should receive the "Hammer of Thor" award for her "unveiling of Diana Napolis/Curio," further proving that Ms. Devereaux's acquaintances were aware that Devereaux's actions were conscious and malicious and apparently it was some type of "game" to them.

475.   To Plaintiff amazement, Defendant Devereaux then began divulging personal details about the mother who she was supervising in her Family Court case on the Witchhunt egroup list on Yahoo. The only way Devereaux could have discovered this information was via the grandparents, the Duckams, apparently using reporter Mark Sauer as the intermediary. The mother still wanted to retain the Plaintiff as a visitation supervisor but Plaintiff discussed the issues with minor's counsel and it was agreed that because she was now a "controversial figure" it might damage her client. Plaintiff also resigned because she was fearful for the mother on her case because Devereaux had information about her.

476.  The next move these co-conspirators made against Plaintiff was to announce on 10-13-2000 by an anonymous person using her real name, Diana Napolis, that she was under investigation for "threatening a child with torture" and that she "should be in jail." On October 13, 2000, an anonymous person, "Uli23@my-deja.com, wrote on alt.usenet.kooks and alt.satanism:

"Diana L. Napolis, of La Mesa, CA, is a serial harasser and a bogus therapist. She has done more damage to children than any of the people she's been harassing over the years. She's a truly evil and psychotic beast. She's currently under investigation for threatening a child with torture because the child failed to denounce the parent. Hopefully, she'll be in jail son. She belongs there."

477. Plaintiff has never caused damage to any child in any job description and, in fact, had spent 10 years at that time acting as a child advocate. On October 13, 2000, "Uli" made another defamatory and false allegation about her again on alt.satanism:

"Diana L. Napolis, a CSW "therapist" based in La Mesa, California, is currently under investigation for threatening a child with torture for failing to support Napolis' allegations of abuse against the child's parent ... This dangerous creep has engaged in numerous instances of internet stalking and abuse and has hurled numerous slanders against innocent parties on the internet. She has destroyed families and injured quite a number of children with her brand of "therapy"... There is no reason to continue to cover her scabby ass by persistently referring to her by the alias she used to harass people online. She deserves no privacy.  She deserves jail."

478.  These types of statements were made violating Plaintiff's privacy and endangering her reputation and career immediately after her real name was revealed by Defendant Sauer and Defendant Copley of the SDUT. This was the sixth time that Plaintiff had been frivolously accused of stalking in this string of libelous messages.

479.  The above information provides an overwhelming paper trail, proving that Plaintiff was the victim of ongoing harassment, censorship, and libel between 1995-2000, which began well before her real identity was discovered. Once John Price, Defendants Aquino, Devereaux et al. discovered Plaintiff's real name, they libeled, harassed, and intimidated her on the internet, and attempted to ruin her reputation and career. This is the Modus operandi of satanic cult groups which has been reported by therapists across the country who have experienced similar treatment although Plaintiff does not know of anyone who was targeted exactly like she was.

480.  Due to Defendant Sauer's selective quoting in the "Web of Intrigue," Plaintiff believed she could no longer effectively work as a Family Court Supervisor as a visitation supervisor. She routinely wrote letters to Family Court and she was required to testify on behalf of children. But due to false allegations in the "Web of Intrigue which tried to make

her appear dangerous and threatening, there were allegations that Plaintiff carried a "gun," and that SDSU was keeping an open "harassment" file on her, Plaintiff believed her credibility was ruined especially after she was forced to resign from her Family court cases due to the SDUT article and the grandparents participation in those events.

481.  On May 23, 2001, Plaintiff sent a letter to SDSU campus police about the misconduct of Officers Susan McCrary and Eddie Gilbert. John Carpenter, SDSU Chief of police, replied on July 2, 2001, stating his officers did nothing wrong and he had released the incident report to the complaining party who had been Defendant Devereaux. He confirmed that SDSU had followed up on a complaint that had been filed in San Francisco about telephone harassment. [Exhibit 16]

482.  Plaintiff contacted a lawyer who agreed to represent her pro bono and she filed a complaint against San Diego State University with the State of California on March 22, 2001 claiming invasion of privacy which they dismissed on June 13, 2001 after advising her to file a lawsuit due to the complexity of this case. Because Plaintiff was suing for invasion of privacy, she decided to respond to Defendant Sauer's article under her pseudonym. Because 2001 was the first year of the millennium, Plaintiff thought she would date and post her response on January 1, 2001 as a symbolic gesture. In part, she wrote that efforts to intimidate her were not going to succeed in stopping her or any other advocate's efforts on behalf of abused children and she briefly corrected the many misrepresentations made by co-conspirators Defendants Hopkins, Loftus, Aquino and Devereaux at that time.

483.  In 2007, Plaintiff reviewed what had been written about her on the internet in addition to new internet messages which contained libel and threats against her.

484.  On May 20, 2001, eight months after the publication of Defendant Sauer's article about Plaintiff, an anonymous person wrote on alt.satanism calling for Plaintiff's "execution." It read, in part:

" No harm was done? Curio, the psychotic with her fantasies, caused untold harm, she ruined lives. She caused psychological damage to the families of the people she harassed and did this for years, including small children in those families. She ruined careers. *She caused a woman to have to leave the country.* Studies have even shown the change in neurochemistry in people who are stalked this way. And what of their wives and children? *Curio should be executed.* It's as simple as that, Curio should be executed to simply set an example. She should be given the death penalty for this damage."

485.  Reporter Defendant Sauer's article "The Web of Intrigue" was attached to the end of this message which identified who "Curio" was - the Plaintiff, Diana Napolis, which proves that Defendant Sauer's invasive and defamatory article which published not only Plaintiff's real name, location and description culminated in not only clear libel, along with

the usual ad hominem attacks and lies, but resulted in attempts to incite physical violence against her as well.

486. Defendant Lysenko/Jantsang (who had earlier described that therapists would be accused of brainwashing) wrote in response to this message calling for Plaintiff's "execution," writing in a message on pg. 1, dated May 21, 2001: [Exhibit 17]

> "Just cutting off her miserable hands should work. Maybe ripping out her tongue too … Yah, works great in churka countries where religious fanatic abound."

487. Defendant Lysenko/Jantsang wrote another message on May 3, 2002 in reply to Plaintiff who was writing under the name of "Karen Jones" but identified herself in the message as "Diana Napolis," and briefly described how she had been targeted by nonlethals. [Exhibit 18] Plaintiff wrote that she was in very poor health and stated Lysenko/Jantsang should not have written a message threatening that her tongue should be pulled out the year before. Defendant Lysenko/Janstang threatened again, which caused Plaintiff significant emotional distress:

> "Oh dear. You are a fucking NUT …Yes, I think your tongue should be pulled out, or you should be legally gagged for stalking the Aquinos and slandering the hell out of them. People like you endanger the very concept of 'free speech.'"

488. Plaintiff then discovered after June of 2007 that Defendant Lysenko/Jantsang had written many messages defending Defendant Aquino and which described Plaintiff – or "Curio," as a "nut," "stalker," a "terrorist," and "harasser," who should not have had "free speech rights, and finally claimed on January 30, 2004 that Plaintiff was a "cyberstalker" which provides evidence proving that she apparently hated Plaintiff and should be punished for what she perceived as her "crimes" against Aquino.

489. On May 30, 2001, on alt.satanism, cursedone7@aol.com wrote an "apology" to Defendant Aquino for "crossing" him/her in the past. The author claimed that "Dr." Aquino "defeated" Curio and claimed that it was the government who was ritually abusing children. This message proves that a satanist on alt.satanism took Defendant Aquino seriously and thought he was dangerous, whereas reporter Defendants Sauer and SDSU officers Garcia and McCrary did not: It read, in part…

> "This is a apology to Dr Aquino for crossing him in the past …Curio became a welfare nutcase after crossing him, she was defeated by him. Linda Blood wound up the same way … The Prince of Darkness has awesome power and Dr. Aquino is his representative  on Earth, My life has gone to total shit for crossing him All these people trashing the TOS are simply has beens they are fools Maybe some will get away with it, but Dr. Aquino has a lot of power and should not be toyed with. I used to think he was nothing, and I made fun of him and called him that Mikey name and such, Now my life is a total fucking hell. Curio is a nobody, Totally defeated by Dr

Aquino ... Only a fool would cross Dr Aquino, He has Magical power and he can curse you and screw up your life, Like he did to me , because I fucked him with online. He is chosen by Set and so is Lilith, Lilith hate's people …Yes SRA is real but it's the fucking govt that's doing it , not some little sect like the TOS."

490.  On June 28, 2001, Defendant Lysenko/Jantsang wrote another message admitting that satanists were setting up therapists and were going to turn on them and accuse them of "brainwashing."  This message proves that her agenda was aligned with that of the FMSF. It reads, in part, on pg. 3, third paragraph:

"Martin, I even wrote a few letters to the TOP psych experts that were claiming SRA was real, and threatened that "our people" would become their patients and then TURN ON THEM and say it was all fake and accuse THEM of brainwashing us. OH don't you know that 1+ year later that is exactly what happened, patients remembered that they were NOT abused and accused the doctors of brainwashing them  - that happened as I sat in astonishment (OH, HOLY SHIT) and wondered if these "Experts" trashed my ranting letters to them, he he he."

491.  In a message dated March 27, 2002, posted in alt.satanism, Defendant Aquino falsely characterized and engaged in libel about Plaintiff by claiming that she was a "cyberstalker." [Exhibit 19] He wrote, in part, at the end of pg. 1:

"My lawsuit against Electricicit.com was for negligence in its failure to disclose Diana "Curio" Napolis' identity as a cyberstalker."

492.  When Plaintiff was in Patton Hospital two years later, Defendant Devereaux wrote a letter to her two colleagues, Dale McCulley and Dr. Ellen Lacter. Plaintiff suggested they cease all communications with her as soon as possible but to question her first about the names of the "dangerous" individuals who had been looking for her identity in 1999-2000 who Deverereux had declined to identify at the time. Plaintiff believed this would be important evidence to gather because Devereaux had been correct, irrevocable harm had come to Plaintiff after she was identified, and the formal identification of the "dangerous" individuals who had been looking for her identity could assist her in building a legal case against them.

493. In a letter to Dale McCulley, dated February 3, 2003, which he forward to Dr. Ellen Lacter, Defendant Devereaux continued to falsify her true motivations and again wrote that the SFPD report that she filed (inferring on Plaintiffs behalf) was #107383 in apparent attempts to cause Plaintiff to search for the wrong police report number and to hide the fact that she had filed a false police report against her under another SFPD report number. [Exhibit 20]. Defendant Devereaux tried to make Mr. McCulley believe that she was going to change sides again and would testify against these co-conspirators in a court of law." Devereaux closed the letter, stating:

"Additionally, Inv. Andrews of the Renton FD has a written notarized statement (from me, dated March, 1999), wherein I stated that it was my belief that if the fire at Kennedy's house was an a arson, it was in all likelihood related to the 'hunt for Curio'…Hopefully what I have provided will contain sufficient evidence for Diana's lawyer to be interested in subpoenaing me, in which case I would then be in a position to 'tell all.'"

494. Defendant Devereaux admitted in this letter that she had provided a notarized statement to an arson investigator that it was possible that people attempting to identify Plaintiff might have been responsible for setting Karen K's house on fire. Since Devereaux documented that statement in a letter, Plaintiff believes that this is further evidence proving that Devereaux's manipulations of law enforcement to have her publicly identified indicated intentional malice and she obviously did not care whether Plaintiff was harmed or not. Defendant Devereaux had attached two letters for Mr. McCulley to read by anonymous sources. The first letter undated and unsigned read that "the search for Curio was sport, not justice. Bullshit, not protecting people."

495. The second letter appeared to have been written by Defendant Hopkins to Defendant Aquino but it was also unsigned with no date. In Defendant Hopkins' alleged letter she wrote that she could gather a small group of people to look for the Plaintiff along with her husband David Hopkins, *the Attorney General in San Diego, Gary Schons (*her ex-boyfriend), reporter Defendant Sauer, and Pam Freyd, founder of the FMSF. Defendant Hopkins ended the letter, asking why, if Defendant M. Aquino was such a "powerful" black magician, was Plaintiff Napolis "still in their midst." This email read:

"Dear Mr. Aquino, you will recall that some years ago we had some communication regarding Curio. At that time I just considered her a nuisance, one of many but did call the person you believed her to actually be and reported back to you on your conversation. I believe that it was after that that she came after me. I now live in Mexico and she has now become very dangerous to me. I enjoy none of the legal protections of US. Law and a large day care case has exploded in my community. A year ago I wrote a cautionary article and somehow the parents (Americans) made contact with Curio and are now printing her slander as truth, trying to have me accused and at the least removed from the country. I have decided that burying my head in the sand may be foolish. Finally, today, I have carefully read her website in the hopes it might provide a clue to her identity. I have always theorized it was Constantine Dahlenberg but I don't know why Dahlenberg would be so interested in the Presidio case. I have gone to your website and must admit that I was a bit (make that very) shocked to find that you actually are involved with the Temple of Set. I had assumed that this was all hyperbole on her part as practically nothing she writes about me is true."

------------------

"I am in complete agreement with your suggestion. I believe if we pool all of our information and are as careful as she is, we'll know who she is. With that in mind, I would like to create a group of you, me, Michelle, my ex-husband (David Hopkins), Gary Schons (prominently featured in the website), and Mark Sauer (also mentioned and a reporter from the San Diego Union Tribune.) I can absolutely vouch for the latter three. They all know what this is doing to me and to them. You seem willing to vouch for Michelle. I would like to suggest that Peter and Pam Freyd also be included. I have great respect for their integrity and equal respect for Peter's incisive intellect."

----------------

"Please, take no offense. My comments regarding the Setian World had nothing to do with anything other than shock that there was something concrete in her writings. (Previously, I had found nothing even marginally truthful.) BTW, reading your site I was struck by the irony of your position on black magic. If black magic is half as powerful as you would claim, how come Curio did not long ago depart our sphere?) Understand we had hundreds of letters each week and I did not remember the substance of what you said. I do remember however that both you and Pam were certain when you gave me the name of the therapist I called that it was Curio. So, you must have had a name at that time. I am copying Peter in on this as I am certain will remember. He never forgets anything."

----------------

496. It appears by information gathered from this letter that a former 1991-92 San Diego Grand Jury member (Defendant Carol Hopkins) was actively colluding with a local newspaper reporter (Defendant Mark Sauer of the SDUT) before the "Web of Intrigue" was ever written, along with two individuals who had been accused of child molest (Defendants Michael Aquino and Peter Freyd), and she asked Aquino if he was so powerful why was Plaintiff still in their sphere. Hopkins also wrote that she and Aquino and exchanged "hundreds" of letters. Why would Hopkins be exchanging letters with a Satanist who had been accused of ritual child molest, torture and murder about Plaintiff? Defendant Hopkins wrote that <u>Defendant Aquino could "vouch" for Defendant Devereaux</u> and wrote "You and Pam were certain …" "Pam" apparently refers to Pam Freyd of the FMSF because several sentences later she mentions the name "Peter." Peter Freyd is Pam Freyd's husband. If this letter was from Defendant Hopkins, then in addition to their statements in the "Web of Intrigue" it appears that all of the named parties conspired to identify Plaintiff. This is important because Defendant Devereaux had repeatedly told Plaintiff that a dangerous group of people were looking for her.

497. On March 15, 2008, Plaintiff discovered this same message allegedly written by Carol Hopkins was posted by an anonymous party on the Witchhunt egroups list in message #31353 titled, "Curio Phyles Resurrected." [Exhibit 21] This message which was copied to "Peter and Pamela Freyd," had been written on May 6, 2000 and included most of the email headers on it which sourced where the message was written from and where it was sent. The message was sent to xeper@ which is Michael Aquino's email account at AOL

except aol.com was deleted. The message was sent from chopkins (her email account) and @aol was deleted as well. According to the IP address - 200.23.156.250 - the name on the organizational heading was "Latin American and Caribbean IP address Regional Registry," located in Rambla Republica de Mexico 6125 in Montevideo, Uruguay. Defendant Hopkins purports to live in Cuernavaca, Mexico and so this message appears to have been written by Carol Hopkins. Hopkins email concluded that message with the following comments about Plaintiff:

> "In some previous activities I have been designated a public personality and so have little leverage for a lawsuit. Moreover, I doubt that this woman has anything substantial that could be gained to make a lawsuit worth an attorney's effort ... my guess is that she is a completely isolated, lost soul. But, we'll see."

498.  In a letter, dated July 8, 2003, from Defendant Devereaux to Dr. Lacter, Dr. Lacter asked Devereaux to explain why she had behaved in the way she had towards Plaintiff. Dr. Lacter wrote:  "If you could really help Diana, that would be wonderful." (The Plaintiff was in jail by that time, with a criminal case pending).  [Exhibit 22] Defendant Devereaux wrote in response, in part:

> "The real story is very long. In fact, I am presently working on a book about it. If the book ever gets published, I will ask the publisher to set up a fund and direct any/all monies from the book to help Diana. It's the very least that I can do. I am writing the book in hopes of exposing what went on in the hunt  -- read, who was involved (**E.g.,**
>
> *Aquino, Pam and Peter Freyd, Loftus, Barden, Clarke, Casebeer, Hopkins, Sherke, Ohme, etc) as well as the subsequent legal tampering of her case – read, Hopkins and Clarke* ... I am also writing the book in hopes of educating ppl on how they play the game – read, how they manipulate ppl and how they hurt ppl ... Ellen, a whole lot of things Diana said was quite true… When I look at the enormity of what I did, I don't know that I will ever forgive myself. I am not asking you to either …I  have since cut contact w/them, simply bc I fear that any contact could draw me back in. I don't want to do that. I don't want to hurt anyone else. I am also in the process of publicly outing several ppl – read, Barden, Hopkins, Freyd, et al."

> "In closing, my motives are this: to undo what harm I have done, expose the FMSF for what they are, and most importantly bc I am very scared for Diana."

499.  Defendant Devereaux wrote this letter in July of 2003, making it appear as if she was benevolent towards Plaintiff (in fact, donating all book proceeds to her), confessed to having knowingly harmed Plaintiff, and made it appear as if she was cutting off all contact with FMSF's Pam Freyd,  a claim which in fact was revealed to be false which is further evidence that Defendant Devereaux manipulates the facts. Defendant Devereaux also claimed in this letter that Defendant Hopkins and a John Clarke had "tampered" with Plaintiff's criminal case which occurred in 2002/2003.

500. Additionally in this correspondence, Defendant Devereaux claimed that Aquino, Freyd, Loftus, Barden, and Hopkins were involved in the "hunt" (for plaintiff's identity), indicating there was a conspiracy to identify Plaintiff which involved Defendant Devereaux which she purportedly was "sorry" for.

501. In another letter, dated August 4, 2003 to Dr. Ellen Lacter from Defendant Devereaux, Dr. Lacter asked her for additional information about who the people were who had been looking for the Plaintiff. Defendant Devereaux again provided the same names. [Exhibit 23] Some of the people named who had directed Devereaux to "locate/expose" the Plaintiff, further proving they were actors in a conspiracy to identify her, were:

> "William Scott Scherk, SA Jordon (AKA Reader AKA John Singleton),
> John M. Price, Carol Hopkins, Elizabeth Loftus, Michael Aquino, Herman Ohme,
> Greg Clarke, Rick Thomas, Jim Giglio, Lesley Wimberly, Laura Pasley, Mark Sauer,
> Michele Gregg, Patricia Prather, Eric Nelson, Francine Casebeer, and Patricia
> Burgus."... "Tertiary people...were David Hopkins, Pam and Peter Freyd, and Gary
> Schons.

502. Again, it was repeated that SDUT reporter Defendant Mark Sauer was one of the parties named who had been searching for Plaintiff's identity, well before he wrote the article, the "Web of Intrigue" about Plaintiff which proves that he was an actor in these events who had a conflict of interest, and apparently his part in this conspiracy was to publicized an invasive and defamatory news article about her after she was formally identified.

503. The attachment to this letter emailed to Dr. Ellen Lacter included the same letter that was sent to Dale McCulley, except that this particular letter had an email address on it. It was emailed to RCBARDEN@aol.com and was dated Thursday, January 13, 2000 from an anonymous party. That is the email address of attorney R. Christopher Barden who had frivolously threatened to sue Plaintiff in 1998 after which she posted a public web page about his tactics.

504. This email letter to Dr. Lacter (about Michelle Devereaux) indicated that R. Christopher Barden was "influential" in instigating the "hunt" for Plaintiff's identity which proves that Barden conspired with Ms. Devereaux, a claim which was submitted to Dr. Ellen Lacter as factual by Michelle Devereaux. It read, in part:

> "The search for Curio was sport, not justice. Bullshit, not 'protecting people'. At
> WHAT expense... for WHO ???" ... "You had an influential part in getting her
> involved in the hunt for Curio – you could admit this in an apology note – it would
> make the mess more human. She's cyber-smart, but the task was inappropriate for
> her."

505. In 2007, Plaintiff searched the FMSF newsletter archives on their web page fmsfonline.org and discovered that Pam Freyd had listed tmdarchives.org (Defendant Michelle Devereaux's new web site) at the end of their newsletter, beginning in 2001, with newsletter Vol. 10, No. 5. to the present. Plaintiff confirmed that this was Defendant Devereaux's website after a "whois" (web page that reveals web site owners) search check revealed Devereaux's email address was internic@cyber4n6.net and was listed as the contact address for that web page as well as for stobsidian.com. In addition Ms. Devereaux has written many public messages claiming that tmdarchiaves.org is her web site.

506. At that time Plaintiff discovered yet again that Defendant Devereaux had stolen her research (albeit the weakest cases), which consisted of approximately 30 news articles and court documents about satanic ritual crime and posted it to her web site making it appear as if that research was in fact Devereaux's own work. Since Plaintiff had requested Devereaux once before to take down her research which was posted on another web site, and in fact Devereaux was responsible for Plaintiff's web pages being taken down and censored from the internet, finding this same information on Devereaux's web page in 2007 has caused Plaintiff significant emotional distress. Apparently Devereaux appreciated Plaintiff's documentation about satanic ritual crime, she just didn't want her name attached to her own work.

507. Given that Defendant Michelle Devereaux had been quoted in the "Web of Intrigue," in attempts to ruin Plaintiff's reputation for her belief that satanic ritual abuse occurred, the fact that Devereaux has some of her evidence of satanic cult crime proves that something unusual is occurring. Ms. Devereaux's statement from the "Web of Intrigue," read, in part:

"[Devereaux] also once believed she had been abused by a satanic cult herself. 'Curio and I were coming from the same place – I spent eight or nine years in therapy, all the while researching satanic-ritual abuse,' Devereaux said. 'It wasn't until 1999 that I exited the cloud of unknowing. 'Curio,' she said, 'sealed it for me that this stuff is all a bunch of crap."

508. In that statement Ms. Devereaux stated that "Curio" had "sealed" it for her that satanic ritual abuse was a bunch of "crap," thereby indicating that at that time Devereaux was serving the role as a satanic cult "retractor." However, it appears that Defendant Devereaux does believe in the reality of satanic ritual abuse based on the content of her own web page. Because Devereaux's web page also has numerous articles pro and con about recovered memory and other subjects, Plaintiff believes Devereaux is attempting to infiltrate the legitimate professional community.

509. As of 2008 Defendant Devereaux has at least four web sites,

1) tmdarchives.org 2) Cyber4n6.net, 3) Cyber4n6.com, and 4) stobsidian.com. Devereaux has a yahoo egroups list called "The Memory Debate," and it is stated on this site that the charter for moderated discussion was taken from sci.psychology.psychotherapy.moderated. Devereaux is also associated with the "Crimsom Shadows Forensic Psychology Portal." In addition Cyber4n6.net is listed as a resource for "Private Security" on one law enforcement website http://www.officer.com and on another private investigator's web site under "Private Security Resources." According to a whois search on all of these web sites Devereaux's contact email is internic@cyber.net.

510.  On public newsgroups in November 2002, Defendant Devereaux had written several messages. When the full message headers were read, under her Organizational Heading it was written "Illuminati New World Order." Under Keywords, it was written "Puppet Master Extraordinaire." At the end of these messages, Devereaux had written in obvious attempts to give the audience a message about what she had done to Plaintiff, she had quoted Plaintiff, herself, and the title of a news article which indicates further evidence of malice on Devereaux's part:

"Ah, the joys of posting anonymously!" -- Curio, 1998
"Hey Curio, I mean Tom, I'll make you famous." -- lurker, Nov. 10, 1999
"Steven Speilberg Curbs Alleged Stalker" -- 2000

511.  Plaintiff wrote a letter to Pam Freyd on July 19, 2007, informing her that the web site she referred readers to in her FMSF newsletter - tmdarchives.org - was owned and operated by Defendant Devereaux. Plaintiff informed Freyd that the majority of the appellate documentation in the satanic ritual crimes section on Devereaux's web page was the product of Plaintiff's own research, and that research was published on Devereaux's web site without her permission.

512.  Plaintiff inquired of Pam Freyd why she was referring others to a web site which listed satanic crime when her organization claimed satanic ritual abuse of children does not exist. Freyd wrote back on July 26, 2007 indicating that she would review the matter but claimed that the fact that a site included information "arguing for the existence of satanic ritual abuse is not a problem. The Foundation believes strongly that people should examine the claims made by people holding very different perspectives and evaluate those claims for themselves."

513.  Given that Pam Freyd has been instrument in attempting to shut down workshop/trainings about satanic ritual abuse throughout the country for years, Ms. Freyds explanation for this unusual occurrence did not make as much sense to Plaintiff as the alternative: Perhaps Ms. Devereaux was rewarded by Pam Freyd for identifying Plaintiff for Pam and Peter Freyd and other conspirators, and because Devereaux wanted to be in the "big leagues," Pam Freyd was willing to elevate Ms. Devereaux's status by linking to her

web page which listed satanic cult crime and articles pro and con about the "memory" debate, perhaps in further efforts to use Devereaux as an infiltrator for the FMSF or satanic cults.

514.    Plaintiff believes that this evidence provides revealing information about the modus operandi of the False Memory Syndrome Foundation, satanic cults, and the lack of credibility of one satanic cult "retractor " – Michelle Devereaux.

### PLAINTIFF'S VICTIMIZATION BY NONLETHAL UNCLASSIFIED TECHNOLOGY, SUCH AS "VOICE TO SKULL, "VOICE SYNTHESIS DEVICES," AND OTHER ILLEGAL SURVEILLANCE TECHNOLOGY

515. The Plaintiff has extensively documented the numerous attempts made by Defendant Aquino and others to publicly discredit her by the usage of ad hominem attack and outright fabrications before the publication of the SDUT September 24, 2000 article, the "Web of Intrigue," and Defendants Hopkins, Loftus, Aquino and Devereaux's attempts to subject her to false light defamation after her real name was revealed. Even though Plaintiff was subjected to libel and threats by Defendant Lysenko/Jantsang and others, it seemed no one had yet acted on those threats. That changed after May of 2001. Since that time, Plaintiff alleges she has been subjected to illegal monitoring by nonlethal government surveillance technology, and she has been made a subject of illegal classified research without her consent, after which this technology was used to assault Plaintiff and subject her to prolonged torture and terrorization.

516.    Plaintiff and victims worldwide report that nonlethals are being used to torture whomever the military perceives as the enemy which also includes civilians, political dissidents, and personal enemies of the wealthy, because the technology is for sale. The nonlethal technology Plaintiff will be describing is both unclassified and public (which documentation supports); classified and secret (which means descriptions within documentation might be redacted, or there are documented sources that have leaked information about the subject but have stopped short of disclosing exactly how this technology operates or how it is being implemented); and above classified which means there is no reference to the technology anywhere and officials will completely deny that it exists. Plaintiff believes that the public has a right to know how far our government has strayed from the adherence to basic human rights, such as the right to privacy and the right to be free of torture, and will attempt to document the existence of this invasive technology.

517.    As previously stated Plaintiff has a Masters Degree in Transpersonal Psychology which is a branch of psychology that incorporates the spiritual dimension into mainstream, clinical practice. Plaintiff is 52 years old and before she was targeted she had meditated and studied esoteric subjects for 28 years, and her philosophy incorporated Buddhist precepts about nonviolence.

518.   Plaintiff was knowledgeable about Holistic health practices and took inordinate care of herself. She exercised at a gym and kept her weight below 118 pounds for 20 years. Plaintiff's diet included mostly health foods and she refused to take medication unless absolutely necessary because she believed prolonged medication usage damaged the body. Before the year 2001, Plaintiff could best be described as someone who chose her associates carefully and who fiercely guarded her privacy.

519.   Because Aquino, his wife Lilith Aquino, John Price, (deceased)  Robert. M. his "wife," M. D., Scott L., Phil S., and others, raped Plaintiff, body, mind and soul, she can no longer meditate and her body has suffered injury. If this could happen to Plaintiff, it could happen to anyone. Plaintiff requests that judgment be suspended until the entire body of information which documents the existence of these weapons is read.

520.   Plaintiff was told by the very wealthy Lt. Col. Aquino, via what was later to be revealed "Voice to Skull Devices" [V2K], that he was able to bribe members of the military intelligence and mind control community, both in the United States and Soviet Union, along with others named in this lawsuit, to target her with the most sophisticated and deadliest technology available. He told Plaintiff millions of dollars were exchanged. These actions were taken against her in retaliation due to her political activism, because her archive of court cases proved that satanic ritual abuse existed, and because she proved, despite Lt. Col. Aquino's assertions to the contrary, that his career ended in 1990 after a ritual abuse child molestation scandal. The Aquinos told Plaintiff that they had noticed that she had dated her response to Defendant Sauer's article on January 1, 2001, the first day of the millennium, a date Plaintiff chose because of its symbolism.  Defendant Aquino and Lilith Aquino told Plaintiff that they wanted to make an example out of her as a symbolic event on behalf of evil, for the millennium, and to show the rest of the world what they were capable of. Aquino told her they had also asked several other satanic organizations to participate along with them in her torture.

521. Defendant Scott L. who in 1998 had told Plaintiff that he worked for the NSA informed her via V2K that he had discovered that the NSA had monitored her in the past because of her prior association with Russell Means who at one time had been the leader of the American Indian Movement. In the 1970's Mr. Means and the American Indian Movement had been the subject of various Counterintelligence programs which were designed to discredit radical organizations considered to be a "threat" to the United States. In the late 1980's Plaintiff had joined Means and others in an illegal encampment in the Black Hills of South Dakota to protest the history of broken treaties between the Native Americans and the United States government. Mr. Means had a history of staging rallies and engaged in civil disobedience occasionally, intended to bring attention to the plight of the Native American people, and was remarkably successful at these activities. Plaintiff had a personal relationship with Mr. Means between the years 1993-1995.  According to Scott L., the NSA monitored him and his associates which at one time included Plaintiff.

522.  On November 18, 2007, Plaintiff discovered a variety of videos on the internet site UTUBE that mentioned Defendant Aquino's name. The first video was titled "Russian Mind Control and Michael Aquino." The second video was entitled "MindWar Paper by NSA Gen. Michael Aquino" (#20) at http://www.youtube.com/watch?v=t5zfrdwh1QY Plaintiff does not believe Defendant Aquino was ever a General for the NSA, but he did write a paper with the title, "From PSYOP to MindWar: The Psychology of Victory" in 1980 in which he discussed psychotronics. The description of this video read:

"This military doctrine paper is quoted in depth to describe the current use
of psychotronic and microwave weapons technology targeting political dissidents
used in terminal experiments to perfect the newest weapons systems to be used
on friend and foe alike."

523.  The following information documents how nonlethal technology can induce bizarre experiences which, if disclosed to mental health professionals, would likely result in a diagnosis of "mental illness," thereby disguising the illegal usage of that invasive and illegal technology.

524. In January 2001 two very unusual incidents occurred. First, for the first time in Plaintiff's life she had what appeared to be an alien "abduction" experience. Plaintiff had read about this phenomena and was curious about what type of trauma victims were actually experiencing. In brief, Plaintiff felt an object coming over her, and then a part of herself being lifted and taken out of her body. The sensation of being lifted was felt kinesthetically and she assumed it was her astral or soul body which was taken by this object. Plaintiff descended down an elevator, exited aboard a craft of some kind, and interacted with unusual looking entities who spoke to her in an unknown language and appeared to be trying to tell her or warn her about something. They showed her a board with physics equations on it and pictures of two people struggling over a weapon.  Plaintiff told them she did not understand what they were trying to tell her. She then returned to her physical body and opened her eyes. Plaintiff had been noting the content of her dreams in personal journals for 20 years and this was not a normal dream.

525. In February 2001, Plaintiff had a second unusual experience. She was unusually tired and fell asleep one evening but woke up within her dream (lucid dreaming) seeing and hearing a man who appeared to be trying to hypnotize her. He was counting down, using the alphabet, but Plaintiff stopped him when he said, "Tommy T." She asked him who he was and requested that he stop violating her. Before that time Plaintiff had never allowed herself to be hypnotized and she did not believe it was possible to hypnotize her.

526.  On February 1, 2001, Plaintiff found employment at a hospital as a Social worker but by the end of the month she began hearing a strange sound in her head which a voice identifying themselves as from the "CIA" said was an "implant."  Because Plaintiff

was continually awakened by this sound, and was never able to get enough sleep to function, she was let go of her job in May of 2001, 8 months into her one year statute of limitations from the date of the SDUT article, the "Web of Intrigue, dated Sept. 24, 2000 was published.

527.   The day after Plaintiff was let go of her job, on exactly May 11, 2001, she was physically assaulted by unknown means which was very intrusive which caused massive shock to Plaintiff. Within one to two weeks of losing her Hospital job, the car of a close relatives was struck and disabled while parked which made it difficult for this relative to visit Plaintiff. Plaintiff believes this was purposefully done so that her perpetrators could isolate her from her family and make it easier to assault and take her over completely.

528.   Plaintiff then began hearing "voices" in her head on a regular basis who identified themselves as employees of NASA Ames and Lawrence Livermore Laboratory who said they were "observing" her because of her "alien abduction" experience, and for other reasons. For the next few months these people succeeded in keeping Plaintiff busy - and more importantly, off the internet - by contriving various scenarios for her. One of these scenarios was that they were experimenting with telepathically communicating with "ET's" and they wanted more information about the particular "ET's" who had accessed Plaintiff because they suspected they were a threat. Other identities, including a man named Jack Aldrich gave her this same information.

529. Defendant Aquino, Scott L. Lorne G., Dr. John Price, Leslie P., Phil S., and several others, all made these types of statements to Plaintiff, seriously telling her there was a "war" against aliens and they were involved. However, associating satanic ritual abuse with claims of "aliens" is a typical tactic when trying to discredit therapists, researchers or victims of satanic ritual abuse. Strangely, not one of these individuals told Plaintiff that she was being victimized by nonlethal weaponry but they all continued to tell her that that she was being monitored from a remote location by "computer." Plaintiff discovered that what they were referring to is called "computer/brain interface" and there is extensive documentation of its existence.

530.   Regarding whether or not the phenomena of "alien abduction" exists, serious researchers are aware that claims of extraterrestrial involvement and government mind control have been inextricably interwoven over the years. Researcher Dr. Helmut Lammer, a Ph.D in Geophysics who reportedly works on NASA space projects, hypothesized that one explanation for UFO phenomena might be the governments illegal usage of Advanced Virtual Reality technology which could induce false ET abduction scenarios into a subject's mind, thereby allowing the government to test illegal, classified technology which was then disguised by what most people believe to be an improbable phenomena – alien abduction.

531.  Although some people believe NASA to be an organization intent on serving the public interest, that is not necessarily the case, and if these were some of the parties making contact with Plaintiff, she was not comforted by their presence. It has been reported that Kurt Debus, one of the first Nazi scientists allowed entrance into the United States via Project Paperclip, later became Director of Cape Canaveral.

532. While Plaintiff of course cannot verify what really occurred behind the scenes, it became clear over time that some of her human perpetrators were trying to disguise their identities, pretending to be "ET's," when in fact they were the parties named in her lawsuit who were using very public nonlethal technology called "Voice-to-Skull Devices," "Voice Synthesis Devices," via Tracking and Data Relay Satellites, "Remote Neural Monitoring," "Psychotronics," and other classified technology which mimics natural telepathy. Plaintiff interacted with some compassionate people who were never identified during that time-period who tried to assist her whenever she was victimized by Defendant Aquino and others but after 4 months of assaults they told her they couldn't do anything more for her and she never heard from them again.

533.  In 2007, Plaintiff discovered the existence of military technology which explained how "telepathic" communication occurred. It is referred to as "Voice to Skull Devices" [V2K] or "microwave hearing," and until one month ago it was defined on the Center for Army Lessons Learned, an official Army website at http://call.army.mil/products/thesaur/00016275.htm. [Exhibit 24]. The definition reads, in part:

### Voice to Skull Devices
### Definition/Scope

Nonlethal weapon which includes (1) a neuron-electromagnetic device which uses microwave transmission of sound into the skull of person's or animal by way of pulse-modulated microwave radiation, and

(2) a silent sound device which can transmit sound into the skull of person or animals.

Note: The sound modulation may be voice or audio subliminal message

534. The above definition clearly describes the military's ability to send "voices" to a selected target by the usage of "microwaves" and there is a substantial body of evidence proving this capability. This definition of V2K was not only on an official Army web site but is mentioned on the website of the Federation of Scientists and several publications. An internet search of the terms "Voice to skull" reveals 750 plus web pages, published by victims and researchers, who describe accounts of verbal and physical assault from a remote

location by the usage of nonlethals and other technology which has not been completely identified to date.

535. The following abstract dated October 31, 1989 was found on the United States patent office web site http://patft.uspto.gov under patent No. 4, 877, 027 submitted by Wayne B. Bruncan which describes how microwave hearing is induced. The Abstract and Description read:

## ABSTRACT

Sound is induced in the head of a person by radiating the head with microwaves in the range of 100 megahertz to 10,000 megahertz that are modulated with a particular waveform. The waveform consists of frequency modulated bursts. Each burst is made up of ten to twenty uniformly spaced pulses grouped tightly together. The burst width is between 500 nanoseconds and 100 microseconds. The pulse width is in the range of 10 nanoseconds to 1 microsecond. The bursts are frequency modulated by the audio input to create the sensation of hearing in the person whose head is irradiated.

## DESCRIPTION

This invention relates to a hearing system for human beings in which high frequency electromagnetic energy is projected through the air to the head of a human being and the electromagnetic energy is modulated to create signals that can be discerned by the human being regardless of the hearing ability of the person.

536. Examples of early research that describes microwave hearing effects are: A. H. Frey "Auditory System Response to Radio Frequency Energy," Aerospace Med. 32, 1140-1142, 1961; Don R. Justesen, "Microwaves and Behavior," Am. Psychologist, 30, 391-401, 1975; Arthur W. Guy, C.K. Chou, James C. Lin, D. Christensen, "Microwave-Induced Acoustic Effects in Mammalian Auditory Systems and Physical Materials," Ann. NY Acad. Sci. 247 , 194-218, 1975 ; Joseph C. Sharp, Mark H. Grove, and Om P. Gandhi, "Generation of Acoustic Signals by Pulsed Microwave Energy," IEEE Trans. Microwave Theory Tech., Vol. MTT-22, pp 583-584, 1974.

537. This body of research referenced above describes experiments attempting to identify the "safety" standards of microwaves which was apparently for the benefit of the operator.  Microwave Hearing is described in NASA Technical Report, Document ID

19810004209 titled, "Effects of Low Power Microwaves on the Local Cerebral Blood Flow of Conscious Rats," (K. J. Oscar) published on June 1, 1980. The abstract reads:

> "A decoy and deception concept presently being considered is to remotely create the perception of noise in the heads of personnel by exposing them to low power, pulsed microwaves. When people are illuminated with properly modulated low power microwaves the sensation is reported as buzzing, clicking, or hissing which seems to originate (regardless of the person's position in the field) within or just behind the head. The phenomena occurs at average power densities as low as microwatts per square centimeter with carrier frequencies from 1.4 to 3.0 GHz. *By proper choice of pulse characteristics, intelligible speech may be created.* Before this technique may be extended and used for military applications, an understanding of the basic principles much be developed. Such an understanding is not only required to optimize the usage of the concept for camouflage, decoy and deception operations but is required to properly assess safety factors of such microwave exposure."

538. Although there was substantial research dedicated to assessing the safety standard of microwaves in the United States, microwaves was eventually used as a weapon in both the United States and the Soviet Union. The Soviet Union's interest in telepathic contact was documented in an article in the Federal Times, on December 13, 1976, titled "Microwave Weapons Study by Soviets Cited." It reads:

> "The Defense Intelligence Agency has released a report on heavy Communist research on microwaves, including their use as weapons. Microwaves are used in radar, television and microwave ovens. They can cause disorientation and possibly heart attacks in humans. Another biological effect with possible anti-personnel uses is "microwave hearing." *Sounds and possibly even words which appear to be originating intracranially (within the head) can be induced by signal modulation at very low average power densities," the report said.* According to the study, Communist work in this area "has great potential for development into a system for disorienting or disrupting the behavior patterns of military or diplomatic personnel."

539. Dr. Robert O. Becker, twice nominated for the Nobel Price, described the ability to send "voices" to a target in 1985 in his book, "The Body Electric - Electromagnetism and the Foundation of Life." On pg. 319, after discussing early experimentation with pulsed microwaves (or audiograms), Dr. Becker wrote that this device had "obvious applications in covert operations designed to drive a target crazy with 'voices' or deliver undetectable instructions to a programmed assassin."

540. New information has been accessed within the past month about the military's usage of Microwaves to induce voices in a target. According to a February 18, 2008 Wired.com news article titled, "Nonlethal Weapons Could Target Brain, Mimic Schizophrenia," the US Army Intelligence and Security Command recently declassified an Army addendum titled, "Bioeffects of Selected Non-lethal Weapons," dated 1998, which was

released to a private citizen under a Freedom of Information Request. [Exhibit 25] It should be noted that [Defendant] Lt. Col. Michael Aquino worked in military intelligence at one time and he was employed by the Army. This declassified report which is posted at http://members.cox.net/dnap/delassifiedmicrowave.pdf reads, in part, beginning on pg. 7:

Tunability

"The phenomenon is tunable in that the characteristics sounds and intensities of those sounds depend on the characteristics of the RF energy as delivered. *Because the frequency of the sound heard is dependant on the pulse characteristics of the RF energy, it seems possible that this technology could be developed to the point where words could be transmitted to be heard like the spoken word, except that it could only be heard within a person's head.* In one experiment, communication of the words from one to ten using "speech modulated " microwave energy was successfully demonstrated. Microphones next to the person experiencing the voices could not pick up the sound. Additional development of this would open up a wide range of possibilities."

Recovery/Safety

*"Humans have been subjected to this phenomenon for many years. "* The energy deposition required to produce this effect is so small that it is not considered hazardous experimentation when investigating responses at the just-perceptible levels."

"Possible Influence on Subject(s)

"Application of the microwave hearing technology could facilitate a private message transmission. It may be useful to provide a disruptive condition to a person not aware of the technology. *Not only might it be disruptive to the sense of hearing, it could be psychologically devastating if one suddenly heard "voices" within one's head.*

541.  Dr. John Price communicated with Plaintiff in the summer of 2001 by V2K. Plaintiff was sitting in her living room and Price identified himself and told Plaintiff how much he hated her. Plaintiff also began hearing voices which sounded familiar to her. One of the voices sounded like her best friend, D., her husband, C., a friend from high school, J., a close relative, and even her ex-boyfriend R. This confused Plaintiff but she kept trying to reality test by contacting these people and asking them questions. None of them appeared to know what she was talking about, and Plaintiff realized they were not involved, but she did not understand how or why the voices that she heard sounded so much like people who she knew.

542. In July 2001, Plaintiff heard a "voice" identifying themselves as an "ET" but who was later identified as a UC Davis professor which was distressing because the voice

sounded as if it was being warped by a synthesizer. Plaintiff is sensitive to sound because she sings and composes music; thus victimizing her on this level caused intense emotional anguish.

543. In 2007, Plaintiff discovered the technology which described how mimicking and distorting "voices" sent to a target was achieved after she searched the Center for Army Lesson Learned website and found the definition for "Voice Synthesis Devices." [Exhibit 26] The definition reads:

Voice Synthesis Devices
Definition/Scope:

Nonlethal weapon which has the ability to clone a person's voice so that a synthesized message in that person's voice can be transmitted (e.g., by satellite) to a selected audience.

544. If technology exists which makes it possible to "clone" a voice and transmit it by "satellite" (as the above definition describes), it would also be possible to make that voice sound any way the perpetrators intended. That is how it was possible to make Plaintiff believe for a short time that people from her past, present, and eventually Hollywood figures, were aware of or were involved in the assaults against her. More importantly, by the usage of this technology, the real perpetrators diverted attention from themselves, disguised their own identity, and by making it appear Plaintiff's friends were involved in her assault it succeeded in making her feel isolated and without support. The latest technology available which induces auditory phenomena is referred to as the "Radio Frequency Hearing Effect."

545. This overwhelming documentation proves - without question - that technology exists which can transmit "voices" to another person's mind, a point which cannot be overemphasized. More importantly, according to this definition, the military admits to using satellites to transmit voices to "selected audiences," apparently via United States NASA Tracking and Data Relay Satellites, and possibly from other private or public facilities located around the world.

546. Plaintiff believes the reason why V2K was included within the arsenal of nonlethal weaponry is because this technology was originally intended to incapacitate a target instead of killing them. Sending "voices" to another, clandestinely, falls within this category of weaponry because hearing "voices" in one's head is tormenting, it does lead to many peoples eventual incapacitation, and once these symptoms are reported to the mental health community, the target is discredited, stigmatized and diagnosed as schizophrenic, due to their symptomology which is diagnosed as "auditory hallucinations." The perfect cover for hiding illegal, invasive military technology. However, the military refers to hearing voices as V2K, acoustic weapons, Artificial Telepathy, Microwave Hearing, Synthetic Telepathy, and Auditory Perception.

547. In the introduction to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, DSM-IV-TR (2000) under Cautionary Statement, it reads:

"These Diagnostic criteria and the DSM-IV Classification of mental disorders reflect a consensus of current formulations of evolving knowledge in our field. They do not encompass, however, all the conditions for which people may be treated or that may be appropriate topics for research efforts."

548. The DSM is updated frequently which is evident due to the fact the DSM authors include a section which describes proposals for new categories which might be included in future editions. Even though this Diagnostic manual is used by clinicians world-wide and is considered authoritative, the DSM authors own caveats acknowledge that their manual is limited, and does not include all possible human conditions. Presently most mental health practitioners explain hearing "voices" as a product of brain dysfunction which means that a paradigm shift needs to occur about the origin of auditory perception. Under the DSM definition of Schizophrenia, it reads:

"Auditory hallucinations are usually experienced as voices, whether familiar or unfamiliar, that are perceived as distinct from the person's own thoughts … it is noted that two or more voices, conversing with one another or voices maintaining a running commentary on the person's thoughts or behavior have been considered to be particularly characteristic of Schizophrenia."

549. Based on the overwhelming evidence available proving that auditory perception can be externally induced by military technology from a remote location, the DSM should be considered an archaic authority and mental health professionals should not assume that hearing voices is a product of "auditory hallucinations" which is prevalent in Schizophrenia. In addition, according to the recently declassified military intelligence report just described it was reported that "humans have been subjected to this phenomenon for many years." Thus, based on Plaintiff's extensive experience with the mental health community as both a therapist and victim of assault weapons, if a client informs a mental health professional that they are impaired by nonlethal technology, Plaintiff believes it is unethical to diagnose the client as mentally ill and force medication onto that client. Rather the client should be considered mentally disabled and counseling should be directed towards efforts to assist the client to cope with the assaults and attempts to seek justice.

550. Congressman Dennis Kucinich, past Presidential Candidate, authored a Bill H.R. 2977 on October 2, 2001 called the Space Preservation Act of 2001 acknowledging the ability to effect the population by the usage of space-based weapons. The Bill introduced its intention as:

"To preserve the cooperative, peaceful uses of space for the benefit of all humankind by permanently prohibiting the basing of weapons in space by the United States, and

to require the President to take action to adopt and implement a world treaty banning space-based weapons."

551. The Bill required that the United Nation and the President order the permanent termination of research and development, testing, manufacturing, production and deployment of all space-based weapons in the United State and their components. Mr. Kucinch's definition of "Weapons" was a "device" capable of any of the following:

- Damaging or destroying an object (whether in outer space, in the atmosphere, or on earth) by:

- Firing one or more projectiles to collide with that object

- Directing a source of energy, including molecular or atomic energy, subatomic particle beams, *electromagnetic radiation*, plasma, or *extremely low frequency* [ELF] or ultra low frequency [ULV] energy radiation against that object; or any other unacknowledged or as yet undeveloped means.

- Inflicting death or injury on, or damaging or destroying a person (or the biological life, bodily health, mental health, or physical and economic well-being of a person) through the use of land-based, sea-based, or space-based systems using radiation, electromagnetic, *psychotronic*, sonic, laser, or other energies directed at individual persons or targeted populations for the purpose of information war, mood management or *mind control* of such persons or populations. Such terms include exotic weapons systems such as electronic, psychotronic, or information weapons, chemtrails, high altitude ultra low frequency weapons systems.

552. Unfortunately, Mr. Kucinich' Bill was withdrawn. What is important in reviewing this paper trail is that Congressman Kucinich had access to enough information which convinced him that space-based weapons were being used on the public for "mind control" purposes, and he wanted to bring those concerns into the public arena and make it illegal to victimize a human being on this level. If this Bill had passed, Plaintiff believes it would have made "Voice to Skull" [V2K] devices, "Voice Synthesis Devices," and the usage of Extremely Low Frequencies [ELF] as a weapon illegal because, as it clearly states on the Center for Army Lessons Learned website, it is by the usage of space-based satellites that "voices" are transmitted which indicates these are space-based weapons. It is unclear at this time why psychologically invasive weapons such as this are considered to be legal.

553. As previously stated Defendants Aquino, Scott L, M. D. and others told Plaintiff numerous times that they were monitoring her by technology which involved computer/brain interface. It was clear they could not only send their voices to Plaintiff but

they could also read her thoughts and could communicate with her sometimes for hours at a time. Plaintiff discovered that not only is it possible to send "voices" to a selected target but current "Mind-Reading" capability is provable.

554.  In a Washington Times article, dated August 17, 2002, "NASA Plans to Read Terrorists Minds At Airports," it was reported that NASA's Ames had the ability to "read minds." It read, in part:

> "Airport security screeners may soon try to read the minds of travelers to identify terrorists. Officials of the National Aeronautics and Space Administration have told Northwest Airlines security specialists that the agency is developing brain-monitoring devices in cooperation with a commercial firm, which it did not identify. Space technology would be adapted to receive and analyze brain-wave and heartbeat patterns, then feed that data into computerized programs 'to detect passengers who potentially might pose a threat,' according to briefing documents obtained by the Washington Times."

> "NASA wants to use 'noninvasive neuron-electric sensors,' imbedded in gates, to collect tiny electric signals that all brains and hearts transmit. *Computers would apply statistical algorithms to correlate physiologic patterns with computerized data on travel routines, criminal background and credit information from 'hundreds to thousands of data sources,'* NASA documents say. The notion has raised privacy concerns. Mihir Kshirsager of the Electronic Privacy Information Center says such technology would only add to airport-security chaos ...The organization obtained documents July 31, the product of a Freedom of Information Act lawsuit against the

> Transportation Security Administration, and offered the documents to this Newspaper .... '*We're getting closer to reading minds than you might suppose,*' says Robert Park, a physics professor at the University of Maryland and spokesman for the America physical Society. 'It does make me uncomfortable. That's the limit of privacy invasion. You can't go further than that.'... '*We're close to the point where they can tell to an extent what you're thinking about by which part of the brain is activated, which is close to reading your mind.* It would be terribly complicated to try to build a device that would read your mind as you walk by.' The idea is plausible, he says, but frightening. "At the Northwest Airlines session conducted Dec. 10-11, nine scientists and managers from NASA Ames research Center at Moffett Field Calif. proposed a 'pilot test' of the Aviation Security Reporting System."

555.  NASA issued a statement denying that they had "mind reading" capability shortly after this article was published, but they are lying. The means to do this is fully operational and the public needs to be informed that this technology exists. It appears NASA was concerned that they might be sued by Privacy organizations because of their illegal surveillance capabilities. Further, NASA AMES was the organization named in this article

who can "read minds," and it was NASA AMES who first made contact with Plaintiff in early 2001 via then some unexplained type of telepathic contact.

556.  In addition to the fact that at times Plaintiff had lengthy conversations with various individuals who could "read" her mind, they could access her dreams and visualizations as well. Plaintiff discovered that the ability to monitor visualizations was within the capability of "mind-reading" technology by the usage of Magnetic Resonance Imaging [MRI] and, surprisingly, documentation of this technology's existence is documented on several mainstream web sites. What is missing in the following articles is the fact that not only can the brain/mind be imaged for nefarious purposes but the entire body can be targeted as well via what Plaintiff believes are Advanced Body mapping systems.

557.  The following articles describe the usage of MRI's to read a subjects mind. In one article titled, "Mind-Reading Machine Knows What You See," dated April 25, 2005, published on the internet site NewScientists.com, it discussed the ability to monitor the visualizations of a subject. It read, in part:

*"It is possible to read someone's mind by remotely measuring their brain activity, researchers have shown. The technique can even extract information from subjects that they are not aware of themselves.* So far, it has only been used to identify visual patterns a subject can see or has chosen to focus on. But the researchers speculate the approach might be extended to probe a person's awareness, focus of attention, memory and movement intention. In the meantime, it could help doctors work out of patients apparently in a coma are actually conscious … In a separate study, also published in Nature Neuroscience, John-Dylan Haynes and Geraint Rees at  University College London, UK, showed two patterns in quick succession to 6 volunteers. The first appeared for just 14 milliseconds - to quick to be consciously perceived by the viewer. *By viewing MRI images of the brain, the researchers were able to say which image had been flashed in front of the subjects.*"

558. Mind-Reading technology was also documented in a February 5, 2006 article, published on the Guardian Observer's web site titled, "We are Moving Ever Closer to the Era of Mind Control, The Military Interest in New Brain-scanning Technology is beginning to Show a Sinister Side." It read, in part:

"Brain imaging has become familiar. Scanners, known by their initials – CAT, Pet, MRI- began as clinical tools, enabling surgeons to identify potential tumors, the damage following a stroke or the diagnostic signs of incipient dementia. But neuroscientists quickly seized on their wider potential. The images of regions of the brain "lighting up" when a person is thinking of their lover, imagining traveling from home to the shops, or solving a mathematical problem have captured the imagination of researchers and public alike. What if they could do more? ...

More seriously, there is increasing military interest in the development of techniques that can survey and possibly manipulate the mental processes of potential enemies, or enhance the potential of one's own troops. In the US, it stretches back at least half a century. Impressed by claims that the Soviet Union was developing psychological warfare, the CIA and the Defense Advanced Projects Agency (Darpa) began their own programmes.  By the 1960's, Darpa, along with the US Navy, was funding almost all US research into "artificial intelligence", in order to develop methods and technologies for the "automated battlefield" and the "intelligent soldier". *Contracts were let and patents taken out on techniques aimed at recording signals from the brains of enemy personnel at a distance, in order to "read their minds"... The step beyond reading thoughts is to attempt to control them directly ...*  A new technique – transcranial magnetic stimulation (TMS) has begun to generate interest. This focuses an intense magnetic field on specific brain regions and has been shown to affect thoughts perceptions and behavior ... TMS at a distance is now under active military investigation."

559.  In a December 2006, 48 page report titled, "US Electromagnetic Weapons and Human Rights" by Peter Phillips, Lew Brown and Bridget Thornton of Sonoma State University, they cite their concerns about Electromagnetic Frequency [EMF] devices and human rights violations. It reads, on pg. 3:

"This research explores the current capabilities of the US military to use electromagnetic (EMF) devices to harass, intimidate, and kill individuals and the continuing possibilities of violations of human rights by the testing and deployment of these weapons ... *Americans have little idea about the research concerning the capabilities of electromagnetics, directed acoustics, or computer-human interfacing* ...The majority of American do not know that we are currently using these new-concept weapons in Iraq and Afghanistan. Indiana University law professor David fiddler stated to the Economist, "because these weapons are most likely to be used on civilians, it is not clear that using them is legal under the international rules governing armed conflict... if they are used in conjunction with conventional weapons, the could end up making war more deadly, rather than less."

"Neurological Technology which has therapeutic applications with Alzheimer's, epilepsy, depression, and stroke victims using Transcranial Magnetic Stimulation [TMS], allows a paralyzed person to control a computer screen or a limb with a brain implant ... From universities to private business to the military, advances in neuron-technology can be used for amazing good. However, as we learned from the history of the Cold War, technology that has the capacity to heal also has the capacity to harm.  Of great concern is the research being conducted at DARPA, which is trying to revolutionize the way soldiers receive information, respond to orders, adapt to stress, and perform

while sleep deprived ... One application of augmented cognition allows a user
to monitor a person's brain function and send anticipatory commands to the person
being monitored. For instance, *a military command unit will be able to monitor
a pilot in a cockpit, and based on the sensory output of the soldier, the
base command can input messages directly into the pilot's brain to improve
performance.* DARPA describes this as a human computer symbiosis whereby,
'This research will enable development of closed loop human-computer
technologies where the state of the user is measured, analyzed, and automatically
adapted to by the computational system. *The increase in human-computer relations
and the ability to manipulate and control a person's senses, memory, and neural
output has wide applications* ... The basic ability to enter a person's mind is
not a futuristic fantasy. This is real and in prototype. Darpa began this
research in 1983.

560. In addition to the above information proving that "mind-reading" capability is
a reality, in 2002 Plaintiff received a report which had been ostensibly filed in Civil Court
under the case name and number, John St. Clair Akwei vs. NSA, Civil Action No. 92-0449.
This report was published on the internet and purported to describe the inner workings of the
National Security Agency [NSA] in regards to their surveillance capabilities via
computer/brain interface which was referred to as "Remote Neural Monitoring." Plaintiff
read this report with interest because Scott L. had told her that he worked for the NSA and
he had discovered that they had placed her and other high-profile political associates under
surveillance at some point.

561. John St. Clair Akwei (or someone using his name - which is what Plaintiff
believes occurred after she investigated) did file a lawsuit against the NSA, but it was hand
written, almost undecipherable, and he did not appear to be the same personality who
provided the sophisticated, detailed information about the inner-workings of the NSA which
is posted on the internet under the case name and filing number of the Akwei lawsuit. In
addition, Plaintiff sent for this case and discovered that this particular report was not in the
case file. There could be many reasons for that but one possibility is that someone
knowledgeable about the NSA took the opportunity to disclose illegal activity by the NSA
under the cover of this lawsuit.

562. This report explained in some detail how the NSA monitored people by
computers (which they referred to as Remote Neural Monitoring) which had been occurring
for at least the past 15 years. In brief, excerpts from the document reading John St. Clair
Akwei vs. NSA, Ft. Meade, MD, USA, read:

Pg. 3:

"The NSA's mission and the NSA's domestic Intelligence Operation Communications
Intelligence (COMINT) includes 'Blanket coverage of all electronic communication in

the U.S. and the world to ensure national security. The NSA at Ft. Meade, Maryland
has had the most advanced computers in the world since the early 1960's. NSA
technology is developed and implemented in secret from private corporations,
academia, and the general public."

"Domestic Intelligence (DOMINT): 'The NSA has records on all U.S. citizens. The
NSA gathered information on U.S. Citizens who might be of interest to any of the over
50,000 NSA agents (HUMINT). These agents are authorized by executive order to spy
on anyone. The NSA has a permanent National Security Anti-Terrorist surveillance
network in place. This surveillance network is completely disguised and is hidden from
the public."

"NSA personnel can control the lives of hundreds of thousands of individuals in the
U.S. by using the NSA's domestic intelligence [Domint] network and cover businesses.
The operations independently run by them can sometimes go beyond the bounds of
law. Long-term control and sabotage of tens of thousands of unwitting citizens by NSA
operatives is likely to happen. NSA Domint has the ability to covertly assassinate U.S.
citizens or run covert psychological control operations to cause subjects to be
diagnosed with ill mental health."

Pg. 4:

"A subject's bioelectric filed can be remotely detected, so subjects can be monitored
anywhere they are. With special EMF equipment NSA cryptologists can remotely read
evoked potentials  (from EEG's). These can be decoded into a person's brain-states and
thoughts. The subject is then perfectly monitored from a distance."

"NSA Personnel can dial up any individual in the country on the Signals Intelligence
EMF scanning network and the NSA's computers will then pinpoint and track that
person 24 hours-a-day. The NSA can pick out and track anyone in the U.S."

"For electronic surveillance purposes electrical activity in the speech center of
the brain can be translated into the subject's verbal thoughts. RNM can send
encoded signals to the brain's auditory cortex thus allowing audio communication
direct to the brain (bypassing the ears.) NSA operative can use this to covertly
debilitate subjects by stimulating auditory hallucinations characteristic of
paranoid schizophrenia."

"Without any contact with the subject, Remote Neural Monitoring can map out
electrical activity from the visual cortex of a subject's brain and show images
from the subject's brain on a video monitor. NSA operatives see what the
surveillance subject's eyes are seeing. Visual memory can also be seen. RNM
can send images direct to the visual cortex, bypassing the eyes and optic nerves.
NSA operatives can use this to surreptitiously put images in a surveillance

subject's brain while they are in R.E.M sleep for brain-programming purposes."

563.  The above information described clear attempts, allegedly by the National Security Agency, to remotely implement illegal Mind control and surveillance operations/programs on the public and Plaintiff has every symptom it describes.

564.  Plaintiff discovered United States Patent No. 3,951,134, dated April 20, 1976, invented by Robert G. Malech, which explained how the preceding description of the NSA's activities – Remote Neural Monitoring – or monitoring the brain waves of a human subject from a remote location was achieved. The abstract reads:

Apparatus and Method for Remotely Monitoring and Altering Brain Waves

"Apparatus for and method of sensing brain waves at a position remote
from the subject whereby electromagnetic signals of different frequencies are
simultaneously transmitted to the brain of the subject in which the signals interfere
with one another to yield a waveform which is modulated by the subject's brain waves.
The interference waveform which is representative of the brain wave activity is
re-transmitted by the brain to a receiver where it is demodulated and amplified.
The demodulated waveform is then displayed for visual viewing and routed to
a computer for further processing and analysis. The demodulated waveform also
can be used to produce a compensating signal which is transmitted back to the brain
to effect a desired change in electrical activity therein."

565.  In Patent No. 6,011,991 invented by Aris Mardirossian on January 4, 2000 titled, "Communication system and Method including Brain wave analysis and/or use of Brain activity" documents the ability for two-way communication via computer/brain interface to occur via satellites. The Abstract and Description reads:

ABSTRACT

"A system and method for enabling human beings to communicate by way of their
monitored brain activity. The brain activity of an individual is monitored
and transmitted to a remote location (e.g. by satellite.) At the remote location,
the monitored brain activity is compared with pre-recorded normalized brain activity
curves, waveforms, or patterns to determine if a match or substantial match is found.
If such a match is found, then the computer at the remote location determines that the
individual was attempting to communicate the word, phrase, or thought
corresponding to the matched stored normalized signal"

## DESCRIPTION

"This invention relates to a system and method for enabling human beings to
communicate with one another by monitoring brain activity. In particular this
invention relates to such a system and method where brain activity of a
particular individual is monitored and transmitted in a wireless manner (e.g. via
satellite) from the location of the individual to a remote location so that the
brain activity can be computer analyzed at the remote location thereby enabling
the computer and/or individuals at the remote location to determine what
the monitored individual was thinking or wishing to communicate."

566. It is overwhelmingly clear, based on these Patents, that it is possible to have
two-way conversations with a target by remotely monitoring the brain waves of that target
via satellite and computer/brain interface.

567. Because of this capability, Plaintiff had other reasons to be concerned when her
perpetrators made threats that because of their illegal surveillance capabilities they were
now aware of the numbers of Plaintiff's bank accounts, her credit card numbers, her pin
numbers, the names and addresses of her relatives, and as of March 2008, the passwords to
her email accounts.

568. From May 11, 2001 to November 2002, Defendant Aquino and others kept
Plaintiff busy almost 24 hours a day by experimenting on her with the above described
technology and other technology yet to be documented. At one point, Plaintiff stayed awake
for 7 days without eating and found little to no need to sleep because of the non-stop assault
and communication.

569. In May 2001, Plaintiff began seeing unexplained phenomena on almost a daily
basis. In approximately June 2001, about 11PM, she was driving down an off-ramp onto the
highway when she saw a low-flying triangular shaped craft coming directly toward her car.
It then disappeared in a flash. Plaintiff was so frightened by this, she put her car into reverse
and illegally sped backwards, up the off-ramp, to another off-ramp which went in the
complete opposite direction on the freeway.

570. Plaintiff discovered terminology which explained how it was possible to
project visual phenomena to a target. According to "Nonlethal Weapons: Terms and
References," by Robert J. Bunker, Editor, for the USA Institute of National Security
Studies, posted at
http://www.usafa.af.mil/inss/OCP/ocp15.pdf, under the term "HOLOGRAMS," it reads:

"HOLOGRAM, DEATH: Hologram used to scare a target individual to death.
Example, a drug lord with a weak heart seeks the ghost of his dead rival appearing at his
bedside and dies of fright."

"HOLOGRAM, PROPHET: The projection of the image of an ancient god over an enemy capitol whose public communications have been seized and used against it in a massive psychological operation."

571.  The usage of holograms might explain why Plaintiff began seeing unusual visual imagery in addition to the fact that it is possible to send imagery to a target once computer/brain interface occurs. If Plaintiff had described this and others types of visual imagery she was eventually subjected to, it might have caused a mental health professional to mistakenly diagnose Plaintiff as experiencing "visual hallucinations" which is another common symptom of schizophrenia.

572.  From May 11, 01 to the present, March 2008, in addition to being psychologically attacked by V2K, Plaintiff has been physically attacked by remote assault weapons. They include Electromagnetic Radiation weapons which can cause the bodily tissues to heat up from a distance (a capability which was explained in the recently released declassified report "Bioeffects of Selected Non-lethal Weaponry,") radio-frequency weapons, pulsed microwaves and  acoustic weapons.

573. To continue with Mr. Bunker's report. He describes:

Acoustic Blast Wave, Projector: "Energy generation from a pulsed laser that will project a hot, high pressure plasma in the air in front of a target. It creates a blast wave with variable but controlled effects on hardware and troops."

574. Throughout May 2002 to the present, Plaintiff has been hit in the head repeatedly by a weapon that felt like a blast. Beginning in 2003 to the present, Defendants Aquino, his wife, Lilith Aquino, Scott L., M. D., Robert M., his wife, Peggy N. and Peter G. and Kevin F. on occasion, have tormented Plaintiff by directing this weapon into the interior of her head. At first it was difficult for Plaintiff to read simple language after these types of assaults but she eventually learned to compensate. The report further describes the capabilities of nonlethals:

Acoustic Bullets: "High power, very low frequency waves emitted from one to two meter  antenna dishes. Results in blunt object trauma from waves generated in front of the target. Effects range from discomfort to death. A Russian device that can propel a 10 hertz sonic bullet the size of a baseball hundreds of yards is thought to exists."

575.  Throughout May 2001 to 2003, Plaintiff experienced being shoved several times by some unknown means, several times so hard that she fell down on her knees. Defendant M. D. and Scott L. would assault her muscle groups and the cartilage in her knees, telling Plaintiff she was so thin and crippled that the medical community would diagnose her with Muscular Dystrophy. They also told her they were targeting her glandular system in order to try to cause subtle changes in her body which Plaintiff later discovered were attempts to damage her chakra system which will be explained in another section of

this lawsuit. Plaintiff's weight had been stable at 118 for 20 years, but as a result of that damage, in addition to being forced to take psychotropic medication for five years by the criminal justice system, Plaintiff now weighs 180 pounds. The report continues:

> Acoustic, Infrasound.    "Very low-frequency sound which can travel long distances and easily penetrate most buildings and vehicles. Transmission of long wavelength sound creates biophysical effects nausea, loss of bowels, disorientation, vomiting, potential internal organ damage or death may occur. By 1972 an infrasound generator had been built in France which generated waves at 7 hertz. When activated it made the people in range sick for hours."

576. For the past seven years, since May 2001, Scott L. has hit Plaintiff with a blast of energy in her stomach region which causes her to vomit.

577. Defendants Aquino and Scott L. have told Plaintiff that they had used the facilities at Scientific Applications International Corporation [SAIC] in San Diego, Lawrence Livermore Laboratory, Sandia Laboratory and NASA AMES to target her in the early years of their assault.

578. In a paper titled, "US Electromagnetic Weapons and Human Rights," dated Dec. 2006, authored by the Media Freedom Foundation from Sonoma State University, they mention that due to private military contractors not needing to respond to FOIA requests, private corporations like Aardvark Tactical, Inc., Ionatron, and SAIC, were free to develop nonlethal weaponry without much oversight. They write:

> "There is a clear consensus of concern for the potentiality of human rights abuse with EMF weapons testing and use. They collectively agree that the U.S. is the leading global researcher in this area ... It is clear that we know very little about the actual levels of experimentation research, and capabilities of EMF weapons technologies due to high levels of U.S. Governmental Security."

579. In approximately June-July 2001, Plaintiff was exercising with Tai Chi, which is an oriental martial art system intended to circulate internal energy, when she suddenly collapsed and was left in a weakened state for several weeks. Scott L. - a martial artist - eventually confessed to Plaintiff that he had been experimenting, trying to impact Plaintiff's atomic field from a distance from Lawrence Livermore Laboratory, and that she was his "science project."

580. Plaintiff has a conference schedule, dated November 16-17 1993, from a "Classified Conference" which had been sponsored by Los Alamos Laboratory about nonlethals. A speaker from Livermore Lab was scheduled to give a lecture on nonlethals at that time so it is clear that this subject was researched by Lawrence Livermore Laboratory and Los Alamos Laboratory. Both of these laboratories were managed by the University of

California School System for the U.S. government and they are funded by the Department of Energy.

581. It has been verified that one of Plaintiff's perpetrators obtained his Ph.D. from UC Davis in Atomic Particle Physics during this time period and worked at a Livermore Lab facility. Plaintiff believes that several other perpetrators either worked or are presently employed by the UC School system.

582. In early June 2001, Plaintiff stayed in a motel room. Once she was in her room, Defendant Aquino and Lorne G. spoke to her and told her they were going to "rape" her. Plaintiff experienced a painful physical sensation in her vagina and then discovered that she was profusely bleeding from her rectum and vagina. Plaintiff took off her pants and tried to clean up. Another person told Plaintiff to open up the door of her motel room. She opened the door and then felt a force push her out the door, into the hall. Plaintiff was then locked out of her hotel room with blood streaming down her legs. The hotel manager was unavailable which caused her to call a relative to request immediate assistance. The police and EMT's arrived and took Plaintiff to her room and wanted to know why there was so much blood on the floor. Plaintiff did not know what to tell them and so said she had been "raped." The EMT's wanted to take her to the hospital but she refused.

583. After these types of assaults, Plaintiff would hear a voice advising her to go to the hospital to document any physical damage. Plaintiff tried to but because Plaintiff had no insurance, she was forced to go to the emergency rooms of Mercy, Alvarado and Thorton Hospitals throughout 2001. These hospital emergency rooms only screen out blatant and obvious physical injuries and so were not able to document any injury to her at that time. Plaintiff was unable to pay for these hospital room visits because she was incapable of working due to being assaulted 24 hours a day and she did not have sufficient funds.

584. On June 10, 2001, Plaintiff was sitting in her living room when her chest began hurting. Phil S. and John Price told her via V2K that they were going to induce a heart attack. Plaintiff was told not to get up from her chair but to remain seated. She immediately got up and tried to walk down the hall to her bedroom where there was a telephone, but she kept falling down. Plaintiff ended up on the floor of her bedroom in a stupor while she felt sensations as if her heart was jumping out of her chest wall. This was just one of several instances in which Plaintiff believed she was going to die. Every time this occurred, she prayed and prepared to die, which she also did in this instance. Plaintiff then heard a new voice saying, "This is Major _____, I want to puke at what's being done to you. I'm so sorry, we didn't know you were such a good person. Someone please stop this." Another person began speaking to Plaintiff in apparent efforts to relax her and she lay there for several hours and then went to sleep.

585. After Plaintiff woke up, she drove to Grossmont hospital to see if they could document any damage done to her. They did. Plaintiff had no prior medical problems with her heart but after Grossmont Hospital technicians performed an ECG test, the Cardiology

Department documented that she had an "abnormal ECG," sinus tachycardia with "short PR," and "ST & T wave abnormality." Medical records reveal that Plaintiff told the emergency room physician that she had been "raped" the week prior so that they would conduct a gynecological exam, but there were no physical abnormalities to be found.

586. Three times, from May 2001 to 2002, Plaintiff felt sensations as if her mind had exploded. In late May 2001 her mind felt like it was filled with some type of field/energy which was later identified as a nonlethal weapon called Extremely Low Frequencies [ELF]. Voices began echoing in her mind and it sounded like she was speaking in "tongues" because of the nonsensical sounds.

587. Plaintiff was in her living room when this occurred for a second time. The field in her home was so intense, her tongue began to vibrate. Plaintiff began responding to the voices she was hearing until a male voice advised her to stop responding because she was in an Artificial Intelligence program that became activated when she responded. When Plaintiff stopped "thinking," the voices stopped. This is disturbing because if artificial intelligence programs are routinely used while targeting victims with V2K phenomena, that means great numbers of people can be targeted at once without the expenditure of much man power.

588. The third time this occurred was in June of 2001. Her mind felt like it was immersed in some type of intense magnetic field, and then it felt like it exploded, and she had great difficulty thinking because her thoughts made no sense. Plaintiff was so psychologically damaged, she could not count change at the grocery store. Plaintiff's perpetrators told her that effect was induced by sending too much ELF or "extremely low frequencies" to her brain. One of her perpetrators spoke to her and said he was going to try to "assist" her with her thinking process. From then on when Plaintiff intended to think a word like "go," it would come out as "stop." Plaintiff was told she was placed on a "word association" program, apparently subliminally, because she had no control over her thoughts. Plaintiff eventually discovered that it was specifically designed so that she would voice thoughts that were the opposite of her intention. This devastated Plaintiff as she had worked for years to improve her thinking processes in efforts to make herself a better person.

589. Col. John Alexander (ex-director of the Nonlethal Department at Los Alamos Laboratory in New Mexico) described the effects of subliminal persuasion via psychotronics and the impact of ELF or Extremely Low Frequencies in his military paper titled, "The New Mental Battlefield: Beam Me Up, Spock," published in Military Review 1980, Vol. LX, No. 12, 47-54, http://www.Bibliotecapleyades.net/sociopolitical/esp_mindcon16.htm. It reads, in part:

> "The psychotronic weapon would be silent, difficult to detect and would require only a human operator as a power source ... *The use of telepathic hypnosis holds great potential. This capability could allow agents to be deeply planted*

*with no conscious knowledge of their programming.* In movie terms, the Manchurian candidate lives and does not even require a phone call ... Other mind-to-mind thought induction techniques are also being considered. If perfected, this capability could allow the direct transference of thought via telepathy from one mind or group of minds, to a selected target audience. The unique factor is that the recipient will not be aware that thoughts have been implanted from an external source. He or she will believe that thoughts are original."

"Soviet researchers studying controlled behavior have also examined the effects of electromagnetic radiation on humans and have applied those techniques against the US Embassy in Moscow. Researchers suggest that certain extremely-low-frequency [ELF] emissions possess psychoactive characteristics. These transmissions can be used to induce depression or irritability in a target population. The application of large-scale ELF behavior modification could have horrendous impact.

590.   Col. Alexander described ELF as electromagnetic radiation and transmissions which could be used to induce depression or irritability in a target population and wrote that the application of large-scale ELF behavior modification could have horrific impact on the population. This is the technology that appears to have been used on Plaintiff. More importantly, the author, Col. John Alexander, openly admitted in this article to the existence of technology which can telepathically impact people from a distance and implant subliminal commands.

591.   Lt. Col. Michael Aquino wrote an unpublished paper in response to Col. Alexander's published article that was just quoted titled, "Mind War: The Psychology of Victory," (1980) in which he also discussed ways in which to impact the public by the usage of extremely low frequencies [ELF] which he appeared to be in favor of, which proves that Aquino is more than aware of this technology. His paper described the U.S. Army's efforts to "map the minds" of neutral and enemy targets. The early efforts to record "evoked" potentials" or "mind-read" was originally referred to by early researchers as "brain-mapping." This paper is posted along with a 2003 update at the Temple of Set website http://www.xeper.org/maquino. It reads, in part:

"LTC John Alexander's Military Review article in support of "psychotronics" intelligence and operational employment of ESP – was decidedly provocative." *"Psychotronic research is in its infancy but the U.S. Army already possesses an operational weapons system designed to do what LTC Alexander would like ESP to do – except that this weapons system uses existing communications media.* It seeks to map the minds of neutral and enemy individuals and then to change them in accordance with U.S. National interests. It does this on a wide scale, embracing military units, regions, nations and blocs. In its present form it is called

Psychological Operations [PSYOPS] ... There are some purely natural conditions under which minds may become more or less receptive to ideas, and MindWar should take full advantage of such phenomena as atmospheric electromagnetic activity, air ionization, and extremely low frequency waves."

Footnote..."Extremely Low Frequency [ELF] - waves are not normally noticed by the unaided senses, yet their resonant effect upon the human body has been connected to both physiological disorders and emotional distortion. Infrasound wave patterns, including an audience toward everything from alertness to passivity. Infrasound could be used tactically, as ELF-waves endure for great distances."

592. Defendant Aquino had at one time not only served in military intelligence in the U. S. Army but was considered to be a psychological warfare specialist which is commonly referred to as PSYOPS. He clearly wrote in the above cited paper that psychotronics was within the arsenal of PSYOPS.

593. As further evidence that Defendant Aquino and the Temple of Set [TOS] is aware of psychotronic technology, according to an internet FAQ dated May 4, 2003 about the TOS's practices, published by a member of this group under the pseudonym Balanone, it reads in response to a question about psychotronics:

"Psychotronic research is a form of research pursued by some within the TOS as part of their interest in Xeper. It's being pursued generally by the same people who are studying angular sounds and shapes. If the U.S. military is also studying this field, that's either coincidence or a mere fluke of timing."

594. Dr. Michael Persinger, a neuro-psychologist at Canada's Laurentian University and FMSF Advisory Board member, believes he can induce mystical phenomena and ET abduction scenarios by stimulating the temporal lobes electromagnetically via extremely low frequencies [ELF]. He wrote an article titled, "On the Possibility of Directly Accessing Every Human Brain by Electromagnetic Induction of Fundamental Algorithims," published in Perceptual and Motor Skills, (1995) 80: 791-799. In addition, Dr. Persinger presented a paper to a symposium for the Institute of Electrical and Electronics Engineers [IEEE] in 1979 titled, "ELF Field Mediation in Spontaneous PSI Events: Direct Information Transfer or Conditioned Elicitation," originally published in physicist Russell Targ's book, "Mind at Large," in 1979 and republished in 2002. Direct Information Transfer is another term for telepathy. This information makes it apparent that some members of the FMSF are aware of the existence of this technology.

595. Russell Targ disclosed in this book that from 1972-1995 the Department of Defense had funded experiments into psychic phenomena at the Stanford Research Institute [SRI] and spent 20 million dollars over 23 years time. Russell Targ, Senior Physicist

Researcher at SRI, reported that these experiments were a success and stated that, without doubt, psychic phenomenon, such as remote viewing and healing from a distance, existed. He claimed that mainstream journals refused to publish these findings due to their ignorance and prejudice. Mr. Targ presented his findings at the symposium of the Institute of Electrical and Electronics Engineers and described a program in the Electronics and Bioengineering Laboratory of SRI where he was conducting experiments in telepathic communications and discussed issues such as whether Extremely Low Frequencies [ELF] could be a carrier for "information transfer" or telepathic contact between two parties, obviously for military applications.

596. Between June 15, 2001 and October 5, 2001, Plaintiff was 5150'd (forcibly taken to the hospital for observation by law enforcement) three times. Plaintiff had been repeatedly seeing unexplained phenomena that appeared to be "UFO's. On June 15, 2001, Plaintiff was seen "talking" to herself while sitting in a doorway. The night before she was 5150'd, she had been driving and had been chased by what appeared to be a "UFO" again and drove 20 miles, trying to elude it. Plaintiff exited on an off-ramp to an unknown area of town, jumped out of her car and began running. She felt something like a fist sock her in the back and she tried to run away from it. Plaintiff then stood in an office doorway all night, looking at the sky where she saw fantastic imagery while various voices describing themselves as "aliens" (who Plaintiff believes were actually Defendant Aquino and others) told Plaintiff that she was about to be sentenced for her "bad" thoughts. Plaintiff sat in a doorway all night, trying to talk them into reducing her "sentence," and that is when the police came to take her to County Mental Health Psychiatric facility in San Diego. After a brief observation in which staff noted that she was very "thin," Plaintiff was released. She refused to tell the psychiatrists at that time about hearing "voices" because she knew she would be misdiagnosed as a "schizophrenic."

597. After Plaintiff returned home from this hospitalization, unidentified parties told her that she was "dead," she had been sent to "hell," and would never be able to enter her home again. Plaintiff was then subjected to further induced visual imagery and she stayed outside all night looking at the images of trees and shrubs which had suddenly turned into the shape of animals.

598. On July 3, 2001, Plaintiff was 5150'd for a second time for refusing to eat food. Plaintiff had asked a friend of hers, Dr. Ellen Lacter, to take her to the hospital because she wanted to see if her latest assault could be medically documented. Plaintiff's palms had turned white, and she couldn't find a heart beat. Defendants Aquino, M. D., Scott L., Phil S., and others tried to horrify Plaintiff by telling her that they were experimenting with "Cybertronics" and were "computerizing" her from a distance in attempts to make a "Cyborg," which the military was interested in. They claimed they could remove her body organs, destroy body organs, and she would still live because of the computer/brain interface even though her body might die. Because Plaintiff was witness and victim to almost incomprehensible events, she did not know what was possible. Defendant Aquino who is a very religious Satanist, and believes himself to be the Anti-Christ, continued to frighten

Plaintiff by telling her that he was going to start an Armageddon with this technology in service of the Antichist, and the Fourth Reich, which is a nazi reference. Plaintiff was urged by other identities to write about it on the internet but because she wrote exactly what had been told to her, she began to appear more and more "delusional

599. Scott L. had told Plaintiff that he did not want her to eat food, and if she did he would harm one of her relatives, including her younger brother. Consequently, she quickly lost weight. At that time Plaintiff was staying at the home of Dr. Ellen Lacter who did not know what was wrong with her other than she appeared to be having some type of psychological breakdown. Plaintiff's weight had quickly dropped to 102 pounds due to her suddenly developed "fear" of eating. Dr. Lacter told the Thornton Hospital emergency staff that Plaintiff refused to eat food and thought she was going to die from starvation. Plaintiff was then forcibly hospitalized at County Mental Health Psychiatric facility where she remained for three days.

600. On July 3, 01 and for two days afterwards, San Diego County Mental health psychiatric facility made Plaintiff drink high calorie drinks and eat food. Because the psychiatric staff did not understand that Plaintiff was being communicated with by V2K technology, they concluded that she was "delusional." According to the clinical record, Plaintiff weighed 102 pounds on July 3, 01 and gained four pounds on July 4, 01. She decided to leave the hospital against medical advice because she was acutely aware that the medical community was not capable of assisting her.

601. After this hospitalization, Plaintiff returned to Dr. Lacter's house and began contemplating suicide. Plaintiff had her gun in her car but because a shell was stuck in the cylinder she shot the gun into some bushes in attempts to dislodge the bullet. Dr. Lacter's husband took the gun away from her, called the police, and gave the gun to them.

602. Plaintiff called the police a few months later and asked for the gun back. The officer told her that he would not file charges against her for firing a gun in public but would file charges if she insisted on having her gun back because he didn't think she was psychologically well. Plaintiff asked for her gun back and the officer filed misdemeanor charges against her in 2002 for discharging a weapon in public. That is the only criminal history that Plaintiff had at that time.

603. On October 5, 2001, Plaintiff was 5150'd for a third time after she was found "wandering" and loitering in a doorway. That was because Plaintiff had been listening to her "voices" and lost track of time again.

604. From June 2001 to the day she was arrested on November 26, 2002, Plaintiff left her home at approximately 7am and either walked throughout the county, sometimes until 3 am, drove her car aimlessly, or rode the trolley system until late at night. From June 2001 to November 2002, while Plaintiff was wondering around town, she lost her purse numerous times, lost a briefcase, lost her cell phone, and could not pay her bills. During this

time-period, Plaintiff neglected her hygiene on a regular basis and rarely bathed or brushed her teeth. As a result of this medical neglect, after 2004, she had extensive dental work which included several cavities filled and root canals.

605.  In approximately June 2001, after Plaintiff listened to her perpetrators, they contrived a scenario which rationalized why she should go "swimming" in Lake Murray, a lake a few blocks from her home. Without much thought, Plaintiff ran to the lake and illegally swam in the lake fully clothed. Plaintiff does not normally like to swim. She then ran home at top speed, while a voice told her, "that took exactly 7 minutes and 30 seconds." Plaintiff's perpetrators could never "order" her to do anything against her will and so they often resorted to manipulative story-telling, hoping she would volunteer to do something that would end up making her appear bizarre.

606.  Shortly afterwards, Plaintiff's neighbor, Ken Wright, spoke to her about her behavior and wanted to know what was wrong. He had been informed by another neighbor that she had swam in the lake and was acting "crazy." Shortly afterwards, Mr. Wright consulted with another neighbor Paul K. and phoned the police after they heard screaming coming from Plaintiff's home. Plaintiff was screaming because at that time her perpetrators were drilling into her head with remote assault weapons and told her they were trying to crack her skull open. Her neighbors and relatives called the police several times to check on Plaintiff's welfare because it sounded like she was being murdered. Plaintiff was being murdered.

607.  Because of these assaults, Plaintiff became severely psychologically incapacitated.  As a result, Plaintiff was incapable of renewing her newly acquired MFT license in November of 2001, a license she had worked years to acquire, and as a result it expired. Plaintiff was also psychologically incapable of gathering the necessary evidence to file a lawsuit during this time period.

608.  Defendant Aquino, Scott L. and M.D. continued to tell Plaintiff that they were injuring/torturing her on another "level," which she would not be able to medically document, which is one of the concerns with nonlethals -- the ability to torture someone without leaving a trace of evidence, apparently via the misuse of principles of physics.

609.  Plaintiff has not yet discovered the necessary documentation to prove that this is what is occurring but she believes that the latest sophisticated assaultive classified technology available is a combination of computer/brain interface, voice to skull technology, and Virtual Reality Telepresence in which the target is the Virtual Reality landscape. Coincidentally, this technology was researched by NASA AMES in the early 1990's. Plaintiff was told by her perpetrators that they were using virtual reality headgear and that this technology produced a 3 dimensional computer image or hologram of the target on computers, which were portable, enabling the perpetrator to assault the target from any location.

1

2

3

4

      610. Based on this information, Plaintiff discovered a website found at http://artificialtelepathy.blogspot.com/2007/02/human-effects-testing-and-body.html which provides the closest description of what may be responsible for most of her assaults at this time. [Exhibit 27] Plaintiff requests that others knowledgeable about physics assist her in documenting the reality of this technology. On this web site it provided an illustration of a human body and read:

5

6

7

8

9

10

11

12

13

14

15

      "This illustration also represents what many Voice Hearers or 'targeted individuals" describe feeling: as if they were wrapped in a cocoon of electromagnetic energy ... the phenomenon might also be described as an advanced form of body mapping. It's as if a 3D hologram of one person's body were projected or superimposed on the body of another person. The result would be more than simple verbal telepathy: it would feel disturbingly as if another person were inside one's own skin ... When irradiated from a distance, it is possible that a highly sophisticated data collection program (similar to the facial recognition programs used at airports) could 'electronically photograph' the body of a human target, eventually building an extremely accurate, computer-generated 3D model, much like the ones shown in the photo above. A similar model could be created for the assailant. A computer could then be used to merge the two body maps. The result would be an extremely powerful means for imposing sensory hallucinations on the target: Think of it as a form of 3D 'voodoo doll' into which pins could be stuck. Such computer models would also provide a powerful means to modeling and measuring the 'bioeffects' of different stimuli delivered by remote radiation or beam weapons."

16

17

18

19

20

21

22

23

24

      611. From June 2001 to 2007, two individuals alleging to be from the Soviet Union interacted with Plaintiff, via V2K, telling her they had been hired to not only physically and psychologically assault her but to spiritually murder her. They told Plaintiff that they made millions of dollars targeting others esoterically in their native country because of their affiliations with the "KGB" and Satanists who had access to this technology. These perpetrators told Plaintiff many stories about how this had occurred. One story was that Defendant Lysenko/Jantsang had an "uncle" in the KGB who was bribed by Michael Aquino. Defendant Lysenko/Jantsang did write a message on the internet indicating that she had a relative in the KGB. The name Lysenko is Russian, and Defendant Lysenko/Jantsang did write under the pseudonym "People's Commissar" for many years which alludes to the Russian government. They told Plaintiff that it was the Soviet Union who began the process of computer/brain interface necessary to target Plaintiff via their satellite. According to Cheryl Welsh of CAHRA, Citizens Against Human Rights Abuse, 75% of victims of nonlethal technology are from the Soviet Union and the United States.

25

26

27

28

      612. Although it would seem that the average nonlethal perpetrator would not find it of interest or too egregious to attack an opponent on the esoteric level, it might interest the average Satanist. When satanists sacrifice their victims to satan, they symbolically attempt to destroy their victims soul or send it to hell which is one reason why they make their victims last waking moments on earth one of intense suffering. Plaintiff's perpetrators told

1  Plaintiff they had isolated where the astral body resided and were intent on attacking her on
2  this level.

3      613. As difficult as it is to believe, the public should be made aware that it is a fact
4  that the "astral body" has been mentioned in the nonlethal literature as well as its usage for
   military surveillance purposes. In a July 1972 declassified paper titled, "Controlled
5  Offensive Behavior," by Captain John D. La Mothe, Medical Intelligence Office, Office of
   the Surgeon General, Department of the Army, posted at
6  http://www.bibliotecapleyades.net/esptemas4.htm it described the Soviet Union's interest in
7  out-of-body travel and what the United States government thought the countermeasures
   should be. It read, in part:

8
9      "This report summarizes the information available on Soviet research on human
       vulnerability as it relates to incapacitating individuals or small groups ... One of the
10     purposes of this report is to evaluate research in the field of influencing human
       behavior in order that the US may be in a position to develop certain countermeasures
11     ... Super-high frequency electromagnetic oscillations may have potential uses as a
       technique for altering human behavior ... In certain nonlethal exposures, definite
12     behavioral changes have occurred ... The science of parapsychology includes special
       sensory biophysical activities, brain and mind control, telepathic communications or
13     bio-information, bioluminescent and bioenergetic emissions, and the effects of altered
14     status of consciousness on the human psyche ... Other terms that may appear in the
       Soviet literature that normally mean parapsychology are psycho physiology,
15     psychotronics, psychoenergetics, or biophysical effects ... The more sinister aspects of
16     paranormal research appear to be surfacing in the Soviet Union ... There are numerous
       reports on Soviet applications of clairvoyance, hypnotism, dowsing, etc, in military
17     operations ... The Apport Technique: *The following discussion on apports and astral
18     projection is not intended to be an endorsement for its scientific the USSR and the US
       are keenly interested in this phenomenon* ... It is a know fact that the Soviet Union
19     takes the appearance of luminous bodies very seriously as evidence by the Kirlian
       photography of the human body's aura ... *The individuals who have studied these
20     effects (real or otherwise) have suggested that since these bodies can travel unlimited
21     distance and are able to pass through solid material (walls), they might well be used to
       produce instant death in military and civilian officials. It is further conjectured that
22     these bodies could disable military equipment or communication nets.*"

23
       "According to Pullman, Director of the Southeast Hypnosis Research Center in Dallas,
24     Texas, before the end of the 1970's, Soviet diplomats will be able to sit in their foreign
       embassies and use ESP (in this case a form of the apport technique) to steal the secrets
25     of their enemies ... *Pullman states that a spy would be hypnotized, then his invisible
       "spirit" would be ordered to leave his body, travel across barriers of space and time
26     to a foreign government's security facility, and there read top-secret documents and
27     relay back their information. Such 'astral projection' already has been accomplished*

28

*in laboratory settings, Pullman said, adding that the Russians are probably now trying to perfect it."*

614. In this declassified report, just referenced, the author described the Soviet Union's research into parapsychology and clearly described what military applications the "astral body" might have.

615. Col. John Alexander, (ex-director of the Nonlethal Department at Los Alamos lab) also discussed the military application of the astral body in his previously cited military paper, " The New Mental Battlefield: Beam Me Up, Spock," published in Military Review. He specifically mentioned the Soviet Union's research into this area and cited the preceding excerpts from Controlled Offensive Behavior, Col. Alexander wrote:

> "Psychotronics may be described as the interaction of mind and matter.
> While the concepts may stretch the imagination of many readers, research
> in this area has been underway for years, and the possibility for employment
> as weaponry has been explored. To be more specific, there are weapons
> systems that operate on the power of the mind and whose lethal capacity
> has already been demonstrated ... *The other area of experimentation*
> *involves parapsychological phenomena known as the out-of-body*
> *experience [OOBE], remote viewing, extrasensory perception or bio-*
> *information* ... It has been demonstrated that certain persons appear to
> have the ability to mentally retrieve data from afar while physically
> remaining in a secure location ... It is generally believed that the Soviets
> and their allies are well in the lead in parapsychological research ... Certainly
> with development, these weapons would be able to induce illness or death
> at little or no risk to the operator. Range may be a present problem, but
> this will probably be overcome if it has not been already ... The Soviets
> have further developed techniques to control and actively employ their
> knowledge of parapsychology. Included in the research has been investigation
> into areas such as telepathy (the mental awareness of information over distance),
> precognition (the knowledge of future events), telekinesis (movement of matter
> with the mind) and the transfer of bioenergy from one body to another ... The
> ability to heal or cause disease can be transmitted over distance, thus inducing
> illness or death for no apparent cause ... The existence of energy emanations
> from the body has been repeatedly demonstrated through radiation field
> photography known as the Kirlian effect. This phenomenon, which has been
> widely replicated in the West, reflects changes in emotional condition."...

> *"The bulk of out-of-body data from US research is anecdotal. Literally thousands*
> *of people have reported the experience of being discretely and consciously*
> *located outside of the physical bodies and yet able to view themselves from that*
> *perspective with a total awareness of activities in that area. This phenomena is*
> *frequently associated with life-threatening circumstances such as accidents,*

*illness or extreme danger. Many soldiers who have had 'close calls' in combat have reported being in the OOBE state of consciousness Many physicians have been embarrassed by patients who, after being revived from an unconscious state, were able to repeat conversations and events that had occurred while they were unconscious ... Scientific experimentation has also been conducted with OOBE. Test subjects have induced OOBE states while being physiologically monitored and have retrieved data that was not available through normal means. Experiments frequently include identification of random numbers either placed out of sight nearby or at a more distant location.*"

616. Col. Alexander described the scientific evidence which proved the existence of the astral body, which he felt was proven by Kirlian photography, in a mainstream military journal, and what applications the astral body might have to military applications, and that was 27 years ago.

617. According to "Remote Viewers: The Secret History of America's Psychic Spies," by Jim Schnabel (1997), several well known nonlethal warfare advocates, including Admiral Albert Stubblebine and Col. John Alexander, had attended Robert Monroe's classes and week long workshops to learn how to "astral travel" by the usage of sound entrained to specific brain waves. Admiral Albert Stubblebine was the Commander of the Army Intelligence and Security Command [INSCOM] during 1981-1984. From Remote Viewers:

"Not long after Stubblebine reached INSCOM in 1981, Army Intelligence began to blossom under his influence with alternative New Age-style-thinking ... altered state and visualization techniques to try to enhance learning and boost performance ... INSCOM staff officers were sent to a place called the Monroe institute, a retreat center in the Blue Ridge mountains where they lay in darkened cubicles, listened to altered-state-inducing tapes, and tried to have out-of-body experiences."

618. Ironically, Col. John Alexander studied with Dr. Elizabeth Kubler-Ross who was an expert in near-death experiences and how to make a conscious death transition into the "light." Plaintiff's perpetrators have told her that this individual had something to do with the way she was targeted. Lt. Col. Alexander was also past president of the International Association for Near Death Studies and was, along with five others, a member of the Aviary, a cabal of intelligence agents who purported to study UFO phenomena.

619. Defendant Aquino and others also told Plaintiff it was known where the Chakras resided and they were going to destroy hers. The seven Chakras are a metaphysical belief system which originated with the Hindus, Chinese and Tibetians, a belief system which Plaintiff subscribes to. Many people in the Western world are practitioners of this belief system and that is what Hatha Yoga is based on, stretching and assuming forms in order to make the body strong enough for the eventual opening of the chakras with the

eventual goal being unity with God. The Chakras are thought to be energy centers which correspond to the endocrine system and nerve centers of the body. Information about the chakra system can be found at:
http://images.google.com/images?hl=en&q=chakra&btnG=Search+Images&gbv=2 .
Technology does exist which can impact the electromagnetic field of the body which Col. John Alexander described in his discussion of Kirlian photography which photographs the subtle emanations of the body. Apparently after discovering that the astral body could be used as a military weapon and for surveillance purposes, there were attempts made to isolate and incapacitate the astral body, and later the chakra system by evil perpetrators, probably by tracking changes in the electromagnetic/energetic emissions of the body. In a speech given by Dr. C. Hammond about ritual abuse he described satanic ritual abuse perpetrators electroshocking the chakras of their victims both for torture and in apparent efforts to spiritually/psychically injure them.

620.  The following information will briefly describe how Plaintiff has been terrorized by the illegal usage of both public and classified invasive technology. It may be difficult to read. Defendant Aquino told Plaintiff via V2K that if she ever made these facts public, he would contact the District Attorney and have her convicted for "criminal libel."

## TERRORIZATION BY V2K, VOICE SYNTHESIS DEVICES, COMPUTER/BRAIN INTERFACE, AND OTHER NONLETHAL TECHNOLOGY

621.  While writing this complaint (from June 2007 to the present) Defendant Aquino and his wife, Lilith Aquino, Robert M., and his "wife," Scott L., M. D., Peggy N., and Peter G. have inflicted a tremendous amount of pain on Plaintiff by directing nonlethals at her ear drums, the interior of her eye sockets, eyes, tissues of her face, gums, genitals, breasts, the back of Plaintiff's neck, her rib cage, the nerve centers within her body, the cartilage of her nose, the internal organs of her body, the soles of her feet, and they are getting worse. Defendant Aquino and his wife Lilith would oftentimes simultaneously direct nonlethals at her coccyx bone and at the top of her spine so that it felt like an electric current was running through her. At other times they would hit Plaintiff in the stomach as hard as they could in order to make her vomit and would apply so much pressure to Plaintiff's skull that she thought it would burst. They would also direct nonlethals into the layers of her skin which would  cause Plaintiff extreme torment. Defendant Aquino and others have repeatedly threatened that they would maim her from a distance so that she would be completely and permanently disabled.

622. Defendant Aquino, his wife, Lilith and his associates – who apparently have similar proclivities as Aquino - have subjected Plaintiff to excessive and cruel physical and emotional abuse for seven years. The Aquinos would often try to take advantage of Plaintiff's counseling skills by telling her about their problems. At one time Defendant Aquino told Plaintiff that she "comforted" him and that sadistically abusing her "soothed"

him. The Aquinos have told Plaintiff that because Aquino paid a substantial sum of money to have her targeted, Plaintiff was their "toy," their "possession" and they "owned" her. Lilith Aquino, who appears to have no intellectual accomplishments, has spent the past three years attempting to claim Plaintiff's intellectual life, talents and attributes as her own. When Plaintiff has reminded Lilith Aquino that it is her "mind," Lilith has said," not anymore, it's ours." Whenever Plaintiff did not conform to Lilith Aquino's "standards," she would hit Plaintiff in one of her nerve endings. When Plaintiff would flinch or silently express pain, Lilith told her, "we don't whine," referring to the fact that she had told Plaintiff that she wanted to pretend that she had "courage" just like Plaintiff had and so did not want Plaintiff expressing anything other than "toughness." Michael Aquino, an extremely evil man, told Plaintiff that he wanted to take over her mind and so that he could pretend to be her so he could pretend to be a higher entity before he died. Both of these individuals have treated Plaintiff as if she is an object in service to their own regressed needs. Defendant Aquino has spent the past 7 years trying to destroy Plaintiff's sense of self and spirituality.

623. For example, in June 2001, Aquino told Plaintiff via V2K that she now "belonged to satan." Apparently Aquino tells this to all of his victims. Plaintiff said, "No, I am a child of Jesus Christ." Several voices began telling her the opposite which caused Plaintiff to repeat it over and over again in opposition. Plaintiff was later told that Aquino irrevocably harmed her after he discovered that she had a spiritual life.

624. The Aquinos have told Plaintiff that they enjoy "playing underneath" her skull," and in fact when Plaintiff cries due to their torment, the Aquinos tell her they are just "playing," and try to stop her from crying by interfering with her thoughts and emotions Both Aquinos have told her she was allowed to live only as long as she entertained them. They would try to interfere in Plaintiff's family relationships, and would make cruel comments about them, informing her, "We're your family now." The Aquinos have told Plaintiff that all of their free time is and will be in the future dedicated to torturing her because they are now "retired" from the Temple of Set and they no longer have their inner order. In fact, they have told Plaintiff that they are in "hiding" for reasons that are known to Plaintiff which she cannot make public at this time. Defendant Aquino has been responsible for inducing visual imagery via holograms to Plaintiff such as spiders and flies. However, it gets worse. Defendant Aquino informed Plaintiff that due to his mind control affiliations with the CIA and "black ops," he was able to monitor some MPD/DID's with V2K because it was disguised by the fact that one of the symptoms of MPD is "hearing voices."

625. Scott L. and M. D. have emotionally traumatized Plaintiff by telling her they were going to spiritually kill Plaintiff's spiritual teachers. After Plaintiff would vomit on the side of the road, due to blows to her stomach, Scott L. and Kevin F. would tell her "Demanifest the sound effects," due to the noise she made while vomiting, subjecting Plaintiff to severe emotional distress. Scott L. and others would hit Plaintiff so hard in the head that it would actually cause Plaintiff to fall to the ground. When they would assault Plaintiff as a group, Scott L. would say, "Let's see who can make her cry first …" "The coup goes to …" He would also direct nonlethals at Plaintiff's throat, causing her to choke,

and told her not to publicly identify him. Scott L. continued to cause intense fear for Plaintiff by telling her that because of the computer/brain interface she is connected to, he would always have access to her and could do anything he wanted. He, along with everyone else, have directed nonlethals at the interior of Plaintiff's body for the past two years, claiming that they wanted to make sure that she was spiritually dead. Defendant Aquino told her "We just wanted to make sure that you can't fly away," referring to the astral body's departure upon death.

626. Robert M., who is apparently Aquino's best friend from the Temple of Set, and his "wife" (who has not been identified) have brutally emotionally assaulted Plaintiff for years by making cruel and childish references to Plaintiff's eye movements, tongue movements, facial expressions, and the noise she makes during bouts of crying after which his "wife" would say, "You look very unattractive when you cry"... "Don't twist your lips." Robert M.s "wife," who perceives herself as witty, often gives "orders" to Plaintiff and when Plaintiff ignores her, she tells her, "You better do as I say!" When Plaintiff would tremble due to the assaults, Robert M.'s wife would say, "Look, she's starting to shake!" This person is the only party who laughs frequently at the suffering of Plaintiff and would tell her, "Don't let this get you down, Diana, we're just having fun," "Why don't you beg us not to hurt you." She would often say to Defendant Aquino, "please let me hurt her more." Robert M and his "wife" have repeatedly told Plaintiff that they feel very "important" because of their participation in this ongoing group assault because they have access to classified technology which the public is unaware of and it gives them an opportunity to "mock" a child advocate who, because of their own tendencies, they don't respect. Plaintiff is struck repeatedly from the time she wakes up in the morning until she goes to bed. Robert M and his wife have told Plaintiff, "We do that to establish dominance over you."

627. The Aquinos and Robert M. and his "wife" have routinely ganged up on Plaintiff and cruelly, and usually ignorantly, judged her innermost thoughts and feeling, and have made every effort to completely annihilate her own identity, which has been deeply traumatizing. They have told Plaintiff that their intent is to "shame" and embarrass her. Plaintiff has repeatedly told them that their acts define them, not her. When Plaintiff's brother died last month, these four parties made cruel remarks and heightened their torture of her because they said she was "vulnerable" at that time. In fact, at that time, to the present they started a tapping sensation on Plaintiff's skull. These four individuals have told her that they are deeply envious that she has talent, a family, and a spiritual inner life, and as satanists they want her to suffer for it. They have told her that they believed this assault against her was the biggest satanic "take-out" of the century," but Plaintiff has told them that there is nothing to be proud of, in actuality they are shameful cowards who are abusing a woman who has no means of defending herself - simply because she outwitted them on the internet - and they will not be admired by the rest of the world. Plaintiff has had to listen to these prattling fools for seven years now and she would like to experience some relief.

628. For the past three years, without fail, whenever these parties speak to Plaintiff they pair their voices with blows to her head in efforts to torment and torture her both

psychologically and physically. It was mentioned that at one point Plaintiff's skull was drilled into so hard that it felt like her head had cracked open. In fact, Scott L. told her that they had succeeded in cracking her skull on "another level" (via what might be quantum computers). Plaintiff has had 2 MRI's and evidence of this assault cannot be proven. It is also possible that they have cracked her skull internally which might not show up on xrays. As a result, for the past 6 years, these "people" have focused nonlethals into what feels like fissures in Plaintiff's skull which causes her extreme torment. These perpetrators are deeply afraid that others will discover how they have further misused assaultive military technology.

## PLAINTIFF'S CRIMINAL "STALKING" CASE AND HOLLYWOOD FIGURES

629.  On November 5, 2003, Plaintiff plea-bargained to stalking Jennifer Love Hewitt after Plaintiff wrote her a pseudo-threat in October of 2002 in efforts to save her own life. Robert M's "wife," Defendant Aquino, and his wife, Lilith, eventually confessed that they had pretended to be Hollywood figures, such as Jennifer Hewitt and Steven Speilberg via V2K and what Plaintiff discovered was "Voice Synthesis Devices" in efforts to drive Plaintiff so crazy from the pain and fear that she would publicly discredit herself.

630. Defendant introduced these Hollywood figures to Plaintiff by claiming that Steven Speilberg was interested in advanced military technology. Plaintiff discovered that it was true that Speilberg used advanced military technology in his films, according to the web site: http://www.nearfuturelaboratory.com/files/ACE2006Keynote_MilitaryIndustrialLightAndMagicComplex.pdf Aquino claimed that through an intermediary, Speilberg was introduced to a modified version of the illegal computer/brain interface technology which monitored Plaintiff after telling him that Plaintiff had a UFO encounter. Steven Speilberg is known to have an interest in "ET's," and at that time, in 2002-2003, he had a TV series about UFO's. In addition, Aquino - a writer himself - has written several fictional stories about "The Lost Ark," and other "Indiana Jones" movies, and it is apparent that he admires Steven Speilberg.

631.   Plaintiff asked "Mr. Speilberg" why he was violating her privacy and he told her that his special effects studio Dream Works was interested in duplicating the technology on film, and because they were making a film together - "The Tuxedo" – he had introduced Jennifer Hewitt and other selected Hollywood types to this novel technology. It is true that these two were making a film together titled The Tuxedo.

632.  Throughout the entirety of 2002, "Jennifer Hewitt," who was later identified as Robert M.'s wife and Lilith Aquino, began cruelly teasing Plaintiff, physically hurting Plaintiff, and succeeded in emotionally devastating Plaintiff, along with Defendant Aquino, Scott L., M.D., Robert M., Phil S. and unnamed others.

633. During this time period, "Steven Speilberg" continued to violate Plaintiff's privacy and refused to remove "Jennifer Hewitt's" access to her when she requested his assistance. This culminated in an incident in approximately May of 2002 in which Hewitt/Lilith Aquino and others told Plaintiff that they were going to try to "crack" her skull open. Plaintiff felt a drilling sensation into her skull and began screaming. Hewitt/Lilith Aquino then proceeded to laugh out loud.

634. Plaintiff, who by that time thought it was possible, although not probable that Hollywood billionaires were having "fun" at Plaintiff's expense, attempted to reality check and confronted Ms. Hewitt at a radio station in San Diego in August 2002 just to see how Hewitt responded. The assaults against Plaintiff continued under Jennifer Hewitt's name which then caused Plaintiff to confront Hewitt again at the Latin Grammy Awards on September 18, 2002. Several individuals told Plaintiff via V2K not to do this but she did it anyway.

635. For several weeks, Plaintiff had extensive contact with Steven Speilberg's security advisor Mr. Borman, explaining what her predicament was: She did not know what was going on but was interested in discovering if it was remotely possible that Speilberg had access to this military technology, and she informed Mr. Borman repeatedly that she was only interested in remaining within the bounds of legal behavior

636. Steven Speilberg filed a restraining order against Plaintiff during this time period, which was finalized in October 2002, within days of the confrontation of Jennifer Hewitt because he was concerned that Plaintiff would confront him too in public. Plaintiff could not attend the court hearing which was held about the restraining order because she was in too much physical pain which her perpetrators were inducing, however she did fax a Declaration to the Los Angeles Superior Court at that time attempting to explain her situation with the limited facts that were available to her at the time.

637. Plaintiff was disappointed to discover that in order to make sure the court ruled in his favor, Mr. Speilberg and his security manager, Kevin Borman, exaggerated and distorted Plaintiff's conduct, history, and statements, causing the media to repeat claims such as Plaintiff had "accused Steven Speilberg of implanting a mind control device in her head," and "Plaintiff believed a group of satanists were working from Speilberg's basement," and she was "planning something big," all statements which she had never made. Plaintiff never made any attempt to directly contact Mr. Speilberg because she wasn't interested. The gist of the complaint was that Speilberg wanted to stop Plaintiff from being able to confront him in a public setting and her writings from the internet during that time-period were used as evidence that she was "delusional."

638. Defendants Aquino and his wife, Lilith, Scott L., M. D., and others, then informed Plaintiff they were going to finally kill her and she would be dead within the week. Plaintiff believed them and slept within reach of the telephone. Plaintiff was so dejected and

frightened, she did not know what do. Because she thought she would be safer in the custody of law enforcement, Plaintiff wrote a pseudo-threat to Jennifer Hewitt's web master, Jim Mix, in October 2002 to have herself purposely arrested and to make sure her case became high-profile. Plaintiff asked Mr. Mix several times to send her threat to Hewitt but because Mr. Mix appeared to think she was joking, Plaintiff reminded him that making email threats was a crime and to be sure to "contact the FBI," although she had no intentions of acting on that threat. Because Plaintiff believed in non-violence, resorting to "threats" indicated that she was in deep distress.

639.  As Plaintiff planned, and her perpetrators intended, Plaintiff was arrested on November 26, 2002 for writing "terroristic threats" and for "stalking" Jennifer Love Hewitt. While in custody Plaintiff continued to be assaulted by Defendants Aquino, his wife Lillith Aquino, Scott. L., M. D., Robert M., his wife, "Kevin F.", and others, but they no longer told her they were going to kill her. In fact, they all frightened Plaintiff by continuing to tell her she would not be able to die a normal death due to the latest techniques in computer/brain interface which is what they intended to happen.

640.  Plaintiff later discovered that the investigatory report, which was written by an investigator at the DA's office under Paul Phingst at that time, further distorted Plaintiff's behavior and alleged conduct by her that also had never occurred. Plaintiff requested of her lawyer, Robert Ford, that she be given permission to act as co-counsel (or advisor) because she knew her case was too complicated for her naïve attorney to present in court alone.

641.  Plaintiff's lawyer, Robert Ford, decided that she was too "mentally ill,"to assist him, and told her that her belief that she was being targeted by psychotronics was completely "delusional" because he had a background as a "nurse." At that time, the only information Plaintiff had to prove that psychotronics or nonlethals existed was the John St. Clair Akwei vs. NSA report and a July 8, 1996 Calgary Herald article titled, "Scientists Offer the End of Death: 'Soul Catcher' Computer Chip Implanted behind the Eye," which had warnings about computer/brain interface.

642.  While in custody, Plaintiff was evaluated by three psychologists, two of whom opined that Plaintiff was either "schizophrenic" or "delusional," and was "paranoid," after she explained what had occurred on the internet between her and her political opponents - which caused her perpetrators endless amusement. Plaintiff was eventually formally misdiagnosed as "mentally ill" and they informed her attorney that his concerns were justified: Plaintiff was too mentally ill to assist her attorney in her own defense. Plaintiff appealed to the court to reconsider because she understood that her past writings were being used as evidence of "mental illness," but since she had discovered that her perpetrators intentionally provided her with mis/disinformation, she no longer believed in what was contained in those writings, and they should not have been used as reason to confine her against her will until she explained the context. Therefore, Plaintiff argued that the underlying facts were in dispute and the psychiatric evaluations should not be considered

legitimate.  The local judge and the appellate court ruled against Plaintiff which resulted in her incarceration at Patton State Hospital until she got "better." While at Patton, Plaintiff was forced to take psychotropic medication even though medication has never alleviated the external assaults she is experiencing by V2K and other technology.

643.  Plaintiff eventually plea-bargained on November 5, 2003 to "stalking" Jennifer Hewitt and was placed on probation for five years, and is now serving her fourth year of probation.  Plaintiff's attorney told her that the DA Fiona Kahill had said in the Judges chambers that Plaintiff's "child-saving" days were over. Plaintiff had no idea at the time why an attorney in the DA's office would make such a personal remark about her until she read Defendant Devereaux's correspondence years later in which she stated that Defendant Hopkins had "tampered" with her legal case. Because Defendant Hopkins was a colleague of then DA Paul Phingst, it appeared entirely possible that this is what occurred because Phingst was still in office at that time. In fact, Ms. Kahill informed the San Diego Superior court that Plaintiff had a "history" of harassing people on the internet, and used Mark Sauer's news article the "Web of Intrigue" as evidence.

644.  Plaintiff, who two years prior to these events had been a high-functioning professional in her local community,  was sentenced to five years probation, ordered by the court to see a psychiatrist, take prescribed medication, she was ordered not to use the internet or computers at all, to submit to random lie detector tests, and to enroll in a counseling program. Because Plaintiff finally "acted out," which was what her perpetrators planned in furtherance of the ongoing conspiracy to ruin her reputation and career, Plaintiff's Marriage and Family Therapy [MFT] license was revoked in 2004 due to her criminal conviction, which caused Plaintiff reputation to be further ruined, and resulted in the loss of her career, income and livelihood.

645.  From approximately November 2003 to 2004, Plaintiff's psychiatrist was Dr. Glassman at East County Mental Health who increased her medication whenever she mentioned she still heard "voices." In March 2004, Plaintiff was awarded Social Security Disability benefits because she was completely incapacitated and incapable of working which Dr. Glassman attested to. Because Dr. Glassman believed Plaintiff was too incapacitated to be her own payee, Plaintiff's relative was named as the payee.

646. From approximately June 2004 to December 2005, Dr. David Marks acted as Plaintiff's psychiatrist, and in October of 2004, he allowed her to become her own payee. But because Plaintiff occasionally decompensates, her checks have continued to have her name and a relative's name on in the event her relative needs to pay her bills.

647. In July of 2004, as a result of Plaintiff's incapacitation which began in May 2001, she was forced to file bankruptcy due to her unpaid bills which totaled  $60,000. Plaintiff's psychiatrist Dr. Marks wrote a statement to the holder of her school loan, giving her such a poor prognosis of ever recovering, that the holder of the loan cancelled her debt.

From approximately 2006 to the present, Plaintiff's psychiatrist has been Dr. Prakash Bhatia.

648.  Between the years 2002 to the present, Defendants Aquino, his wife, Lilith Aquino, Scott L. M. D., Robert M. his "wife," and occasionally Peggy N., and Peter G. have attempted to take over Plaintiffs mental life even further and have terrorized and tormented her. Because of this excessive torment, between the years 2002-2007, Plaintiff could not sit down for any length of time and paced up to 7 hours a day. At that time 10 or more people would be talking to Plaintiff which she was later told were members of the Temple of Set and Church of Satan. Because she is often kept awake all night by these individuals, she has been forced to take sleeping pills on a semi-regular basis.

649. These facts should prove that Plaintiff met the "insanity" provision of Civil Code and Procedures 352 from May of 2001 until on or about May of 2007 when she began exercising her mental functioning due to a court order which allowed her to use the word processor.

**SAN DIEGO PROBATION DEPARTMENT AND DR. ELIZABETH LOFTUS**

650.  After Plaintiff was finally released from jail in November 2003, she told her temporary probation officer that she had been pursued by a satanic cult and she expected them to try to make trouble for her with San Diego Probation at some point.  In approximately March of 2004, Plaintiff was assigned Probation Officer Stephanie Morehead with Anna Guzman acting as Supervisor.

651.  In 2004, Plaintiff began to have difficulty with Officer Morehead and Anna Guzman after they made attempts to violate her First amendment rights to free speech and routinely mischaracterized her in front of the San Diego Superior Court, all of which has caused Plaintiff significant emotional distress. After Plaintiff was invited to appear on the Montel Williams show, they called the producers of the show, telling them she could not appear and instructed the producers to contact them if Plaintiff ever contacted them again. These individuals have never believed that she has been targeted illegally with military technology and instead have routinely believed the misinformation and disinformation that has been written about her. Plaintiff believes that these individuals have violated her rights to free speech only because they have a different opinion than she about what she is experiencing, and the topic of nonlethal technology appears to be beyond their comprehension.

652. In mid 2006, because Defendant Aquino, his wife, Lilith, Robert M. and his wife became upset with Plaintiff, and because they wanted to emotionally traumatize her, they told Plaintiff that they had targeted all of her relatives. Plaintiff was devastated, and as a result she decided to bring publicity to the issue again even though she lived in fear of these people. In retrospect, before this time she had been victim to a psychological condition

similar to the Stockholm Syndrome – total dependence upon one's captors – but her fear for her relatives overcame her fear for herself, and she began to extricate herself from their dominance.

653. In July and August of 2006 Plaintiff decided to write some exploratory letters to the Institutional Review Boards of UC Davis, Berkeley and Irvine, requesting that they investigate whether a UC Davis professor, Scott L., John Price, or Defendant Elizabeth Loftus had ever listed her as a human research subject because Los Alamos Laboratory and Lawrence Livermore Lab was run by the Office of the President of the University of California school system and appeared to research nonlethal technology. The Office of the President responded to Plaintiff by claiming that they had found no public record of such events, which is what she expected would be but was interested in what the reaction might be - if any. Plaintiff was told by UC Irvine that their "Whistleblowers Unit" of UC Irvine would handle her complaint.

654. Plaintiff had expressed in these letters that she had a public "breakdown," the context of which she wanted to explain to the IRB's if this issue ever arose. Plaintiff also wrote that she had not pursued this matter earlier because she was afraid of the people involved.

655. In approximately June/August 2006, Plaintiff's probation officer Stephanie Morehead began receiving complaints from the UC Campus Police about the letters she had sent to the IRB's of both UC Davis and UC Irvine. The IRB's had taken Plaintiff's confidential requests for an investigation, and then apparently notified the individuals involved – despite Plaintiffs claim that she had been afraid to come forward until that time - and turned the correspondence over to the campus police, who then sent it to San Diego County Probation and Officer Morehead.  Since Plaintiff had not mentioned to any of these IRB's that she was on probation for a criminal offense, and her letters could not possibly have been construed as threatening, an unknown party who was aware of her probationary status obviously informed the IRB's, she believes to discredit and retaliate against her.

656. In approximately August of 2006, Morehead told Plaintiff to cease all communication with the UC System (for that time period) and reiterated that she was not allowed to use the word processor at all. It became evident that Morehead and the Administration of Probation were speaking to people from these schools and elsewhere who were claiming Plaintiff was guilty of some activity, but Plaintiff did not know what that could be, and feared that she was being "set-up" again by one or more of the Defendants. She asked Morehead whether she would be informed about what the exact allegations against her were so that she could defend herself and Morehead said "yes." However, that was not the case.

657. In September of 2006, Plaintiff was informed by her then psychologist that he had received a phone call from Probation Supervisor Anna Guzman who told him she was building a "legal case" against Plaintiff based on her long telephone bill and the complaints

made by the UC System. Ms. Guzman had phoned several people on Plaintiffs phone bill but unfortunately did not appear to understand the content of the information that she received from those phone calls. Plaintiff's attempts to access the Akwei v. NSA lawsuit were described by Guzman as attempts to "obtain a court file without a court order," which was an unusual remark for an officer of the court to make because it should be common knowledge that court files are open to the public unless they are ordered sealed by the court which the Akwei case was not; Plaintiff's phone calls to the aid of Congressman Kucinich and other government officials was misconstrued as "calling Capitol Hill," without good cause. Plaintiff has every right to call government officials as they are in office to serve their citizenry. Ms. Guzman then misinterpreted Plaintiff's communication with a researcher known to Plaintiff who investigates the paranormal, apparently because Ms. Guzman does not understand the paranormal or does not believe in its existence. Plaintiff wrote a letter to Ms. Guzman and her supervisor Ms. Donohoo attempting to explain these issues, advised them of their mistake, and thought that was the end of the matter.

658. Plaintiff requested Probation to schedule a hearing at San Diego Superior Court to return her belongings that were confiscated by the District Attorney 4 years prior and to request word processing and internet/intranet privileges again due to her good behavior because she wanted to write a book and eventually file a lawsuit.

659. On December 14, 2006, Officer Morehead wrote and Supervisor Guzman signed a report which was submitted to the San Diego Superior Court titled, "San Diego County Probation Department Probation Officer's Supplemental Report," which was completely filled with false allegations about Plaintiff. " Ms. Morehead wrote:

"The Probation Department scheduled this hearing at the request of the defendant to modify probation conditions relative to full computer access and full library privileges and permission to write a "tell all" book. Probation is 'strongly' opposed to this modification for the following reasons."

660. Plaintiff responded that she had never requested permission to write a "tell all" book and that it was well within her Constitutional rights to write a book if she wished. The court remained silent on this issue. Morehead continued:

"On 5/26/2006, the undersigned received a call from a concerned citizen claiming the defendant was 'posting' her manifesto on the internet. His name is mentioned in the manifesto in a derogatory manner. The undersigned directed the defendant not to access the internet. She said she was researching psychotronics aka electronic harassment and remote neural monitoring. The defendant continues her claim to be a victim of psychotronics, which is the sole cause of her schizophrenia. The defendant adamantly denies any mental illness to present."

661. The Plaintiff had in fact not been on the internet, and instead it appeared that one of Plaintiff's perpetrators who had her under illegal surveillance had contacted

Probation at the approximate time she was requesting review by the UC school system's Institutional Review Boards in apparent efforts to cause trouble for her. Ms. Morehead continued:

> "On 7/26/2007, the undersigned received a phone call from another concerned citizen and stated the defendant was attempting to send a message to her through 3rd parties threatening to expose private information about the caller. Given the sensitivity of these claims as well as the dynamics of the case before the court the undersigned will clarify further at the Court discretion."

662. This type of allegation sounded like the false allegations Defendant Devereaux had made to the San Francisco police department to have Plaintiff identified. However, Morehead refused to reveal the names of the complaining parties. Morehead continued:

> "On 8/10/2006, the Probation department received information from Detective Henock of the UC Davis police regarding an incident report that had been filed on 8/2/2006. The defendant sent a letter and called to report that she was a subject of unauthorized experiments by a former student and a former staff member using computer/brain interface technology. The defendant also sent a 40 page faxed document outlining her background and stating she was writing to inform the Internal Review Board (IRB) administration about the usage of ultra-sophisticated technology that was used on her by a satanic cult from 2001 to present."

> "The numerous letters sent to others appear to border on harassment to government officials, academic officials, professionals and private citizens. The defendant has been told that no investigations will be conducted into her allegations with the UC system."

663. Plaintiff told the court that Probation Officer Morehead had seriously mischaracterized her work and activities, and it appeared that Probation, in addition to new allegations, were continuing to raise the same allegations that she had attempted to correct Anna Guzman about several months earlier, in spite of the fact that they had no physical evidence upon which to base these claims. Further they made no attempts to violate her probation due to her alleged activities. The report continued:

> "On 8/17/2006, the undersigned received a fax from Detective Altamarino of UC Irvine consisting of a complaint letter sent to the Subjects Rights Committee from the Defendant to report same/similar conduct of wrongdoing by campus officials since 2001 to present." "On 8/25/2006 the undersigned directed the defendant not to utilize any electronic communicative device until further notice. She was also directed to provide a copy of her phone bills to ensure the defendant will be not accessing the internet via home or cell phone."

> "On or about 9/7/2006, the undersigned received a call from Detective Altamarino
> of UC Irvine Police regarding the defendant's behavior. The defendant mailed
> three floppy discs and one letter to a UCI professor. The same employee had
> received e-mails from an unidentifiable person containing information about the
> Curio Jones files. Curio Jones is one of the defendants AKAs. The employee
> expressed fear to campus police."

664.   The reference to a "UCI professor" was later discovered to be Defendant
Elizabeth Loftus.  However, Plaintiff had never made direct contact with Elizabeth Loftus
but chose instead to contact the IRB's. It was the Plaintiff's opponents – the "Dr's" in
sci.psychology.psychotherapy who referred to Plaintiff's work as the "Curio Files" or as an
obvious pun, the "Curiophiles." It was discovered after an internet search that in July and
August of 2006, which was in this exact time period, that "Raven," or John Singleton, had
publicly posted information that some body of work called the "Curio Files" was circulating
Morehead continued:

> "Additionally, the defendant wants to write a book regarding her beliefs on
> psychoelectronic monitoring which may include the victims in this case" … "As
> such, and in order to protect the community, the academic world and the victim's,
> the Probation Department recommends that the defendants modification be denied
> and probation be continued on the same terms and conditions as previously ordered
> on 11/05/2003."

665.   By making these types of allegations, falsely alleging that there were "victims"
of Plaintiff, along with the ridiculous notion that the "academic community" needed
protection from her, it appeared that Morehead and Guzman were making themselves actors
in furtherance of the conspiracy by Defendants to deprive Plaintiff of exercising her first
amendment rights to free speech after speaking to one or more defendants on this case. In
fact, it is apparent that some members of the academic community have only feared public
exposure by Plaintiff, not fear that she was going to hurt them in any way.

666.   For example, Plaintiff was told that one of the reasons why she was targeted
was because it was discovered that she was planning to review the study "Characteristics
and Sources of Allegations of Ritualistic Abuse" in the year 2000. In December 2007
Plaintiff was psychologically recovered enough to complete that review and discovered so
many serious irregularities that she requested that a formal review occur by the Office of the
President of the UC System. That request is still pending.

667.   As a result of these false complaints, which resulted in Morehead/Guzman
suggestion to the court that she be restricted from writing a book, or at least be impeded in
her ability to write a book, the court denied Plaintiff access to a word processor and the
internet/intranet. Plaintiff then requested a continuance to allow her time to respond to these
false allegations about her which the court allowed.

668.  A hearing was held on January 5, 2007 during which time Plaintiff inquired of the court why her probationary status was not violated if she was indeed guilty of these activities. Plaintiff was given permission by Probation administrator Lisa Donohoo to contact the UC system to investigate the false complaints made about her. However, Ms. Donohoo refused to disclose what the police report numbers were from UC Davis and UC Irvine about her alleged activity because she said it was policy that probationers not access police reports.

669.  Plaintiff discovered after speaking with UC Davis Officer Henoch that Plaintiff did not send a "40 pg. fax," but had sent approximately 40 pages of materials to the UC Davis IRB. Plaintiff agreed, and asked what was illegal about that activity. Plaintiff was told by Det. Henock that there was nothing illegal about that activity. Furthermore, it did not appear that Officer Morehead had investigated this complaint to discover what phone number was at the top of the fax or any other information which would provide forensic evidence indicating whether or not Plaintiff had actually sent this alleged "fax."

670.  On approximately January 11, 2007, Plaintiff discovered from Kathie Allen of UC Irvine's "Whistleblowers' Unit," that she had initiated the police report about Plaintiff on behalf of a party she refused to identify. The Whistleblower's unit was evidently designed to protect complaining parties in case that person experienced retaliation. However, these individuals did not protect Plaintiff in this case.

671.  On approximately January 11, 2007, Plaintiff spoke to UC Irvine's campus Detective Altamarino who told her that Defendant Elizabeth Loftus had alleged that discs, and a letter were sent to her from Plaintiff.  Plaintiff confirmed with Altamarino's supervisor, Sgt. Dublin of UC Irvine Campus police that she had been a suspect in a case in which Dr. Elizabeth Loftus alleged that Plaintiff had sent her this material, after which she felt "fear." However, Dublin explained that she was no longer a suspect after DOJ checked fingerprints on the envelopes in question and none of the fingerprints matched hers.

672.  Sgt. Dublin confirmed that their logs revealed that a Supplemental Report with this information had been sent to San Diego County Probation on September 19, 2006 which detailed that Plaintiff was no longer a suspect. This report was evidently sent a full three months before Officer Morehead wrote her December 2006 report factually stating that Plaintiff was guilty of the above activity. Sgt. Dublin told Plaintiff he could not of course release this report to her but could to San Diego Probation if they requested another copy. As a result, due to the fact Probation would not allow her access to the original police report made by Defendant Elizabeth Loftus, due to Delayed Discovery, Plaintiff is not aware of any more specific details regarding the false allegations that Defendant Loftus made against her. Plaintiff attempted to file charges against Loftus for making a false police report but she was told the evidence had been destroyed and that could not be done.

673. It is not explained why Defendant Loftus would claim she felt "fear," even if Plaintiff had sent her this material, because she does not know the content of this alleged

material. However, a victim's feelings of "fear" is a critical element in a criminal stalking complaint. Plaintiff believes that Elizabeth Loftus is smart enough to figure out how Plaintiff was targeted and knew perfectly well she had nothing to fear from Plaintiff other than public exposure

674. The Director of Probation claimed that Morehead had not received the Supplemental report but Plaintiff does not believe that is a satisfactory response. If Morehead had done her job and picked up the telephone and contacted UC Irvine for an update on their investigation within that three month time-period, Morehead would have been updated. If she had accessed the alleged fax that was sent she might have discovered that 1) there was no fax or 2) it was sent by someone else.

675. Plaintiff alleges that because she requested UC Irvine's IRB's to investigate whether Dr. Loftus might be involved in or was aware of Human Subjects Research violations involving Plaintiff, Defendant Loftus intentionally orchestrated emails, files, and discs be sent to herself on purpose to set-up Plaintiff in retaliation for requesting an investigation of Loftus. These false claims could easily have resulted in the loss of Plaintiff's freedom and her reincarceration because Ms. Anna Guzman appeared to dislike Plaintiff and was looking for a reason to reincarcerate her. At the very least, these false allegations were being used as a reason to deny Plaintiff access to a word processor and the internet/intranet in order to impede her from writing a book. This indicates malice and San Diego Probation had no right to do this to Plaintiff.

676. Defendant Loftus has a long history of misrepresenting the facts concerning other parties, according to many people. According to a San Diego Union-Tribune article titled, "Memory Expert Quits after Rebuke," March 18, 2003:

"Elizabeth Loftus, who has spent 25 years studying people's memories, says she left the University of Washington for a position in California after her colleagues chastised her efforts to discredit a case study on repressed memories. Loftus accepted a position at the University of California Irvine after colleagues at Washington questioned the methods used in her challenge and recommended she take an ethics class ... During her career, Loftus has examined more than 20,000 people and written 19 books. She appeared frequently in court as an expert witness. However, Loftus often is criticized by victims' advocates, attorneys', and other scientists for challenging so-called repressed memory, the theory that the mind can bury painful, memories, then recover them."

677. In the late 1990's, according to therapist David Calof, the FMSF and Defendant Loftus were implicated in the harassment of Mr. Calof almost immediately after he wrote about the FMSF in his journal "Treating Abuse Today." Defendant Loftus recently settled a court case (2007) with a Ms. Taus who accused Loftus of misrepresenting herself in order to obtain information about her in order to deny Ms. Taus's case of repressed memory. Defendant Loftus has routinely acted on behalf of the defense in cases alleging satanic ritual abuse, including the Dale Akiki case, the Paul Ingram case, and others. Loftus

is an Advisory Board member of the FMSF, an organization which denies that satanic ritual abuse occurs. Defendant Loftus gave false information to SDUT reporter Mark Sauer about Plaintiff in the "Web of Intrigue," in September 2001. Loftus also appears to be a close friend of Defendant Carol Hopkins. In 2003, Defendant Devereeaux listed Elizabeth Loftus in correspondence to Dr. Ellen Lacter as one of the parties who had been searching for Plaintiff's identity during the years when she was safeguarding her privacy, therefore, even though Defendant Loftus is sometimes described as the most "famous memory expert" in the world, to Plaintiff, her credibility is decidedly lacking.

678. Plaintiff believes that she is not required to prove a negative, and instead it is Defendant Loftus who is required to justify her actions and furnish the evidence upon which her false allegations were based, because these false allegations have caused Plaintiff significant emotional distress for close to two years, and it has taken her a full thirteen months to correct the record and the injustice which was done to her. Throughout that entire time period, Plaintiff thought she might be rearrested on false charges.

679. In February 2007, Plaintiff notified Officer Morehead that there was a Supplemental report available from UC Irvine which released her as a potential suspect and she requested that Morehead write a corrective report to the court advising them of that fact. However, Morehead refused to write a corrective report, telling Plaintiff that it was "no big deal," because her probationary status was not "violated." Plaintiff told Morehead she thought it was a very "big deal" to make false allegations about someone in a criminal court case, let alone refuse to correct those false allegations when new information became available. In fact, False Reporting is not allowed by County employees, and it indicates malfeasance.

680. On approximately February 1, 2007, Plaintiff left a message for Anna Guzman on her voice mail, telling her that a Supplemental report from UC Irvine was available which released her as a suspect, and to please write a corrective report to the court alerting them to that fact. There was no response.

681. On approximately February 5, 2007, Plaintiff telephoned Guzman's supervisor Lisa Donohoo to tell her Morehead refused to write a corrective report and requested that Donohoo contact UC Irvine's Sgt. Dublin and access the Supplemental Report proving that she was no longer a suspect. Ms. Donohoo promised that she would email UC Irvine, and if it appeared these were false allegations, she would make sure a corrective report was written. However, Donohoo said she would only send one email to UC Irvine because she did not want them to think she was "harassing" them. Donohoo then advised Plaintiff not to make this issue drag "on and on," Plaintiff's probationary status was not violated, and advised her that she only had only a year more of probation so to let the issue "go." Plaintiff told Donohoo that she disagreed, if these allegations were not corrected it might harm her at a later point and be used against her, and perhaps be used as cumulative evidence as reason to imprison her. At that time, Donohoo confirmed for Plaintiff that she had been receiving phone calls from people from the UC system who were apparently making allegations about

her, but she refused to tell Plaintiff who these people were or what the allegations were. Plaintiff then contacted Donohoo's supervisor John Hensley who refused to correct the allegation involving Defendant Loftus but agreed to correct the false allegations about the 40 page "fax."

682.  In March of 2007, Plaintiff scheduled a court hearing at San Diego Superior Court requesting "Clarification of a Court Order," updating the court on the new information which released her as a suspect involving allegations made by Defendant Loftus and an unknown party at UC Davis. She asked the court to revisit the earlier court order because it would impede her from filing a lawsuit. Neither Morehead, Guzman, or Donohoo were present at that hearing and Plaintiff was not provided with any corrective report. However, on that court date, Judge Szumowski made a restrictive court order allowing Plaintiff to use the word processor and have access to the internet/intranet via a third party, which in that context appeared to refer to a librarian.

683.  In March 2007 and April 2007 Plaintiff wrote letters of complaint to the Director of Probation about Officer Morehead and Guzman's unwillingness to correct false allegations about her with San Diego Superior Court. On September 14, 2007, the Director of Probation, Mr. Cranford, wrote a letter informing Plaintiff that two outstanding allegations from the UC School system would be corrected.

684. On approximately January 15, 2008, Plaintiff checked the contents of her court file at San Diego Superior Court, and did not find the corrective report ordered to have been written by Probation Director Cranford in September of 2007, but found further reports by Officer Morehead to the court which seriously mischaracterized Plaintiff and which continued to misrepresent the facts about what had occurred which she had never seen.

685. On approximately January 10, 2007, Plaintiff informed the new Director of Probation, now Mack Jenkins, that the corrective report ordered to have been written by acting Director David Cranston had never been written which meant Officer Morehead and Guzman refused to follow a direct order by their Director, apparently out of malice felt for Plaintiff. Plaintiff was then immediately notified by Guzman that the corrective report had just been written and had been sent to the court. Plaintiff received a copy of this barely legible report, dated January 15, 2008, almost a full year after they had received this information. It read, in part:

"The Probation Department is submitting an ex parte report to apprise the Court of two issues that were before the Court on 12/14/2006 depicting the defendant's conduct relative to matters at UC Davis. The report dated 12/14/2006, stated the defendant faxed a 40 page document to UC Davis when in fact the information was mailed by the Defendant. On 02/15/2007, the undersigned submitted a report clarifying that issue.

On 02/05/2007, Lisa Donohoo, probation director received a call from the defendant claiming she spoke with Detective Altamarino regarding a 'false report.' The Defendant stated she (the defendant) was informed by Detective Altamarino that UC Irvine had a supplemental report and/or information exonerating her. On 02/05/2007, Ms. Donohoo contacted Detective Altamarino via e-mail indicating the defendant's claim and requested reports and or information to that effect.

"On 02/05/2007, Detective Altamarino responded to Director Donohoo's the e-mail with the following quoted from the investigative supplemental report #06-0918. 'On 09/18/2006 indicating no identifiable latent prints were found on the floppy discs or the clear tape on the mailing envelope. One identifiable print was developed on the back of the white letter paper that was also inside the envelope. The print was prepared and entered into the Cal-Id AFIS system and was searched against the OC and CA DOJ fingerprint databases. Search results were negative. There were no further reports associated with this case on the defendant.'"

686.   According to this information Probation had the information which released Plaintiff as a suspect for almost a year but they refused to write this corrective report to the court. For more than one year, due to this incompetence and malfeasance, Plaintiff has expressed severe emotional distress to her psychologist which was directly connected to the false allegations and libel by Defendant Loftus and an unknown party at UC Davis immediately after Plaintiff requested an investigation about Loftus be made by the Institutional Review Board. Even though Mr. Jenkins responded in a letter that Officer Morehead was simply responding to allegations made by others, Plaintiff believes that Ms. Morehead and Anna Guzman were intentionally negligent and malfeasance occurred which is now a subject of a claim which will be filed against the County because of these issues. Plaintiff believes that one interpretation which might explain these omissions might be that because Ms Guzman, and perhaps Morehead, had been trying to "build" a case against her which did not pan out, and perhaps because they and Ms. Donohoo felt embarrassment because Plaintiff went over their heads and corrected them, that they purposely refused to correct these false allegations against her and intended that this information confuse the court or sway the court into deciding to imprison Plaintiff if any other allegations surfaced based on these outstanding allegations. Plaintiff believes that what occurred was very unprofessional, and notes that if she had been mentally ill, she would have been unable to seek justice. Instead, she had to endure this behavior while she was being tortured.

687.   As further evidence of malice felt for Plaintiff, after her brother died in March 2008, Ms. Guzman refused to issue her a travel pass to attend to his remains. Plaintiff was forced to go over her head and complain to the Administration office, and after doing so she was granted that travel pass. Plaintiff was later told by Lisa Donohoo that San Diego Probation's travel pass policy only required that the probationer be currently meeting the mandates of probation, a requirement which Plaintiff has fulfilled. Therefore, there was no legitimate reason for having denied Plaintiff permission to leave the county.

688. Probation promised to release Plaintiff early from Probation in March of 2008 but then changed their mind. Therefore, Plaintiff still cannot access the UC Irvine police report that was fraudulently filed by Kathie Allan and/or Elizabeth Loftus.

**FURTHER  EVIDENCE OF LIBEL AND DEFAMATION AGAINST PLAINTIFF**

689.  In approximately May of 2007 Plaintiff struggled to resume her research and updated her Satanism and Ritual Abuse archive, and because of her new court order  she was able to slowly gather evidence about the dialogue that took place on the internet between her and the Defendants as preparation for this lawsuit. Because she was forced to use an intermediary, Plaintiff has had difficulty accessing this information in a timely manner. Librarians would only spend 5 minutes with her and it was only when she was able to access the internet directly that Plaintiff discovered further evidence of libel by Aquino. She was also constrained from accessing certain web sites, such as the WITCHUNT egroups list, because it required an email address and the librarians refused to assist her.

690.   After May of 2007 Plaintiff accessed articles from the San Diego Union-Tribune about her arrest and plea-bargain to "stalking" Jennifer Hewitt. In an article dated, Dec. 31, 2002, authored by Mark Sauer which was published by Defendant Copley (which Plaintiff had briefly seen in 2003 but had not fully understood due to her mental incapacitation) titled, "Stalking suspect to undergo more psychological tests," a number of false allegations were made by Defendant Sauer. [Exhibit 28] Defendant Sauer wrote and Defendant Copley published the following:

> "A former county social worker accused of stalking movie director Steven Spielberg and charged with making death threats against actress/singer Jennifer Love Hewitt is headed for a mental-competency hearing before standing trial."

691. There was never any evidence indicating that Plaintiff ever "stalked" Steven Speilberg - because she never made contact with him - and to her knowledge neither Mr. Speilberg or the Los Angeles court ever accused her of it. Mr. Sauer continued:

> "Spielberg got a Los Angeles judge to issue a restraining order against Napolis last fall, claiming she had threatened him and his family at the time his studio's movie "the Tuxedo," starring Love Hewitt, premiered."

692. Plaintiff has never "threatened" Steven Speilberg. Apparently he argued that because of her confrontation of Hewitt, and her accusations against him, he felt that he might be threatened by Plaintiff at some point in the future. Mr. Sauer continued:

"Under the code name "Curio, Napolis anonymously made hundreds of Internet postings from the mid-1990s to 2000, accusing several individuals in San Diego and the Bay Area of heinous crimes against children.

693.  Plaintiff has never made baseless charges about anyone and this was an unfair representation of her activities on the internet which has been described in detail. Mr. Sauer then wrote:

"The Internet postings ended in the summer of 2000, however, when Napolis was arrested by campus police for cyberstalking while using a computer at the SDSU Library. No charges were filed but Curio was effectively exposed."

694.  Plaintiff was never arrested by SDSU for "cyberstalking." Apparently this is what Mr. Sauer wished had happened, but it never did. Because Mr. Sauer was the reporter who covered this incident for the newspaper, his misstatement of fact indicates intentional libel and malice. Mr. Sauer wrote:

"Her Internet campaign and the quest to expose her by those whom Napolis had targeted was chronicled in a Union-Tribune story in September 2000. Since then, she has included the newspaper among those she believes are trying to torment her."

695.  Sauer again intentionally placed Plaintiff in a false light. Plaintiff never "targeted" anyone on the internet between the years 1995-2000. She has also never claimed that the newspaper is trying to "torment" her. These are obvious fabrications by Mark Sauer who was attempting to capitalize on the Jennifer Hewitt case in attempts to make Plaintiff appear "crazy" in order to undermine her research.

696.  In a San Diego Union-Tribune article, dated September 30, 2003, by SDUT reporter Onell R Soto titled, "Ex-social worker pleads guilty to stalking actress," which Plaintiff became aware of only after August of 2007, it continued to misrepresent Plaintiff's activities on the internet and placed her in a false light. [Exhibit 29] Mr. Soto and Defendant Copley published:

"A September 2000 Union-Tribune story detailed how Napolis used the code name "Curio" to anonymously send hundreds of Internet postings from the mid-1990s to 2000 accusing San Diego and San Francisco area figures of crimes against children."

697.  Plaintiff never accused anyone from San Diego of "crimes against children." In another San Diego Union-Tribune dated November 6, 2003 by Onell R. Soto, titled "Stalker of actress scheduled to be freed," this writer falsely claimed, for the third time, that Plaintiff had "threatened" Steven Speilberg. [Exhibit 30]  Mr. Soto wrote:

"She also made threats against Speilberg, who obtained a restraining order against her in Los Angeles."

698. Mr. Soto then again mischaracterized Plaintiff's activities on the internet. He wrote:

> "Napolis, a former county social worker, made accusations on the internet against people who opposed theories of satanic ritual abuse of children, but was never charged for those comments." ... "Her campaign, much of it under the pseudonym "Curio," was the subject of a September 2000 Union-Tribune profile."

699. Plaintiff alleges that these statements indicated malice, and further exposed her to public hatred, contempt, ridicule and disgrace by inferring that she should be "charged" for her comments which rebutted her political opponents claims that satanic ritual abuse of children did not occur.

700. In approximately January of 2008, Plaintiff contacted the Board of Behavioral Sciences and requested that they release the contents of her file that contained any complaints about her. However, the MFT board will only respond to a subpoena therefore this is further evidence of delayed discovery.

701. On February 7, 2008, Plaintiff discovered in a set of documents that Dr. Ellen Lacter compiled, an article titled "Jennifer Love Hewitt," dated January 8, 2002, which had been posted on the web site of "Celebrity Justice," a TV program that has since been cancelled. [Exhibit 31] Plaintiff had not been aware of this articles existence before this time. It appeared that the author misstated the year that this story was published because Plaintiff was not arrested until November 26, 2002. In addition, this article was filled with misinformation and disinformation about the interaction with Jennifer Hewitt and her family which Plaintiff would like to correct for the record. Plaintiff never "hit" or "pushed" Ms. Hewitt's mother. If she had been guilty of that activity she would have been charged with battery, especially so because these are famous people and law enforcement's sympathy would have been directed towards them, not Plaintiff. This article proceeded to quote Defendant Carol Hopkins false allegations that Plaintiff had "stalked" and "threatened Hopkins," and tried to make it appear as if Plaintiff was responsible for her move to Mexico due to these alleged threats. These remarks were extreme, libelous, and were made with malice. Plaintiff believes these types of remarks were made because it was thought that she would never psychologically recover enough to ever legally address the issue. It read, in part:

> "Carol Hopkins is another Napolis target. The cyberthreats were so extreme, the former school administrator moved to Mexico. But, using the Internet, Napolis convinced others that their new America neighbor was a child molester. Hopkins says, "I had been threatened, I had been told that I would lose my visa, I could lose my house, and that I could be put in jail." Now Napolis is in jail and faces a second court order mental examination to find out if she's fit to stand trial."

702. Plaintiff discovered that the Celebrity Justice web site no longer exists and this brief article cannot be found on the internet. However, Dr. Ellen Lacter wrote a letter to the court, dated February 18, 2008, attesting to the fact that Plaintiff discovered this "Celebrity Justice" article at her home on February 9, 2008 [Exhibit 32].

703. On March 4, 2008, the San Diego County Superior Court allowed Plaintiff to access the internet and intranet on her own behalf for the first time in 5 years. On March 15, 2008, Plaintiff accessed message #31004 on the Witchhunt egroups list, dated January 11, 2003, titled, "Curio's National TV Debut on EXTRA" in which Herman Ohme referred to Carol Hopkins' statement about Plaintiff, and referred to an "EXTRA" television show transcript allegedly from this television program. This information indicates that Defendant Hopkins, again with malice, made slanderous commentary about Plaintiff on national television.

704. On March 14, 2008, Plaintiff discovered a web site on which Defendant Aquino made further libelous statements about her in an attempt at revisionism which is a well-known propaganda technique.  These remarks can be found on http://en.wikipedioa.org/wiki/Talk:Michael_Aquino [Exhibit 33]. In efforts to skew information about the Presidio Army Daycare case investigation, and manipulate the facts in response to an anonymous person – Sherurcij's - mention of information which had been sourced by "Curio Jones" about the Presidio case, Defendant Aquino wrote, beginning on pg. 6:

> "As for 'Curio Jones', she was another notorious internet stalker and character assassin whose real name was Diana Napolis. She was eventually arrested and confined for stalking and threatening other people such as Steven Speilberg. The inaccuracy and distortions of her attacks on me were easily discoverable ..."

705. Plaintiff was never an "internet stalker" or a "character assassin" on the internet during the time period in question in which she and Defendant Aquino debated. Plaintiff was never "inaccurate," nor did she ever distort information about the Presidio investigation, and no one can produce facts indicating otherwise. Due to the fact that Defendant Aquino clearly indicated by these remarks that he was referring to Plaintiff's pre-2002 arrest, and inferred that Plaintiff had stalked and threatened Defendant Aquino, and later stalked and threatened Steven Speilberg, these are libelous remarks. Plaintiff plea-bargained in 2003 to "stalking" Jennifer Hewitt. In fact, the anonymous party who was editing information about Defendant Aquino stated they would not accept these characterizations of Curio Jones/Napolis without the proper legal citations which Aquino was unable to provide.

706. Further on in this exchange, in response to Sherurcij's reference to the 1997 Aquino v. Electriciti lawsuit, which was described as Aquino's attempts to block messages written from this internet company that Aquino claimed constituted "libel," Aquino again characterized Plaintiff as a "stalker," which was why he claimed he sued ElectriCiti. Aquino wrote, beginning on pg. 8:

"No, for refusing to identify the anonymous stalker, "Curio' (Napolis, see above) who was using their ISP for her hate campaign. The suit failed because the Communications Decency Act was found to immunize ISPs against the conduct of their subscribers."

707.   On March 15, 2008, Plaintiff discovered another libelous message which had been written her by Defendant Aquino on the Witchhunt Egroups list on October 4, 2000 titled, "Rightmeyer Discovers ecom Suit!" (Alex Constantine's real name) which again inferred Plaintiff had been a cyberstalker as it regarded Aquino. The original message which was previously submitted did not have a date. It is being resubmitted with the full email headers and date on it. [Exhibit 34] Aquino was responding to an article about the lawsuit Aquino v. ElectriCiti. It read, in part:

"Unfortunately for Ecom, which had hired one of the most expensive law firms in San Francisco, the judge also ruled that this was not a SLAPP-suit, hence Ecom would be on their very own hook for their law firm's quite substantial (based on their web site squawking for donations) bills.

So much for cyberstalker's thinking that they can abuse SLAPP laws to allow them to conduct hate campaigns with immunity and impunity. SLAPP was never intended for that purpose, as cases like this are continuing to establish.

"This lawsuit came at a time before some of the very strong new anti-cyberstalking legislation in California and at the federal level had appeared. Thanks to the Napolises of the Internet we are coming more into a time where cyberstalking will be less and less possible, and more criminalized. The CDA immunity of ISPs which was never intended to shelter cyberstalkers, will obviously be adjusted to reality as well."

708.   In a message to Mr. Constantine, dated September 16, 2000, which Plaintiff discovered on sci.psychology.psychotherapy on April 5, 2008, [Exhibit 35] Defendant Aquino made a libelous comments about Plaintiff, again referring to her as a "cyberstalker." He wrote:

"I'm not sure what you find 'humorous' in Napolis' use of that [or any other] ISP for a clandestine cyberstalking campaign.

709.   In a message to "Chive Mynde," dated October 2, 2000, which Plaintiff discovered on April 5, 2008 on sci.psychology.psychotherapy, Defendant Aquino made libelous comments about Plaintiff on pg.6, again describing her as "cyberstalker." [Exhibit 36]. This same article, dated October 1, 2000, was posted on the Witchhunt list which Plaintiff discovered on April 4, 2008. It is being resubmitted with the full email headers [Exhibit 37].   He wrote:

"One wonders why you would favor allowing cyberstalkers such as Napolis to conduct years of malicious falsehoods about innocent people without taking personal responsibility for what she was posing. Readers may review for themselves California's anti-cyberstalking law, California Penal Code #646.9 and judge for themselves whether it fairly applies to Napolis's conduct: http://www.leginfo.ca.gov.ilinfo.html "

710.  In summary, during 1995-2000, Plaintiff engaged in public debate on several internet forums and proved that the satanic ritual abuse of children existed in spite of repeated censorship and clear efforts to violate her First Amendment Rights to Free Speech. Defendant Aquino, his associate Dr. John Price, and Defendant Devereaux have a documented history of engaging in this activity. It is alleged that Defendants Aquino, Hopkins, Loftus, Devereaux, and Sauer - who have spent years trying to persuade the public that satanic ritual abuse does not exist - conspired with Defendant SDSU's Campus police to have Plaintiff identified, which resulted in the invasion of Plaintiff's privacy by fraudulent misrepresentation, efforts to ruin her reputation, subject her to emotional distress, and target her with nonlethal technology in attempts to permanently incapacitate her so that she could no longer assert her rights to free speech. SDSU became an actor in these events by siding with Defendants and participating in these violations of her civil rights. These allegations are provable based on documented evidence from the internet, Defendant Michelle Devereaux's correspondence to Plaintiff's colleagues, Devereaux's false San Francisco Police Report (discovered in November/December 2007) despite her attempts to hide this police report, an SDSU campus police report (the original of which SDSU refuses to release), and the content of the SDUT news article "The Web of Intrigue."

711.  After Plaintiff's identification by SDSU officials, Defendant Sauer wrote and Defendant Copley negligently published a personally invasive and defamatory newspaper article about Plaintiff which quoted the above Defendants. The disinformation and false allegations in this news article caused tremendous harm to Plaintiff which allowed Defendant Devereaux and others to intrude into her Family Court case, caused Plaintiff to resign from that case out of concern that these satanists might endanger the party she was supervising, and after she became a "controversial figure." This caused Plaintiff financial hardship. SDSU and Defendant Sauer's identification of Plaintiff then caused public threats to be made against her by Defendant Lysenko/Jantsang and others in efforts to discredit and frighten Plaintiff so that she would no longer participate on the internet.  The false allegations in the "Web of Intrigue" caused the District Attorney and San Diego Probation to believe Plaintiff had a history of "harassing" others, all of which has contributed to Plaintiff's ongoing emotional distress, and was due to the willful negligent, egregious and outrageous conduct of Defendants.

712.  After Plaintiff was publicly identified, Defendant Aquino and others targeted her with assaultive military nonlethal weaponry which resulted in her complete psychological incapacitation in further efforts to keep Plaintiff from resuming her research so that she would cease to be a political opponent.  It has been proven that Aquino had the

motive to harm Plaintiff, the means to buy this technology, he has access to this technology based on his Army military connections – the definition for "voice to skull devices" was listed on an Army educational web site - Aquino is knowledgeable about psychotronics and has in fact written about this topic, and according to a Temple of Set FAQ psychotronics is a subject that is studied by his own organization. Defendant Aquino has been accused of Mind control in various book publications and court records and the technology Plaintiff has described is the latest in advanced Mind control techniques. In addition there is a video on the internet site Utube which names Aquino and uses his military paper, "Mind War: The Psychology of Victory" (1980) as evidence to prove that "psychotronics" is being used against political dissidents.

713.  As a result of these intentionally malicious actions by Defendant Aquino and others, Plaintiff wrote a pseudo-threat to a Hollywood figure in 2002 in order to have herself arrested for her own protection which resulted in further ruination of Plaintiff's reputation, revocation of her MFT license, and resulted in humiliation, lost wages and her livelihood.

714.  It is further alleged that Defendants Hopkins, Loftus and other Does made false allegations (both libelous and slanderous) about Plaintiff to either the District Attorney's office and/or San Diego County Probation. San Diego Probation made themselves an actor in these events in furtherance of the conspiracy to violate Plaintiff's First Amendment Rights to Free Speech and intentionally cause her emotional distress by submitting what appears at this time to be false reports to San Diego Superior Court and by their refusal to correct those reports in a timely manner.

715.  In the latter part of 2007 and 2008, Plaintiff discovered further libelous and defamatory articles on the internet about her by Defendants Aquino, Lysenko/Jantsang and Hopkins. Even if Plaintiff had discovered these particular messages at the time they were written, she was incapable of filing a lawsuit within the one year statute of limitations because she was incapacitated after May of 2001. After 2007, Plaintiff discovered and was able to comprehend further defamation in the San Diego Union Tribune, due to Defendant Sauer's intentional malicious misrepresentations about Plaintiff and to publisher Defendant David Copley's negligence for publishing these articles, which has caused Plaintiff further emotional distress. Because of delayed discovery the last act of these co-conspirators is unknown.

716. Whether one believes Plaintiff's claim that she has been brutally targeted by nonlethals for the past seven years, or if one prefers to believe Plaintiff had a psychological breakdown after the publication of the "Web of Intrigue," Plaintiff became severely psychological incapacitated after May of 2001 and therefore met the definition of the Code of Civil Procedures 352 "insanity" tolling provision until on or about May of 2007. Plaintiff is not and never has been "mentally ill," instead she was intentionally psychologically disabled due to nonlethals and only repeated what her perpetrators had told her which was used against her at a later time. Plaintiff still decompensates and her abuse is ongoing.  What used to take hours, now takes weeks and months to complete. While Plaintiff has gathered the evidence necessary to file this complaint, she has continued to be tortured, terrorized,

1    and assaulted. Because of these outrageous and egregious acts by Defendants, in efforts to
2    harm Plaintiff body, mind, and soul, she has suffered social isolation, stigmatization, and
     suffered false allegations that she is "mentally ill."

3        717.  Defendant Aquino cannot claim that Plaintiff is guilty of actionable libel due to
4    her claims that he and a group of others have tormented and tortured her for seven years
5    because Michael Aquino has publicly proclaimed himself to be a satanist, the Anti-Christ,
     and he has been openly and publicly accused during the past 20 years of the intentional
6    creation of MPD/DID, brainwashing, Mind control, electroshock, ritual child molest, and
7    murder. Aquino has never sued the authors of the books who have made these allegations
     against him. As of April 24, 2008, a google search of the terms "Michael Aquino" and
8    "psychotronic" reveals 1,840 hits. In another search, using the terms "Michael Aquino,"
     "torture" and "nonlethal," it produces 2,510 hits. Therefore, Plaintiff's allegations against
9    Defendant Aquino are just one more in a long litany of complaints about torture/abuse
10   perpetrated by him, except this time Defendant Aquino chose to victimize a child abuse
     investigator.

11       718.  Defendant Aquino and others have placed Plaintiff in an electronic and
12   computer-based torture chamber for seven years, which he has told her is in service to the
13   Fourth Reich, leaving her with no option other than to lawfully expose these activities.
     Michael Aquino is not above the law no matter how much of an exception he believes
14   himself to be.  Because Lilith Aquino is his wife, and is allegedly his current companion, it
15   is reasonable to assume that she is also involved in these activities although, of course, these
     two have never been criminally charged with any crime.

16                                    **CONCLUSION**

17       719.  According to Peter Phillips in his report "US Electromagnetic Weapons and
18   Human Rights," (2006) the realm of non-lethal weapons extends into universities with
     millions of dollars in scholarships and research fellowship. According to the lawsuit,
19   International Committee on Offensive Microwave Weapons v. The United States of
20   America, in 1948 the United Nations adopted the Universal Declaration of Human Rights
     which, at Article 5, states that "no one shall be subjected to torture or to cruel, inhuman or
21   degrading treatment or punishment." According to a Presidential Memorandum, dated
22   March 27, 1997, it prohibited any agency from conducting or supporting any classified
     human research without the informed consent of the subject.

23       720.  Clearly, classified experimentation is taking place – without the subject's
24   consent - due to the sheer number of victims reporting these events.  Due to capabilities of
25   V2K technology, brain/computer interface which allows two-way communication via
     satellite link-up, and by what appears at this time to be 3D Advanced Body Modeling  and
26   disturbing advances in physics, it is now possible to target anyone, either foreign or
     domestic, and cause them to believe they are in communication with God, Allah, beloved
27   relatives, ET's, Hollywood figures, or anyone the perpetrator wishes to overtly or
28   subliminally influence, in addition to the ability to completely access and assault a human

being from a remote location.  Presently it appears that this technology from the Soviet Union and the United States is for sale and victims can be secretly isolated and identified by satellite from these two countries and perhaps others. Therefore international treaties against torture do nothing to stop these types of assaults. Public nonlethal capabilities such as Voice to Skull technology and computer/brain technology allowing two week communication should be outlawed. Plaintiff recommends that privacy organizations examine these weapon systems and most importantly recommends that an informal humans rights watch group be organized by those with expertise in nonlethals to monitor potential abuses of these and other technologies. Perhaps it is time for authorities to place alleged perpetrators under remote surveillance in order to investigate the veracity of these complaints and to discover whether other countries are targeting U.S. citizens.

721.  This complaint describes the latest in Mind control and substantial evidence has been described which proves its existence.  Therefore, it is a travesty for mental health professionals to continue to misdiagnose victims of nonlethal technology as mentally ill, and it is paramount that they educate themselves about these remote assault weapons. Dr. Todd Pizitz, Plaintiff's psychologist for the past four years, has stated that he does not know with certainty what Plaintiff's diagnosis is, given the amount of information he received from her about nonlethals. Plaintiff believes that in light of the evidence available, that is the only ethical response to make.

722.  Plaintiff believes that there is incontrovertible evidence proving the existence of the satanic ritual abuse of children. Therefore the actions taken against therapists throughout the United States and other countries who are uncovering this activity, and in some instances, uncovering the government's culpability in the intentional creation of MPD/DID using satanism as a trauma base, should be carefully reviewed. Plaintiff believes that malpractice actions against therapists instigated by the False Memory Syndrome Foundation on the basis that there is no evidence to prove SRA or repressed memory in or outside of court proceedings should be investigated for possible fraud.  A review of the research study, "Characteristics and Sources of Allegations of Ritualistic Child Abuse" has revealed substantial irregularities, and further review is still pending. Therefore, therapists who have been accused of malpractice based on FMSF mis/disinformation and this study might consider consulting with an attorney to explore whether their cases can be overturned based on new information.

### FIRST CAUSE OF ACTION
### NEGLIGENCE
### (Against All Defendants)

723.  Plaintiff incorporates by reference herein paragraphs 1 through 722 inclusive, as though fully set forth herein.

724. Plaintiff believes that the acts of Defendants listed above continue to this day and are intended to cause Plaintiff continued harm, embarrassment and humiliation.

725. Plaintiff is informed and believes and thereon alleges that Defendants committed the acts as alleged above which caused injury to Plaintiff as a result of Defendants' want of ordinary care. Defendants had a legal duty to conform to a standard of conduct of reasonableness and conform to said conduct, their failure to do so caused legal harm to Plaintiff, and Plaintiff has, in fact, suffered harm of a kind that is legally compensable by damages. Defendants' acts were a substantial factor in causing Plaintiffs harm.

726. Plaintiff believes that the acts as alleged above were negligent and a reasonable person or entity would not do the same or act in a similar manner as Defendants.

727. Defendants were under a duty to exercise ordinary care toward Plaintiff and to avoid reasonably foreseeable injury to Plaintiff and knew or should have foreseen with reasonable certainty that Defendants' acts would cause Plaintiff to suffer damages as set forth herein.

728. Defendants' acts were careless and negligent as described herein and were a direct and proximate cause of the damages suffered by Plaintiff in an amount presently unknown but which will be established at trail, according to proof.

## SECOND CAUSE OF ACTION
## DEFAMATION
### (Against All Defendants)

729. Plaintiff incorporates by reference herein paragraphs 1 through 722 inclusive, as though fully set forth herein.

730. Plaintiff believes that the acts of Defendants herein continue to this day and are intended to cause Plaintiff continued harm, embarrassment and humiliation.

731. Defendants, as listed herein, made or provided numerous libelous and slanderous statements to other individuals about Plaintiff. Defendant reasonably understood that these statements about Plaintiff were intended to inflict harm on Plaintiff. Defendants made statements about Plaintiff that she committed numerous crimes and Defendants knew that these statements were false when made.

732. Defendants knew that when they made these false statements that it could cause substantial damage to Plaintiff. Statements about Plaintiff's alleged crimes were, in fact,

harmful and a substantial factor in causing damage to Plaintiff. These damaging statements caused harm by effecting Plaintiff's first amendment rights, loss of livelihood, loss of business, loss of profession, loss of property and occupation. Defendants' statements also caused severe damage to Plaintiff's reputation, causing shame and embarrassment.

733.  These false statements by Defendants were made with malice, and the specific intent to cause injury to Plaintiff. In the acts of Defendants above were made with conscious disregard for the rights and safety of Plaintiff.

734.  The aforementioned conduct of Defendants was intentional, cruel and in conscious disregard of Plaintiff's rights so as to cause severe damage to Plaintiff and justifies an award of exemplary and punitive damages.

## THIRD CAUSE OF ACTION
## VIOLATION OF PLAINTIFF'S RIGHT TO PRIVACY
### (Against all Defendants)

735. Plaintiff incorporates by reference herein paragraphs 1 through 722 inclusive, as though fully set forth herein.

736. Plaintiff believes that the acts of Defendants listed above continue to this day and are intended to cause Plaintiff continued harm, embarrassment and humiliation.

737.  Plaintiff had a reasonable expectation of privacy regarding her beliefs, occupation and background. Defendants intentionally intruded into Plaintiff's private affairs, including her occupation, personal religious beliefs and psychological well being. The intrusion was highly offensive and would be to any reasonable person. Plaintiff was harmed as a result of these intrusions as indicated in the facts above and the conduct was a substantial factor in causing Plaintiff's loss of occupation, loss of reputation, and other damages to be proven at trial. Defendants' motives and goals were to discredit Plaintiff, damage her reputation and incarcerate her. As alleged above, Defendants have invaded Plaintiff's personal space and effected her mental well being. Defendants have publicized private information concerning Plaintiff that any reasonable person would consider to be highly offensive. In addition, Defendant Aquino has caused Plaintiff to be targeted with invasive nonlethal and surveillance technology.

738.  Defendants knew and acted with reckless disregard of the fact that a reasonable person such as Plaintiff would consider information they have published in the newspaper, Internet and in other publications highly offensive. The information disseminated to the public was harmful to Plaintiff and proximate cause of Plaintiff's damages to be proven at the time of trial.

### FOURTH CAUSE OF ACTION
### FALSE LIGHT
### (Against all Defendants)

739.  Plaintiff incorporates by reference herein paragraphs 1 through 722 inclusive, as though fully set forth herein.

740.  Plaintiff believes that the acts of Defendants herein continue to this day and are intended to cause Plaintiff continued harm, embarrassment and humiliation.

741. Plaintiff believes and has stated herein that Defendants have publicized information and material that show Plaintiff in a false light. Defendants publicized false information about Plaintiff on the Internet, and in newspapers, periodicals, and other methods of dissemination that were highly offensive and would be to a reasonable person. Any reasonable person examining the e-mails, websites, publications or other disseminated information from Defendants would determine that a false impression was made of Plaintiff. Defendants' acts were made in reckless disregard or the truth and were malicious and intended to harm Plaintiff.

742.  Plaintiff sustained harm to her profession, occupation, person, property and other damages to be proven at the time of trial. The conduct of Defendants was a substantial cause in causing Plaintiff's harm.

### FIFTH CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against All Defendants)

743.  Plaintiff incorporates by reference herein paragraphs 1 through 722 inclusive, as though fully set forth herein.

744.  Plaintiff believes that the acts of Defendants herein continue to this day and are intended to cause Plaintiff continued harm, embarrassment and humiliation.

745.  The conduct indicated above by Defendants was clearly outrageous. Defendants intended to cause Plaintiff emotional distress and their acts as stated above were made with reckless disregard of the probability that plaintiff would suffer emotional distress knowing that Plaintiff would suffer an emotional reaction to the negligent, defamatory, and fraudulent acts and misstatements about Plaintiff.

746.  As a result of Defendants' acts, Plaintiff did, in fact, suffer severe emotional distress, including severe mental anguish. Defendants' conduct was a substantial factor in causing Plaintiff severe emotional distress. Plaintiff believes that said acts by Defendants continue to this day and are continuing to cause emotional distress to Plaintiff.

747. Defendants' activities were despicable and subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights so as to justify an award of exemplary and punitive damages.

## SIXTH CAUSE OF ACTION
## CONSPIRACY TO VIOLATE PLAINTIFF'S RIGHT TO PRIVACY AND FIRST AMENDMENT RIGHT TO FREE SPEECH
### (Against All Defendants)

748. Plaintiff incorporates by reference herein paragraphs 1 through 722 inclusive, as though fully set forth herein.

749. Plaintiff believes that the acts of Defendants herein continue to this day and are intended to cause Plaintiff continued harm, embarrassment and humiliation.

750. Plaintiff believes that the acts of Defendants are part of a conspiracy amongst all Defendants to violate Plaintiff's right to privacy and Plaintiff's first amendment right to free speech, and this conspiracy and these acts continue to the present.

751. Defendants were aware of all co-conspirators and acted in concert to deprive Plaintiff of her right to privacy and first amendment right to free speech by conspiring to identify her by fraudulent means, censor her on the internet, and frighten her so that she would no longer participate on the internet in furtherance of the efforts to violate her free speech.

752. The United States and California recognizes the right to privacy. Defendants violated Plaintiffs' right of privacy as indicated in the facts stated above. Defendants intentionally disseminated sensitive and confidential information about Plaintiff into periodicals, on the Internet, under websites, and blogs which afterwards caused Plaintiff to be identified and targeted with invasive nonlethal technology, which violated her right to privacy and resulted in discrediting her in further violations of her free speech after she became psychologically incapacitated.

753. The acts as stated above were a serious invasion of Plaintiff's right to privacy and Plaintiff was severely harmed emotionally and monetarily as a result of said conduct.

754. Plaintiff had a legally protected privacy right as to personal information about her, which was disclosed by Defendants opening her to humiliation and emotional distress. Such acts by Defendants were either negligent or intentional and caused significant damage to Plaintiff.

755. The conduct by Defendants was offensive and resulted in the penetration of Plaintiff's physical and sensory privacy and was the proximate cause of Plaintiff's severe and mental suffering and anguish.

**SEVENTH CAUSE OF ACTION**
**CONSPIRACY**
**(Against All Defendants)**

756.  Plaintiff incorporates by reference herein paragraphs 1 through 722 inclusive, as though fully set forth herein.

757.  Plaintiff believes that the acts of Defendants herein continue to this day and are intended to cause Plaintiff continued harm, embarrassment and humiliation.

758.  Plaintiff believes that the acts of Defendants are part of a conspiracy amongst all Defendants to violate Plaintiff's first amendment right to free speech, right to privacy and to defame Plaintiff, and this conspiracy and these acts continue to the present.

759.  Defendants were aware of all co-conspirators and acted in concert to deprive Plaintiff of her first amendment right to free speech by seeking to have her incarcerated, defaming her and placing her in a false light. Defendants, acting in agreement, conspired to subject Plaintiff to torture via non-lethals (illegal surveillance) and to invade her right to privacy as stated herein.

760.  Defendants operated together as part of the conspiracy to commit these wrongful acts stated herein which resulted in severe emotional and psychological damage to Plaintiff. Said conspiracy was the proximate cause of plaintiff's damages. The conspiracy was planned, and designed with malice to injure Plaintiff.

WHEREFORE, Plaintiff prays for Judgment as follows:

1.  General damages of no less than $10,000,000.00;  As to Defendant Aquino general damages of no less than $30,000,000.00

2.  For punitive damages in an amount appropriate to punish Defendants and to deter others from engaging in similar conduct;

3.  For attorney's fees and costs of suit incurred herein;

4.  For such other and further relief as the court may deem just and proper

By: _Diana Napolis_   May 1, 2008
Diana Napolis, Plaintiff
In Pro Per