# Satanism and Ritual Abuse Archive © 2000, 2007 Diana Napolis M.A.

The following cases describe legal proceedings held in Juvenile, Family, Civil and Criminal Courts around the world where there have been allegations of Satanism or the use of Ritual to abuse others.

Any religion or organization can be used as a front to hide ritual abuse activity, including Christianity, Buddhism, Shamanism, Hinduism, Masonry, Mormonism, Pagan and Satanic religions; however, not all Satanists commit crimes and not all occultism is Satanism. It is imperative that investigators and professionals familiarize themselves with cross-cultural belief systems so as not to target any particular group.

This document will have regular updates; this present version is current as of July 10, 2007. It is recommended that this archive be used as a resource only and original documents be obtained from Lexis/Nexus or Westlaw with the assistance of an attorney. If the reader does not have access to legal searches, or if there are any updates to these cases, contact the author at:

6977 Navajo Rd. PMB 114, San Diego, California 92119-1503

Warning: Some of the following cases depict graphic, violent activity.

---

INTRODUCTION: In the 1980's adults and children came forward around the world disclosing that they were victims/perpetrators of satanic ritual abuse [SRA] and/or were witness to satanic ritual murders. These claims were routinely dismissed by FBI's Special Agent Ken Lanning and an organization called the False Memory Syndrome Foundation which came into existence in 1992 stating there were no case convictions or scientific evidence to prove that satanic ritual abuse existed. Claims such as this should not go unchallenged because therapists across the country have lost their licenses due to allegations that the memories of SRA victims are too "bizarre" to be believed and are to be attributed solely to "False Memory Syndrome." It is apparent that these beliefs have been instigated by the FMSF because they are a political and legal advocacy group acting on behalf of accused perpetrators.

It has been documented that the FBI has been responsible for not only ruining case investigations in several instances but intimidating witnesses to recant their abuse. [See, Westpoint (1991), Bonacci v. King (1999), Finders (1993) case]. In the Finders case it appeared that the FBI had a conflict of interest because this organization was in their counter-intelligence files.



In regard to the scientific community's opinions about the reality of satanic ritual abuse, it appears the Appellate Court in the State of Arkansas had the last word about this subject. According to Echols vs. State (1996):

> "Echols next contends that Dr. Griffis should not have been allowed to testify that the murders had the 'trappings of occultism' because there was no testimony that the field of satanism or occultism is generally accepted in the scientific community. The trial court did not allow the evidence to prove that satanism or occultism is generally accepted in the scientific community. Rather, the trial court admitted the evidence as proof of the motive for committing the murders."

Entire families have been implicated in the ritual abuse of children which proves the fact that generational Satanism exists. See the following legal cases:   Parker (1995), Figured/Hill (1994), and Gallup (1991) Perpetrators have been found to be professionals who work in law enforcement, the military or daycare, and Christian fronts have been used in some instances as a means of hiding the satanic motivation of the perpetrators. See Cannaday (1994), Wright (1992), Gallup (1991) and Orr (1984). In several cases the perpetrators have confessed to the satanic element of the crime or participation in prior satanic offenses. See Helms (2006), Cala (2003), Smith (2003), Delaney (2002), Morris (2001), South (2000), Page (2000), T. Kokoraleis (1999), Bonacci (1999), Brooks (1996), Hughes (1996), Penick (1995), Alvarado (1995), Ingram (1992), Rogers (1992), and Fryman (1988).

The FMSF and those affiliated with this organization have been using the Appellate courts to overturn cases convictions involving ritual abuse themes. The Appellate court cases in this archive are valuable because most Opinions have affirmed that Satanism was the motivation for the crime and the introduction of that evidence has been routinely found to be probative and not prejudicial. The author has chosen to describe the satanic element of the crime only rather than every point of law that was appealed. This level of documentation is important because, if published, the rulings of these courts can be cited as case law. The majority of the appellate cases cited in this archive are published opinions.

In addition to court documents this archive also references news articles that document the ritual elements of the crime which include perpetrator confessions, cannibalism, murder, mutilation in the context of Satanism, and there is ample evidence to prove the existence of cult groups who sacrifice their victims as an offering to Satan.  This proves beyond doubt that unusual occult belief systems exist and the bizarre acts committed by these individuals are not only not unusual, they are commonplace.

In some cases involving multiple defendants the legal histories have been combined in the title of the case and are separated by semicolons, but in other instances the histories are described separately.

This archive begins with a First Amendment case, filed on behalf of a prisoner in the late 1980's, regarding his use of the Satanic Bible [written by Anton La Vey of the Church of Satan] and other accouterments of Satanism.

**August 24, 1989, CHARLES MCCORKLE v. W. E. JOHNSON, WARDEN, JOSEPH KOLB, CHAPLAIN, FREDDIE V. SMITH, COMMISSIONER, UNITED STATES COURT OF APPEALS, ELEVENTH CIRCUIT, 881 F.2d 993, Denial of Satanic Material Affirmed**

Overview: Appellate court documents state that Charles McCorkle, a state prisoner confined in the Holman facility in Alabama, filed a complaint, seeking redress for the deprivation of his first amendment rights to freely exercise his chosen religion – Satanism. The prison officials denied his request to access certain Satanic books and articles, including the Satanic Bible, the Satanic Book of Rituals, and a Satanic medallion because they posed security threats and were directly contrary to the goals of the Institution.

The court wrote: "The prohibition on Satanic materials such as those requested by the plaintiff is justified by the defendant's concern for institutional security and order. It is an informed and measured response to the violence inherent in Satan worship and to the potential disorder that it might cause within the prison. "

Testimony was given at an evidentiary hearing where the plaintiff, McCorkle, recounted two of the rituals espoused by the Satanic Book of Rituals. The fertility ritual included the sacrifice of a female virgin, preferably a Christian. The initiation ritual called for wrist slashing, blood drinking, and the consumption of human flesh – usually fingers. The candles preferred by the plaintiff and other Satanists "are not made of wax or paraffin, instead they are made from the fat of unbaptized infants." The plaintiff had been observed drawing his own blood, by slicing his wrists, and had asked other inmates for their blood. One inmate was "highly irritated when the plaintiff requested that he donate a vial of blood for use in the worship of Satan."

The warden testified that upon review of the Satanic Bible, he concluded that persons following its teaching would murder, rape, or rob at will without regard for moral or legal consequences. He thought the prisoner's safety would be at risk if other inmates knew of the contents of the Satanic Bible. Anton Szandor LaVey was quoted in a chapter from the Book of Satan, stating that "right and wrong had been inverted too long," and he challenged readers to "rebel against the laws of man and God." He declared that hatred of one's enemies was of utmost importance and revenge should be a top priority.

The court noted that there were several Satanic sects represented at Holman Prison who did not need these specific books to practice their religion and that plaintiff's right to freely worship Satan could be exercised only at significant cost to guards, other prisoners, and society in general. Accordingly, he denied plaintiff's requests.

----

In State v. Freeman, 559 P.2d 152 (1976) it was the opinion of the expert witness that revenge was the motivation for the murder that the defendant was being tried for, and noted that the defendant had underlined certain passages in the Satanic Bible addressing vengeance and revenge. He stated…that the language, "not only sanctioned revenge, but required it."

3

In <u>Childs v. Duckworth,</u> 705 F.2d 915 (1983) the plaintiff Donald Childs, an alleged member of the "Satanic Church," brought a Civil rights claim, requesting permission for various Satanic items, including the Satanic Bible, which the appellate court denied. Childs confessed to having sacrificed cats and pigeons and casting spells to retaliate against others. The Warden and Director both stated that Satanism was not recognized as a religion by that Institution. The Court stated the authorities had legitimate reason for denying inmates request and it did not deprive him of his Constitutional rights.

In <u>Doty v. Lewis</u>, 995 F. Supp. 1081 (1998) the court ruled that a ban on high security prisoners possession of candles, incense, Baphomet tapestry, and Satanic religious tracts which advocated retaliation, sacrifices, spells and racial separation, did not impinge on plaintiff Doty's free exercise rights, given rational reasons related to prison security for banning materials, and despite the prisoner's sincere belief in the Satanic religion. Materials requested were not essential to practice his religious tenets and there was a rational connection between restrictions of these materials and prison security concerns.

The inmate had thirty-one disciplinary actions reflecting an escalation of violence and aggression each year, and he was trying to engage other prisoners in violent behavior. It was thought that the Satanic Bible in the hands of this particular prisoner would endanger the security of the prison.

The appellate court stated the Satanic Bible presented a serious threat to the safety and security of the prison, that the book condoned human sacrifice, and the book's philosophies were blatantly "vicious," "selfish," and brutal." The book "advocated hurting someone, who in the opinion of the Satanists, deserved to be harmed and destroyed." The plaintiff Doty also admitted that he had engaged in "sacrificing cows."

In <u>Burton v. Frank</u>, 2004 U.S. Dist. LEXIS 9603, the prisoner's request for the Satanic Bible was denied because the prison had shown that inmates possession of the Satanic Bible posed a threat to the prison's legitimate interest in maintaining security and promoting rehabilitation. Passages from the Satanic Bible book were quoted:

"The only time a Satanist would perform a human sacrifice would be if it were to serve a two-fold purpose: that being to release the magician's wrath in the throwing of a curse, and more important, to dispose of a totally obnoxious and deserving individual."

At least one Satanist inmate engaged in a ritual in which an effigy was tortured and "murdered." The appellate court stated that the Satanic Bible outlined procedures for destroying enemies through the use of effigies.

The prison's position was that the Satanic Bible promoted "violent and illegal" behavior and that "manipulation, disregard for laws and authority, self-indulgence and revenge," were inconsistent with criminal rehabilitation. The court also noted that other Satanists in this particular prison kept a notebook called the "Book of Shadows" which was filled with murderous language.

Note: The Church of Satan claims they have never been associated with any criminal activity. However, that is incorrect. Followers of Anton La Vey have routinely requested the Satanic Bible while in prison, and in the majority of cases their requests have been

denied. As of 7/4/07 a Lexis Nexus search revealed more than 30 appellate decisions in which the Satanic Bible was mentioned. In this archive, in Maine vs. Waterhouse (1986), the appellate court quoted passages from the Satanic Bible to prove and uphold the satanic motivation for the crime. In Adoption of Quentin (1997) the appellate court noted the perpetrator had read the Satanic Bible.

[Note: The source of cattle mutilations has remained unsolved in the United States which makes the admission of the sacrifice of a cow in Doty vs. Lewis a point of interest.] See "Mutilated Bull: No Blood, No clues," Gallup Independent, May 5, 2007; "The Truth is Out There," The Gallup Independent, May 5, 2007].

**<u>January 6, 2006, STATE OF IDAHO v. THOMAS WENDELL HELMS, COURT OF APPEALS OF IDAHO, 137 P.3d 466, 2006 Ida App. LEXIS 3, Sentencing for Battery of a Correctional Officer Modified</u>**

Overview: Appellant documents state that defendant Thomas Helms was serving time in the Idaho Maximum Security Institution for grand theft, possession of a dangerous weapon by an inmate, and battery with intent to murder. He had a self-inflicted wound on his arm which had required stitches and needed to be moved to another cell. When officers attempted to move him he threw toilet water on them which then required tests to insure that the guards had not contracted HIV or Hepatitis. Helms was charged with battery on a correctional officer and received the maximum prison sentence after a jury trial, a sentence which this appellant court reduced.

Defendant Helms had a history of disruptive behavior and had been placed in increasingly restrictive confinements. He was self-mutilating, destroyed property, exposed himself, and threw feces and urine. Helms had told investigators about "feats" of murder and cannibalism during a brief period of his life when he was not incarcerated, although it was not clear to the majority opinion whether these were actual crimes.

The Dissenting Judge thought a stronger sentence should have been imposed and remarked that the majority opinion minimized Helms' behavior. He was in favor of Helms never being released and cited the following evidence as reason why he should be kept in confinement:

As a youth Helms had sexually violated a young girl and his younger brother. He was designated a sexual predator shortly thereafter. His parole officer stated Helms had no conscience. Helms slashed the throat of one inmate and planned to murder another one. After the attack Helms told officers that if they had not stopped him, he planned to eviscerate the victim, pull out his internal organs, and eat some of them

Helms repeatedly displayed a fascination with homicide, cannibalism, and idolized Charlie Manson. In the year 2000, Helms told investigators that in 1994 he had been involved in the murder of a female African-American prostitute and subsequently ate her heart after assisting in cutting up her body to pieces. He also confessed to another murder at that time. When asked about the truth of these statements in the year 2003, Helms again affirmed that these statements were true, that he was part of a satanic cult at that time, and he had engaged in murder and cannibalism.

5

Based on this evidence, the Dissenting Judge thought Helms would always remain a danger to society.

**May 26, 2005, THE PEOPLE v. RICHARD JOHN VIEIRA, SUPREME COURT OF CALIFORNIA, 25 Cal. Rptr. 3d 337, Death Sentence Affirmed on Three Counts; Remand to Trial Court and Reversal of the Death Sentence for one count**

Overview: Appellate documents state a jury convicted Richard John Vieira of Stanislaus County of four counts of murder and conspiracy which took place in 1990. Vieira and his co-defendants, David Beck and Gerald Cruz, all lived in a camp where Gerald Cruz served as the leader. Cruz instigated the murders of four individuals from a rival group.

Defendant's sister testified that she lived with Cruz in 1987-1988, at which time Cruz led others in the study of the occult and the performance of supposedly occult rituals that included candles, robes and chanting. Cruz told Young that "to sacrifice your first newborn was the greatest thing you could ever do and that it was 'for the satisfaction of Satan.'"

The defense solicited testimony regarding defendant's cult membership and his incapacity to form the requisite criminal intent. Testimony evidenced that Vieira was a "slave" to other members of the group. Family members testified defendant often appeared to have been "beat up" with black eyes, fat lips and slashes on his arm. According to defendant's diary he had been electroshocked and beat up by members of the group.

A cult expert testified that Cruz directed a cult which had occult and satanic underpinnings, they engaged in various rituals, and defendant was under mind control at the time of the crime. Cruz directed the members of the group to read and study the books of Alistair Crowley of whom Cruz believed himself to be the reincarnation. There were also reports that the defendants were part of a Nazi or White Supremacist organization. The court ultimately rejected the defense's argument that the crimes were committed under duress.

The dissenting Judge wrote that he would have reversed the death penalty and acknowledged that at the time of the murders the defendant was a submissive member of a satanic cult led by Gerald Cruz.

"In this case, the evidence shows that defendant acted under the substantial domination of cult leader Gerald Cruz who controlled every aspect of defendant's life and threatened to kill anyone who did not follow his orders. Absent the pernicious influence of a satanic cult leader, it is doubtful that defendant would have committed murder."

The dissent thought that the defendant was under mind control at the time of the crime and noted that the expert explained how cults use isolation, sleep deprivation, punishment, and occult ritual to dominate and control the minds of their members.

**March 18, 2005, TRACE ROYAL DUNCAN v. STATE OF ALABAMA, COURT OF CRIMINAL APPEALS OF ALABAMA, 925 So.2d 245, 2005 Ala. Crim. App. Lexis 78, Affirmed in Part, Remanded with Instructions; 827 So. 2d 838, 2005 Ala Crim App. LEXIS 116, Court of Appeal Reversed the Death Penalty**

Overview: Appellate documents and news articles state four teenagers, Trace Royal Duncan, 17, Cary Dale Grayson, 19, Kenny Loggins, 17, and Louis Mangione, 16, kidnapped and murdered hitchhiker, Vicki De Blieux, 37, who was traveling to her mother's home in Tennessee. The defendants picked her up and promised to take her to her mother's but instead took her to a wooded area. After she spurned their sexual advances, they kicked and stomped her and threw her over a cliff. Carey Grayson told Louis Mangione that he was going to "sacrifice the bitch." Three defendants then returned to the scene and proceeded to mutilate, cannibalize part of her body, and remove all of her fingers, both to thwart identification, and to keep as souvenirs. The defendants were arrested after Louis Mangione began showing Ms. De Blieux's fingers to friends. Kenneth Loggins and Carey Dale Grayson were sentenced to death. Louis Christopher Mangione and Trace Royal Ducan received a sentence of life imprisonment

The medical examiner found that every bone in the victim's face was fractured at least once, her skull was broken open with most of the brain separated from it. Large lacerations were found on the back of her head along with extensive bruising on the head, her left and right ribs were fractured, there were at least 180 stab wounds all over her body, two incised wounds were found in her chest and abdomen, her left lung was removed by a knife, there was bleeding of the tongue, and all her fingers and thumbs had been removed. The medical examiner could not be certain what wounds were inflicted before and after death.

The satanic element of the crime was documented in Trace Royal Duncan's appeal and several news articles. Duncan's trial counsel stated that his co-defendants were Satanists and that Mr. Duncan "kicked the victim a few times in the head," and the other codefendants "returned to the victim's body to mutilate it, stabbing it over 180 times, removing organs and eating them and removing fingers to thwart identification and to keep as souvenirs..." Counsel was able to interject his theory that two co-defendants were Satanists who instigated the murder, committed most of the acts against the victim, and threatened to kill the appellant if he told what happened. He attempted to portray co-defendant Grayson as the older instigator and leader who was a Satanist wanting to sacrifice the victim to Satan. In closing arguments the defense stated that the co-defendants could have committed the murder as a satanic ritual.

The legal history of this case is as follows:

Trace Royal Duncan: 925 So. 2d 245, 2005 Ala. Crim. App. LEXIS 78; 827 So. 2d 839, 1999 Ala. Crim. App. LEXIS 224; 673 So. 2d 838, 1995 Ala. Crim. App. LEXIS 350

Carey Dale Grayson: 954 So. 2d 1141, 2005 Ala. Crim. App. LEXIS 2676; 824 So. 2d 844, 2002 Ala. LEXIS 13; 824 So. 2d 844, 2001 Ala. LEXIS 167; 824 So. 2d 804, 1999 Ala. Crim. App. LEXIS 261; 665 So. 2d 986, 1995 Ala. Crim. Appl. LEXIS 71 .

Kenneth Loggins: 771 So. 2d 1093, 2000 Ala. LEXIS 217; 910 So. 2d 146, 2005 Ala. Crim. App. LEXIS 57; 771 So. 2d 1070, 1999 Ala. Crim. App. LEXIS 52

Louis Christopher Mangione: 740 So. 2d 444, 1998 Ala. Crim. App. LEXIS 133; 796 So. 2d. 446, 1999 Ala. Crim. App. LEXIS 2553

News articles report that co-defendant Dale Grayson told newspaper reporters that it was Trace Duncan who stabbed the woman, hacked open her chest and pulled out an organ from her body. The police were told that Grayson was a Satanist who drank the blood of his victim. See "Murder Suspect Claims He's No Satanist," Birmingham News, April 29, 1994; "Grayson Says Friends Carved Woman's Body," Birmingham News, May 5, 1994; "Trial Will Begin for Man Accused in Woman's Sport Killing," Birmingham News, October 29, 1995.

**October 21, 2003, ANGLESEY, NORTH WALES, MATHEW HARDMAN, Appealing Conviction for Murder**

Overview: News reports state a teenager found guilty of murdering his elderly neighbor and drinking her blood in a vampire ritual was attempting to challenge his conviction. He was jailed in 2002 for a minimum of 12 years following his trial. The jury was told the art student killed 90 year old Mabel Leyshon and removed her heart in a satanic-style ritual in November 2001. His first bid to appeal was rejected by the Court of Appeal in early 2003. See "Vampire Killer to Challenge Conviction," Press Association, October 21, 2003.

**September 11, 2003, BRASILIA, BRAZIL, Cesio Brandao aka Cesi Favio Caldas aka Sergio Brandao et al. Sentenced for Murder and Attempted Murder**

Overview: News articles report that five influential members of Brazilian society went on trial in 2003 for the torture, castration, and murder of five children, aged eight to 13, whose sexual organs had been removed and used in rites of black magic between 1989 and 1993. Amailton Madeira Gomes, son of a businessman, Carlos Alberto Santos, policeman, and two doctors, Anisio Ferreira de Souza, and Cesio Brandao, aka Cesi Favio aka Sergio Brandao were charged with the crimes. The fifth defendant, 75 year old Valentina Andrade, a fortune teller and leader of a UFO group called the Superior Universal Alignment, was tried for these crimes but was not convicted.

The five defendants, including Valentina Andrade, allegedly used their influence in efforts to stop the case from going to trial, intimidated victims, and destroyed evidence. The prosecution asked for the trial to be moved to another locale, Para State.

A total of 19 boys, aged eight to 14, were victimized. Five were mutilated and died, three escaped with horrible injuries, six escaped before they were harmed, and five have never been seen again. Some victims had their eyes gouged out, wrists slit, and sexual organs

cut off. The two doctors were accused of selling the internal organs of the children and using their genitals in satanic rituals.

Two mutilated survivors, now adults, escaped from Brazil's Amazon region where they had been tied to trees after being doped and castrated. They both identified Carlos Alberto Santos as the man who kidnapped them when they were nine and 10 years old.

Brazil's Special Secretary for Human Rights said the trial had symbolic significance because of the influential professions of the defendants. The trial was seen as a test of Brazil's ability to bring justice to isolated areas where it was suspected the legal system might be under the sway of powerful locals.

Carlos Albert Santos was sentenced to 35 years, Amailton Gomes was sentenced to 57 years, Anisio Ferreira de Souza was sentenced to 77 years, Cesio Brandao was sentenced to 56 years. See "Trial Opens on Ritualistic Murders of Brazilian Children," Agence France Presse, August 29, 2003; "Two Sentenced in Mutilation Murder Case in Brazil," Associated Press, August 30, 2003; "Satanic Sect Leader Denies Charges She tortured, Murdered Children in Brazil," Agence France Presse, November 19, 2003. See http://www.religionnewsblog.com for articles: "Five on Trial for Child Ritual Murders," August. 29, 2003; "Doctor Gets 56 for Brazil Sect Killings," September 10, 2003; "Brazil Jails Occult Killers," Aug. 31, 2003; "Brazil Court Finds 2 Guilty in Mutilation Killings," August 30, 2003; "Doctor Gets 77 Years for Brazil Sect Killings," Sept. 5, 2003.

**August 9, 2003, CHARLESTON, WEST VIRGINIA: KANAWHA COUNTY CIRCUIT COURT, Case No. 93-F45, Louis Kelley Sentenced to 15 years in prison for Sexual Assaults**

Overview: News reports state that Louis Kelley, 37, was sentenced by the court to serve 15-30 years in prison for sexual assault and one to five years in prison for sexual abuse of a boy. Kelly, who also called himself Damien Prince, convinced the boy to participate in Satanic rituals and molested him numerous times. Kelly pleaded guilty in February 2003 to the two counts related to an incident on Halloween night in 1991. "Man to Serve 15 Years for Sexual Assault of Boy During Ritual," Associated Press, August 9, 2003.

**June 19, 2003, MANASSAS, VIRGINIA, JUVENILE AND DOMESTIC COURT, PRINCE WILLIAM COUNTY, Case No. JA020390-02-00, Russell John Smith Plea-Bargained to Four Counts of Rape and was Sentenced to 48 Years**

Overview: News reports state that self-described Satanist Russell John Smith, 38, a former guard at the Prince William County jail and founder of a satanic worship group on the internet, plead guilty to four counts of rape. He claimed that most of the sex acts with a 12 year old girl were part of his Satanic rituals. Police who searched his home found numerous Satanic items, including robes, black candles, a goat's skull, a pentagram and an altar. See "Virginia Fugitive Arrested in Oregon," Associated Press, Sept. 4, 2002; "Self-described Satanist Sentenced to 48 Years for Rape," Associated Press, July 25, 2003; "Sentencing Delayed for Satanist who Raped Girl," Associated Press, June 19, 2003; "Metro in Brief," The Washington Post, July 28, 2003.

**May 19, 2003, POWELL v. THE STATE, SUPREME COURT OF GEORGIA, 581 S.E. 2d 13, 2003 Ga. LEXIS 478, Conviction for Murder Affirmed**

Overview: Appellate documents state that on May 22, 1998, Keith Powell, 44, who had been living with his parents, shot his unarmed father during a family dispute. Powell routinely carried a .45 caliber handgun in a holster on his person while in the home.

Mr. Powell claimed that the shooting was in self-defense and that he feared his father due to the abuse he suffered as a child. A friend of his testified to the "positive" relationship that existed between Powell and his father but stated that Powell had a lot of anger toward his mother, accusing her of abusing him in a ritualistic satanic manner.

Note: A psychologist opined that Powell had a delusional disorder, apparently due to the fact he spoke of being beaten, drugged and threatened, supposedly because of "gold" he had discovered at some point in his life. This case has been included because a diagnosis of "delusional disorder" does not necessarily negate this defendant's claim of alleged satanic ritual victimization by his mother.

**January 31, 2003, ROANOKE, VIRGINIA, ROANOKE CITY CIRCUIT COURT, Case No. CR02000968-04, Terry Dale Duncan, Pleaded No Contest to Attempted Capital Murder**

Overview: News reports state Terry Dale Duncan, 30, a self-styled Satanic high priest, pleaded no contest in an attempt to murder his one month old son. His child would have died if not for the intervention of a nurse and social worker after the child missed a doctors appointment. Duncan's child had suffered fractures to a leg, a shinbone, both collarbones, and bruises covered his nose, forehead and eyes. The authorities also discovered a wound that appeared to be a cigarette burn at the back of his throat.

The father said he decided to "sacrifice" the child because he believed he was not the child's father, so he tried to "disassemble" him. The father claimed he used to injure victims in this manner when he was affiliated with an Oklahoma based satanic cult. He told police that, "The majority of those States that we done the sacrifices, some of them were immediate sacrifices to where the heart was busted or the throat was enclosed to cause breathing to stop immediately and cause instant death, and then we disassembled the bodies."

He confessed to many satanic murders but the police stated law enforcement in other communities did not respond to their request for information about any unsolved homicides. See "Father Pleads No Contest to Abusing Infant," The Roanoke Times, January 31, 2003.

**January 8, 2003, FORT WORTH, TEXAS, TARRANT COUNTY JUSTICE CENTER, Case No. 0822743, Joseph Frank Cala II, Conviction for Murder**

Overview: News reports state Joseph Frank Cala II, 41, pleaded guilty to murder in the 2001 death of his 79 years old mother, Lydia M. Cala, after he "beat her to death, sliced her open, and ate some of her heart." After a three-hour hearing, the District Judge chose the maximum of the 20-30 year sentence range contained in a plea agreement.

The victim's daughter testified that she went to her mother's house the evening of Oct. 15, 2001 after neighbors called and said windows had been shattered from inside the house. She was afraid to enter the residence due to fear of her brother, so she notified authorities. Officer Kevin Meador testified that when he looked through a bedroom window, he saw a naked, bloody man standing over what he learned later was a woman's mutilated body. Another officer saw Cala eat what appeared to be an organ, according to police reports. Meador and other officers said they went inside and heard Joey Cala saying that he worshipped the devil. When officers took him into custody, he told them they had interrupted his "sacrifice." The 76 pound woman, had a broken nose, teeth, collar bone, ribs and multiple bruises and cuts likely caused by fist or feet, the medical examiner said. After she died, "her chest and abdomen were cut open and some organs were removed," the medical examiner testified. Part of her heart contained teeth marks and a piece was missing. See "Man Gets 30 Years for Killing, Cannibalizing Mother," Associated Press, January 8, 2003.


**March 13, 2002, MICHAEL DELANEY, INDIVIDUALLY AND AS GUARDIAN AD LITEM FOR BRYAN DELANEY, JASON DELANEY AND JUSTYN DELANEY v. CAROL CLIFTON, PH.D AND MARY ELLEN FARLEY, M.A., COURT OF APPEALS OF OREGON, 41 P.3d 1099, Dismissal of Lawsuit Against Therapist Affirmed**


Overview: Appellate documents state patient's former husband and her children sued professional counselor and clinical psychologists for professional malpractice and the husband, a third party to the therapeutic relationship, sued for intentional infliction of emotional distress.

As background, in 1993, Lee Ann, the wife of the appellant, began to attend lectures and read books about Multiple Personality Disorder [MPD, now called Dissociative Identity Disorder – (DID)] and Satanic cults. She began to suspect she had been a victim of satanic ritual abuse. Her husband, the plaintiff, also became convinced of the existence of the satanic cult, his own involvement, and the validity of the therapy she was receiving.

In therapy, Lee Ann described "alters" that surfaced in response to environmental cues and believed she participated in ceremonies in which people and animals were tortured. Lee Ann was referred to a specialist who also diagnosed her as MPD.

The plaintiff and Lee Ann divorced and the husband filed a claim for damages against the therapist, alleging that the diagnosis of MPD was considered "controversial and unreliable in the mental health profession" and the therapists damaged the relationship between he and his wife. The local court dismissed this claim because the husband was a third party to the therapeutic relationship and Lee Ann had no complaint about her treatment. The appellate court noted that the plaintiff called for the court to join a "national trend" of jurisdictions that, in the context of MPD generally and memory retrieval in particular, recognize negligence claims against therapists brought by persons outside the therapist-patient relationship.

The Appellate court wrote: "We are unconvinced that such a trend exists. More to the point, however, we would have to depart from settled Oregon tort jurisprudence to join the trend, if there were one. We decline to do so."

Several other lawsuits have had successful outcomes for therapists after their clients have recanted their disclosures of satanic activity:

November 30, 2000, Jones v. Lurie, 32 S.W. 3d 737. After a trial, no negligence was found on the part of psychologist Lurie and they found her treatment was within the standard of care. The client had disclosed that her grandfather, father, and brother, had sexually abused her, and that her parents took her to satanic rituals where she was physically and sexually abused by other cult members. She claimed to remember murdering and cannibalizing babies and believed "Nazi mind-control" methods were utilized on her, although she later attributed these statements to her therapist. The client had been diagnosed by all of her psychiatrists and treating psychologists with Multiple Personality Disorder [or DID]. A Dr. Johnstone, who was a witness for the client, testified that there was no such diagnosis as multiple personality disorder and that other professionals who wrote about MPD were '"quacks." The court found that the client was mentally ill long before Lurie treated her and affirmed the judgment of the trial court that found no negligence on the part of the therapist.

November 1, 2000, Bloom v. Braun, et al. 739 N.E. 2d 925. After her mother recommended treatment with therapist/defendant Braun, who she was also seeing in therapy, the client came to believe that she had a diagnosis of MPD [DID] and was involved in satanic cult ritual abuse. The client alleged that the therapist "misrepresented" as fact that satanic ritual abuse was proven to exist, there was no objective evidence of such cults, and that since her mother had recovered memories of participating in such rituals, she was also a victim/participant in this activity. She claimed that her memories and the resultant Multiple Personality Disorder were actually caused by the therapy. The appellate court dismissed Bloom's complaint based on her failure to satisfy the requirements of the legal disability exception to the statue of limitations.

August 22, 2000, Althaus v. Cohen, 2000 Pa. LEXIS 2017. After a jury awarded monetary damages to the client and her parents, the therapist appealed. The issue in this case was whether a therapist -- after being referred by social services -- who treats a child for alleged parental sexual abuse owes a duty of care to the child's parents in a therapeutic setting where the child allegedly has been abused by the parents. The child had accused her parents of incest, murder, and leading a satanic cult. The appellate court found that the therapist did not owe a duty of care to the client's parents and reversed the jury's decision, resulting in the parents having to return the monetary award. However, this decision did not affect the nominal amount of money awarded to the child.

August 19, 1998, Green v. Charter Pines Hospital, Wallace, Timmons, et al., No. 96-CVS-5235. Lawyer R. Christopher Barden argued that his client Susan A. Green had been made to falsely believe she had been molested by her father and by satanic cult members. He also stated that therapies which claim to retrieve forgotten sexual abuse memories from deep inside the mind are based on "junk science." The jury rejected these claims and found in favor of the psychologists and believed that the therapist's

therapeutic techniques were well within the standard of care during the time the therapeutic relationship occurred.

September 18, 1995, <u>Stecks v. Young</u>, 38 Cal. App. 4th 365. David and Nancy Stecks brought an action for libel, slander, and intentional infliction of emotional distress against psychologist Young after she made a report to Child Protective Services regarding the Steckses and others. Her client had alleged that these individuals engaged in child abuse and participated in cult activities such as human and animal sacrifice. The appellate court ruled because the therapist was a mandatory reporter, she had absolute immunity.

<u>July 15, 1998, Charter Peachford Behavior Health System, et al. v. Kohout, 504 S.E. 2d 514, 1998 Ga. App. LEXIS 995.</u> The appellate court reversed the judgment of the lower courts finding that therapists and hospital could be sued. The client, Kimberly Kohout, had claimed that she was "brainwashed" into creating "false memories" about being sexually and ritually abused by family members in Satanic cult ceremonies. Kohout admitted to having contacted the False Memory Syndrome Foundation about her "memories." The court ruled that instead of using a "subjective standard" of the patient's awareness of psychological harm, the court should use the objective one of when the patient reasonably should have known about it. The suit was dismissed due to the statute of limitations precluding a legitimate cause of action.

--------------

**<u>July 18, 2001, IN THE INTEREST OF S. C. P., A/K/A  S. C. J, MINOR CHILD, M.C.P, MOTHER, COURT OF APPEALS OF IOWA, 2001 Iowa App. LEXIS 442, Termination of Parental Rights Affirmed</u>**

Overview: Appellate documents state that the mother, Mary, was diagnosed with Multiple Personality Disorder [or DID] and other psychological disorders. Her child was a ward of the Juvenile Court and they wanted to terminate parental rights. There was domestic violence between her and the father of her child. The Court's concern was that "by November 1999 Mary was stating she had been the victim of Satanic ritualistic abuse." She blamed her father for causing her mental illness. Mary's therapist testified that she might be able to care for her child within one year. Her therapist stated she was working with the mother on her Dissociative Identity Disorder, helping her to map and contain her identity.

**<u>July 16,  2001, JEFFREY DEWAYNE CLARK v. MICHAEL O'DEA, UNITED STATES COURT OF APPEALS, SIXTH CIRCUIT, 257 F.3d 498, Conviction for First Degree Murder Affirmed</u>**

Overview: Appellate documents state a Kentucky jury convicted Jeffrey Clark and an accomplice of first-degree murder in 1995 for which he received a life sentence. Rhonda Sue Warford was stabbed multiple times and one stab wound pierced her brain stem. The medical examiner noted that an inverted cross was tattooed below her left clavicle, and that her injuries were caused by a sharp singled-edged instrument such as a knife. Both Keith Hardin and Jeffrey Clark were questioned about the crime and they were both indicted, jointly tried, and convicted for first degree murder.

Several witnesses testified about Clark and Hardin's Satanic worship. Search warrants for both Clark's and Hardin's residence were obtained. The Sheriff found various occult related items and documents at the residences of both. Jeffrey Clark was also found to have an inverted tattoo on his shoulder. A witness claimed he took her to an area where he said a number of animal sacrifices had been made. Another witness testified that Clark always carried a knife with him and called it his "sacrificial knife," and stated he had admitted to sacrificing an animal in front of a church. The victim's sister testified, stating she too knew that Hardin was involved in satanic worship.

Defendant Clark contested the admittance of Satanism at his trial, claiming there was a lack of evidence to prove the murder was a ritualistic killing. The State claimed it introduced evidence of Satanism to support its theory that the victim's murder was motivated by the belief held by Clark and Hardin that they would gain "power" by killing her. Testimony had been solicited about satanic teachings and, according to a witness, certain worshippers could empower themselves by killing other living beings by performing a human sacrifice.

The appellate court stated this evidence was probative as to the motive for the killing.

### April 12, 2001, SHARON LYNNE ARMSTRONG MORRIS v. JOEY FRANKLIN MORRIS, SUPREME COURT OF MISSISSIPPI, 783 So. 2d 681, Judgment of Custody Decision Affirmed

Overview: Appellate documents state the husband brought a divorce action against his wife (a nurse), and the court awarded him custody of their three children. The wife, Ms. Armstrong, filed an appeal. The husband alleged she subjected him to cruel and unusual treatment, in part, because she had homicidal thoughts of killing him and her mother. The record describes in detail mutual conflict between the parties. The mother had blackouts and would not know how to get home and would not recognize her husband and children. At times, she was suicidal.

The appellate court noted that her mental problems likely stemmed from her sexual abuse perpetrated by her grandfather from the ages of 8-12. The mother admitted to a history of Satanic cult involvement. Her involvement was reportedly at the insistence of her grandfather, and included "group sex, animal sacrifices, cannibalism and perhaps caused the death of at least one individual." The court acknowledge that much of her emotional problems occurred because of this sexual abuse and because she was made to participate in satanic cult rituals as a child and raped as an adult. Consequently, the appellate court affirmed the decision of the local court.

### October 24, 2000, FORT LAUDERDALE, FLORIDA, BROWARD COUNTY COURT, Case No. 9900926-CF10A, Darrel Wayne Harris Convicted of Attempted Second Degree Murder

Overview: News reports state that Darrel Wayne Harris, a 17-year-old, was charged as an adult and was arraigned on an attempted first-degree murder charge in a stabbing attack that stemmed from a Satanic ritual, police said. Harris allegedly stabbed Robert

14

Menendez four to six times in the throat and back with a carving knife after a ritual in which they cut their hands to let their blood mingle and chanted lines from a satanic book together. Menendez and Harris had been friends for about a year. Harris told him he had prepared a "special alter" (sic) for satanic ritual at the site, Menendez testified.

As they were chanting on April 21, they drew a pentagram in the dirt and Harris told Menendez to look down at the symbol. As Menendez looked down, Harris attacked him with the knife. "Somewhere along the line the culprit just started to hack him with the knife," said Fort Lauderdale Detective Arturo Carbo. "The victim told us that the stabbing was not part of the ritual and he firmly believed he was going to die." Harris and others left Menendez for dead but he managed to crawl to a nearby area and get help. There was evidence that Harris planned the attack. The victim was hospitalized for several days.

"Harris and Menendez were part of a network of 30 to 40 local young people who were involved in Satanic activities," Carbo said. Menendez told police he and Harris, who had known each other for at least 18 months, hung out at local public libraries to use computers to access satanic Web sites and send e-mail to each other. The group used online nicknames such as Natas, which is Satan spelled backwards, Mindblower and Deathtrap.

On October 24, 2000, a jury convicted Darrel Wayne Harris for attempted second degree murder. The victim formally testified in court that he had "dabbled in the occult" and had read a book on Satanic ritual. He accompanied Harris out of curiosity. Harris took a butcher knife and book on satanic rituals out of his backpack. Using the knife, Harris cut his hand and Menendez' hand and the two mixed their blood. Harris carved a pentagram in the ground and stood behind the cross-legged Menendez, telling him to stare at his hand and watch as the fingers disappeared and reappeared. Harris using the butcher knife, stabbed Menendez once in the neck, and three times in the back. See "Teen Charged as Adult in Stabbing that Took Place During Satanic Ritual," Associated Press, May 28, 1999; "Satanic Ritual Ends in Stabbing: Teen Charged with Attempted Murder," Sun Sentinel, May 28, 1999; "Mom: Son Depressive Teen Charged with Stabbing in Satanic Ritual," Sun Sentinel, May 29, 1999; "Teen Guilty in Occult Ritual Stabbing Garners Second-Degree Murder Verdict," Oct. 25, 2000.

### October 12, 2000, EDDIE LEE SEXTON vs. STATE OF FLORIDA, SUPREME COURT OF FLORIDA, 775 So. 2d. 923, 2000 Fla. LEXIS 1993; 697 So. 2d. 833 (1997) Conviction and Death Sentence Affirmed

Overview: Appellant documents state that Eddie Sexton's criminal trial was continued until August 1998 after the Appeals court in 1997 remanded the case back to the local court because testimony about the abuse of his children needlessly inflamed the jury. After the second trial, Eddie Lee Sexton was found guilty and sentenced to death again on Nov. 18, 1998. The Supreme Court of Florida affirmed the conviction and death sentence on October 12, 2000.

Eddie Sexton was convicted and sentenced to death for the participation in the murder of his son-in-law, Joel Good. Joel was murdered by Sexton's 22 year old son, Willie, who

15

strangled him to death under Sexton's direction. Willie Sexton testified against his father in exchange for his guilty plea to second-degree murder.

The court noted Sexton moved to Florida in 1993 with his family and the victim to avoid arrest and prevent authorities in Ohio from removing his children from the home. His infant grandchild, who was the son of the victim and his daughter, died under suspicious circumstances.

Sexton objected to the testimony of 5 of his daughters, as cited in the appellate opinion that he: "beat them, conducted 'marriage' ceremonies with his daughters, had regular sex with them and fathered several of their children, encouraged his children to have sex with each other, made his sons compare their penis sizes and ridiculed them, practiced Satanism and engaged in other bizarre conduct, threatened his children if they discussed family matters with others, trained his children how to kill FBI agents, engaged in a standoff with police in Ohio shortly before coming to Florida, fled to Florida to prevent his children from being taken into custody, and directed the killing of his infant grandchild."

The States proposed motive for the killing was that Sexton's son-in-law knew Sexton was the father of his own "grandchildren." The prosecution wanted prior bad acts admitted to show the control this man had over his children. The appeals court thought this testimony needlessly inflamed the jury and so ordered a new trial.

News reports state that during the second trial, his son, Willie Sexton, said his father convinced him he had Satanic powers and sexually abused him. He also stated that he was tied up to his bed at night when he was a child, and the father gave coins to the other children to call home if anyone spoke about the abuse.

Sherri Sexton, daughter of Eddie Lee Sexton, discussed séances held in the home. She told news reporters that her dead cat was placed on a table and "my dad had all of us go around the table holding hands. He was talking weird. He was saying he was Satan... He kept asking us to give our souls to him – to follow him to Satan."

Eddie Lee Sexton had been "ordained" by mail order at one time and had filed incorporation papers for a "Calvary Church of God." Mr. Sextons own father was a "Free Will Baptist Preacher." See "Children Tell of Life of Incest, Violence," Beacon Journal , February 6, 1994; "Court Revisits Murder Case, Son's Fears," St. Petersburg Times, September 2, 1998.

[Eddie Lee Sexton is the husband of Estella Sexton whose case is described next.]

**March 9, 1998, STATE OF OHIO vs ESTELLA SEXTON, COURT OF APPEALS OF OHIO, FIFTH APPELLATE DISTRICT, STARK COUNTY, 1998 Ohio App. LEXIS 1302; 1995 Ohio App. LEXIS 1413, Convictions for Complicity to Rape, Felonious Sexual Penetration, Gross Sexual Imposition, Complicity to Gross Sexual Imposition, and Child Endangerment Affirmed**

Overview: Appellate documents state that in April 1992 Machelle, one of Estella Sexton's

daughters, alleged that their father, Eddie Sexton, was molesting the three oldest daughters. There were 12 children in the family. DHS took six of the children into custody, but three of the children were returned to the mother under an agreement that she would keep the children away from the father.

In December of 1992, Mrs. Sexton fled Ohio with the three children, and reunited with Mr. Sexton at a hotel in Kentucky. On January 14, 1994, appellant and Eddie Sexton were arrested in Hillsboro County, Florida. The three children were returned to the custody of DHS. While living in Jackson Township, and in a camper in Hillsboro County, Florida, appellant and her husband perpetrated acts of sexual, physical, and mental abuse against all of the children. While living in Jackson Township, Kim, Lana, and Machelle were forced to participate in a wedding ceremony with their father. During the ceremony, Eddie engaged in a French kiss with the girls. Appellant was present, and took pictures of the ceremony.

The Court writes: "In the camper in Florida, appellant and Eddie gave Kim and Chris little red pills and Nyquil to ingest every evening, despite the fact that neither had a cold. On one occasion, Kim did not ingest the medicine and saw appellant fondling Chris' penis while he was asleep."...The mother and father inflicted "shaving rituals" on the girls. While living in Jackson Township, Lana and Machelle were forced to experience a similar shaving ritual. Lana was taken to the master bedroom for the purpose of punishment. Once inside the room, appellant held Lana down, while Eddie shaved her entire body with a razor. "While shaving her, Eddie cut her leg, put the blood on her finger, and made her sign a paper, saying that she was selling her soul to the devil." During the shaving, both appellant and Eddie Sexton fondled Machelle's vaginal area.

Chris received beatings from both appellant and Eddie Sexton. He would beat Chris once or twice a week, while appellant guarded the door. The beatings would often leave bruises. Appellant and Mr. Sexton also punished Chris by having him stand against the wall for five to six hours, holding a penny against the wall with his nose. During this punishment, Chris was not permitted to go to the bathroom.    At age twelve, Chris was forced to participate in weekend parties involving the family members in which he was given beer to drink.

According to Ohio vs. Estella Sexton, February 13, 1995, 1995 Ohio App. Lexis 1413, one of the children stated that family members were involved in satanic rituals, invoking spirits, and "baby thingies and things like that." "We will hold hands ... it mostly takes place after my grandmother died. They will bring her spirit back. Sometimes they bring devils back. They come out of the table and you see them floating around in the room ... we all hold hands while it's happening." This testimony regarding Satanic ritual was found by the court to be relevant to the proceedings.

Note: On October 11, 2005, COURT OF APPEALS OF OHIO, FIFTH APPELLATE DISTRICT, 2005 Ohio App. Lexis 5150, upheld the finding of the local court that Estella Sexton was a "Sexual Predator."

**September 30, 2000, MURFREESBORO, TENNESSEE, RUTHERFORD COUNTY JUDICIAL BUILDING, Case No. 48444, Alonzo South Pleaded Guilty to Three Counts of Aggravated Sexual Battery, Sentenced to 24 years in prison**

Overview: News articles state that according to the plea agreement Alonzo South, 31, admitted that on at least three occasions over the last two years he participated in satanic rituals in which a nude girl under the age of 10 was sexually touched. Court records say the child, who was the daughter of a woman involved in the Satanic group, was raped in a home, the nearby woods, a shed, a pickup truck and a car. See, "Man Gets 24 years for Satanic-ritual Rape of 10-year-old Girl," The Tennessean, Sept. 30, 2000.

**August 10, 2000, PEOPLE OF THE STATE OF ILLINOS v. PATRICK PAGE, SUPREME COURT OF ILLINOIS, 737 N.E.2d 264, Death Sentence Affirmed**

Overview: Appellate documents state that Patrick Page was convicted of three murders in approximately 1985-87. He confessed to committing these murders, along with other defendants, Kenneth Cherney and Gerald Feinberg. One victim was stabbed and set on fire. The second murder victim was also stabbed and a "fire was started over the grave with lighter fluid." The third victim was stabbed, buried, and a sheet and rug were burned over his grave.

Defendant Page claimed that his trial counsel failed to include evidence regarding his involvement in a cult as a mitigating factor because it would explain to the jurors how he was associated with these murders, how others were more culpable, and how he came to be able to be involved in such acts. He claimed he needed to be in a hospital setting.

Defendant told one psychologist that he was engrossed in the study of black magic and that he and several friends, led by a 24 year old warlock, held services, conjured demons and cast spells. A prior police report quoted a witness stating that "there are people who believe Mr. Patrick Page is the Anti-christ, and that Page derived a power from the location where victim was buried… and indicated Page was a leader of a Satanic cult." Another witness, and friend of Page, also stated Page derived "power" from certain locations and she "provided notes regarding defendant's involvement in black magic, rituals and sacrifices."

Defendant Page wrote in an affidavit that he was involved in certain practices from a young age and was still in fear of individuals who were involved and who may still be involved in these practices. Mr. Page's father and brother submitted affidavits stating that when defendant was 16 years old, he was involved in some kind of cult or devil worship. Another psychologist and physician stated that defendant was under the influence of a cult leader at the times he committed these murders. The Doctors described the mind-control techniques used by leaders of cults.

The court thought if this information had been submitted, far from being mitigating evidence, it would probably have served as aggravating evidence. "This evidence describes defendant's involvement in devil worship and ritualistic sacrifices." Defendant wanted his case remanded back to the local court so he could have Neurological

18



Assessment and a cult-related Psycho Social Investigation. The court denied this request and upheld defendant's death sentence.

### April 1, 2000, WARSAW, POLAND, Tomasz Suszyna and Robert Krakowian Pleaded Guilty to Murder

Overview: News articles state Tomas Suszyna, 22, and Robert Krakowian, 19, plead guilty to a double murder and said the victims were an offering to Satan. The victims, a 19-year-old woman and a 17-year-old boy, were killed during a ritual Satanic mass in southern Poland, police said, after finding the cut up and burned bodies. The two victims were members of a sect that staged the Black mass in a disused bunker on the outskirts of the town of Ruda Slaska, but they did not know they were to die. Another teenage cult member who survived was taken to the hospital with multiple knife wounds. See "Teenage Cult Members Killed in Satanic Mass," Agence France Presse; March 4, 1999 and "Polish Satanists Jailed for Ritual Double Murder," Agence France Presse, April 1, 2000.

### March 9, 2000, IN THE MATTER OF: SHAWN ELLIS, DEPENDENT MINOR CHILD, (FRANKLIN COUNTY CHILDREN SERVICES, COMPLAINANT-APPELLEE, CARLA RICHARDSON, RESPONDENT-APPELLANT) . IN THE MATTER OF: KIMBERLY DAVIS, DEPENDENT MINOR CHILD, (FRANKLIN COUNTY CHILDREN SERVICES, COMPLAINANT-APPELLEE, CARLA RICHARDSON, RESPONDENT-APPELLANT) COURT OF APPEALS OF OHIO, TENTH APPELLATE DISTRICT, FRANKLIN COUNTY, 2000 Ohio App. LEXIS 849, Permanent Court Commitment of Children Affirmed

Overview: Appellate documents state in May 1995 allegations of abuse and neglect were filed against the mother, Carla Richardson, on behalf of her two children. She failed to protect the children from being sexually molested by a boarder in the home who was ultimately convicted of rape. After three and a half years of offering services and receiving treatment from six different counselors, the mother remained in denial about the abuse her children had suffered. None of the parents complied with the reunification plans for their children and the court stated Satanic occult practices were allegedly commonplace.

The court noted that after being in counseling for over three years, appellant continued to deny what happened to her children and claimed an inability to remember the abuse. "There was even testimony that appellant could not recall taking blood and hair from the children as part of satanic rituals."

### February 24, 2000, NASHVILLE, TENNESSEE, Motion Withdrawn to Hold State in Contempt of Court

Overview: News articles report that a Federal judge was asked to hold the State in contempt of court in February 2000 for its continued failure to provide court-ordered and doctor-prescribed mental health services to a severely traumatized 17-year-old victim of rape and occult ritual abuse.



Four months prior, State officials signed a federal consent decree in the case which was known as Grier vs. Wadley to make sure Sarah C. received the care she needed. While in the custody of the State, she was exposed to occult sadism, was beaten, hung from walls locked for prolonged periods in closets, and raped repeatedly. This all happened before the age of seven. A State advocacy group, Tennessee Justice Center, filed a class action lawsuit against the State for failure to properly administer the appeals procedure for the health care plan enrollees of TennCare, (Tennessee Behavioral Health). The 17 yr. old victim was just one of the people named in the settlement but she was left without proper care until this motion was filed. In April, the state agreed to properly attend to her care. See "Tenn. Could be in Contempt if Mental Care for Teen Inadequate," The Commercial Appeal, February 24, 2000; "Foster Parents Say State Failed to Care for Abused Girl in State Care," AP, February 24, 2000; "Sarah C. to Get Badly Needed Care," Knoxville News-Sentinel Co., April 18, 2000.

### October 21, 1999, SOUTH AFRICA, Ameriko Manyike Sentenced to Life in Prison

Overview: News articles state Ameriko Manyike, 32, mutilated a 15-yr-old boy and tried to sell his genitals which he had cut off. "Ritual or 'muti' murders are common in South Africa where people are prepared to pay well for potions made of human parts which they believe will bring good health or good fortune." See "Mozambican Jailed for Life in S. Africa for Ritual Murder," Agence France Presse, Oct. 21, 1999.

### August 18, 1999, STATE OF OHIO v. KENNETH J. SMITH, 1999 Ohio App. LEXIS 3794, Status as Sexual Predator Affirmed

Overview: Appellate documents state that on June 4, 1991 Kenneth Smith pled guilty to sexual imposition against a 10 year old child. Years later he appealed the designation as a sexual predator. The trial court noted the nature of the sexual conduct with the victim as indicated in the summary in the presentence investigation report and found defendant's conduct demonstrated "a pattern of abuse."

The court stated that in making its decision, the report indicated alcohol was used, the defendant had threatened the victim, and that Satanic ceremonies had been involved.

### August 11, 1999, HELSINKI, FINLAND, Jarno Sebastian Elg, Terhi Johanna Tervashonka, Mika Kristian Riska Sentenced for Murder

Overview: News articles state a court sentenced three alleged Satanists, including a 17-year-old girl, to prison terms for ritually killing a man and ingesting some of the body parts. Jarno Sebastian Elg, 24, was given a life sentence for killing a 23-year-old man in November and instigating others to participate in a ritual that included torturing the victim and listening to heavy-metal music. The Hyvinkaa District Court in southern Finland sentenced Terhi Johanna Tervashonka, 17, to two years and six months in prison and Mika Kristian Riska, 21, to two years and eight months in the case. The victim, who was not named, suffered prolonged torture and eventually was strangled to death, the court said. It also said the three people convicted "were strongly influenced by Satanism." The court declared most of the details of the case secret. See "Alleged Satanists Sentenced for Murder, Cannibalism," Associated Press, August 11, 1999.



**August 3, 1999, KIEV, Dmitry Dyomin was Sentenced to Death for Murder; His Accomplices, Valentin Chelyshev and Alexei Andreyev Sentenced to 13 and 8 yrs. in jail**

Overview: News articles state Dmitry Dyomin and his two accomplices, Valentin Chelyshev and Alexei Andreyev, killed a 15-year-old girl whose tongue was then boiled and ate. Dyomin belonged to a Satanic cult and with the help of his two accomplices, he severed the girl's head with a kitchen knife. Dyomin later lacquered the skull and kept it in his room. Skulls that he had taken out of graves, and books on black magic, pentagrams, and upside-down crucifixes were found during a search of the defendants home. See "Cannibal Satanists Get Death Sentence," ITAR-TASS NEWS Agency, August 3, 1999.

**July 24, 1999, UGANDA, AFRICA, Yunus Samanya, Francis Muwanga, Gloria Nagadya, Sentenced to Death**

Overview: News reports state that Yunus Samanya, 23, a native healer, Francis Muwanga, 24, and his wife, Gloria Nagadya, 21, were sent to the gallows for the ritual murder of a girl, Shamin Muhamad.

The girl's head, tongue, private parts, and two fingers were cut off. The motive for the murder was that the perpetrators wanted to become "rich," with the assistance of evil spirits, and a witchdoctor advised them to make a human sacrifice.

The article also mentioned that cases of child sacrifice had triggered public outrage. See "Shamin Killers for the Gallows," Africa News, July 24, 1999.

Four companion cases are described below:

**October 6, 1999, PEOPLE, STATE OF ILLINOIS v. ROBIN GECHT, SUPREME COURT OF ILLINOIS, 720 N.E. 2d 1098, 1999 Ill. LEXIS 1423, Petition For Leave to Appeal Denied**

Note: Four members of a satanic cult, Andrew Kokoraleis, 23, Thomas Kokoraleis, 26, Robin Gecht, 28, and Edward Spreitzer, 26, were convicted in a series of murders, rituals, and acts of cannibalism over a number of years in the mid 1980's. The case broke after an 18-year-old prostitute was brought unconscious to the local hospital after being found naked, bleeding profusely and near death. Her left breast had been severed and she identified Robin Gecht, a carpenter-electrician, as her attacker.

All of the defendant's appeals are in published decisions except for Robin Gecht's which is reported as a Table case.

Overview: News articles report that Robin Gecht, 28, a carpenter-electrician was arrested on Oct. 20, 1982, in the vicious slashing of an 18-year-old prostitute which "proved to be the opening of a Pandora's box of depravity, sadism, Satan worship and cannibalism that

21

perhaps involved nearly a score of Chicago-area women." Within a week of Gecht's release on bond for the attack on the prostitute, another woman claimed to have been attacked by him. He was then rearrested.

Following clues, the police had pulled a van over to the side of the road which was driven by Edward Spreitzer, and which had Andrew Kokoraleis as a passenger, who told them the van belonged to Robin Gecht. The gruesome link between many of the slayings in which the remains were still identifiable was that victim's breasts had been mutilated or slashed off with a knife or piano wire. The three suspects then began implicating each other.

"The first inkling that the killings might have been part of a cult ritual came when a former neighbor of Gecht in Villa Park told authorities that Gecht enjoyed reading books on torture practices of ancient cultures. 'He told me that he was reading about how the ancients cut off the breasts of women and saved them for tobacco pouches,' she said."

The police found six crosses, some black and some red, painted on the walls of a tiny attic room in a house once occupied by Robin Gecht. Thomas Kokoraleis told investigators that the room had contained an altar, made from a board covered with red cloth, where cult members cut up animal parts, and sometimes human parts, for sacrifice.

"All were found to have been legally sane at the time of the murders, but Gecht was said by behavioral experts to exhibit multiple personalities, perhaps as a ruse. For example, in their discussion with him he wandered. His voice changed. He would speak as a small child, a teenager or a businessman. The experts said it probably was a sham."

Robin Gecht was ultimately convicted of the attack on the 18 year old prostitute, and is currently serving a sentence of 120 years. Authorities learned later that Gecht had worked twice for John Wayne Gacy [the well-known serial murderer of 33 boys] as a construction worker.  See "Disappearances of Young Women Formed a Path Into the Darkest Depths of the Human Psyche," Chicago Tribune, Oct. 11, 1987; "Trail's End: Gruesome Clues Led to an Altar in an Attic," Chicago Tribune, Oct. 12, 1987.

------------

**March 15, 1999, THE PEOPLE OF THE STATE OF ILLINOIS v. ANDREW KOKORALEIS, SUPREME COURT OF ILLINOIS, 707 N.E.2d 1224, 1999 Ill. LEXIS 670; 637 N.E.2d 1015 (1994); 547 N.E.2d 202 ( 1989); 507 N.E.2d 146 (1987), Stay of Execution Allowed** .

Overview: Appellate documents state Andrew Kokoraleis was convicted of the murder and kidnapping of Lorraine Borowski and Rose Beck Davis and was sentenced to death for these murders which occurred in 1982. Lorraine Borowski's skeletal remains were discovered in a cemetery. Defendant told officers that he and his alleged accomplices, Robin Gecht and Edward Spreitzer, engaged in intercourse with the chest cavities of the victims after the breasts were removed. The State presented evidence of defendant's participation in two other murders, Linda Sutton and Shui Mak, and the defendant ultimately confessed to 16 murders.

One of the victims, Linda Sutton, was found with her breasts and anterior chest wall absent. The pathologist concluded that the condition of the body was consistent with breast mutilation. The court agreed to exclude evidence of cult involvement in this defendant's case at the start of the proceedings but the prosecutor told the jurors that the defendant lived out the "Satanic Bible."

In 1994 Defendant Andrew Kokoraleis appealed his conviction and sentence of death in the murder of Lorraine Borowski. He claimed ineffective representation of counsel during his sentencing phase which resulted in the death penalty. He argued that counsel did not independently investigate the psychological factors that made him vulnerable in following co-defendant Robin Gecht, who "fancied he possessed a Charles Manson-like persona, (who) subjected defendant to his will to commit the crimes."

Andrew Kokoraleis denied responsibility for the crimes committed and stated that his statements to police were coerced and that he was "framed." The court stated that given the circumstances of this case, it was not unreasonable for his attorney to not have investigated his "disturbed psyche" because the defense strategy had been to "bar at the outset of trial the introduction of evidence that defendant's crimes were part of some cult ritual. It would have been inconsistent with the strategy of barring that evidence for counsel to later argue the very same evidence showed, in the sentencing phase, that defendant's culpability was due to a disturbed psyche. The fact that counsel did not investigate sources to glean such evidence is therefore rendered strategically inconsequential. Further, as already noted, arguing the lurid particularities of the crimes as evidence of a psyche ripe for Gecht's enslavement was inconsistent with defendant's sworn proclamations of innocence."

On March 15, 1999, the Appeals court stayed Andrew Kokoraleis execution until the Supreme Court reviewed the case. The Supreme Court denied his writ of certiorari, and on March 17, 1999 Andrew Kokoraleis was executed.

See "Cult Murder Trial Opens in Du Page," Chicago Tribune, March 11, 1987; "Mutilation Cult Suspect on Trial," Chicago Tribune, Feb 5, 1985; "Kokoraleis Found Guilty in Rape, Killing," Chicago Tribune, Feb. 12, 1985; "Man Guilty in Murder of Woman," Mar 19, 1987; High Court is Asked to Set Killer's Execution," Chicago Tribune, Dec. 10, 1998; "Gruesome Clues Led to an Altar in an Attic," Chicago Tribune, October 12, 1987; "Cult Murder Trial Opens in Du Page," Chicago Tribune, March 11, 1987; "Satanic Crime Police Say the Devil Made Some People Do It," Chicago Tribune, April 18, 1988; Book – "Deadly Thrills," by Jaye Slade Fletcher.

------------

**March 28, 1991, PEOPLE OF THE STATE OF ILLINOIS v. EDWARD SPREITZER, SUPREME COURT OF ILLINOIS, 572 N.E.2d 931, 1991 Ill. LEXIS 22; 525 N.E. 2d 30 (1988), Dismissal of Post-Conviction Petition Affirmed**

Overview: Appellate documents state that Edward Spreitzer was found guilty along with Andrew and Thomas Kokoraleis for the murder of Linda Sutton, whose breast had been amputated. Edward Spreitzer confessed to the crime and implicated Robin Gecht. He



stated they had picked up a black woman and Gecht dragged her into the bushes, cut off one of her breast, and had sex in the chest cavity. Spreitzer retrieved a wire from their van at Gecht's request, and Gecht severed the woman's other breast and had sex in that chest cavity. Spreitzer later admitted to also severing the victim's breast.

Defendant Spreitzer confessed to 4 other murders, including that of Shuk Mak, Rose Davis, Sandra Deleware, and Raphael Tiradao. Several of these victims also had their breasts removed. The Appellate court stated that the defendant filed a motion to exclude information about his "religious cult" in which "ritualistic ceremonies" were preformed with the amputated breasts in Gecht's attic. Due to the agreement, the prosecutor erred by raising the issue of "devil worship," but defendant did not object to it at the trial court.

Edward Spreitzer plead guilty and was sentenced to die for the slaying of Linda Sutton, and for his part in the killings of Lorraine Borowski, Shui Mak, Rose Beck Davis, Sandra Deleware and Rafael Tirado, but his sentence was commuted by the Governor in 2003.

See "Prosecutors to Seek Death in Devil-Worship Killings," Chicago Tribune, Feb 25, 1986; "Defendant to Tell About Mutilation Victim Was Dead, Lawyer Says," Chicago Tribune, March 4, 1986; "Defense Lawyer Admits Mutilation," Chicago Tribune, Feb 26, 1986; "Spreitzer Sentenced to Death," Chicago Tribune, March 20, 1986; "The Push to Restore Wisconsin's Death Penalty: Advocates Have New Strategy, New Majority," Madison Capitol Times, March 1, 2003.

-----------

### January 25, 1990, PEOPLE OF THE STATE OF ILLINOIS v. THOMAS C. KOKORALEIS, APPELLATE COURT OF ILLINOIS, SECOND DISTRICT, 549 N.E.2d 1354, 1990 Ill. App. LEXIS 105; 501 N.E. 2d 207 (1986), Denial of Request to Withdraw Guilty Plea Affirmed

Overview:  Appellate documents state that Defendant Thomas Kokoraleis was convicted of the rape and murder of Lorraine Borowski. The Appellate court overturned his conviction in 1986 and remanded the case back to court. Defendant then plead guilty to murder in return for a 70 year sentence. Defendant sought to withdraw his guilty plea but the court denied his request.

The Defense stipulated that if the case had gone to trial, the State would have presented evidence to show that Borowski's body was found with her left breast removed; that the defendant admitted to police officers that he and his cohorts had abducted Borowski, removed her left breast with a piano wire, and killed her; and that the defendant was part of a cult that would rape and kill women and cut off their breasts. The Appellate Court ruled that because the Defendant had falsely confessed to another murder it did not affect his admission of guilt regarding two other murders which he plead guilty to.

News articles report that Cook County Assistant State's Attorney Richard Beuke testified at Thomas Kokoraleis's trial in Du Page County, stating that the severed breast of the murder victims would be removed from a box and placed on the altar. The rituals, while Gecht read passages from the Bible, involved cannibalism. Police thought Robin Gecht

24



was the leader of the group.  See "Gang Member Gets 70 Years in 1982 Slaying," Chicago Tribune, July 17, 1987, and other articles.

**February 19, 1999, PAUL A. BONACCI vs. LAWRENCE E. KING, 4:CV91-3037, UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEBRASKA; $1 Million Default Judgment Awarded for Conspiracy, Emotional Abuse, Battery, False Imprisonment**

Overview:  Court documents and a book publication by Paul Bonacci's attorney, ex-senator John de Camp, state that Larry King organized groups of children to sexually blackmail and compromise politicians and businessmen while he served as Manager of the Franklin Credit Union in Omaha, Nebraska.  King had political ties that reached the presidency of the United States and he sang at the 1988 Republican National Convention in New Orleans.

Paul Bonacci, who suffers from Multiple Personality Disorder [or DID], stated that as a youth he had been subjected to Mind Control, he had been transported across the U.S., and was forced to have sex with various people, forced to deliver drugs, and forced to participate in satanic snuff films, where Larry King was present. He identified the Bohemian Grove in Northern California, a well known gathering/meeting site for politicians, as the location of a satanic murder, and he had inside knowledge about many satanic ritual abuse cases around the country that he claimed to have been present at. These include a case in Jordan, Minnesota, in which Jim Rud was the only defendant charged, and in Bakersfield, California, another case in which several individuals were criminally charged for the sexual abuse of children within the context of ritual abuse.

The Omaha police chief, Robert Wadman and publisher of the local newspaper Harold Andersen, were implicated in the sexual abuse allegations. The FBI refused to investigate the child abuse allegations because the local FBI representative, Nick O'Hara, claimed that Robert Wadman was his "friend." A Grand Jury was convened which labeled the children's allegations as a "hoax," apparently due to the high-profile nature of the alleged perpetrators, the ritual abuse allegations, and after one witness, Troy Boner, recanted his statements about abuse. John de Camp states that his retraction was a key factor in the Grand Jury's findings that all the children had lied. Troy Boner later claimed that the FBI threatened him into recanting.

One sexual molest victim, Alicia Owen, was charged with perjury due to naming the police chief, Robert Wadman, as one of her abusers. She served prison time for this charge but was released in the year 2000. Paul Bonacci claimed that the sex ring that plunged him into Satanism and Mind Control was centered at Offutt U.S. Air force Base, near Omaha. The main investigator assigned to this case, Gary Cadiori, died in a suspicious plane crash shortly after he took statements from the children.

Larry King was convicted in 1991 and sentenced to 15 years in prison for embezzlement, conspiracy, and making false financial record entries. The Credit Union was missing 40 million dollars and there were allegations that funds were used to finance the Contras, and other clandestine operations by the CIA.

John de Camp linked Lt. Col. Michael Aquino, leader of the satanic group, the Temple of Set, to mind control operations and writes:

"Child victims gave evidence in depth of the role of Lt. Col. Michael Aquino in this depravity. Aquino…was long the leader of an Army psychological warfare section which drew on his expertise and personal practice in brainwashing, Satanism, Nazism, homosexual pedophilia and murder."

Noreen Gosch, mother of Johnny Gosch who was kidnapped 20 years ago when he was 12, testified at Mr. Bonacci's hearing on his behalf on February 5, 1999 in this civil lawsuit against Mr. King. Ms. Gosch was responsible for the passage of legislation on behalf of missing children, and due to her efforts the National Center for Missing and Exploited Children was created. Over the years, she carried out her own investigation about her son's disappearance and observed at this hearing that if the FBI had actually done their job in her case, it would have "opened up the biggest scandal in the United States, bigger than the Iran-Contra story." Paul Bonacci gave information to Noreen Gosch about the kidnapping of her son, Johnny Gosch, and admitted to participating in his kidnapping.

Ms. Gosch claimed her son, Johnny, visited her in March of 1997 and told her the exact same story Paul Bonacci had, and asked her to make these claims public. He said kidnapped children and others were being used by professional pedophiles and some of those children were victims of mind control. In Ms. Gosch's book, "Why Johnny Can't Come Home," (2000) she wrote that he and three others claimed that Lt. Col. Michael Aquino was involved in Johnny's kidnapping. (pg. 223) Ms. Gosch stated the following in the court hearing:

"There was a man by the name of Michael Aquino. He was in the military. He had top Pentagon clearance. He was a pedophile. He was a Satanist. He's founded the Temple of Set. And he was also a very close friend of Anton LaVey. The two of them were very active in ritualistic sexual abuse. And they deferred funding from this government program to use this experimentation upon children …where they deliberately split off the personalities of these children into multiples so that when they're questioned or put under oath or questioned under lie detector, that unless the operator knows how to question a multiple personality disorder, they turn up with no evidence. They use these kids to sexually compromise politicians or anyone else they wish to have control of…they were taken to be used by professional pedophiles. People that have the money to buy what they want, take the kids wherever they want... and by splitting the children's personalities they could then train each one of the personalities to do a different function. And the rest of the personalities within that host personality would not be aware of it or remember it."

The Circuit court wrote in its judgment against Larry King:

"Two counts are alleged against the defendant King in the complaint. Count V alleges a conspiracy with public officers to deprive the plaintiff [Paul Bonacci] of his civil rights, designed to continue to subject the plaintiff to emotional abuse and to prevent him from informing authorities of criminal conduct. Count VIII charges battery, false imprisonment, infliction of emotional distress, negligence and conspiracy to deprive the

26



plaintiff of civil rights. Between December 1980 and 1988, the complaint alleges, the defendant King continually subjected the plaintiff to repeated sexual assaults, false imprisonments, infliction of extreme emotional distress, organized and directed Satanic rituals, forced the plaintiff to 'scavenge' for children to be a part of the defendant King's sexual abuse and pornography ring, forced the plaintiff to engage in numerous masochistic orgies with other minor children. The defendant King's default has made those allegations true against him. The issue now is the relief to be granted monetarily.

The now uncontradicted evidence is that the plaintiff has suffered much. He has suffered burns, broken fingers, beating of the head and face and other indignities by the wrongful actions of the defendant King. In addition to the misery of going through the experiences just related over a period of eight years, the plaintiff has suffered the lingering results to the present time. He is a victim of multiple personality disorder, involving as many as fourteen distinct personalities aside from his primary personality. He has given up a desired military career and received threats on his life. He suffers from sleeplessness, has bad dreams, has difficulty in holding a job, is fearful that others are following him, fears getting killed, has depressing flashbacks, and is verbally violent on occasion, all in connection with the multiple personality disorder and caused by the wrongful activities of the defendant King."

Larry King did not appear at this civil hearing and a one million dollar default judgment was awarded to Mr. Bonacci.

See books which describes this case: "The Franklin Cover-up: Child Abuse, Satanism, and Murder in Nebraska," by John W. DeCamp, 1996; Why Johnny Can't Come Home, by Noreen Gosch, 2000; [See, Aquino vs. Stone, 1992, Aquino vs. ElectriCiti, 1997], and news articles: "Judge Determining Damages in Bonacci Lawsuit," AP, February 6, 1999; "Owen is Paroled: Served a 4 ½ year sentence - The Woman Linked to the Franklin Credit Union Sexual Abuse Investigation Wants to be a Normal Person." Omaha World-Herald, Sept. 21, 2000. The Court Transcript of this hearing can be ordered from Latimer Reporting 402-476-1153

### July 24, 1998, STATE OF OREGON v. MICHAEL JAMES HAYWARD, SUPREME COURT OF OREGON, 963 P.2d 667, 1998 Ore. LEXIS 593, Murder, Assault, Kidnapping, Robbery, and Burglary Affirmed, Death Sentence Affirmed

Overview: Appellate documents state that on April 10, 1994 Jason Brock, Daniel Rabago, Jason Brumwell, and Johl Brock, three of whom considered themselves to be Satanists and members of a "Death-Metal" band, decided to rob a Dari Mart. They listened to their Death-Metal music before they committed the crime, which included lyrics to "The Pick-Axe Murders," An Experiment in Homicide," "Hammer Smashed face," Meat Hook Sodomy," "Gutted," and "Living Dissection." They planned their crime and went to a Dari Mart store, killed a female clerk, and brutally beat another one.

Jason Brock described the lyrics of "Cannibal Corpse," as explaining or picturing through words "killing people."  Johl Brocks testified that the death metal lyrics to which the group listened "described basic satanic practices, ceremonies and stuff." He also stated

that the lyrics on the CD by the band Decide is what led to the two of them "dabbling into Satanism." Daniel Rabago testified "we were all into evil and we were all pretty much deathers."

The evidence of "Death-metal" music and Satanism was admitted into the court testimony and was upheld because it partially explained the motive for the crime and the motive for the degree of brutality used.

### April 28, 1998, LUBUK PAKAM, INDONESIA, Achmad Suradji Sentenced to Death for Murdering 42 Women

Overview: News reports state an Indonesian sorcerer Achmad Suradji, 47, was sentenced to death for murdering 42 women as part of a bizarre attempt to "boost his magical powers." The case first came to light in April last year when police, following up a missing person's report, found a body buried in a sugar cane field near Suradji's house. When they went to question the sorcerer, they found women's shoes and handbags. Over the next few weeks, a further 41 bodies were unearthed close to his village. According to the police, Suradji said that he had a dream in 1986 in which the ghost of his father had told him to kill a total of 70 women and then drink their saliva in order to enhance his mystical powers. See "Sorcerer to die for 42 murders," The Daily Telegraph, April 28, 1998 and "Witch Work; How an Indonesian Lured 42 Women to Their Death," Asiaweek, June 6, 1997.

### March 25, 1998, MEXICO CITY, MEXICO, Elio Hernandez Rivera, David Serna Valdes and Sergio Martinez Salinas, Sentences for Murder, Conspiracy, Drug Trafficking and Weapons Violations Reduced

Overview: News articles state that reputed "Godmother," Sara Maria Aldrete Villarreal, a student at Texas Southmost College, and four other members of a cult were sentenced to more than 60 years in prison for the ritual slaying of 13 people, including Texas College student, Mark Kilroy. After they appealed, an appellate judge reduced the sentences of Rivera, Valdes, and Salinas from 67 to 50 years.

Mark Kilroy, 21, a pre-med student, was kidnapped on the streets of Matamoros on March 14, 1989 during Spring Break. Police arrested cult member Serafin Hernandez, a drug trafficker, after he drove through a federal judicial police roadblock outside Matamoros believing he was rendered "invisible" by his cult's "black magic."

Hernandez confessed to participating in the kidnapping and burial of Mark Kilroy and took authorities to his remains on a ranch near the Rio Grande. Sara Aldrete and other cult members had taken Kilroy there, where they ritualistically murdered him, removed his brain and cut his body into pieces. The police also discovered the remains of 13 other victims, including another U.S. citizen, and a 9-year-old child.

Decomposed goat heads, parts of a rooster, bowls containing dried blood, a cauldron with human remains, including a brain and a heart, and spines crafted into necklaces, were found on the ranch. Authorities said Sara Aldrete was the "Godmother" who presided over rituals along with "Godfather" and cult leader Adolfo de Jesus Constanza. In 1989



Aldofo Constanza was killed by another cult member at his request during a police shootout.

The group thought their self-styled religion, which drew from the Caribbean Santeria and the African Palo Mayombe traditions, would render them bulletproof and protect them from police and rival gang members which was the rationale for why they "sacrificed" Mark Kilroy and others. See "I've Never Seen Anything Like This Before," St. Louis Post-Dispatch, April 16, 1989; "Texan Arrested in Cult Killings," St. Louis Post-Dispatch, April 18, 1989; "Behind Drug Cult Killings in Mexico," San Francisco Chronicle, February 7, 1991; "Cult Killers Given Lighter Sentences," San Antonio Express-News, March 25, 1998; "'Devil Ranch' Priestess Still Says She's Innocent," San Antonio Express-News, March 21, 2004.

## March 18, 1998, SOUTH AFRICA, Naledzani Mabuda and his Wife Helen Madida Confessed to Murder

Overview: News reports state the father, Naledzani Mabuda, 26, a traditional healer and spiritual medium, and his wife, Helen, 22, confessed to ritually killing their 23 month old son because Mabuda's ancestors had threatened to destroy him if he did not. Police found the boy's head, legs, hands and genitals buried under various parts of the floor in the couple's house. Mabuda testified in court that killing his son as a sacrifice to the family's ancestors was central to his role as a traditional healer and spiritual medium. Later searches revealed the toddler's intestines, liver, and other internal organs found in a series of ritual "graves" on the nearby mountainside.

The couple were refused bail after another local traditional leader banned them from the village. He testified that the couple had committed a crime of the "greatest evil" and that the townspeople were terrified by the act. A series of sangomas were asked to testify about ritual human sacrifices as part of traditional African beliefs. See, "A Sangoma Couple in Court for Sacrificing Child to Ancestors," Africa News Service, March 18, 1998.

In January 1998 several of South Africa's witch-doctors, or sangomas, claimed that ritual murders and killings related to the medicinal quest for body parts had decreased by more than 90 percent. The news article reports that police estimate that several hundred people, many of them children, are killed in South Africa each year for their body parts. Female genitals, breasts and placentas are used for infertility and good luck, while hands burned to ashes and mixed into a paste are seen as a cure for strokes, and hearts for heart disease. Blood is given to impart vitality and brains for political power and business success. However "true sangomas eschew the use of body parts, treating physical and mental ailments using herbal medicines." See "Witch-doctors Not Making a Killing Any More: South African Healers Say Ritual Murders No Longer in Vogue." The Ottawa Citizen, January 2, 1998.

**February 4, 1998, SEAN RICHARD SELLERS  v. RONALD WARD, WARDEN OF THE OKLAHOMA STATE PENITENTIARY, UNITED STATES COURT OF APPEALS TENTH CIRCUIT, 135 F.3d 1333, 1998 U.S. App. LEXIS 1621; 728 P.2d 515 (1996); 889 P. 2d 895 (1995); 809 P.2d 676 (1991); Federal Habeas Corpus Relief Denied**

Overview: Appellate documents state in 1985 - 1986, at the age of 16, Sean Sellers killed three people, including his parents. He was tried as an adult and sentenced to death. Evidence of his Satanic belief system was admitted by the defense at trial. His defense counsel had portrayed Sellers as the victim of Satanism and said he was addicted to the game Dungeons and Dragons.

Sean Sellers appealed in recent years due to new evidence that he suffered from Multiple Personality Disorder or (DID). Extensive medical documentation was submitted to the court indicating that an "alter" committed the offenses. The appeal was denied although the court was clearly disturbed by the ramifications of Sean Seller's mental disorder.

"Although troubled by the extent of uncontroverted clinical evidence proving Petitioner suffers from Multiple Personality Disorder, now and at the time of the offenses  of conviction, and that the offenses were committed by an 'alter' personality, we are constrained to hold Petitioner has failed to establish grounds for federal habeas corpus relief."

There was no evidence that Sellers host personality was aware of or could not control the alter, and that alter knew the difference between right and wrong at the time they committed the crime.

Note: Sean was executed on Feb. 4, 1999 despite appeals by Amnesty International contesting the legal wisdom of executing a man for crimes he committed at age 16 and who suffered from a psychological disorder like MPD/DID.

**November 26, 1997,  STATE OF TENNESSEE vs. CHRISTA GAIL PIKE, COURT OF CRIMINAL APPEALS OF TENNESSEE, AT KNOXVILLE, 1997 Tenn. Crim. App. LEXIS 1186 (First Degree Murder-Death Penalty) Conviction for First Degree Murder and Conspiracy to Commit First Degree Murder Affirmed. Death Penalty Affirmed**

Overview: Appellate documents state Christa Pike killed another female she felt rivalry with and carved a pentagram into her chest.  A group of "others" were named who helped her, but Pike did not provide information about them. Both the Defendant and suspect Tadaryl Shipp wore pentagram necklaces and a "Satanic Bible" was recovered from a search of Shipp's room. The Defendant admitted that she and another person carved the pentagram in the victim's chest. The medical examiner testified that all of the wounds prior to the final blow to the head had been made while the victim was alive and conscious.

The psychiatrist involved thought there were Satanic elements to the crime but believed that Pike was just a "dabbler" in Satanism. A witness stated that as the Defendant described hitting Slemmer in the head with a piece of asphalt and carving a pentagram in her chest, she danced around in a circle, "smiling and singing."

News articles report that an acquaintance of Pike stated she "seemed just like us when she first got here…two weeks later she's talking about the Satanic Bible."

Two years later another news report states Tadaryl Shipp was convicted for this murder:

"A Knox County judge imposed consecutive prison terms Thursday for a young Memphis man who took part in the torture slaying of a Knoxville Job Corps student. Criminal Court Judge Mary Beth Leibowitz said public safety concerns dictate that Tadaryl D. Shipp be imprisoned as long as the law allows. Shipp, 21, had no regard for human life when he helped murder Colleen A. Slemmer, 19, the night of Jan. 12, 1995, the judge said. He treated her with 'gross cruelty' while at least partly satisfying an interest in Satanism, Leibowitz said."

See "Orange County Woman to Die for Tenn. Killing," The News & Observer, April 1, 1996; "Judge Orders Shipp to Serve Life in Slaying, Then Another 25-year Term " Knoxville News-Sentinel, March 12, 1999.

### October 3, 1997, EQUATORIAL GUINEA, An Unnamed Individual was Condemned to Death

Overview: News reports state that an unnamed individual was condemned to death after removing the eyes, tongues, ears, and genitals of his 10 year old victim. Malabo radio reported that 17 ritual murders were committed in Equatorial Guinea in August and September of 1997, according to official figures. --- See "Ritual Murderer of Girl, 10, Sentenced to Death," Agence France Presse, October 3, 1997.

Another news report cites a Spanish journalist and ethnographer, Jose Manuel Novoa, an expert on the country who has conducted investigations in Equatorial Guinea since 1979 and has written two books about cannibalism in the region. Novoa claims that anthropophagy (eating human flesh) is widespread in the country. He stated, "Eating human flesh was a tradition of warriors pertaining to the ethnic group of the Fang, which lives in Equatorial Guinea, Nigeria, Gabon and Cameroon...as they conquered new territories, Fang warriors ate parts of their victims to absorb desirable qualities such as youth and strength...human organs are eaten by members of secret brotherhoods which practice sorcery in forests at night. New members are initiated in ceremonies which invoke spirits...bodies are obtained through murder and robbing them from cemeteries ...the secret groups are known as 'evu societies', because many Guineans believe the human body to contain an organ known as the 'evu.'"... "The human brain is known to be highly toxic, for which reason the cannibals seek to immunize themselves by ingesting potent vegetal poisons in small doses...nevertheless, the cannibalism is believed to have led to a disease known as the kuru." See "Cannibalism Still Common in Equatorial Guinea, Spanish Expert Claims," Deutsche Presse-Agentur, April 5, 1998.

31

In April of 1988, President Omar Bongo met with leaders of the Catholic, Protestant and Moslem communities to discuss possible action against imported beliefs and practice. This action was taken after an admission by a witchdoctor, purporting to belong to a sect based in neighboring Equitorial Guinea, that he had eaten six humans, including two of his own children, over the past decade. The witchdoctor was a railway worker and his followers had killed another victim, a teacher who was seeking help to solve family problems. See "Bongo Denounces Sects in Wake of Gruesome Cannibalism Tale." Reuters (Libreville), April 29, 1988.

The following case involves the author of this archive

**September 23, 1997, SAN FRANCISCO, CALIFORNIA, Aquino v. ElectriCiti, et al., Inc., Media Law Reporter, 26 Med. L. Rptr. 1032, No. 984751, Civil Suit Alleging Infliction of Emotional Distress, and other Claims Dismissed**

Note: Lt. Col. Michael Aquino sued internet provider ElectriCiti, located in San Diego, California, for promoting "defamation," "infliction of emotional distress," and other claims, due to an anonymous person posting information about him on the internet. The author of this archive, Diana Napolis, was this "anonymous" person, who debated with Lt. Col. Aquino while using the pseudonym "Karen Jones" and "Curio" during the years 1995-2000. Lt. Col. Aquino sued, claiming he was "defamed" when it was clear he only wanted the name of the owner of the account in question after military records were posted to the internet, proving he had been processed out of the Army in 1990 after a ritual abuse investigation.

After the Internet provider reviewed the allegedly "defamatory" messages and ascertained that no libel had occurred, they refused to divulge any account name to Lt. Col. Aquino because they believed he was dangerous. ElectriCiti was sued twice, but the claims were ultimately dismissed due to the Communications Decency Act, which precluded internet companies from being held liable for messages written by their customers.

The Media Law Reporter gave an overview of the complaint but unfortunately quoted Aquino's description of the "facts." They wrote that "Curio" stated the Aquinos were the "ring leaders of an international conspiracy to further the satanic ritual abuse of children, and that they engaged in kidnapping, cannibalism and murder of anyone who stood in the way of this international conspiracy."

Lt. Col. Aquino submitted this information to the Media Law Reporter for reasons unknown, even though this author never made those particular statements at the time. However, due to new information which has been reviewed, namely a publication by John de Camp, "The Franklin Coverup," (1996) which alleges criminal activity by Michael Aquino, Noreen Gosch's book, "Why Johnny Can't Come Home," (2000) which alleges that Aquino paid for the kidnapping of her child, and other confidential information about the Presidio investigation, it does appear that the above statements are absolutely correct.

32

Lt. Col. Aquino claimed he was not processed out of the Army in 1990; however, according to a letter from the National Personnel Records Center, dated December 1, 2006, his dates of service in the Army were from June 14, 1968 to August 31, 1990. Aquino is known for frivolously suing anyone who mentions this fact. [Aquino v. TimesWarner/Linda Blood, Aquino v. Lockwood]

An internet metasearch reveals 70 web pages which describe this lawsuit [Aquino v. ElectriCiti.] See news articles: "Internet Provider Sued Over Postings," San Diego Union-Tribune, June 24, 1997; "Wired News Flash, Satanist Sues ISP to Silence Usenet Poster," San Francisco, Business Wire, May 22, 1997; [See cases in this archive: Aquino vs. Stone, Presidio Army Base, People v. Daryl Ball, Fort Bragg/Jubilation Day Care Case].

A lawsuit is pending against Lt. Col. Aquino due to his continued efforts to violate the authors First amendment rights to free speech.

### May 13, 1997, J. P. v. CLARENCE CARTER, COMMISSIONER OF THE VIRGINIA DEPARTMENT OF SOCIAL SERVICES, COURT OF APPEALS OF VIRGINIA, 485 S.E.2d 162, 1997 Va. App. LEXIS 310, True Finding of Child Molestation Affirmed

Overview: Appellate documents state that on May 8, 1993 the Arlington County Police Department received a report that two children had been sexually molested by appellant, their thirteen year old baby sitter. Their report included claims that the appellant, J. P., conducted Satanic rituals, used a "magic" crystal and a "magic" ring, as well as allegations of statutory rape, sodomy, and aggravated sexual battery. The 13 yr. old female minor, J. P., was found to have molested two children in the context of Satanic ritual ceremony while she was babysitting them. The kids reported to their parents and investigators that: "...[appellant] had undressed and fondled [one child] on these two different occasions, performed oral sodomy, had [him] touch her breast and sat on top of [him] and quote 'hurt his penis.' [Appellant] allegedly had [the other child] draw a pentagram and circle and told [him] this is where to love Satan while she fondled his penis. . . [The children's mother] said the boys reported that [appellant] talked of Satan's power and that she would kill them and their parents if they told anyone what happened. This minor's name was submitted to the central registry as a founded sexual abuser."

### May 13, 1997, ADOPTION OF QUENTIN & OTHERS, SUPREME JUDICIAL COURT OF MASSACHUSETTS; 678 N.E.2d 1325, 1997 Mass. LEXIS 104, Order Granting Petition to Dispense with Consent to Adoption of Three Children Affirmed

Overview: Appellate documents state Department of Social Services planned to adopt out the children of the father and mother. The parents appealed and the court briefly describes Social Services case for neglect, sexual molestation, and statements of the children. While describing the past history of the father, the court writes:

"In 1983, the father joined a religious organization called Orlo Templi Orientis and studied the so-called 'Satanic Bible.' In January, 1984, he was convicted of grave robbing,

and sentenced to two months in jail. After release, he returned to his transient life-style, alternating between Los Angeles and San Francisco."

"The eldest child, E. was diagnosed as suffering from posttraumatic stress disorder. During an interview with Dr. O'Connell, she stated that "her 'Daddy's a witch;' that 'bad witches took my picture with no clothes on;' that '[Paul, a friend of the father] calls me his girlfriend;' that [Paul] took pictures of her with no clothes on; that [Paul] said not to tell; that she and her mother were tied up together with no clothes on while her father had no clothes on; and that the witches 'shared weenies' and tried to touch her with their weenies but that she ran away." Two licensed social workers who evaluated the children testified that they were suffering from effects of post traumatic stress disorder.

[Two companion cases are described below]

## December 23, 1996, DAMIEN WAYNE ECHOLS AND CHARLES JASON BALDWIN v. STATE OF ARKANSAS, SUPREME COURT OF ARKANSAS, 936 S.W.2d 509; 902 S.W. 2d 781 (1995), Convictions and Sentencing for Murder Affirmed

Overview: Appellate documents state Damien Echols and Jason Baldwin were jointly tried and convicted for killing three 8 yr. old boys. Their accomplice, Jessie Misskelley, confessed and implicated both Echols and Baldwin in the murders. Misskelley was tried separately. In an appellate opinion dated July 17, 1995 (902 S.W.2d 781) Echols had previously appealed his case but filed a motion specifically waiving all points concerning his death sentence. The appellate court ordered the case back to the lower court to address Echols competency to waive an appeal of the death penalty. Echols finally decided to appeal his death sentence but the sentence was upheld.

One jury member received a death threat, another had received a threatening phone call during the trial. In the courts overview of the sufficiency of the evidence arguments, there were detailed descriptions of the three victims bodies, they'd been beaten and stabbed, and there were injuries to the genital area, evidencing forced oral sex. There was evidence of castration regarding child victim, Christopher Byers. "The skin of the penis had been removed, and the scrotal sac and testes were missing."

When asked by police how he thought the boys had been killed, Echols gave them statements not yet publicly known. On the witness stand, Echols testified that he'd read these facts from the newspaper. When the newspapers were shown to him, Echols admitted the information he was referring to was not in them and he didn't access the information in question from the newspaper after all. Two witnesses testified they overheard Echols admit he killed the three boys and that he was going to kill two more. The state thought the killings had been performed in a satanic ritual and an expert witness on the occult gave that opinion also. Echols admitted to being involved in the occult; items in his home included journals that had references to "morbid images, spells, and dead children." His parents had concerns about his involvement in "devil worship."

Medical records contained statements by Echols about his belief system: "People are in two classes, sheeps and wolves, and the wolves eat the sheep." He thought he obtained power from drinking the blood of others, especially from his sexual partners.

In regards to whether the field of satanism has scientific validity, the court notes:

**"Echols next contends that Dr. Griffis should not have been allowed to testify that the murders had the 'trappings of occultism' because there was no testimony that the field of satanism or occultism is generally accepted in the scientific community. The argument is without merit, as the trial court did not allow the evidence to prove that satanism or occultism is generally accepted in the scientific community. Rather, the trial court admitted the evidence as proof of the motive for committing the murders."**

In regards to Jason Baldwin, a witness testified that Baldwin spoke of the murders. "He told me he dismembered the kids, or I don't know exactly how many kids. He just said he dismembered them. He sucked the blood from the penis and scrotum and put the balls in his mouth."

------------

### April 1, 1996, JESSIE LLOYD MISSKELLEY, JR. v. STATE OF ARKANSAS, SUPREME COURT OF ARKANSAS, 915 S.W.2d 702, Convictions for First and Second Degree Murder Affirmed

Overview: Appellate documents state three 8 yr. old boys were brutally murdered, raped, and mutilated in Arkansas by Jesse Misskelley and two other accomplices-- Damien Echols and Jason Baldwin. The case against Misskelley was primarily based on his confession and supporting circumstantial evidence. "Misskelley stated he had been involved in a cult for three months, they met in the woods, they engaged in orgies and, as an initiation rite, the killing and eating of dogs. At one cult meeting, he saw a picture that Echols had taken of the three boys. Another witness testified that she had attended a Satanic cult meeting with Echols and Misskelley. A doctor offered testimony that the type of cuts in one of the victim's genital area required the use of 'skill and precision.'"

### October 25, 1996, ST. CLAIRSVILLE, OHIO, BELMONT COUNTY COURTHOUSE, Case No. 96CR-28, Nathan Brooks Found Guilty of Murder and Sentenced to Two Consecutive Life Terms

Overview: News reports state Nathan Brooks was found guilty of the mutilation slaying of his parents. He decapitated his father and his mother was hacked to death. Brooks told the officers he used the head in a Black mass ritual that he believed would increase his Satanic powers. He said he had also planned to kill a younger brother, but the youngster was visiting a friend. See "Man to be Jailed at least 43 Years in Satanic Killings," Columbus Dispatch, October 25, 1996; "Man Guilty in Parents Slayings: Deaths Were Part of Satanic Ritual, Son said in Statement," Columbus Dispatch, October 22, 1996.

**July 16, 1996, IN INTEREST OF P. J. M.,/E. C. M.,/J. W. M., MINORS, MISSOURI COURT OF APPEALS, 926 S.W.2d 223, Termination of Parental Rights Affirmed**

Overview: Appellate documents state this self-described Satanic family had been in and out of social services for many years resulting in their parental rights being terminated as to three of their seven children. The father had hit their 3 months old child while striking at the mother, and knocked that child to the ground. Later the child and mother fell from an automobile operated by the father while attempting to avoid apprehension.

There was constant and severe domestic violence; the father continually abused the mother, including using a cattle prod to electrically shock her, shot her with a gun, cut her with a razor blade and violated her with a baseball bat. The mother then claimed she made up the story, although physical evidence was discovered, she had a stab wound in her side and she was bleeding internally. She also related past abuse by the father, including being raped, shot, stabbed, and of attempts to cut her throat and cut off her arm.

Both parents had been arrested for the rape of a teenager, but the witness wouldn't testify so the charges were dropped. Both parents had tried to commit suicide and were involved in drug usage, satanic worship, and they sacrificed animals in front of the children. The mother admitted to this activity and to giving the children drugs to forget the ceremonies. The children also stated that this occurred.

**February 29, 1996, BRIAN SIMMONS v. THE STATE OF NEVADA, SUPREME COURT OF NEVADA, 912 P.2d 217, Conviction For First Degree Murder Affirmed**

Overview: Appellate documents state Defendant Brian Simmons shot his high school classmate, 15 year old Jason Kopack. Mr. Simmons had become preoccupied with Satanism, mutilation, rape, and killing. The court notes that in handwritten journals admitted into evidence, Simmons had copied Satanic invocations from books and expressed his desire to please Satan by murdering and mutilating people he knew. He reportedly told his victim's girlfriend that if Satan told him to kill someone, including Jason, he would do so. He had a list of five other individuals he planned to murder.

The court found that a book concerning witchcraft, expressing satanic themes was seized because it was considered relevant to the murder that was under investigation.

**February 6, 1996, SUZANNE HUGHES v. DEPARTMENT OF SOCIAL SERVICES ARLINGTON COUNTY, COURT OF APPEALS OF VIRGINIA, 1996 Va. LEXIS 77, Termination of Parental Rights Affirmed**

Overview: Appellate documents state a baby was removed from the custody of the mother, Suzanne Hughes, after evidence of abuse. The mother was eventually diagnosed with Multiple Personality Disorder [or DID]. The child was returned to her, but after

36

further incidents of abuse and neglect, she was taken into custody again. The mother's counselor testified that the mother stated she was involved with a Satanic cult that killed adults and babies, and they had threatened her. She stated she was involved with them since she was 7 yrs. old and she reported members of the cult abducting and raping her.

Under cross-examination, the mother was asked about the maternal grandparent's failure in reporting her own abuse, and the court was concerned that she was living at the maternal grandfather's home. The trial judge expressed concern over the continued existence of the Satanic cult, appellant's inability to help the police prosecute a member of this cult, appellant's continued residence in the same family home where she had been verbally and physically abused as a small child, and lack of family support that was missing when appellant was an abused child.

The appellate court found that the evidence of Ms. Hughes participation in the cult described was relevant to the proceedings.

### December 19, 1995, JIMMIE LEE PENICK v. STATE OF INDIANA, SUPREME COURT OF INDIANA, 659 N.E.2d 484, Conviction for Murder and Enhanced Sentence Affirmed

Overview: Appellate documents state four practitioners of Satanism, Jimmie Penick, Mark Goodwin, Keith Lawrence, and David Lawrence, conspired and planned to murder a prospective member, William Ault, of their "Satanic Church." All worked at a County Fair. They were concerned that the victim, William Ault, knew about a prior murder. They took him to what he thought was an initiation..."Ault was asked to lay down on a door, which was being used as an altar. Keith Lawrence read an invocation to Satan...Goodwin and the Lawrences made cuts on Ault's chest and abdomen in the form of an inverted cross, as well as other cuts...Penick's own words describe how the victim's chest and abdomen were cut open, how Goodwin tried to cut out victim's heart before he died, and how the victim remained conscious throughout this and responded to questions from the defendant."

The Court found that the aggravators were that Penick rendered his victim physically defenseless prior to torturing and killing him by painful and torturous methods, he dismembered the victim's body and orchestrated and assisted in concealing the victim's remains. There was evidence that victim's chest and abdomen were cut open, that a co-conspirator tried to cut out the victim's ear before he died, and that the victim remained conscious throughout.

Penick dismembered the victim's head and hands and admitted he removed the head to give the skull to a friend. Penick's defense was that he acted under the influence of his strong beliefs in Satanism but that he had converted to Christianity while in prison.

### Nov. 6, 1995, MCINTYRE v. THE STATE, SUPREME COURT OF GEORGIA, 463 S.E. 2d 476, Conviction For Murder Affirmed

Overview: Appellate documents state defendant Robert McIntyre was convicted of murdering a young female victim who was a runaway because she spurned his advances.

Robert McIntyre was a member of a Satanic group of which a Terry Chapman was the leader. Malisa Earnest and the victim were runaways who were given shelter by Chapman.

After the victim rejected McIntyre's sexual advances, McIntyre, Chapman and Earnest discussed killing the victim and agreed to strangle her with a boot lace. McIntyre then took the lace and tightened it around her neck. McIntyre and Chapman sat on either side of the victim's body... "Holding hands, they repeated a Satanic chant."

Terry Chapman and Malisa Earnest were also tried and convicted.

The Court found that the evidence regarding Satanism was properly admitted as motive for the crime.

**November 15, 1995, STEVEN BRIAN ALVARADO v. STATE OF TEXAS, COURT OF CRIMINAL APPEALS OF TEXAS, 912 S.W.2d 199, Convictions and Death Sentence Affirmed**

Overview: Appellate documents state Steven Alvarado killed two people, a mother and son, during a drug deal in 1991 when he was 17 years old. A year or so prior to the murder Alvarado had been in the hospital. The psychologist stated that at that time, based on her reports, the appellant was "violent and dangerous and that he had a full-blown antisocial personality disorder."... He had "no concern for the rights of others, and admitted selling illegal weapons, abusing and selling illegal drugs, sexually assaulting a woman, mutilating human infants in Satanic rituals, and committing numerous other crimes. He was discharged after twelve days in the hospital because he was felt to be a danger to the other patients and that he was not suffering from a mental illness that was treatable, and, therefore under the mental health code had to be discharged."

The Court found that these and other factors supported the jury's finding at the punishment stage of the trial on the future dangerousness of the defendant.

**August 24, 1995, EDWARD BENNETT v. THE STATE OF NEVADA, SUPREME COURT OF NEVADA, 901 P.2d 676; 787 P.2d 797 (1990), Denial of Post Conviction Petition Affirmed**

Overview: Appellate documents state Edward Bennett was sentenced to death for killing a girl. Writings were seized as evidence. Some of the statements included: "There's a problem in this country and has a lot to do with being white. There's too many people with ugly skin."... "I need to kill somebody or tear someone apart. I got to satisfy my need, cure this thirst for blood. So as I make the sacrifice by doing it just for you and kill this child, for it is a first born, I'm giving you my soul, Satan. Where is my reward? My thirst for blood is now calm, but it shall rise again. My power is so strong I need to cause some death. For Lucifer's inside of me, and I don't want to let him out. I look in the mirror, I see him in my eyes. I feel his heart beating in my chest, and I know it is not mine. For I feel so privileged for I'm with number one. I'm so f____powerful and my reign has just begun as I kill and kill again. I feel my rewards come on. My power's

growing even greater. I'm so f___ strong for I am the devil's right-hand man. I carry out his every chore. I make this sacrifice in his name, Lucifer the Great, blood splattered on my face from the kill I've just done."

The prosecutor argued that the murder committed by Bennett was a "random, ritualistic, satanic execution." The Court found that the murder was "ritualistic and satanic," and that was a proper interpretation of the evidence.

**July 5, 1995, STATE OF NORTH CAROLINA v. MICHAEL ALAN PARKER, SR., COURT OF APPEALS OF NORTH CAROLINA, 459 S.E.2d 9, 1995 N.C. App. LEXIS 523, Convictions for Multiple Counts of Child Molestation Affirmed**

Overview: Appellate documents state the defendant Michael Parker thought there should be a mistrial for several reasons, one of which was witness testimony that he threatened to bomb the woman's shelter his wife and family were staying at. Defendant's children all testified to several specific instances of sexual abuse.

The Court described children's testimony: "...Defendant pulled down S's pants and threw her on the floor and inserted a spoon into her vagina and moved it around. Defendant took blood that was on the spoon, put it in a cup and drank it while the others were standing around singing with lit candles."... "S testified that when defendant took her to the woods behind her grandmother's house and abused her in front of several people holding lit candles, another young girl, A Robinson, started screaming at first and then she jumped up and she had no clothes on and she started running and her dad jumped up and started chasing after her through the woods."

On one occasion, defendant took M. to his grandmother's house, where she removed his clothes and got on top of him on the bed and jumped up and down on his private parts. Defendant watched and did nothing. One of the spectators Travis Gordon, put his penis in M's mouth. Defendant also placed his penis in M's mouth. M. Testified to another similar incident with the same 4 people.

The grandmother, Mildred Parker, was named as a co-defendant and was convicted for indecent liberties with a child.

News articles describe the children testifying that Parker raped and sodomized them in the family's trailer near Saluda and in nearby woods, often while other people wearing black pants and white shirts chanted. One child testified that on one occasion, defendant placed a brush handle into her vagina. Medical examinations of the three victims corroborated each of the victim's testimony and indicated a diagnosis of sexual abuse. See "Dad Guilty of Abusing Children Sexually, Eight Life Sentences," Greensboro News and Record, Feb. 6, 1994.

**June 29, 1995, ATHENS, GREECE, Asimakis Katsoulas and Manos Dimitrokallis were Found Guilty of Kidnapping, Rape and Murder . They were Sentenced to Life Imprisonment. Dimitra Maryetti was Found Guilty of Complicity and Sentenced to 23 years**

Overview: News reports state Satanic cult leader Asimakis Katsoulas and his "high priestess," confessed to leading a 20 member Satanic cult which had conducted animal and human sacrifices for three years. They were found guilty of kidnapping, raping and murdering a 30 year old woman and a 15 year old girl during occult ceremonies. The first victim was killed at her initiation ceremony. Katsoulas claimed he was the vehicle for "ancient demons." Another witness was abducted when the murderers told her they were police officers who wanted to question her. See "Two Young Men Confess to Rape, Murder of Two Women as Part of a Satanic Cult Ritual, Police said," AP, Dec. 28, 1993 and "Court Convicts, Sentences Two to Life Terms for Murder," AP, June 30, 1995; "Dark Trial of Yong Greek Satanists Grips Public," June 29, 1995.

**December 30, 1994, IN THE MATTER OF HEATHER BARKER, NEGLECTED CHILD, COURT OF APPEALS OF OHIO, SEVENTH APPELLATE DISTRICT, HARRISON COUNTY, 1994 Ohio App. LEXIS 6100, Juvenile Court Decision to Grant Permanent Custody to DHS affirmed**

Overview: Appellate documents state that at the age of 5 years Heather Barker was taken into custody by DHS due to physical injuries to her genital area. Cumulative testimony proved to the court that she had been sexually molested by clear and convincing evidence, although there was no obvious perpetrator to hold accountable. The mother was cited for neglect and was given 18 months reunification services but that did not alleviate the problems which brought the child into custody. Social Services did not believe the mother could protect the child. The child was prone to "trance-like" states after unsupervised visits with the mother and other unusual behavior. Both a treating psychologist and social worker evaluated the child and thought she had been ritually sexually abused based on her statements. A trial took place contesting these matters and the court amended the abuse complaint, based on clear and convincing evidence, to a finding of neglect as well.

**September 10, 1994, ARIZONA, PINAL COUNTY SUPERIOR COURT, STATE OF ARIZONA vs. EDWARD G. CANNADAY, DEFENDANT, Sexual Conduct with a Minor, Sentenced to 20 years // Co-Defendant, STATE OF ARIZONA, PLAINTIFF, vs. SHARLOTTE ANN BROWN, DEFENDANT, Case No. CR 16909, Convicted of Contribution to the Delinquency/Dependency of a Minor, Sentenced to Probation**

Overview: News articles state the children of Edward Cannaday (misspelled as Canaday in newspaper article), 38, a former pastor, claimed that their father and his three retarded brothers were part of a satanic cult that sacrificed animals, babies and children, and engaged in family group sex in the desert west of Coolidge in 1988. Cannaday was accused of having sex with and fondling his daughters and step-daughter, then 5, 10 and 11, and molesting his 6 year old son. All of the children were placed in foster homes.

Police heard reports during the late 1980's that dozens of dead bodies had been seen, but none were found, and no charges were filed, but still unexplained were bone fragments, bits of clothing and scraps of duct tape that were found.

Five other relatives were indicted on charges ranging from aggravated assault to child molestation but charges against the three younger brothers were dropped when they were declared incompetent to stand trial.

After a three-week trial Edward Cannaday was convicted of sexual molestation of a child. The defense attorney didn't dispute that the children were chronically abused which testimony and medical evidence suggested. His co-defendant and sister, Sharlotte Ann Brown, was convicted for contributing to the delinquency of a minor.

See "Man Could Get 162 Years in Molestations," The Arizona Republic, September 10, 1994; Ex-Pastor Sentenced On Child-Sex Charges, The Arizona Republic, November 19, 1994.

**October 26, 1994 , PEOPLE OF TEXAS v. FRANCES AND DANIEL KELLER, COURT OF APPEALS, Both Cases Upheld on Appeal No. 3-92-603-CR and No. 3-92-604-CR, Convicted for Aggravated Sexual Assault on a Child upheld; Sentenced to 48 years**

Overview: Appellate documents and news articles state Defendants Dan and Frances Keller were indicted in Travis County, Texas. They arranged to surrender to police but fled to Las Vegas instead after Dan Keller dyed his hair. The police tracked them down and arrested them in Las Vegas. The Kellers had a joint trial after which a jury found them guilty of sexually abusing a three year old girl. A doctor had found lacerations to the labia and hymen of the child that were consistent with an allegation of sexual abuse.

News reports state that more than one child was thought to have been abused at "Fran's Day Care" in Austin, Texas, operated by the Kellers, but this particular case cites their conviction of only one 3 ½ year old child. A 6-yr-old child, who also claimed to be a victim, testified on the behalf of the 3 1/2 year old and called Fran's Day Care, "Fran's Hate Care." About eight children were in therapy due to the abuse.

The children described ritual acts: being terrorized in a graveyard, seeing animals killed, being buried alive with animals, painting pictures with bones dipped in blood, being shot and resurrected, being stuck with needles and drugged, and seeing bodies dug up and mutilated with a chainsaw. A child led an investigator to a graveyard where they found animal bones. Parents reported children who were terrified of baths, children who believe they must kill themselves on their birthday, children who were afraid of ponies, fearful they will be put in jail, and children who could conduct a séance, complete with otherworldly "chants."

Children spoke of being forced to close their eyes while the Kellers took a meat cleaver and pretended to chop off their fingers and toes. One child peeked and saw Dan Keller pull a bone from a bag and smear it with blood from a jar and realized the perpetrator had tried to fool him. The child was forced to paint a picture with "Satan's arm" dipped in blood.

They spoke of seeing the Kellers place infants in the backyard swimming pool and letting them sink. Frances Keller would then remove the baby from the bottom of the pool, baptize it with blood, and offer it to Satan. The Kellers reportedly killed a baby named

41

Rachel by cutting her heart out. The heart was placed in a child's hand who described it going "thump, thump, thump until it stopped." The body was put in the swimming pool, and its skin and eyeballs buried in a hole.

One boy said a gun was held to his head while he was forced to molest his infant sister. When the pornographic movie was replayed for him, the gun was not visible and he realized he'd been tricked. At least three children developed an "eerie habit of behaving like cats. In sudden realistic transformations, parents say, the children would crawl, meow, hiss and demand food from bowls." One parents stated her daughter told her they were taken to an actual jail cell, and she was put in there with a kitten, and then it crawled through the bars and the perpetrators stomped on the cat, cut it up, and told them if they told, that's what would happen to them. They would show the children their parent's payment in check and would say, "See? Your mommy pays us to do this to you." The children then hatched a plan to try to kill Dan Keller. Texas Ranger Johnny Waldrip said he believed the kids wholeheartedly and thought they were subjected to ritualistic acts so they would be discredited. A therapist and expert witness testified about the reality of ritual abuse for the jury.

The defense lawyers used videos showing some the younger child recanting, saying the abuse never happened, in efforts to try to undermine the case. The defense also stated that the claims were "too outlandish to be believed" because the children also spoke of going on airplane rides and seeing a baby killed. The parents claimed that one of the perpetrators was flashing threatening hand signals during the child's testimony.

Another mother said,"I put my son in a mental hospital as a result of this abuse (by the Kellers), and it's only been through over a year of intensive psychotherapy that he's begun to partially heal."

Three other people were indicted for sexually abusing children at this daycare. They were Douglas Perry, a Travis County road maintenance worker, Janise White, a Travis County constable – Perry's wife, and Raul Quintero, another Travis County constable and White's partner. Douglas Perry was originally given immunity but denied any knowledge of events on the witness stand. Prosecutors then introduced a statement written by Perry on July 7, 1992 which was read to the jury. The statement described sexual activities with two children by the aforementioned individuals. He confessed to tearing a head off a doll and threatening the children that if they told, their heads would come off the same way

Perry eventually pleaded guilty to a charge of indecent acts with a child and he received 10 years probation. Indictments against White and Quintero were dismissed. Parents of two children filed a civil suit holding these three people accountable for not reporting the abuse, but the case was dismissed.

See "Speaking the Unspeakable/Nightmares of Fran's Day Care Stalk Families," Austin American-Statesman, Dec. 13, 1992; "6-yr-old Testifies He Witnessed Abuse of girl," Nov. 24, 1992; "Kellers Found Guilty of Sexual Assault," Austin American Statesman, Nov. 26, 1992; "Therapist Describes Ritualistic Abuse Claims," Austin American Statesman, Nov. 20, 1992.

**August 16, 1994, STATE OF NORTH CAROLINA v. PATRICK S. FIGURED, COURT OF APPEALS OF NORTH CAROLINA, 446 S.E. 2d 838, Convictions Affirmed For First Degree Sexual Offenses**

Overview: Appellate documents and news articles state Patrick Figured, 41, a former executive of an electronics company, entered an Alford plea of guilty to three counts of first degree sex offenses. The State agreed to dismiss the charges against a co-defendant, Sonja Hill, 34, who was Figured's girlfriend.

In July of 1990, the outgoing DA re-indicted Sonja Hill on the same charges. Figured filed a motion to have his guilty pleas set aside due to the DA violating terms of the agreement. On March 9, 1992, the Grand Jury re-indicted Figured for three counts of first degree sex offenses which occurred in 1988. The Court noted that each child who testified stated that the defendant inserted a screwdriver in his or her anus. Physicians found physical abnormalities in these children. Two of the children testified that the defendant made a dog urinate and forced the children to drink it. The Jury heard how Figured and his girlfriend, Sonja Hill, would drug and then molest the children at the unlicensed child care center in the Smithfield home of Hills' mother, Virginia "Polly" Byrd. The children testified that there were video cameras present when Figured sodomized them. Figured was then convicted of all charges.

Sonja Hill was convicted of indecent liberties with a child on 7/28/93

News articles describe this case as one involving child pornography, satanic rituals, and animal abuse. Parents of children who were abused filed a civil suit against Sonja Hill and her mother, Polly Byrd, who ran the daycare center. They alleged that their children had been forced to participate in Satan worship while being abused. The kids spoke of having to drink blood, their abusers burned Bibles, and wore masks and capes. Mr. Figured told the children that he did not believe in God.

Sonja Hill and her mother did not respond to the lawsuit, but a Johnston County jury awarded a $10.5 million judgment to the parents who did not believe they would ever collect the money but wanted other people to know that these acts do occur. See "Raleigh Man Sentenced to 3 Life Terms for Abuse," News and Observer, Oct. __1992

"Johnston Couple Win Child Sexual Abuse Suit," News and Observer, March 27, 1990.

**April 12, 1994, IN RE: CHRYSTAL AND TASHA, SUPERIOR COURT OF CONNECTICUT, JUVENILE MATTERS, 1994 Conn. Super. LEXIS 1061, Termination of Parental Rights Affirmed**

Overview: Appellate documents state that children Chrystal and Tasha were in several placements over a period of 4 years after a finding of neglect in Juvenile court. The mother was in and out of prison due to drug usage and sales. A Social worker who had worked with Tasha four days out of the week in the hospital noted that one of the children had been diagnosed with Multiple Personality Disorder [or DID] and had been subjected to Satanism. The Court said that because of the introduction of evidence of

43

ritual or Satanic sexual abuse, which came to light only after that child's commitment in 1989, it could account for her fragile emotional condition. It was not clear whether the incidents took place with the biological mother or in the foster homes the child was in over the years where allegations of abuse had been confirmed.

The Social worker could not eliminate the mother's home because Tasha identified her mother as a "ghost" and expressed fear of her. The child had referred to her mother as "Natas," which is Satan spelled backwards. Tasha recognized her mother as "Mama Dawn," one of the "Mamas" who involved her in the terrifying experiences she recounted from the Satanic ritual abuse connected with the Church, and feared her. Contact with her mother was suspended when the child began exhibiting negative behaviors after visitations or after other types of communication.

### March 22, 1994, COMMONWEALTH OF PENNSYLVANIA v. RICKIE JAY GADDIS, SUPERIOR COURT OF PENNSYLVANIA, 639 A. 2d 462, 1994 Pa. Super. LEXIS 963, Sentence Affirmed, Fine Vacated

Overview: Appellate documents state that the consolidated appeals were taken from the judgments of sentence imposed on February 9, 1993 against the father, Rickie Gaddis. He was found guilty in two separate trials of more than 150 counts of aggravated assault; recklessly endangering another person; terroristic threats; endangering the welfare of children; corruption of minors; false imprisonment; simple assault; prohibited offensive weapons; rape; statutory rape; involuntary deviate sexual intercourse; aggravated indecent assault; indecent exposure; incest; and criminal conspiracy.

The charges arose from the "horrific sexual, physical and emotional" abuse and neglect by Rickie Jay Gaddis, of his minor children. Gaddis was sentenced to "235 to 470" years in prison. The appellate court affirmed his sentence but vacated his fine. There had been concern he was going to capitalize on his crimes by selling a book.

News reports quote the police, stating the children were subjected by their parents and neighbors to ritualistic torture that included bloodlettings with a sword, Satanic ceremonies, hot needles under their fingernails, sodomy, stretching and tattooing. The children told police of Satanic rituals in which their 34 year old father used ceremonial swords to draw blood from adults and children to pour on the grave of a daughter killed in a fire three years ago. Also arrested were a 39 year-old man and three juveniles who lived with him, a 41 year-old man, and a 29 year-old man, visitor to the house.

Rickie Gaddis' wife, Debbie Louis Gaddis, 33, was also convicted.

In news reports dated 2006, Ricky Gaddis requested release from prison due to health woes but the Judge denied his request. He was described as a notorious child rapist/torturer and quoted his children's testimony about how he ruled over them with the claim of having "special powers."  See "Pa. Couple is Charged with Torturing Children: Police Say Neighbors Also Took Part in Abuse," The Atlanta Journal and Constitution, November 26, 1991; "Pennsylvania Couple Charged with Brutalizing their Children," The Washington Post, November 26, 1991; and "Parents Charged with Torturing their Children," Associated Press, Nov. 25, 1991; "Gaddis Released Denied: Judge Unmoved

44

by Health Woes," Tribune-Democrat, December 9, 2006; "Child Abuser Seeks Prison Release," Tribune-Democrat, September 30, 2006.

**Dec. 27, 1993, WASHINGTON D.C., U. S. News and World Report, "'Through a Glass, Very Darkly': Cops, Spies and a Very Odd Investigation"**

Overview: This news article cites that the Justice Dept. was reinvestigating the Finders case and that some of the unresolved questions were allegations that the Finders Group were linked to the Central Intelligence Agency and they wanted to know whether or not the investigation into their activity had been closed inappropriately. "The many unanswered questions about the Finders case now have Democratic Rep. Charlie Rose of North Carolina, Chairman of the House Administration Committee, and Florida's Rep. Tom Lewis, a Republican, more than a little exercised. Could our own government have something to do with this Finders organization and turned their backs on these children? "That's what all the evidence points to," says Lewis, and there's a lot of evidence."... "Law enforcement sources say some of the Finders are listed in the FBI's classified counterintelligence files."

As background, in early Feb. 1987, six children were taken into custody in Tallahassee, Florida. Two men were charged with child abuse, but charges were dropped. The men said they were transporting these children to Mexico to a school for brilliant children. Their mothers were located in a group called the Finders. At the same time, Washington, D.C., police and U.S. Customs Service agents raided a duplex apartment building and a warehouse connected to the group.

Customs Reports dated 2/12/87 and 4/13/87 cite that among the evidence seized were detailed instructions about obtaining children for unknown purposes around the world, child trafficking, instructions to keep the above six children moving, and how to avoid detection. There were several photographs of nude children that appeared to "accent" the child's genitals, photographs of children involved in underlined animal rituals, an altar, jars of urine and feces, and a staging area, all of which appeared to the Custom's Agents as an "indoctrination" center. Custom's agents were told to drop their investigation because it had become a "CIA internal matter," a fact which is documented in the Custom's documents.

*According to U.S. District court records, a confidential police source reported that the Finders were a "cult" that used "brainwashing" techniques. The source told of being recruited by the Finders with promises of financial reward, sexual gratification, and of being invited to explore satanism with them.*

Officials of the U.S. Customs Service, called in to aid in the investigation, said that the material seized included photos showing children involved in bloodletting ceremonies, of animals, and one photograph of a child in chains. Customs officials said they were looking into whether a child pornography operation was being conducted. See Officials Describe 'Cult Rituals' in Child Abuse Case," The Washington Post, Feb. 7, 1987. Contact the author for copies of the Customs Reports.

**December 14, 1992, THE STATE OF TEXAS vs. PHIL STANLEY ROGERS; CASE NO. 18, 738, Charged and Pleaded guilty to "Indecency with a Child, Younger than 17 years, Committed During the Course of a Ritual." Jury sentence – 99 years**

Overview: Court documents and a news article state that Phil Stanley Rogers plead guilty to Indecency with a Child during the course of a Ritual. Items taken as evidence included books covering Satanic topics, pentagram symbols, candles, daggers and wands. An Abilene Police specialist on the occult explained how the items were used to gain "power and control." The 15 year old victim, a relative of the defendant, cried as she testified that the rituals began with the purchase of a Ouija board, chanting, and meditation were next. See "Man Admits Indecency with Child During Course of a Satanic Ritual," Abilene Reporter News, Dec. 15, 1992.

Note: Mr. Rogers was convicted under a ritual abuse law that was in the Texas penal code in 1992 but it has since been rescinded.

**April 29, 1992, IN THE MATTER OF THE WELFARE of J. M. P., COURT OF APPEALS OF MINNESOTA, 1992 Minn. App. LEXIS 436, Termination of Parental Rights Affirmed**

Overview: Appellate documents state the mother of J. M. P, Sharon Pieske, challenged the trials court's termination of her parental rights. The court noted that her past included "years of sexual and physical abuse, parental neglect, early and long-standing addiction to numerous drugs, serious mental health problems, and involvement in a Satanic cult." Her child was taken into custody after two hospitalizations due to overdosing. The mother was involved in four incidents, three involving criminal convictions, which caused harm to the children, including J.M.P. The child was enuretic, periodically preoccupied with themes of violence and bodily injury, and her "disorder is not curable." The mother tried to commit suicide, and was diagnosed with borderline personality disorder.

**May 9, 1992, ORLANDO, FLORIDA, ORANGE COUNTY COURTHOUSE, James L. Wright, Case No. CR0911814-A, was Convicted of Raping and Fondling Five Children; Margie Wright, Case No. CR0911814-B, Pleaded No Contest to Three Charges of Attempted Sexual Battery and Two Charges of Attempted Lewd Acts and was Sentenced to 5 1/2 years in Prison**

Overview: Three news articles describing this case state that Jim Wright, 36, and Margie Wright, 29, were charged with molesting children in the context of Satanic rituals. The victim's parents met the Wrights through their Church and Bible classes they attended together. The children reported that they saw Wright sacrifice a stray dog, slit its throat and stomach, and remove some entrails. He held up the entrails for the children to see and said the same thing could happen to the children if they "tattled." Sheriff's investigators found the dog's skeleton near the Wright's trailer.

46

A psychological evaluation of three boys said there were strong symptoms of sexual abuse associated with the cult activity. A 9 year old girl told investigators that Jim Wright forced her to have oral sex with him at gunpoint. "I didn't tell because I was scared," said a child. "Jim had a gun and said he'd kill my family, and he put a bad curse on us. Jim said devil words to us."

The Wrights molested children during their "Magic Show"; the victims said he pulled a gun out of a hat and made their underwear "disappear." The children described Satanic symbols, chalices filled with blood, and a box containing a corpse.

The parents of three of the victims moved residences and the prosecutor expressed concern because the children had been threatened by the cult not to testify. The parents said cult members had come to their house to take the children to stop them from testifying against the Wrights. The children had to be moved to a secure location due to the threats.

Maggie Wright testified against her husband while she pleaded no contest to reduced charges. See "Convict's Wife Sentenced for Trying to Molest Kids," Orlando Sentinel Tribune, May 9, 1992; "A Family Fears That Satanic Cult Will Try to Silence their Sons," Orlando Sentinel Tribune, August 10, 1991; "Child Abuse Suspect Trades Testimony for Lesser Charges," Orlando Sentinel Tribune, January 31, 1992.

**January 22, 1992, THE STATE OF WASHINGTON v. PAUL ROSS INGRAM, COURT OF APPEALS OF THE STATE OF WASHINGTON, No. 13613-9-II, Division Two, Confession to Sexual Molestation and 20 yr. Exceptional Sentence Affirmed**

Overview: The Appellate court stated Paul Ingram, former Thurston County Chief Civil Deputy Sheriff and 16-year law enforcement officer, was arrested on November 28, 1988 following allegations of sexual abuse made by his daughters, then 18 and 22 years old. Ingram waived his right to counsel and made incriminating statements. After six months of further investigation and interrogation, Ingram was charged by amended information with six counts of rape in the third degree - three counts per daughter - covering July through October 1988. He tried to withdraw his guilty plea but that was denied.

In May of 1989, Ingram signed a statement pleading guilty, acknowledging that he had sexually abused his daughters. The trial court had meticulously questioned Ingram about each element of the crime. Ingram stated on the record that the plea was voluntary. In October of 1989, Ingram sought to withdraw his guilty plea. He claimed that the original plea was the result of influences, including deception, brainwashing, religious and familial coercion. Dr. Richard Ofshe, a sociologist, testified for Ingram, stating that he thought the plea had not been entered in a knowing matter but was the result of fantasies created from intensive coercion. However, the three psychologists who testified for the State all agreed that Ingram's statements were real recollections and not the products of any trances or hypnosis. Bill Lennon, originally hired by the defense, eventually submitted a report that reflected statements made by Ingram, acknowledging long term abuse of his children and involvement in incest, sodomy, and homosexual activity.

47

"Ingram's Nov. 28 statement to officers were made before any contact with psychologists, his wife's pastor, or his wife's attorney, and contains virtually uncontestable evidence of guilty. Ingram confessed to using sex practices to prevent pregnancy with one of his daughters and of that daughters abortion in another county when she became pregnant by him, and of having anal intercourse with the daughter during her menstrual period so that the bed wouldn't get 'messed up.'"

Aggravating factors found were that Ingram threatened to kill his victims and the court concluded that the threats demonstrated deliberate cruelty.

Note: Paul Ingram, ostensibly a Christian man, confessed to police officers that he ritually abused his children in the context of Satanic ceremony, which his daughters also claimed took place. Richard Ofshe of the FMSF tried to talk Ingram out of his confession by claiming he confessed in a "trance-like" state and "proved" that by suggesting to Ingram a case scenario which very well could have occurred. Both Ofshe and Elizabeth Loftus, of the False Memory Syndrome Foundation, testified at Ingram's clemency hearing trying to assist in obtaining his release. According to news articles and the Clemency Board Transcripts, dated June 7, 1996, Ingram's son also attended that particular hearing and asked the board to keep his father in prison because he had been physically and sexually abused by him, which the board did. See: "Felons Hope for a Parting Gift from Lowry," Seattle Times, Dec. 12, 1996, Clemency Court Transcripts can be ordered at: (360) 753-6780.

For documentation of the satanic allegations, see "Remembering Satan - Part I," The New Yorker, May 17, 1993; "Remembering Satan - Part II," The New Yorker, May 24, 1993, by Lawrence Wright. The conclusions Mr. Wright reaches are closely aligned with the False Memory Syndrome Foundation. However, because this organization does not believe in the existence of SRA, their observations about individual cases are not particularly important.

Lt. Col. Aquino was implicated in the following four cases

**February 26, 1992, MICHAEL A. AQUINO v. MICHAEL P.W. STONE, SECRETARY OF THE ARMY, UNITED STATES DISTRICT COURT, 957 F.2d 139; 768 F.Supp. 529 (1991), Titling of Officer Affirmed**

Overview: Appellate documents, court documents, news articles, and confidential sources state Michael Aquino, founder of a Satanist group the Temple of Set was a Lt. Col in the Army Active Reserves. After a ritual abuse investigation at the Presidio Army Base where he was stationed, he sued the Army after they "Titled" him under an investigatory report, which was released two months after the criminal statue of limitations ran, for indecent acts with a child, sodomy, conspiracy, kidnapping, false swearing, and for his dismissal from the active reserves in 1990. Only one child victim, the daughter of the Chaplain of the Presidio, was named in the victim block although the word "children" was mentioned throughout the reports.

The child had identified Aquino as "Mikey" and his wife, Lilith, as "Shamby" after she sighted them at an Army PX on August 12, 1987. She told her mother that "Mikey was

48

the 'blood man' because he had put blood on her and licked it off." The CID investigators showed photographs to the child:

"Photographs do show a number of items that corroborate Kinsey's and other children's descriptions of the house where they were taken: (1) masks (2) guns (4) toy animals or dinosaurs (4) a lion picture on the wall and lions on the Egyptian throne (5) a computer (6) camera (7) a black room with soft walls and (8) a robot."

The investigation of Lt. Col Aquino, a very wealthy man, and his wife, Lilith, involved multi-jurisdictions and several children interviewed identified him from photo lineups as their alleged abuser, but the identification of Lilith Aquino was not persuasive. A child stated that during their abuse "Mikey" was dressed in woman's clothes and "Shamby" was dressed in men's clothing.

*An article dated Nov. 16, 1987 entitled "Second Beast of Revelation" in Newsweek magazine described the Presidio Daycare case and noted that Lt. Col. Aquino referred to himself as the Anti-Christ and he had an interest in the Nazi SS.

*In 1994, Temple of Set member Lillian Rosoff filed a restraining order against Michael Aquino, claiming he harassed her for leaving his "Church" after being a member for 18 years. [San Mateo County Superior Court Case #CIV-388423 – Case Sealed].

Internal court documents to Aquino vs. Stone can be ordered from: Office of the Clerk, Albert V. Bryan, US Courthouse, 401 Courthouse Square, Alexandra, Virginia, 22314-5798. Michael Aquino has also been associated with the case of Paul Bonacci, [See US District Court v. Paul A. Bonacci, 1999], and the following three cases in this archive.

See "Sect Founder Says Accuser Not a Member," San Francisco Chronicle, June 25, 1994; "Satanic Chief Tied to Mendocino Sex Abuse," Press Democrat, May 15, 1989; "Preschool Child Sex Abuse: The Aftermath of the Presidio Case," Journal of Orthopsychiatry 62 (2), April 1992, by Diane Ehrensaft, Ph.D; Books: "The New Satanists," by Linda Blood, 1994; "Why Johnny Can't Come Home," by Noreen Gosch, 2000.

## 1989, SAN FRANCISCO, CALIFORNIA, PRESIDIO ARMY DAY CARE CASE, Monetary Settlement with parents

Overview: News reports state that on Jan 5, 1987 Gary Willard Hambright, Presidio Daycare employee, was indicted for molesting one child who had been sodomized, but after a year of investigation, more than 30 victims at the Presidio Army Base had been identified. Children gave statements about being ritually abused, they were taken off base to private homes, and they claimed other perpetrators were involved in their abuse. The children alleged they were sexually abused,  forced to urinate and defecate on Gary Hambright – and he would do the same to them - and they were forced to drink urine and eat feces.

One child said she played "pop poo baseball" at the home of one of her female teachers. Some children said they had blood smeared on their bodies, had guns pointed at them,

and were threatened that if they told about the abuse their parents would be killed. Many children said their abuse occurred during satanic rituals. Inside a concrete bunker behind the Military Intelligence Building at the Presidio, the words "Prince of Darkness" were painted. Another wall was covered with the numerals 666 and occult drawings.

In the early 1980's, a gardner's shack adjacent to the Presidio was raided. They found a pentagram on the floor and dolls heads on the ceiling. Two investigators were given permission to set up surveillance on the shack but they were then told to call it off. "We were sitting there, we've got a cult on the Presidio of San Francisco and nobody cares about it," said one investigator.

Three months after the indictment of Hambright, charges were dismissed without prejudice. The court would not allow hearsay evidence and ruled the victim could not qualify as a witness because of his age. Hambright was reindicted on Sept. 30 1987 for molesting 10 children. At that time he suggested there were other people involved. The US Attorney was criticized for not including children in the case who had persuasive evidence of molestation, but she did not want to present the more "bizarre" elements before a jury. She decided that Federal Jurisdiction in the case ended at the boundaries of the Presidio, which meant children who claimed they were taken off base could not be used as witnesses, and the case was dismissed. Gary Hambright later died of AIDS. The parents alleged a cover-up and after the investigation 23 children filed a $55 million claim against the Army.

Lt. Col. Michael Aquino was questioned in this case. [See Aquino vs. Stone] See "Satanic Priest Questioned in New Sex Case," San Jose Mercury News, May 13, 1989; "CHILD ABUSE AT THE PRESIDIO, THE PARENTS AGONY, THE ARMY'S COVER-UP, THE PROSECUTION'S FAILURE, San Jose Mercury News, July 24, 1988. The Army's settlement with the parents is documented by Presidio parent Sue Dorsey.

### September 21, 1988, PEOPLE v. DARYL T. BALL, SR. AND CHARLOTTE THRAILKILL, SUPERIOR COURT OF CALIFORNIA, COUNTY OF SONOMA, SCR 14750-C, Pleaded no contest to lewd and lascivious acts

Overview: This case was described by the prosecutor as involving multi-victims/perpetrators and ritual abuse although only Daryl Ball and Charlotte Thrailkill were the only ones charged. In an arrangement designed to spare the children the ordeal of testifying, Daryl T. Ball and Charlotte Thrailkill pleaded no contest to a total of nine counts involving lewd and lascivious conduct with six children. Ball was sentenced to 24 years in prison, Thrailkill was given a 14 year prison term.

Officials who interviewed and examined the children said there was no question they had been the victims of repeated and severe sexual assaults. The probation officers who wrote the presentencing evaluations said the children were in psychological treatment but the damage might be "irreparable."

The prosecutor described the extreme terror the children experienced and how difficult it was for them to testify. During the 18 month preliminary hearing, the children testified

50

that they were threatened to keep quiet or the perpetrators would eat their mothers hearts and make them eat it too. They described being given injections (or were bled), and being tied up. Daryl Ball threatened witnesses to keep them from testifying. The children also described being molested while being filmed with a banner in the background reading "Super Duper Child Molest Day." They were forced to watch the video of their own molest afterwards. A plea bargain was struck, reportedly to spare the kids from having to testify further.

The Criminal Investigative Division of the Army interviewed some of these same children in this case in their "Titling" investigation of Michael Aquino of the Temple of Set. [Aquino v. Stone]

A May 17, 1989 San Jose Mercury news article reports the statements of several parents:

"Ritual Sex Abuse of children has been under investigation in Mendocino County since at least 1984, when several children at the Jubilation Day Care Center in Fort Bragg said they had been sexually abused, tortured and forced to drink blood and eat feces. Debi Withrow, a Ukiah mother of two children who told police and Army investigators that Aquino abused them, said parents hope that their 'children will have their day in court.' Another parent, Dee Hartnett of Santa Rosa, said her daughter also told authorities that Aquino was one of the people who abused her in Mendocino County in 1986. The daughter testified against two of her abusers in a case in Santa Rosa that resulted in plea bargains last year. One of the accused Daryl T. Ball was sentenced to prison for 4 years in connection with the abuse of Hartnett's daughter and five other children. The other, Charlotte Thrailkill, was sentenced to 14 years in prison."

See "Child Sexual Abuse Case Ends with Prison Terms," The Press Democrat, Sept. 21, 1988; "Mendocino County Cops, Parents Seek Help in Child Abuse Probe," San Jose Mercury News, May 17, 1989.

**In Sept. 1998, Charlotte Thrailkill was declared a violent sexual predator -- the first female to have that distinction in California and she was sent to a State Hospital. See, "Thrailkill a Sexual Predator, Ex-SR Woman First in State with Designation," Santa Rosa Press Democrat, Sept. 9, 1998.

### 1984, FORT BRAGG, CALIFORNIA, Barbara and Sharon Orr's Daycare Closed by State, License Permanently Revoked

Overview: Pamela Hudson, L.C.S.W. assessed and treated over 27 children from a Fort Bragg daycare case called the Jubilation Daycare in Mendocino County between the years 1983 and 1990. The children stated the daycare operators and their "friends" abused them. Ms. Hudson described having no prior experience or training about ritual abuse but came to understand it after many years of treating these particular victims. Some of the symptoms the children exhibited were defecating on the floor in certain patterns and lying spread-eagled on the floor as if in crucification. She described children reporting being locked in a cage, their parents were threatened, they were buried in the ground in "boxes," held under water, threatened with guns and knives, injected with needles, bled and drugged, photographed during the abuse, tied upside down over a "star," hung from

51

poles and hooks, had blood poured on their heads, and witnessed the ritual sacrifices of babies, after which they were forced to chant "Baby Jesus is dead."

Jubilation Daycare, operated by Sharon and Barbara Orr (who presented themselves as Christians who held "Bible Study" meetings) was closed in 1984 and their license was permanently revoked after the State Department of Social Services investigated and found sufficient evidence of "child endangerment." There were no medical facilities in that immediate area that could evaluate child sexual abuse, but of all the children taken out of county to medical facilities, all were diagnosed with sexual molestation. Because the perpetrators had four months advanced warning, no other evidence was found, and no criminal charges were filed.

Children from this case also identified Lt. Col. Aquino as one of their abusers. From a 1989 Press Democrat news article:

"Local authorities for almost four years have insisted their investigations are inconclusive about repeated allegations from Debi and Greg Withrow that his two sons, from a former marriage were victims of ritual molestation during ceremonies witnessed by a large group of adults…"

"Last week, criminal investigators with the Army reportedly questioned Lt. Col Michael Aquino the satanic priest implicated in the Presidio case, about allegations he was involved in molestation cases in Mendocino and Sonoma counties. Besides the Withrow angle, Aquino was questioned about sexual abuse at the Jubilation Day Care Center in Fort Bragg."

Lt. Col. Michael Aquino and Lilith Aquino were open satanists and High Priest and Priestess of their own cult, the Temple of Set, for 20 years while Aquino served in the Armed forces. They have never been criminally convicted of any crime.

See book publications: "Treating Survivors of Satanist Abuse," edited by Valerie Sinason, pgs. 71- 81, 1994, and "Ritual Child Abuse: Discovery, Diagnosis and Treatment," by Pamela S. Hudson L.C.S.W., Jan 1, 1991; "Satanic Chief tied to Mendocino Sex Abuse," Press Democrat, May 15, 1989; "Ukiah Pair Keep Molest Case Alive," Press Democrat May 16, 1989.

**August 28, 1991, STATE OF OREGON v. MARY LOU GALLUP, COURT OF APPEALS OF OREGON, 816 P2d. 669, 1991 Ore. App. LEXIS 1266, Conviction Remanded // September 6, 1989, STATE OF OREGON v. EDWARD J. GALLUP, SR., 779 P.2d 169, Conviction for Sodomy Affirmed**

Overview: Appellate documents state Mary Lou Gallup sought reversal of her conviction for sexual abuse in the first degree. The Appeals Court found error in the local courts ruling that material contained in the District Attorney file was work product, and exempt from discovery, which resulted in her conviction being vacated.

Mary Lou Gallup operated a private kindergarten in Roseburg, Oregon, called the Gallup Christian Daycare center. Her husband, Edward J. Gallup Sr., operated a separate

52

preschool in that same vicinity and their son, Edward (Chip) J. Gallup Jr., operated a preschool in Winston, Oregon.

In 1987 defendant Edward Gallup Sr. was indicted for sexually assaulting a young boy who was a student at his preschool, and his son, Chip, was ultimately indicted on six separate charges for sexually assaulting six other preschool students. Edward (Chip) Gallup Jr. was ultimately found guilty of three charges.

In February 1988, defendant Edward Gallup Sr. and his wife were indicted on new charges for sexually assaulting another child. Edward Gallup Sr. appealed, claiming that publicity in his case prevented him from having a fair trial. He objected to a State's witness' testimony and the fact that he wasn't allowed to question his expert witness on re-direct. He also objected to the State's psychologist statement that children who have been sexually abused will very often not report the incident if they have been threatened by the abuser. The appellate court affirmed the conviction of Edward Gallup Sr.

According to a documentary about this case the children reported having to participate in the killing of animals, they were put in cages, the Gallups "dunked" children's heads in buckets of blood, they threatened the children, telling them that if they disclosed their abuse their parents would be killed. The Gallups would take toothpicks and make crucifixes or crosses out of them, and would ask, "Who are we worshipping today?... Jesus." Then on other occasions they would turn the crosses upside down and ask, "Who are we worshipping today?" and the Gallups would say "Satan." A child was worried that she would not go to heaven because she believed she participated in the killing of another person. Edward Gallup Sr. was an ex-minister of the Nazarene church.

See "Introduction to Children at Risk: Ritual Abuse in America," 1992, Narrated by Mike Farrell, for documentation of the ritual abuse aspects of this case. Ordering information is at: http://www.cavalcadeproductions.com/index.html

### July 30, 1991, COMMONWEALTH OF PENNSYLVANIA v. JASON L. ENDERS, ET AL., SUPERIOR COURT OF PENNSYLVANIA, 407 Pa. Superior Ct. 201, Conviction for False Imprisonment Affirmed

Overview: Appellate documents state Jason Enders and three co-defendants Scott Francis Liptak, Alexander O. Steinberg and Daniel Nelson were convicted of false imprisonment stemming from their participation in a Satanic cult ritual. The victim stated he wanted nothing to do with them but he was forcibly taken to an abandoned barn and tied to stakes in the ground over a pentagram drawn in the dirt. He had a leather collar with nails placed around his neck and a Satanic ritual was performed over him. One of the defendants punctured the victim's neck by pressing on the nails, and placed his fingers in the victim's blood, and then to his lips. A medical expert testified to treating wounds to the victims neck. The victim was then released after being warned he would be killed if he told anyone about what had been done to him. Skulls and books on the occult were taken from the perpetrators homes as evidence.

The court described the crimes as ritualistic acts and stated that admitting evidence of the belief in and involvement in Satanism at the time was relevant and probative.



**June 11, 1991, NEW YORK, WESTPOINT MILITARY ACADEMY DAYCARE CASE, Monetary Settlement with Parents, Court File Sealed**

Overview: News articles state that in 1984-85 a 3 yr. old child from Westpoint's daycare was diagnosed with physical findings of molest -- a lacerated vagina. 50 children who attended West Points Army daycare were then interviewed by the FBI and several of them alleged sexual abuse. The parents in this case alleged a cover-up because no criminal charges were filed. The Times Herald Record reported on June 11, 1991 that the incidents unfolded against a backdrop of satanic acts, animal sacrifices and cult-like behavior. A parent complained that the Army was not prepared to treat satanic abuse and the FBI "botched" the investigation. "The specter of Satanism would later spur U.S. Military Academy officials to change the West Point child-care center's building number from 666 to 673."

San Jose newspaper reporter Linda Goldston, who covered the Presidio case, described the Westpoint case as one involving ritual abuse. The children said they had excrement smeared on their bodies and were forced to eat feces and drink urine. They said they were taken away from the day care center.

At that time, U.S. prosecutor Rudolph Giuliani declined to indict any alleged perpetrators and was criticized for potential conflict of interest because he was also defending West Point for the government against civil suits brought by the parents against the Army.

In 1985, the parents of 11 children filed a $110 million civil suit against the Army alleging their children were sexually abused. The Army concluded the case in 1991 by negotiating a monetary settlement with the parents, but no other facts are known because the court case was sealed. See "West Point Case Provoked $100 Million Civil Suit," San Jose Mercury News, August 9, 1987; "A Legacy of Pain," The Times Herald Record, June 11,1991; "The People v. R. Giuliani," The Record, Sept. 27, 1987; "CHILD ABUSE AT THE PRESIDIO, THE PARENTS AGONY, THE ARMY'S COVER-UP, THE PROSECUTION'S FAILURE, San Jose Mercury News, July 24, 1988.

**April 29, 1991, STATE OF MONTANA v. LEON LLOYD WHITCHER, SUPREME COURT OF MONTANA, 810 P.2d 751, Conviction For Sexual Intercourse Without Consent Affirmed**

Overview: Appellate documents state, Leon Lloyd Whitcher, 30, a self-described "high priest" of a Satanic cult, had sexual intercourse with a 14 yr. old without her consent. Prior to the assault, he asked her a series of questions about initiation into his satanic cult, whether she wanted "power," and if she'd "obey a high priest." He told the victim about a creature with a cat head and human body who would protect her.

The Court described "a pentagram, a satanic symbol in the form of a five-sided star inside of a circle with an eye in the center of the star that was painted on the floor of a large room in the house." Whitcher told the victim to change into a black robe, lie down, and stare at a pentagram painted on the ceiling before he assaulted her.



### April 13, 1991, SANTA ANA, CALIFORNIA, SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE, B. , ET. AL V. ROE, ET. AL, Case # 590362: Civil Suit for Child Abuse Won Against Parent

Overview: News reports state a pair of anonymous sisters, Bonnie, 48, and Patty, 38, who said their parents worshiped Satan and forced them to perform incest, ritual abuse and murderous deeds, won a lawsuit against their mother. The daughters told of human sacrifice and sexual abuse by a network of satanic cult members across Southern California who scared them into repressed silence for more than 30 years. They also accused their mother of sexually abusing her granddaughter, then 11 years old. "This [case] involved brainwashing, mind control and hypnosis," the daughter's attorney told an Orange County Superior Court jury. "We're talking about sick people who enjoy inflicting pain – who get their jollies from being sadistic."

No monetary damages were awarded, but the jury found that the two daughters suffered abuse and found that the mother was negligent. During the trial, Bonnie told jurors she was 12 when her parents forced her to kill an infant she conceived after being raped by a cult leader. She said her father cut up and burned the child. Patty also testified she was forced to kill a homeless man when she was 12. See "Mother to Trial, Alleging Ritual and Sexual Abuse," Orange County Register, March 19, 1991; "Sisters Win Suit on Satanic Abuse," The San Diego Tribune, April 13, 1991.

### March 12, 1991, STATE OF MISSOURI v. THERON REED ROLAND II , COURT OF APPEALS OF MISSOURI, WESTERN DISTRICT, 808 S.W.2d 855, 1991 Mo. App. LEXIS 371, First Degree Murder Conviction Affirmed

Overview: Appellate documents state Theron Reed Roland was convicted for the murder of his friend Steven Newberry. According to Roland, he murdered him after becoming involved in Satanism, began using drugs, and after listening to groups like "Megadeth" which advocated sexual and physical violence. After an abusive childhood, he began hallucinating, practiced self-mutilation, tortured and killed animals and "chanted" to Satan for power. He developed a mentor relationship with another teen Satanist and they both decided to sacrifice Steve Newberry by clubbing him to death.

Roland believed this human sacrifice would "cause Satan to appear and give them power." Roland wanted the defense expert on the occult to testify about the effects of Satanism on the mind. The court let the expert testify to other aspects of the occult but didn't feel that he was qualified to testify on psychiatric aspects of the case. The expert, Carl Raschke, testified that Satanists abhor everything that Judeo-Christian morality deems good, and deems good everything Judeo-Christian morality abhors. A Catholic priest, and authority on Satanism, explained the differences between satanic groups for the jury.

**December 17, 1990, PEOPLE v. CLIFF ST. JOSEPH, 226 Cal. App. 3d 289, DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, HABEAS PETITION DENIED, Conviction For First Degree Murder Perpetrated by Torture Affirmed**

Overview: Appellate documents stated defendant, Cliff St. Joseph, was convicted of the murder by torture of John Doe No. 60, and the sodomy and false imprisonment of Ricky Hunter. At trial, the court permitted an accomplice, Mr. Bork, to testify under a grant of immunity to the charges.

As background, four people were arrested for disturbing the peace. One of the parties arrested, Mr. Hunter, had been taken to the apartment two days before by appellant. Ricky Hunter claimed St. Joseph and the others had held him against his will and assaulted him; there was talk of Satanic worship and the other three people had been speaking of "sacrificing" him. At the apartment he was restrained and repeatedly assaulted by appellant, Mr. Bork, and another person by the name of Mr. Spela. Bork was present in the apartment when the murder victim arrived. He left the apartment after he heard screaming from the bedroom and saw appellant slashing the victim's chest.

A body was later discovered in San Francisco, California on June 15, 1985. "John Doe" had multiple stab wounds, genital injuries, and a pentagram had been carved into his chest. The court notes that there was "substantial evidence" that it was a sadistic, ritualistic human sacrifice consisting of whipping with a chain, slashing the victim's lips, dripping wax into the victim's eyes, burning and carving the victim's flesh with a knife, multiple stabbings, tying the limbs with guitar wire, and genital mutilations. The identity of the victim was never established. One of the offenders stated he had been present when St. Joseph had "John Doe" in his home and he helped St. Joseph dispose of the murdered victim described above. The court found that there was sufficient evidence proving that the injuries had been inflicted on the victim while he was still alive. The Coroner testified that some of the wounds inflicted were consistent with sadomasochistic practices, but the Court made a point of highlighting that the manner in which the victim was murdered, along with inferred intent, indicated that this was a ritualistic sacrifice.

**July 14, 1990, DETROIT, MICHIGAN,  Case No. 01008804, Agustin Pena and Jaime Rodriguez Jr., Convicted of First-Degree Murder, Sentenced to Life in Prison**

Overview: News reports state that Agustin Pena and his cousin, Jaime Rodriguez Jr., were convicted of killing Stephanie Dubay in 1991. Prosecutors described the slaying as ritualistic activity and part of Rodriguez's devil worship. Both Pena and Rodriguez lost their appeals in the State court system in the mid-1990's. The Medical examiner said Dubay, a 15 year old runaway, was killed in a ritual crime, based on her tattoos, wounds and the "meticulous mutilation" of her body.

Dubay was decapitated, her skull skinned and saved in a freezer, and her tongue, right index finger and spleen were removed, all with surgical precision. Dubay had been stabbed 10 times in the back and chest and dismembered in the basement of Pena's house. Body parts were buried in three plastic bags in a shallow grave, and a fourth bag

56

was found in the front seat of a car in the garage. Law enforcement experts stated that each of these acts had a significance in some satanic belief systems. They believe that extraordinary powers can be captured and controlled through stylized sacrifice, mutilation, or taking specific body parts. See "Dismemberment Skills Hint at Other Crimes, Police Say," Detroit Free Press, July 14, 1990; "Beheading Murderer Seeks to Overturn Conviction," The Macomb Daily, August 27, 2006.

**February 22, 1990, STATE OF UTAH v. ALAN B. HADFIELD, SUPREME COURT OF UTAH, 788 P.2d 506, Convictions for Sodomy and Child Molest; Remanded Back to Court for Evidentiary Hearing**

Overview: Appellate documents state Alan Hadfield was convicted of sodomy and sexual abuse of his children after his children testified against him. He appealed based on claims of "newly discovered evidence." This was an allegation by a paralegal who stated that therapist Barbara Snow, who was involved in counseling Hadfield's children and others in this Mormon community, was the common factor in these cases, and inferred that the therapist was responsible for the allegations.

The appellate opinion cites that at "least fifteen adults and fifteen children were identified as participants in various unusual sexual activities, including instances of group abuse of children by adults. The activities described by the children involved Satanic ritual, costumes and masks, photography equipment, men dressing in women's clothing, and frequent episodes of playing with and consuming human excrement. A specific instance of abuse related to Dr. Snow by W. and described by her at trial for example, involved defendants removing feces from W's rectum with a spoon and forcing him to play with it." The court stated that the defendant's strategy of undermining the believability of the children by attacking the practices of the therapist was ultimately unsuccessful with the jury.

The appellate court remanded the case back to court for an evidentiary hearing to see if the affidavit by the paralegal had merit.

Note: On 9/2/98 Assistant Attorney General Robert Parrish stated to this author that the Judge reviewed the information about claims against the therapist and found that there was no evidence to support the claims of the paralegal. Alan Hadfield's conviction still stands and he was released from probation in 1998. See: Video "Promise not to Tell" which documents the Hadfield case. Ordering information can be found at http://www.imdb.com/title/tt0889650/maindetails

**November 26, 1989, GIBREVILLE, GABON, Mba Ntem was Found Guilty and Sentenced to Death for Murder and Leading Cannibalism Rites**

Overview: Several members of a religious cult were found guilty of aiding in "cannibalism ceremonies by serving human flesh to worshippers." A victim's mutilated remains were found in another town, and a photo was published of the high priest with a knife in his teeth and a jar containing pieces of a victim's tongue in his manacled hands. In the ceremony led by Mba Ntem, members of the cult ate the victim's stomach, liver, heart, lungs, tongue and genitals in what their leader called a "sacred plate." Some of the

57

worshippers were unaware of the contents, Ntem told the court. The court prohibited other details from being released. The news article states that "Animism" is a loose religious belief popular in central Africa and other parts of the word that a spirit or force resides in every animate and inanimate object. See "Death Sentence for High Priest in Cannibalism Trial," Associated Press, November 26, 1989.

### April 6, 1989, HAROLD GLENN SMITH v. THE STATE OF TEXAS, COURT OF APPEALS OF TEXAS, 1989 Tex. App. Lexis 794, Conviction for Murder Affirmed

Overview: Appellant documents state that Harold Smith was one of a group of young people who planned and carried out the brutal murder of their friend, Dennis Keith Medler. A group tricked him into accompanying them to a cemetery where they tortured him. Forensic evidence established that Medler died from lack of oxygen due to blockage of the airway by foreign objects, his own teeth and blood. Medler's torturer repeatedly beat him with their fists and kicked him, fractured both his upper and lower jaw, caused two teeth to lodge in his trachea, cut and stabbed him with a knife, burnt his hair, choked him by using a bandana and pipe tourniquet, and used the same pipe to pierce one of his eye sockets in an attempt to gouge out the eye. Medler begged his murders to "knock him out," once he realized they planned to kill him.


A witness testified that Smith compared the planned murder of his victim with animal sacrifice rituals he had carried out before and the prosecution presented evidence of his Satanic belief system. Mr. Smith appealed this issue but the Court upheld references to Satanism as motive for the crime.

### December 30, 1988, STATE OF OHIO v. JOHN L. FRYMAN, COURT OF APPEALS OF OHIO, TWELFTH APPELLATE DISTRICT, BUTLER COUNTY, 1988 Ohio App. LEXIS 5296, Conviction for Murder Affirmed

Overview: Appellate documents state John Fryman took the victim Monica Lemen to his "sorcery room where he had erected an altar for Satanic worship." He then shot her in the head. The next day he cut off the woman's legs above the knees and disposed of them behind an old church. The rest of the body was never found. Fryman claimed that he had killed her because she had insulted him by bringing another magician to his trailer, and that he disposed of her legs behind the church because "it was the place he practiced magic. By throwing her legs there he increased the power of that spot."

### November 25, 1988, SINGAPORE, Adrian Lim, Tan Mui Choo, and Hoe Kah Hong hanged for murder

Overview: News reports state three cult members, Adrian Lim, 46, his wife, Tan Mui Choo, 34, and his girlfriend Hoe Kah Hong, 33, were convicted in 1983 of murdering Agnes Ng Siew Heok, eight, and Ghazali Marzuki, 10, in 1981. The three perpetrators belonged to a cult that believed sacrificing children could bring "good luck." The three drank the children's blood after suffocating them in a bathtub.



Another news report states that the "macabre ritualistic killings included drinking the children's blood, trances, and electric shock 'treatments.'" See "Three Singaporeans Hanged for Cult Murder of Children," Reuters, November 25, 1988 and "Three Hanged in Singapore for Ritual Killings," UPI, Nov 25, 1988.

**July 7, 1988, IN THE MATTER OF DANIEL "DD" ET AL., ALLEGED TO BE ABUSED AND NEGLECTED CHILDREN, CHEMUNG COUNTY DEPARTMENT OF SOCIAL SERVICES; ALICE "DD", SUPREME COURT, APPELLATE DIVISION, THIRD DEPARTMENT, 530 N.Y.S.2d 314, Finding of Neglect Affirmed**

Overview: Appellate documents state the mother was appealing an order from Family Court finding she had neglected her children in New York State. She had allowed visitations to continue between the father and his girlfriend even though she knew that the girlfriend's children had been removed from the home for sexual abuse, but she did not question the situation until the father and girlfriend were arrested on sexual abuse charges.

Social Services discovered that all children had been forced by threats of physical abuse to engage in acts of sexual intercourse among themselves and with adults. In addition, they described participation in forced acts of bestiality, as well as involvement in Satanic rituals involving the sacrifice of animals and the drinking of blood. The court cites there was evidence that the mother may have been involved in these activities as well but that was never proven.

**March 30, 1987, HAMILTON, ONTARIO, FAMILY COURT, Children Declared Wards of the Court**

Overview: A legal publication reports that two children, "Janis," 7 years, and "Linda," 5 years old, were voluntarily placed in foster care by their mother "Sharon Wells" after she had a nervous breakdown. The children began disclosing information about their abuse in satanic rituals to their foster parent after which the foster parent recorded the details in an 165 page journal. The children spoke of being lowered into coffins with rotting corpses, of being forced to eat flesh from freshly murdered children, and starring in child pornography. Disbelieving the young girl's stories, the police declined to thoroughly investigate their allegations.

The Wardship hearing lasted 17 months, with 150 hearings days, 15,000 pages of transcripts, 61 witnesses and 142 exhibits, including 45 hours of audio and videotaped sessions of the children in play therapy. After nine days detailing her traumatic life on the witness stand, the mother collapsed, screaming on the courtroom floor, and had to be taken away by ambulance.

Family Court Judge Thomas Beckett summed up the horrific elements of the case in his ruling:

"The Court heard allegations of murder, of cannibalism, of graveyard rituals, and acts of bestiality. Allegations so horrible, so gruesome, so loathsome, that no one, including

myself, wanted to believe any of it. In fact, I wanted very much to believe that none of the allegations made by the two little girls could be true."... "The descriptions of midnight graveyard scenes with dancing and singing, people with masks, opening of graves and coffins, together with gross sexual acts, suggest cult activities" ..."And why did the children speak of the number '666' – the symbol used in the Book of Revelations?"... "To say they 'lied' or that it was fantasy falls far short of explaining how such things could have been in their minds"... "The children gave graphic descriptions of the murder of children as well as adults, of dismemberment, of cutting flesh from bones."

Judge Beckett ordered police protection for the mother after she alleged her former husband threatened to kill her, the judges, and lawyers in the case.

On March 30th 1987, Judge Becket ruled that the two girls were sexually abused and forced to eat feces by their parents and the mother's former boyfriend. He made the girls Crown Wards and also ordered the third child, born to the mother during the hearing, be made a ward of the court as well.

News articles report that in 2006 the mother, Sharon Wells, publicly asked her now two grown daughters to donate a kidney to her, in order to "save her life." See "The Cannibal Case," Canadian Lawyer, March 7, 1989; "Questions of Satanism: Tales of Ritual Abuse are Common," MacLean's, April 21, 1997; "Sick Mom, Much Sicker Story- Daughters asked to Donate Kidney to Ailing Mother they Accused of Horrific Sexual Abuse," The Toronto Sun, January 29, 2006.

**August 15, 1986, STATE OF MAINE v. SCOTT WATERHOUSE, SUPREME JUDICIAL COURT OF MAINE, 513 A.2d 862, 1986 Me. LEXIS 862, Murder Conviction Affirmed**

Overview: Appellate documents state Scott Waterhouse was convicted for the murder of a 12 yr. old girl. The presence of semen on the victim's clothing indicated that the perpetrator masturbated over the victim's body.

Defendant claimed that the trial court erred in admitting evidence of his belief in Satanism. The Appeals Court disagreed. The State admitted a taped conversation between defendant and police officer in which defendant described at length both Satanism and the extent of his involvement with that belief. In addition, the State introduced into evidence portions of the "Satanic Bible." The defendant described sex and destruction rituals as part of the system of satanic beliefs. He stated that Satanism represented the darker side of humanity and urges indulgence of man's carnal needs rather than abstinence. He characterized the "seven cardinal sins" of the Christian faith as representing abstinence.

The portions of the Satanic Bible that were introduced as evidence were:

*Satan represents indulgence, instead of abstinence!

60

*Satan represented all of the so-called sins as they all lead to physical, mental, or emotional gratification!

*Are we not all predatory animals by instinct? If humans ceased wholly from preying upon each other, could they continue to exist?

*Death to the weakling, wealth to the strong!

*Blessed are the powerful, for they shall be reverenced among men -- cursed are the feeble, for they shall be blotted out.

The court stated: "Defendant could view commission of the heinous crime involved in this case as a means of achieving 'physical, mental or emotional gratification,' similarly he could believe that a demonstration of strength by domination of a weaker person would bring 'reverence among men.' At the expense of who, 'being weak, deserved his fate.'"

Both evidence of Satanic beliefs was considered probative of motive and the identity of the perpetrator.

[Two companion cases are described below]

### March 12, 1986, COMMONWEALTH OF MASSACHUSSETT v. CARL H. DREW, SUPREME JUDICIAL COURT OF MASSACHUSETTS, 489 N.E.2d 1233, Murder Conviction Affirmed

Overview: Appellate documents state Carl Drew was convicted of the first degree murder of one of his Satanic cult members in Fall River. The victim, Karen Marsden, was identified by a portion of the skull, clumps of hair, clothing, and jewelry. Evidence was admitted describing Marsden and another prostitute Doreen Levesque who were killed.

According to witness testimony... "The killing was performed as a diabolic ritual during which the soul of Marsden was purportedly given to Satan." Earlier, Marsden had tried to sever relationship with the cult. Drew threatened to kill her on several occasions, which he finally did. "Murphy dragged Marsden by the throat and hair into the woods. As she did this, the defendant walked alongside while Fletcher and Davis followed close behind. Murphy and the defendant then began striking Marsden with rocks. After further brutalizing Marsden, the defendant ordered Murphy to slit Marsden's throat and Murphy complied. The defendant then tore the head from the body and kicked it."

Carl Drew later told another person that he had killed Marsden because "she wanted to leave the cult and that he wanted her to feel pain." Several witnesses testified to the defendant's cult practices and he was asked to remove his jacked to exhibit a tattoo on his arm of a devil's head with the partially obliterated inscription "Satan's Avengers." The Court described the defendant chanting in a low, scratchy voice during rituals, purported to conjure Satan's presence.

The court specifically stated Drew's involvement in Satanism and the victim's desire to leave the cult was evidentially important to detail the context of the crime to the jury, as

61

opposed to viewing the murders as just random acts of violence.

------------

### May 28, 1982, WILLIAM SMITH v. COMMONWEALTH OF MASSACHUSETTS, SUPREME JUDICIAL COURT OF MASSACHUSETTS, 436 N.E.2d 377, Immunity for Witness was Affirmed

Overview: Appellate documents state William Smith contested immunity for witness, Robin Murphy, who was to testify against him for the murder of Doreen Levesque. The appellate opinion states "These murders were among a series of ritual killings performed in the Fall River area by members of a Satanic cult." The witness described the ritual that accompanied the murder, and named various participants. The witness also recanted several times before finally testifying but finally admitted that she had been involved in the murder. She described the practices of the Satanic cult and indicated that both victims, Karen Marsden and Doreen Levesque, had been connected with the cult, either as devotees of the faith, or as associates in a prostitution enterprise.

### February 19, 1986, COMMONWEALTH OF PENNSYLVANIA v. FRANK G. COSTAL, JR., SUPERIOR COURT OF PENNSYLVANIA, 505 A.2d 337, Murder Conviction Affirmed

Overview: Appellate documents state expert testimony regarding Satanism and mind control was admitted into the court record to explain the killings of a mother and her 4 yr. old daughter by Frank Costal. The killings appeared to be in retaliation for the mother's interference in a drug deal and homosexual relationship between her husband and Costal. The state submitted evidence that the murders were performed in a "ritualistic manner." The victims were stabbed in a similar fashion, in the same pattern. Ceremonial robes, books, posters, plastic skulls and bats, and marriage licenses drawn up by Costal and signed by him as a "high priest" of Satan were seized from his apartment. A witness testified that Costal told him of attendance at human sacrifices and that 17 was the number of stab wounds required at these ritualistic killings.

### December 3, 1983, DETROIT, MICHIGAN, Case No. 83004343, Arzell Jones was convicted of first-degree criminal sexual conduct, single counts of kidnapping and using a firearm during a felony. Linda Greene was convicted of two counts of first-degree criminal sexual conduct

Overview: News reports state Arzell Jones, a private investigator, and Linda Greene, a Detroit policewoman, were convicted of sexually assaulting a 31-year-old woman who was held for more than three days and forced to take part in Satanic rituals. The prosecutor stated the woman was a victim of some "cultism and some ultimate psychological warfare." See: "Judge Says Victim was Subjected to 'Reign of Terror' Man, Policewoman Guilty of Sexual Assault in Satanic Rituals," Detroit Free Press, December 3, 1983.

ABOUT THE AUTHOR:    Diana Napolis has a Masters Degree in Transpersonal Psychology and was a licensed therapist in the State of California. Between the years 1990-2000 she worked as a Court Intervention Child Abuse Investigator at Child Protective Services in San Diego County, California, and as a Supervisor of Court ordered visitations for Family Court. Her specialty was investigating allegations of ritual abuse. Ms. Napolis has been collecting court documents in attempts to prove the reality of ritual abuse since 1991 after witnessing a coverup of ritual abuse in San Diego County which has been widely publicized. She believes the documentation in this archive proves without doubt that this type of abuse occurs. In 1998, shortly after publishing a web page covering a "false memory" federal trial of several therapists in Houston, Texas, Ms. Napolis was tracked by satanist Michael Aquino, Michelle Devereaux – an SRA "retractor" - Dr. Elizabeth Loftus, Advisory Board member of the FMSF, Attorney R. Christopher Barden, and Peter and Pamela Freyd, founding members of the FMSF. [Ms.Napolis has correspondence by Ms. Devereaux reflecting these facts] In 2001 Ms. Napolis discovered she had been targeted by ultra-sophisticated technology called "Voice to Skull Devices." [1]

---

[1] See the Center for Army Lessons Learned for the documentation of and definitions for "Voice to Skull Devices" at http://call.army.mil/products/thesaur/00016275.htm and "Voice Synthesis Devices" at http://call.army.mil/products/thesaur/00016274.htm